1  Ann Hobart, Bar No. 019129
   Jordan Kendall, Bar No. 038647
2  Assistant Attorneys General
   Arizona Attorney General's Office
3  2005 N. Central Avenue
   Phoenix, Arizona 85004
4  Telephone:  (602) 542-8347
              (602) 542-7687
5  Facsimile:  (602) 542-7644
   Ann.Hobart@azag.gov
6  Jordan.Kendall@azag.gov
   EmploymentLaw@azag.gov
7
8  Attorneys for Defendants State of Arizona,
9  Michael R. Sheldon, Aaron Bowen,
   Lea'cher Carter, and Unique Coleman
10

11             **IN THE UNITED STATES DISTRICT COURT**

12                **FOR THE DISTRICT OF ARIZONA**

13  | Matthew Phillip Solan, | Case No:  CV24-02061-JJT-DMF |
    |---|---|
14  | Plaintiff, | **MOTION TO DISMISS COUNTS ONE, FOUR, ELEVEN, AND TWELVE OF THE FIRST AMENDED COMPLAINT (DOC. 6) ON BEHALF OF DEFENDANTS THE STATE OF ARIZONA, MICHAEL R. SHELDON, AARON BOWEN, LEA'CHER CARTER AND UNIQUE COLEMAN** |
15  | vs. | |
16  | | |
17  | The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10, | |
18  | | |
19  | | |
20  | | |
21  | Defendants. | |
22

23         Pursuant to the December 10, 2024, screening Order, the Court has required

24  Defendant State of Arizona to respond to Counts One and Four; Defendants Michael R.

25  Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman to respond to Count

26  Eleven; and Defendants Sheldon and Bowen to respond to Count Twelve of the First

27  Amended Complaint.  (Doc. 8 at 21.)  Pursuant to Rule 12(b)(6) of the Federal Rules of

28  Civil Procedure, undersigned counsel hereby moves to dismiss each of the Counts on

1    behalf of all of these Defendants for failure to state a claim on which relief can be

2    granted.  This Motion is supported by a certification pursuant to LRCiv 12.1(c), which is

3    attached hereto as Exhibit A.

4    **I.      Factual and Procedural Background**

5          On March 12, 2020, Plaintiff Matthew Solan was convicted in the Coconino

6    County Superior Court of one count of aggravated assault and sentenced to a 7.5-year

7    term of imprisonment in the Arizona Department of Corrections, Rehabilitation &

8    Reentry.  (Doc. 8, at 3 n. 3.)  Because he has been diagnosed as Seriously Mentally Ill

9    ("SMI") and was adjudicated Guilty Except Insane, Solan was committed to the Arizona

10   State Hospital ("ASH") under the jurisdiction of the Psychiatric Security Review Board.

11   (*Id.*; Doc. 6 at 13, ¶ 56.)  Solan was admitted to ASH on April 1, 2020.  (*Id.*)

12         Shortly following his admission, Solan asked to have his service dog Foxy (from

13   which he had been separated in 2019 when he was arrested and placed in a detention

14   facility) live with him at ASH.  (Doc. 6 at 14-15, ¶¶ 66-67.)  ASH denied his request,

15   citing security and health and safety concerns, and administrative burden.  (*Id.* at ¶ 67.)

16   Solan filed a lawsuit and Motion for Preliminary Injunction with this Court, *Solan v.*

17   *Arizona State Hospital,* CV-20-02209-PHX-JJT (DMF), alleging that ASH's refusal to

18   modify its policies and procedures to allow Foxy to live with him at the forensic

19   psychiatric hospital violated the ADA.  ("CV-20-02209.")  On March 22, 2022, the

20   Court granted Solan's motion and ordered ASH to conduct a particularized assessment to

21   determine whether reasonable modifications could be made to allow Foxy to live with

22   Solan at ASH "without fundamentally altering ASH's services."  (Doc. 6 at 16, ¶ 76.)

23         On or about May 6, 2022, ASH provided Solan a report of its particularized

24   assessment setting forth six general areas of concern that justified denying his request to

25   have Foxy live with him at ASH.  (Doc. 6 at 17, ¶ 81 & 64-69 [Ex. A].)  This Court had

26   advised Solan that, if he was "again dissatisfied" with ASH's decision following the

27   particularized assessment, he could "again move for preliminary injunctive relief."  (CV-

28   20-02209, Doc. 84, at 16.)  Solan did not do so, although by the time he received the

1  particularized assessment report, he was represented by counsel.  (Doc. 6 at 19, ¶ 93.)

2  Solan learned that Foxy had passed away on July 13, 2022.  (*Id.* ¶ 94.)  However, he did

3  not stipulate to dismissal of his case until January 26, 2023.  (CV-20-02209, Doc. 94.)

4  The dismissal was with prejudice (*id.*) even though, by then, Solan had already arranged

5  to have Foxy cloned (doc. 6 at 19, ¶ 97).

6         On November 9, 2023, Foxy was "reincarnated."  (*Id.* at 20, ¶ 105.)  On June 13,

7  2024, Solan submitted a request to have her live with him at ASH.  (*Id.* at 22, ¶ 117.)

8  ASH denied this request, based on the same concerns that it had articulated in the May

9  2022 particularized assessment report.  (*Id.* at 22-23, ¶ 123.)  These concerns included

10  that "based on [Solan's] own personal statements, [his] past relationships and

11  interactions with a 'service animal' have not only been counter-therapeutic, but also

12  inappropriate (sexual in nature)."  (*Id.* at 23, ¶ 124(a), & 86.)  On August 14, 2024, Solan

13  filed this lawsuit complaining that ASH's denial violated Title II of the Americans with

14  Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehab Act").

15  (Doc. 1.)  In the operative First Amended Complaint ("FAC") filed on November 18,

16  2024, Solan alleged claims for false light invasion of privacy and defamation as well.

17  (Doc. 6 at 50, 51.)

18         Though these four alleged claims survived screening, they should nonetheless be

19  dismissed for failure to state a claim.  For the same reasons that ASH explained to Solan

20  in the May 2022 particularized assessment report, neither the ADA nor the Rehab Act

21  require the State to allow Foxy's clone to live with Solan at ASH.  Solan's false light

22  invasion of privacy and defamation claims against Bowen are barred by the one-year

23  statute of limitations for state-law claims against State employees.  Those claims fail as

24  to Sheldon because Solan has not alleged any false statements that can be attributed to

25  him.  The allegedly defamatory statements from Carter and Coleman that Solan

26  complains placed him in a false light were allegedly made only in the hearing of Solan

27  and a few fellow ASH patients and therefore do not support a claim for false light

28  invasion of privacy.  For all of these reasons, as discussed more fully below, the Court

1   should grant Defendants' motion to dismiss in its entirety.

2   **II.     Legal Argument**

3       **A.     The Federal Pleading Standard**

4

5       A pleading must contain a "short and plain statement of the claim *showing* that

6   the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). To survive a

7   motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint

8   must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

9   plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

10  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it

11  contains "factual content that allows the court to draw the reasonable inference" that the

12  moving party is liable. *Id.* "In evaluating a Rule 12(b)(6) motion, the court accepts the

13  complaint's well-pleaded factual allegations as true and draws all reasonable inferences

14  in the light most favorable to the plaintiff." *Adams v. U.S. Forest Srvc.*, 671 F.3d 1138,

15  1142-43 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555-56). However, "the tenet that

16  a court must accept as true all of the allegations contained in a complaint is inapplicable

17  to legal conclusions." 556 U.S. at 678. "Threadbare recitals of the elements of a cause

18  of action, supported by mere conclusory statements, do not suffice." *Id.* (citing

19  *Twombly*, 550 U.S. at 555). "Only a complaint that states a plausible claim for relief

20  survives a motion to dismiss." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).

21  Contrastingly, "dismissal . . . is proper if there is a lack of a cognizable legal theory or

22  the absence of sufficient facts alleged under a cognizable legal theory." *Conservation*

23  *Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quotation omitted).

24      **B.     Counts One and Four Should Be Dismissed Because Neither Title II of
            the ADA nor Section 504 of the Rehabilitation Act Require the State of
25          Arizona to Allow Foxy to Live with Solan at ASH.**

26

27      In Count One of the FAC, Solan alleges that by denying his request to have Foxy

28  live with him at ASH, the State of Arizona violated Title II of the ADA ("Title II"),

4

1   which provides that "no qualified individual with a disability shall, by reason of such

2   disability, be excluded from participation or denied the benefits of the services,

3   programs, or activities of a public entity, or be subjected to discrimination by any such

4   entity."  42 U.S.C. § 12132 (cited in Doc. 6 at 32, ¶ 167).  Similarly, in Count Four of

5   the FAC, Solan alleges that the State's denial violated Section 504 of the Rehabilitation

6   Act (the "Rehab Act"), which provides, in relevant part, that "no otherwise qualified

7   individual with a disability . . . shall, solely by reason of his or her disability, be excluded

8   from the participation in, be denied the benefits of, or be subjected to discrimination

9   under any program or activity receiving federal financial assistance."  29 U.S.C. § 794

10  (cited in Doc. 6 at 37, ¶ 199.)  The Court may analyze Count One and Count Four

11  coextensively because "there is no significant difference in the analysis of rights and

12  obligations created by the two Acts."  *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th

13  729, 737 (9th Cir. 2021).

14          As this Court ordered in CV-20-02209, ASH performed a particularized

15  assessment of Solan's request and identified six reasons that Title II did not require the

16  State of Arizona to allow Foxy to live with him at ASH.  (Doc. 6 at 17, ¶ 81, & 64-69

17  [Ex. A].)  With the exception of the specific medications that the 16-year-old Foxy was

18  required to take, the State's legitimate, non-discriminatory reasons to exclude her from

19  ASH in May 2022 apply equally to her youthful reincarnation three years later.[1]

20  Moreover, the State's particularized assessment under Title II and its enabling

21  regulations is valid under the Rehab Act as well.  *See Payan,* 11 F.4th 729 at 737.

22          **1.  Foxy is not necessary for Solan to participate in and benefit from**
            **ASH's services, programs, and activities.**
23

24          Regulations interpreting Title II require that a public entity "make reasonable

25  modifications in policies, practices, or procedures when the modifications are necessary

26

27  [1] The factual points and legal authorities discussed in Sections II.B.1-6, below, were all
    discussed in the May 2022 particularized assessment report that Solan attached as
28  Exhibit A to the FAC.  (Doc. 6 at 64-69.)  "A copy of a written instrument that is an
    exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10.

to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Generally, Title II requires a public entity to "modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 35.136(a). The State does not believe that these regulations apply in Solan's case, however, because it does not believe that Foxy is necessary for him to participate in and benefit from ASH's services, programs, and activities.

During an interview conducted as part of the individualized assessment, Solan represented that Foxy is a "psychiatric service animal" and, as such, "she's not providing much physical assistance at all." "[S]he doesn't pull me around or direct me as if I'm blind." Solan continued: "There isn't much physical necessity for her to do much as a psychiatric service animal, it's more her mental abilities." Thus, Solan acknowledged that he did not need Foxy to get around the Forensic Hospital or to meet other physical needs, like toileting or hygiene. As for Foxy's "mental abilities," ASH does not believe they are necessary for Solan to participate in and benefit from the Hospital's services, programs, and activities. As Solan's treating psychiatrist stated in an affidavit that he provided in connection with ASH's particularized assessment: "[I]n a level one psychiatric hospital there is no need for a service animal simply because services are provided by trained people whose job it is to provide these very things as needed to all patients on a regular basis. There is a 24/7 medical staff for that."

Moreover, Solan's psychiatrist believed that having Foxy with him at the Forensic Hospital would actually impede Solan's treatment. He observed that Solan was committed to the Forensic Hospital, "in part, to learn how to better get along with people so that he can provide for his own needs without alienating or provoking people or otherwise getting into trouble with either the law or with friends or with people who work for him in the future. With this in mind, a beloved therapy animal would only serve to get in the way." Solan's psychiatrist concluded: "Matthew has said he likes

1    animals better than people, and he says that people are 'tools' to achieve his needs.  This

2    needs a reality check."

3        During the particularized assessment interview, Solan stated that Foxy's

4    "presence is necessary for [him] to receive the treatment [he is] entitled to" at the

5    Forensic Hospital.  Solan's psychiatrist disagrees.  He believes that the "necessary part is

6    for Matthew to learn how to deal with people in spite of his autistic spectrum disorder.

7    He tells me that he had the dog as a transition object to remove himself from the 'co-

8    dependent' relationship he had with his mother. . . .  Now, my suggestion to him is to

9    move even further and drop the transition object.  He is realizing he is not as disabled as

10   he thought he was and is realizing capabilities he didn't know he had.  A transition

11   object is no longer needed."  In sum, Solan's psychiatrist did "not believe that a service

12   animal is clinically appropriate" for Solan.  Based on Solan's treating psychiatrist's

13   professional opinion, ASH denied Solan's request to have Foxy live with him at the

14   Forensic Hospital.

15            **2.  Foxy cannot be tethered as Title II requires while in the Forensic**
                 **Hospital.**
16

17       Title II requires that a service animal be under its handler's control.  *See* 28

18   C.F.R. § 35.136(d).  Specifically, the law requires that a service animal "shall have a

19   harness, leash, or other tether."  *Id.*  However, leashes and harnesses are ligatures that

20   ASH policy, in adherence and consistent with definitions from licensure and the Joint

21   Commission, classifies as contraband.  This means that they are not approved for patient

22   possession or use, even under staff supervision, because patients may use ligatures to

23   harm themselves or others.  *See* ASH AdmPtRights Policy No. 004 (Patient Property,

24   Storage, and Contraband) and attachment listing Contraband and Controlled Items for

25   the Civil and Forensic Hospitals (specifically identifying "clothing with removable

26   straps, strings/drawstrings, metal, plastic, or wire pieces (i.e., underwire)" and "items

27   that can be used as ligature (i.e., chain, rope/twine, drawstrings, wire, cords, etc.)" as

28   contraband).  When conducting licensing and regulatory compliance surveys, State

7

regulators, and the Joint Commission are particularly vigilant about citing potential ligature risks.  Rightly so, given the direct threat to patient and staff safety that ligatures present.  The conflict between Title II's tethering requirement and ASH's prohibition on items that can be used as ligature cannot be overcome.  For this additional reason, ASH denied Solan's request to have Foxy live with him at the Forensic Hospital.

### 3. Solan would need ASH Staff's assistance to care for and supervise Foxy, which Title II does not require.

Under Title II, "[a] public entity is not responsible for the care or supervision of a service animal."  28 C.F.R. § 35-136(e).  In Solan's particularized assessment interview and preliminary injunction briefing in CV-20-02209, however, he acknowledged that if Foxy were allowed to live with him at the Forensic Hospital, he could not care for her daily needs without substantial assistance from ASH staff in two fundamental respects:

**Feeding:**  ASH policy prohibits patients from keeping or consuming food in their rooms.  Solan therefore proposed storing food for Foxy in his bin in the room where patients' hygiene products and electric razors are stored.  Patients do not have free access to this room, so Solan would need a staff member to get Foxy's food and bowl (and to return the clean bowl to storage) in the morning and the evening.  These are times that staff is generally involved in supervising patients' meal service and, in the morning, supervising their hygiene activities.  Solan did not suggest where he would feed Foxy (understanding that it could not be in his room), how he would dispose of any leftover food and clean her feeding bowl, or how he would coordinate her feeding times with his own meal times and hygiene practices.

**Toileting/Exercise:**  Solan acknowledged that he does not have free access to the Forensic Hospital's mall, where Foxy would relieve herself and get exercise.  Solan currently is allowed to walk the mall for half an hour once a day under staff supervision.  His current level of supervision is 1(supervisor)-to-5(patients).  Assuming that Foxy could accompany him on these mall walks, Solan has indicated that ASH staff would have to give him access to the mall an additional two or three times a day, according to

Foxy's needs.  In his particularized assessment interview, Solan stated that despite being 16 years old, Foxy would be able to sleep through the night while the units are locked down without needing to relieve herself.  But in case she does, Solan could get puppy pads and put them down "in the bathroom" as he did when he was traveling with Foxy years before.  This plan ignored that Solan does not have a private bathroom, and Foxy could not open the door to the unit bathrooms available for patient use.  The reality is that if Foxy used puppy pads, it would be on the floor in Solan's room.  At Solan's interview, he stated that this is no different from a patient who requires using adult diapers.  If that is so, disposal of the soiled puppy pads, like the soiled adult diapers, would fall to staff.  If Foxy missed the puppy pad, the clean-up also would involve staff, as patients do not have unsupervised access to cleaning supplies on the unit or training on necessary cleaning protocols.

In addition to these aspects of Foxy's daily care, Solan's psychiatrist noted that her supervision also would fall exclusively to ASH staff when, as has happened several times in the past, Solan required seclusion.

In sum, it is clear that Foxy could not safely reside at the Forensic Hospital without significant assistance from ASH staff, which Title II does not require.  This was a third independent reason why ASH denied his request.

### 4. Veterinary medications cannot be safely stored or administered at the Forensic Hospital.

The record shows that, as of May 2022, Foxy's veterinarian had prescribed her enalapril twice a day for a heart condition and gabapentin once or twice a day for osteoarthritis.  Consistent with Hospital policy, licensing requirements, and state and federal regulations, however, ASH cannot store or administer veterinary medications—and Forensic Hospital patients cannot store or administer medications of any kind.  Particularly acute are the health and safety issues relating to a forensic patient's possession of gabapentin.  While it is not yet a controlled substance in Arizona, it is commonly abused, and forensic patients should not have ready access to it, as they

1   would if Solan were allowed to store and administer this drug.  That Foxy could not

2   receive her prescribed medications at the Hospital was another reason that ASH denied

3   Solan's request to have her live there in May 2022.  That Foxy's reincarnation may not

4   currently require daily doses of enalapril and gabapentin does not change the fact that

5   neither Solan nor ASH staff could provide her with any veterinary medications that she

6   may eventually require.

### 5.  Modifying ASH policies to allow staff to care for Foxy would fundamentally alter the nature of the Forensic Hospital's Services.

9        As discussed above, Solan could not care for Foxy's daily needs at the Forensic

10  Hospital without help from ASH staff.  ASH's existing patient care policies and

11  practices, however, do not provide for giving such assistance and would have to be

12  modified to address various concerns, including issues arising from interactions between

13  humans and animals, animal waste, and the storage, dispensing, and administration of

14  medication to animals.  The policies that would have to be modified to allow Foxy to

15  reside at the Hospital include, but are not limited to, ASH ClinSvsProfSvs Policy No.

16  002 (Patient Nutrition, Education, and Food Services); ASH Infection Control Plan;

17  ASH Infection Control Risk Assessment and Progress Report; ASH Environment of

18  Care SFY 2021-22 Hazardous Materials and Waste Management Plan; ASH

19  Administering Medications Policy; ASH Medication Management Policy; ASH

20  Medication Safety Policy; and ASH Medications Brought Into the Hospital by a

21  Patient/Patient's Family Policy.  Admitting Foxy would also require revising the Task

22  Assignment Sheets (day and night shifts) for the unit where Solan currently resides.  In

23  ASH's view, such a thorough-going overhaul of its policies, procedures, and practices

24  would require fundamentally altering the Hospital from a facility that cares for humans

25  to one that cares for humans and animals.  Title II does not require such a fundamental

26  alteration.  *See* 28 C.F.R. § 35.130(b)(7)(i) (when they are necessary to avoid disability

27  discrimination, "[a] public entity shall make reasonable modifications in policies,

28  practices or procedures . . . unless the public entity can demonstrate that making the

modifications would fundamentally alter the nature of the service, program, or activity").
For this additional reason, ASH denied Solan's request to have Foxy live with him at the
Forensic Hospital.

**6. ASH cannot ignore information that Solan's relationship with Foxy may be abusive or risk enabling such abuse.**

Finally, while Solan asked ASH to consider Foxy to be a psychiatric service animal, statements that he made to ASH staff and patients indicated that he considered her to be something other than an animal that is individually trained to perform a task or work that is directly related to Solan's disability, which is how the ADA defines "service animal." *See* "Frequently Asked Questions about Service Animals and the ADA," https://www.ada.gov/regs2010/service_animal_qa.html (last consulted February 25, 2025). Reports are that Solan considered Foxy to be his "familiar," a "soul mate," a "person," a "woman," and a "fiancée." Additionally, ASH received information that Solan had either touched Foxy inappropriately in the past or contemplated doing so in the future. For example:

- In a Progress Note dated December 2, 2020, Solan described Foxy as a "co-sovereign" and "like a wife."
- In a Progress Note dated April 24, 2021, Solan was reported as saying that he and Foxy "put our tongues in each other's mouth."
- In another Progress Note dated April 24, 2021, he was reported as saying that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it. He was also reported to have talked to another patient about sticking his fingers in Foxy's rectum and noting that his hand would not fit because it was too big.
- In a Progress Note dated May 8, 2021, Solan was quoted as saying near the nursing station: "Foxy is my service dog, she is more than a service dog, ASH can't stop me from marrying her. Biden passed a law." Around this time, Solan applied for a marriage license for himself and Foxy. At Solan's particularized

11

1  assessment interview on April 18, 2022, he stated that "under the common law
2  we'd already be married."

3  ● On June 14, 2021, Solan enlisted a number of his peers to participate in a
4  "manumission" ceremony, in which he referred to Foxy as a "woman" and a
5  "private person incarnate" and to himself as a "man" and a "private person
6  incarnate."   At his April 18, 2022, interview, Solan explained that
7  "[m]anumission was used in ancient Rome for releasing a slave to the freedom of
8  a municipality, it meant giving freedom to somebody that wasn't considered a
9  person."

10  ● On August 23, 2021, Solan reportedly told staff that he was saving himself for his
11  fiancée Foxy, "who ha[d] not consented to intercourse as of yet."

12  ● On September 1, 2021, Solan reportedly told his treatment team that he identified
13  as a Pomeranian and that is why he referred to Foxy as his fiancée.  At his April
14  18, 2022, interview Solan admitted making this statement.  He explained that
15  "there's all this lately in the news about people claiming to be a different gender
16  identity, so I said why can't I identify as a Pomeranian, I'd rather live with 'em, I
17  like 'em better than people which is true, people are confusing and difficult, I'd be
18  happy living with Pomeranians and no one else but, so why not just identify as a
19  Pomeranian?"

20  ● On November 11, 2021, Solan reportedly told his occupational therapist (in a
21  conversation about his inattention to personal hygiene) that Foxy "licks the inside
22  of my mouth and cleans all the gunk from my teeth."  In his interview on April
23  18, 2022, Solan confirmed that at one time, Foxy indeed performed that function
24  for him.

25  ● In a December 12, 2021 Progress Note, Solan is reported to have said that he
26  wanted a Viagra order so that he could have sex with his dog.

27  ● In an IR dated December 22, 2021 Solan is reported as saying about Foxy during
28  an On-Unit Open Art Group on the Pinon Unit: (1) "yeah baby, we are the

12

1    superior breed my little fox"; and (2) "I cannot wait to touch you my baby

2    Pomeranian."

3         During his interview on April 18, 2022, Solan denied making some of these

4    statements and asserted that his interest in marrying Foxy was "ceremonial" and not

5    sexual.  Be that as it may, ASH could not (and cannot) ignore multiple reports (and his

6    own admissions) that Solan had inappropriate feelings for Foxy.  Nor can it ignore the

7    risk that allowing Foxy to reside at the Forensic Hospital would give Solan scope to

8    abuse Foxy in the private room that ASH has provided to Solan at his request because of

9    his issues getting along with other patients.  Animal abuse is a criminal act and ASH will

10   not facilitate such crimes.  For this additional reason, ASH denied Solan's request to live

11   with Foxy at the Forensic Hospital.

12        With the exception of the specific medications that the 16-year-old Foxy was

13   required to take, the State's legitimate, non-discriminatory reasons to exclude her from

14   ASH in May 2022 apply equally to her youthful reincarnation three years later.

15   Moreover, the State's particularized assessment under Title II and its enabling

16   regulations is valid under the Rehab Act as well.  *See Payan,* 11 F.4th 729 at 737.

17   Accordingly, the Court should dismiss Count One and Count Four against the State of

18   Arizona for failure to state a claim on which relief can be granted.

19        **C.    Count Eleven Should Be Dismissed Because Solan Failed to State a**
          **Claim for False Light Invasion of Privacy Against Bowen, Sheldon,**
20        **Carter, or Coleman.**

21        In Count Eleven of the FAC, Solan alleges a claim for false light invasion of

22   privacy against Defendants Bowen, Sheldon, Carter, and Coleman for "falsely" accusing

23   him of "engaging or planning to engage in, inappropriate and illegal sexual activities

24   with Foxy."  (Doc. 6 at 50, ¶¶ 279-80.)  Solan claims that these statements were "made

25   to or in the presence of ASH staff and/or patients," but he does not indicate what,

26   exactly, those statements were or to whom, exactly, they were made.  (*Id.* ¶ 280.)  Such

27   conclusory allegations are insufficient to state a claim on which relief can be granted.

28   *Iqbal*, 556 U.S. at 678.

13

1        In Count Twelve, Solan complains that "Bowen published the Particularized

2  Assessment letter," that "Sheldon published the Denial Letter" relating to the

3  reincarnated Foxy, and that "Carter and Coleman each made defamatory statements

4  about Plaintiff in front of other ASH patients, including 'you eat dog a**,' and 'you eat

5  dog p***y.'"  (Doc. 6 at 51-52, ¶¶ 289, 290, 294.)  These allegations also are insufficient

6  to state a claim for false light invasion of privacy against any of the Defendants.

7        As an initial matter, Solan's alleged claim against Bowen is time-barred.  A.R.S.

8  § 12-821. "A cause of action accrues when the damaged party realizes he or she has been

9  damaged and knows or reasonably should know the cause, source, act, event,

10  instrumentality or condition that caused or contributed to the damage." A.R.S. § 12-

11  821.01.  Solan's putative false light claim against Bowen accrued on or about May 6,

12  2022, when he had Solan served with the Particularized Assessment letter.  (Doc. 6 at 17,

13  ¶ 81.)  Therefore, to be timely, Solan would have had to have filed his false light

14  invasion of privacy claim against Bowen no later than May 6, 2023.  Solan, however, did

15  not raise that claim until he filed the FAC on November 18, 2024.  (Doc. 6.)

16  Accordingly, the one-year statute of limitations bars Solan's false light invasion of

17  privacy claim against Bowen.

18        Additionally, to state a claim for false light invasion of privacy, a plaintiff must

19  allege "(1) the defendant, with knowledge of falsity or reckless disregard for the truth,

20  gave publicity to information placing the plaintiff in a false light, and (2) the false light

21  in which the plaintiff was placed would be highly offensive to a reasonable person in the

22  plaintiff's position." *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 922 (D.

23  Ariz. 2019).  "[T]o qualify as a false light invasion of privacy, the publication must

24  involve 'a major misrepresentation of [the plaintiff's] character, history, activities or

25  beliefs,' not merely minor or unimportant inaccuracies." *Godbehere v. Phoenix*

26  *Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989) (quoting Restatement (Second) of

27  Torts § 652E cmt. c.).  "[I]t is not an invasion of the right of privacy ... to communicate a

28  fact concerning the plaintiff's private life to a single person or even to a small group of

1    persons." Restatement (Second) of Torts § 652D, cmt. a).[2] The publication must be "to

2    the public at large, or to so many persons that the matter must be regarded substantially

3    certain to become one of public knowledge." *Christakis v. Deitsch*, 478 P.3d 241, 244

4    (Ariz. App. 2020); *see also Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1115 (D. Ariz.

5    2022) (dismissing the plaintiff's false light claim because the publicity element was not

6    met where the defendant placed a bankruptcy filing in a google drive folder that could be

7    accessed by the public and emailed the folder's link to three individuals).

8            Solan has failed to plead sufficient facts to plausibly allege the knowing or

9    reckless falsity and publication elements of a false light invasion of light claim against

10   any of the Defendants. As this Court has noted, what the Particularized Assessment

11   letter had to say about Solan's relationship with Foxy was based on "statements recorded

12   by various medical professionals and staff in progress notes and an April 2022 interview

13   of Plaintiff." (Doc. 8 at 13.) Solan has alleged no facts to suggest that Bowen doubted

14   or had reason to doubt these statements. Moreover, while Solan alleges that Bowen had

15   an ASH grievance investigator deliver the Particularized Assessment letter to him at the

16   ASH Cottonwood unit, he has alleged no facts to suggest that Bowen disclosed the letter

17   to the public at large. (Doc. 6 at 17, ¶ 81.)

18           Similarly, the "legitimate concerns" expressed in the Denial Letter were "based

19   on [Solan's] own personal statements" indicating that his "past relationships and

20   interactions with a 'service animal' have not only been counter-therapeutic, but also

21   inappropriate (sexual in nature)." (*Id.* at 23, ¶124(a).) Further, the Denial Letter came

22   from Arizona State Hospital Administration (not from Sheldon), was addressed to Solan,

23   and copied only to ASH's counsel. (*Id.* at 22-23 & 86 [Ex. H].) Solan has alleged no

24   facts to suggest that Sheldon doubted or had reason to doubt Solan's "own personal

25   statements" about his relationship with Foxy, or that Sheldon published the Denial Letter

26   (or caused it to be publicized) beyond Solan and ASH's attorney.

27

28   _____
     [2] "Arizona courts follow the *Restatement (Second) of Torts* absent authority to the
     contrary." *Koepnick v. Sears Roebuck & Co.*, 762 P.2d 609, 617 (Ariz. App. 1988).

15

1      Finally, Solan alleges that the allegedly "defamatory" statements that ASH

2  Behavioral Health Technician Carter and Coleman made about him were made in his

3  "presence and in front of other ASH patients." (*Id.* at 11-12, ¶¶ 44, 46; 26, ¶ 137.)  But

4  Solan has alleged no facts to imply that Carter and/or Coleman knew or had reason to

5  know that their statements were false or that they publicized their comments beyond a

6  small group of ASH patients, which is insufficient to establish the publicity element of

7  the false light invasion of privacy tort.

8      Accordingly, Solan has failed to state a claim for false light invasion of privacy

9  against Defendants Bowen, Sheldon, Carter, or Coleman.

10      **D.    Count Twelve Should Be Dismissed Because Solan Failed to State a
           Claim for Defamation Against Bowen or Sheldon.**
11

12      In Count Twelve of the FAC, Solan asserts that Bowen and Sheldon defamed him

13  with statements contained in the Particularized Assessment letter and the Denial Letter,

14  respectively, which, he alleges, implied that he engaged in "bestiality and animal abuse"

15  with Foxy. (Doc. 6 at 51, ¶¶ 289, 290.)[3]  However, he fails to state a defamation claim

16  against either Defendant, for several reasons.  Initially, for the reasons discussed in

17  Section II.C., above, the claim against Bowen is time barred, and Sheldon did not make

18  the statements about Solan's relationship to his service dog contained in the Denial

19  Letter.  Additionally, to be liable for defamation against a private individual like Solan, a

20  defendant must publish a false and defamatory communication "(a) know[ing] that the

21  statement is false and it defames the other, (b) acts in reckless disregard of these matters,

22  or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts

23  § 580(B) (1977).  Here, Solan has alleged no facts to suggest that Bowen made any of

24

25  _____

[3] Solan also alleges that Carter and Coleman defamed him with their alleged statements
26  about his sexualized conduct with a dog. (Doc. 6 at 16 & 52, ¶¶ 137, 294.)  However,
the Court has not ordered Carter or Coleman to answer Count Twelve. (*See* Doc. 8 at 21,
27  ¶ 5.)  Perhaps this is so because "obscenities, vulgarities, insults, epithets, name-calling,
and other forms of verbal abuse are insufficient to raise a claim for defamation." *Breeser*
28  *v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1162 (D. Ariz. 2013), *aff'd sub
nom. Breeser v. Menta Grp., Inc.*, 622 F. App'x 649 (9th Cir. 2015).

16

1  the statements in the Particularized Assessment letter knowing they were false or with

2  reckless or negligent disregard of whether they were true.

3  **Conclusion**

4       For the reasons set forth above, Defendants respectfully request that the Court

5  grant this motion and dismiss the First Amended Complaint for Restitution, Damages,

6  and Disgorgement, and for Injunctive, Declaratory, and Other Relief in its entirety.

7       Respectfully submitted this 25th day of February, 2025.

8                                     Arizona Attorney General's Office

9

10                                /s/ Ann Hobart

                               Ann Hobart

11                                Jordan Kendall

                               Assistant Attorneys General

12                                Attorneys for Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

1 | I certify that I electronically transmitted
the attached document to the Clerk's Office
2 | using the CM/ECF System for filing this
25th day of February, 2025.

3

COPY emailed
4 | this 25th day of February, 2025, to:

5 | Matthew P. Solan
c/o Arizona State Hospital
6 | 501 N. 24th Street
Phoenix, Arizona 85008-6056
7 | legal@fox-ranch.com
Plaintiff

8

COPY of the foregoing to be mailed the
9 | 26th day of February, 2025, to:

10 | The Honorable Deborah M. Fine
U.S. District Court, Suite 321
11 | 401 W. Washington Street, SPC 15
Phoenix, AZ 85003-2120

12

Matthew P. Solan
13 | c/o Arizona State Hospital
501 N. 24th Street
14 | Phoenix, Arizona 85008-6056
legal@fox-ranch.com
15 | Plaintiff

16 | /s/      Ann Hobart

17

18

19

20

21

22

23

24

25

26

27

28