1  Ann Hobart, Bar No. 019129
   Jordan Kendall, Bar No. 038647
2  Assistant Attorneys General
   Arizona Attorney General's Office
3  2005 N. Central Avenue
   Phoenix, Arizona 85004
4  Telephone:  (602) 542-8347
                (602) 542-7687
5  Facsimile:   (602) 542-7644
   Ann.Hobart@azag.gov
6  Jordan.Kendall@azag.gov
   EmploymentLaw@azag.gov
7
8  Attorneys for Defendants State of Arizona,
   Michael R. Sheldon, Aaron Bowen,
9  Lea'cher Carter, and Unique Coleman
10

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE DISTRICT OF ARIZONA

13  Matthew Phillip Solan,                   Case No:  CV24-02061-JJT-DMF

14             Plaintiff,                     **MOTION TO DISMISS COUNTS ONE,
                                              FOUR, ELEVEN, AND TWELVE OF
15      vs.                                   THE FIRST AMENDED COMPLAINT
                                              (DOC. 6) ON BEHALF OF
16  The State of Arizona; Jennifer L.         DEFENDANTS THE STATE OF
    Cunico; Michael R. Sheldon; Aaron         ARIZONA, MICHAEL R. SHELDON,
17  Bowen, Calvin J. Flowers; Steven Kwoh;    AARON BOWEN, LEA'CHER
    Kindra Ochoa, Lea'cher Carter, Unique     CARTER, AND UNIQUE COLEMAN**
18  Coleman; John Does 1-100; Jane Does 1-
    100; Black Corporations 1-10; and White
19  Entities 1-10,
20
               Defendants.
21
22

23      Pursuant to the December 10, 2024, screening Order, the Court has required

24  Defendant State of Arizona to respond to Counts One and Four; Defendants Michael R.

25  Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman to respond to Count

26  Eleven; and Defendants Sheldon and Bowen to respond to Count Twelve of the First

27  Amended Complaint.  (Doc. 8 at 21.)  Pursuant to Rule 12(b)(6) of the Federal Rules of

28

1    Civil Procedure, undersigned counsel hereby moves to dismiss each of the Counts on

2    behalf of all of these Defendants for failure to state a claim on which relief can be

3    granted.  This Motion is supported by a certification pursuant to LRCiv 12.1(c), which is

4    attached hereto as Exhibit A.

5    **I.        Factual and Procedural Background**

6           On March 12, 2020, Plaintiff Matthew Solan was convicted in the Coconino

7    County Superior Court of one count of aggravated assault and sentenced to a 7.5-year

8    term of imprisonment in the Arizona Department of Corrections, Rehabilitation &

9    Reentry.  (Doc. 8, at 3 n. 3.)  Because he has been diagnosed as Seriously Mentally Ill

10   ("SMI") and was adjudicated Guilty Except Insane, Solan was committed to the Arizona

11   State Hospital ("ASH") under the jurisdiction of the Psychiatric Security Review Board.

12   (*Id.*; Doc. 6 at 13, ¶ 56.)  Solan was admitted to ASH on April 1, 2020.  (*Id.*)

13          Shortly following his admission, Solan asked to have his service dog Foxy (from

14   which he had been separated in 2019 when he was arrested and placed in a detention

15   facility) live with him at ASH.  (Doc. 6 at 14-15, ¶¶ 66-67.)  ASH denied his request,

16   citing security and health and safety concerns, and administrative burden.  (*Id.* at ¶ 67.)

17   Solan filed a lawsuit and Motion for Preliminary Injunction with this Court, *Solan v.*

18   *Arizona State Hospital,* CV-20-02209-PHX-JJT (DMF) ("CV-20-02209"), alleging that

19   ASH's refusal to modify its policies and procedures to allow Foxy to live with him at the

20   forensic psychiatric hospital violated the ADA.  On March 22, 2022, the Court granted

21   Solan's motion and ordered ASH to conduct a particularized assessment to determine

22   whether reasonable modifications could be made to allow Foxy to live with Solan at

23   ASH "without fundamentally altering ASH's services."  (Doc. 6 at 16, ¶ 76.)

24          On or about May 6, 2022, ASH provided Solan a report of its particularized

25   assessment setting forth six general areas of concern that justified denying his request to

26   have Foxy live with him at ASH.  (Doc. 6 at 17, ¶ 81 & 64-69 [Ex. A].)  This Court had

27   advised Solan that, if he was "again dissatisfied" with ASH's decision following the

28

1  particularized assessment, he could "again move for preliminary injunctive relief." (CV-

2  20-02209, Doc. 84, at 16.)  Solan did not do so, although by the time he received the

3  particularized assessment report, he was represented by counsel.  (Doc. 6 at 19, ¶ 93.)

4  Solan learned that Foxy had passed away on July 13, 2022.  (*Id.* ¶ 94.)  However, he did

5  not stipulate to dismissal of his case until January 26, 2023.  (CV-20-02209, Doc. 94.)

6  The dismissal was with prejudice (*id.*) even though, by then, Solan had already arranged

7  to have Foxy cloned (doc. 6 at 19, ¶ 97).

8          On November 9, 2023, Foxy was "reincarnated."  (*Id.* at 20, ¶ 105.)  On June 13,

9  2024, Solan submitted a request to have her live with him at ASH.  (*Id.* at 22, ¶ 117.)

10  ASH denied this request, based on the same concerns that it had articulated in the May

11  2022 particularized assessment report.  (*Id.* at 22-23, ¶ 123.)  These concerns included

12  that "based on [Solan's] own personal statements, [his] past relationships and

13  interactions with a 'service animal' have not only been counter-therapeutic, but also

14  inappropriate (sexual in nature)."  (*Id.* at 23, ¶ 124(a), & 86.)  On August 14, 2024, Solan

15  filed this lawsuit complaining that ASH's denial violated Title II of the Americans with

16  Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehab Act").

17  (Doc. 1.)  In the operative First Amended Complaint ("FAC") filed on November 18,

18  2024, Solan alleged claims for false light invasion of privacy and defamation as well.

19  (Doc. 6 at 50, 51.)

20          Though these four alleged claims survived screening, they should nonetheless be

21  dismissed for failure to state a claim.  For the same reasons that ASH explained to Solan

22  in the May 2022 particularized assessment report, neither the ADA nor the Rehab Act

23  require the State to allow Foxy's clone to live with Solan at ASH.  Solan's false light

24  invasion of privacy and defamation claims against Bowen are barred by the one-year

25  statute of limitations for state-law claims against State employees.  Those claims fail as

26  to Sheldon because Solan has not alleged any false statements that can be attributed to

27  him.  The allegedly defamatory statements from Carter and Coleman that Solan

28

1  complains placed him in a false light were allegedly made only in the hearing of Solan

2  and a few fellow ASH patients and therefore do support the publication element of a

3  false light invasion of privacy claim.  For all of these reasons, as discussed more fully

4  below, the Court should grant Defendants' motion to dismiss in its entirety.

5  **II.    Legal Argument**

6          **A.    The Federal Pleading Standard**

7

8          A pleading must contain a "short and plain statement of the claim *showing* that

9  the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  To survive a

10 motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint

11 must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

12 plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

13 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it

14 contains "factual content that allows the court to draw the reasonable inference" that the

15 moving party is liable.  *Id.*  "In evaluating a Rule 12(b)(6) motion, the court accepts the

16 complaint's well-pleaded factual allegations as true and draws all reasonable inferences

17 in the light most favorable to the plaintiff."  *Adams v. U.S. Forest Srvc.*, 671 F.3d 1138,

18 1142-43 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555-56).  However, "the tenet that

19 a court must accept as true all of the allegations contained in a complaint is inapplicable

20 to legal conclusions."  556 U.S. at 678.  "Threadbare recitals of the elements of a cause

21 of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing

22 *Twombly*, 550 U.S. at 555).  "Only a complaint that states a plausible claim for relief

23 survives a motion to dismiss."  *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).  Therefore,

24 "[d]ismissal . . . is proper if there is a lack of a cognizable legal theory or the absence of

25 sufficient facts alleged under a cognizable legal theory."  *Conservation Force v. Salazar*,

26 646 F.3d 1240, 1242 (9th Cir. 2011) (quotation omitted).

27

28

1
2
3

        **B.**       **Counts One and Four Should Be Dismissed Because Neither Title II of the ADA nor Section 504 of the Rehabilitation Act Require the State of Arizona to Allow Foxy to Live with Solan at ASH.**

4          In Count One of the FAC, Solan alleges that by denying his request to have Foxy

5   live with him at ASH, the State of Arizona violated Title II of the ADA ("Title II"),

6   which provides that "no qualified individual with a disability shall, by reason of such

7   disability, be excluded from participation or denied the benefits of the services,

8   programs, or activities of a public entity, or be subjected to discrimination by any such

9   entity."  42 U.S.C. § 12132 (cited in Doc. 6 at 32, ¶ 167).  Similarly, in Count Four of

10  the FAC, Solan alleges that the State's denial violated Section 504 of the Rehabilitation

11  Act (the "Rehab Act"), which provides, in relevant part, that "no otherwise qualified

12  individual with a disability . . . shall, solely by reason of his or her disability, be excluded

13  from the participation in, be denied the benefits of, or be subjected to discrimination

14  under any program or activity receiving federal financial assistance."  29 U.S.C. § 794

15  (cited in Doc. 6 at 37, ¶ 199.)  The Court may analyze Count One and Count Four

16  coextensively because "there is no significant difference in the analysis of rights and

17  obligations created by the two Acts."  *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th

18  729, 737 (9th Cir. 2021).

19       As this Court ordered in CV-20-02209, ASH performed a particularized

20  assessment of Solan's request and identified six reasons that Title II did not require the

21  State of Arizona to allow Foxy to live with him at ASH.  (Doc. 6 at 17, ¶ 81, & 64-69

22  [Ex. A].)  With the exception of the specific medications that the 16-year-old Foxy was

23  required to take, the State's legitimate, non-discriminatory reasons to exclude her from

24  ASH in May 2022 apply equally to her youthful reincarnation three years later.[1]

25

26  ---

[1] The factual points and legal authorities discussed in Sections II.B.1-6, below, were all
27  discussed in the May 2022 particularized assessment report that Solan attached as
Exhibit A to the FAC.  (Doc. 6 at 64-69.)  "A copy of a written instrument that is an
28  exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10.

1  Moreover, the State's particularized assessment under Title II and its enabling

2  regulations is valid under the Rehab Act as well.  *See Payan,* 11 F.4th 729 at 737.

3      **1. Foxy is not necessary for Solan to participate in and benefit from ASH's services, programs, and activities.**

4

5  Regulations interpreting Title II require that a public entity "make reasonable

6  modifications in policies, practices, or procedures when the modifications are necessary

7  to avoid discrimination on the basis of disability, unless the public entity can

8  demonstrate that making the modifications would fundamentally alter the nature of the

9  service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  Generally, Title II requires a

10 public entity to "modify its policies, practices, or procedures to permit the use of a

11 service animal by an individual with a disability."  28 C.F.R. § 35.136(a).  The State

12 does not believe that these regulations apply in Solan's case, however, because it does

13 not believe that Foxy is necessary for him to participate in and benefit from ASH's

14 services, programs, and activities.

15 During an interview conducted as part of the individualized assessment, Solan

16 represented that Foxy is a "psychiatric service animal" and, as such, "she's not providing

17 much physical assistance at all."  "[S]he doesn't pull me around or direct me as if I'm

18 blind."  Solan continued: "There isn't much physical necessity for her to do much as a

19 psychiatric service animal, it's more her mental abilities."  Thus, Solan acknowledged

20 that he did not need Foxy to get around the Forensic Hospital or to meet other physical

21 needs, like toileting or hygiene.  As for Foxy's "mental abilities," ASH does not believe

22 they are necessary for Solan to participate in and benefit from the Hospital's services,

23 programs, and activities.  As Solan's treating psychiatrist stated in an affidavit that he

24 provided in connection with ASH's particularized assessment:  "[I]n a level one

25 psychiatric hospital there is no need for a service animal simply because services are

26 provided by trained people whose job it is to provide these very things as needed to all

27 patients on a regular basis.  There is a 24/7 medical staff for that."

28

1   Moreover, Solan's psychiatrist believed that having Foxy with him at the Forensic

2   Hospital would actually impede Solan's treatment.  He observed that Solan was

3   committed to the Forensic Hospital, "in part, to learn how to better get along with <u>people</u>

4   so that he can provide for his own needs without alienating or provoking people or

5   otherwise getting into trouble with either the law or with friends or with people who

6   work for him in the future.  With this in mind, a beloved therapy animal would only

7   serve to get in the way."  Solan's psychiatrist concluded:  "Matthew has said he likes

8   animals better than people, and he says that people are 'tools' to achieve his needs.  This

9   needs a reality check."

10  During the particularized assessment interview, Solan stated that Foxy's

11  "presence is necessary for [him] to receive the treatment [he is] entitled to" at the

12  Forensic Hospital.  Solan's psychiatrist disagrees.  He believes that the "necessary part is

13  for Matthew to learn how to deal with people in spite of his autistic spectrum disorder.

14  He tells me that he had the dog as a transition object to remove himself from the 'co-

15  dependent' relationship he had with his mother. . . .  Now, my suggestion to him is to

16  move even further and drop the transition object.  He is realizing he is not as disabled as

17  he thought he was and is realizing capabilities he didn't know he had.  A transition

18  object is no longer needed."  In sum, Solan's psychiatrist did "not believe that a service

19  animal is clinically appropriate" for Solan.  Based on Solan's treating psychiatrist's

20  professional opinion, ASH denied Solan's request to have Foxy live with him at the

21  Forensic Hospital.

22   **2.  Foxy cannot be tethered as Title II requires while in the Forensic
23       Hospital.**

24  Title II requires that a service animal be under its handler's control.  *See* 28

25  C.F.R. § 35.136(d).  Specifically, the law requires that a service animal "shall have a

26  harness, leash, or other tether."  *Id.*  However, leashes and harnesses are ligatures that

27  ASH policy, in adherence and consistent with definitions from licensure and the Joint

28

1    Commission, classifies as contraband.  This means that they are not approved for patient

2    possession or use, even under staff supervision, because patients may use ligatures to

3    harm themselves or others.  *See* ASH AdmPtRights Policy No. 004 (Patient Property,

4    Storage, and Contraband) and attachment listing Contraband and Controlled Items for

5    the Civil and Forensic Hospitals (specifically identifying "clothing with removable

6    straps, strings/drawstrings, metal, plastic, or wire pieces (i.e., underwire)" and "items

7    that can be used as ligature (i.e., chain, rope/twine, drawstrings, wire, cords, etc.)" as

8    contraband).  When conducting licensing and regulatory compliance surveys, State

9    regulators, and the Joint Commission are particularly vigilant about citing potential

10   ligature risks.  Rightly so, given the direct threat to patient and staff safety that ligatures

11   present.  The conflict between Title II's tethering requirement and ASH's prohibition on

12   items that can be used as ligatures cannot be overcome.  For this additional reason, ASH

13   denied Solan's request to have Foxy live with him at the Forensic Hospital.

14              **3.   Solan would need ASH Staff's assistance to care for and supervise
                      Foxy, which Title II does not require.**
15

16           Under Title II, "[a] public entity is not responsible for the care or supervision of a

17   service animal."  28 C.F.R. § 35-136(e).  In Solan's particularized assessment interview

18   and preliminary injunction briefing in CV-20-02209, however, he acknowledged that if

19   Foxy were allowed to live with him at the Forensic Hospital, he could not care for her

20   daily needs without substantial assistance from ASH staff in two fundamental respects:

21           **Feeding:**  ASH policy prohibits patients from keeping or consuming food in their

22   rooms.  Solan therefore proposed storing food for Foxy in his bin in the room where

23   patients' hygiene products and electric razors are stored.  Patients do not have free access

24   to this room, so Solan would need a staff member to get Foxy's food and bowl (and to

25   return the clean bowl to storage) in the morning and the evening.  These are times that

26   staff is generally involved in supervising patients' meal service and, in the morning,

27   supervising their hygiene activities.  Solan did not suggest where he would feed Foxy

28

1   (understanding that it could not be in his room), how he would dispose of any leftover

2   food and clean her feeding bowl, or how he would coordinate her feeding times with his

3   own meal times and hygiene practices.

4           **Toileting/Exercise:**  Solan acknowledged that he does not have free access to the

5   Forensic Hospital's mall, where Foxy would relieve herself and get exercise.  Solan

6   currently is allowed to walk the mall for half an hour once a day under staff supervision.

7   His current level of supervision is 1(supervisor)-to-5(patients).  Assuming that Foxy

8   could accompany him on these mall walks, Solan has indicated that ASH staff would

9   have to give him access to the mall an additional two or three times a day, according to

10  Foxy's needs.  In his particularized assessment interview, Solan stated that despite being

11  16 years old, Foxy would be able to sleep through the night while the units are locked

12  down without needing to relieve herself.  But in case she did, Solan could get puppy pads

13  and put them down "in the bathroom" as he did when he was traveling with Foxy years

14  before.  This plan ignored that Solan does not have a private bathroom, and Foxy could

15  not open the door to the unit bathrooms available for patient use.  The reality is that if

16  Foxy used puppy pads, it would be on the floor in Solan's room.  At Solan's interview,

17  he stated that this is no different from a patient who requires using adult diapers.  If that

18  is so, disposal of the soiled puppy pads, like the soiled adult diapers, would fall to staff.

19  If Foxy missed the puppy pad, the clean-up also would involve staff, as patients do not

20  have unsupervised access to cleaning supplies on the unit or training on necessary

21  cleaning protocols.

22          In addition to these aspects of Foxy's daily care, Solan's psychiatrist noted that

23  her supervision also would fall exclusively to ASH staff when, as has happened several

24  times in the past, Solan required seclusion.

25          In sum, it is clear that Foxy could not safely reside at the Forensic Hospital

26  without significant assistance from ASH staff, which Title II does not require.  This was

27  a third independent reason why ASH denied Solan's request.

28

1

2

### 4. Veterinary medications cannot be safely stored or administered at the Forensic Hospital.

3    The record shows that, as of May 2022, Foxy's veterinarian had prescribed her

4 enalapril twice a day for a heart condition and gabapentin once or twice a day for

5 osteoarthritis.  Consistent with Hospital policy, licensing requirements, and state and

6 federal regulations, however, ASH cannot store or administer veterinary medications—

7 and Forensic Hospital patients cannot store or administer medications of any kind.

8 Particularly acute are the health and safety issues relating to a forensic patient's

9 possession of gabapentin.  While it is not yet a controlled substance in Arizona, it is

10 commonly abused, and forensic patients should not have ready access to it, as they

11 would if Solan were allowed to store and administer this drug.  That Foxy could not

12 receive her prescribed medications at the Hospital was another reason that ASH denied

13 Solan's request to have her live there in May 2022.  That Foxy's reincarnation may not

14 currently require daily doses of enalapril and gabapentin does not change the fact that

15 neither Solan nor ASH staff could provide her with any veterinary medications that she

16 may eventually require.

### 5. Modifying ASH policies to allow staff to care for Foxy would fundamentally alter the nature of the Forensic Hospital's Services.

17

18

19

20    As discussed above, Solan could not care for Foxy's daily needs at the Forensic

21 Hospital without help from ASH staff.  ASH's existing patient care policies and

22 practices, however, do not provide for giving such assistance and would have to be

23 modified to address various concerns, including issues arising from interactions between

24 humans and animals, animal waste, and the storage, dispensing, and administration of

25 medication to animals.  The policies that would have to be modified to allow Foxy to

26 reside at the Hospital include, but are not limited to, ASH ClinSvsProfSvs Policy No.

27 002 (Patient Nutrition, Education, and Food Services); ASH Infection Control Plan;

28

1    ASH Infection Control Risk Assessment and Progress Report; ASH Environment of

2    Care SFY 2021-22 Hazardous Materials and Waste Management Plan; ASH

3    Administering Medications Policy; ASH Medication Management Policy; ASH

4    Medication Safety Policy; and ASH Medications Brought Into the Hospital by a

5    Patient/Patient's Family Policy.  Admitting Foxy would also require revising the Task

6    Assignment Sheets (day and night shifts) for the unit where Solan currently resides.  In

7    ASH's view, such a thorough-going overhaul of its policies, procedures, and practices

8    would require fundamentally altering the Hospital from a facility that cares for humans

9    to one that cares for humans and animals.  Title II does not require such a fundamental

10   alteration.  *See* 28 C.F.R. § 35.130(b)(7)(i) (when they are necessary to avoid disability

11   discrimination, "[a] public entity shall make reasonable modifications in policies,

12   practices or procedures . . . unless the public entity can demonstrate that making the

13   modifications would fundamentally alter the nature of the service, program, or activity").

14   For this additional reason, ASH denied Solan's request to have Foxy live with him at the

15   Forensic Hospital.

16              **6.  ASH cannot ignore information that Solan's relationship with
                    Foxy may be abusive or risk enabling such abuse.**
17

18         Finally, while Solan asked ASH to consider Foxy to be a psychiatric service

19   animal, statements that he made to ASH staff and patients indicated that he considered

20   her to be something other than an animal that is individually trained to perform a task or

21   work that is directly related to Solan's disability, which is how the ADA defines "service

22   animal."  *See* "Frequently Asked Questions about Service Animals and the ADA,"

23   https://www.ada.gov/regs2010/service_animal_qa.html (last consulted February 25,

24   2025).  Reports are that Solan considered Foxy to be his "familiar," a "soul mate," a

25   "person," a "woman," and a "fiancée."  Additionally, ASH received information that

26   Solan had either touched Foxy inappropriately in the past or contemplated doing so in

27   the future.  For example:

28

- In a Progress Note dated December 2, 2020, Solan described Foxy as a "co-sovereign" and "like a wife."

- In a Progress Note dated April 24, 2021, Solan was reported as saying that he and Foxy "put our tongues in each other's mouth."

- In another Progress Note dated April 24, 2021, he was reported as saying that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it.  He was also reported to have talked to another patient about sticking his fingers in Foxy's rectum and noting that his hand would not fit because it was too big.

- In a Progress Note dated May 8, 2021, Solan was quoted as saying near the nursing station:  "Foxy is my service dog, she is more than a service dog, ASH can't stop me from marrying her.  Biden passed a law."  Around this time, Solan applied for a marriage license for himself and Foxy.  At Solan's particularized assessment interview on April 18, 2022, he stated that "under the common law we'd already be married."

- On June 14, 2021, Solan enlisted a number of his peers to participate in a "manumission" ceremony, in which he referred to Foxy as a "woman" and a "private person incarnate" and to himself as a "man" and a "private person incarnate."  At his April 18, 2022, interview, Solan explained that "[m]anumission was used in ancient Rome for releasing a slave to the freedom of a municipality, it meant giving freedom to somebody that wasn't considered a person."

- On August 23, 2021, Solan reportedly told staff that he was saving himself for his fiancée Foxy, "who ha[d] not consented to intercourse as of yet."

- On September 1, 2021, Solan reportedly told his treatment team that he identified as a Pomeranian and that is why he referred to Foxy as his fiancée.  At his April 18, 2022, interview, Solan admitted making this statement.  He explained that

1   "there's all this lately in the news about people claiming to be a different gender

2   identity, so I said why can't I identify as a Pomeranian, I'd rather live with 'em, I

3   like 'em better than people which is true, people are confusing and difficult, I'd be

4   happy living with Pomeranians and no one else but, so why not just identify as a

5   Pomeranian?"

6   ● On November 11, 2021, Solan reportedly told his occupational therapist (in a

7   conversation about his inattention to personal hygiene) that Foxy "licks the inside

8   of my mouth and cleans all the gunk from my teeth."  In his interview on April

9   18, 2022, Solan confirmed that at one time, Foxy indeed performed that function

10   for him.

11   ● In a December 12, 2021, Progress Note, Solan is reported to have said that he

12   wanted a Viagra order so that he could have sex with his dog.

13   ● In an IR dated December 22, 2021, Solan is reported as saying about Foxy during

14   an On-Unit Open Art Group on the Pinon Unit: (1) "yeah baby, we are the

15   superior breed my little fox"; and (2) "I cannot wait to touch you my baby

16   Pomeranian."

17   During his interview on April 18, 2022, Solan denied making some of these

18   statements and asserted that his interest in marrying Foxy was "ceremonial" and not

19   sexual.  Be that as it may, ASH could not (and cannot) ignore multiple reports (and his

20   own admissions) that Solan had inappropriate feelings for Foxy.  Nor can it ignore the

21   risk that allowing Foxy to reside at the Forensic Hospital would give Solan scope to

22   abuse Foxy in the private room that ASH has provided to Solan because of his issues

23   getting along with other patients.  Animal abuse is a criminal act and ASH will not

24   facilitate such crimes.  For this additional reason, ASH denied Solan's request to live

25   with Foxy at the Forensic Hospital.

26   With the exception of the specific medications that the 16-year-old Foxy was

27   required to take, the State's legitimate, non-discriminatory reasons to exclude her from

28

1 ASH in May 2022 apply equally to her youthful reincarnation three years later.

2 Moreover, the State's particularized assessment under Title II and its enabling

3 regulations is valid under the Rehab Act as well. *See Payan,* 11 F.4th 729 at 737.

4 Accordingly, the Court should dismiss Count One and Count Four against the State of

5 Arizona for failure to state a claim on which relief can be granted.

6         **C.**     **Count Eleven Should Be Dismissed Because Solan Failed to State a**
**Claim for False Light Invasion of Privacy Against Bowen, Sheldon,**

7                 **Carter, or Coleman.**

8

9      In Count Eleven of the FAC, Solan alleges a claim for false light invasion of

10 privacy against Defendants Bowen, Sheldon, Carter, and Coleman for "falsely" accusing

11 him of "engaging or planning to engage in, inappropriate and illegal sexual activities

12 with Foxy." (Doc. 6 at 50, ¶¶ 279-80.) Solan claims that these statements were "made

13 to or in the presence of ASH staff and/or patients," but he does not indicate what,

14 exactly, those statements were or to whom, exactly, they were made. (*Id.* ¶ 280.) Such

15 conclusory allegations are insufficient to state a claim on which relief can be granted.

16 *Iqbal*, 556 U.S. at 678.

17      In Count Twelve, Solan complains that "Bowen published the Particularized

18 Assessment letter," that "Sheldon published the Denial Letter" relating to the

19 reincarnated Foxy, and that "Carter and Coleman each made defamatory statements

20 about Plaintiff in front of other ASH patients, including 'you eat dog a**,' and 'you eat

21 dog p***y.'" (Doc. 6 at 51-52, ¶¶ 289, 290, 294.) These allegations also are insufficient

22 to state a claim for false light invasion of privacy against any of the Defendants.

23      As an initial matter, Solan's alleged claim against Bowen is time-barred. A.R.S.

24 § 12-821. "A cause of action accrues when the damaged party realizes he or she has been

25 damaged and knows or reasonably should know the cause, source, act, event,

26 instrumentality or condition that caused or contributed to the damage." A.R.S. § 12-

27 821.01. Solan's putative false light claim against Bowen accrued on or about May 6,

28

1   2022, when he had Solan served with the Particularized Assessment letter.  (Doc. 6 at 17,

2   ¶ 81.)  Therefore, to be timely, Solan would have had to have filed his false light

3   invasion of privacy claim against Bowen no later than May 6, 2023.  Solan, however, did

4   not raise that claim until he filed the FAC on November 18, 2024.  (Doc. 6.)

5   Accordingly, the one-year statute of limitations bars Solan's false light invasion of

6   privacy claim against Bowen.

7           Additionally, to state a claim for false light invasion of privacy, a plaintiff must

8   allege "(1) the defendant, with knowledge of falsity or reckless disregard for the truth,

9   gave publicity to information placing the plaintiff in a false light, and (2) the false light

10  in which the plaintiff was placed would be highly offensive to a reasonable person in the

11  plaintiff's position." *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 922 (D.

12  Ariz. 2019).  "[T]o qualify as a false light invasion of privacy, the publication must

13  involve 'a major misrepresentation of [the plaintiff's] character, history, activities or

14  beliefs,' not merely minor or unimportant inaccuracies." *Godbehere v. Phoenix*

15  *Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989) (quoting Restatement (Second) of

16  Torts § 652E cmt. c.).  "[I]t is not an invasion of the right of privacy ... to communicate a

17  fact concerning the plaintiff's private life to a single person or even to a small group of

18  persons."  Restatement (Second) of Torts § 652D, cmt. a).[2]  The publication must be "to

19  the public at large, or to so many persons that the matter must be regarded substantially

20  certain to become one of public knowledge." *Christakis v. Deitsch*, 478 P.3d 241, 244

21  (Ariz. App. 2020); *see also Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1115 (D. Ariz.

22  2022) (dismissing the plaintiff's false light claim because the publicity element was not

23  met where the defendant placed a bankruptcy filing in a google drive folder that could be

24  accessed by the public and emailed the folder's link to three individuals).

25

26

27

---

[2] "Arizona courts follow the *Restatement (Second) of Torts* absent authority to the

28  contrary."  *Koepnick v. Sears Roebuck & Co.*, 762 P.2d 609, 617 (Ariz. App. 1988).

1    Solan has failed to plead sufficient facts to plausibly allege the knowing or

2  reckless falsity and publication elements of a false light invasion of light claim against

3  any of the Defendants.  As this Court has noted, what the Particularized Assessment

4  letter had to say about Solan's relationship with Foxy was based on "statements recorded

5  by various medical professionals and staff in progress notes and an April 2022 interview

6  of Plaintiff."  (Doc. 8 at 13.)  Solan has alleged no facts to suggest that Bowen doubted

7  or had reason to doubt these statements.  Moreover, while Solan alleges that Bowen had

8  an ASH grievance investigator deliver the Particularized Assessment letter to him at the

9  ASH Cottonwood unit, he has alleged no facts to suggest that Bowen disclosed the letter

10  to the public at large.  (Doc. 6 at 17, ¶ 81.)

11    Similarly, the "legitimate concerns" expressed in the Denial Letter were "based

12  on [Solan's] own personal statements" indicating that his "past relationships and

13  interactions with a 'service animal' have not only been counter-therapeutic, but also

14  inappropriate (sexual in nature)."  (*Id.* at 23, ¶124(a).)  Further, the Denial Letter came

15  from Arizona State Hospital Administration (not from Sheldon), was addressed to Solan,

16  and copied only to ASH's counsel.  (*Id.* at 22-23 & 86 [Ex. H].)  Solan has alleged no

17  facts to suggest that Sheldon doubted or had reason to doubt Solan's "own personal

18  statements" about his relationship with Foxy, or that Sheldon published the Denial Letter

19  (or caused it to be publicized) beyond Solan and ASH's attorney.

20    Finally, Solan alleges that the allegedly "defamatory" statements that ASH

21  Behavioral Health Technician Carter and Coleman made about him were made in his

22  "presence and in front of other ASH patients."  (*Id.* at 11-12, ¶¶ 44, 46; 26, ¶ 137.)  But

23  Solan has alleged no facts to imply that Carter and/or Coleman knew or had reason to

24  know that their statements were false or that they publicized their comments beyond a

25  small group of ASH patients, which is insufficient to establish the publicity element of

26  the false light invasion of privacy tort.

27

28

1    Accordingly, Solan has failed to state a claim for false light invasion of privacy

2    against Defendants Bowen, Sheldon, Carter, or Coleman.

3        **D.**    **Count Twelve Should Be Dismissed Because Solan Failed to State a Claim for Defamation Against Bowen or Sheldon.**

4

5    In Count Twelve of the FAC, Solan asserts that Bowen and Sheldon defamed him

6    with statements contained in the Particularized Assessment letter and the Denial Letter,

7    respectively, which, he alleges, implied that he engaged in "bestiality and animal abuse"

8    with Foxy.  (Doc. 6 at 51, ¶¶ 289, 290.)[3]  However, he fails to state a defamation claim

9    against either Defendant, for several reasons.  Initially, for the reasons discussed in

10   Section II.C., above, the claim against Bowen is time barred, and Sheldon did not make

11   the statements about Solan's relationship to his service dog contained in the Denial

12   Letter.  Additionally, to be liable for defamation against a private individual like Solan, a

13   defendant must publish a false and defamatory communication "(a) know[ing] that the

14   statement is false and it defames the other, (b) acts in reckless disregard of these matters,

15   or (c) acts negligently in failing to ascertain them."  Restatement (Second) of Torts

16   § 580(B) (1977).  Here, Solan has alleged no facts to suggest that Bowen made any of

17   the statements in the Particularized Assessment letter knowing they were false or with

18   reckless or negligent disregard of whether they were true.

19

20

21

22

23

---

24   [3] Solan also alleges that Carter and Coleman defamed him with their alleged statements

25   about his sexualized conduct with a dog.  (Doc. 6 at 26 & 52, ¶¶ 137, 294.)  However,
     the Court has not ordered Carter or Coleman to answer Count Twelve.  (*See* Doc. 8 at 21,

26   ¶ 5.)  Perhaps this is so because "obscenities, vulgarities, insults, epithets, name-calling,
     and other forms of verbal abuse are insufficient to raise a claim for defamation."  *Breeser*

27   *v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1162 (D. Ariz. 2013), *aff'd sub*
     *nom. Breeser v. Menta Grp., Inc.*, 622 F. App'x 649 (9th Cir. 2015).

28

**Conclusion**

For the reasons set forth above, Defendants respectfully request that the Court grant this motion and dismiss the First Amended Complaint for Restitution, Damages, and Disgorgement, and for Injunctive, Declaratory, and Other Relief in its entirety.

Respectfully submitted this 13th day of March, 2025.

Arizona Attorney General's Office

/s/ Ann Hobart
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing this 13th day of March, 2025.

COPY of the foregoing emailed this 13th day of March, 2025, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

COPY of the foregoing mailed this 13th day of March, 2025, to:

The Honorable Deborah M. Fine
U.S. District Court, Suite 321
401 W. Washington Street, SPC 15
Phoenix, AZ 85003-2120

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/      Deb Sawyer