**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel:    1.970.FOX.9611
Fax:    1.970.844.1733
Email: legal@fox-ranch.com

*Plaintiff in propria persona*

___ FILED      ___ LODGED
___ RECEIVED  ___ COPY

MAR 1 7 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Matthew Phillip Solan,
                            *Plaintiff,*

        *v.*

State of Arizona, *et al.*,
                            *Defendants.*

Case no. CV24-02061-PHX-JJT-DMF

**MOTION FOR A PRELIMINARY INJUNCTION**

F.R.C.P. Rule 65

**Expedited Consideration Requested**

COMES NOW Plaintiff Matthew Phillip Solan ("Plaintiff"), and hereby moves for a preliminary injunction restraining Defendant State of Arizona (the State") from excluding Plaintiff's service animal Foxy ("Foxy") from the Arizona State Hospital ("ASH").

## I. Factual Background

Plaintiff is a 35 year-old patient committed to ASH's for a period of treatment after being adjudicated Guilty Except Insane ("GEI"). Plaintiff suffers from numerous disabilities, including a cerebral dysfunction manifesting as Autism Spectrum Disorder ("ASD"), Posttraumatic Stress Disorder ("PTSD"), and a Chronic Inflammatory Response Syndrome ("CIRS"), with which he was, prior his confinement at ASH and preceding pretrial confinement, assisted by Foxy.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Plaintiff brought an action before this Court in 2020 to challenge ASH's denial of his prior service animal accommodation request. *See* Solan v. Arizona State Hospital, 2:20-cv-02209 (D. Ariz.) (hereinafter the "prior case"). After the Court ordered ASH to conduct a particularized assessment of Plaintiff's request for a service animal accommodation in the prior case, Aaron Bowen ("Bowen"), ASH's former CEO, sent a particularized assessment letter to Plaintiff. *See* Doc 6 at 64-69. Bowen resigned approximately 2 days later. ASH's letter repeated the same affirmative defenses rejected by the Court in its March 22, 2022 order (Exhibit A), answered none of the questions posed by the Court, and egregiously concluded with a defamatory attack on Plaintiff's relationship with his service animal, to-wit: that Plaintiff might rape, murder, and eat Foxy, and that ASH's admittance of Foxy would be tantamount to aiding and abetting bestiality and animal abuse. While Plaintiff was preparing a motion to challenge the validity of ASH's particularized assessment, Foxy passed away.

After Foxy's untimely demise, the prior case was dismissed. Plaintiff consequently had Foxy cloned, flown into Arizona, and trained to perform various tasks to assist him in managing the effects of his neurodevelopmental disabilities. Plaintiff made a new request for a service animal accommodation on June 17, 2024. *See* Doc 6 at 81-84. ASH summarily denied the request in their July 5, 2024 letter (the "Denial Letter"). *See* Doc 6 at 86. The Denial Letter attempted to raise the same defenses this Court rejected in the prior case, adding only the fraudulent claim that Plaintiff's relationship with Foxy's progenitor was "sexual in nature." *See* Id. In considering Plaintiff's request, Defendants never met with Plaintiff, let alone Foxy, nor did they conduct a particularized assessment.

While the ASH administration maintains that Foxy is not "medically necessary," and is even "counter-therapeutic", Plaintiff's treatment team has taken a different stance, asserting that Plaintiff's "Primary Strength" is that he "has a trained service dog." *See* Exhibit B, pp. 1-2.

Further, on February 21, 2021, Plaintiff appealed his ASH Individualized Treatment and Discharge Plan ("ITDP"), challenging ASH's refusal to provide Animal Assisted Therapy ("AAT") services. On July 1, 2021, an Administrative Law Judge at the Arizona Office of Administrative Hearings granted Plaintiff's appeal in part, finding that Plaintiff had "sustained the required burden of proof," and that "[b]ased on the hearing record...pursuant to A.AC. R9-21-307 and A.A.C. R9-21-311, the ASH animal services therapy, along with an explanation of its availability or unavailability at this time, is appropriate to be added to the ITDP." See Exhibit C.

Despite the fact that AAT remains an integral component of Plaintiff's IDPT, ASH refuses to implement the service. ASH partially implemented the AAT service from 2022 to around July of 2023, when their volunteer therapy dog, Starla, passed away. ASH now claims that "[w]hen Animal Assisted Therapy becomes available at the forensic hospital, Matthew will be offered AAT service." *See* Exhibit B at 3. However, ASH has a therapy dog they are refusing to utilize:

Foxy's interim caretaker, Joseph Cowsert ("Mr. Cowsert") sought certification from the same organization Starla was certified through, the Alliance of Therapy Dogs ("ATD"). Foxy passed her auditing with flying colors, and she and Mr. Cowsert were certified by ATD as a therapy animal team on January 10, 2025. See Exhibits D and E.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

On or about February 5, 2025, Mr. Cowsert sent a letter to ASH's Director of Rehab Services, Scott Stanbaugh, informing him that Foxy was available to begin providing AAT services to all the forensic patients at ASH. *See* Exhibit F. On February 13, 2025, Plaintiff sent a formal request to his treatment team seeking immediate implementation of the AAT stipulated under the ITDP and requesting a written letter of determination. *See* Exhibit G. On or about March 6, Kindra Ochoa, an ASH Behavioral Health Medical Provided, notified Plaintiff that ASH's "legal counsel" had informed her that they did not need to respond to the request because the matter was "under litigation."

Without Foxy present to perform the tasks that alleviate his symptoms, Plaintiff has experienced extreme distress, anguish, and heightened mental health symptoms including hyper-vigilance, nightmares, flashbacks, sensory overload, increased anxiety, suicidal ideation, and self-injurious stimming behavior; and on numerous occasions since ASH denied Plaintiff's service animal accommodation, he has engaged in self-injurious actions, including head banging and hair pulling, which could have been prevented or immediately interrupted by Foxy.

## II. The Court Should Grant Plaintiff's Motion Because the Facts and Law Strongly Favor Plaintiff's Position

This Court has broad discretion to grant a preliminary injunction in this case. The granting or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See* Senate of Cal. v. Mossbacher, 968 F.2d 974, 975 (9th Cir. 1992).



MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Even when a preliminary injunction requires affirmative action by the enjoined party, courts will grant them where the facts and law merit them. *See, e.g.,* Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399, 14031404 (9th Cir. 1993) (upholding preliminary injunction requiring drug manufacturer to provide drugs to study participants and to inject the drugs into the participants' veins); Sullivan v. Vallejo City Unified Sch. Dist., 731 F. Supp. 947, 959 (E.D. Cal. 1990) (issuing preliminary injunction requiring defendant school district to allow plaintiff student's service dog). Further, the courts have repeatedly granted injunctions, including preliminary injunctions, mandating service animal accommodations for patients residing in locked psychiatric wards. *See* C.L. v. Del Amo Hospital, Inc., 992 F.3d 901 (C.D. Cal. 2024); Tamara v. El Camino Hosp., 964 F. Supp. 2d 1077, 1083–84 (N.D. Cal. 2013); Solan v. Arizona State Hospital, *supra*.

A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (*per curiam*)); *see also* Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Plaintiff is prepared to carry the burden of persuasion here.

A plaintiff seeking injunctive relief under Rule 65, F.R.C.P. must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See* Winter, *supra*, 555 U.S. 7, 20 (2008). Plaintiff prevails on all elements of the Winters test, as demonstrated below:

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**A. Plaintiff is Likely to Succeed on the Merits**

*i.        Plaintiff Will Prevail on His Title II Claim.*

The State is a public entity that provides behavioral health services through its Department of Health Services to the patients at ASH, thus subjecting the State to Title II of the ADA. Title II provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. As such, to prevail on his ADA claim against the State, Plaintiff must show (1) that he is a qualified individual within the meaning of the ADA, (2) that Defendant is a public entity, and (3) that Defendant discriminated against him or that he was otherwise denied the benefits of their services, programs, or activities. *See* Duffy v. Riveland, 98 F.3d 447, 455-56 (9th Cir. 1996).

Plaintiff is likely to succeed on the merits because the ADA provides "clear, strong, consistent, enforceable standards" precluding hospitals from discriminating against persons who use service dogs. 42 U.S.C. § 12101; 28 C.F.R. Pt. 36, App. B at 697. The State excluded Foxy from ASH without making any effort to modify its practices or policies, and without conducting a valid particularized assessment of Plaintiff's needs or request.

The ADA defines a person with a disability as someone with "a physical or mental impairment that substantially limits one or more major activities of such individual." *See* 42 U.S.C. 12102. Plaintiff meets this definition; the Court held in the prior case that Plaintiff meets this definition; and Defendants have repeatedly conceded this fact.

A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 130(b)(7)(i).

The ADA does not "require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 CFR § 35.150(a)(3). However, when a public entity refuses to make a requested accommodation on the above basis, the decision "must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion." *Id.*

The State proffers its 2022 Particularized Assessment letter to feign compliance with the ADA; but this letter was from another administration, and for a different service animal. Even if it could be argued that presenting a nearly 3 year old assessment letter written for a separate service animal complies with the ADA, ASH's 2022 letter never constituted a valid particularized assessment within the framework set by the Court.

Specifically, the Court ordered ASH to "conduct a particularized assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital in accordance with the ADA and the relevant Code of Federal Regulations to determine 1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital; and 2)

Matthew Philip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

whether Foxy specifically (as distinct from "service dogs" generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them, including the probability that injury will actually occur."

In two footnotes, the Court further narrowed its requirements for ASH's assessment: "Defendant's assessment must identify which policies, practices, or procedures are of concern, and explain why each could, or could not, be modified in compliance with the ADA and the relevant Code of Federal Regulations…Reliance on the profile of Forensic Hospital patients is not sufficient. The assessment must consider whether specific patients would have specific difficulties with the present of Foxy." See Exhibit A at 18-19. *(Internal quotes omitted.)*

ASH's particularized assessment letter did not address how Foxy specifically (as distinct from "service dogs" generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, does not address the fact that Plaintiff did not then, does not now, and cannot in the future, because of his PTSD, have a human roommate; it did not provide any evidence or include any assessment of individual patients at Plaintiff's current housing unit, the effect Foxy may have on them, or even argue that Foxy would likely cause them any injury. Instead, the particularized assessment letter weaves a fictional narrative about how Foxy and Plaintiff would be harmful to each other.

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

The State's obligations here are straightforward. With regards to service animals, "[g]enerally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 CFR § 35.136(a). Where a service animal is permitted, it "shall be under the control of its handler," and the public entity "is not responsible for the care or supervision of [the] service animal." 28 CFR §35.136(d), (e). While "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 CFR § 35.130(h). ASH has repeatedly refused to demonstrate how Foxy would fundamentally alter the nature of its programs or services, an administrative and financial burden, or pose a direct threat to patients. Instead, ASH relies entirely on wild speculations to justify its wrongful denial.

Except for Defendants' false and clearly speculative claims of animal abuse, the facts and circumstances underlying Plaintiff's accommodation request, and Defendants' denial thereof, as well as the exceptions they attempt to claim in the latest Denial Letter, are substantively identical to those argued in the prior case. This Court previously denied all of the State's claimed exceptions, and gave the State a generous opportunity to conduct a particularized assessment and potentially recover some of their defenses. Rather than making a good faith attempt to conduct a proper assessment and work with Plaintiff to accommodate his needs, on information and belief, ASH wasted hundreds of thousands of taxpayer dollars paying Roca & Lewis to draft a hit piece which substantively failed to address any of the Court's narrowly drawn concerns about Foxy.

1    The State has given no valid reason why Foxy would fundamentally alter the

2 nature of the services provided at ASH either. That ASH is not open to the public at large

3 remains immaterial; Title II of the ADA still applies to the recipients of state government

4 services at ASH, even if those services are not open to the public. ASH's unspecified

5 "medical and safety reasons" still do not meet the criteria to properly exclude a service

6 animal.

7    And the State still claims without evidence that Plaintiff could not care for Foxy at

8 ASH without substantial staff intervention, but this remains untrue: as the Court found in

9 the prior case, Plaintiff would manage all of Foxy's day-to-day care, and Plaintiff's

10 agents would facilitate any outside services Foxy may require. Staff involvement would

11 be minimal to nonexistent, and "the issues identified by Defendant[s]…would be, at most,

12 a minor inconvenience…and would not amount to *de facto* responsibility for Foxy." *See*

13 Solan v. Arizona State Hospital, *supra*.

14    Further, while ASH cites numerous policies it believes would need to be modified,

15 this is a gross exaggeration. Of the hospitals that Plaintiff is aware of which maintain

16 lawful service animal policies, each have condensed the service animal related provisions

17 into one policy document. There is no reason ASH cannot do the same.

18    Moreover, ASH has been on notice, since the Court issued its injunction in the

19 prior case, that a blanket ban on service animals is illegal. ASH's policies should address

20 this, but they don't: ASH has had 3 years to revise its policies, and despite its entire

21 policy set having gone through at least one review cycle, ASH has refused to fix its

22 illegal anti-service animal policy.

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Additionally, the State has repeatedly miscited the ADA's tether requirements in an attempt to mislead the Court. ASH claimed in its Particularized Assessment letter, and the State has attempted to argue in its now-stricken Motion to Dismiss (Doc. 13) that 28 C.F.R. § 35.136(d) requires a service animal to "have a harness, leash, or other tether." However, the full text of §35.136(d) states, "[a] service animal shall be under the control of its handler. A service animal shall have a harness, leash, or other tether, ***unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (*e.g.*, voice control, signals, or other effective means)." Emphasis added.* This is a very substantial omission on the State's part.

Brad Smith testified that "Foxy performs well on and off leash, [and] consistently responds to her handler's verbal and nonverbal commands…" Doc. 6 at 91:11-12. Joseph Cowsert testified similarly: "She [Foxy] is well received by everyone and is perfectly well behaved in public, on and off leash." Doc. 6 at 96:20-21. Foxy does not need to be tethered for Plaintiff to maintain control of her, in fact or in law, and ASH cannot justify its denial by the mere speculation that Plaintiff might not be able to control her.

The fact of the matter is that Foxy's presence will not fundamentally alter the ASH's services, nor will it create an administrative or fiscal burden on the State. Likewise, Foxy does not pose a direct threat to anyone at ASH; rather, she is a "friendly and well-adjusted animal, [who] has acquired all the skills necessary to effectively assist her handler." Doc. 6 at 91:14-15.

### ii.    Plaintiff Will Not Rape, Murder, or Eat Foxy

Defendants maintain the inane stance that their exclusion of Foxy is valid based on the contrived claim that Plaintiff might rape, murder, and eat his service dog. Plaintiff has never raped, murdered, eaten, or otherwise abused any canid, let alone his beloved service animal. These allegations are categorically false, and Defendants know they are false. The original Foxy passed away peacefully in her sleep at over 16 years of age—an impossibility if she had suffered the abuse Defendants allege. It is equally absurd to suggest that Plaintiff would invest over $60,000 to clone, transport, and train a successor service animal if his intent was to harm her.

If Defendants truly believed Plaintiff posed a danger to canids, they would not have permitted his participation in Animal-Assisted Therapy with Starla, which occurred without incident. Yet, despite ASH's own policies acknowledging AAT's therapeutic benefits, the State now refuses to allow Foxy onto the ASH campus—even for short visitations or court-ordered therapy. This blatant contradiction underscores the pretextual nature of Foxy's exclusion from ASH, and further exposes the State's malice in refusing even the most basic accommodations.

The ADA provides a limited set of exemptions from its service animal access mandate, and baseless allegations of bestiality are not among them. The direct threat exemption ASH attempts to invoke applies only where a person or service animal poses a danger to the public—not where a handler is speculatively deemed a risk to his own service animal. Moreover, the burden is on Defendants to prove an actual, imminent threat. *See* 28 C.F.R § 35.139.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    Even if ASH could sustain its burden to prove that Plaintiff posed a direct threat to

2    Foxy—which it cannot—it would then be required to assess whether the "...provision of

3    auxiliary aids or services will mitigate the risk." *Id.* Yet, at no point have Plaintiff's

4    providers suggested or diagnosed him with a zoophilic disorder, which is a treatable

5    condition under the DSM-V-TR. If ASH truly believed its own claims, its failure to treat

6    Plaintiff for such a disorder would itself constitute gross negligence. Instead, these

7    allegations are nothing more than a bad-faith attempt to evade ADA compliance and

8    justify the State's ongoing discrimination.

9    **B. Plaintiff is Likely to Suffer Irreparable Harm Absent the Relief Sought**

10   Deprivation of Plaintiff's service animal is *per se* irreparable harm. See Chalk v.

11   U.S. Dist. Court Cent. Of California, 840 F.2d. 701, 709 (9th Cir. 1988) (discussing the

12   "psychological and psychological distress" that disability discrimination causes as a

13   substantial and irreparable injury); Sullivan, *supra* ("[e]ach day she is forced to be

14   separated from her service dog...his usefulness to her is diminished. As a consequence of

15   defendant's conduct, plaintiff's ability to function as an independent person...is injured

16   daily."); see also Tamara, *supra* ("Discriminatory deprivation of a service animal is

17   irreparable harm...Every day Tamera is away from [her service dog] Ingis, she is not

18   only deprived of her independence, but she loses time training and bonding with Inglis,

19   resulting in future loss of independence...El Camino's refusal to admit Inglis into the

20   psychiatric ward, without substantial evidence of a direct threat to health and safety, is

21   imminent, irreparable harm.")

22   The goals of the ADA include assuring individuals with disabilities enjoy "quality

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. §12101. Injuries to individual dignity and deprivations of civil rights constitute irreparable injury. *See* Chalk, *supra*; Sullivan, *supra* (injury to function as independent person constitutes irreparable injury). Plaintiff and others similarly situated face great harm to their overall independence, equality, and dignity as a result of ASH's illegal blanket service animal ban. In comparison, ASH faces only minor administrative inconvenience mandated by law in accommodating Foxy. *See* Exhibit A at 9:15-17.

The injury to Plaintiff is grave and irreparable: Plaintiff will be deprived of Foxy and therefore continue to be impaired in his psychosocial functioning, and Foxy's value as a service animal will jeopardized if she does not receive ongoing maintenance training with Plaintiff. The enmity between Plaintiff and his treatment team resulting from the exclusion of Foxy has also annihilated their therapeutic relationship, and Plaintiff's ability to receive adequate therapeutic services from them. *See* Exhibit H at 9.

As the Court noted in its prior injunction, "[t]he deprivation of a prisoner's[1] constitutional right to adequate medical care is sufficient to establish irreparable harm [and] [e]motional injuries, psychological distress, and risk of suicide may constitute irreparable harm." *See* Porretti v. Dzurenda, 11 F.4th 1037 (9th Cir. 2021) (citations omitted). Absent a preliminary injunction issuing, Plaintiff will likely suffer additional emotional and self-inflicted physical injuries, psychological distress, and the ever-present risk of suicide.

---

[1] The Court also noted that Plaintiff is not a "prisoner" for purposes of his ADA claim.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

### C. The Requested Injunction is in the Public Interest

The public interest mostly concerns the injunction's impact on nonparties rather than parties. *See* Porretti, *supra*. Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* The Court must "balance the interests of all parties and weigh the damage to each." *See* Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1203 (9th Cir. 1980). The Court must also consider whether there exists some critical public interest that would be injured by the grant of preliminary relief. *See* Independent Living Center of Southern California, Inc. v. Maxwell-Jolly, 572 F.3d 644, 659 (9th Cir. 2009)(vacated in part, on other grounds). When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *See* Porretti, *supra*.

The public has a strong interest in promoting equality of all persons. *See* Concerned Parents to Save Dreher Park Center v. City of West Palm Beach, 846 F. Supp. 986, 993 (S.D. Fla.1994); *see also* Tamara, *supra*. While Plaintiff's claim is brought pursuant to the ADA, rather than a constitutional provision, it is always in the public interest to see the laws made in pursuance of the Constitution faithfully executed. *See* Solan v. Arizona State Hospital, *supra* (citing Accord United States v. Raines, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."); Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

Matthew Philip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

### D.  The Balance of Equities Tips Sharply in Plaintiff's Favor

To determine the balance of equities in a preliminary injunction request, courts "must balance the competing claims of injury and must consider the effects on each party of the granting or withholding of the requested relief," including "the public consequences" of issuing an injunction. *See* Winter*, supra*, 555 U.S. at 24, *internal quotations omitted*; Indep. Living Ctr. of S. Cal., *supra* 572 F.3d 644, 657-58 (9th Cir. 2009).

In this case, the balance of hardships tips sharply in Plaintiff's favor. As it stands, Plaintiff risks serious injury to his mental health, psychosocial functioning, and independence without Foxy's assistance, and with his mental health treatment compromised, risks (and has indeed suffered) an unnecessarily prolonged hospitalization, and protracted involvement in the criminal justice system.

On the other hand, Defendants risk only a minor administrative inconvenience mandated by law. When a defendant is being asked to follow the law, it cannot claim hardship. Notwithstanding, it should not be hardship for ASH to do what other hospitals have done. Many hospitals have implemented lawful service animal policies. *See* Exhibits I through M, inclusive.

Moreover, ASH's own policy, signed by Defendant Sheldon and titled "Animal Assisted Activities & Animal Assisted Therapies," promotes animal-patient interaction and establishes guidelines for the use of therapy dogs at ASH. See Exhibit N. In fact, ASH maintains that animal assisted therapy *will* be provided to Plaintiff as soon as a therapy dog can be found, unless, for some undisclosed reason, that therapy dog is Foxy.

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

### III. Conclusion

The State has not merely discriminated against Plaintiff—it has weaponized false, grotesque allegations to circumvent their legal obligations under the ADA. The State's allegations are not only defamatory—they are a calculated attempt to dehumanize Plaintiff, and portray him as unworthy of the basic dignity guaranteed to all individuals. This is not merely a failure of legal compliance; it represents a total moral failure, a breach of the public trust, and a gross abuse of state power. ASH will suffer no measurable harm by accommodating Foxy and respecting Plaintiff's human dignity, whereas Plaintiff will continue to suffer irreparable harm if an injunction does not forthwith issue. For all the foregoing reasons, Plaintiff moves the Court to issue a preliminary injunction restraining and enjoining Defendants, their successors, officers, employees, agents, and all other persons acting in concert with them, from denying Foxy entry to the grounds and facilities of ASH, and from otherwise denying Plaintiff the accompaniment of Foxy during the pendency of this suit.

As the State has made it clear by its actions that it has no intention of complying with the ADA or the prior orders of this Court, Plaintiff respectfully requests that the Court afford the State no latitude to simulate compliance, and instead issue an injunction explicitly commanding ASH to open its doors to Foxy.

**SIGNED, SEALED, AND DATED** this 13th day of March, 2025.



**Matthew Phillip Solan**
Plaintiff in *Pro. Per.*

**<u>EXHIBIT A</u>**

ASH

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan, | No.  CV 20-02209-PHX-JJT (MHB) |
| Plaintiff, | |
| v. | **ORDER** |
| Arizona State Hospital, *et al.*, | |
| Defendants. | |

Pending before the Court is a Motion for Preliminary Injunction (Doc. 24), filed by Plaintiff.[1]

**I.    Background**

On November 12, 2020, Plaintiff Matthew Phillip Solan, who is currently confined in the Arizona State Hospital (ASH), filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. Subsequently, Plaintiff filed a First Amended Complaint (Doc. 9). On screening the First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a claim pursuant to the Americans with Disabilities Act (the ADA) and Arizona's state analogue (the AzDA) in Count Two against the Arizona State Hospital, and directed it to answer the claim. (Doc. 11.) The Court dismissed the remaining claims and

---

[1] Defendant has also filed a Motion to Dismiss (Doc. 14), and Plaintiff has filed several motions for various injunctive relief styled as: a "Motion to Show Cause" (Doc. 35); a "Motion for Relief and Notice of Non-Inclusion of Exhibits Due to Obstruction by Defendant" (Doc. 46); and a Motion for Temporary Restraining Order (Doc. 62). Because these filings are either moot or can be summarily denied, the Court will discuss them after its analysis of Plaintiff's Motion for Preliminary Injunction.

1   Defendants. (*Id.*) Plaintiff subsequently withdrew the AzDA portion of his First Amended

2   Complaint. (Doc. 36.)

3   **II.   Motion for Preliminary Injunction**

4        "A preliminary injunction is 'an extraordinary and drastic remedy, one that should

5   not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"

6   *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520

7   U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555

8   U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy

9   never awarded as of right").

10       A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil

11  Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer

12  irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his

13  favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council,*

14  *Inc.*, 555 U.S. 7, 20 (2008).  When the government opposes a preliminary injunction, "[t]he

15  third and fourth factors of the preliminary-injunction test—balance of equities and public

16  interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities"

17  concerns the burdens or hardships to a complainant compared with the burden on the

18  government defendants if an injunction is ordered. *Id.* The public interest mostly concerns

19  the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless,

20  "[i]t is always in the public interest to prevent the violation of a party's constitutional

21  rights." *Id.* (citation omitted).

22       Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction,

23  injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very

24  serious damage will result' that is not 'capable of compensation in damages,' and the merits

25  of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017)

26  (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

27  (9th Cir. 2009)). Further, under the Prison Litigation Reform Act,[2] injunctive relief must

28  _____

        [2] Although Plaintiff is not a "prisoner" for purposes of his ADA claim, he is a

1  be narrowly drawn and be the least intrusive means necessary to correct the harm. 18

2  U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir.

3  2000).

4      The Court lacks jurisdiction over claims for injunctive relief that are not related to

5  the claims pleaded in the operative complaint. *See Pac. Radiation Oncology, LLC v.*

6  *Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015) ("[w]hen a plaintiff seeks

7  injunctive relief based on claims not pled in the complaint, the court does not have the

8  authority to issue an injunction"); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th

9  Cir. 1994) (per curiam) (a party seeking injunctive relief must establish a relationship

10 between the claimed injury and the conduct asserted in the complaint); *see also Prince v.*

11 *Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009)

12 (unless a claim concerns access to the courts, the Plaintiff must show a nexus between the

13 relief sought and the claims in the lawsuit.).

14     "The deprivation of a prisoner's constitutional right to adequate medical care is

15 sufficient to establish irreparable harm [and] [e]motional injuries, psychological distress,

16 and risk of suicide may constitute irreparable harm." *Porretti*, 11 F.4th at 1050 (citations

17 omitted).

18 **III.  Relevant Facts**

19     Plaintiff is a 31 year-old patient at ASH's Forensic Hospital after being adjudicated

20 "Guilty Except Insane" by the Coconino County Superior Court.[3] Plaintiff suffers from "a

21 number of physical, neurological and psychiatric disabilities, including a cerebral

22 dysfunction manifesting as Autism Spectrum Disorder, Post-Traumatic Stress Disorder

23 (PTSD), Bipolar Disorder, and a Chronic Inflammatory Response Syndrome," with which

24 _____

25 prisoner for purposes of the PLRA. *See* Doc. 11 at 1-2 n.1 (noting that pursuant to 28
   U.S.C. § 1915A(c), "the term 'prisoner' means any person incarcerated or detained in any

26 facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for,
   violation of criminal law . . . .").

27     [3] *See* Coconino County Superior Court case no. CR2019-00347 (*available at*

28 https://apps.supremecourt.az.gov/publicaccess/minutes.aspx, search "Court" for
   "Coconino County Superior" and "Case Number" for "CR-201900357"; select hyperlink
   for "3/12/2020 Minute Entry") (last accessed Mar. 11, 2022).

he was—prior to his arrest—assisted by a service dog, Foxy, a 17 pound, 12-year old Pomeranian. (Doc. 24 at 3.) Foxy assisted Plaintiff with these disabilities by "alert[ing] Plaintiff of incipient panic attacks and manic episodes, assit[ing] him in leaving overwhelming situations, alert[ing] him to the presence of other people, interrupt[ing] his impulsive and destructive behaviors, help[ing] Plaintiff find lost items, wak[ing] him up when he's severely depressed and buffer[ing] him in crowded situations." (*Id.* at 4.) Foxy also "relieves panic attacks and enhances Plaintiff's socialization and coping skills through a type of physical touch called grounding." (*Id.*) Prior to acquiring Foxy, Plaintiff "had extreme difficulty interacting with people in person, resulting in self-isolation," and Foxy "is the primary reason Plaintiff began tolerating in-person social interactions." (*Id.*)

Upon his arrest, Foxy was separated from Plaintiff. On April 1, 2020, Plaintiff was transferred to the Forensic Hospital at ASH. The Forensic Hospital is a secure facility that exclusively houses patients who have been court ordered for pre- or post-trial treatment as part of criminal proceedings. (Doc. 33 at 1-2.) The Forensic Hospital has strict protocols to "ensure the safety of patients, staff, and the public," including: ensuring that patient dormitories are locked, that patients are accompanied at all times by staff members when moving throughout the facility, and that "transportation safety devices" or GPS monitors are applied whenever patients are transported off-site to prevent their escape. (*Id.* at 2.) Visitation can only occur at designated times and locations, and it is closely monitored by staff. (*Id.*) Patients are not allowed to keep hygiene or food items in their dormitories in order to prevent the patients from harming themselves (by, for example, swallowing unsafe items) or their use as weapons. (*Id.* at 4.) Patients interact with each other each day during set meal times in the dining area, while moving throughout the facility, and while in the shared day room, care areas, and outdoor open-space area. (*Id.* at 5.) The Forensic Hospital "controls its patient population by maintaining an orderly and disciplined environment through a strict schedule of programming" and regulatory functions, including: medication administration, active treatment programs, rehabilitation activities, and one-on-one line-of-sight patient observation. (*Id.* at 6.)

1    On April 3, 2020, Plaintiff requested that Foxy be allowed to accompany him at

2    ASH. (Doc. 24 at 30.) Plaintiff indicated that he would "provide any

3    medical/vaccination/licensing documentation that is requested," and that Foxy's

4    "transportation to ASH, and all of her food, grooming, and sanitation products w[ould] be

5    provided by [Plaintiff's] family." (*Id.*). Plaintiff stated that he "w[ould] take full

6    responsibility for all of [Foxy's] needs and ensure that this accommodation is a minimal

7    burden to the facility." (*Id.*).

8    On April 21, 2020, ASH's Chief Compliance Officer, Margaret McLaughlin, after

9    "review[ing] the [ADA] regulations on service animals as part of its consideration of

10   [Plaintiff's] request," denied Plaintiff's request, for the following reasons:

11
12       First, "[w]hile [ASH] falls under the definition of a 'public entity,' the
         facilities maintained by the Hospital, including the Forensic Hospital, are
         secure facilities and not accessible to the general public. Furthermore, the
13       Hospital provides health care services at its facilities to individuals who are
         under court order for treatment (i.e. the Hospital does not provide health care
14       services to the public at large)." Second, "[t]here are legitimate medical and
         safety reasons to exclude a service animal from the Hospital." Third, "[t]he
15       presence of a service animal within an [ASH] facility would require the
         alteration of services, programs, and/or activities and would fundamentally
16       alter many typical functions of the Hospital." And fourth, "[t]he proper
         handling of a service animal, including the toileting, feeding, grooming, and
17       veterinary care could not feasibly be provided at the sole responsibility of
         [Plaintiff]. Such activities would require a certain degree of staff resources
         and coordination."
18

19   (Doc. 24 at 32). Plaintiff appealed the denial, but was informed on June 5, 2020, that ASH's

20   denial was "precedent." (*Id.* at 5). On June 10, 2020, plaintiff appealed to the Patient's

21   Rights Advocate for assistance, but was told that "her hands were tied." (*Id.*). Plaintiff then

22   sought the assistance of the Arizona Center for Disability Law, which, on September 18,

23   2020, sent a letter on his behalf asking ASH to reconsider its denial. (*Id.* at 5-6). On

24   October 2, 2020, ASH responded that it was not willing to permit Plaintiff to bring Foxy

25   into the Forensic Hospital. (*Id.* at 6.)

26   This lawsuit, and Plaintiff's Motion for Preliminary Injunction, followed. In his

27   Motion, Plaintiff states that as a result of not having Foxy with him he "has had increasing

28   difficulty interacting with other patients and socializing in group settings," and "his ability

1   to engage in group programming has diminished to the point where Plaintiff is barely

2   engaging in any treatment programs . . . ." (Doc. 24 at 6.) Without Foxy, "Plaintiff's severe

3   social anxiety has returned, causing Defendants to attempt, unsuccessfully, to treat

4   Plaintiff's anxiety with drugs . . . ." (*Id.* at 15.) Plaintiff also alleges that "Foxy's value as

5   a service animal is put at risk if she does not receive her daily training," and that "the loss

6   of relationship with Foxy, and loss of independence and psychological functioning . . . is

7   also gravely injuring [Plaintiff's] health and his ability to receive adequate treatment." (*Id.*

8   at 14-15.) Accordingly, Plaintiff seeks an order directing Defendant "to admit service dogs

9   into the hospital unless and until it proves by substantial evidence that a particular dog

10  poses a 'direct threat' to the health and safety of others that cannot be mitigated . . . ." (*Id.*

11  at 17.)

12  **IV.    Discussion**

13          **A.    Likelihood of Success on the Merits**

14          Title II of the ADA provides that "[n]o qualified individual with a disability shall,

15  by reason of such disability, be excluded from participation in or be denied the benefits of

16  the services, programs, or activities of a public entity, or be subject to discrimination by

17  any such entity." 42 U.S.C. § 12132. As such, to prevail on his ADA claim, Plaintiff must

18  demonstrate 1) that he is a qualified individual within the meaning of the ADA, 2) that

19  Defendant is a public entity, and 3) that Defendant discriminated against him or that he

20  was otherwise denied the benefits of Defendant's services, programs, or activities. *Duffy v.*

21  *Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996).

22          There is no dispute between the parties as to either Plaintiff's status as a qualified

23  individual with a disability,[4] or to ASH's status as a public entity.[5] Accordingly, the Court's

24  discussion will be limited to whether Plaintiff has met his burden of showing that

25

26  _____

27          [4] *See e.g.* Doc. 33 at 4 (Defendant noting Plaintiff's diagnoses and conceding that
    Plaintiff "can likely establish that he is a qualified person with a disability.")

28          [5] *See e.g.* Doc. 14 at 3 (noting that ASH is operated by the State of Arizona, as part
    of the Department of Health Services).

1   Defendant discriminated against him or that he was otherwise denied the benefits of

2   Defendant's services, programs, or activities.

3       "A public entity shall make reasonable modifications in policies, practices, or

4   procedures when the modifications are necessary to avoid discrimination on the basis of

5   disability, unless the public entity can demonstrate that making the modifications would

6   fundamentally alter the nature of the service, program, or activity." 28 CFR § 130(b)(7)(i).

7   Further, the ADA does not "require a public entity to take any action that it can demonstrate

8   would result in a fundamental alteration in the nature of a service, program, or activity or

9   in undue financial and administrative burdens." 28 CFR § 35.150(a)(3). However, when a

10  public entity refuses to make a requested accommodation on the above bases, the decision

11  "must be made by the head of a public entity or his or her designee after considering all

12  resources available for use in the funding and operation of the service, program, or activity,

13  and must be accompanied by a written statement of the reasons for reaching that

14  conclusion." *Id.* Additionally, while "[a] public entity may impose legitimate safety

15  requirements necessary for the safe operation of its services, programs, or activities," it

16  "must ensure that its safety requirements are based on actual risks, not on mere speculation,

17  stereotypes, or generalizations about individuals with disabilities." 28 CFR § 35.130(h).

18      With regards to service animals, "[g]enerally, a public entity shall modify its

19  policies, practices, or procedures to permit the use of a service animal by an individual with

20  a disability." 28 CFR § 35.136(a). Where a service animal is permitted, it "shall be under

21  the control of its handler," and the public entity "is not responsible for the care or

22  supervision of [the] service animal." 28 CFR §35.136(d), (e).[6]

23  _____

24      [6] Citing the Appendix to Part 35 of the Code of Federal Regulations, Plaintiff asserts
    that "Title II entities have the same legal obligations as Title III entities" with regards to
25  service animals. (Doc. 24 at 8). While Plaintiff is correct that the *1991 version* of Part 35
    required Title II entities— such as Defendant—to adhere to the Title III regulations with
26  regard to service animals, this was because "there [was] no specific language in the 1991
    Title II regulation concerning service animals." (*See* App'x A to Title 28, Part 35 of the
27  Code of Federal regulations). However, the subsequent adoption of 28 CFR § 35.136 has
    obviated this requirement, and the Appendix now recognizes that although there are
28  similarities between the requirements for Title II entities and Title III entities, the Title II
    requirements are distinct from the Title III requirements. (*See Id.*, noting that the
    Department of Justice "proposed incorporating the title III regulatory language of

- 7 -

1    Defendant argues that Plaintiff is unlikely to succeed on the merits of his claim

2    because Defendant denied Plaintiff's request for two legally permissible reasons.  First,

3    Defendant asserts that "Plaintiff could not feasibly perform any of the tasks involved in

4    caring for Foxy independently" and that "[a]ll such tasks would require assistance from

5    ASH employees." Second, Defendant argues that permitting Foxy to join Plaintiff would

6    fundamentally alter the nature of ASH's services, programs, or activities, and would result

7    in undue financial and administrative burdens.

8                    *i.*      *Responsibility for Foxy*

9    Defendant asserts that ASH patients are not allowed to keep food or hygiene items

10   in their dormitories because "patients could use these items to harm themselves . . . or as

11   weapons to harm others." (Doc. 33 at 4.) As such, "any time Plaintiff would need food or

12   [to] groom his service animal, or to clean up after a toileting accident, he would require the

13   assistance of ASH staff in retrieving the items necessary to perform the task, monitoring

14   Plaintiff while he had the items in his possession (if [the] items had an inherent risk or

15   [were] clinically indicated), and returning the items when he was finished using them." (*Id.*

16   at 4-5.) Similarly, "any time Plaintiff needed to take the dog for exercise or outside to

17   relieve herself, ASH staff would need to be summoned and would need to escort Plaintiff

18   during the entirety of the time," and "any time Plaintiff's service animal would require off-

19   site veterinary treatment, ASH staff would be needed to physically deliver the service

20   animal to Plaintiff's family member or friend." (*Id.* at 5.) This would also require

21   coordination between ASH staff and Plaintiff's family member or friend upon the animal's

22   return. (*Id.*) As such, Defendant asserts that "[i]n essence, ASH staff would have to be

23   involved in virtually every aspect of caring for the service animal, and, therefore, ultimately

24   would be responsible for the care and supervision of the animal." (*Id.*). Plaintiff responds

25   that he "has on-unit storage for his hygiene items, and could easily store dog food with the

26   hygiene items." (Doc. 40 at 4.) Plaintiff further alleges that ASH patients "can access the

27   hygiene storage area any time they want," and that "[c]leaning spray and paper towels are

28   § 36.302(c) into [the] new § 35.136(a)," but that the final rule included "some
     modifications.").

available to patients at all times." (*Id.*) Plaintiff also states that his shampoo is formulated for both humans and dogs, and that as such he "can give [Foxy] [a bath] at the same time [Plaintiff] takes a shower…" (*Id.*) Plaintiff also asserts that he could deliver Foxy to friends or family in the lobby himself. (*Id.*) He states that the lobby "is secure and Plaintiff has been escorted there on multiple occasions to meet with a notary public," and that "Foxy only sees the vet twice annually for checkups . . . ." (*Id.*). Plaintiff argues that the only "actual modification in its practices that ASH would have to make is allowing Plaintiff and Foxy into the mall a few extra times each day for Foxy to relieve herself." (*Id.*) However, "there are already allotted times throughout the day that patients can go out and walk around the mall," and "some patients need to go outside and cool off when they get upset" outside of the normal times and "[s]taff will let those patients out at any time of the day and stay outside with them . . . ." (*Id.* at 4-5.) As such, Plaintiff asserts that "[s]taff involvement would be minimal," he "will be in charge of virtually every aspect of caring for [] Foxy and will ultimately be responsible for her care and supervision." (*Id.* at 5.)

Of the issues identified by Defendant, Plaintiff has demonstrated that they would be, at most, a minor inconvenience for Defendant, and would not amount to de facto "responsibility" for Foxy. Rather, it appears that Defendant would only be required to do what it already does (e.g., provide access to the storage area when requested), and that the only difference would be the *purpose* of the access (i.e. for retrieval of dog food, rather than human food). Accordingly, on this record, Defendant has failed to demonstrate that it would be responsible for Foxy's care or supervision in violation of 28 CFR § 35.136(d).

*ii.    Fundamentally Alter/Undue Burden*

Defendant asserts that "[p]atients in the Forensic Hospital interact with each other on a daily basis during set meal times in the dining area; while moving throughout the facility; and while in the unit day room, shared patient care areas, or outdoor open-space area." (Doc. 33 at 5.) The patients are "closely monitored," and "[i]ncidents involving patients (which include assaultive or other concerning behavior) are recorded and tracked on a daily basis." (*Id.* at 6.) As of July 21, 2020, 90% of the patients had been adjudicated

1    "guilty except insane." (*Id.*) The Forensic Hospital "controls its patient population by
2    maintaining an orderly and disciplined environment through a strict schedule of
3    programming" and regulatory functions, including: medication administration, active
4    treatment programs, rehabilitation activities, and one-on-one line-of-sight patient
5    observation." (*Id.*) Defendant argues that "[g]iven the profile of Forensic Hospital patients,
6    a small dog such as Plaintiff's service animal likely would be at risk of harm," "likely
7    would be disruptive to patients and interfere with their ability to comply with the strict
8    programming requirements," and "could be very distracting for staff to have to control and
9    manage patients while a small dog moved throughout the facility, which would create
10   opportunities for patients to engage in harmful behaviors towards staff members, other
11   patients, or themselves." (*Id.*) Further, Defendant asserts that "[t]here would be no practical
12   way to separate the other patients from Plaintiff's service animal," and that the "additional
13   demands on ASH's staff's time for caring for Plaintiff's service animal would divert
14   attention away from other necessary and regulatory functions." (*Id.* at 7.) As such,
15   Defendant posits that "allow[ing] a small dog to live at the Forensic Hospital would
16   fundamentally alter the nature of the services, activities, and programs it provides and
17   would be an undue administrative burden." (*Id.*)

18       Plaintiff responds that "[a]ssaults are infrequent on the forensic campus, especially
19   on the unit Plaintiff resides on, which houses primarily high functioning individuals," and
20   he cites statistics gathered by ASH indicating that "there are significantly higher rates of
21   assault at the civil hospital than at the forensic hospital." (Doc. 40 at 5.)[7] Plaintiff also
22   asserts that the Forensic Hospital is "nowhere near as regimented as Defendant makes it
23   out to be," noting that many of the "floor-level staff" are "senior citizens," and that they
24   "carr[y] no weapons or chemical deterrents." (*Id.* at 5-6). Rather, "[p]atients basically
25   manage themselves." (*Id.* at 5). Plaintiff also posits that Foxy would not be disruptive, but

26
27       [7] *See* Doc. 40 at 14-15, indicating that the Civil Hospital reported 39 assaults in
     March and 45 in April 2020, while the Forensic Campus reported 10 assaults in March and
28   2 assaults in April 2020. Further, the statistics indicate that "less than 1% required first aid
     or medical attention," and that the majority of these incidents were caused by a small
     handful of individuals.

- 10 -

1    would "mind her business while confined at ASH the same way she does in the stores,

2    supermarkets, restaurants, airplanes and other public places that Plaintiff has taken her."

3    (*Id.* at 6).

4         As an initial matter, even assuming *arguendo* that Foxy's presence would create an

5    undue *administrative* burden, Defendant makes no argument that it would also create an

6    undue *financial* burden. The language of 28 CFR § 35.150(a)(3) is conjunctive; an

7    accommodation is unreasonable if it results in "undue financial _and_ administrative

8    burdens." Because Defendant has not argued, let alone demonstrated, that Foxy's presence

9    would result in an undue financial burden, it can find no solace in 28 CFR § 35.150(a)(3)

10   "undue burdens" clause.

11        Further, while Defendant's safety concerns are legitimate, the ADA requires that it

12   demonstrate any requirements flowing from those concerns "are based on actual risks, not

13   on mere speculation, stereotypes, or generalizations about individuals with disabilities."

14   28 CFR § 35.130(h). Relying on the "profile of Forensic Hospital patients" to posit that

15   Plaintiff's service animal would be disruptive appears to run headlong into this prohibition,

16   and is precisely the sort of "speculation, stereotypes, or generalizations" that the ADA

17   seeks to remedy. Moreover, were Foxy permitted in ASH, she would be, by law, under

18   Plaintiff's control, and, if Plaintiff failed to control Foxy, ASH would have grounds for

19   removing Foxy. 28 CFR § 35.136(b)(1). Such "control" would naturally extend to the

20   effect of Foxy on the other patients at ASH, and, if Foxy could not be controlled such that

21   she did not interfere with the rights and abilities of ASH's other patients to receive their

22   treatment, ASH would have grounds to remove her. *Id.* However, without reference to any

23   specific disruption that Foxy *would* cause—as opposed to what Foxy is, as Defendants put

24   it, "likely" to cause—Defendant has failed to demonstrate that Foxy would unreasonably

25   endanger ASH patients, staff, or visitors.

26        Finally, on the record presented, Defendant has not demonstrated that Foxy's

27   presence would result in a "fundamental alteration" of ASH's services, programs, or

28   activities. The Forensic Hospital would remain a Forensic Hospital whether Foxy was

present or not; the Court is unable to see how any of the programs and services Defendant refers to would cease to be if a service dog was present. Presumably, an anger management course, for example, would remain an anger management course regardless of whether a service dog was present. And, as noted, to the extent that Foxy's presence or behavior was so disruptive as to fundamentally alter ASH's services, programs, or activities, ASH would have grounds for removing Foxy. But merely speculating that Foxy's presence would cause such an alteration without reference to any specific concerns (such as the diagnosed inability of other patients to engage in treatment with a service animal present, or that certain patients have a documented history of violence towards animals) is insufficient under the ADA. 28 CFR § 35.130(h). Because Defendant did not elaborate on how Foxy's presence would fundamentally alter its services, programs, or activities in its response to Plaintiff's April 3, 2020 request, and because Defendant has failed to demonstrate that the concerns it cites are sufficient under the ADA to prohibit Plaintiff's service dog, the Court finds that, on the record presented thus far, Plaintiff has demonstrated that he is likely to succeed on the merits of his ADA claim.

## B. Irreparable Harm

Defendant asserts that it "is unclear whether the injunctive relief Plaintiff seeks will actually prevent his alleged injury" because Plaintiff has stated that he "ha[s] no desire to assimilate into the collective or join 'society' or 'civilization'" and is "completely fine with limiting [his] interactions with [his] own species to occasional encounters." (Doc. 33 at 8) (*quoting* Doc. 24 at 3-4).) As such, Defendant argues that "it is doubtful that [Plaintiff's] refusal to participate in treatment is solely a result of not having his service animal, or that [Plaintiff] would behave any differently if he had her with him." (*Id.* at 9.) Defendant also argues that ASH did not separate Plaintiff from Foxy, and that Plaintiff has not been diligent in seeking Foxy's return. (*Id.* at 7-8.)

As an initial matter, the fact that ASH did not initially separate Foxy from Plaintiff is of no moment. Plaintiff is not seeking relief for what occurred prior to his arrival at ASH, but is instead seeking relief for ASH's refusal to allow Foxy to accompany him. Further,

the Court finds that Plaintiff has been diligent in seeking to be reunited with Foxy. Plaintiff asserts, and Defendant does not contest, that he sought to be reunited with Foxy during his pre-trial incarceration, and Plaintiff made his initial request to ASH to allow Foxy to accompany him within two days of his arrival at ASH. Thereafter, he appealed ASH's denial of his request through several avenues, and only when those other avenues had been exhausted did he file this lawsuit and Motion for Preliminary Injunction. This is not undue delay.

Further, Defendant essentially only questions Plaintiff's sincerity in whether he will engage in treatment should Foxy be allowed to accompany him, but does not address Plaintiff's argument that "Foxy's value as a service animal is put at risk if she does not receive her daily training," and that "the loss of relationship with Foxy, and loss of independence and psychological functioning . . . is also gravely injuring [Plaintiff's] health and his ability to receive adequate treatment." (*Id.* at 14-15.) These injuries are independent of Plaintiff's engagement in treatment and are sufficient to demonstrate irreparable harm absent injunctive relief. *Porretti*, 11 F.4th at 1050 ("[e]motional injuries, psychological distress, and risk of suicide may constitute irreparable harm.") (internal citations omitted); *Sullivan v. Vallejo City Unified School Dist.*, 731 F. Supp. 947, 961 (E.D. Cal. 1990) (deprivation of service dog diminishes individual independence and constitutes "grave and irreparable injury").

**C.    Balance of Equities/Public Interest**

Defendant asserts that requiring it to admit Foxy would "cause a significant administrative burden, and a fundamental alteration of the Forensic Hospital's services, programs, and activities in treating its patients and maintaining a safe and orderly environment." (Doc. 33 at 9.) Defendant further asserts that requiring it to admit Foxy "would set a precedent for other forensic hospitals, and potentially correctional institutions, requiring them to allow service animals to live within their facilities and eroding their defenses under the ADA." (*Id.*) Defendant also posits that many of its functions "are similar

to the functions that correctional facilities perform," and that it should thus be granted "wide-ranging deference" in its decisions in the same way that prisons.

The Forensic Hospital is not a prison, its patients are not prisoners, and while it is granted at least some deference in the decisions it makes, that deference is not absolute. As discussed, Defendant has failed to demonstrate that Foxy's presence would "fundamentally alter" the nature of the Forensic Hospital, or that it would otherwise unduly burden Defendant. In contrast, Plaintiff has sufficiently demonstrated that he is likely to suffer irreparable injury absent a preliminary injunction. That such an injunction might create "precedent" is not as ominous as Defendant appears to suggest; rather, such "precedent" would only constitute affirmation that public entities must comply with Title II of the ADA. Forensic hospitals, correctional institutions, and any other public entities will remain free to deny a service dog so long as such denial complies with the ADA and its attendant regulations. And while Plaintiff's claim is brought pursuant to the ADA, rather than a constitutional provision, the Court finds that it is always in the public interest to see its laws faithfully executed. *Accord United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party' s constitutional rights."); *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F. Supp. 986, 993 (S.D. Fla. 1994) (public has strong interest in promoting the equality of all persons). Accordingly, the Court finds that the balance of equities and the public interest tip in Plaintiff's favor.

**V.      Injunction**

Because the Court concludes that Plaintiff has sufficiently demonstrated his entitlement to a preliminary injunction, the Court turns to the form of that injunction. The Court is mindful that under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

1    The Court is further mindful that the ADA does not *require* that a public entity admit

2   service dogs. Rather, the admission of service dogs to a public entity under the ADA is a

3   general requirement subject to several exceptions. A public entity properly refuses to admit

4   a service dog when it is "out of control" and its handler "does not take effective action to

5   control it," 28 CFR § 35.136(b)(1), the animal is not housebroken, 28 CFR § 35.136(b)(2),

6   or when the admission of the animal "would result in a fundamental alteration in the nature

7   of a service, program, or activity or in undue financial and administrative burdens." 28 CFR

8   § 35.150(a)(3).

9    The Court is also mindful that a great deal of time has elapsed since Plaintiff first

10   requested from ASH that Foxy be allowed to accompany him; in particular, Plaintiff

11   indicates that he has been moved to a different unit of the Forensic Hospital and now has a

12   roommate. (Doc. 62). As such, the possibility exists that the particulars of Plaintiff's ability

13   to care and be responsible for Foxy may have materially changed, and/or that the programs,

14   services, and activities provided by ASH at Plaintiff's new unit may be materially different

15   from those available in April 2020 and thus impact whether Foxy's presence would now

16   constitute an undue burden or fundamental alteration of the Forensic Hospital's programs,

17   services, and activities. Further, given the now multi-year separation from Plaintiff and

18   attendant loss of her daily trainings with Plaintiff, it is not clear whether Foxy would still

19   be a suitable service dog for Plaintiff.

20   The Court is additionally mindful that 28 CFR § 35.136(a)—the wellspring from

21   which Plaintiff's ADA claim flows—provides that a public entity shall "modify its policies,

22   practices, or procedures to permit the use of a service dog by an individual with a

23   disability." It does not appear that Defendant considered—either in its response to

24   Plaintiff's Motion for Preliminary Injunction or in response to his original April 3, 2020

25   request—whether any modifications to ASH's policies, practices, or procedures could be

26   made to permit Plaintiff's use of Foxy.

27   With these concerns in mind, the Court will not order that Foxy be permitted to

28   accompany Plaintiff at the Forensic Hospital. Rather, the Court will direct Defendant to

conduct a particularized assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital in accordance with the ADA and the relevant Code of Federal Regulations to determine 1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital;[8] and 2) whether Foxy specifically (as distinct from "service dogs" generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them,[9] including the probability that injury will actually occur. Upon conclusion of this assessment, Defendant shall inform Plaintiff, in writing, whether it will permit Foxy to accompany him while at the Forensic Hospital, and include therewith a detailed discussion of the above-ordered assessment. This assessment shall be conducted as soon as practicable, but no more than 45 days from the date of this Order.

Nothing in this order should be construed to imply that Foxy must be allowed to accompany Plaintiff at the Forensic Hospital. If Plaintiff is again dissatisfied with Defendant's determination at the end of the above-described assessment, he may again move for preliminary injunctive relief.

## VI.    Remaining Motions

### A.    Defendant's Motion to Dismiss

On April 20, 2021, Defendant filed a Partial Motion to Dismiss the First Amended Complaint to the extent Plaintiff sought relief pursuant to the AzDA. (Doc. 14). As noted, on June 21, 2021, Plaintiff withdrew the AzDA portion of his claim against Defendant. (Doc. 36.) As such, Defendant stipulated that its Motion was moot. (Doc. 42). Because

---

[8] Defendant's assessment must identify which policies, practices, or procedures are of concern, and explain why each could, or could not, be modified in compliance with the ADA and the relevant Code of Federal Regulations.

[9] Reliance on "the profile of Forensic Hospital patients" is not sufficient. The assessment must consider whether specific patients would have specific difficulties with the present of Foxy.

Defendant has stipulated that, with the withdrawal of Plaintiff's AzDA claim, its Motion is moot, the Court will deny the Motion as moot.[10]

## B. Plaintiff's Miscellaneous Motions for Injunctive Relief

In his June 15, 2021 Motion to Show Cause, Plaintiff seeks an order directing Defendant "to provide Plaintiff and other forensic patients access to an adequate and up to date law library, and legal assistance from a person trained in the law . . . ." (Doc. 35 at 15.) In his July 12, 2021 "Motion for Relief," Plaintiff seeks to have the Court accept tardy exhibits he had endeavored to include with his Motion to Show Cause,[11] and for the Court to "assess appropriate penalties, and provide such other relief, injunctive or otherwise, as would seem just and proper" due to alleged "staff" refusing to "make copies" and other difficulties with his assigned Patient Rights Advocate. (Doc. 46 at 3.) And in his August 9, 2021 Motion for Temporary Restraining Order, Plaintiff seeks an order directing Defendant to "return Plaintiff's legal papers"—which had allegedly been confiscated during Plaintiff's transfer to a new housing unit—and an order enjoining Defendant "from imposing arbitrary limits on Plaintiff's computer access," and that "the Court refer Defendant to a U.S. Attorney for investigation and prosecution…" (Doc. 62 at 7.)

None of Plaintiff's requests relate to his underlying ADA claim, and the Court thus lacks jurisdiction over them. *Pac. Radiation Oncology, LLC*, 810 F.3d at 636 ("[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction"); *Devose*, 42 F.3d at 471 (a party seeking injunctive relief must establish a relationship between the claimed injury and the conduct asserted in the complaint). To the extent Plaintiff's requests implicate his right of access to the courts, *see Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (unless a claim concerns access to the courts, the Plaintiff must show a nexus between the

_____

[10] Plaintiff has also filed a Motion to Strike Defendant's Partial Motion to Dismiss. (Doc. 19.) Because Defendant stipulates that it's Motion is moot, Plaintiff's Motion will also be denied as moot.

[11] The Court will accept the filings (which Plaintiff provided on July 19 and 21, 2021) as timely filed.

relief sought and the claims in the lawsuit), the Court observes that Plaintiff has had no difficulty making numerous filings in this action, complete with well-researched analysis and cogent exhibits.[12] Given this filing history, the Court finds that Plaintiff has failed to demonstrate that he has suffered any actual injury, *see Lewis v. Casey*, 518 U.S. 343, 354 (1996), and has thus failed to meet his burden of demonstrating irreparable harm in the absence of his requested injunctive relief. Accordingly, Plaintiff's June 15, 2021 "Motion to Show Cause," July 12, 2021 "Motion for Relief and Notice of Non-Inclusion of Exhibits Due to Obstruction by Defendant," and August 9, 2021 Motion for Temporary Restraining Order will be denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendant's Partial Motion to Dismiss (Doc. 14) and Plaintiff's Motion to Strike (Doc. 19), Motion for Preliminary Injunction (Doc. 24), "Motion to Show Cause" (Doc. 35), "Motion for Relief and Notice of Non-Inclusion of Exhibits Due to Obstruction by Defendant" (Doc. 46), and Motion for Temporary Restraining Order (Doc. 62).

(2)    Defendant's Partial Motion to Dismiss (Doc. 14) and Plaintiff's Motion to Strike (Doc. 19) are **denied as moot**.

(3)    Plaintiff's "Motion to Show Cause" (Doc. 35), "Motion for Relief and Notice of Non-Inclusion of Exhibits Due to Obstruction by Defendant" (Doc. 46), and Motion for Temporary Restraining Order (Doc. 62) are **denied**.

(4)    Plaintiff's Motion for Preliminary Injunction (Doc. 24) is **granted**.

(5)    Defendant is **ORDERED**, within **45 days** of the date of this Order and **AS DISCUSSED HEREIN**, to conduct a particularized assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital in accordance with the ADA and the relevant Code of Federal Regulations to determine 1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of

---

[12] In addition to the above, Plaintiff has made 36 separate substantive filings in this action, complete with exhibits, as well as a Petition for Writ of Mandamus in the Ninth Circuit.

Foxy while housed at the Forensic Hospital;[13] and 2) whether Foxy specifically (as distinct from "service dogs" generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them,[14] including the probability that injury will actually occur. Upon conclusion of this assessment, Defendant shall inform Plaintiff, in writing, whether it will permit Foxy to accompany him while at the Forensic Hospital, and include therewith a detailed discussion of the above-ordered assessment.

Dated this 22nd day of March, 2022.

Honorable John J. Tuchi
United States District Judge

---

[13] Defendant's assessment must identify which policies, practices, or procedures are of concern, and explain why each could, or could not, be modified in compliance with the ADA and the relevant Code of Federal Regulations.

[14] Reliance on "the profile of Forensic Hospital patients" is not sufficient. The assessment must consider whether specific patients would have specific difficulties with the present of Foxy.

**EXHIBIT B**



# ARIZONA DEPARTMENT OF HEALTH SERVICES
## ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW   (35310) | | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | | |

**Legal Status**

   Legal Status: Title 13.3994 Guilty Except Insane          Effective Date: 03/12/20

| Diagnosis | |
|---|---|
| **Description:** (F84.0) Autistic spectrum disorder | **Ranking:** Primary |
| **Description:** (F60.2) Antisocial personality disorder | **Ranking:** Secondary |
| **Description:** (E78.1) Hypertriglyceridemia | **Ranking:** Secondary |
| **Description:** (E66.9) Obesity (BMI 30.0-34.9) | **Ranking:** Secondary |
| **Description:** (Z91.199) Medical non-compliance | **Ranking:** Secondary |
| **Description:** (F60.81) Narcissistic personality disorder | **Ranking:** Tertiary |
| **Description:** (F63.3) Trichotillomania | **Ranking:** No Entry |

**Reason for Admission:**

 Mr. Matthew Solan (DOB: 07/17/1989)  was admitted to the Arizona State Hospital on 04/01/2020, after being adjudicated Guilty except Insane (GEI) for one count of Aggravated Assault (a Class 3 Felony) with a presumptive sentence of 7.5 years (expiration date: 08/1/2026). Per reports, Mr. Solan threatened to kill his caretaker and his caretaker's family, after the caretaker refused to drive Mr. Solan from Arizona to Massachusetts and Florida.  Per reports, Mr. Solan had plans to travel to Massachusetts to harm his parents, who reside in Massachusetts, and then go to Disney World in Florida with his service animal.  Mr. Solan reportedly placed a gun to his caretaker's head, and physically grabbed his caretaker's arm, when the caretaker attempted to leave.  After the incident was reported to the Coconino County Sheriff's Office, Officers attempted to apprehend Mr. Solan during a high-risk traffic stop.  Per repo Mr. Solan remained in the passenger seat of the car, while the two other passengers obeyed officers' directive to exi the vehicle. Per reports, Mr. Solan made various suicidal remarks, and a multi-hour standoff with Mr. Solan ensued. During the standoff, Mr. Solan reportedly held a handgun under his chin in an upward motion. Mr. Solan reports that eventually shot himself in the left leg, before exiting the vehicle.

Reports confirm Mr. Solan was on probation at the time of his index offense. Reports also indicate that Mr. Solan had three other felony convictions preceding this offense. Mr. Solan has reportedly been ordered for two years of standar probation, upon release from the Arizona Department of Corrects and the AzSH, for a Theft of Means of Transportati (a Class 5 Felony) charge.

**Patient Strengths:**

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES
### ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW   (35310) | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | |

Mr. Solan has a trained service dog. He is intelligent, a good historian, articulate, creative, inquisitive, studious, has insight into his triggers, and is an excellent self-advocate. Mr. Solan reports that he "is learned in the law, has a substantial history of successful pro se litigation, has a large and highly involved legal team". He demonstrates knowledge of previous treatment and relevant legal matters. His parents provide long-term financial support, and he "has full time caretaker with experience working with autistic adults". Mr. Solan holds a GED and "and certificates in graphic design, interactive media, and 3D animation". He has expressed a desire to continue his higher education. According to Mr. Solan, he "wants to continue studying law, machine learning, business, permaculture, and restorative agroforestry." He also states that he "owns homes in 3 states, has a limousine, diesel motor coach, and full time driver". Mr. Solan reports having a "growing food forest and functional homestead in Arizona". He adds that he "is an entrepreneur and successful small business owner".

### Discharge Barriers/Treatment Barriers/Risk Factors:

History of not complying with supervised probation, Limited engagement with community resources, Historical difficulties separating his delusions from reality, History of impulsive and reckless behavior, Three other felony convictions preceding index offense, Preoccupation with litigious actions.
Patient reports, "ASH is unable to treat the patient's primary condition due to institutional, staffing, and funding limitations".

### Discharge Goals:

Patient discharge plans ultimately remain under the jurisdiction of the Superior Court. All factors impacting patient's potential for discharge include compliance with hospital expectations and engaging in GEI programming.

### After Care Plan:

Upon discharge, patient will likely benefit from a 24 hour supervised placement, before transitioning to a less-restrict options of care. This is due to patient history of limited compliance to medication regimen or advised structural programming, such as probation, when in the community. It should also be noted that Mr. Solan would likely benefit from intensive case management with routine medication management/monitoring available, rehab programming, therapy, vocational programming and education programming related to his mental illness. Mr. Solan's aftercare plan subject to change based on his progression through the GEI Program and needs at the time of discharge.

### Cultural/Spiritual Preferences Relative to Treatment:

Patient provided written documentation to update his cultural preferences on 8/8/2024 to the following, "Patient is a practicing occultist with an extensive background in metaphysics, western magick, and esoterism. The patient subscribes to the fundamental doctrines of Scientology, Christian Science, and oriental fox magick. The patient is trained in traditional herbal medicine, spagyrics, and entheogenic shamanism, and is radically opposed to western medicine and the use of patent pharmaceutical drugs. The patient contends that statism is a religion and a dangerous cult, and does not subscribe to its tenets."

### Identified Natural Supports for the Patient:

This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.

# ARIZONA DEPARTMENT OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW   (35310) | | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | | |

Patient identifies his primary support is "his autism service dog, Foxy". Patient reports having a "legal team that is heavily involved in his treatment and ongoing litigation". Patient reports having a "full time driver who has experience working with autistic adults, and who manages the patient's Arizona homestead while he resides inpatient". Patient also identified his "mother and father" as his "long-term financial supports, and the patient has trust funds set up to financially support him and his service dog."

**Stable Medical Conditions Currently Being Monitored at this Time:**

History of hypertriglyceridemia, migraine, ongoing health maintenance

*See Nursing Care Plan for all acute care that requires treatment for less than 30 days.*

| Psychiatric Issue |
|---|

| Long Term Goal |
|---|
| Matthew will meet with this provider weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro social behaviors. This provider will identify coping skills to address symptoms that hinder him from pro social behaviors. |

| Responsible Staff | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
|---|---|---|---|
| Date Opened: 09/19/24 | Target Date: 01/13/26 | Status: Continued | Date Closed: |

| Short Term Goal |
|---|
| Matthew will identify his safe place to turn to when he feels triggered such as his room, a quite room, or walking on the patio. Matthew will utilize his safe place, a quiet room, and behaviors identifies in his TIPS sheet when feeling triggered, overwhelmed, or emotionally dysregulated. |

| Is This Part of a Behavior Plan? | No | | |
|---|---|---|---|
| Responsible Staff | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| Date Opened: 09/19/24 | Target Date: 04/30/25 | Status: Continued | Date Closed: |

| Intervention |
|---|
| When Animal Assisted Therapy becomes available at the forensic hospital, Matthew will be offered AAT service. |

| Responsible Staff | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
|---|---|---|---|
| Date Opened: 09/19/24 | Target Date: 04/30/25 | Status: Continued | Date Closed: |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



**ARIZONA DEPARTMENT OF HEALTH SERVICES**

ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW   (35310) | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | |

| **Psychiatric Issue    ...(CONTINUED)...** |
|---|

| **Intervention** |
|---|
| The assigned psychiatric provider shall meet with the patient at least once a week to discuss SOTA technologies and scientific advancement in ASD and PTSD treatment; provide the patient with sufficient resources, peer reviewed literature, pharmaceutical drug manufacturer's inserts, MSDS I PubChem I etc. datasheets, and phamacodynamic information sheets, as applicable, to enable the patient to provide informed consent to all and any proposed treatmer |

| Responsible Staff | OCHOA,KINDRA (Primary) | | |
|---|---|---|---|
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

| **Intervention** |
|---|
| The Primary nurse will meet with Matthew at least once a month to assess his mental status and provide education o medications. |

| Responsible Staff | SOLIZ,AQUALINA (Primary) or assigned Nursing Staff | | |
|---|---|---|---|
| Date Opened:<br>03/21/22 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

| **Short Term Goal** |
|---|
| Matthew will participate in trauma therapy, focusing on identifying triggers for symptoms and emotional regulation strategies. |

| Is This Part of a Behavior Plan? | No | | |
|---|---|---|---|
| Responsible Staff | BRIMLOW,AMANDA (Primary) | | |
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

| **Intervention** |
|---|
| Psychologist will meet with Matthew weekly for a minimum of 4 sessions, utilizing CBT/DBT/REBT therapeutic interventions. |

| Responsible Staff | BRIMLOW,AMANDA (Primary) | | |
|---|---|---|---|
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



ARIZONA DEPARTMENT
OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW  (35310) | | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | | |

### Psychiatric Issue    ...(CONTINUED)...

#### Long Term Goal

Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports.

| Responsible Staff | CARLOS,JELOME (Primary) or assigned Social Worker MCKELLAR,JOSEPH (Secondary) or assigned Rehab Provider | | |
|---|---|---|---|
| Date Opened: 02/14/22 | Target Date: 01/13/26 | Status: Continued | Date Closed: |

#### Short Term Goal

Matthew will independently attend 1 therapeutic social intervention (TSI) weekly, in order for him to demonstrate healthy social interactions and develop interpersonal skills as evidenced by Matthew verbalizing one healthy social interaction since last ITDP Review.

| Is This Part of a Behavior Plan? | No | | |
|---|---|---|---|
| Responsible Staff | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| Date Opened: 09/19/24 | Target Date: 04/30/25 | Status: Continued | Date Closed: |

#### Intervention

Rehab will offer Therapeutic Social Interventions (TSI's) weekly.

| Responsible Staff | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
|---|---|---|---|
| Date Opened: 09/19/24 | Target Date: 04/30/25 | Status: Continued | Date Closed: |

#### Short Term Goal

Matthew will attend 1 group with assigned rehab staff weekly in order for him to improve his ability to address his stated difficulty in attending groups due to auditory stimuli. Progress will be demonstrated by a personal report check in with rehab staff every 5 minutes.

| Is This Part of a Behavior Plan? | No | | |
|---|---|---|---|
| Responsible Staff | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| Date Opened: 09/19/24 | Target Date: 04/30/25 | Status: Continued | Date Closed: |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES
## ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW   (35310) | | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | | |

### Psychiatric Issue    ...(CONTINUED)...

#### Intervention

Rehab will attend 1 group with Matthew weekly.

| Responsible Staff | | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | |
|---|---|---|---|
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

#### Short Term Goal

Matthew will meet with his social worker to develop a discharge plan and "apply for DDD services and other commur supports and essential services so the same will be in place for when the patient is discharged."

| Is This Part of a Behavior Plan? | No | | |
|---|---|---|---|
| Responsible Staff | CARLOS,JELOME (Primary) or assigned Social Worker | | |
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

#### Intervention

Assigned social worker will meet with the patient at least once a month to assist the patient in developing a discharge plan and obtain community services to promote a successful community reintegration.

| Responsible Staff | CARLOS,JELOME (Primary) or assigned Social Worker | | |
|---|---|---|---|
| Date Opened:<br>06/27/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

### Medical Issues

#### Long Term Goal

Matthew's overall health and hygiene will improve as evidenced by improvement in BMI, lipids, BP, and his appearan in the next 90 days.

| Responsible Staff | Prabhu,Maitreyi (Primary) or assigned Medical Provider | | |
|---|---|---|---|
| Date Opened:<br>09/19/24 | Target Date:<br>01/13/26 | Status:<br>Continued | Date Closed: |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES

### ARIZONA STATE HOSPITAL

## Individualized Treatment and Discharge Plan

| Patient: SOLAN, MATTHEW (35310) | | DOB: 07/17/89 | DOA: 04/01/20 | Episode: 1 |
|---|---|---|---|---|
| Assigned BHMP: OCHOA, KINDRA | | Unit: Cottonwood | | |
| Plan Date: 01/13/25 | Plan End Date: 12/31/25 | Projected Discharge Date: 08/01/26 | | |

### Medical Issues    ...(CONTINUED)...

#### Short Term Goal

- Matthew will shower at least every other day, wear clean clothes and will not keep any old food cartons/wrappers/trash in his room to avoid infections
-Matthew will exercise at least 1 time/week, as offered while at ASH for next 30 days
- Matthew will drink at least 6[8 oz] glasses of water each day
-Matthew will cooperate with labs at least once a year to monitor lipids and metabolic status
-Matthew will cooperate with BP , weight checks at least once a month and as needed
-Matthew will comply with offered treatments such as medications/clinics/tests/vitals as needed

| Is This Part of a Behavior Plan? | | No | |
|---|---|---|---|
| Responsible Staff | Prabhu,Maitreyi (Primary) or assigned Medical Provider | | |
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

#### Intervention

Medical provider will assess, educate pt at least once a month and as needed and order meds/clinics as needed.

| Responsible Staff | Prabhu,Maitreyi (Primary) or assigned Medical Provider | | |
|---|---|---|---|
| Date Opened:<br>09/19/24 | Target Date:<br>04/30/25 | Status:<br>Continued | Date Closed: |

### Participants in the ITDP Development

| Name: OCHOA,KINDRA    Role: Psychiatric Provider    Plan Author: No |
|---|
| Name: Solan, Matthew  Role: Patient    Plan Author: No<br>Is Patient/Guardian in agreement with ITDP? No<br>If no, explanation of patient/guardian's non-agreement:  Patient expressed disagreement with his plan, "you don't want to work with me" |
| Name: BREI,PHILLIP    Role: STAFF    Plan Author: Yes |
| Name: CUESTA,JAIME Role: Nursing    Plan Author: No |
| Name: CARLOS,JELOME   Role: Social Work   Plan Author: No |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

### Master ITDP Reviews (Scheduled)

| | | | |
|---|---|---|---|
| **Patient Name:** SOLAN,MATTHEW | **ID:** 35310 | **Episode:** 1 | **D.O.B.:** 07/17/89 |
| **Age:** 35 | **Sex:** Male | **Admission Date:** 04/01/20 | |

**Selected Plan Information:** (CURRENT) Entry Date: 2024-11-25 --- Entry Time: 01:03 PM --- Entered By: Krysteeana Hurles - Health Plan Coordina --- Plan Date: 11/25/2024 --- Plan ID: TXC67169.00001

**Date of Review:** 01/09/25          **Review Duration (minutes):** 15

**Does Patient have a specific projected Discharge Date?** Yes

**Projected Discharge Date:** 08/01/26

## Participants:

**Patient in Attendance:** Yes

**Comments (optional):**

## Indicate other participants, including full name and title (check all that apply):

### Inpatient

| | | |
|---|---|---|
| **BHMP:** | Yes | **BHMP Name:** Kindra Ochoa, APRN, PMHNP-BC |
| **Att. Psych:** | N/A | **Att. Psych Name:** |
| **Nurse:** | Yes | **Nurse Name:** Jalme Cuesta, RN |
| **Social Worker:** | Yes | **Social Worker Name:** Jelome Carlos, LMSW |
| **Rehab:** | No | **Rehab Name:** |
| **Psychologist:** | No | **Psychologist Name:** |
| **Therapist:** | N/A | **Therapist Name:** |
| **PCP:** | No | **PCP Name:** |
| **Other(s):** | Yes | |

**Other Name(s) or Information:** Tabitha Hackett - Lead Teach, BHT 4

### Outpatient

| | | Telephonic /Virtual | Prior Invite | |
|---|---|---|---|---|
| **RBHA:** | Yes | Yes | Yes | **RBHA Name:** AzCH/Care1st |
| **Guardian:** | N/A | | | **Guardian Name:** |
| **CM:** | N/A | | | **CM Name:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

### Master ITDP Reviews (Scheduled)

| | | | |
|---|---|---|---|
| **Patient Name:** SOLAN,MATTHEW | **ID:** 35310 | **Episode:** 1 | **D.O.B.:** 07/17/89 |
| **Age:** 35 | **Sex:** Male | **Admission Date:** 04/01/20 | |

| | | | |
|---|---|---|---|
| **OHR:** | N/A | | **OHR Name:** |
| **Family:** | No | No | **Family Name:** |
| **Attorney:** | No | Yes | **Attorney Name:** Holly Gieszl |
| **DDD:** | N/A | | **DDD Name:** |
| **Other(s):** | N/A | | |
| **Other Name(s) or Information:** | | | |

## Summary of the Patient's progress of Long-Term Goals:

Link LTG's: Yes

**Summary of Progress Since Last Review**
Date of Last Review: 11/22/2024

Long Term Goals:
(PSYCHIATRIC ISSUE) Matthew will meet with this provider weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro social behaviors. This provider will identify coping skills to address symptoms that hinder him from pro social behaviors.
BHMP: patient has been nonverbal towards his psychiatric provider, not meeting his goal.
Nursing: patient has been nonverbal towards nursing staff, not meeting his goal.
Psychology: patient has terminated his 1:1 therapy with assigned psychologist, not meeting his goal.

(PSYCHIATRIC ISSUE) Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports.
TSI: patient has not met attended rehabilitative treatment programming, not meeting his goal.
SW: patient has been nonverbal towards assigned social worker. pt has been willing to go on walks around the Forensic mall.

(MEDICAL ISSUES) Matthew's overall health and hygiene will improve as evidenced by improvement in BMI, lipids, BP, and his appearance in the next 90 days.
-no report

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

### Master ITDP Reviews (Scheduled)

---

**Patient Name:** SOLAN,MATTHEW    **ID:** 35310    **Episode:** 1    **D.O.B.:** 07/17/89

**Age:** 35    **Sex:** Male    **Admission Date:** 04/01/20

---

## Recommended Changes:

**ITDP Requires Change or Update?:** No

**LTG (BHMP/Attending Psychologist to provide changes):**

**STG/Interventions:**

    **Staff Responsible for Communicating Changes:**

    **Staff Name Changes:**

    **Other Staff Responsible for Communicating Changes:**

**Other Recommended Changes:**

    **Other Information:**

**If No Changes:** ALL STG/Interventions remain appropriate and reflect Patient's current treatment needs.

## Progress/Barriers towards Discharge:

**Patient Ready for Discharge:** No

    **Ready for Discharge Information:**

    **Not Discharge Ready:** Maintain ALL Current Barriers

    **Not Ready for Discharge Information:** Discharge Barriers/Treatment Barriers/Risk Factors: History of not complying with supervised probation, Limited engagement with community resources, Historical difficulties separating his delusions from reality, History of impulsive and reckless behavior, Three other felony convictions preceding index offense, Preoccupation with litigious actions.

    Patient reports, "ASH is unable to treat the patient's primary condition due to institutional, staffing, and funding limitations".

    **Plan (check all that apply):** ITDP to be updated as applicable, Next ITDP Review to be scheduled-60 day & SW to review ITDP updates with Patient

    **Other Information:**

## Acceptance of ITDP:

    **Patient is in Agreement with Updated ITDP?** No

    **Brief Explanation:** Patient did not attend his ITDP staffing.

---

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*



# ARIZONA DEPARTMENT OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

### Master ITDP Reviews (Scheduled)

**Patient Name:** SOLAN,MATTHEW    **ID:** 35310    **Episode:** 1    **D.O.B.:** 07/17/89
**Age:** 35    **Sex:** Male    **Admission Date:** 04/01/20

**Guardian is in Agreement with Updated ITDP?** N/A

**Brief Explanation:** Patient is his own guardian.

**Draft/Final?**  Final
**Electronically Signed by:**  Jelome Carlos - Social Worker
**Date submitted:** 01/10/25    **Time submitted:** 01:22 PM

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

**EXHIBIT C**

AHCCS decision, pdf 11


## AHCCCS
Arizona Health Care Cost Containment System

Douglas A. Ducey, Governor
Jami Snyder, Director

---

### BEFORE THE DIRECTOR OF
### THE ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

| | |
|---|---|
| **Matthew P. Solan v. Arizona State Hospital**<br><br>**In Re: Matthew P. Solan** | **DIRECTOR'S DECISION**<br><br>**21F-BHS-257251-AHC** |

---

SI USTED NO PUEDE LEER INGLES, Y NECESITA AYUDA PARA COMPRENDER ESTA CARTA, POR FAVOR LLAME AL (602) 417-4455 O 1-800-654-8713 EXTENSIÓN 74232

PURSUANT TO the authority granted to me by A.R.S. §§ 41-1092.08(B), 36-3413, 36-2903.01(B)(4), and the Director's delegation of authority pursuant to A.R.S. § 36-2903.01(D)(3), and in consideration of the record in the above matter, along with the applicable federal and state statutes and regulations, I hereby make the following Decision and Order:

IT IS ORDERED that the Administrative Law Judge's Findings of Fact, Conclusions of Law, and Recommended Decision contained in the attached Decision are **accepted.**

If you disagree with this decision, you may ask the Administration to reconsider its decision or you can appeal to the Superior Court.

If you choose to file a Motion for Rehearing or Review, a rehearing or review may be granted only if you can establish one of the following causes:

1.  Irregularity in the proceedings of the hearing that deprived you of a fair hearing;

2.  Misconduct of a party or an agency;

3.  Newly discovered material evidence that could not, with reasonable diligence, have been discovered and produced at the hearing;

4.  That the Director's Decision is the result of passion or prejudice;

5.  That the Director's Decision is not justified by the evidence or is contrary to law; or,

6.  Good cause is established for the nonappearance of a party at the hearing.

You must submit your request within 30 days of the date of the Decision. The thirty (30) days start five (5) days after the postmark date of the Director's Decision if the Decision is mailed to you; however, if the Director's Decision is mailed to you by certified mail, the thirty (30) days start after the date of delivery of the certified mail as shown on the certified mail return receipt.

The Motion for Rehearing or Review must be received by the AHCCCS Administration by the thirtieth (30th) day; if your Motion for Rehearing or Review is mailed or postmarked on or before the thirtieth (30th) day, but not received by AHCCCS until after the thirtieth (30th) day, it will be considered untimely and will be denied. If you do file a Motion for Rehearing or Review, you should mail a copy of your Motion to all other parties. Please mail requests for re-hearing to:

AHCCCS Office of Administrative Legal Services
Attn: Director's Designee
PO Box 25520, Mail Drop 6200
Phoenix, AZ 85002
Or fax to: 602-253-9115 Attn: Director's Designee

A Motion for Rehearing or Review is not required in order to exhaust administrative remedies; you may choose to appeal directly to court. If you choose to appeal directly to court, you must commence a legal action in Superior Court in accordance with the provisions of A.R.S. §§ 12-901 through 12-914, and you must do so within thirty-five (35) days after the personal delivery or mailing of this decision.

/s/ Gina Relkin
Gina Relkin
Director's Designee

Mailed July 30, 2021 to:

Joseph Cowsert
217 S. 5th St.
Williams, Arizona 86046

Matthew P. Solan
c/o Arizona State Hospital
Pinon Unit
2500 East Van Buren Street
Phoenix, AZ 85008

Erin Cohen
Arizona Attorney General's Office
Health and Education Section
2005 North Central Avenue
Phoenix, AZ 85004-2926


By /s/ Sladjana Kuzmanovic

Copy transmitted electronically on July 30, 2021 to:

Office of Administrative Hearings
1740 West Adams Street, Lower Level
Phoenix, AZ 85007

# IN THE OFFICE OF ADMINISTRATIVE HEARINGS

| | |
|---|---|
| Matthew P. Solan,<br>　　　　Complainant,<br><br>v.<br><br>Arizona State Hospital,<br>　　　　Respondent. | No. 21F-BHS-257251-AHC<br><br>**ADMINISTRATIVE LAW JUDGE DECISION** |

**TELEPHONIC HEARING:** June 9, 2021

**APPEARANCES:** Complainant Matthew Solan represented himself, with his designated representative Joseph Cowsert also present.[1]  Assistant Attorney General Erin Cohen represented the Arizona State Hospital (ASH).

**ADMINISTRATIVE LAW JUDGE:** Kay A. Abramsohn

_____

After review of the entire hearing record in this matter, the undersigned Administrative Law Judge makes the following Findings of Fact and Conclusions of Law, and issues this Recommended Decision to the Director of the Arizona Heath Care Cost Containment System (AHCCCS).

## FINDINGS OF FACT

1.    The Notice of Hearing issued by AHCCCS set forth the appeal issue as follows:

> **[M]ember's appeal of his Individualized Treatment and Discharge Plan (ITDP)** as provided for in **Arizona Administrative Code (A.A.C.) Title 9, Chapter 21, Articles 3 and 4**.

2.    Complainant was admitted to the ASH on April 1, 2020 through the court system after being adjudicated guilty except insane; he remains at ASH under A.R.S. § 13-3994.  To be admitted to ASH, Complainant had to admit guilt to the underlying criminal actions being charged and agree to engage in treatment at ASH in lieu of being

---

[1] At the time of the hearing, Complainant indicated that Mr. Cowsert is his authorized representative as to treatment issues, but that Complainant represents himself regarding this appeal.  At hearing, Complainant's representative queried ASH with regard to Complainant's current ITDP but provided no testimony or evidence.

incarcerated.  Pursuant to A.R.S. § 13-3994, Complainant is under the jurisdiction of the psychiatric security review board (PSRB) with regard to any determination of release from the commitment to ASH.[2]  Complainant's February 5, 2021 ITDP contains the following Discharge Goal:[3]

> Patient discharge plans ultimately remain under the jurisdiction of the PSRB. All factors impacting patient's potential for discharge include compliance with hospital expectations and engaging in GEI programming.

3.    Complainant's treatment team (Team) in the Pinon Unit developed the February 5, 2021 ITDP.

4.    On February 18, 2021, Complainant indicated, in a Notice of Appeal (Appeal), that he was in disagreement with his ITDP for multiple reasons.  Complainant's Appeal noted that he had provided a re-write of the ITDP "offering reasonable changes" and that, as a result, the Team had provided a draft of an amended ITDP (Draft).[4] Complainant further noted that the Draft had not addressed the gravamen of his grievances and had only implemented a few of his requested changes.

5.    On March 3, 2021, ASH conducted an informal conference regarding Complainant's Appeal.  ASH noted that, at that time, Complainant discussed the following "main" issues: (a) the Team not adhering to the ITDP; (b) ASH personnel being untrained in autism spectrum disorder; (c) his "personal needs" not being met; and, (d) the lack of a service animal in the ITDP.

6.    As an accommodation discussed at the informal conference, Complainant agreed to allow the Team two weeks to review the issues discussed at the informal conference.

---

[2] ASH noted that a patient must complete the levels and phases before ASH can even recommend to the PSRB that PSRB consider release (or a conditional release); AHS noted that a release would be a release to the hospital and not a release to the community.
[3] The Complainant-drafted ITDP contains the exact same Discharge Goal.
[4] ASH provided a copy of the Complainant-drafted ITDP which is dated January 29, 2021; that document differs in multiple areas of the ITDP.  Neither party identified a Team "draft amended" ITDP in the hearing record.

7.      On March 17, 2021, ASH transferred Complainant to the Cottonwood Unit, where he has an entirely different treatment team.[5] In its March 3, 2021 informal conference notes, ASH indicated that the reason for the transfer was a belief that the Psychology-led treatment team in Cottonwood Unit might be better able to address Complainant's issues about the ITDP Long Term Goal #1, *i.e.*, whether (as ASH indicates) Complainant has yet to achieve "sustained remission" of his psychiatric symptoms or whether (as Complainant indicates) Complainant has already achieved "remission" of his psychiatric symptoms.

8.      On or about March 29, 2021, the CGA Manager met with Complainant to discuss what the Team was considering for ITDP changes. However, Complainant did not agree with the Team recommendations and requested to go forward with the Appeal.

9.      On April 7, 2021, ASH conducted a second informal conference. While no resolutions on the Appeal issues were achieved, Complainant agreed to keep working with the Cottonwood Team to discuss goals and changes to this ITDP.

10.     The matter was subsequently forwarded for administrative hearing.

11.     At hearing, Chief Medical Officer Kate Woods, D.O., testified that the ITDP process is designed to ensure that a plan is developed tailored to the individual needs of the patient and to keep the patient engaged in the phases and levels required to meet their treatment goals. Dr. Woods noted that when a patient demonstrates insight and reasonable judgment as to their treatment and meets the Team with an open mind as to treatment, the Team takes into account the patient's requests. Dr. Woods opined that, in this case however, Complainant does not have insight or reasonable judgment (*i.e.*, due to his mental illness diagnoses) and, further, the Team has indicated to her that Complainant has not made any progress toward the ITDP goals. Dr. Woods indicated that Complainant refuses to attend the scheduled group therapy, that Complainant continues to have problematic interactions with staff (harassing, provoking, taunting,

---

[5] During the administrative hearing process, ASH file a Motion to Dismiss (Motion) the case as now being moot for the reason that when a person is transferred to a new unit, a new treatment plan is developed by the new treatment team. Complainant objected to the Motion. The Motion was taken under advisement by the Administrative Law Judge.

3

using derogatory and profane language[6]) and, the same sometimes, with other patients, and that Complainant continues to file multiple complaints with/about ASH.[7]

12.     Dr. Woods provided the following information about Complainant's current ITDP, which she also indicated Complainant will not sign:

    a.  weekly meetings with staff and monthly treatment plan meetings;

    b.  scheduled meetings with a psychiatrist and prescribed medications (which Complainant takes);

    c.  scheduled meetings with a psychologist;

    d.  therapy with vocational or rehabilitation professional (which Complainant refuses);

    e.  music therapy (in which Complainant participates);

    f.  large group therapy (which Complainant refuses);

    g.  small group therapy (in which Complainant sometimes participates);

    h.  occupational therapy for sensory issues;

    i.  medical services whenever needed (in which Complainant participates);

    j.  and other general services such as access to computers, phones, and the café.

13.     At hearing, Complainant argued that his issues are not new issues, but have existed from the beginning.  Complainant did acknowledge that he receives "some adequate services" and that the new [Cottonwood Unit] Team has made some modifications to the ITDP that were beneficial to him; however, Complainant continues to have disagreements regarding his ITDP.

14.     In his Declaration of Facts and Exhibits in Support of Appeal (Declaration), Complainant posits that the Individual Service Planning (ISP) rules of Title 9, Chapter 21 should apply to the ITDPs at ASH.[8]

---

[6] At hearing, Complainant stated that he is only "rude" to staff if they are "rude" to him.

[7] At hearing, Complainant acknowledged that he had threatened to sue some staff people at ASH but stated that he had never threatened to harm anyone.

[8] While the ISP rules technically apply to maximize a seriously mentally ill person's *independence in and integration into the community*, which clearly is not possible under the circumstances in this case, the rules or concepts within the rules would have some limited use for application in conjunction with a seriously mentally ill person being housed at ASH and served through an ITDP.

4

15.    Pursuant to A.A.C. R9-21-307, The Individual Service Plan, an ISP is supposed to include "the most appropriate and least restrictive services, consistent with the client's needs and preferences ... without regard to the availability of services or resources."    An ISP identifies services that "maximize the client's strengths, independence, and integration into the community."[9]  If services are not available, alternative services should be set forth to the extent possible.   An ISP contains measurable goals and objectives that facilitate meaningful evaluation of a person's progress in attaining those goals and objectives.   These concepts appear to be encompassed in the ITDP at issue.

16.    Pursuant to A.A.C. R9-21-307(10), when a seriously mentally ill person is a "resident[] of an inpatient facility, the facility's treatment and discharge plan shall be developed according to R9-21-312 and shall be incorporated in the ISP."  In this case, Complainant's ITDP has been developed by an ASH Team.

17.    In his Declaration, Complainant makes only one reference to the Title 9, Chapter 21, Article 3 administrative rules, citing to A.A.C. R9-21-311 with regard to the issue of service animal/his service dog.  Complainant stated that because his personal service dog is not available, ASH is required to develop an alternative plan/service for him in the place of a personal service dog.

18.    A.A.C. R9-21-311, Alternative Services, provides that when a service that is already identified in an ISP is not currently available, the clinical team shall develop an alternative plan for alternative services, based upon the client's strengths, needs, and preferences.

19.    Complainant wants ASH to add to the ITDP his service dog ["Roxie"], and training about the proper use of a service dog, regardless of whether a personal service dog is permitted to be with him at ASH at this time, arguing that the ITDP is supposed to include appropriate services, even if the stated services are not available at the time.

---

[9] As noted previously, the phrase "into the community" as utilized in Article 3 regarding the general community would not apply to a person housed at ASH but could, as applied to ASH, be viewed as being living within the parameters available at ASH.

5

Complainant indicated that this particular issue, the opportunity for him to have his own service dog at ASH, was presently being adjudicated.

20.    Complainant acknowledged that ASH permits animal therapy among the patients, but that ASH is not currently able to provide animal therapy at this time due to lack of a provider, which ASH indicated the provider must be a certified therapy dog handler.[10]    Therefore, alternatively, with regard to such services, Complainant wants ASH to add animal therapy to his ITDP and provide the explanation of its availability, unavailability, or estimated time of future provision.

21.    Complainant believes that, rather than the existing phases and levels, the ITDP should contain clear and concise steps which he must meet to get a conditional release from the PSRB so that he is aware of a "roadmap" to release.    Complainant argued that the "levels" programming in the ITDP is not compliant with the A.R.S. § 13-3994(F)(3) release provisions and that, when he is no longer dangerous, he should be released to his caretaker, Mr. Cowsert.[11]

22.    While he is now being given up to 2 hours of vocational therapy, Complainant believes that the offered vocational "therapy" (such as painting pottery and sewing) is inadequate and of no use to him individually because he functions at a much higher level, and he requests to be allowed educational opportunity and/or to use his training and background to perhaps run a career-oriented business.[12]

23.    Complainant argued that he needs accommodations as to therapy because he cannot handle large group therapy; he indicated large group therapy is too stressful for him.    However, at hearing, Complainant indicated that he is now allowed 1-1 therapy once a week.

---

[10] During the March 2021 informal conference, Complainant indicated to ASH that this was non-negotiable issue with him.
[11] This Tribunal has no jurisdiction to make determinations on issues or concerns with regard to the authority of the PSRB under A.R.S. § 13-3994.
[12] ASH indicated that they offer therapies to patients, including vocational therapy, but argued that ASH is not obligated to provide educational opportunity.  Generally, all person with serious mental illnesses have rights with regard to support and treatment in the realm of behavioral health services; however, there is no requirement for educational opportunity to be provided.

24.    Complainant argued that he is not receiving adequate medical care because ASH has not allowed him to be evaluated (or treated naturopathically) for a chronic inflammatory medical condition which he stated he acquired when living in Massachusetts from long-term exposure to black mold.[13]    Complainant acknowledged that the medical field does not widely accept such a lingering medical condition, but noted that he had been diagnosed with chronic mold toxicity syndrome in 2016 when he lived in Massachusetts.    At hearing, Complainant argued that he just wants to be evaluated to find out if he is "better" now as to that condition.

25.    Overall, ASH argued Complainant's [February 5, 2021] ITDP offered and provided appropriate services to Complainant and that Complainant's appeal is based on multiple erroneous assumptions as to his admission and presence at ASH until the PSRB determines the possibility for release.    ASH's position is that each ITDP is fluid and is reviewed each month as to a patient's individual needs and that Complainant's appeal should be dismissed due to the transfer to a new Team, which must develop a new ITDP.

26.    At the end of the hearing, Complainant indicated that, other than not being allowed to be evaluated regarding the stated medical condition, he agreed with the services that he is being provided at ASH.    Complainant's position was that ASH had not disputed the information that he had presented and that his issues need to be addressed.

## CONCLUSIONS OF LAW

1.    Complainant bears the burden to prove, by a preponderance of the evidence, that the determinations made by ASH were incorrect, inappropriate or not in conformity with applicable law.    *See* A.A.C. R2-19-119.    In this matter, Complainant has sustained the required burden of proof.

2.    Based on the hearing record, the Administrative Law Judge concludes that, pursuant to A.A.C. R9-21-307 and A.A.C. R9-21-311, the ASH animal services therapy, along with an explanation of its availability or unavailability at this time, is appropriate to be added to the ITDP.    Therefore, ASH should add to Complainant's ITDP the ASH animal services therapy along with an explanation of its availability or unavailability at this time.

---

[13] At hearing, Dr. Woods indicated that she had had some training in alternative medicine and she opined that chronic mold/toxicity syndrome is not a recognized diagnosis.

7

3.    Based on the hearing record, because the issue of a "personal service dog" is under litigation, which litigation may determine whether or not such may be added to the ITDP, the Administrative Law Judge concludes that such a service is not appropriate to be added to the ITDP.

4.    Based on the hearing record, the Administrative Law Judge concludes that Complainant has not demonstrated that the actions of ASH in developing the ITDP were inappropriate or improper regarding the remainder of the ITDP issues Complainant has raised.  Further, Complainant has not demonstrated that the February 5, 2021 ITDP was inappropriate regarding services provided to Complainant by ASH.

5.    Therefore, the Administrative Law Judge concludes that the ASH Motion to Dismiss is Denied and Complainant's appeal in this matter should be granted in part and denied in part.

## ORDER

The Director shall grant Complainant's appeal in part regarding the ASH animal therapy services and shall deny the remainder of Complainant's appeal.

*In the event of certification of the Administrative Law Judge Decision by the Director of the Office of Administrative Hearings, the effective date of the Order is the date of that certification.*

Done this day, July 1, 2021.

/s/ Kay A. Abramsohn
Administrative Law Judge

Transmitted electronically to:

Jami Snyder, Director
Arizona Health Care Cost Containment System

8

**EXHIBIT D**

# 2024 ALLIANCE OF THERAPY DOGS CERTIFICATION TEST
**\* \* \* MUST BE RECEIVED BY THE OFFICE WITHIN SIX MONTHS FROM THE DATE OF THE HANDLING ASSESSMENT \* \* \***

☐ with stroller    ☒ without stroller

Applicant Full **Legal** Name: _JOSEPH M COUSERT JR_    Dog's Call Name: _FOXY_

Is this the first time being assessed with this dog for ATD?    ☒ Yes    ☐ No

If assessed before, please indicate the approximate previous assessment date(s):

> **The ATD Certification Test may be taken no more than three times with the same dog, with at least 30 days in between tests.**
> **Falsification of any information will result in membership denial.**

**BRING TO THE TEST:**
☐ Proof that you have successfully completed the Sterling Volunteers background check
☐ A completed Health Verification Form

## EACH HANDLER/DOG TEAM MUST PASS ALL SECTIONS OF THIS ASSESSMENT

**Handling Test Sections 1 ~ 9**

| 1. | **Handler's attention to instructions:** Handler arrived at assessment appointment with the following required items: | | | | |
|---|---|---|---|---|---|
| | Did the handler bring an approved collar for the dog? | | ☒ Yes | | ☐ No |
| | Did the handler bring an approved 4 foot or shorter leash for the dog? | | ☒ Yes | | ☐ No |
| | Was the handler clean and dressed appropriately, including correct footwear? | | ☒ Yes | | ☐ No |
| | Comments: | | | | |

| 2 | **Initial meeting:** | | | | |
|---|---|---|---|---|---|
| | Was the handler in control? | | ☒ Yes | | ☐ No |
| | Were the handler and dog polite? | | ☒ Yes | | ☐ No |
| | Was the dog corrected/redirected for inappropriate behavior? | ☒ NA | ☐ Yes | | ☐ No |
| | Was the dog praised for good behavior? | | ☒ Yes | | ☐ No |
| | Was the dog clean and well groomed? | | ☒ Yes | | ☐ No |
| | Comments: | | ☒ PASS | | ☐ FAIL |

| 3. | **Canine-human behavior:** friendly stranger | | | | |
|---|---|---|---|---|---|
| | Dog held, lifted or carried for assessment\* | ☐ NA | ☐ Yes | | ☒ No |
| | Was the handler in control? | | ☒ Yes | | ☐ No |
| | Did the dog bark at person(s)? | | ☐ Yes | | ☒ No |
| | Was the dog interested in the person(s)? | | ☒ Yes | | ☐ No |
| | Was any sign of aggression demonstrated? | | ☐ Yes | | ☒ No |
| | Was the dog corrected/redirected for inappropriate behavior? | ☒ NA | ☐ Yes | | ☐ No |
| | Did the handler praise the dog? | | ☒ Yes | | ☐ No |
| | Comments: | | ☒ PASS | | ☐ FAIL |

| 4. | **Physical handling of the dog and dog's response:** | | | | |
|---|---|---|---|---|---|
| | Dog held, lifted or carried for assessment\* | ☐ NA | ☐ Yes | | ☒ No |
| | Stroking the head, body and tail with both hands | | ☒ Acceptable | | ☐ Unacceptable |
| | Touching the paws | | ☒ Acceptable | | ☐ Unacceptable |
| | Scratching/petting the throat | | ☒ Acceptable | | ☐ Unacceptable |
| | Holding the ears | | ☒ Acceptable | | ☐ Unacceptable |
| | Comments: | | ☒ PASS | | ☐ FAIL |

\*Any dog that might be held, lifted or carried during visits must also perform this exercise held by the handler.
\*\*A dog too short to be reached for petting must have its front legs lifted or propped up for this exercise.

| 5. | Handler control of dog with a loose leash: | | | |
|---|---|---|---|---|
| | Team moving forward, changing pace between normal, slow and quick | | ☒ Yes | ☐ No |
| | Team making left and right turns and turning around | | ☒ Yes | ☐ No |
| | Stopping with dog staying calmly by the handler's side for 5 seconds | | ☒ Yes | ☐ No |
| | A person rushing past the team while in motion (from front/back/sides) | | ☒ Yes | ☐ No |
| | Near a person walking unsteadily* | | ☒ Yes | ☐ No |
| | Team going up to a seated person for petting* ** | | ☒ Yes | ☐ No |
| | Dog held, lifted or carried for assessment* | ☐ NA | ☐ Yes | ☒ No |
| | Comments: | | ☒ PASS | ☐ FAIL |
| 6. | Canine-canine behavior:<br>NEVER allow the dogs to be closer than 2 feet or to stare at another dog. | | | |
| | Dog held, lifted or carried for testing* | ☐ NA | ☐ Yes | ☒ No |
| | Was the handler in control? | | ☒ Yes | ☐ No |
| | Did the dog bark at other dog(s)? | | ☐ Yes | ☒ No |
| | Was the dog interested in other dog(s)? | | ☒ Yes | ☐ No |
| | Was any sign of unprovoked aggression demonstrated? | | ☐ Yes | ☒ No |
| | Was the dog corrected/redirected for inappropriate behavior? | ☒ NA | ☐ Yes | ☐ No |
| | Did the handler praise the dog? | | ☒ Yes | ☐ No |
| | Comments: | | ☒ PASS | ☐ FAIL |
| 7. | Dog's apparent responsiveness: | | | |
| | Did the dog demonstrate a willingness to participate in the exercises? | | ☒ Yes | ☐ No |
| | If initially excited, did the dog calm down and begin to respond? | ☐ NA | ☒ Yes | ☐ No |
| | Did the dog exhibit signs of avoidance or stress during the test? | | ☐ Yes | ☒ No |
| | Comments: | | ☒ PASS | ☐ FAIL |
| 8. | Does the handler have the ability to safely handle this dog? | | ☒ Yes | ☐ No |
| | Comments: | | ☒ PASS | ☐ FAIL |
| 9. | Did the handler follow your instructions during the handling portion of the assessment? | | ☒ Yes | ☐ No |
| | Comments: | | ☒ PASS | ☐ FAIL |

| Date of Handling Assessment: 12 - 12 - 24 | ☒ PASS | ☐ FAIL |
|---|---|---|

TESTER SIGNATURE *Robin Petrillo*

TESTER NAME (print) Robin Petrillo

Comments:

| Assessment for an Exception? | ☐ Yes | ☒ No |
|---|---|---|

REQUIRED Specify the exception:

**If assessing for an exception application goes through Alternative Review Committee**

| Observations 1 – 4 | |
|---|---|
| Applicant Full Legal Name | *JOSEPH M COWSERT JR* |
| Dog's Name | *Foxy* |

- **<u>MINIMUM OF THREE OBSERVATIONS REQUIRED</u>**
- **<u>MAXIMUM OF FOUR ALLOWED</u>**
- **Two observations must be done at a medical care facility**
- **All observations must be conducted on 3 (or 4) different days**
- **Please use the comment section for all exceptions or stating observed dog in stroller.**

| Observation #1 -- Type of facility used for observation | ☐ Medical | ☒ Other | | |
|---|---|---|---|---|
| Was the dog's behavior acceptable when held, lifted or carried by handler? | ☒ NA | ☐ Yes | ☐ No |
| The handler has the ability to safely handle this dog. | | ☒ Yes | ☐ No |
| Did the handler follow your instructions? | | ☒ Yes | ☐ No |
| Did the handler follow the ATD Rules and Regulations during this observation? | | ☒ Yes | ☐ No |
| Did the prospective handler arrive with the proper approved equipment for the assessment? | | ☒ Yes | ☐ No |
| The team demonstrated the appropriate skills to safely interact with people in animal assisted functions. | | ☒ Yes | ☐ No |
| Needs Improvement (If yes, list improvement needed in comments below). | | ☐ Yes | ☒ No |
| Fourth observation required (If yes, indicate why in comments below). | | ☐ Yes | ☒ No |
| Observation: | | ☒ PASS | ☐ FAIL |
| OBSERVER SIGNATURE *Robin Petrillo* | | Date | |
| OBSERVER NAME (print) *Robin Petrillo* | | *12-12-24* | |

Comments: *Joseph & Foxy have a strong connection. He has put in a lot of time and energy in training and it shows. Nice team!*    Observed in stroller ☐ Yes ☒ No

| Observation #2 – Type of facility used for observation | ☒ Medical | ☐ Other | | |
|---|---|---|---|---|
| Was the dog's behavior acceptable when held, lifted or carried by handler? | ☐ NA | ☒ Yes | ☐ No |
| The handler has the ability to safely handle this dog. | | ☒ Yes | ☐ No |
| Did the handler follow your instructions? | | ☒ Yes | ☐ No |
| Did the handler follow the ATD Rules and Regulations during this observation? | | ☒ Yes | ☐ No |
| Did the prospective handler arrive with the proper approved equipment for the assessment? | | ☒ Yes | ☐ No |
| The team demonstrated the appropriate skills to safely interact with people in animal assisted functions. | | ☒ Yes | ☐ No |
| Needs Improvement (If yes, list improvement conducted in comments below). | | ☐ Yes | ☒ No |
| Fourth observation required (If yes, indicate why in comments below). | | ☐ Yes | ☒ No |
| Observation: | | ☒ PASS | ☐ FAIL |
| OBSERVER SIGNATURE *Robin Petrillo* | | Date | |
| OBSERVER NAME (print) *Robin Petrillo* | | *12-18-24* | |

Comments: *Joseph & Foxy did well in a hospice environment. She was able to sit on the bed and brought love and joy. Beautiful.*    Observed in stroller ☐ Yes ☒ No

**2024 Alliance of Therapy Dogs® Certification Test**

| Observation #3 – Type of facility used for observation | ☒ Medical | ☐ Other | | |
|---|---|---|---|---|
| Was the dog's behavior acceptable when held, lifted or carried by handler? | | ☒ NA | ☐ Yes | ☐ No |
| The handler has the ability to safely handle this dog. | | | ☒ Yes | ☐ No |
| Did the handler follow your instructions? | | | ☒ Yes | ☐ No |
| Did the handler follow the ATD Rules and Regulations during this observation? | | | ☒ Yes | ☐ No |
| Did the prospective handler arrive with the proper approved equipment for the assessment? | | | ☒ Yes | ☐ No |
| The team demonstrated the appropriate skills to safely interact with people in animal assisted functions. | | | ☒ Yes | ☐ No |
| Needs Improvement and a fourth observation (list improvements needed in comments) | | | ☐ Yes | ☒ No |

Observation:

OBSERVER SIGNATURE _Robin Petrillo_    ☒ PASS    ☐ FAIL

OBSERVER NAME (print) _Robin Petrillo_

Date 12-23-24

Comments:                                                    Observed in stroller ☐ Yes ☒ No

| Observation #4 – (if needed) Type of facility used for observation | ☐ Medical | ☐ Other | | |
|---|---|---|---|---|
| Was the dog's behavior acceptable when held, lifted or carried by handler? | | ☐ NA | ☐ Yes | ☐ No |
| The handler has the ability to safely handle this dog. | | | ☐ Yes | ☐ No |
| Did the handler follow your instructions? | | | ☐ Yes | ☐ No |
| Did the handler follow the ATD Rules and Regulations during this observation? | | | ☐ Yes | ☐ No |
| Did the prospective handler arrive with the proper approved equipment for the assessment? | | | ☐ Yes | ☐ No |
| The team demonstrated the appropriate skills to safely interact with people in animal assisted functions. | | | ☐ Yes | ☐ No |

Observation:

OBSERVER SIGNATURE _____    ☐ PASS    ☐ FAIL

OBSERVER NAME (print) _____

Date

Comments:                                                    Observed in stroller ☐ Yes ☐ No

**EXHIBIT E**

# ALLIANCE OF THERAPY DOGS

have completed the requirements and have been certified as a

*Joseph Cowsert*

and

*Foxy*

## Pet Therapy Team

Alliance of Therapy Dogs

sharing smiles and joy™

**President**

01/10/2025

**Date**

THIS IS NOT A SERVICE OR ASSISTANCE DOG CERTIFICATION

**EXHIBIT F**

 **FOX RANCH COMPANY**

---

| **From:** | Joseph M. Cowsert Jr., Manager | **To:** | Scott Stambaugh, Director |
|---|---|---|---|
| | Fox Ranch, LLC | | Rehab Services |
| | 217 South 5th Street | | Arizona State Hospital |
| | Williams, Arizona 86046 | | 501 North 24th Street |
| | Tel: (928) 310-5931 | | Phoenix, Arizona 85008 |
| | joseph.cowsert@fox-ranch.com | | scott.stambaugh@azdhs.gov |

---

| **In Re:** | **Volunteer Animal Therapy Services** | **Date:** | February 6, 2025 |
|---|---|---|---|

Dear Mr. Stambaugh,

My name is Joseph Cowsert, and I am a manager for the Fox Ranch Company. We are pleased to announce that Foxy, a cloned Pomeranian dog our company is sponsoring, has been certified as a therapy animal by the Alliance of Therapy Dogs ("ATD").

We would like to offer volunteer animal therapy services to the patients of the Arizona State Hospital's forensic campus. Foxy presently lives at Fox Ranch near the unincorporated town of Valle, Arizona. I manage the ranch property and care for Foxy while her trustee, Mr. Matthew Solan, is receiving habilitation services at your facility. We are able to drive Foxy to Phoenix once or twice a month to provide animal therapy services to your patients. While it is my understanding that Mr. Solan has a specific treatment order for Animal Assisted Therapy, we intend to offer volunteer services to the entire forensic patient population.

Please find enclosed a copy of Foxy's ATD certification papers, county dog license, health and vaccination certificates, business cards, ATD brochures, and a photo of us providing services at a Prescott, Arizona hospice.

We look forward to hearing from you, and to serving the patients of ASH. Feel free to reach out to me by phone, mail, or email at the contact information provided above. Thank you for your interest in our services!

Sincerely,

Joseph M. Cowsert Jr., Manager
Fox Ranch, LLC

Cc:

Holly R. Gieszl, Esq.
2325 E. Camelback Rd., Ste. 400
Phoenix, Arizona 85016
holly@gieszlfirm.com

Joshua N. Mozell, Esq.
2525 E. Arizona Biltmore Cir., Ste. D140
Phoenix, Arizona 85016
jmozell@mozellgroup.com

**EXHIBIT G**



**MATTHEW PHILLIP SOLAN**
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

## REQUEST FOR HABILITATION SERVICES

To Kindra Ochoa, the remaining members of my treatment team, and to all to whom these presents shall come, greeting: This letter serves as a formal request for immediate implementation of the Animal-Assisted Therapy ("AAT") services stipulated under my Individualized Treatment and Discharge Plan ("ITDP").

As you are aware, I prosecuted an administrative appeal against the Arizona State Hospital ("ASH") in 2021 to remedy, *inter alia*, ASH's refusal to include AAT services in my ITDP. After I prevailed in my appeal, the Office of Administrative Hearings ordered, and the Director of the Arizona Cost Containment System directed ASH to add AAT services to my ITDP. ASH eventually complied, and nearly a year later began providing AAT services to me through a small mixed-breed dog named Starla ("Starla").

Starla and her human partner were certified by the Alliance of Therapy Dogs ("ATD") as a therapy dog team. ASH insisted upon this certification as a requirement before they would allow any therapy dog onto the forensic hospital campus. Starla's visits were sporadic, extremely short (usually less than 5 minutes each), and Starla clearly lacked the vitality to effectively engage in the sessions. After Starla passed away in 2023, ASH refused to locate another therapy dog team to provide AAT services to me, despite AAT remaining an integral component of my ITDP.

Contemporaneously, my service dog Foxy passed away. I contracted with ViaGen Pets and Equine to produce a somatic cell nuclear transfer clone of Foxy from her stored DNA. A cloned Foxy puppy ("Foxy") was born on November 9, 2023, flown into Arizona, and trained by All Dogs Unleashed to serve as my Autism Spectrum Disorder ("ASD") service animal. After Foxy's service animal training concluded on May 16, 2024, I requested her admission to ASH as a reasonable accommodation for my neurodevelopmental disabilities The ASH administration denied my reasonable accommodation request, and I filed suit in the United States District Court, seeking an injunction to compel Foxy's admission to ASH.

Around the same time, I commenced another administrative appeal of my ITDP, asserting your total failure to treat my ASD, and contesting your continued failure to provide the AAT services stipulated under my ITDP. In response to this appeal, you continued in your assertion that AAT would be provided to me when a therapy dog could be located. You confirmed this in your revised ITDP, which states "When Animal Assisted Therepy becomes available at the forensic hospital, Matthew will be offered AAT service." I later withdrew my ITDP appeal under duress of ongoing retaliation.

During the pendency of my ADA suit, Foxy's expensive service animal training must be maintained. Until I am able to work with Foxy myself, I have been forced to seek alternative means to ensure her maintenance training is regularly conducted. In consideration of this, I resolved to enroll Foxy and my general agent, Joseph Cowsert ("Mr. Cowsert") in an AAT program where Foxy could provide therapy services to individuals in total care institutions. My hope, in encouraging Foxy to render therapeutic services to such patients, is that her service animal training, especially her public access etiquette, will be maintained by these interactions.

Upon reaching 1 year of age, Foxy became eligible to enroll with ATD and seek certification. I directed my agent, Mr. Cowsert to contact ATD and seek certification as a therapy dog team with Foxy. Between November 2024 and January 2025, Mr. Cowsert and Foxy traveled to Prescott, Arizona for training, auditing, and practice with hospice patients. The Fox Ranch Company sponsored the auditing, and provided a vehicle for transporting Foxy between Williams, Arizona and Prescott. Foxy passed her auditing with flying colors, and ATD certified her and Mr. Cowsert as a therapy dog team on January 10, 2025. Foxy and Joseph have since been able provide AAT services to seniors in Williams, and desire to provide AAT services ASH's forensic patients as well.

On or about February 5, 2025, Mr. Cowsert sent a letter to ASH's Director of Rehab Services, Scott Stanbaugh ("Mr. Stanbaugh"). Mr. Cowsert informed Mr. Stanbaugh that he and Foxy were available to begin providing AAT services to ASH's forensic patient population. Mr. Cowsert has informed me that he has not yet received any response to his letter.

As you have now found a therapy animal team that meets ASH's strict certification requirements, there is no reason to delay the provision of AAT services to me. Please be mindful that the behavioral health services stipulated under my ITDP are not mere privileges that can be suspended by a state agency at will; they represent treatment services deemed medically necessary for my habilitation and reintegration. AAT in this context is treatment right, and I am entitled to demand my treatment rights be respected and enforced.

I understand ASH would like Foxy to provide AAT services to other patients, in addition to providing AAT to me. I have no objection to this, and wish to support Foxy's desire to meet and play with lots of new people. I accordingly consent to Foxy providing AAT services to other patients on ASH's forensic campus. Based on the reports of unit staff, I am not convinced that any human or non-human animal would be safe on ASH's civil campus and, at least for the time being, withhold my consent for Foxy to visit that campus.

**NOW, THEREFORE,** I hereby request that you forthwith provide AAT services to me through Foxy, or show cause why the same cannot or should not be provided. I require your written letter of determination **no later than March 6, 2025**, outlining how and when you intend to provide the AAT services to me, or why the same cannot be provided.

In accordance with A.A.C. R9-21-401(B), any denial must include a notice of my right to appeal your determination. Should you fail to respond by the above date, I will presume my request is denied, and pursue appropriate legal action.

**SIGNED, SEALED, AND RESPECTFULLY SUBMITTED** this 13th day of February, 2025.

_____
**Matthew Phillip Solan**

**A copy of this letter was or will be sent via U.S. Mail to:**

Holly R. Gieszl, Esq.
2325 E. Camelback Rd., Ste. 400
Phoenix, Arizona 85016

Joshua N. Mozell, Esq.
2525 E. Arizona Biltmore Cir., Ste. D140
Phoenix, Arizona 85016

**Enclosures:**

Foxy's ATD Certificate
Foxy's Health Certificate
Foxy's Business Card

**EXHIBIT H**

## DECLARATION OF MATTHEW PHILLIP SOLAN

I, Matthew Phillip Solan, hereby declare under penalty of perjury that the following statements are true and correct, and if called open as a witness, I would testify as follows:

### I.    Introduction

1.  I make the following declaration based on my personal knowledge and experience as a victim of state oppression.

2.  To avoid repetition, the appellation "Foxy" shall be used herein refer to my service animal Foxy in both her present and prior incarnations.

3.  I was born in Massachusetts in 1989 and diagnosed with Autism Spectrum Disorder ("ASD") at an early age. My ability to communicate, engage in social interactions, and process sensory stimuli has always been profoundly different from those of neurotypical individuals.

4.  I am an autodidactic polymath with an intelligence quotient 3 standard deviations higher than that of the general public. As a child, I found solace in logic, mathematics, and computers—disciplines where human irrationality had no place. But I also found support in non-human animals, whose social rules were clear, predictable, and unburdened by arbitrary cruelty.

5.  As an adult, I self-initiated, studied, and currently engage in the practice of computer science, machine learning, electrical engineering, law, business administration, and restorative agroforestry, as well as alchemy, spagyrics, chaos magick.

6.  Despite my superior intellect, I have been deemed disabled all my life, and have never been able to hold employment.




MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

7.  While I have performed limited freelance/contract work in the fields of animation and industrial automation, my sensory sensitivities and atypical modes of communication have alienated me from the vulgar masses.

8.  In the 26 years prior to adopting Foxy, I found no respite in contemporary therapeutic modalities: therapists infuriated and alienated me, and every psychiatric drug I tried made me worse. Foxy was the only agent that ever enlarged my capacity for self-determination without making me want to kill myself.

9.  With her, I could function and engage socially in ways that I cannot not without her. She mitigated my sensory overload, calmed my panic attacks, and allowed me to function without harmful medication.

10. My parents did not understand me. They viewed my differences as a problem to be corrected rather than a reality to be accommodated. Their solution, much like the State of Arizona's, was punishment, control, and, eventually, abandonment.

11. I have been confined in the Arizona State Hospital ("ASH") against my will for nearly five years. I have spent that time fighting—not only for my habilitation, not only for basic human dignity, but for the single accommodation that allows me to exist in this world with some measure of peace: my service animal, Foxy.

12. ASH does not want me to have Foxy. That much is clear. What is not clear is how far they are willing to go to keep her from me. They have not merely refused to comply with the Americans with Disabilities Act; they have not merely disregarded this Court's orders: they have waged a calculated campaign of retaliation—one so depraved that it defies comprehension.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

## II.    My Background

13. I was born in the Winchester General hospital in Winchester Massachusetts in 1989, and adopted 9 days later.

14. At or around age 3, I attended Miss Tanya's preschool at the Westborough, Massachusetts Baptist Church. I was removed from Miss Tanya's because I couldn't sit still, could not be "controlled," and was not "engaged" with the other children.  I was then moved to a Montessori preschool in Shrewsbury, Massachusetts, but was quickly removed from there as well, for the same reasons.

15. In 1993, I was evaluated by for a neurodevelopmental disability and diagnosed with Attention Deficit Hyperactivity Disorder. I was then sent to Assabet Valley Regional Technical Vocational High School ("AVRTVHS") to attend their special needs preschool for the next 2 years, before transitioning into public school.

16. At age 5 I attended Kindergarten at Hasting's Elementary in Westborough, Massachusetts, and had an IDEA aide throughout the whole year.

17. Though ages 6, 7, and 8, I attended first, second, and third grade, respectively, at Hasting's Elementary in Westborough, Massachusetts, and had an IDEA aide each of those years as well.

18. Half way through the third grade, Hasting's Elementary was condemned for black mold in its HVAC system. Many students and teachers got sick, some ended up with serious health problems, and at least one child died from the mold. My neurological health sharply declined during this period as well.

19. At age 9 I attended fourth grade at Armstrong Middle School in Westborough,

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Massachusetts without an aide, but progressively decompensated. I wore a fanny pack to keep two stuffed hummingbirds in, which I used to communicate with other humans. I wore nothing but soft sweat pants and sweatshirts, because I couldn't stand the texture of any other type of clothes. My mother had to cut out the tags or I wouldn't wear them. As a result, I was often taunted and mocked by the other students for my "uncool" apparel and my hummingbirds.

20. At age 10 I attended fifth grade at Armstrong Middle School, and rapidly decompensated. At recess, students would rush up to me, grab my hummingbirds out of my fanny pack, and throw them over the fence, where I would have to get school staff to go retrieve them.

21. To protect my hummingbirds, I started fighting back against the students who were stealing them, and was accused of being aggressive, and was told by the school that it was my fault for having the hummingbirds where other student could grab them.

22. By age 11, I was formally diagnosed with an Autism Spectrum Disorder following a series of evaluations conducted as part of my IEP. I was enrolled at Pathways Middle School for autistic children on the grounds of McLean Hospital in Belmont, Massachusetts.

23. This lasted about 6 months. My parents thought the school was making me worse, and were not happy with the rapid staff turnover and the corruption at the school, or with having to drive me 100+ miles a day to and from school, so they pulled me out and homeschooled me thereafter.

24. From around age 3-11, I was often physically abused by my parents. Whenever I had

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6026

autism meltdowns (which was probably every day), they would both pin me to the ground, face down, and sit on me; one on my back and one on my head, until I passed out or otherwise stopped moving.

25. My dad would also fly off the handle whenever he was frustrated at me. His face would turn red, and he would grab me by the arm, throw me up against a wall, and then drag me around the house. My mother would yell at him to stop, but she was more concerned that someone would see, or that he would leave a bruise (which he often did). My dad would justify this abuse by blaming me for "flopping on the ground like a damned rag doll" whenever he grabbed my arm.

26. In 2005, the ASD diagnosis was confirmed as a "Cerebral Dysfunction manifesting as Asperger's syndrome" by Dr. Karen Bresnahan, M.D. at Tufts Floating Hospital for Children in Boston, Massachusetts.

27. Later, in 2016, Dr. Daniel Cagua-Koo, M.D., clarified the cerebral dysfunction as a form of autoimmune encephalopathy resulting from a Chronic Inflammatory Response Syndrome ("CIRS") – caused by genetic predisposition and mold exposure.

28. After I received my GED in 2009, my mother and I moved back in with my father in Westborough, and I attended AVRTVHS, this time as an adult in their adult vocational program.

29. I acquired a certificate in design and interactive media from AVRTVHS, and a year later was awarded a certificate in 3d animation from Boston University's Center for Digital Imaging and Arts ("CDIA").

30. My time at AVRTVHS and CDIA was spent in anguish. Not because of the workload:

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

I excelled at this schoolwork, and left my peers in the dust every day. But the sensory overstimulation was unbearable. If it weren't for a handful of teachers who were aware of my disabilities, and went above and beyond their duties to advocate for me, make environmental modifications, and constantly encourage me to stick it out, I would have dropped out within the first month in both cases.

31. After completing these certificate programs, I moved into my Aunt's empty condo in North Oxford, Massachusetts. I self-isolated for years, only venturing out during the day when my mother dragged me out to breakfast, and at night from time to time when my elementary school friend would invite me to a hackerspace for some late-night programming.

32. Between 2006 and 2009, I acquired extensive experience training wolf-dogs working with a breeder in Dennisport, Massachusetts. But in 2013 I met a Pomeranian for the first time, and realized that these fluffy little critters were an advanced life form, superior to both wolf-dogs and humans.

33. After meeting Foxy on the astral plane in 2014, I adopted her in 2015, and trained her to serve as my ASD service animal. Foxy and I moved to northern Arizona in the summer of 2015. We chose this location because there was supposed to be a low incidence of mold growth; I wanted to heal from my mold-induced CIRS.

34. Upon moving to Arizona, Foxy and I organized FOX RANCH, LLC and began our self-initiation into the small business world. Despite nearly all of the company's assets being stolen or destroyed while I was in state custody, and despite ASH's constant interference with my business management activities, we've managed to

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

build back even stronger, and I have had the opportunity represent the company in Justice Court pursuant to Ariz. Sup. Ct. Rule 31.3(c)(3), where I successfully litigated a contractual breach and fraud claim the company brought against a local mechanic.

35. Foxy and I acquired a homestead on a remote tract of land atop the majestic Howard Mesa, and set up shop in a place where the noise and chaos of the human realm should have been shut out. Unfortunately, this is not what happened.

36. In 2015, I was subjected to an incident of extreme police brutality at the hands of the Coconino County Sheriff's Department. Their paramilitary terrorist-style attack on Foxy and me was apparently a result of a fake call – a swatting incident.

37. I developed extreme PTSD from the incident, and became convinced that the Sheriff's department was a criminal racket, not a de jure law enforcement agency. While I now have more clarity of the events, my assessment of the agency has not really changed.

38. This colored all my interactions with law enforcement thenceforth, which resulted in repeated altercations with sheriff's deputies, many of which I resulted in serious harm to me, false arrests, and malicious prosecutions: not because I was engaged in crime, but because I panicked and tried to run every time I saw a uniformed officer.

39. In 2019, I was arrested after an escalating mental health crisis led to a stand-off with law enforcement. Instead of receiving the treatment I desperately needed, I was thrown into solitary confinement in a county jail, where I deteriorated further.

40. After over a year of subjection to horrendous, inhumane conditions of confinement, I was coerced into pleading guilty except insane—a legal trap that allowed the State to imprison me in its fake hospital under the guise of mental health treatment.

### III.    ASH's Repeated Denials of my Legal and Human Rights

41. Upon arriving at ASH, I requested a service animal accommodation for Foxy to live with me. This request was denied by ASH's former Chief Compliance Officer, Margaret McLaughlin, citing the supposedly secure nature of ASH, unspecified health and safety concerns, and a nebulous administrative burden.

42. I contested ASH's denial multiple times, and with the assistance of the Arizona Center for Disability Law, submitted a formal demand letter to ASH's legal counsel. However, the accommodation I required was repeatedly denied.

43. This led me to file a lawsuit and a Motion for Preliminary Injunction in the United States District Court for the District of Arizona.

44. In 2022, this Court ordered ASH to conduct a particularized assessment of my request for a service animal. ASH blatantly violated that order.

45. Instead of conducting a legitimate particularized assessment, ASH paid Roca & Lewis a substantial sum to draft assessment letter that wove a fictional narrative of medical contraindication and animal abuse justify their patent discrimination.

46. Before I could launch a legal challenge to ASH's disgusting letter, I was notified that Foxy had passed away.

47. This presented an existential crisis for me: Foxy was the only thing that anchored me to this world throughout the years of state terrorism and abuse. I had no reason to remain, and strongly considered terminating my temporal existence, and jointing with Foxy on the astral plane.

48. Owing only to my desire for righteous retribution, I opted to live, with certain

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    stipulations, namely: that Foxy would return to help me avenge her death, and restore

2    her honor.

3    49. I immediately directed Foxy's caretakers to transport her body to a veterinarian. I

4    ordered biopsies, and directed the veterinarian to send the samples to Genetic

5    Reflections LLC for somatic cell culture and preservation.

6    50. On August 22, 2023, I commissioned the production of a cloned body for Foxy via

7    Somatic Cell Nuclear Transfer ("SCNT"). Foxy's replacement body was birthed on

8    November 9, 2023.

9    51. On June 13, 2024, I submitted a reasonable accommodation request letter to ASH's

10   CEO, Michael Sheldon. On July 5, 2024, ASH summarily denied my new request,

11   recycling the same legally insufficient excuses the Court rejected in 2022.

12   52. This time around, ASH added one new, more grotesque allegation—that my request

13   should be denied because my relationship with Foxy was "sexual in nature."

14   53. If ASH's allegations about my relationship with Foxy were true, why was I never

15   investigated? Why I was never treated for such a serious mental illness? Why was I

16   ever allowed around the therapy dog ASH repeatedly brought to my treatment unit

17   after Foxy passed away? The answer is simple: because the ASH administration

18   knows its allegations are lies.

19   54. ASH's continued interference with Foxy has made keeping a therapeutic relationship

20   with my treatment teams impossible.

21   55. The members of my treatment teams have continuously claimed they support Foxy

22   living with me at ASH, but assert their hands are tied by the ASH administration.



MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA, 85008-6056

56. However, whenever I plead for my treatment team to advocate for my disability rights, they refuse, and tell me they've done their best to advocate for me, but the "ASH administration" won't allow them to help me.

57. When I've asked who, in the ASH administration, is telling them this, they refused to respond, and just stare at me. Every member of my treatment team as done this. If the exclusion of Foxy was not bad enough, this continual gaslighting has obliterated any prayer of reconciliation with ASH's employees.

58. Without Foxy, my mental health has deteriorated. I have been afflicted with sensory overload so severe that I have been forced to switch to night shift and self-isolate from other patients to avoid their noise. I have been swallowed by panic attacks so intense that I have been forced to byte my hands until I bled to stop the terror. I have ripped out my own hair. I have bashed my head against walls until my vision blurred. Unit staff documented this, but the ASH administration claims it never happened.

59. ASH is aware of the harm they are causing, and perpetuate it intentionally. ASH is not merely negligent. It is a rogue institution, engaged in systemic human rights violations.

I declare under penalty of perjury that the foregoing is true and correct.

**SIGNED, SEALED, AND DATED** this 13th day of March, 2025.



**Matthew Phillip Solan**
Plaintiff / Declarant

**EXHIBIT I**

| Stanford HEALTH CARE | Last Approved Date: May 2022 |
|---|---|
| **Policy Title**: Service Animals | Page 1 of 10 |
| **Departments Affected**: All Departments | |

## I.   PURPOSE:

The purpose of this policy is to ensure that service animals that accompany patients, staff and visitors with disabilities have public access to Stanford Health Care (SHC) facilities, except where the access may present risk to the animals or patients. This policy also provides guidance to staff regarding how to identify and interact with services animals (dogs) or miniature horses (MH).

## II.   POLICY:

A.  It is the policy of SHC that persons with disabilities shall not be discriminated against and that they will have full and equal access, services, and treatment.

B.  All staff, patients, and visitors accompanied by a dog or miniature horse that is individually trained to do work or perform tasks for a disabled person must be permitted to enter all areas of SHC open to the general public, unless

1.  Poses a direct threat or
2.  Fundamentally alter SHC's operations, policies, practices, and/or procedures or
3.  The area requires the general public to adopt safety measures that cannot reasonably be adopted by the service animal to mitigate safety risks and no other accommodation can be made or
4.  The area is closed to the general public.

C.  **Excluding / Removing Service Animals and/or Comfort / Emotional Support Dogs** - Any decision to exclude service animals and/or comfort/emotional support dogs from SHC shall be made only after an individualized assessment by the department manager in consultation with other services, including, but not limited to Infection Control, Guest Services and Risk Management, and Stanford Attending Veterinarian. The individualized assessment shall include the following (Appendix A):

1.  Reasonable judgment that relies on current medical knowledge or on the best available objective evidence.
2.  Ascertaining the nature, duration, and severity of the risk.
3.  Probability that the potential injury will occur; and
4.  Whether reasonable modification of policies, practices or procedures or provisions of auxiliary aids or services could mitigate the risk.

D.  **Restricted Areas** – Service animals may be excluded from areas which may provide risk to the animals including imaging (e.g., MRI and CT) and radiology and use of radionuclides, chemotherapy, and lasers. In addition, service animals shall be excluded from areas in where patient with presumed or active infection as some may pose a risk to the service animal. Service animals are prohibited from operating rooms, patient care units housing immunosuppressed patients and isolation for infectious precautions, unless it is determined that the service animal does not pose a direct threat or fundamentally alter SHC's operations, policies, practices, and procedures.

| Stanford HEALTH CARE | **Last Approved Date:** May 2022 |
|---|---|
| **Policy Title:** Service Animals | Page 2 of 10 |
| **Departments Affected:** All Departments | |

E. **Staff Inquiry**
   1. SHC staff shall use minimal inquiry when the work, service or tasks performed by the dog or miniature horse are not obvious and apparent.
   2. When it is not obvious or apparent what service, task or work the *dog* performs, staff may ask two questions only:
      a. Is the dog a service animal required because of a disability; and
      b. What work or task has the dog been trained to perform?
   3. Under the Americans with Disability Act (ADA), staff shall rely upon the patient or visitor's word that the dog is a service animal and the description of the service, task or work it performs. If the animal is not a service animal, staff shall use CI-CARE words that work and contact Guest Services, if necessary.
   4. Staff shall not engage in the following lines of inquiry:
      a. Ask about the nature or extent of the person's disability.
      b. Require documentation to support service animal status (ex: ID card, proof of certification and training).
      c. Ask dog to demonstrate ability to perform service, task, or work.
      d. Refuse access based upon allergies and fear of dogs.
      e. Modify practices and accommodate the service animal (ex: move patient to another comparable room, change staff schedules)
      f. Treat patients and visitors with service animals less favorably.
      g. Pet the service animal (May distract from assigned tasks).
      h. Feed, clean, toilet or care for the service animal.
      i. Ask patient, visitor, or handler to remove service animal from premises, unless there is a legitimate reason, and an individualized assessment has been completed (Appendix A).
F. **Requirements for Handlers and Service Animals** – Service animals shall be under the handler's control at all times via harness, leash, tether, unless these devices interfere with the service animal's work in which case the handler must be able to maintain control over the service animal via voice control, motion/signal control or effective controls.
   1. The handler shall perform hand hygiene and follow Standard Precautions policy for self and animal care.
   2. The handler shall use the prescribed/designated areas for animal relief (e.g., 500 Pasteur Dog Park, see Appendix B).
   3. If a service animal becomes sick or injured while in SHC facilities, the handler is responsible for arranging veterinary care. Neither the hospital nor campus veterinary services can provide care to privately owned animals.
G. **Safety Incidents and Legitimate Reasons for Removing the Service Animal**

| **Stanford** HEALTH CARE | **Last Approved Date:** May 2022 |
|---|---|
| **Policy Title**: Service Animals | Page 3 of 10 |
| **Departments Affected**: All Departments | |

1. All patient and staff safety incidents shall be reported to SAFE and to the Stanford Attending Veterinarian and Security Operations Center. Reasons for removal of Service Animals from SHC facilities shall include the following (Appendix A):
   a. Direct threat
   b. Fundamentally alters SHC's operations, policies, practices, and procedures.
   c. Dog is out of control and handler does not take effective action to control
      i. Disruption (e.g., barking, running, jumping).
      ii. Aggressive behavior (e.g., biting, lunging).
   d. Not housebroken
   e. Poor hygiene (e.g., fleas, skin conditions).
   f. Dog is sick (e.g., coughing, sneezing, vomiting, and diarrhea and/or has had a fever within the past 3 days).
   g. The handler is a patient and during care is incapable of managing the animal. In such cases, staff shall contact Guest Services to arrange for alternate care.

H. **Miniature Horses (MH)**
   1. Miniature Horses are not Service Animals under the ADA; however, MHs shall be accommodated where reasonable and if individually trained to do work or perform tasks for people with disabilities.
   2. The department manager, in consult with other departments as needed, shall complete an individualized assessment to determine whether miniature horses can be accommodated. The four (4) assessment factors are:
      a. Whether the MH is housebroken or has devices used to support elimination.
      b. Whether the MH is under the owner or handler's control.
      c. Whether the facility can accommodate the miniature horse's type, size, and weight; and
      d. Whether the MH's presence will not compromise legitimate safety requirements necessary for safe operations.

III. **DEFINITIONS:**
   A. Individual with a Disability: A person who:
      1. Has a physical or mental impairment that substantially limits one or more major life activities,
      2. Has a record of such an impairment, or
      3. Is perceived by others as having such an impairment
   B. Service Animal: Only dogs (excludes other species of animals, however, see additional considerations for miniature horses; See also Miniature Horses (MH) section herein) that are individually trained to do work or perform tasks for people with disabilities qualify as service animals.
      1. Service animals recognize and respond to needs. Examples include, but are not limited to:

| Stanford **HEALTH CARE** | **Last Approved Date:** May 2022 |
|---|---|
| **Policy Title**: Service Animals | Page 4 of 10 |
| **Departments Affected**: All Departments | |

       a. Guiding vision impaired
       b. Alerting hearing impaired
       c. Pulling wheelchair
       d. Retrieving items
       e. Stability and ambulation
       f. Alerting or protecting person having seizure
       g. Reminding person to take medication
       h. Calming person with Post-Traumatic Stress Disorder during an anxiety attack
       i. Preventing or interrupting impulsive or destructive behavior
       j. Removing disoriented individuals from dangerous situations

C. "Trained": The ADA provides that a service dog must be trained to do work or perform tasks. In other words, a dog cannot be a service animal until it has completed its training. However, the California Disabled Persons Act extends its protection to dogs in training and provides that service animals in the process of being trained may be taken into a public place for the purpose of furthering its training.

D. Comfort / Emotional Support Dogs

    1. Dogs or other animals that solely provide companionship, comfort, and emotional support are not service animals under the Americans with Disability Act (ADA) and therefore do not have the same service animal accommodation requirements and considerations.

       a. Companionship, comfort, and emotional support do not constitute work or tasks

       b. While several institutions such as hospitals clinical practices allow and encourage the presence of therapy animals, the handlers and/or owners of the therapy animals are not granted the same rights to public access as assistance dogs under the Americans with Disability Act (ADA).

E. Direct Threat: A significant risk of substantial harm to the health or safety of others that cannot be eliminated or reduced by reasonable accommodations.

F. Fundamental Alteration: A change that is so significant that it alters the nature of the facility or service offered. For example, service animals are generally prohibited from the operating room and burn units, which are not open to the public and requires strict hygiene and protective barriers that could not be reasonably imposed on the service animal. Allowing a service animal in areas such as the operating room would require a fundamental alteration of the nature of the facility.

G. Undue burden: Generally, means significant difficulty or expense. Additional information regarding factors to consider with undue burden can be found at the following link: https://www.ada.gov/reachingout/l2factors.html

| **Stanford** HEALTH CARE | **Last Approved Date:** May 2022 |
|---|---|
| **Policy Title**: Service Animals | Page 5 of 10 |
| **Departments Affected**: All Departments | |

IV. **COMPLIANCE:**
   A. All workforce members including employees, contracted staff, students, volunteers, credentialed medical staff, and individuals representing or engaging in the practice at Stanford Health Care (SHC) are responsible for ensuring that individuals comply with this policy.
   B. Violations of this policy will be reported to the Department Manager and any other appropriate Department as determined by the Department Manager or in accordance with SHC policy. Violations will be investigated to determine the nature, extent, and potential risk to SHC. Workforce members who violate this policy will be subject to the appropriate disciplinary action up to and including termination.

V. **RELATED DOCUMENTS / PROCEDURES:**
   A. Disabled Accessibility and Services Policy
   B. Disability Discrimination Grievance Policy
   C. Workplace Accommodations Policy

VI. **APPENDICES:**
   A. Appendix A: Individualized Service Animal Assessment Tool
   B. Appendix B: Stanford Hospital Dog Park

VII. **DOCUMENT INFORMATION:**
   A. Legal References / Regulatory Requirements:
      1. Americans with Disabilities Act of 1990 U.S.C. §12181 et seq.
      2. 28 CFR §§ 35.104, 35.130, 35.136, 36.104, 36.208, 36.301, 36.302
      3. The Rehabilitation Act of 1973, 2a USC §794
      4. Cal. Civ. Code §54 - 55.32
      5. Cal. Pen. Code §§365.5, 365.6
   B. Original Document Owner:
      1. Author and date: Dana Orquiza, March 7, 2014
      2. Stored in: Administrative Manual
   C. Review and Renewal Requirements:
      1. This policy will be reviewed and/or revised every three years or as required by change of law or practice.
   D. Review and Revision History:
      1. 05/2021, Kevin Burson, Risk Manager, Risk Management; Sherril Green DVM, Veterinarian, Stanford University Veterinarian; Steve Felt DVM, Veterinarian, Stanford University; Employee Safety Council
      2. 03/2022 Kevin Burson, Risk Manager, Risk Department; Angelo Soto, EHS Integrity and HIMS Operations Director, HIMS Department; Jody Greenhalgh OTR/L, Occupational

| Stanford HEALTH CARE | **Last Approved Date:** May 2022 |
|---|---|
| **Policy Title**: Service Animals | Page 6 of 10 |
| **Departments Affected**: All Departments | |

Therapist, Stanford Medicine Alliance for Disability Inclusion and Equity; Nitay Gill, Director Special Patient Services, Customer Navigation; Fred Ehlers, Director, Site Support Services; Suzanne Harris, Director of Employee Labor Relations, Human Resources

E.  Approvals:
1. 08/2014, Quality, Patient Safety & Effectiveness Committee
2. September 2014, SHC Medical Executive Committee; SHC Board Credentials, Policies & Procedures Committee
3. 03/2022 Barbara Hardy, Chief IDHE Officer, Inclusion, Diversity & Health Equity; Helen Wirth, Administrative Director, Hospitality Services
4. 04/2022 Policy & Procedure Steering Committee
5. 05/2022 Medical Executive Committee; SHC Board of Credentials, Policy & Procedure

*"This document is intended for use by staff of Stanford Health Care.*
*No representations or warranties are made for outside use. Not for outside reproduction or publication without permission." V05.17.*



**Appendix A: Individualized Service Animal Assessment Tool**

Any decision to **exclude or remove a service animal** from Stanford Health Care (SHC's) shall be made only after an individualized assessment completed by the department manager in collaboration with staff nurses, social work, physicians, advanced practice professionals and in consultation with other departments *as needed* including, but not limited to Infection Control, Guest Services and Risk Management.

Individualized assessment of direct threat must include all the following:

    A. Be based on actual risks, not speculation or generalizations; rely upon current medical knowledge or best available objective evidence

    B. The nature, duration and severity of the risk

    C. Determine the probability that potential injury will occur, and

    D. Determine reasonable accommodations to policy, practice, or procedures to accommodate the disability.


**Assessment Date**: _____

**Dept. Manager Name/Designee**: _____

**Name**: _____

**MRN (If Patient), ID (If Employee) Write N/A if Family, Visitor or Other:** _____

**Animal Being Assessed (*Circle*):** Service Dog          Miniature Horse

**A. Check All Boxes That Apply to the <u>Animal</u>:**

1. Animal poses a **direct threat[1]** to the health and safety of others

    ☐    Not housebroken; has had more than one accident

    ☐    Poor hygiene (malodorous, dirt, fleas)

    ☐    Illness (fever, vomiting, diarrhea, impaired ability to serve patient)

    ☐    Out of control / disruptive (barking, jumping, running, lunging, biting)

**Additional facts:**

_____

_____

_____

_____

_____

Stanford
HEALTH CARE

2. **If you have checked any boxes above, please answer the following**:

   a. Nature of risk animal poses:

   _____

   b. Duration of the risk the animal poses:

   _____

   c. Severity of the risk:

   _____

   d. Probability that injury will occur:

   _____

   e. What reasonable accommodations can be made?

   _____

3. Animal **fundamentally alters**[1] SHC's operations, policies, practices, and procedures or would result in an **undue burden**[2].

   NOTE: #3 should be completed when applicable. #3 must be completed if denying or removing an accommodation and section 2.e above is left blank.

   **Provide Facts Demonstrating a Fundamental Alteration or Undue Burden:**

   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

**B. Check All Boxes that Apply to the <u>Patient/Handler/Owner</u>**

   ☐ Refuses or is unable to control the animal (tether, harness, verbal commands, visual cues)

   ☐ Refuses or is unable to feed and care for the animal (ambulation, toileting)
   ☐ Refuses or does not designate / provide handler to control animal
   ☐ Does not have friends or family who can control and care for the animal

---

[1] Does the presence of the animal significantly alter the nature of the services, goods, and facilities that SHC provides? (Ex: Dog would fundamentally alter the services in the OR since the OR is a limited access area that requires strict hygiene and protective barriers. No infection control measures could be reasonably imposed on the service animal).

[2] Does an accommodation present significant difficulty or expense?

**Stanford**
HEALTH CARE

Send completed forms to:

1. **If Patient:** HIMS Departments to be scanned and placed in the Media Tab of the patient's Legal Medical Record. Forms can be sent to HIMS by mail to: Stanford Health Care Health Information Management 300 Pasteur Drive, MC 5200, Stanford, CA 94305-5202 or email to: DL-HIMS-Document Imaging DL-HIMS-DocumentImaging@stanfordhealthcare.org.

2. **If Employee:** The employee's immediate supervisor should complete and send to Employee & Labor Relations.

3. **If Family, Visitor, or Other:** Send to guestservices@stanfordhealthcare.org

Stanford
HEALTH CARE

**Appendix B: Stanford Hospital Dog Park**

The Sierra Dog Park is approximately 500-square-foot fenced play area, with artificial turf, located near the promenade between 500 Pasteur and 300 Pasteur. It features a dog-friendly water fountain, waste disposal bags and can emptied three times a day, benches for human companions and a centrally located rock.

Veterinary Assistance Contact: Business Hours 650-723-3876, Non-business Hours 650-723-4408
*If a service animal becomes sick or injured while in SHC facilities, the handler is responsible for arranging veterinary care. Neither the hospital nor campus veterinary services can provide care to privately owned animals.*




**EXHIBIT J**

THE UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS          NO.: LD 4.05
Chicago, Illinois                                        PAGE: 1 of 5

---

**UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS**
**MANAGEMENT POLICY AND PROCEDURE**

---

**NO.: LD 4.05**
**EFFECTIVE DATE:  March 16, 2020**
**APPROVAL DATE:  March 16, 2020**

**SUBJECT: Service Animals**

## OBJECTIVE

To protect individuals with disabilities covered under the Americans with Disabilities Act (ADA) from discrimination in the use of service animals and to ensure access, wherever feasible, for service animals within University of Illinois Hospital and Clinics (Hospital) as required by ADA regulations.

## DEFINITIONS

For the purpose of this policy, the following definitions apply:

**Disability** is defined as any physical, mental, or intellectual impairment that substantially limits one or more major life activities, including but not limited to a physical, sensory, psychiatric, intellectual, or other mental disability.

**Service Animal** is defined as a dog that is individually trained to do work or perform tasks for an individual with an ADA-recognized disability. The tasks(s) performed by the dog must be directly related to the person's disability.
**Note 1:** Under the ADA, **only dogs that are individually trained are eligible to be considered service animals.** Under certain circumstances miniature horses that are also individually trained to do work or perform tasks for the benefit of an individual with a disability, may be permitted as service animals. The University will determine whether a miniature horse should be permitted as a service animal on a case-by-case basis. Please see UIC's Service Animal and Assistance Animal Policy for further information.
**Note 2:** Emotional support animals, therapy animals, comfort animals, and companion animals are NOT considered service animals under the ADA.
**Note 3:** The Hospital has a separate Pediatric Clinical Care Guideline for its PEDS 1.01 Animal Assisted Therapy Program.

**Service Animal Work/Tasks** are defined as specific actions that a trained dog, or under certain circumstances a miniature horse, provides to an individual with disabilities. Specific work and tasks include, but are not limited to, assisting the visually impaired, alerting health status, reminding the individual to take medications, or detecting sudden onset of sickness or symptoms related to the individual's disability.

**Individual** is defined as a person with a disability who relies on the assistance of a service animal for one or more major life activities including walking, talking, seeing, breathing, or hearing.

**Guardian** is defined as:
• A family member or friend entrusted by the Individual to control and care for the service animal;

---

**UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS
MANAGEMENT POLICY AND PROCEDURE**

- Any third party contracted by the Individual to properly care for the service animal; or
- Any party designated by the Hospital to care for the service animal, e.g. as secured by Hospital Social Work, if the Individual is not able to care for the animal and has not designated a Guardian.

**Direct Threat** is defined as a significant risk to the health and/or safety of others that cannot be eliminated or 'mitigated by a modification of policies, practices, or procedures. Risks include, but are not limited to, the potential for infection, injury, or allergic reaction of patients, visitors, guests, employees, volunteers, or students.

## POLICY

In compliance with the Americans with Disabilities Act (ADA), individuals with disabilities who are accompanied by service animals must be allowed access with their service animals in places of public accommodation, unless doing so creates a direct threat to other persons or a fundamental alteration in the nature of services.

A Guardian will be designated to control and care for a patient's service animal when it is determined that the Individual cannot care for or maintain control of their service animal.

This policy applies to patients, visitors, guests, employees, volunteers, and students who require the use of a trained service animal.

## PROCEDURE

A. Service animals are allowed to accompany patients, visitors, and guests in authorized areas within the Hospital facilities in accordance with the Americans with Disabilities Act, unless the presence of the service animal poses a direct threat to other persons or a fundamental alteration in the nature of services.

B. In order to determine if an animal is a service animal, staff may  ask:
   1. "Is the dog a service animal required because of a disability?", and
   2. "What tasks is the dog trained to perform?"

   It is not permissible to ask about the nature of the individual's disability, to request any documentation for the service animal, or to request that the service animal demonstrate its task.

**NOTE:** The ADA does not require service animals to wear a vest, ID tag, or special harness.

C. Service animals must be leashed or otherwise contained at all times while on the Hospital premises. The animal's ability to accompany their Individual may be restricted if there are any concerns about the animal regarding:
   1. **Physical condition,** e.g. visible sores, rashes, fleas, dirt, or other potential sources of infection;
   2. **Behavior,** e.g. snarling, growling, barking, or other aggressive, disruptive, or menacing behavior; or

THE UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS                    NO.: LD 4.05
Chicago, Illinois                                                          PAGE: 3 of 5

## UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS
## MANAGEMENT POLICY AND PROCEDURE

   3. **Containment,** e.g. the animal is not able to be controlled or escapes the individual's oversight.

D. Service animals are never permitted in restricted areas. These include, but are not limited to: food preparation areas; medication preparation areas; clean or sterile supply areas; preoperative holding areas; operating rooms; post-anesthesia care units; and procedure rooms;

E. In the psychiatric units if a service animal is required, an individual assessment will be made of the patient and the situation (See letter F below)

F. When a decision must be made regarding a service animal's access to other areas of the Hospital, the Individual, service animal's, and health care situation should be evaluated on a case-by-case basis by the supervisor of the area in question in coordination with the Office of Access and Equity to determine whether significant risk of harm exists and whether reasonable modifications will mitigate this risk. Three types of harm that must be considered are the risk of (1) infections, (2) allergic reactions, and/or (3) other medical issues that the service animal's presence could pose to patients, guests, volunteers, students, or staff.
**NOTE:** The Patient & Guest Experience Office (312-355-0101), Administrator on Call (312- 519-3402), and/or Infection Control (312-996-8953, and pager 3707) should be consulted if additional input or assistance is needed.

G. When an Individual with a service animal requires admission as an inpatient, the Individual and their service animal must be placed in a private room. The immediate supervisor and Nursing Resource Office (312-996-3725 or pager 2401) will be immediately notified of the presence of the service animal. The immediate supervisor or NRO will notify Infection Control (312- 996-8953, pager 3707) and, if appropriate, the Administrator on Call (312-519-3402).

H. Care and supervision of a service animal is the responsibility of the Individual; this includes the provision of water, food, toileting, and other related care. The Hospital employees are not expected to assist with the care or control of a service animal.

I. The service animal must remain in the patient's private room except when being taken outside for toileting.

J. If the service animal has an accident inside a Hospital facility, the Individual or Guardian is responsible for cleaning up after the service animal, placing the animal's waste in a plastic bag, and ensuring that a staff member discards it in a trash container in the dirty utility room. Environmental Services should be notified immediately so they can disinfect the area after the clean-up is complete.

K. The Individual shall provide the name and phone number of a Guardian for the service animal if he/she is unable to care for or control the animal.

L. Hospital Social Work (312-996-0293) will assist in making arrangements for a Guardian for the service animal if the Individual is unable to care for the animal and

THE UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS          NO.: LD 4.05
Chicago, Illinois                                        PAGE: 4 of 5

---

### UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS
### MANAGEMENT POLICY AND PROCEDURE

has not designated a Guardian in a timely manner. All costs associated with guardian services will be the responsibility of the Individual.

M. Incidents or concerns involving service animals should be promptly reported to the immediate supervisor or Nursing Resource Office (312-996-3725, pager 2401). The immediate supervisor or NRO will notify Infection Control (312-996-8953, pager 3707) and will make a determination about notification of the Administrator on Call (312-519-3402) and/or the Safety & Risk Hotline (312-413-4775) as appropriate

N. When interacting with service animals, all persons should wash their hands with soap and water before and after any contact with the animal.

O. Service Animals for Employees and Students, Volunteers:
1. Hospital employees who require the use of a service animal in their workplace must make a request for reasonable employment accommodations through the Office of Access and Equity.
2. Students who require the use of a service animal while providing clinical care to patients at the Hospital must make a request for reasonable accommodation through the Disability Resource Center.
3. Volunteers who require the use of a service animal while volunteering at the Hospital should contact the Office of Access and Equity prior to bringing their service animal to the Hospital.
4. When addressing a request for reasonable accommodation from a Hospital employee, student providing care to Hospital patients, or a volunteer at the Hospital, the Office of Access and Equity or Disability Resource Center will work with representatives from University Health Service and Infection Control to ensure compliance with all state, federal, and the Hospital regulations related to service animals in the workplace. This conversation will result in a written agreement detailing:
   a) verification of vaccination and veterinary records;
   b) the specific areas on Hospital premises where the animal is allowed;
   c) how long the animal will accompany the employee (temporarily or permanently);
   d) where the animal will excrete waste;
   e) how the waste will be disposed of;
   f) where the animal 's food and water will be stored; and
   g) how often the animal will be bathed & groomed.

This arrangement will be revisited at least annually, or more frequently if issues arise.

THE UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS          NO.: LD 4.05
Chicago, Illinois                                        PAGE: 5 of 5

---

### UNIVERSITY OF ILLINOIS HOSPITAL AND CLINICS
### MANAGEMENT POLICY AND PROCEDURE

**Key Word** blind

**References**
**Hospital Management Policy and Procedure**
HR 1.01 University Health Services (UHS)
LD 1.06 Patient Safety Event Reporting Process
LD 1.13 Resolution of Issues Related to Patient Care Utilizing the Chain of Command

**Department of Pediatrics Clinical Care Guideline**
PEDS-1.01 Animal Assisted Therapy Program

**University of Illinois Student Handbook**
http:// www.housing.uic.edu/ files/Student-Handbook-14-15.pdf

UIC Service Animal and Assistance Animal Policy
Americans with Disabilities Act, 2010 and 2016 Regulations
28 C.F.R. Parts 35 and 36
75 Fed. Reg. 56164, 56177 (Sept. 15, 2010); 81 Fed. Reg. 53204 (Aug. 11, 2016).

**Addendum** none

**Rescission Date**
June 2019
September 2016
February 2014
May 2010
April 2007

**Reviewed by**
This policy was reviewed and endorsed by the following individual(s):
Chief Quality Officer

**Policy Owner-Medical Director, Infection Prevention**

**EXHIBIT K**

 An official website of the United States government  Here's how you know

**NIH〉 Clinical Center**                                                        MENU

# Service Animals: Guidelines for Patients and Visitors

Home   Patient Services   Service Animals: Guidelines for Patients and Visitors        Share   Print

Are service animals permitted at the Clinical Center?

Should I bring paperwork about my service animal?

Should I notify the Clinical Center in advance that I will be bringing a service animal?

Should I contact my service animal's veterinarian before my visit?

What happens when I arrive?

Where can I walk my service animal?

Should I bring my service animal's food and water bowls?

May my service animal always stay with me?

What if I am unable to care for my service animal during my stay?

May visitors bring service animals?

Questions?

En Español

**Printable Resources**

Service Animals: Guidelines for Patients and Visitors

## Are service animals permitted at the Clinical Center?

Service animals are welcome at and may accompany patients and visitors to the Clinical Center. The term "service animal" is used to include any dog or miniature horse that is individually trained to do work and perform tasks for the benefit of an individual with a disability, including physical, sensory, psychiatric, intellectual, or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition, and, along with pets, are generally excluded from the Clinical Center.

Dogs whose sole function is for crime deterrence, comfort, or emotional support are not considered service animals, and will ordinarily be excluded as well.

**A service animal may be removed from the Clinical Center if the animal:**

- is not under the control of the patient (or visitor);
- is not housebroken;
- exhibits aggressive behavior such as snarling, biting, scratching, or teeth baring;
- is excessively noisy;
- is determined to be infectious or ill by the Clinical Center veterinarian; or
- otherwise poses a direct risk to the health or safety of people or other service animals.

Your animal may not be permitted in certain parts of the Clinical Center due to patient safety concerns and infection control standards. These include, but are not limited to, operating rooms and surgical suites, sterile areas, and food preparation areas. You are responsible for your animal's care during your visit. This includes feeding, grooming, and walking.

## Should I bring paperwork about my service animal?

If you will be staying at the Clinical Center as an inpatient, you must bring the following:

- Name and telephone number of the veterinarian who cares for the animal; and

- Documentation of current rabies vaccination and core current vaccines as directed by the service animal's primary veterinarian.

Service animals accompanying inpatients will have routine and constant interactions with staff, patients, and visitors over the course of admission. The information requested above will help the Clinical Center to maintain patient care, patient safety, and infection control standards.

Outpatients and visitors with a service animal are not required to provide documentation of vaccinations due to the more limited frequency and duration of interactions with staff, patients, and visitors.

## Should I notify the Clinical Center in advance that I will be bringing a service animal?

Inpatients who will be bringing a service animal into the Clinical Center are encouraged to notify their care team in advance of their appointment or visit.

## Should I contact my service animal's veterinarian before my visit?

It is a good idea to alert your veterinarian that you want to bring your service animal to your inpatient stay. The Clinical Center veterinarian may also wish to contact your veterinarian if there are any concerns.

## What happens when I arrive?

If the Clinical Center was notified of your inpatient admission in advance, all paperwork will be in place and noted in your medical record. If the Clinical Center was not made aware, the veterinarian will make all reasonable efforts to determine the required documentation for the service animal, from your local veterinarian.

The Clinical Center veterinarian is available to meet to discuss Clinical Center policies and answer any questions if needed. Veterinary examination is not normally necessary unless the animal exhibits overt signs of infection, illness, evidence of parasites, and/or aggression.

Additionally, hospital staff will post a sign, "Service Animal in Residence," on the door of your inpatient room.

## Where can I walk my service animal?

Service animals are permitted in all public areas across the NIH campus. There are recommended walking areas around the Clinical Center, including the grassy section at the NW corner of the Mark O. Hatfield Clinical Research Center near the children's playground and the lawn just beyond the Warren G. Magnuson Clinical Center South Entrance. You must clean up and dispose of your animal's waste.

**Note: Your service animal must always be on a leash or harness.**

## Should I bring my service animal's food and water bowls?

If requested, the Clinical Center veterinarian will provide sterile, stainless steel bowls for your animal's food and water.

## May my service animal always stay with me?

Your service animal may stay with you anywhere the general public is permitted to go within the hospital. Exceptions include if the presence of your animal poses a direct risk to the health or safety of people or other service animals or if the situation poses a risk to the animal directly.

If your patient care unit cannot house your animal (e.g., acute inpatient hospital settings including intensive care units, stabilization units, locked mental health units) and family/friends cannot assist, your admitting Institute may arrange to board your service animal outside of the NIH campus. If this is necessary, you will be responsible for paying for boarding.

## What if I am unable to care for my service animal during my stay?

You are responsible for the care of your service animal. If you are temporarily unable to walk, feed, or perform other care duties for your animal with the assistance of family and friends, then your care team may assist, if resources permit. If this is not practical, your Institute will arrange to board the animal. If this is necessary, you will be responsible for paying for boarding.

## May visitors bring service dogs?

As stated above, visitors may bring their service animals to the Clinical Center, and documentation is not required. The same rules and

limitations for exclusion or removal apply to visitors and their service animals.

## Questions?

If you have questions about bringing service animals into the Clinical Center, contact:

Lisa G. Portnoy, DVM DACLAM
Animal Program Director
Telephone: 301-435-5304
Email: portnoyl@cc.nih.gov

10 Center Drive, Bethesda, MD 20892

**More About Clinical Studies**

Are Clinical Studies for You?

Featured Studies

Ethics in Clinical Research

Kids in Research

Referring a Patient

ResearchMatch

Search the Studies

**Visiting**

Edmond J. Safra Family Lodge at NIH

Hospital Floor Plan

Patient and Patient Visitor Parking

Parking Changes at the NIH Clinical Center

Places to Stay (off campus)

The Children's Inn at NIH

TakeMeThere app

Traveling around Campus

**Donate**

About Blood Donation

About Platelet Donation

**Newsroom**

Clinical Center Tour Requests

Communications Team Contacts

Media Resources

## Stay up to date - by Email

Your email address

Sign up

| Directions |
|---|

| Contact Us |
|---|

Accessibility          FOIA          USA.gov

Privacy Statement          Disclaimer          National Institutes of Health

HHS Vulnerability Disclosure          No Fear Act          U.S. Department of Health & Human Services

## NIH

(301) 496-4000

in          X                    ●●

**EXHIBIT L**



**El Camino Hospital®**
THE HOSPITAL OF SILICON VALLEY

**POLICY/PROCEDURE TITLE:** Administrative: Service Animals for Disabled Patients or Visitors

**CATEGORY: Administrative**
**LAST APPROVAL DATE: 6/15**

---

**SUB-CATEGORY: Administrative Policies & Procedures**
**ORIGINAL DATE:9/09**

**COVERAGE:**

All El Camino Hospital staff
All Inpatients, Outpatients and Visitors of El Camino Hospital using a service animal

**PURPOSE:**

**STATEMENT:**

It is the policy of El Camino Hospital to comply with the requirements of the Americans with Disability Act and other state and federal regulations to provide access to individuals with disabilities who present with service animals unless it has been determined that the animal poses a direct threat to the health or safety of others.  If a service animal is not permitted in the hospital pursuant to the policy below, the hospital shall ensure that the needs of the disabled individual are accommodated.  Except as specified below, a person using a service animal shall generally be afforded the same access to the Hospital as that afforded the public in general. Care of the service animal is the obligation of the person with the disability.   Any questions about this policy should be directed to the Manager of Risk Management.

**DEFINITIONS:**

A. <u>Disability</u>:  A disability is defined as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, including but not limited to walking, talking, breathing, hearing or caring for oneself.

B. <u>Service Animal:</u>  A *service animal* is defined as a dog trained to work or perform tasks for the benefit of an individual with a disability.  For sight impaired patients who are allergic to dogs, a miniature horse (usually not more than 26 inches in height or more than 100 pounds) may be used as a service animal. However, the miniature horse must be trained to provide assistance to the individual with a disability and must be house broken. The work or tasks performed by a service animal must be directly related to the

1

**NOTE:** Printed copies of this document are uncontrolled. In the case of a conflict between printed and electronic versions of this document, the electronic version prevails.



**El Camino Hospital**®
THE HOSPITAL OF SILICON VALLEY

**POLICY/PROCEDURE TITLE:** Administrative: Service Animals for Disabled
**Patients or Visitors**

individual's disability. This includes but is not limited to the following: guiding
individuals with impaired vision, alerting individuals with impaired hearing to sounds,
providing minimal protection.

C. <u>Direct Threat:</u> A direct threat is defined as a significant risk to the health or safety of
others that cannot be eliminated or mitigated by a modification of policies and procedures
or by the provision of auxiliary aids/services. The Hospital shall make an individual
assessment based on reasonable judgment that relies on current medical knowledge or on
the best available objective evidence to ascertain the nature, duration, and severity of the
risk, the probability that the potential injury will actually occur, and whether reasonable
modifications of policies, practices or procedures will mitigate the risk.

**PROCEDURE:**

**Responsibility**

A. Patient.

1) The patient is responsible for arranging for the care of the service animal,
   including food, water, toileting and cleaning up after the service animal.

2) If the patient is unable to take care of the service animal or needs to be separated
   from the service animal for a period of time, the patient is responsible for
   arranging the care of the animal through family members, friends or other
   accompanying person (not including staff). The patient's physician may be
   involved with assessing whether the patient is able to care for the service animal
   due to his/her condition or whether the patient needs to be in a restricted access
   area.

3) The service animal shall be well groomed, clean and housebroken. If the service
   animal does not appear to be well groomed, the patient may be asked to remove
   the service animal due to the direct threat it poses to the health and safety of
   patients and visitors.

4) If the service animal becomes out of control and not able to be managed by the
   patient or designated handler within a reasonable amount of time, the
   patient/designated handler will be asked to immediately remove the animal from
   the Hospital. The patient/designated handler shall be responsible for any damage
   caused by the service animal.

B. Healthcare Provider/Staff

**NOTE:** Printed copies of this document are uncontrolled. In the case of a conflict between
printed and electronic versions of this document, the electronic version prevails.

# El Camino Hospital®
### THE HOSPITAL OF SILICON VALLEY

**POLICY/PROCEDURE TITLE:** Administrative: Service Animals for Disabled Patients or Visitors

1) Any service animal in attendance of a patient or visitor will be recognized as an animal trained to assist a disabled person and will not be viewed as a "pet".

2) If any El Camino Hospital employee has a concern that an animal is a "pet" rather than a service animal, the employee may ask the following questions and consult with Risk Management.

   a) If the animal is a service animal required because of a disability
   b) What work/task has the service animal been trained to perform

3) If the person answers "No" to either of the questions above, then the animal is not considered a service animal and the staff member should refer to the Animal Visitation Policy for further guidance about allowing the animal to visit with the patient. The staff member should document this interaction in the patient's medical record. If the patient answers yes to the questions, the service must be allowed unless it is in a restricted area.

4) Staff must not ask for information about the person's disability, require medical documentation regarding the service animal, or request to see a special identification card or training documentation for the service animal.

## Procedure

A. In general, a service animal shall be permitted in any area of the Hospital that is unrestricted to inpatients, outpatients or visitors such as lobbies, cafeterias and patient rooms provided that the service animal does not pose a Direct Threat to the health and safety of others and would not require a fundamental alteration in the Hospital's policies and procedures.

   1) Upon identification that a patient has a service animal, staff shall notify the clinical manager of the area and the Hospital Supervisor if the patient requires admission.

   2) For inpatients, the patient should be placed in a private room if at all possible.

   3) The manager of the unit and/or Hospital Supervisor should aid patients or staff with known or suspected allergies to a service animal by making reasonable accommodations such as arranging for different staff members, arranging for physical separation whenever possible.

3



**El Camino Hospital**
THE HOSPITAL OF SILICON VALLEY

**POLICY/PROCEDURE TITLE:** **Administrative: Service Animals for Disabled Patients or Visitors**

B. Restricted Access Areas. Areas that are considered restricted where service animals will not be allowed include areas where the general public is not permitted. Additional areas may be identified on a case-by-case basis to protect the health and safety of patients, visitors and employees of El Camino Hospital. These areas include but are not limited to:

1) Procedural and interventional areas including the operating room, cath labs, endoscopy and the PACU.
2) Patient units where a patient is immunocompromised
3) Patients who are placed in isolation for respiratory, enteric or infectious precautions.
4) Areas where the hospital determines that the service animal presents a direct threat or the presence of the service animal would require a fundamental alteration in the unit/department's policies, practices, or procedures. Prior to excluding the service animal, hospital staff must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

C. If a patient with a service animal is located in an area with restricted access, efforts must be made to accommodate the patient's disability.

D. Risk Management/Clinical Effectiveness shall be notified before a patient is denied access to an area with his/her service animal.

E. The patient will be informed about the decision to allow/deny the service animal, the reasons why, and what accommodations will be made for his/her disability and documentation will be in the medical record.

4

 **El Camino Hospital®**
THE HOSPITAL OF SILICON VALLEY

**POLICY/PROCEDURE TITLE:** Administrative: Service Animals for Disabled Patients or Visitors

| APPROVAL | APPROVAL DATES |
|---|---|
| Patient Care Management Council: | 9/13 |
| Medical Committee (if applicable): | |
| ePolicy Committee: (Please don't remove this line) | 5/15 |
| Pharmacy and Therapeutics (if applicable): | |
| Medical Executive Committee: | 5/15 |
| Board of Directors: | 6/15 |

Historical Approvals:

Patient Care Management Council, 8/13, 9/13
Medical Executive Committee, 9/12, 9/13
Board of Directors: 11/12, 9/13

5

**NOTE:** Printed copies of this document are uncontrolled. In the case of a conflict between printed and electronic versions of this document, the electronic version prevails.

**EXHIBIT M**

# PATIENT/VISITOR SERVICE ANIMALS FACT SHEET



## Can I bring my service animal to Mount Sinai Medical Center?

Mount Sinai Medical Center welcomes the use of service animals by any person with a disability. A disability, under the Americans with Disabilities Act, is defined as any physical or mental impairment that limits one or more major life activities, such as breathing, hearing, walking or caring for oneself. A service animal is a dog or miniature horse that is individually trained to do work and perform tasks for the benefit of an individual with a disability, including physical, sensory, psychiatric, intellectual, or other mental disability. **A service animal is not a pet because it is specially trained to help a person overcome the limitations caused by the disability.** Other species of animals, whether wild or domestic, trained or untrained, are not considered service animals for the purposes of this definition. These animals, along with pets, are generally excluded from the medical center.

## Can I bring my comfort or emotional support animal to the medical center?

**No.** According to the ADA, comfort or emotional support animals are not service animals. Service animals receive special training to do specific tasks that a person may not be able to do because of their disability. The ADA does not consider the sense of companionship, comfort or security that animals may provide a "trained task."

## Do I have to provide identification or information about my service animal?

Mount Sinai does not require information about a person's disability or proof of the service animal's training. If a staff member is not sure that an animal is a service animal, you may be asked:

*Is the animal a service animal?*
*What tasks or services has the animal been trained to perform?*

You should bring proof of current rabies and other vaccinations as directed by the service animal's veterinarian and proof of county licensure, along with the name and telephone number of your veterinarian. Service animals accompanying patients and visitors will have numerous interactions with staff, patients, and visitors. We are committed to enforcing infection control standards and ensuring that we take the appropriate measures to keep our patients, visitors and staff safe.

## What are my responsibilities?

- You are responsible for the feeding, toileting, care and behavior of your service animal at all times. You should have a plan for your service animal in case you are unable to provide care at any point, or if you must go to an area of the medical center where service animals are not allowed. Mount Sinai employees may not take care of a service animal at any time. If you do not have someone available to care for your service animal and you are unable to do so, the medical center will make arrangements to board your service animal until you are able to assume responsibility for the animal. If this is necessary, you will be responsible for paying for boarding.

- Mount Sinai employees and patients (other than the owner) may not pet or play with your service animal.

- Service animals must always be on a leash, harness, or tether unless your disability prevents it, or your service animal cannot perform its service or task while leashed, harnessed or tethered. If not on a leash, the animal must remain under voice control at all times.

- Service animals should not be exposed to any patient's open area of skin (for example: cuts, surgical wounds, area around a drainage tube, etc.)

# Mount Sinai
## MEDICAL CENTER

- Everyone, including the animal's owner, should wash their hands with alcohol hand sanitizer or soap and water after touching the service animal, its equipment or any other item the animal has touched.
- You should not bring your service animal into the medical center if the animal is sick, has diarrhea, fleas, ticks or sores. If your service animal shows any signs of poor health or is not house-trained, you may be asked to remove the animal from the medical center.
- You should be able to control your service animal's behavior, including barking and jumping, at all times. You may be asked to remove the animal from the medical center if it is out of control and not obeying commands.
- You should report any incidents, such as bites or scratches, to a medical center staff member.
- If your service animal growls, bites or acts aggressively, or otherwise is determined to pose a direct risk to the health or safety of people or other service animals, you will be asked to remove the animal from the medical center right away.

## Where is my service animal allowed in the medical center?

You may bring the service animal to any area of the medical center where the general public is allowed.

**Service animals are not allowed in:**

- Operating rooms
- Rooms or units that require special air quality for patients at high risk for infection such as oncology units
- Intensive care units (ICUs) or other restricted units
- Pharmacy and central processing areas
- Areas where visitors must take special precautions to reduce the risk of infection and may involve wearing gowns, gloves, or masks
- Food preparation areas

**Visitors with service animals may not be allowed if:**

- The patient is in an ICU or other restricted unit
- The patient is on isolation precautions
- The patient or roommate is at high risk for infection
- The patient or roommate has an allergy or a severe fear of the service animal
- The patient or roommate has behavioral or psychiatric issues that may pose a danger if a service animal visits.

If a visitor with a service animal is not allowed in a particular part of the medical center for any reason, efforts will be made to allow visits with the patient in another location.

## Should I notify the medical center in advance that I will be bringing a service animal?

Inpatients who will be bringing a service animal into the medical center are encouraged to notify their care team in advance of their appointment or visit, but are not required to do so. Advance notification will allow us to ensure all required paperwork is presented for the service animal and to verify that patients have made arrangements for their service animal should they be unable to care for them at some point during their medical center stay.

## Where can I walk my service animal?

Service animals are permitted in all public areas across the Mount Sinai campus. There are recommended walking areas behind the Jacobson Building and across from the main building near the loop exit. You must bring plastic bags and other supplies to clean up and dispose of your animal's waste. Please throw away these bags in outdoor trash bins.

## What happens if my service animal has an accident in the medical center?

If your dog has a bathroom accident inside the medical center, clean up after your dog as best as you can and then tell a staff member. You can also call Environmental Services at **305.674.2640** so they can disinfect the area.

## Should I bring my animal's food and water bowls?

You are responsible for bringing all supplies necessary for the care of your service animal while in the medical center.

## Can I get in trouble if I falsely claim an animal is a service animal?

**Yes.** Under Florida law, a person who knowingly or willfully misrepresents himself or herself as using a service animal or being qualified to use a service animal commits a second degree misdemeanor, punishable by up to 60 days in jail, six months probation, a $500 fine, and a requirement that you perform 30 hours of community service for an organization that serves individuals with disabilities.



# Mount Sinai
## MEDICAL CENTER

Questions or Concerns? Contact Patient Relations at 305.674.2990 Option 4

**EXHIBIT N**

| ARIZONA DEPARTMENT OF HEALTH SERVICES **ARIZONA STATE HOSPITAL** | LEVEL | REFERENCE CODE | EFFECTIVE DATE |
|---|---|---|---|
| | II | Provision of Care, Tx, Services (PC) | March 8, 2022 |

| TITLE: | ANIMAL ASSISTED ACTIVITIES & ANIMAL ASSISTED THERAPY | |
|---|---|---|
| SUPERSEDES: | Animal Assisted Activities & Animal Assisted Therapy, approved 3/20/19 | |
| REVIEW CYCLE: | Three Years | GOVERNING BODY APPROVAL: | No |

## PURPOSE

Animal companionship, animal-assisted therapy and animal-assisted activities are used to promote the improvement of patient/staff morale, emotional well-being, and to open lines of communication.

## POLICY

The Arizona State Hospital (ASH) supports the use of certified Pet Partner teams under the conditions outlined in this policy.

## APPLICABILITY

All Hospital staff, whether state employed or contracted, and volunteers participating in the provision of or assistance with pet therapy activities.

## DEFINITIONS

**Animal-Assisted Activity (AAA**): "AAA provides opportunities for motivational, educational, recreational, and/or therapeutic benefits to enhance quality of life. AAA is delivered in a variety of environments by specially trained professionals, paraprofessionals, and/or volunteers, in association with animals that meet specific criteria."  (www.petpartners.org)

**Animal-Assisted Therapy (AAT)**: "AAT is a goal-directed intervention in which an animal that meets specific criteria is an integral part of the treatment process. AAT is directed and/or delivered by a health/human service professional with specialized expertise, and within the scope of practice of his/her profession. AAT is designed to promote improvement in human physical, social, emotional, and/or cognitive functioning [cognitive functioning refers to thinking and intellectual skills]. AAT is provided in a variety of settings and may be group or individual in nature. This process is documented and evaluated." (www.petpartners.org)

**Handler:** The human half of the pet partner team.

**Pet Partner Team:** The handler and the therapy animal.

**Therapy Animal:** The animal half of the pet partner team.

## GENERAL GUIDELINES

**A.** The Pet Partner's team must be certified through a national animal therapy organization, such as the Delta Society, prior to being permitted to participate in the program.

**B.** Prior to bringing the therapy animal on grounds, coordinating staff will verify that adequate liability insurance is in place in the event an accident or injury occurs. Liability insurance coverage must be submitted and will be retained by the Director of Rehabilitation Services or his/her designee.

**C.** The handler is responsible for providing a certificate of health annually that abides by the national organization's standard guidelines. This record is retained by the Director of Rehabilitation Services or his/her designee and is updated on an annual basis.

**D.** The handler will be a Hospital volunteer and receive the required Hospital orientation prior to the animal's first visit.

**E.** Employees may become certified handlers, but they may function in this role only as a volunteer and must complete the volunteer intake process.

**F.** The therapy animal must be under the direct supervision of the handler <u>at all times</u>, including puppy petting which will follow the same requirements as outlined in this policy.

**G.** The therapy animal will be bathed and/or groomed the day of the visit.

**H.** The handler and animal will wear attire consistent with the Hospital's dress code, including a picture I.D. from the certifying organization and an ASH Volunteer Badge.

**I.** Should an incident occur that involves a Nationally Certified Animal:

   1. The certifying organization will be notified, and
   2. An incident report will be completed as per Hospital policy.

**J.** The animals are not permitted in the following areas:

   1. Food preparation and storage areas
   2. Clean utility rooms
   3. Medication rooms
   4. Storage areas
   5. Cafeteria and patient dining areas
   6. Observation or isolation rooms

## PROCEDURE

**A.** A patient is referred by the treatment team for AAT and is evaluated by the treatment team and/or the person making the referral for participation. The BHMP must concur that AAT is medically necessary, and document the same in the EHR.

**B.** The Pet Partner team must go through the office of Rehabilitation Services to receive approval for visiting the facility.

**C.** All animals must comply with the health requirement of the certifying organization (including up-to-date vaccinations, grooming, etc.).

**D.** A copy of the animal's certificate of health from the veterinarian will be kept on file at the Office of Rehabilitation Services.

**E.** The handler must have the following equipment on a visit:

1. Hand sanitizer
2. Leash/harness/head collar/neck collar
3. Registration tag
4. Current vaccination record
5. Equipment for waste removal
6. Hospital Picture ID
7. Certifying organization's method of identification

**F.** The Pet Partner team will check in with Hospital Security personnel at Traffic Control.

**G.** A Rehabilitation Therapy Services Representative will meet the Pet Partner team and stay with the team throughout the visitation period.

**H.** Animals will be permitted in the following areas:

1. Recreation areas
2. Day rooms
3. Outdoor areas within the perimeter of the unit yards
4. Outdoor recreation areas
5. Non-treatment areas, not otherwise specified as prohibited areas
6. A patient's room only under strictly supervised conditions, if none of the occupants or the handler objects, and if the patient's medical condition does not prohibit it.

**EXHIBIT O**

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8    Matthew Phillip Solan,                    Case no. CV24-02061-PHX-JJT-DMF
                     *Plaintiff,*
9
         *v.*
10                                              **[PROPOSED] PRELIMINARY**
                                                **INJUNCTION**
     State of Arizona, *et al.,*
11                   *Defendants.*

12

13          Pending before the Court is a Motion for Preliminary Injunction (Doc. 15), filed

14   by Plaintiff. Based on the record thus far, it is clear to the Court that Defendant State of

15   Arizona ("Defendant") has neither complied with the Court's previous injunction

16   regarding Plaintiff's former service animal, Foxy I, nor not acted in good faith in denying

17   Plaintiff's most recent request for reasonable accommodations for his new service animal,

18   Foxy II. The Court finds that requiring Defendant to admit Foxy II is the least intrusive

19   means to correct the harm caused by Defendant's blanket service animal ban. Therefore,

20          **IT IS HEREBY ORDERED** restraining and enjoining Defendant, including its

21   public and contracted officers and employees, from denying entry and accompaniment of

22   Foxy II while Plaintiff is committed to the Arizona State Hospital ("ASH").

                                    Page 1 of 2

1     **IT IS FURTHER ORDERED** that Defendant may ask Plaintiff to remove Foxy

2 II from ASH if, and only if (a) she becomes out of control and Plaintiff does not take

3 effective action to control her, (b) it becomes evident that Foxy II is not housebroken, or

4 (c) Foxy II becomes a direct threat to the health or safety of others within the meaning of

5 the ADA, and the threat is such that it cannot be mitigated by reasonable modifications to

6 ASH's policies, practices, or procedures, or the provision of auxiliary aids or services. If

7 ASH hereafter removes Foxy from ASH for any of the foregoing reasons, it must notify

8 Plaintiff and this Court of the reasons for the removal.

9     **IT IS FURTHER ORDERED** that this preliminary injunction binds Defendant

10 and all persons and other entities through which it may act. Defendant shall forthwith

11 distribute this Order to all current state and contracted officers and employees of the

12 Arizona State Hospital.

13     **IT IS FURTHER ORDERED** that this Order shall become effective immediately

14 and shall remain in effect during the pendency of this case, or until this Court orders

15 otherwise.

16     **IT IS FURTHER ORDERED** that failure to comply with the terms of this Order

17 may result in civil or criminal sanctions for contempt of this Court.

18     **DATED** this _____ day of _____, 20____.

19

20

21                           Honorable John J. Tuchi
                          United States District Judge

22

1

## CERTIFICATE OF SERVICE

2        I certify that on March 13, 2025, a copy of the foregoing was deposited in the U.S.

3    mail, addressed to:

4
         Ann Hobart and Jordan Kendall
5        Assistant Attorneys General
         Arizona Attorney General's Office
6        2005 N. Central Avenue
         Phoenix, Arizona 85004
7
         *Attorneys for Defendants*

8

9

10                                                    _____
                                                      Matthew Phillip Solan
11

12

13

14

15

16

17

18

19

20

21

22

Page 1 of 1