**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel:    1.970.FOX.9611
Fax:    1.970.844.1733
Email: legal@fox-ranch.com

*Plaintiff in propria persona*

☑ FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 2 6 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Matthew Phillip Solan,
                    *Plaintiff*,

  *v.*

State of Arizona, *et al.*,
                    *Defendants*.

Case no. CV24-02061-PHX-JJT-DMF

**PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' SECOND  MOTION TO DISMISS (DOC 15)**

F.R.C.P. Rule 12(f); LRCiv 7.2(i), (m)(1)

COMES NOW Plaintiff Matthew Phillip Solan ("Plaintiff"), and moves for an Order striking Defendants' second Motion to Dismiss (Doc. 15) ("Second MTD") for the reasons set forth hereinafter.

## **INTRODUCTION**

Defendants' Second MTD flagrantly violates the formatting, page limitations, and content standards required by the Federal Civil Rules of Procedure ("FRCP") and Rules of Practice of the U.S. District Court for the District of Arizona ("LRCiv," "Local Rules," or "Local Rules of Civil Procedure"). Specifically:

1. The body of the motion is improperly formatted with 1.55-line spacing instead of the double-spacing required by LRCiv 7.1(b)(1).

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA, 85008-6056

2. Defendants' Second MTD is 18 pages, and when correctly reformatted to double-spacing, the motion expands to 22 pages, exceeding the 17-page limit imposed by LRCiv 7.2(e) by 5 pages.

3. The Second MTD incorporates scandalous, immaterial, and impertinent matter concerning Plaintiff, including inflammatory, unverified allegations regarding his relationship with his service animal and personal beliefs.

The Court previously struck Defendants' First Motion to Dismiss (Doc. 13) for violating LRCiv 12.1(c). Defendants were thus on clear notice of the mandatory nature of the Local Rules. Rather than correcting course, Defendants have escalated their disregard for this Court's rules and decorum. Plaintiff accordingly moves to strike the Second MTD in its entirety pursuant to LRCiv 7.2(i), (m)(1) and F.R.C.P. Rule 12(f).

**PROCEDURAL BACKGROUND**

1. Plaintiff filed a Complaint with this Court on August 14, 2024, and subsequently filed the operative First Amended Complaint (Doc. 6) ("FAC") on November 18, 2024.

2. On February 25, 2025 Defendants filed their first motion to dismiss the FAC ("First MTD"), and included therewith a certificate which stated, "[p]ursuant to LRCiv 12.1(c), counsel for Defendants State of Arizona, Michael R.Sheldon, Aaron Bowen, Lea'Cher Carter, and Unique Coleman hereby certifies that she considered attempting to confer with Plaintiff about the deficiencies that she perceives with the claims from the First Amended Complaint (doc. 6) that survived the Court's screening Order (doc. 8). However, given that Plaintiff already has filed a Second Amended Complaint (doc. 10), she has concluded that such efforts would be futile."

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA, 85008-6056

3. On February 27, 2025, the Court struck Defendants' First MTD *sua sponte*, holding that "[d]espite the mandatory requirement of conferral, Defendants' counsel considered complying but decided not to do so, claiming futility of such conferral despite that there is no futility exception in the rule [12.1(c)]." *Internal quotes omitted*.

4. Defense counsel telephonically conferred with Plaintiff the following week. The conference call lasted approximately 90 minutes, and the parties discussed the perceived deficiencies in each other's filings.

5. While defense counsel contends that the LRCiv 12.1(c) conference was "substantive," it should be noted that during the telephonic conference, Plaintiff informed Ms. Hobart and Mr. Kendall of numerous impertinent, improper, and scandalous arguments contained in their stricken MTD, and suggested that they were improper content for a Motion to Dismiss.

6. However, Ms. Hobart adamantly insisted that the First MTD was correct, that Plaintiff was wrong on every point raised, that the conference was just a procedural requirement, and that she would be refiling the motion at the beginning of the week. Mr. Kendall mostly remained silent throughout the conference.

7. On March 13, 2025, Defendants filed the Second MTD—a substantively identical motion to dismiss—but this time with a certificate that, at least superficially, complied with LRCiv 12.1(c).

8. The same day, the Court ordered "that Plaintiff must file a response to Defendants' Motion to Dismiss, no later than 30 days from the date of [the] Order." (Doc. 16). The Court's order stated that "…as lawyers must, *pro se* litigants must also become

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

familiar, and comply, with the Federal Rules of Civil Procedure and the Rules of

Practice and Procedure…You must comply with the provisions of LRCiv 7.2,

including:

> (e) **Length of Motions and Memoranda.** Unless otherwise permitted by the Court, a motion including its supporting memorandum, and the response including its supporting memorandum, each shall not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts. Unless otherwise permitted by the Court, a reply including its supporting memorandum shall not exceed eleven (11) pages, exclusive of attachments.
>
> ….
>
> (i) **Briefs or Memoranda of Law; Effect of Non-Compliance.** If a motion does not conform in all substantial respects with the requirements of this Local Rule, or if the unrepresented party or counsel does not serve and file the required answering memoranda, or if the unrepresented party or counsel fails to appear at the time and place assigned for oral argument, such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily."

9. All of Plaintiff's filings in this case have complied with LRCiv 7.2(e).

10. On or about March 20, 2025, Plaintiff received Defendants' Second MTD. The Second MTD is not in compliance with LRCiv 7.2(e) or LRCiv 7.1(b)(1).

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

LRCiv 7.2(f) requires, as the Court noted in its March 13 Order (Doc. 16), that "a motion including its supporting memorandum, and the response including its supporting memorandum, each shall not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts." Defendants' Second MTD is 18 pages long.

While one extra page is technically enough to warrant striking a motion, Plaintiff acknowledges that the Court may not wish to concern itself with such trifles as a 1-page overages.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA, 85008-6056

However, the 18-page count in Defendants' filing is misleading. LRCiv 7.1(b)(1) requires that "[t]he body of all documents shall be typed double-spaced and…shall not be single-spaced except for footnotes and indented quotations." Further, "[a]ll pleadings, motions and other original documents filed with the Clerk shall be in a fixed-pitch type size no smaller than ten (10) pitch (10 letters per inch) or in a proportional font size no smaller than 13 point, including any footnotes."

After a careful inspection of Defendants' Second MTD, Plaintiff has discovered that is was typeset using Times New Roman, a proportional font, at 13 point. *See* Exhibit A - Declaration of Matthew Phillip Solan ("Declaration") ¶¶ 15, 18. But the Second MTD is not double-spaced; rather, the body of the motion is formatted with a 1.55 line-spacing multiplier instead of the required 2.0 double-spacing. *See* Exhibit B; Declaration ¶¶ 6-7. In other words, the lines are spaced 0.55 lines apart instead of 1.00 lines apart. Plaintiff imported Defendants Second MTD into Microsoft Word 2010, and attempted to adjust the line spacing to double-spaced as LRCiv 7.1(b)(1) requires. *See* Exhibit C & D; Declaration ¶¶ 5-8. The result was a 22 page document. *See* Exhibit E.

What this means, in effect, is that Defendants Second MTD is 5 pages over the 17-page limit, rather than 1. Plaintiff is allowed the same 17 pages for a response that Defendants are allotted for their motions. It would be manifestly unjust to allow one of the largest law firms in the state, the Arizona Attorney General's Office, to "sneak in" five additional pages, while simultaneously holding that *pro se* litigants must "become familiar, and comply, with the Federal Rules of Civil Procedure and the Rules of Practice and Procedure of the U.S. District Court for the District of Arizona."

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    Defense counsel's chosen formatting is no mere accident–1.55 line spacing is not a

2    preset in Microsoft Word, or any other word processor that Plaintiff is aware of; 1.5 line

3    spacing is, but 1.55 requires the drafter type in that specific offset. Moreover, violations

4    of the Court's typeface styleguides comprise the second most frequent rule violation in

5    the District of Arizona according to the Court's pamphlet, "The 10 Most Frequent

6    Violations of the Rules of Practice." [1] *See* Exhibit E.

7    The Local Rules of Civil Procedure are "laws of the United States," United States v.

8    Hvass, 355 U.S. 570, 575 (1958), "have the force of law[,] are binding upon the parties

9    and upon the court, and a departure from local rules that affects substantial rights requires

10    reversal." Professional Programs Group v. Department of Commerce, 29 F.3d 1349, 1353

11    (9th Cir. 1994) (internal quotation marks omitted). "A departure is justified only if the

12    effect is so slight and unimportant that the sensible treatment is to overlook [it]." Id.

13    If a motion does not conform in all substantial respects with the requirements of

14    LRCiv 7.2(f), "such non-compliance may be deemed a consent to the denial or granting

15    of the motion and the Court may dispose of the motion summarily." LRCiv 7.2(i). For the

16    foregoing reasons, the Court deem Defendants' second round of non-compliance with the

17    Local Rules of Practice a consent to the denial of their Second MTD, and strike the same

18    summarily, without leave to amend.

19    FRCP Rule 12(f) further empowers the Court to strike any redundant, immaterial,

20    impertinent, or scandalous matter. Defendants' Second MTD, like their First MTD, is a

---

[1] U.S. District Court for the District of Ariz., Top 10 Local Rule Violations (n.d.), https://www.azd.uscourts.gov/sites/azd/files/top%2010%20local%20rule%20violations.pdf

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

collage of immaterial, impertinent, and scandalous matters. Defendants have used their Second MTD to launch baseless personal attacks on Plaintiff, including allegations of bestiality and psychosexual pathology—none of which are supported by admissible evidence. These claims are not only immaterial to whether or not the ADA was violated; they are manifestly scandalous and designed to prejudice the Court against Plaintiff.

## CONCLUSION AND REQUEST FOR RELIEF

This Court previously struck Defendants' First MTD for noncompliance with LRCiv 12.1(c). Rather than correcting course, Defendants responded by intentionally filing an identical motion—bloated with improper line spacing, exceeding the permitted page count by nearly 30%, and replete with scandalous *ad hominem* attacks, impertinent and immaterial arguments, and defenses that are manifestly devoid of merit. Plaintiff now invites the Court to sanction Defendants for their ongoing failure to comply with the formatting and page limits imposed by LRCiv 7.1(b)(1) and 7.2(e), and for burdening the record with 18 pages of immaterial, impertinent, and scandalous matter.

**WHEREFORE,** Plaintiff respectfully moves for an Order pursuant to LRCiv 7.2(i), (m)(1) and F.R.C.P. Rule 12(f) striking Defendants' Second MTD (Doc. 15) in its entirety, and denying Defendants leave to amend the same.

**SIGNED, SEALED, AND DATED** this 25th day of March, 2025.



**Matthew Phillip Solan**
Plaintiff in *Pro. Per.*

legal@fox-ranch.com
501 North 24th Street
Phoenix, AZ 85008
+1 (970) 369-9611

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**EXHIBIT A**

## DECLARATION OF MATTHEW PHILLIP SOLAN

I, Matthew Phillip Solan, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1.  I am the Plaintiff in the above-captioned matter and make this declaration in support of my Motion to Strike Defendants' second Motion to Dismiss (Doc. 15).

2.  I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience, as well as my professional expertise as a graphic designer and typesetter.

3.  I have held a certificate in Design and Visual Communications since 2011. See Attachment "A."

4.  I have worked as a freelance designer and digital media consultant for over 15 years. My work spans a broad range of disciplines, but relevant here are my skills in typesetting, formatting, page layout, and document assembly across diverse print and digital media domains.

5.  On or about March 20, 2025, I received a copy of Defendants' second Motion to Dismiss (Doc. 15) ("Second MTD"). As I prepared to dissect the Defendants' arguments by making notes between the lines of the motion's body text, I noticed the line spacing was unusually small.

6.  I transposed the body of the Second MTD into a Microsoft Word 2010 document for inspection and discovered that the text was formatted with 1.55 line spacing— not the required double-spacing (2.00) mandated by Local Rule of Civil Procedure 7.1(b)(1).

7.   I confirmed this by opening the Paragraph Formatting dialog box within Word, which displays the spacing attribute.  A screenshot of this display showing 1.55 spacing and the 18-page length of the document is shown in Exhibit A.

8.   I then changed the line spacing to exactly 2.0 (double-spacing), keeping all other formatting attributes intact. Once changed, the document expanded to 22 full pages. A screenshot of this spacing change and the resulting page count is shown in Exhibit B.

9.   I then printed a copy of the reformatted, double-spaced version of the Second MTD and attached it to my Motion to Strike as Exhibit C.

10.  Based on my professional training and experience in document formatting and analysis, I certify that the only substantive change I made to the original motion was the adjustment of line spacing from 1.55 to 2.0.

11.  In my professional opinion as a typesetter, Defendants' Motion does not conform to the formatting requirements of LRCiv 7.1(b)(1), and when properly formatted, exceeds the 17-page limit set forth in LRCiv 7.2(e) by 5 pages.

12.  There are two primary categories of typefaces relevant to court filings: fixed-pitch (monospaced) and proportional fonts. In fixed-pitch fonts, each character occupies the same horizontal space.

13.  An example of a monospaced font is Courier New, which conforms to the fixed-pitch standard specified in LRCiv 7.1(b)(1).

14.  By contrast, proportional fonts assign different horizontal widths to different characters based on their shape.

15. Times New Roman, the *de facto* standard typeface in legal drafting, is a proportional font because narrower characters (e.g., "i", "l") take up less space than wider characters (e.g., "M", "W").

16. Proportional fonts were not possible with traditional typebar typewriters, daisy-wheel printers, teletypewriters, or monospaced dumb terminals. They became practical with the advent of personal computing and graphical user interfaces (e.g., Mac OS in 1984, Windows 1.0 in 1985), and were developed primarily to improve readability and aesthetics in rich text applications, as well as to maximize space efficiency when rendering text on dot-matrix and later raster-based printers.

17. The authorization of fixed-pitch fonts in the Local Rules of Practice appears to be a surviving artifact of the 1980s, when both monospaced daisy-wheel printers, and proportional-font capable dot-matrix and early raster-based printers were standard fixtures in American business and legal offices.

18. Defendants' Motion utilizes a 13 point, Times New Roman typeface throughout.

19. Under standard pleading format—double-spaced Times New Roman, 13-point font, 1" top and bottom margins, 1.5" left, and 0.5" right margins—the number of lines per page will be approximately 22. This is consistent with my own filings.

20. By contrast, under the same page and spacing constraints, a fixed-pitch font such as Courier New 10-point allows for approximately 28 lines per page. This occurs because Courier New characters are wider in the aggregate, due to uniform spacing, resulting in fewer characters per line, but more vertical lines per page due to smaller font height.

21. This difference makes line spacing compliance especially critical in documents using proportional fonts, because a visually compressed line spacing—such as 1.55—can deceptively increase the amount of text per page without triggering obvious page count inflation.

22. Defendants' Second MTD, as filed, is 18 pages. After accounting for the improper vertical compression, the motion's actual page count is 22.


I declare under penalty of perjury that the foregoing is true and correct.

**SIGNED, SEALED, AND DATED** this 25th day of March, 2025.



_____
Matthew Phillip Solan

**ATTACHMENT A**





Lead Instructor

Director of Technical Programs



*Matthew Solari*

Awarded to

Outstanding Performance in the
Design and Visual Communications
Post Graduate Program 2011



ASSABET VALLEY REGIONAL VOCATIONAL SCHOOL DISTRICT

Certificate Of Excellence

**EXHIBIT B**

Defendant's Motion to Dismiss shown using the Times New Roman proportional typeface at 13 point font scale, **single-spaced with a line hight of 1.55**, 1 inch top and bottom margins, 1 ½ inch left margin, and ½ inch right margin, on 8 ½ inch by 11 inch letter paper.

Showing the typeface, font size, number of pages (18), lines per page (28), and line spacing:



**EXHIBIT D**

1  Ann Hobart, Bar No. 019129
   Jordan Kendall, Bar No. 038647
2  Assistant Attorneys General
   Arizona Attorney General's Office
3  2005 N. Central Avenue
   Phoenix, Arizona 85004
4  Telephone:    (602) 542-8347
                 (602) 542-7687
5  Facsimile:    (602) 542-7644
   Ann.Hobart@azag.gov
6  Jordan.Kendall@azag.gov
   EmploymentLaw@azag.gov
7
   Attorneys for Defendants State of Arizona,
8  Michael R. Sheldon, Aaron Bowen,
   Lea'cher Carter, and Unique Coleman
9

10              **IN THE UNITED STATES DISTRICT COURT**

11                **FOR THE DISTRICT OF ARIZONA**

12  Matthew Phillip Solan,                    Case No: CV24-02061-PHX-JJT-DMF

13          Plaintiff,                        **MOTION TO DISMISS COUNTS ONE,
                                              FOUR, ELEVEN, AND TWELVE OF
14  vs.                                       THE FIRST AMENDED COMPLAINT
                                              (DOC. 6) ON BEHALF OF
15  The State of Arizona; Jennifer L. Cunico; DEFENDANTS THE STATE OF
    Michael R. Sheldon; Aaron Bowen,         ARIZONA, MICHAEL R. SHELDON,
16  Calvin J. Flowers; Steven Kwoh; Kindra   AARON BOWEN, LEA'CHER
    Ochoa, Lea'cher Carter, Unique Coleman;  CARTER, AND UNIQUE COLEMAN**
17  John Does 1-100; Jane Does 1-100; Black
    Corporations 1-10; and White Entities 1-
18  10,
             Defendants.
19

20          Pursuant to the December 10, 2024, screening Order, the Court has required

21  Defendant State of Arizona to respond to Counts One and Four; Defendants Michael R.

22  Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman to respond to Count

Eleven; and Defendants Sheldon and Bowen to respond to Count Twelve of the First Amended Complaint. (Doc. 8 at 21.) Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, undersigned counsel hereby moves to dismiss each of the Counts on behalf of all of these Defendants for failure to state a claim on which relief can be granted. This Motion is supported by a certification pursuant to LRCiv 12.1(c), which is attached hereto as Exhibit A.

## I.    Factual and Procedural Background

On March 12, 2020, Plaintiff Matthew Solan was convicted in the Coconino County Superior Court of one count of aggravated assault and sentenced to a 7.5-year term of imprisonment in the Arizona Department of Corrections, Rehabilitation & Reentry. (Doc. 8, at 3 n. 3.) Because he has been diagnosed as Seriously Mentally Ill ("SMI") and was adjudicated Guilty Except Insane, Solan was committed to the Arizona State Hospital ("ASH") under the jurisdiction of the Psychiatric Security Review Board. (*Id.*; Doc. 6 at 13, ¶ 56.) Solan was admitted to ASH on April 1, 2020. (*Id.*)

Shortly following his admission, Solan asked to have his service dog Foxy (from which he had been separated in 2019 when he was arrested and placed in a detention facility) live with him at ASH. (Doc. 6 at 14-15, ¶¶ 66-67.) ASH denied his request, citing security and health and safety concerns, and administrative burden. (*Id.* at ¶ 67.) Solan filed a lawsuit and Motion for Preliminary Injunction with this Court, *Solan v. Arizona State Hospital,* CV-20-02209-PHX-JJT (DMF) ("CV-20-02209"), alleging that ASH's refusal to modify its policies and procedures to allow Foxy to live with him at the forensic psychiatric hospital violated the ADA. On March 22, 2022, the Court granted

Solan's motion and ordered ASH to conduct a particularized assessment to determine whether reasonable modifications could be made to allow Foxy to live with Solan at ASH "without fundamentally altering ASH's services." (Doc. 6 at 16, ¶ 76.)

On or about May 6, 2022, ASH provided Solan a report of its particularized assessment setting forth six general areas of concern that justified denying his request to have Foxy live with him at ASH. (Doc. 6 at 17, ¶ 81 & 64-69 [Ex. A].) This Court had advised Solan that, if he was "again dissatisfied" with ASH's decision following the particularized assessment, he could "again move for preliminary injunctive relief." (CV-20-02209, Doc. 84, at 16.) Solan did not do so, although by the time he received the particularized assessment report, he was represented by counsel. (Doc. 6 at 19, ¶ 93.) Solan learned that Foxy had passed away on July 13, 2022. (*Id.* ¶ 94.) However, he did not stipulate to dismissal of his case until January 26, 2023. (CV-20-02209, Doc. 94.) The dismissal was with prejudice (*id.*) even though, by then, Solan had already arranged to have Foxy cloned (doc. 6 at 19, ¶ 97).

On November 9, 2023, Foxy was "reincarnated." (*Id.* at 20, ¶ 105.) On June 13, 2024, Solan submitted a request to have her live with him at ASH. (*Id.* at 22, ¶ 117.) ASH denied this request, based on the same concerns that it had articulated in the May 2022 particularized assessment report. (*Id.* at 22-23, ¶ 123.) These concerns included that "based on [Solan's] own personal statements, [his] past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature)." (*Id.* at 23, ¶ 124(a), & 86.) On August 14, 2024, Solan filed this lawsuit complaining that ASH's denial violated Title II of the Americans with

1    Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehab Act"). (Doc.

2    1.) In the operative First Amended Complaint ("FAC") filed on November 18, 2024,

3    Solan alleged claims for false light invasion of privacy and defamation as well. (Doc. 6 at

4    50, 51.)

5        Though these four alleged claims survived screening, they should nonetheless be

6    dismissed for failure to state a claim. For the same reasons that ASH explained to Solan

7    in the May 2022 particularized assessment report, neither the ADA nor the Rehab Act

8    require the State to allow Foxy's clone to live with Solan at ASH. Solan's false light

9    invasion of privacy and defamation claims against Bowen are barred by the one-year

10   statute of limitations for state-law claims against State employees. Those claims fail as to

11   Sheldon because Solan has not alleged any false statements that can be attributed to him.

12   The allegedly defamatory statements from Carter and Coleman that Solan complains

13   placed him in a false light were allegedly made only in the hearing of Solan and a few

14   fellow ASH patients and therefore do support the publication element of a false light

15   invasion of privacy claim. For all of these reasons, as discussed more fully below, the

16   Court should grant Defendants' motion to dismiss in its entirety.

17   **II.    Legal Argument**

18       **A. The Federal Pleading Standard**

19       A pleading must contain a "short and plain statement of the claim *showing* that the

20   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). To survive a

21   motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint

22   must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Id.* "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." *Adams v. U.S. Forest Srvc.*, 671 F.3d 1138, 1142-43 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555-56). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556). Therefore, "[d]ismissal . . . is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quotation omitted).

**B. Counts One and Four Should Be Dismissed Because Neither Title II of the ADA nor Section 504 of the Rehabilitation Act Require the State of Arizona to Allow Foxy to Live with Solan at ASH.**

In Count One of the FAC, Solan alleges that by denying his request to have Foxy live with him at ASH, the State of Arizona violated Title II of the ADA ("Title II"), which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs,

1    or activities of a public entity, or be subjected to discrimination by any such entity." 42

2    U.S.C. § 12132 (cited in Doc. 6 at 32, ¶ 167). Similarly, in Count Four of the FAC, Solan

3    alleges that the State's denial violated Section 504 of the Rehabilitation Act (the "Rehab

4    Act"), which provides, in relevant part, that "no otherwise qualified individual with a

5    disability . . . shall, solely by reason of his or her disability, be excluded from the

6    participation in, be denied the benefits of, or be subjected to discrimination under any

7    program or activity receiving federal financial assistance." 29 U.S.C. § 794 (cited in Doc.

8    6 at 37, ¶ 199.) The Court may analyze Count One and Count Four coextensively because

9    "there is no significant difference in the analysis of rights and obligations created by the

10    two Acts." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

11        As this Court ordered in CV-20-02209, ASH performed a particularized

12    assessment of Solan's request and identified six reasons that Title II did not require the

13    State of Arizona to allow Foxy to live with him at ASH. (Doc. 6 at 17, ¶ 81, & 64-69 [Ex.

14    A].) With the exception of the specific medications that the 16-year-old Foxy was

15    required to take, the State's legitimate, non-discriminatory reasons to exclude her from

16    ASH in May 2022 apply equally to her youthful reincarnation three years later.[1]

17    Moreover, the State's particularized assessment under Title II and its enabling regulations

18    is valid under the Rehab Act as well. *See Payan,* 11 F.4th 729 at 737.

19        **1.  Foxy is not necessary for Solan to participate in and benefit from**

---

[1] The factual points and legal authorities discussed in Sections II.B.1-6, below, were all discussed in the May 2022 particularized assessment report that Solan attached as Exhibit A to the FAC. (Doc. 6 at 64-69.) "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10.

1          **ASH's services, programs, and activities.**

2          Regulations interpreting Title II require that a public entity "make reasonable

3    modifications in policies, practices, or procedures when the modifications are necessary

4    to avoid discrimination on the basis of disability, unless the public entity can demonstrate

5    that making the modifications would fundamentally alter the nature of the service,

6    program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Generally, Title II requires a public

7    entity to "modify its policies, practices, or procedures to permit the use of a service

8    animal by an individual with a disability." 28 C.F.R. § 35.136(a). The State does not

9    believe that these regulations apply in Solan's case, however, because it does not believe

10   that Foxy is necessary for him to participate in and benefit from ASH's services,

11   programs, and activities.

12         During an interview conducted as part of the individualized assessment, Solan

13   represented that Foxy is a "psychiatric service animal" and, as such, "she's not providing

14   much physical assistance at all." "[S]he doesn't pull me around or direct me as if I'm

15   blind." Solan continued: "There isn't much physical necessity for her to do much as a

16   psychiatric service animal, it's more her mental abilities." Thus, Solan acknowledged that

17   he did not need Foxy to get around the Forensic Hospital or to meet other physical needs,

18   like toileting or hygiene. As for Foxy's "mental abilities," ASH does not believe they are

19   necessary for Solan to participate in and benefit from the Hospital's services, programs,

20   and activities. As Solan's treating psychiatrist stated in an affidavit that he provided in

21   connection with ASH's particularized assessment: "[I]n a level one psychiatric hospital

22   there is no need for a service animal simply because services are provided by trained

1    people whose job it is to provide these very things as needed to all patients on a regular

2    basis. There is a 24/7 medical staff for that."

3        Moreover, Solan's psychiatrist believed that having Foxy with him at the Forensic

4    Hospital would actually impede Solan's treatment. He observed that Solan was

5    committed to the Forensic Hospital, "in part, to learn how to better get along with people

6    so that he can provide for his own needs without alienating or provoking people or

7    otherwise getting into trouble with either the law or with friends or with people who work

8    for him in the future. With this in mind, a beloved therapy animal would only serve to get

9    in the way." Solan's psychiatrist concluded: "Matthew has said he likes animals better

10    than people, and he says that people are 'tools' to achieve his needs. This needs a reality

11    check."

12        During the particularized assessment interview, Solan stated that Foxy's "presence

13    is necessary for [him] to receive the treatment [he is] entitled to" at the Forensic Hospital.

14    Solan's psychiatrist disagrees. He believes that the "necessary part is for Matthew to

15    learn how to deal with people in spite of his autistic spectrum disorder. He tells me that

16    he had the dog as a transition object to remove himself from the 'co-dependent'

17    relationship he had with his mother. . . . Now, my suggestion to him is to move even

18    further and drop the transition object. He is realizing he is not as disabled as he thought

19    he was and is realizing capabilities he didn't know he had. A transition object is no

20    longer needed." In sum, Solan's psychiatrist did "not believe that a service animal is

21    clinically appropriate" for Solan. Based on Solan's treating psychiatrist's professional

22    opinion, ASH denied Solan's request to have Foxy live with him at the Forensic Hospital.

**2. Foxy cannot be tethered as Title II requires while in the Forensic Hospital.**

Title II requires that a service animal be under its handler's control. *See* 28 C.F.R. § 35.136(d). Specifically, the law requires that a service animal "shall have a harness, leash, or other tether." *Id.* However, leashes and harnesses are ligatures that ASH policy, in adherence and consistent with definitions from licensure and the Joint Commission, classifies as contraband. This means that they are not approved for patient possession or use, even under staff supervision, because patients may use ligatures to harm themselves or others. *See* ASH AdmPtRights Policy No. 004 (Patient Property, Storage, and Contraband) and attachment listing Contraband and Controlled Items for the Civil and Forensic Hospitals (specifically identifying "clothing with removable straps, strings/drawstrings, metal, plastic, or wire pieces (i.e., underwire)" and "items that can be used as ligature (i.e., chain, rope/twine, drawstrings, wire, cords, etc.)" as contraband). When conducting licensing and regulatory compliance surveys, State regulators, and the Joint Commission are particularly vigilant about citing potential ligature risks. Rightly so, given the direct threat to patient and staff safety that ligatures present. The conflict between Title II's tethering requirement and ASH's prohibition on items that can be used as ligatures cannot be overcome. For this additional reason, ASH denied Solan's request to have Foxy live with him at the Forensic Hospital.

**3. Solan would need ASH Staff's assistance to care for and supervise Foxy, which Title II does not require.**

Under Title II, "[a] public entity is not responsible for the care or supervision of a

service animal." 28 C.F.R. § 35-136(e). In Solan's particularized assessment interview and preliminary injunction briefing in CV-20-02209, however, he acknowledged that if Foxy were allowed to live with him at the Forensic Hospital, he could not care for her daily needs without substantial assistance from ASH staff in two fundamental respects:

**Feeding:** ASH policy prohibits patients from keeping or consuming food in their rooms. Solan therefore proposed storing food for Foxy in his bin in the room where patients' hygiene products and electric razors are stored. Patients do not have free access to this room, so Solan would need a staff member to get Foxy's food and bowl (and to return the clean bowl to storage) in the morning and the evening. These are times that staff is generally involved in supervising patients' meal service and, in the morning, supervising their hygiene activities. Solan did not suggest where he would feed Foxy (understanding that it could not be in his room), how he would dispose of any leftover food and clean her feeding bowl, or how he would coordinate her feeding times with his own meal times and hygiene practices.

**Toileting/Exercise:** Solan acknowledged that he does not have free access to the Forensic Hospital's mall, where Foxy would relieve herself and get exercise. Solan currently is allowed to walk the mall for half an hour once a day under staff supervision. His current level of supervision is 1(supervisor)-to-5(patients). Assuming that Foxy could accompany him on these mall walks, Solan has indicated that ASH staff would have to give him access to the mall an additional two or three times a day, according to Foxy's needs. In his particularized assessment interview, Solan stated that despite being 16 years old, Foxy would be able to sleep through the night while the units are locked down

without needing to relieve herself. But in case she did, Solan could get puppy pads and put them down "in the bathroom" as he did when he was traveling with Foxy years before. This plan ignored that Solan does not have a private bathroom, and Foxy could not open the door to the unit bathrooms available for patient use. The reality is that if Foxy used puppy pads, it would be on the floor in Solan's room. At Solan's interview, he stated that this is no different from a patient who requires using adult diapers. If that is so, disposal of the soiled puppy pads, like the soiled adult diapers, would fall to staff. If Foxy missed the puppy pad, the clean-up also would involve staff, as patients do not have unsupervised access to cleaning supplies on the unit or training on necessary cleaning protocols.

In addition to these aspects of Foxy's daily care, Solan's psychiatrist noted that her supervision also would fall exclusively to ASH staff when, as has happened several times in the past, Solan required seclusion.

In sum, it is clear that Foxy could not safely reside at the Forensic Hospital without significant assistance from ASH staff, which Title II does not require. This was a third independent reason why ASH denied Solan's request.

### 4. Veterinary medications cannot be safely stored or administered at the Forensic Hospital.

The record shows that, as of May 2022, Foxy's veterinarian had prescribed her enalapril twice a day for a heart condition and gabapentin once or twice a day for osteoarthritis. Consistent with Hospital policy, licensing requirements, and state and federal regulations, however, ASH cannot store or administer veterinary medications—

1  and Forensic Hospital patients cannot store or administer medications of any kind.

2  Particularly acute are the health and safety issues relating to a forensic patient's

3  possession of gabapentin. While it is not yet a controlled substance in Arizona, it is

4  commonly abused, and forensic patients should not have ready access to it, as they would

5  if Solan were allowed to store and administer this drug. That Foxy could not receive her

6  prescribed medications at the Hospital was another reason that ASH denied Solan's

7  request to have her live there in May 2022. That Foxy's reincarnation may not currently

8  require daily doses of enalapril and gabapentin does not change the fact that neither Solan

9  nor ASH staff could provide her with any veterinary medications that she may eventually

10 require.

**5. Modifying ASH policies to allow staff to care for Foxy would**

**fundamentally alter the nature of the Forensic Hospital's Services.**

13       As discussed above, Solan could not care for Foxy's daily needs at the Forensic

14 Hospital without help from ASH staff. ASH's existing patient care policies and practices,

15 however, do not provide for giving such assistance and would have to be modified to

16 address various concerns, including issues arising from interactions between humans and

17 animals, animal waste, and the storage, dispensing, and administration of medication to

18 animals. The policies that would have to be modified to allow Foxy to reside at the

19 Hospital include, but are not limited to, ASH ClinSvsProfSvs Policy No. 002 (Patient

20 Nutrition, Education, and Food Services); ASH Infection Control Plan; ASH Infection

21 Control Risk Assessment and Progress Report; ASH Environment of Care SFY 2021-22

22 Hazardous Materials and Waste Management Plan; ASH Administering Medications

1    Policy; ASH Medication Management Policy; ASH Medication Safety Policy; and ASH

2    Medications Brought Into the Hospital by a Patient/Patient's Family Policy. Admitting

3    Foxy would also require revising the Task Assignment Sheets (day and night shifts) for

4    the unit where Solan currently resides. In ASH's view, such a thorough-going overhaul of

5    its policies, procedures, and practices would require fundamentally altering the Hospital

6    from a facility that cares for humans to one that cares for humans and animals. Title II

7    does not require such a fundamental alteration. *See* 28 C.F.R. § 35.130(b)(7)(i) (when

8    they are necessary to avoid disability discrimination, "[a] public entity shall make

9    reasonable modifications in policies, practices or procedures . . . unless the public entity

10    can demonstrate that making the modifications would fundamentally alter the nature of

11    the service, program, or activity"). For this additional reason, ASH denied Solan's

12    request to have Foxy live with him at the Forensic Hospital.

13    **6. ASH cannot ignore information that Solan's relationship with Foxy**

14    **may be abusive or risk enabling such abuse.**

15    Finally, while Solan asked ASH to consider Foxy to be a psychiatric service

16    animal, statements that he made to ASH staff and patients indicated that he considered

17    her to be something other than an animal that is individually trained to perform a task or

18    work that is directly related to Solan's disability, which is how the ADA defines "service

19    animal." *See* "Frequently Asked Questions about Service Animals and the ADA,"

20    https://www.ada.gov/regs2010/service_animal_qa.html (last consulted February 25,

21    2025). Reports are that Solan considered Foxy to be his "familiar," a "soul mate," a

22    "person," a "woman," and a "fiancée." Additionally, ASH received information that

Solan had either touched Foxy inappropriately in the past or contemplated doing so in the future. For example:

- In a Progress Note dated December 2, 2020, Solan described Foxy as a "co-sovereign" and "like a wife."

- In a Progress Note dated April 24, 2021, Solan was reported as saying that he and Foxy "put our tongues in each other's mouth."

- In another Progress Note dated April 24, 2021, he was reported as saying that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it. He was also reported to have talked to another patient about sticking his fingers in Foxy's rectum and noting that his hand would not fit because it was too big.

- In a Progress Note dated May 8, 2021, Solan was quoted as saying near the nursing station: "Foxy is my service dog, she is more than a service dog, ASH can't stop me from marrying her. Biden passed a law." Around this time, Solan applied for a marriage license for himself and Foxy. At Solan's particularized assessment interview on April 18, 2022, he stated that "under the common law we'd already be married."

- On June 14, 2021, Solan enlisted a number of his peers to participate in a "manumission" ceremony, in which he referred to Foxy as a "woman" and a "private person incarnate" and to himself as a "man" and a "private person incarnate." At his April 18, 2022, interview, Solan explained that "[m]anumission was used in ancient Rome for releasing a slave to the freedom of a municipality, it

1    meant giving freedom to somebody that wasn't considered a person."

2    • On August 23, 2021, Solan reportedly told staff that he was saving himself for his

3    fiancée Foxy, "who ha[d] not consented to intercourse as of yet."

4    • On September 1, 2021, Solan reportedly told his treatment team that he identified

5    as a Pomeranian and that is why he referred to Foxy as his fiancée. At his April 18,

6    2022, interview, Solan admitted making this statement. He explained that "there's

7    all this lately in the news about people claiming to be a different gender identity,

8    so I said why can't I identify as a Pomeranian, I'd rather live with 'em, I like 'em

9    better than people which is true, people are confusing and difficult, I'd be happy

10    living with Pomeranians and no one else but, so why not just identify as a

11    Pomeranian?"

12    • On November 11, 2021, Solan reportedly told his occupational therapist (in a

13    conversation about his inattention to personal hygiene) that Foxy "licks the inside

14    of my mouth and cleans all the gunk from my teeth." In his interview on April 18,

15    2022, Solan confirmed that at one time, Foxy indeed performed that function for

16    him.

17    • In a December 12, 2021, Progress Note, Solan is reported to have said that he

18    wanted a Viagra order so that he could have sex with his dog.

19    • In an IR dated December 22, 2021, Solan is reported as saying about Foxy during

20    an On-Unit Open Art Group on the Pinon Unit: (1) "yeah baby, we are the

21    superior breed my little fox"; and (2) "I cannot wait to touch you my baby

22    Pomeranian."

During his interview on April 18, 2022, Solan denied making some of these statements and asserted that his interest in marrying Foxy was "ceremonial" and not sexual. Be that as it may, ASH could not (and cannot) ignore multiple reports (and his own admissions) that Solan had inappropriate feelings for Foxy. Nor can it ignore the risk that allowing Foxy to reside at the Forensic Hospital would give Solan scope to abuse Foxy in the private room that ASH has provided to Solan because of his issues getting along with other patients. Animal abuse is a criminal act and ASH will not facilitate such crimes. For this additional reason, ASH denied Solan's request to live with Foxy at the Forensic Hospital.

With the exception of the specific medications that the 16-year-old Foxy was required to take, the State's legitimate, non-discriminatory reasons to exclude her from ASH in May 2022 apply equally to her youthful reincarnation three years later. Moreover, the State's particularized assessment under Title II and its enabling regulations is valid under the Rehab Act as well. *See Payan,* 11 F.4th 729 at 737. Accordingly, the Court should dismiss Count One and Count Four against the State of Arizona for failure to state a claim on which relief can be granted.

**C. Count Eleven Should Be Dismissed Because Solan Failed to State a Claim for False Light Invasion of Privacy Against Bowen, Sheldon, Carter, or Coleman.**

In Count Eleven of the FAC, Solan alleges a claim for false light invasion of privacy against Defendants Bowen, Sheldon, Carter, and Coleman for "falsely" accusing him of "engaging or planning to engage in, inappropriate and illegal sexual activities with

1    Foxy." (Doc. 6 at 50, ¶¶ 279-80.) Solan claims that these statements were "made to or in

2    the presence of ASH staff and/or patients," but he does not indicate what, exactly, those

3    statements were or to whom, exactly, they were made. (*Id.* ¶ 280.) Such conclusory

4    allegations are insufficient to state a claim on which relief can be granted. *Iqbal*, 556 U.S.

5    at 678.

6           In Count Twelve, Solan complains that "Bowen published the Particularized

7    Assessment letter," that "Sheldon published the Denial Letter" relating to the

8    reincarnated Foxy, and that "Carter and Coleman each made defamatory statements about

9    Plaintiff in front of other ASH patients, including 'you eat dog a**,' and 'you eat dog

10   p***y.'" (Doc. 6 at 51-52, ¶¶ 289, 290, 294.) These allegations also are insufficient to

11   state a claim for false light invasion of privacy against any of the Defendants.

12          As an initial matter, Solan's alleged claim against Bowen is time-barred. A.R.S. §

13   12-821. "A cause of action accrues when the damaged party realizes he or she has been

14   damaged and knows or reasonably should know the cause, source, act, event,

15   instrumentality or condition that caused or contributed to the damage." A.R.S. § 12-

16   821.01. Solan's putative false light claim against Bowen accrued on or about May 6,

17   2022, when he had Solan served with the Particularized Assessment letter. (Doc. 6 at 17,

18   ¶ 81.) Therefore, to be timely, Solan would have had to have filed his false light invasion

19   of privacy claim against Bowen no later than May 6, 2023. Solan, however, did not raise

20   that claim until he filed the FAC on November 18, 2024. (Doc. 6.) Accordingly, the one-

21   year statute of limitations bars Solan's false light invasion of privacy claim against

22   Bowen.

1    Additionally, to state a claim for false light invasion of privacy, a plaintiff must

2    allege "(1) the defendant, with knowledge of falsity or reckless disregard for the truth,

3    gave publicity to information placing the plaintiff in a false light, and (2) the false light in

4    which the plaintiff was placed would be highly offensive to a reasonable person in the

5    plaintiff's position." *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 922 (D. Ariz.

6    2019). "[T]o qualify as a false light invasion of privacy, the publication must involve 'a

7    major misrepresentation of [the plaintiff's] character, history, activities or beliefs,' not

8    merely minor or unimportant inaccuracies." *Godbehere v. Phoenix Newspapers, Inc.*, 783

9    P.2d 781, 787 (Ariz. 1989) (quoting Restatement (Second) of Torts § 652E cmt. c.). "[I]t

10   is not an invasion of the right of privacy ... to communicate a fact concerning the

11   plaintiff's private life to a single person or even to a small group of persons." Restatement

12   (Second) of Torts § 652D, cmt. a).[2] The publication must be "to the public at large, or to

13   so many persons that the matter must be regarded substantially certain to become one of

14   public knowledge." *Christakis v. Deitsch*, 478 P.3d 241, 244 (Ariz. App. 2020); *see also*

15   *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1115 (D. Ariz. 2022) (dismissing the

16   plaintiff's false light claim because the publicity element was not met where the

17   defendant placed a bankruptcy filing in a google drive folder that could be accessed by

18   the public and emailed the folder's link to three individuals).

19   Solan has failed to plead sufficient facts to plausibly allege the knowing or

20   reckless falsity and publication elements of a false light invasion of light claim against

---

[2] "Arizona courts follow the *Restatement (Second) of Torts* absent authority to the contrary." *Koepnick v. Sears Roebuck & Co.*, 762 P.2d 609, 617 (Ariz. App. 1988).

any of the Defendants. As this Court has noted, what the Particularized Assessment letter had to say about Solan's relationship with Foxy was based on "statements recorded by various medical professionals and staff in progress notes and an April 2022 interview of Plaintiff." (Doc. 8 at 13.) Solan has alleged no facts to suggest that Bowen doubted or had reason to doubt these statements. Moreover, while Solan alleges that Bowen had an ASH grievance investigator deliver the Particularized Assessment letter to him at the ASH Cottonwood unit, he has alleged no facts to suggest that Bowen disclosed the letter to the public at large. (Doc. 6 at 17, ¶ 81.)

Similarly, the "legitimate concerns" expressed in the Denial Letter were "based on [Solan's] own personal statements" indicating that his "past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature)." (*Id.* at 23, ¶124(a).) Further, the Denial Letter came from Arizona State Hospital Administration (not from Sheldon), was addressed to Solan, and copied only to ASH's counsel. (*Id.* at 22-23 & 86 [Ex. H].) Solan has alleged no facts to suggest that Sheldon doubted or had reason to doubt Solan's "own personal statements" about his relationship with Foxy, or that Sheldon published the Denial Letter (or caused it to be publicized) beyond Solan and ASH's attorney.

Finally, Solan alleges that the allegedly "defamatory" statements that ASH Behavioral Health Technician Carter and Coleman made about him were made in his "presence and in front of other ASH patients." (*Id.* at 11-12, ¶¶ 44, 46; 26, ¶ 137.) But Solan has alleged no facts to imply that Carter and/or Coleman knew or had reason to know that their statements were false or that they publicized their comments beyond a

small group of ASH patients, which is insufficient to establish the publicity element of the false light invasion of privacy tort.

Accordingly, Solan has failed to state a claim for false light invasion of privacy against Defendants Bowen, Sheldon, Carter, or Coleman.

**D. Count Twelve Should Be Dismissed Because Solan Failed to State a Claim for Defamation Against Bowen or Sheldon.**

In Count Twelve of the FAC, Solan asserts that Bowen and Sheldon defamed him with statements contained in the Particularized Assessment letter and the Denial Letter, respectively, which, he alleges, implied that he engaged in "bestiality and animal abuse" with Foxy. (Doc. 6 at 51, ¶¶ 289, 290.)[3] However, he fails to state a defamation claim against either Defendant, for several reasons. Initially, for the reasons discussed in Section II.C., above, the claim against Bowen is time barred, and Sheldon did not make the statements about Solan's relationship to his service dog contained in the Denial Letter. Additionally, to be liable for defamation against a private individual like Solan, a defendant must publish a false and defamatory communication "(a) know[ing] that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts §

---

[3] Solan also alleges that Carter and Coleman defamed him with their alleged statements about his sexualized conduct with a dog. (Doc. 6 at 26 & 52, ¶¶ 137, 294.) However, the Court has not ordered Carter or Coleman to answer Count Twelve. (*See* Doc. 8 at 21, ¶ 5.) Perhaps this is so because "obscenities, vulgarities, insults, epithets, name-calling, and other forms of verbal abuse are insufficient to raise a claim for defamation." *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1162 (D. Ariz. 2013), *aff'd sub nom. Breeser v. Menta Grp., Inc.*, 622 F. App'x 649 (9th Cir. 2015).

580(B) (1977). Here, Solan has alleged no facts to suggest that Bowen made any of the statements in the Particularized Assessment letter knowing they were false or with reckless or negligent disregard of whether they were true.

### Conclusion

For the reasons set forth above, Defendants respectfully request that the Court grant this motion and dismiss the First Amended Complaint for Restitution, Damages, and Disgorgement, and for Injunctive, Declaratory, and Other Relief in its entirety.

Respectfully submitted this 13th day of March, 2025.

Arizona Attorney General's Office
/s/ Ann Hobart
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing this 13th day of March, 2025.

COPY of the foregoing emailed this 13th day of March, 2025, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

1  The Honorable Deborah M. Fine
   U.S. District Court, Suite 321
2  401 W. Washington Street, SPC 15
   Phoenix, AZ 85003-2120
3
   Matthew P. Solan
4  c/o Arizona State Hospital
   501 N. 24th Street
5  Phoenix, Arizona 85008-6056
   legal@fox-ranch.com
6  Plaintiff
7  /s/    Deb Sawyer

**EXHIBIT E**

## The 10 Most Frequent Violations of the Rules of Practice ("Local Rules"[1])

1.  Use proper capitalization in the case caption to denote the party names. See LRCiv 7.1(a)(3) (also applies in criminal cases pursuant to LRCrim 12.1 which incorporates LRCiv 7.1(a)(3))

2. Use "a fixed-pitch type size no smaller than ten (10) pitch (10 letters per inch) or proportional font size no smaller than 13 point, *including any footnotes*" for all pleadings, motions and other original documents. (emphasis added). The body of all documents must be typed double-spaced and shall not exceed 28 lines per page and must not be single-spaced except for footnotes and indented quotations. *See* LRCiv 7.1(b)(1). (applies in criminal cases pursuant to LRCrim 12.1) While footnote type size must be no smaller than 13 point, footnotes may be single spaced.

3. Except for Social Security appeals, motions, responses, briefings and memoranda must not exceed 17 pages and replies must not exceed 11 pages unless otherwise authorized in advance of filing by the assigned judge for good cause shown, exclusive of attachments and any Rule 56 Statement of Facts. *See* LRCiv 7.2(e).

4. For lawyers or *pro se* litigants authorized to file electronically, all pleadings, motions, memoranda, or other filings must be filed in text-searchable format. *See* LRCiv 7.1(c) and definition of ".pdf," ECF Manual, at I(A). ("[E]lectronic documents must be converted to .pdf directly from a word processing program (e.g., Microsoft Word® or Corel WordPerfect®) and must be text searchable."). Such filings shall not be printed to paper and then scanned and saved as portable document format (.pdf). Documents which exist only in paper form, like exhibits, contracts, or certain attachments to pleadings may, however, be scanned from a paper copy and saved in a portable document format (.pdf).

5.  When filing a motion to continue or for an extension of time, state the position of the other party in the motion (except in civil matters when one party is an unrepresented prisoner). "If the moving party's efforts to determine the position of any other party are unsuccessful, a statement to that effect must be included in the motion or stipulation." *See*

---

[1] Local rules are "laws of the United States," *United States v. Hvass*, 355 U.S. 570, 575 (1958), "have the force of law[,] are binding upon the parties and upon the court, and a departure from local rules that affects substantial rights requires reversal." *Professional Programs Group v. Department of Commerce*, 29 F.3d 1349, 1353 (9th Cir. 1994) (internal quotation marks omitted). "A departure is justified only if the effect is so slight and unimportant that the sensible treatment is to overlook [it]." *Id.* Significantly, the district court is under an obligation to construe local rules so that they do not conflict with federal rules and statutes. *Marshall v. Gates*, 44 F.3d 722, 725 (9th Cir. 1995); Rule 83(a)(1), Fed.R.Civ.P.

LRCiv 7.3(b)

6.  When specific relief is requested in a motion, the attorney or party must lodge with the Clerk a separate proposed order except for a motion to dismiss or a motion to summary judgment pursuant to Federal Rules of Civil Procedure 12(b) or 56. *See* LRCiv.7.1(b)(2).

7. According to LRCiv.7.1(b)(3), proposed orders must **NOT**:

    a. contain any information identifying the party submitting the order (leave your name and firm's info off),

    b. incorporate by reference, but rather must set forth the relief requested or the terms of the parties' stipulation.

    c. contain a date or signature block for proposed orders submitted electronically, and **MUST:**

    d. be included as an attachment to the motion or stipulation.

    e. the motion or stipulation and proposed order must be sent to the assigned district judge or magistrate judge in a separate e-mail addressed to the appropriate judge's chambers e-mailbox, e.g., (anderson_chambers@azd.uscourts.gov)

8.  When a case is filed and randomly assigned to a U.S. Magistrate Judge, the form Consent to Exercise of Jurisdiction by United Sates Magistrate Judge/District Judge Option is provided by the Clerk to the individual or attorney who is filing the case.  LRCiv 3.7(b) requires that each party must indicate his or her consent or election on the form. The form must be electronically filed in the pertinent civil case.  The event for e-filing the form is located in the Other Documents category:  Consent/Election For m LRCiv 3.7(b).  If a party has not been authorized to e-file in ECF, the party must submit the completed paper form to the Clerk's Office.

9. Filing parties should be aware of LRCiv.15.1(a) and (b):

    a. **Amendment by Motion.**  A party who moves for leave to amend a pleading must attach a copy of the proposed amended pleading as an exhibit to the motion, which must indicate in what respect it differs from the pleading which it amends, by bracketing or striking through the text to be deleted and underlining the test to be added.  The proposed amended pleading must not incorporate by reference any part of the preceding pleading, including exhibits. If a motion for leave to amend is granted, the party whose pleading was amended must file and serve the amended pleading on all parties under Rule 5 of the Federal Rules of Civil Procedure within fourteen (14) days of the filing of the order granting leave to amend, unless the Court orders otherwise.

    b. **Amendment as a Matter of Course or by Consent.** If a party files an amended pleading as a matter of course or with the opposing party's written consent, the amending party must file a separate notice of filing the amended pleading. The notice must attach a copy of the amended pleading that indicates in what respect it differs from the pleading which it amends, by bracketing or striking through the text that was deleted and underlining the text that was added. The amended pleading

2

must not incorporate by reference any part of the preceding pleading, including exhibits. If an amended pleading is filed with the opposing party's written consent, the notice must so certify.

10. Many lawyers fail to comply with the specific requirements for substituting in/out as counsel of record or moving to withdraw in a case. Key: where such application does not bear the written approval of the client. *See* LRCiv 83.3(b).

Revised 4/23/2024

### CERTIFICATE OF SERVICE

I certify that on March 25th, 2025, a copy of the foregoing document was deposited in the U.S. mail, addressed to:

Ann Hobart and Jordan Kendall
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004

*Attorneys for Defendants*

_____
Matthew Phillip Solan

Page 1 of 1