

1   **MATTHEW PHILLIP SOLAN**
2   501 North Twenty-Fourth Street
    Phoenix, Arizona, 85008-6056
3   Tel:    1.970.FOX.9611
    Fax:    1.970.844.1733
4   Email: legal@fox-ranch.com
5   *Plaintiff in propria persona*

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8   Matthew Phillip Solan                    Case no. CV24-02061-PHX-JJT-DMF
9                        *Plaintiff,*
                                             **PLAINTIFF'S RESPONSE TO**
10      *v.*                                 **DEFENDANTS' "MOTION TO DISMISS**
                                             **COUNTS ONE, FOUR, ELEVEN, AND**
11  State of Arizona, *et al.,*              **TWELVE OF THE FIRST AMENDED**
                                             **COMPLAINT (DOC. 6) ON BEHALF OF**
12                       *Defendants.*       **DEFENDANTS THE STATE OF**
                                             **ARIZONA, MICHAEL R. SHELDON,**
13                                           **AARON BOWEN, LEA'CHER**
14                                           **CARTER, AND UNIQUE COLEMAN"**
15                                           **(DOC. 15)**

16          COMES NOW Plaintiff Matthew Phillip Solan ("Plaintiff"), and in response to Defendants'

17  "Motion to Dismiss Counts One, Four, Eleven, and Twelve of the First Amended Complaint (Doc.

18  6) on Behalf of Defendants The State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher

19  Carter, and Unique Coleman" (Doc. 15) ("MTD"), states in opposition as follows:

20                                   **INTRODUCTION**

21          Plaintiff filed the operative First Amended Complaint (Doc. 6) ("FAC") on November 12,

22  2024. The Court issued a PLRA screening order responsive to the FAC on December 10, 2024

23  (Doc. 8) ("Screening Order"). In the Screening Order, the Court allowed Plaintiff's Title II, RA,

24  libel, and false light claims to proceed, and dismissed the remaining claims without prejudice. On

25  February 25, 2025, Defendants filed their MTD asking the Court to dismiss the operative claims.

26          Defendant's MTD purports to be a proper Rule 12(b)(6) motion. In reality, Defendants have

27  filed an excessively long and procedurally improper paper, rife with scandalous narratives and

28  littered with contentious factual disputes.

1    The pertinent facts underlying Plaintiff's ADA/RA claims are straightforward: (a) Plaintiff is a
2    qualified individual with a disability who has a service animal named Foxy; (b) Plaintiff made a
3    formal request to ASH in June, 2024 to have Foxy live with him at ASH as a reasonable
4    accommodation for his autism and PTSD; and (c) ASH denied the request without ever meeting
5    Foxy, or conferring with Plaintiff before issuing its summary denial. None of these facts are in
6    dispute. Rather, the case, with respect to the ADA/RA claims, hinges on the State's erroneous
7    belief that the ADA does not "apply" to ASH. MTD at 6:9-14. In support of this belief, the State
8    raises numerous factual disputes over Foxy's utility to Plaintiff as a service animal, and continues
9    to chase phantasms of its own creation which hold neither merit nor relevance. A Rule 12(b)(6)
10   motion is not the place to argue such factual disputes. Some of the State's contentions present
11   mixed questions of fact and law, but even these have a substantially fact-dominant nature. To the
12   extent the State raises some pure questions of law, a Rule 12(b)(6) motion could be appropriate,
13   but for the reasons set forth below, the State's arguments are meritless. Additionally, Defendants'
14   arguments with respect to Counts Eleven and Twelve also fail for the reasons set forth below.

15                    **MEMORANDUM OF POINTS AN AUTHORITIES**

16   **I.    Count One, Four, Eleven, and Twelve of the FAC Properly State Claims for Relief**

17   When ruling on a Rule 12(b)(6) motion, the review is based on the contents of the complaint
18   and must contain sufficient factual allegations to state a facially plausible claim. Ashcroft v. Iqbal,
19   556 U.S. 662, 678 (2009); Buckey v. Cty. of Los Angeles, 968 F.2d 791, 794 (9th Cir. 1992).  A
20   claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the
21   reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678.

22   The Federal Rules of Civil Procedure generally require only "a plausible short and plain
23   statement of the plaintiff's claim, not an exposition of his legal argument." Skinner v. Switzer, 562
24   U.S. 521, 530 (2011). "All allegations of material fact are taken as true and construed in the light
25   most favorable to the nonmoving party." *Buckey*, 968 F.2d at 794. A well-pleaded complaint may
26   proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a
27   recovery is very remote and unlikely." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)
28   (internal quotations omitted).

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    In *Starr v. Baca*, the Ninth Circuit clarifies two guiding principles in interpreting Supreme

2    Court precedent on the pleading standard. 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S.

3    Ct. 2101 (2012). First, to be entitled to the presumption of truth, allegations in a complaint cannot

4    simply recite the elements of a cause of action; they must contain sufficient allegations of

5    underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Id.

6    Second, "the factual allegations that are taken as true must plausibly suggest an entitlement to

7    relief, such that it is not unfair to require the opposing party" to litigate the claims. Id. The Ninth

8    Circuit further offers direction in the event that the parties' explanations are equally plausible:

9    "If there are two alternative explanations, one advanced by defendant and the other advanced by
10   plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under
     Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible
11   alternative explanation is so convincing that plaintiff's explanation is implausible. The standard
     at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The
12   factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'"

13   *Starr*, 652 F.3d at 1216-17. Plaintiff's FAC easily satisfies this standard. Counts 1, 4, 11, and 12

14   present plausible, short, and plain statements of the respective claims, and each Count incorporates

15   by reference the extensive factual background set forth at pp. 13-30 of the FAC.

16   **A. Plaintiff Has Stated a Claim Under Title II of the ADA Against the State**

17   The State argues that, "[a]s this Court ordered in CV-20-02209, ASH performed a

18   particularized assessment of Solan's request and identified six reasons that Title II did not require

19   the State of Arizona to allow Foxy to live with him at ASH," and that "the State's legitimate, non-

20   discriminatory reasons to exclude her from ASH in May 2022 apply equally to her youthful

21   reincarnation three years later." MTD at 5:19-24.

22   As an initial matter, the State bases its entire chain of argumentation on ASH's alleged

23   particularized assessment of Foxy's original incarnation; however, as the Court has acknowledged

24   in its Screening Order, Foxy's cloned body constitutes a *sui generis* entity, distinct from Foxy's

25   prior incarnation. See Doc. 8 at 4, footnote 4 (holding that "[t]o avoid confusion, the Court will

26   refer to this animal as Foxy II." *Internal quotes omitted*. As such, the State's arguments pertaining

27   to Foxy's original incarnation are irrelevant as to Plaintiff's 2024 accommodation request.

28   Moreover, the particularized assessment letter failed to demonstrate a single valid exception to

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1  the ADA's service animal access mandate. Bowens' letter is not proof that ASH properly
2  interpreted the ADA, or the facts of the prior case; if anything, its proof that Bowen was engaged in
3  the unauthorized practice of law. *See* Rule Ariz. Sup. Ct. Rule 31.2(a).

4      The State cannot stand on Bowen's erroneous conclusions to avoid liability for Sheldon's
5  failure to conduct an individualized assessment in 2024. Sheldon was still required to conduct an
6  individualized assessment Plaintiff's latest request. By 2024, Plaintiff had a new service animal,
7  new patient housing circumstances (including new treatment unit and single-patient room), and 2
8  years of new treatment, the majority of which was conducted under new treatment teams. Bowen's
9  letter, aside from its invalidity, was obviously outdated and inapplicable in 2024.

10      A public entity is required to "make reasonable modifications in policies, practices, or
11  procedures when the modifications are necessary to avoid discrimination on the basis of disability,
12  unless the public entity can demonstrate that making the modifications would fundamentally alter
13  the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The State must
14  "modify its policies, practices, or procedures to permit the use of a service animal by an individual
15  with a disability." 28 C.F.R. § 35.136(a). A service animal is "any dog that is individually trained
16  to do work or perform tasks for the benefit of an individual with a disability, including a physical,
17  sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. Pt. 35, App. A, p. 614.
18  Service animals are permitted to go anywhere a patient goes. Id. at § 35.136(g). The ADA
19  recognizes only two absolute exceptions to this access mandate: if Foxy is out of control and
20  Plaintiff does not take effective action to control her; or, if Foxy is not housebroken. 28 C.F.R. §
21  35.136(b). The State does not claim either exception.

22      The issue here, rather, can be summed up in one sentence: the State does not believe it needs to
23  follow the law. Indeed, the State "does not believe that the ADA's implementing regulations apply
24  in Solan's case…because it does not believe that Foxy is necessary for him to participate in and
25  benefit from ASH's services, programs, and activities." (MTD at 6:11-14). What the State may
26  believe about Foxy's necessity is wholly immaterial to the question of whether the required
27  assessment was performed, and whether Foxy was properly excluded from ASH. The State argues
28  at length to justify its unlawful exclusion of Foxy, but all of its arguments collapse under scrutiny:

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6036

1    **1. Plaintiff Does Not Need to Prove That Foxy Is Necessary for Him to Participate In**
2    **and Benefit From ASH's Services, Programs, and Activities.**

3    Under very limited circumstances, a public entity may exclude a service animal if it can
4    demonstrate that admitting the animal would "fundamentally alter" the nature of the facility or the
5    services it provides, 28 C.F.R. § 35.150(a)(3), or that the animal poses a "direct threat" to the health
6    or safety of others. 28 C.F.R. § 35.139(a); 28 C.F.R. Pt. 35, App. A at 615. These exceptions are
7    intended to be invoked rarely. "[I]t is intended that the broadest feasible access be provided to
8    service animals in all…hospitals..." 28 C.F.R. Pt. 36, App. B; Pt. 35, App. A at 613 ("title II entities
9    have the same legal obligations as title III entities to make reasonable modifications in policies,
10   practices, or procedures to allow service animals…"). The State's belief that Foxy is not necessary
11   for Plaintiff to participate in and benefit from ASH's services, programs, and activities is wrong,
12   and this could easily be proven at trial. A Rule 12(b)(6) motion is not the place argue this.
13   Notwithstanding, Plaintiff will address the points raised by the State in its MTD.

14   ***First,*** the State takes issue with Plaintiff's representations from 2022 that that Foxy was a
15   psychiatric service animal in her prior incarnation, and, as such, she was "not providing much
16   physical assistance at all." This argument is frivolous. The ADA clearly applies to psychiatric
17   service animals. The DOJ defines a "service animal" as "any dog that is individually trained to do
18   work or perform tasks for the benefit of an individual with a disability, including a physical,
19   sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. Pt. 36, App. A, p. 614.

20   Indeed, "[p]sychiatric service animals can be trained to perform a variety of tasks that assist
21   individuals with disabilities to detect the onset of psychiatric episodes and ameliorate their effects."
22   Id. It is "the fact that the animal is trained to respond to the individual's needs that distinguishes an
23   animal as a service animal." 28 C.F.R. Pt. 36, App. A, p. 616. For example, "if a service animal
24   senses that a person is about to have a psychiatric episode and it is trained to respond for example,
25   by nudging, barking, or removing the individual to a safe location until the episode subsides, then
26   the animal has indeed performed a task or done work on behalf of the individual with the disability,
27   as opposed to merely sensing an event." Id. Defendants do not rebut the averments in the FAC or
28   attached testimony of Foxy's trainers, all of which set forth Foxy's task training.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    **Second,** the State argues that "Solan's treating psychiatrist stated in an affidavit" that
2    Plaintiff has no need for a service animal simply because ASH has "trained people" whose job it is
3    to provide "things" to "all patients" on a regular basis. MTD at 6:23-27. The existence of "trained
4    people" is not a factor in determining if a service animal can be excluded. Only the "direct threat"
5    factors may be considered: The nature, duration, and severity of the risk; the probability that the
6    potential injury will actually occur; and whether reasonable modifications of policies, practices, or
7    procedures or the provision of auxiliary aids or services will mitigate the risk. 28 C.F.R. §
8    35.139(b); Roe v. Providence Health Sys.-Oregon, 655 F. Supp. 2d 1164, 1168 (D. Or. 2009). The
9    question of providing alternate measures only arises if and when a dog is lawfully excluded.

10    Further, Plaintiff does not have a "treating psychiatrist." Dr. Stephen Morris, who the State
11    alleges provided the affidavit, resigned in 2023, the day he was scheduled for deposition in CV-20-
12    02209. Plaintiff had a terrible relationship with Morris when he was Plaintiff's psychiatrist, and
13    Plaintiff hasn't seen him in over 2 years. Plaintiff's current psychiatric providers consider Foxy one
14    of Plaintiff's primary strengths. *See* Doc. 17 at 40-41 [Ex. B] ("Patent Strengths: Mr. Solan has a
15    trained service dog…"). And even if Plaintiff was committed to ASH "in part, to learn how to
16    better get along with people," ASH has utterly failed to effect this goal without Foxy present.
17    Plaintiff is now more alienated than ever, is not engaged in any treatment, and has lost all faith in
18    humanity. *See* Doc. 17 at 85:8-14 [Ex. H]; Doc. 6 at 99:7-12 [Ex. K].

19    Indeed, ASH's CMO, Dr. Stephen Kwoh recently certified that that Plaintiff is now "totally
20    and permanently disabled." Exhibit A. Plaintiff's treating psychologist, Amada Brimlow, similarly
21    confirmed that "Mr. Solan has persistent deficits in social communication and social interaction
22    across multiple contexts. While he has been a patient at this hospital, he has continued to struggle
23    with appropriate verbal and nonverbal interactions with staff and peers. He has a history of lacking
24    social-emotional reciprocity, and interest in others which has led to difficulties in developing and
25    maintaining relationships with others. He has presented with an inflexible adherence to routine, as
26    evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and
27    making demands of the staff and his treatment team despite hospital policies. He has expressed
28    hyperreactivity to sensory input while he has been a patient at Arizona State Hospital. He will sleep

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1  during the day to avoid noises, states that he requires soundproofing materials to be installed on the
2  unit, and will not attend social  groups with others due to being overstimulated." *See* Exhibit B
3  (Internal quotes omitted).

4  Ms. Brimlow concluded that, "[w]ith services and support, it is possible for him to learn new
5  compensatory strategies to better manage his symptoms." Id. But Plaintiff has received no such
6  services or support at ASH: in Sheldon's report issued pursuant to Ariz. Laws 2022, Chapter 359,
7  Section 3, he states that ASH "is not able to meet the needs of patients with Autism." *Arizona State*
8  *Hospital Clinical Improvement and Human Resource Plan*[1] at Option F, p. 41 (Exhibit C). He also
9  confirmed that patients with Autism are hospitalized at ASH for significantly longer periods than
10  their peers. Specifically, "12.2% of Forensic patients" have a neurocognitive or
11  neurodevelopmental disorder "and have an average length of stay 2.9 years longer than their peers
12  without a Neurocognitive or Neurodevelopmental Disorder." *Id.* at Option A, p. 27 (Exhibit D).
13  The State is not merely violating the ADA by excluding Foxy. By removing Plaintiff's only real
14  support, the State reduces him to a mere statistic—just one more patient with Autism confined "2.9
15  years longer than their peers" because of ASH's systemic refusal to accommodate their disability-
16  related needs.

17  Moreover, the State erroneously claims that Plaintiff's needs could be met by providing "24/7
18  medical staff". MTD at 6:27. The State has it backwards. Plaintiff does not have a need for 24/7
19  medical staff: he has a need for independence. See 42 U.S.C. § 12101 (the goals of the ADA
20  include assuring that individuals with disabilities enjoy "equality of opportunity, full participation,
21  independent living, and economic self-sufficiency."); *see also* Sullivan By and Through Sullivan v.
22  Vallejo City Unified School Dist., 731 F. Supp. at 958 (E.D. Cal. 1990) ("[E]ach day [the plaintiff]
23  is forced to be separated from her service dog…his usefulness to her is diminished. As a
24  consequence of defendants' conduct, plaintiff's ability to function as an independent person…is
25  injured daily.").

---

[1] Arizona Department of Health Services, Clinical Improvement and Human Resource Plan (Sept. 1, 2023), https://www.azdhs.gov/documents/director/agency-reports/clinical-improvement-and-human-resource-plan-09-01-2023.pdf.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    The ADA does not require Plaintiff to accept a 24/7 medical staff escort in lieu of a 24/7

2  service animal. *See* 42 U.S.C. § 12201(d). Like the plaintiff in *Sullivan*, Plaintiff uses a service dog

3  who he controls to manage the effects of his Autism and PTSD. In so doing, Plaintiff is able to

4  exercise greater control over his environment and achieve greater independence in all aspects of his

5  life. By denying Plaintiff access to Foxy, the State has deprived Plaintiff of his independence.

6    **2. The ADA Does Not Require Foxy to be Tethered and ASH's Contraband Policy**

7    **Does Not Preempt the ADA's Accessibility Mandate**

8    The State, citing 28 C.F.R. § 35.136(d), argues that Title II requires that a service animal be

9  under its handler's control. Plaintiff agrees. However, the State then goes on to assert that,

10  "[s]pecifically, the law requires that a service animal "shall have a harness, leash, or other tether.""

11  This is an egregious misstatement of the law. Defendants have replaced a comma with a period

12  and excluded the remainder of the clause to avoid the fact that 28 C.F.R. § 35.136(d) expressly

13  exempts handlers from the general tether rule where a tether would cause a safety issue. The full

14  text of 28 C.F.R. § 35.136(d) is as follows:

15  *Animal under handler's control.* A service animal shall be under the control of its handler. A
service animal shall have a harness, leash, or other tether, unless either the handler is unable

16  because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or
other tether would interfere with the service animal's safe, effective performance of work or

17  tasks, in which case the service animal must be otherwise under the handler's control (e.g.,

18  voice control, signals, or other effective means).

19    While Defendants attempt to invoke Fed. R. Civ. P. 10 to pull the 2022 particularized

20  assessment letter under the operative scope of the FAC (See MTD at 4, Footnote 1), they

21  completely ignore the attached testimony of Foxy's two trainers. Brad Smith, the owner of All

22  Dogs Unleash testified that "Foxy performs well on and off leash, [and] consistently responds to

23  her handler's verbal and nonverbal commands..." (Doc. 6 at 91:11-12 [Ex. K]). Joseph Cowsert,

24  Foxy's interim handler and trainer testified similarly: "She [Foxy] is well received by everyone and

25  is perfectly well behaved in public, on and off leash." (Doc. 6 at 96:20-21 [Ex. J]). The evidence

26  Plaintiff has presented, which Defendants do not contest, demonstrates that Foxy does not need to

27  be tethered for Plaintiff to maintain control of her. Neither can ASH justify its denial by the mere

28  speculation that Plaintiff might be unable to control her. 28 C.F.R. § 35.130(h).

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    Further, while the State claims that "leashes and harnesses are ligatures...and…are not
2    approved for patient possession or use, even under staff supervision"– this is a complete ruse. ASH
3    previously allowed Plaintiff to keep Foxy's old 6-foot training leash and service dog harnesses in
4    his bedroom. Plaintiff had these items from around 2021 to July of 2024, and kept them fastened to
5    his SensorySoothers weighted stuffed therapy fox.[2] *See* Exhibit E.  Plaintiff would often walk this
6    therapy fox around the treatment unit with the leash and harness attached, but it was not until July
7    of 2024 that Sheldon scrambled to rewrite ASH's contraband policy, direct ASH campus security
8    to raid Plaintiff's unit and bedroom, and seize the leash, harness and soft silicone as "contraband."

9    After seizing all of Foxy's accouterments, ASH authorized nearly every patient on Plaintiff's
10    treatment unit to possess 9-foot long GPS ankle monitor charging cords. Patients check these cords
11    in and out of the nurses' station at shift change, but are allowed to use them completely
12    unsupervised throughout the day. ASH has also allowed nearly every patient at the forensic
13    campus, including Plaintiff, to possess shoelaces, typically exceeding 30" in length. ASH provided
14    Plaintiff an autism compression vest too, which is not substantively dissimilar to a dog harness.

15    Because the State has failed to demonstrate that Plaintiff will be unable to control Foxy without
16    a tether, or that strict adherence to ASH's ligature policy with respect to service animals is the least
17    restrictive means of ensuring patient safety, ASH's tether argument fails. The argument is purely
18    speculative and therefore violates ADA's "actual risks" mandate. *See* 28 C.F.R. § 35.130(h).

19    **3.  Title II Does not Require That ASH Staff Cannot Provide Any Assistance To**
20    **Plaintiff While He Cares for and Supervises Foxy**

21    Under Title II, "[a] public entity is not responsible for the care or supervision of a service
22    animal. 28 C.F.R. 35.136(e). This much is true. But the State claims that "[i]n Solan's
23    particularized assessment interview and preliminary injunction briefing in CV-20-02209, however,
24    he acknowledged that if Foxy were allowed to live with him at the Forensic Hospital, he could not

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

---

[2] *Weighted Red Fox, Weighted Stuffed Animal, Sensory Toy, Anxiety, PTSD*, Sensory
Soothers,  https://web.archive.org/web/20240419145427/https://www.sensorysoothers.co
m/collections/farm-animals/products/19-weighted-stuffed-animal-fox-red-fox-sensory-
animal-stuffed-fox-weighted-fox-fox-lap-pad-fox-plushie (archived Apr. 19, 2024).

1  care for her daily needs without substantial assistance from ASH staff..." (MTD at 8:17-20).
2  Plaintiff *never* acknowledged that he could not care for Foxy's daily needs without substantial
3  assistance from ASH staff. This issue was extensively briefed in CV-20-02209, and Plaintiff held
4  the entire time that he could care for Foxy at ASH with nearly no assistance from ASH staff.

5       The Court held that, "[o]f the issues identified by Defendant, Plaintiff has demonstrated that
6  they would be, at most, a minor inconvenience for Defendant, and would not amount to *de facto*
7  responsibility for Foxy. Rather, it appears that Defendant would only be required to do what it
8  already does (e.g., provide access to the storage area when requested), and that the only difference
9  would be the purpose of the access (i.e. for retrieval of dog food, rather than human food).
10 Accordingly, on this record, Defendant has failed to demonstrate that it would be responsible for
11 Foxy's care or supervision in violation of 28 CFR § 35.136(d)." CV-20-02209, Doc. 84 at 9:15-21.
12 The State has not raised any new arguments as to why Plaintiff "could not care for her daily needs
13 without substantial assistance from ASH staff," and the State judicially and/or collaterally estopped
14 from relitigating this issue here.

15       The State also argues that, "[i]n addition to these aspects of Foxy's daily care, Solan's
16 psychiatrist noted that her supervision also would fall exclusively to ASH staff when, as has
17 happened several times in the past, Solan required seclusion." As stated above, Morris is not
18 Plaintiff's psychiatrist, and Plaintiff's current provider has made no such assertion. Further, at no
19 time under Ms. Ochoa's care has Plaintiff been confined in any seclusion room. Plaintiff has also
20 never "required" seclusion. On a few occasions from 2021 to 2023, ASH temp staff with no
21 experience dealing with autistic patients made the improper decision to drag Plaintiff to the ASH
22 seclusion room while he was having an autism meltdown. The responsible staff was admonished
23 for their actions when core staff returned.

24       Even assuming, *arguendo*, that Plaintiff may require seclusion in the future, ASH has given
25 no reason why Foxy could not accompany Plaintiff in the seclusion room, or stay alone in
26 Plaintiff's single-patient bedroom during such an incident. And ASH has conveniently failed to
27 consider the fact that Foxy's work would *drastically mitigate* Plaintiff's autism meltdowns, as her
28 prior incarnation did, thereby potentially eliminating the risk of seclusion entirely.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 850008-6056

**4. Veterinary Medications Can be Safely Stored and Administered at the Forensic Hospital, but Foxy Does not Take Medication**

The State wastes half a page of the Court's docket arguing that Foxy's 17-year-old predecessor took heart medication and that such medication could not be safely stored at ASH, but then concludes "[t]hat Foxy's reincarnation may not currently require daily doses of enalapril and gabapentin." MTD at 10:1-16. Foxy is 1 ½ years old and does not take any medication. Even if she did, all the medications ASH listed are designed for humans, and incidentally used in veterinary practice. There is no reason human medications could not be safely stored at ASH. At any rate, while "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 CFR § 35.130(h). The State's concerns here are entirely speculative.

**5. ASH Policies Do Not Need to Be Modified to Allow Staff to Care for Foxy In Order for Her to Live at ASH**

The State argues that "ASH's existing patient care policies and practices…would have to be modified to address various concerns, including issues arising from interactions between humans and animals, animal waste, and the storage, dispensing, and administration of medication to animals," and then lists several policies it believes would have to be amended. MTD at 10:21-27, 11:1-6. The State further alleges that "such a thorough-going overhaul of its policies, procedures, and practices would require fundamentally altering the Hospital from a facility that cares for humans to one that cares for humans and animals." These arguments are completely devoid of merit, and the Court previously called ASH out for this nonsense in CV-20-02209:

> "Defendant has not demonstrated that Foxy's presence would result in a fundamental alteration of ASH's services, programs, or activities. The Forensic Hospital would remain a Forensic Hospital whether Foxy was present or not; the Court is unable to see how any of the programs and services Defendant refers to would cease to be if a service dog was present…merely speculating that Foxy's presence would cause such an alteration without reference to any specific concerns (such as the diagnosed inability of other patients to engage in treatment with a service animal present, or that certain patients have a documented history of violence towards animals) is insufficient…"

CV-20-02209, Doc. 84 at 11-12. The Court accordingly enjoined ASH to "conduct a particularized

MATTHEW PHILLIP SOLAN
301 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital" including "whether Foxy specifically…would be disruptive to the health or safety of other patients at Plaintiff's current housing unit…and include[] an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them." Id at 18-19. The Court also ordered that "Defendant's assessment must identify which policies, practices, or procedures are of concern, and explain *why* each could, or could not, be modified in compliance with the ADA and the relevant Code of Federal Regulations." Id at 19, footnote 1.

Neither Bowen's 2022 assessment letter, nor Sheldon's 2024 denial letter meet the requirements set by the Court. Because Sheldon's 2024 denial letter does not demonstrate that ASH's policies cannot be modified to avoid discrimination, that Foxy's admission would constitute an actual  fundamental alteration, or that having ASH's in-house counsel make minor changes to ASH's written policies would cause undue financial and administrative burdens, the State has violated 28 C.F.R. §§ 35.130(b)(7)(i) and 35.150(d)(3).

**6. The State Cannot Conjure Fictional Narratives of Paraphilic Intent, Then Rely on its Phantasms to Justify Violations of Federal Law**

The State claims "ASH could not (and cannot) ignore multiple reports (and his own admissions) that Solan had inappropriate feelings for Foxy. Nor can it ignore the risk that allowing Foxy to reside at the Forensic Hospital would give Solan scope to abuse Foxy in the private room that ASH has provided to Solan..." MTD at 14:19-24.

*First,* Plaintiff has never admitted that he has "inappropriate feelings for Foxy." Defendants are correct that Plaintiff "likes dogs better than people." This not an uncommon sentiment in modern society. But Plaintiff has never "touched Foxy inappropriately in the past or contemplated doing so in the future." This is a complete fabrication by the State. Plaintiff did not sexually assault Foxy's prior incarnation and has no intention doing so now. All of the State's examples are either completely fabricated, or taken completely out of context.

One glaring example is the State's attack on Plaintiff's protected spiritual practices. Plaintiff's use of terms such as "manumission" and "marriage" are symbolic rituals rooted in sincerely held religious beliefs, and are protected under RLUIPA and the First Amendment. *See, e.g.,* Holt v.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1   Hobbs, 574 U.S. 352 (2015). These rituals have no carnal or sexual connotation. Manumission is
2   "the freeing of a Villien or Slave out of his bondage…Manumission expressed is, when the Lord
3   makes a Deed to his Villien, to infranchise him with this word Mannumittere, the manner of which
4   in old Time is thus: The Lord, in the presence of other Persons, took the Bond-man by the head,
5   saying I will this man be free…" *See* The Interpreter of Words and Terms Used Either in the
6   Common or Statute Law of Great Britain and in Tenures and Jocular Customs (1727).

7       Plaintiff is a therian and ecocentrist, and finds the State's treatment of Foxy as "personal
8   property" morally reprehensible. The manumission ceremony was meant to invest Foxy with
9   personhood, and the "marriage" ceremony was meant aid in ratification of the manumission by
10  symbolically invoking 8 C.F.R. § 319.1(a). Had Bowen simply asked Plaintiff, he would have
11  learned this. But after Plaintiff filed CV-20-02209, ASH staff refused to discuss anything relating
12  to Foxy, robotically citing "ongoing litigation." And Plaintiff's assertion that Foxy is a sovereign
13  being, even superior to the vulgar masses, is First Amendment protected speech. That Bowen
14  could infer something sexual from this is a reflection of his debased state of mind, not Plaintiff's.

15      The State also alleges Plaintiff "considered [Foxy] to be something other than an animal that is
16  individually trained to perform a task or work that is directly related to Solan's disability." MTD at
17  11:18-22. This is both irrelevant and logically flawed. There is no reason Foxy cannot serve
18  conterminous roles as a service animal and an esoteric familiar. The State's argument is
19  tantamount to claiming a woman can't be a lawyer if she's a mother, and fails for the same reason.

20      **Second,** the State may not rely on its contrived speculation that Plaintiff might "abuse Foxy" to
21  exclude her without violating the ADA. It is true that the ADA "does not require a public entity to
22  permit an individual to participate in or benefit from the services, programs, or activities of that
23  public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. §
24  35.139(a). Whether §35.139(a) even applies in this context is doubtful. At any rate, when
25  determining if an individual poses a direct threat to the health or safety of others, "a public entity
26  must make an individualized assessment, based on reasonable judgment that relies on current
27  medical knowledge or on the best available objective evidence, to ascertain: the nature, duration,
28  and severity of the risk; the probability that the potential injury will actually occur; and whether

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1 reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or

2 services will mitigate the risk." Id at § 35.139(b). Even if the Court were to entertain Bowen's

3 gaslighting, Sheldon's letter does not discuss "whether reasonable modifications…will mitigate the

4 risk." But the Court does not need to accept Bowen's conclusions as fact. On the contrary; when

5 determining the propriety of a medical provider's "direct threat" analysis, the Supreme Court has

6 directed lower courts not to defer to medical providers' opinions in the absence of valid data. In

7 Bragdon v. Abbott, 524 U.S. 624 (1998), a dentist refused to treat a patient who had HIV, in fear

8 that the virus would be transmitted to him or his staff. The Court rejected the dentist's opinion

9 because it was not based on medical or other objective evidence:

10
11
12
> "As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability…[P]etitioner receives no special deference simply because he is a health care professional."

13    Bowen's claim that Plaintiff posed a threat to Foxy was not grounded in any objective

14 evidence. Bowen was not Plaintiff's treating psychologist and had no first-hand knowledge the

15 alleged statements. Instead, he took second and third-hand hearsay, twisted it out of context, and

16 created a fantastical narrative to justify his illegal conduct, after he had been sued and lost.

17    The State argues, "this Court has noted, what the Particularized Assessment letter had to say

18 about Solan's relationship with Foxy was based on statements recorded by various medical

19 professionals and staff in progress notes…" (Doc. 8 at 13.)" *Internal quotes omitted.* Plaintiff has

20 reviewed all notes and reports relating to Foxy that ASH disclosed under a records request. These

21 reports were written by Behavioral Health Technicians ("BHTs"). With all due respect to the

22 Honorable Justices of this Court, BHTs are not "medical professionals." Under Arizona law, they

23 are deemed "Unlicensed Assistive Personnel" who operate strictly under the supervision of

24 Registered Nurses, and may only be delegated tasks that do not "require assessment, interpretation,

25 or independent decision making." *See* A.A.C. R9-4-19- 401(D)(4); *see also* Exhibit F.

26    Despite heavily citing the alleged testimony of the *only* medical professional the State actually

27 names in its MTD, Morris is not quoted as believing Plaintiff poses any threat to Foxy. On the

28 contrary, he calls her a "beloved therapy animal." MTD at 7:6. Plaintiff's current providers

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1   similarly identify Plaintiff's "trained service dog" as a "Patient Strength" (Doc. 17 at 40-41 [Ex. B])
2   and state that "[w]hen Animal Assisted Therapy becomes available at the forensic hospital,
3   Matthew will be offered AAT service." Id. No medical professional at ASH, unless Bowen can be
4   so called, has ever accused Plaintiff of harboring illicit sexual desires for Foxy.

5   **B. Plaintiff Has Stated a Claim Under the Rehabilitation Act Against the State**

6   The State argues that its "particularized assessment under Title II and its enabling regulations is
7   valid under the Rehab Act as well." (MTD at 6:1-2). The State bases its position on the idea that
8   "there is no significant difference in the analysis of rights and obligations created by the two Acts,"
9   (MTD at 5:15-18, citing Payan v. Los Angeles Cmty. Coll. Dist., 11 F.4th 729, 737 (9th Cir.
10  2021)). Plaintiff concurs that there is no significant difference in the analysis of rights and
11  obligations created by Title II of the ADA and Section 504 of the RA with respect to analyzing
12  Count Four. Plaintiff denies, however, that the State's May 2022 particularized assessment was
13  valid under Title II. Because the State's 2022 particularized assessment was not valid under Title II,
14  and because the State was required, but failed to perform a new individualized assessment in 2024,
15  Plaintiff has properly stated a claim for relief in Count Four of the FAC.

16  **C. Plaintiff Has Properly Stated a Claim for False Light**

17  While outright accusing Plaintiff of bestiality in the MTD itself, Defendants Bowen, Sheldon,
18  Carter, and Coleman argue that Plaintiff "does not indicate what, exactly, those statements were or
19  to whom, exactly, they were made." MTD at 14:13-14. But this is not true: Defendants cite Doc. 6
20  at 50, ¶¶ 279-80, but conveniently ignore ¶ 278, in which "Plaintiff repleads and incorporates by
21  reference, as if fully set forth again herein, the statements contained in the preceding paragraphs."
22  This includes ¶¶ 137-38, which state that "…Defendant Lea'cher Carter…and Defendant Unique
23  Coleman…made various lewd and defamatory statements about Plaintiff and Foxy…in front of
24  other ASH patients," including "you eat dog p***y" and "you eat dog a**," and that Carter
25  "openly made these statements" and also publicly proclaimed that Plaintiff's "d*** is so small you
26  need a magnifying glass to see it."  Plaintiff need not plead the entire list of people who may have
27  been in earshot while Carter and Coleman were defaming Plaintiff. The only places Plaintiff would
28  be "in front of other ASH patients" are the public spaces of the hospital. These statements were

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1   made in the unit day room over multiple days, in front of 10 or more patients. ASH is a proverbial

2   echo-chamber for gossip; it is highly unlikely Defendants did not perceive what all patients know:

3   tabloid-worthy statements made in the presence of patients or staff spread like wildfire at ASH.

4   Bowen argues that Plaintiff's claims against him are time-barred under A.R.S. § 12-821.01.

5   Even if Plaintiff's damages accrued in 2022, Plaintiff pleaded the necessary elements for equitable

6   tolling under the continuing tort doctrine, and the Court allowed the claim to proceed. However,

7   Plaintiff's claims against Bowen did not accrue in 2022. Bowen had a grievance investigator

8   deliver the particularized assessment letter to Plaintiff in a sealed envelope around May 4th, 2022.

9   Plaintiff agrees that there was no reason to believe, at that time, that "Bowen disclosed the letter to

10  the public at large." MTD at 16-7:9. Plaintiff first suspected Bowen had publicly disseminated the

11  letter around May 22, 2024, after Plaintiff announced to the Cottonwood unit that Foxy had

12  completed service dog training on May 17, 2024. This is when Coleman and Carter started

13  publicly accusing Plaintiff of engaging in oral sex with Foxy. Dissemination of Bowen's letter was

14  confirmed on July 5, 2024, when Sheldon based his letter on its findings. A cause of action accrues

15  when "'the plaintiff has a complete and present cause of action.'" Flynt v. Shimazu, 940 F. 3d 457,

16  462 (9th Cir. 2019) (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)). In other words, the cause

17  of action accrues when a plaintiff "knows or has reason to know of the actual injury." Id. (citing

18  Scheer v. Kelly, 817 F. 3d 1183, 1188 (9th Cir. 2016)). Plaintiff's claim against Bowen

19  accordingly accrued after July 5, 2024, when Plaintiff first discovered he had been injured by

20  Bowen's letter. Further, by arguing "the Denial Letter came from Arizona State Hospital

21  Administration (not from Sheldon)," Sheldon admits that both letters circulated among office staff.

22  Accusations of bestiality, especially the extreme acts Defendants allege, including having "sex

23  with" a small lapdog, and "eating" her backside, are extreme and outrageous. No reasonable

24  person would presume another individual was engaged in such bestial acts solely on the distant

25  hearsay the State claims the 2024 denial was based on. Neither Bowen, Sheldon, Carter, or

26  Coleman applied reasonable efforts to determine if the alleged statements had any factual basis,

27  before basing official actions with serious consequences on them, or announcing them publicly.

28  All of these facts, when taken together, are sufficient to establish the requisite publicity element.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**D.  Plaintiff Has Stated a Claim for Libel Against Bowen and Sheldon**

To prove defamation, a plaintiff must show the defendant knowingly, recklessly, or negligently published a defamatory statement of fact about the plaintiff. See Arimilli v. Rezendes, No. CV-21-00345-PHX-GMS, 2023 WL 2734456, at *5 (D. Ariz. Mar. 31, 2023) (citing Peagler v. Phoenix Newspapers, Inc., 560 P.2d 1216, 1222 (Ariz. 1977)); Revised Arizona Jury Instructions ("RAJI") (CIVIL) 7th Defamation 1A-B. "To be defamatory, the statement 'must be false and must bring the [plaintiff] into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation.'" Stuart v. City of Scottsdale, No. CV-20-00755-PHX-JAT, 2022 WL 704121, at *8 (D. Ariz. Mar. 9, 2022) (quoting Turner v. Devlin, 848 P.2d 286, 288-89 (Ariz. 1993)); see RAJI (CIVIL) 7th Defamation 2. To prove defamation, a plaintiff generally must show that the statement caused damages, but damages are presumed when the statement is defamatory *per se*. See Peagler, 560 P.2d at 1222; Hobbs v. Oppenheimer, No. CV-22-00290-TUC-JCH, 2022 WL 16855194, at *3 (D. Ariz. Nov. 10, 2022); RAJI (CIVIL) 7th Defamation 8. A statement is defamatory *per se* "when its publication…imputes the commission of a crime involving moral turpitude." de Jesus v. Dignity Health Corp., No. CV-21-00926-PHX-DWL, 2023 WL 244489, at *11 n.12 (D. Ariz. Jan. 18, 2023) (quoting Modla v. Parker, 495 P.2d 494, 496 n.1 (Ariz. Ct. App. 1972)).    Bestiality and animal abuse are criminal acts. A.R.S. §§ 13-1411, 13-2910; MTD at 13:23-24. Bowen and Sheldon knew they were accusing Plaintiff of a crime and knew they had no evidence that a crime had or would be committed against Foxy. Instead, they twisted distant hearsay into grotesque phantasmagorias, and disseminated these narratives to numerous staff persons, who used them to harm Plaintiff. Bowen took no reasonable steps to ascertain the truth about Plaintiff's relationship with Foxy, and Sheldon never opened an inquiry.

Defendants claim "the Denial Letter came from Arizona State Hospital Administration (not from Sheldon)." If true, then the State admits nobody with authority under 28 C.F.R. § 35.150(a)(3) issued the denial, which is *per se* a violation of the ADA. The "Arizona State Hospital Administration," is not a juridical person and cannot be Sheldon's designee for the purposes of 28 C.F.R. § 35.150(a)(3). But it is unlikely that "Sheldon did not make the statements about Solan's relationship to his service dog contained in the Denial Letter." (MTD at 17:10-12). Sheldon is the

"head" of ASH for the purposes of 28 C.F.R. § 35.150(a)(3). See A.R.S. § 36-206 ("The superintendent is directly responsible to the director for carrying out the purposes for which the hospital is maintained."). Even if Sheldon had an attorney ghostwrite the letter, he was the only person who could have issued it. Plaintiff's accommodation request was served on Sheldon by Certified Mail, Restricted Delivery. It was received on June 20, 2024 by Jen Bartush as Sheldon's "agent." *See* Exhibit G. Ms. Bartush was at that time Sheldon's secretary. *See* Exhibit H. Plaintiff's letter asked Sheldon to "respond no later than July 4, 2024." A response issued July 5, 2024 under the name "Arizona State Hospital Administration" (Doc. 6 at 84, ¶ 2 [Ex. G]).

No entity named "Arizona State Hospital Administration" is defined in the Arizona Revised Statutes, Administrative Code, or 2023 ASH policies. If ASH is considered in its capacity as a charitable trust, the "administrator" is the apparently vacant office of trustee. *See* State v. Coerver, 100 Ariz. 135 (1966); Ariz. Laws 1973 Ch. 158, §§ 34-45; Executive Order No. 74-6 (1974); Senate v. Hobbs, No. CV2023019899, (Super. Ct. Ariz. Maricopa Cty., 2024). However, between patients and staff, "the Administration" is used to address CEO Sheldon and his various underlings appointed pursuant to A.R.S. §§ 36-205(E) and A.R.S. § 36-206(A). Applying Occam's razor, "Arizona State Hospital Administration" can be defined as "the ASH C-suite officers acting in their collective capacity." At any rate, Sheldon's attempt shield himself from liability by hiding behind a fictitious entity is a patently frivolous, and potentially fraudulent defense.

## CONCLUSION

Plaintiff's FAC properly states claims for relief in Counts 1, 4, 11, and 12. Defendants' MTD seeks reconsideration of the Court's Screening Order, is replete with irrelevant and scandalous arguments designed to prejudice the Court against Plaintiff, and fails to raise any valid defenses.

**WHEREFORE,** the Court should strike the irrelevant and scandalous matters from Defendants MTD, and deny the motion in its entirety. Should the Court find any deficiency in Counts 1, 4, 11, or 12, Plaintiff respectfully requests leave to amend the relevant claims.

**SIGNED, SEALED, AND DATED** this 4th day of April, 2025.



**Matthew Phillip Solan**
Plaintiff in *Pro. Per.*

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6656

**EXHIBIT A**

## CERTIFICATION OF DISABILITY FOR PROPERTY TAX EXEMPTION

Pursuant to Article IX, Sections 2, 2.1, 2.2, and 2.3 of the Arizona Constitution, A.R.S. Title 42, Chapter 11, Article 3, § 42-11111 and Article 4, §§ 42-11151, 42-11152, 42-11153, and Arizona Administrative Code R15-4-116.

This form can be completed on-line and then printed, or it can be printed and completed manually. To assure that the exemption affidavit (DOR 82514) is processed for the current Tax Year, if hand-delivered, the copy of this form which has the applicant's and the physician's or psychiatrist's signatures MUST be filed along with the copy of the DOR 82514 Affidavit of Individual Exemption form with the County Assessor of the county in which the applicant's property is located no later than the last business day in February. If this form and the DOR 82514 are mailed to the County Assessor, they must be postmarked on or before the last business day of February.

| Applicant's Name: | Solan | Matthew | P |
|---|---|---|---|
| (Type or Print) | (Last) | (First) | (Initial) |
| Address: | 3471 South Apollo Avenue | | |
| | (Street) | | |
| | Williams | AZ | 86046 |
| | (City) | (State) | (Zip) |

Date of Birth: 07/17/89   Marital Status: Single [✓]   Married [ ]

Applicant's Signature: _____   Date Signed: 08/27/24

**Pursuant to Arizona Administrative Code R15-4-116: Exemption for Totally and Permanently Disabled Person**

A. For purposes of the property tax exemption in the Arizona Constitution Article 9, Section 2.2, a person is "totally and permanently disabled" if the person is unable to engage in any substantial gainful activity, for pay or profit, by reason of any physical or mental impairment that is expected to:
   1. Last for a continuous period of 12 months or more, or
   2. Result in death within 12 months.
B. To qualify for the exemption, a disabled person shall be certified as totally and permanently disabled by a person licensed under:
   1. A.R.S. Title 32, Chapter 8, 13, 14, 17, 19.1, or 29; or
   2. The laws of another state that are comparable to the laws governing persons qualifying under subsection (B)(1).

## MEDICAL CERTIFICATION FOR TOTALLY AND PERMANENTLY DISABLED PERSONS

### THE FOLLOWING IS TO BE COMPLETED BY THE EXAMINING PHYSICIAN OR PSYCHIATRIST:

#### I hereby certify the applicant's condition as stated below:

The above-named applicant is unable to engage in any substantial gainful activity and therefore is considered to be totally and permanently disabled as defined above.   YES [✓]   NO [ ]

| Type or Print | Dr. Steven Kwoh, M.D., Acting CMO |
|---|---|
| | Physician or Psychiatrist's Name |
| | Arizona State Hospital, 2500 East Van Buren Street |
| | Business Address |
| | Phoenix                AZ            85008 |
| | City                   State         Zip |
| | 602 - 244 -1331 |
| | Telephone Number |
| | Physician or Psychiatrist's Signature        08/27/24 |
| | Date |

Physician's or Psychiatrist's Office Stamp:

DOR 82514B (12/2011)

**EXHIBIT B**



ARIZONA DEPARTMENT
OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

Amanda Brimlow, Psy.D
Arizona State Hospital
2500 E Van Buren Street
Phoenix, AZ 85008
602-629-7045
amanda.brimlow@azdhs.gov

December 30, 2024

To Whom It May Concern:

The purpose of this letter is to address Mr. Matthew Solan's mental health diagnosis and his current level of functioning since admission to the Arizona State Hospital on April 1, 2020.

Per his records (Dr. Kamean-Silva, in 2000), Mr. Solan was diagnosed with autism when he was 11 years old, and required services in school to address his unique needs. He has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships. It is this writer's opinion that he still meets the criteria for an Autism Spectrum Disorder diagnosis as an adult. He was psychologically evaluated by Dr. Wirth in 2022, and his diagnosis of Autism Spectrum Disorder was retained.

Mr. Solan has persistent deficits in social communication and social interaction across multiple contexts. While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers. He has a history of lacking social-emotional reciprocity, and interest in others which has led to difficulties in developing and maintaining relationships with others. He has presented with an inflexible adherence to routine, as evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and making demands of the staff and his treatment team despite hospital policies. He has expressed hyperreactivity to sensory input while he has been a patient at Arizona State Hospital. He will sleep during the day to avoid noises, states that he requires soundproofing materials to be installed on the unit, and will not attend social groups with others due to being "overstimulated." It is important to note that when Mr. Solan feels his needs are not being met appropriately, he will say racial slurs and threaten to harm or kill others. This is indicative of the substantial functional limitations related to his Autism diagnosis and deficits in appropriate social interactions with others.

Katie Hobbs | Governor     Jennie Cunico | Cabinet Executive Officer / Executive Deputy Director

2500 E. Van Buren Street, Phoenix, AZ 85008     P | 602-244-1331     F | 602-240-6413     W | azhealth.gov
Health and Wellness for all Arizonans

Per the DSM-V-TR, Mr. Solan currently meets the diagnostic criteria for a diagnosis of Autism Spectrum Disorder, Requiring support for deficits in social communication and for restricted, repetitive behaviors, Without accompanying intellectual or language impairments. With services and support, it is possible for him to learn new compensatory strategies to better manage his symptoms. It is unlikely that Mr. Solan's symptoms will abate or decrease with time, and will continue to affect his ability to function without assistance. He will continue to have difficulties with receptive and expressive language, self-direction, capacity for independent living, and economic self-sufficiency, requiring coordinated special, interdisciplinary treatment.

Please let me know if more information is required or if there are any questions.


*Amanda Brimlow*, Psy.D

Amanda Brimlow, Psy.D
Licensed Psychologist

Katie Hobbs | Governor    Jennie Cunico | Cabinet Executive Officer / Executive Deputy Director

2500 E. Van Buren Street, Phoenix, AZ 85008    P | 602-244-1331    F | 602-240-6413    W | azhealth.gov
*Health and Wellness for all Arizonans*

**EXHIBIT C**

# ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL



state of arizona
arizona department of health services
arizona state hospital
civil treatment facility

## Clinical Improvement and Human Resource Plan

Submitted Pursuant to Laws 2022, Chapter 359, Section 3

September 1, 2023

**Jennie Cunico, MS**
Director - Arizona Department of Health Services

**Michael R. Sheldon, MPA**
Chief Executive Officer - Arizona State Hospital
Deputy Director - Arizona Department of Health Services

*[This Page Left Intentionally Blank]*



ARIZONA DEPARTMENT
OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

September 1, 2023

The Honorable Katie Hobbs, Governor - State of Arizona;
The Honorable Warren Peterson, President - Arizona State Senate;
The Honorable Ben Toma, Speaker - Arizona House of Representatives;
The Honorable Thomas "T.J." Shope, Chair - Senate Health and Human Services Committee;
The Honorable Steve Montenegro, Chair - House Health and Human Services Committee.

Transmitted herein please find a clinical improvement and human resource plan ("Plan")
developed by the Arizona Department of Health Services, Arizona State Hospital pursuant to
Laws 2022, Chapter 359, Section 3.

Per the authorizing legislation, this Plan provides a series of recommendations, with budget
estimates, for potential enhancements to the programs, facilities and staff at the Arizona State
Hospital to improve services for patients in the Civil and Forensic Hospitals and residents of the
Arizona Community Protection and Treatment Center (ACPTC). As part of this effort, the
Hospital solicited input from various community stakeholders - specifically, the state's
Independent Oversight Committees (IOC), community-based treatment facilities, guardians,
families, and representatives of patients, as well as clinical and administrative leaders from
multiple health plans under contract for the provision of behavioral health services to qualified
individuals.

The Department of Health Services appreciates the opportunity to provide this information for
your review and consideration and will make our subject matter experts available to address any
clarifying questions you may have.

Sincerely,

Michael R. Sheldon, MPA
Chief Executive Officer - Arizona State Hospital
Deputy Director - Arizona Department of Health Services

Katie Hobbs | Governor        Jennie Cunico | Director

501 N. 24th Street, Phoenix, AZ 85008    P | 602-244-1331    F | 602-240-6413    W | azhealth.gov
Health and Wellness for all Arizonans

*[This Page Left Intentionally Blank]*



# ARIZONA DEPARTMENT
# OF HEALTH SERVICES

## ARIZONA STATE HOSPITAL

Pursuant to Laws 2022, Chapter 359, Section 3, the Arizona Department of Health Services ("ADHS" or "the Department"), Arizona State Hospital ("ASH" or "Hospital") has developed a clinical improvement and human resource plan (the "Plan") focused on addressing several areas critical to Hospital operations including admissions, discharges, clinical programming and staffing levels.

Per the authorizing legislation, the Hospital solicited input from various community stakeholders in developing this Plan - specifically, the State's Independent Oversight Committees (IOC), community-based treatment facilities, guardians, families and representatives of patients, as well as clinical and administrative leaders from multiple health plans under contract with the Arizona Health Care Cost Containment System (AHCCCS) for the provision of behavioral health services to qualified individuals.

The Plan detailed herein provides a series of recommendations, with budget estimates, for potential enhancements to the programs, facilities and staff at the Arizona State Hospital to improve services for patients in the Civil and Forensic Hospitals and residents of the Arizona Community Protection and Treatment Center (ACPTC). The Department has structured this document in such a manner as to permit the Governor's Office, members of the State Legislature and other policymakers the opportunity to decide which priorities may result in the maximum return on investment for Arizona, should they elect to pursue Hospital-specific and/or statewide enhancements in the future.

While there are always opportunities for improvement, it is critical for all parties to recognize that the Hospital is only one of hundreds of interdependent entities providing critical services in the State's comprehensive psychiatric system of care, and any perception that the Hospital is not functioning optimally is indicative of a larger set of systemic deficiencies within that care continuum. The Hospital's dedicated team of medical, clinical, and administrative professionals stand ready to assist the State however necessary to improve care, promote transparency, and better serve our fellow Arizonans in need of intensive psychiatric support and inpatient treatment.

Sincerely,

Michael R. Sheldon, MPA
Chief Executive Officer - Arizona State Hospital
Deputy Director - Arizona Department of Health Services

*[This Page Left Intentionally Blank]*

## Table Of Contents

| | |
|---|---|
| Table Of Contents | 3 |
| Background | 5 |
| Options for Enhancement and/or Expansion | 11 |
|    Additional Resources Needed to Meet Current Obligations | 15 |
|    Option A - Enhance Clinical Model for Existing Patients and Residents | 27 |
|    Option B - Increase Civil Bed Capacity with No Changes to Clinical Model | 31 |
|    Option C - Increase Civil Bed Capacity and Enhance Clinical Model | 35 |
|    Option D - Create a Civil Reintegration Unit | 37 |
|    Option E - Develop a Special Needs Unit for ACPTC | 39 |
|    Option F - Expand Service Model Beyond Primary Psychiatric Care | 41 |
| Admission Volumes and Wait Times | 47 |
| Optimal Staffing Levels | 55 |
| Patient Discharges and Care Transition | 59 |
| Pandemic Response and Operational Continuity | 67 |
| Independent Investigations | 69 |
| Appendix A - Detailed Budgetary Analysis | 73 |
|    Additional Resources Needed to Meet Existing Obligations | 73 |
|    Option A - Enhance Clinical Model for Existing Patients and Residents | 75 |
|    Option B - Increase Civil Bed Capacity with No Changes to Clinical Model | 77 |
|    Option C - Increase Civil Bed Capacity and Enhance Clinical Model | 81 |
|    Option D - Create a Civil Reintegration Unit | 83 |
|    Option E - Develop a Special Needs Unit for ACPTC | 85 |
|    Option F - Expand Service Model Beyond Primary Psychiatric Care | 87 |
| Appendix B - Community Stakeholder Survey Results | 89 |

Option F - Expand Service Model Beyond Primary Psychiatric Care

Beyond the above-cited issue with the Hospital's current licensure restrictions, the Hospital is not able to meet the needs of patients with Autism, DD/ID, dementia/neurocognitive disorder, or substance use disorder as primary diagnosis. Appropriately meeting the needs of these populations takes whole teams with specialized training. The Hospital's current allocation meets its needs for the treatment of severe general primary psychiatric illnesses (such as schizophrenia, bipolar disorder, depression, etc.). ASH can address other issues mentioned if they are *secondary* conditions, as all clinical staff have basic abilities to address these issues when minor or secondary. Antisocial personality disorder (which is a disqualifying diagnosis for Title 36 court ordered treatment and has no evidence-based treatments for the diagnosis), cannot be treated by ASH regardless of the specialized staff hired.

There is a second, equally important, issue for patients with Autism, DD/ID, Dementia/ Neurocognitive Disorders, severe personality disorders, or substance use disorders as a primary component of their behavioral issues. These patients require specialized and separate patient care environments for optimal treatment and to mitigate disruption for patients with primary general psychiatric illness. The Hospital does not currently have sufficient or appropriate facilities to provide such varied and specialized treatment.

States that are currently treating all of these diagnoses (Autism, DD/ID, Dementia/ Neurocognitive Disorders, or substance use disorders) as primary presentations of behavioral issues typically do so in separate facilities, or in dedicated and separately licensed units. For example, New Mexico, Connecticut, New York, Massachusetts, Washington, and many other states treat patients with significant behavioral issues due to Autism/DD/ID, in separate dedicated inpatient facilities. Many also have separate, dedicated state nursing homes for patients with dementia and co-occurring severe behavioral issues that cannot be managed elsewhere. Some states also operate long-term substance-use rehab facilities. Having a State Hospital **System** that can meet all of these diverse needs requires significant physical structure and programmatic enhancements beyond that of ASH's existing Civil facility.

According to data collected by NRI (Figure 20, below), Arizona has the lowest number of dedicated state-run Civil psychiatric beds per capita (1.6 per 100k residents) in the nation.[25] The limited number of dedicated psychiatric beds per capita, along with the lack of State-operated beds for other types of patients that may be in need of longer term hospitalization, is problematic. A dedicated psychiatric environment is not conducive to the care of patients with significant dual-comorbidities, as well as patients with primary diagnoses of neurocognitive disorders (dementia, Traumatic Brain Injuries, etc). Similarly, patients with primary DD/ID/Autism, and primary diagnosis with severe personality disorders that can be treated (such as Borderline Personality Disorder), require specialized and dedicated treatment environments in order to properly meet their behavioral needs that are distinct from those that a primary psychiatric facility can properly address.

---

[25] NRI - 2020-2021 State Profiles

**EXHIBIT D**

Option A - Enhance Clinical Model for Existing Patients and Residents

Due largely to past funding priorities targeted to emphasize milieu management and safety, specifically a focus on Behavioral Health Technicians and Security Officers, clinical services have not been provided the necessary resources to accommodate the changing and increasingly complex needs of the patient population, including specialized therapies and evidenced-based behavioral modification procedures. This section of the Plan seeks to address these deficiencies and propose solutions that will allow the Hospital to provide more expansive psychiatric care to our existing patient and resident population, as well as meet their secondary or tertiary behavioral health needs beyond that of a primary psychiatric disorder. Respondents to the public survey soliciting feedback for this Plan believed this to be the action likely to result in the most long-term benefit for the State as a whole.

As previously indicated, individuals with a Neurocognitive Disorder (i.e., Dementia, Traumatic Brain Injury, etc.) or a Neurodevelopmental Disorder (i.e., Autism Spectrum Disorder or an Intellectual Disability) require specialized treatment due to the complexity of the behaviors and symptoms that are associated with these disorders. Furthermore, when these disorders are combined with a Serious Mental Illness, the need for specialized care is compounded and oftentimes leads to longer hospitalizations and difficulty discharging to a less-restrictive setting. While preparing this Plan, the Hospital reviewed the prevalence of Neurocognitive Disorders and Neurodevelopmental Disorders across its existing patient population. It should be noted that for both the Civil and Forensic campuses, individuals that had either a Neurocognitive Disorder, a Neurodevelopmental Disorder, or a combination, have been hospitalized for a significantly longer time period than their peers. Specifically, 32.5% of Civil patients and 12.2% of Forensic patients had at least one of these diagnoses and have an average length of stay 2.9 years longer than their peers without a Neurocognitive or Neurodevelopmental Disorder.

**Figure 12**

| Prevalence of Top Non-Psychiatric Disorders Among Existing Hospital Population[15] | | | | |
|---|---|---|---|---|
| Disorder Category | Percent of Civil Patients | Percent of Forensic Patients | Percent of ACPTC Residents | Percent of ASH Population |
| Neurocognitive Disorder | 20.18% | 4.35% | 1.03% | *8.90%* |
| Neurodevelopmental Disorder | 12.28% | 7.83% | 14.43% | *11.35%* |
| Personality Disorder | 23.68% | 18.26% | 68.04% | *34.97%* |
| Substance Related Disorder | 32.46% | 61.74% | 50.52% | *48.16%* |

---

[15] Data as of June 21, 2023

**EXHIBIT E**

## SENSORYSOOTHERS, 19-INCH RED FOX

### WEIGHTED AUTISM THEREPY ANIMAL





Jen on May 7, 2020

★★★★★

It is just the right amount of weight for my child and so fluffy. Great for an anxious fox admirer.

🖵 Contact buyer



19" Fox, Up to 5lbs, Weighted Stuffed Animal, Fox, Red Fox, Sensory Animal, Stuffed Fox, Weighted Fox, Fox Lap Pad, Fox Stuffed Animal





Shania on Apr 20, 2020

★★★★★

I absolutely love it!! I held it all day yesterday. 😍 It's very comforting. quick shipping, great communication between the seller and I. What more could you ask for? 100% recommend this seller.

🖵 Contact buyer

19" Weighted Stuffed Animal, Fox, Red Fox, Sensory Animal, Stuffed Fox, Weighted Fox, Fox Lap Pad, Fox Plushie





May on Apr 9, 2020

★★★★★

I struggle with severe anxiety and the first night I had my fox was the best I've slept in weeks. She's beautifully crafted, the fur is so soft, and the 5 pound weight is perfect. Teresa is so nice and helpful, I received my fox in two days from the other side of the country. Very happy with my purchase!

🖵 Contact buyer



19" Weighted Stuffed Animal, Fox, Red Fox, Sensory Animal, Stuffed Fox, Weighted Fox, Fox Lap Pad, Fox Plushie



**FOXY'S VESTS:**



**RECEIPTS:**

amazon.com

## Final Details for Order #115-2343629-1573027
Print this page for your records.

**Order Placed:** November 29, 2015
**Amazon.com order number:** 115-2343629-1573027
**Order Total: $27.84**

---

### Shipped on November 30, 2015

---

**Items Ordered**                                                                                          **Price**
1 of: *Quick-Ship Service Dog Vest with FREE patches and 5 FREE Info Cards In Clear Pocket*   $23.85
Sold by: Griffco Supply (seller profile)
Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
GENERAL DELIVERY
LANESBORO, MA 01237-9999
United States

**Shipping Speed:**
One-Day Shipping

---

### Payment information

**Payment Method:**                          Item(s) Subtotal:            $23.85
• No current charges                         Shipping & Handling:          $3.99
                                                                          -----
**Billing address**                          Total before tax:            $27.84
Matthew Solan                                Estimated tax to be collected: $0.00
10760 S HIGH MESA TRL                                                     -----
TEL 508 986-9191                             **Grand Total:               $27.84**
WILLIAMS, AZ 86046-5180
United States

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2025, Amazon.com, Inc. or its affiliates

amazon.com

## Final Details for Order #111-6920967-3280262

Print this page for your records.

**Order Placed:** March 2, 2017
**Amazon.com order number:** 111-6920967-3280262
**Order Total: $941.48**

---

### Shipped on March 2, 2017

---

**Items Ordered**                                                                 **Price**

1 of: *Youphoria Yoga 1/4-Inch Thick Memory Foam Mat with Carry Strap - Blue*      $16.99
Sold by: Youphoria (seller profile) | Product question? Ask Seller
Supplied by: Other


Condition: New


**Shipping Address:**
Matthew Solan
10760 S HIGH MESA TRL
TEL 508 986-9191
WILLIAMS, AZ 86046-5180
United States


**Shipping Speed:**
Two-Day Shipping

---

### Shipped on March 3, 2017

---

**Items Ordered**                                                                 **Price**

1 of: *ALBCORP Reflective Service Dog Vest / Harness, Woven Polyester & Nylon, Neoprene*    $21.95
*Padding, EXTRA SMALL, BLACK*
Sold by: ALBCORP (seller profile)
Supplied by: Other


Condition: New

1 of: *OneTigris Tactical Dog Training Bungee Leash with Control Handle Quick Release*    $14.95
*Nylon Leads Rope (Black)*
Sold by: OneTigris (seller profile)
Supplied by: Other

Condition: New

1 of: *Garmin Alpha 100 TT 15 Dog GPS Bundle*                    $799.99

Sold by: Amazon.com Services, Inc

Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
10760 S HIGH MESA TRL
TEL 508 986-9191
WILLIAMS, AZ 86046-5180
United States

**Shipping Speed:**
Two-Day Shipping

---

## Shipped on March 3, 2017

**Items Ordered**                                              **Price**

1 of: *Outward Hound Port A Bowl Collapsible Hiking and Travel Folding Dog Food and Water*   $3.99
*Bowl, Small*

Sold by: Amazon.com Services, Inc

Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
10760 S HIGH MESA TRL
TEL 508 986-9191
WILLIAMS, AZ 86046-5180
United States

**Shipping Speed:**
Two-Day Shipping

---

## Payment information

| **Payment Method:** | Item(s) Subtotal: | $857.87 |
| No current charges | Shipping & Handling: | $0.00 |
| | | ----- |

amazon.com

### Final Details for Order #111-3015155-8617818
Print this page for your records.

**Order Placed:** September 20, 2017
**Amazon.com order number:** 111-3015155-8617818
**Order Total: $192.54**

---

## Shipped on September 21, 2017

---

**Items Ordered**                                                                          **Price**

1 of: *DOUBLE SIDED SERVICE DOG with Red Medical Alert Symbol 1.25 inch Durable Dog*       $10.00
*Tag*
Sold by: K9King (seller profile)
Supplied by: Other

Condition: New
Brand New Double Sided Service Dog with Easily Identifiable Medical Alert Symbol. Durable light weight Stainless Steel
with a Metal lobster clasp used to ensure the tag stays in place. Our tags are engraved and filled with Soft Enamel to
giving the tag a very rich jewelry look and feel. The process gives you peace of mind that they will not scratch or fade
off like standard printing, these tags are built to last.

1 of: *Earthbath All Natural Oatmeal and Aloe Conditioner, 16-Ounce*                        $13.49
Sold by: (seller profile)
Supplied by: Other

Condition: New
1 of: *Wild Republic Cuddlekin Fennic Fox 12" Plush*                                        $14.99
Sold by: Amazon.com Services, Inc
Supplied by: Other

Condition: New
1 of: *Albcorp Reflective Service Dog Patches with Hook Backing for Service Animal Vests /*  $9.95
*Harnesses Medium (5 X 1.5) Inch*
Sold by: ALBCORP (seller profile)
Supplied by: Other

Condition: New
1 of: *Pettom Heavy Duty Adjustable Nylon Tactical Military US Army Police Dog Training*    $16.58
*Leash Elastic Pet Quick Release Control Leads Rope(Black)*
Sold by: Pettom (seller profile)
Supplied by: Other

Condition: New

1 of: *Organic All Natural Body Wash Soap. Anti-fungal, Anti-bacterial. Aloe, Shea Butter,*   $14.99
*Bentonite and Essential Oils. Concentrated-Long Lasting, Eco-Friendly. Hose Off Brand*
Sold by: Fieldworks Supply Company (seller profile) | Product question? Ask Seller
Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
GENERAL DELIVERY
DURANGO, CO 81301-9999
United States

**Shipping Speed:**
One-Day Shipping

## Shipped on September 21, 2017

**Items Ordered**                                                                                          **Price**

1 of: *Natural Dog Shampoo. Anti-Bacterial-Anti-Fungal- Anti-Itch , Promotes Healthy Hair*   $14.49
*and Skin, Helps Hot Spots. Shea Butter, Neem and Argan Oil, Aloe Vera and Bentonite.*
*Concentrated-Organic by Moosh*
Sold by: Fieldworks Supply Company (seller profile) | Product question? Ask Seller
Supplied by: Other

Condition: New

1 of: *Top Performance Hair Dye Gel for Dogs, 4 Ounces, Tuxedo Black*                         $14.99
Sold by: Amazon.com Services, Inc
Supplied by: Other

Condition: New

1 of: *BONAMART ® 5 Pack Women Men Unisex Split Two Toe Tube Bamboo Tabi Socks Free*   $15.99
*Size*
Sold by: BONAMART-COM (seller profile)
Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
GENERAL DELIVERY
DURANGO, CO 81301-9999

United States

**Shipping Speed:**
One-Day Shipping

## Shipped on September 21, 2017

**Items Ordered**                                                                       **Price**

1 of: *OneTigris Tactical Dog Training Molle Vest Harness (Black, S / 33.5 cm)*          $19.99
Sold by: OneTigris (seller profile)
Supplied by: Other

Condition: New

**Shipping Address:**
Matthew Solan
GENERAL DELIVERY
DURANGO, CO 81301-9999
United States

**Shipping Speed:**
One-Day Shipping

## Payment information

| | | |
|---|---|---|
| **Payment Method:** | Item(s) Subtotal: | $145.46 |
| Visa  ending in 4006 | Shipping & Handling: | $45.90 |
| | | ----- |
| **Billing address** | Total before tax: | $191.36 |
| Matthew Solan | Estimated tax to be collected: | $1.18 |
| 10760 S HIGH MESA TRL | | ----- |
| TEL 508 986-9191 | **Grand Total:** | **$192.54** |
| WILLIAMS, AZ 86046-5180 | | |
| United States | | |
| **Credit Card transactions** | Visa ending in 4006: September 21, 2017: | $150.08 |
| | Visa ending in 4006: September 21, 2017: | $42.46 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2025, Amazon.com, Inc. or its affiliates

**EXHIBIT F**

# Apply Now

First Name

Last Name

Email

APPLY

## BEHAVIORAL HEALTH TECH 1

- 524135
- PHOENIX
- DEPT OF HEALTH SERVICES
- Full-time

## DEPT OF HEALTH SERVICES

*The Arizona Department of Health Services promotes and protects the health of Arizona's children and adults. Our mission is to promote, protect, and improve the health and wellness of individuals and communities in Arizona. We strive to set the standard for personal and community health through direct care, science, public policy, and leadership. ADHS promotes alternative work schedules, flexible hours. We have positions that can fit any stage in your career, from entry to senior level. We offer a robust benefit package, including the ADHS Student Loan Assistance Pilot Program, where eligible employees can receive up to $437.50 per month for their outstanding student loans. Come check us out and see how you can make a difference in the lives of all Arizonans.*

## BEHAVIORAL HEALTH TECHNICIAN 1

### Arizona State Hospital

Job Location:

Address: 501 N. 24th Street Phoenix, AZ 85008

Posting Details:

Salary: $17.5306

Grade: 15

Closing Date: Open Until Filled

Job Summary:

This position is eligible for a $5,000 hiring incentive.

What's it like working as a Behavioral Health Technician at the Arizona State Hospital?
Watch the video here: https://youtu.be/Bi-PG6dI_Vk

The Behavioral Health Technician 1 will work under the supervision of a Registered Nurse, and will provide physical and psychological care to psychiatric patients. The position works on a rotating schedule and may be required to work varied schedules to meet the staffing needs of the hospital. The individual in this role will provide basic paraprofessional nursing care as directed which can include tasks such as providing patient assistance with performing ADL's (activity of daily living), monitoring nutrition intake, and taking vital signs.

This role monitors and accurately documents patient activities and changes in behavior, mood, physical or psychological status following current policy. The BHT 1 alerts the charge nurse of any identified changes in physical or psychological status of the patients. The individual in this role will escort patients to clinical referrals and outings, and will also respond to psychiatric and medical emergencies, using approved interventions per hospital policy. The BHT 1 will maintain safety and security for patients and staff while assisting with orienting patients and new staff to the unit. This position offers weekend differential, and shift differential along with a comprehensive benefit package.

Job Duties:

- Supervising patient activities, social skills, and assists them with money management

- Communicating with patients in various situations, activity groups, and as directed by the supervisor

- Participating as a member of the care team and implements assigned treatment plans under general supervision

- Assisting with organizing and participating in therapeutic activities, exercise, and rehabilitation

- Charting on patients on special observation

- Completing progress notes and reports to the nurse on unusual incidents/events

- Charting vital signs and implements assigned treatment plans under general supervision

- Reporting all unusual incidents as required

- Attending shift reports, unit meetings, mandatory education and training requirements

- Coordinating with supervisor to complete required clinical oversight per policy

– Observing, reporting and documenting patient psychiatric and medical problems

– Responding to medical and psychiatric codes, such as seclusions and restraints, code arrests, etc.

– Intervening pro-actively using approved NVCI techniques, including using the least restrictive interventions appropriate for the situation

– Promoting quality service within a compassionate environment by treating patients, staff, and coworkers with respect and dignity

– Maintaining an environment that supports patient rights

Knowledge, Skills & Abilities (KSAs):

– Knowledge of basic mental health principles, therapeutic interventions, behavioral management and motivational techniques, basic group process, patient rights, infection control, safety policies and procedures, and concepts of performance improvement activities

– Skills in teaching activities of daily living, i.e., personal hygiene, social skills, communication skills, coping skills, and community resources as part of discharge planning, paraprofessional nursing care as directed, providing therapeutic interactions and activities

– Ability to respond to medical and psychiatric emergencies; understand and follow detailed verbal and written instructions; organizing and participate in therapeutic groups and recreational and social activities; document progress notes and incident reports; appropriately utilize NVCI techniques and principles when interacting with patients, including using the least restrictive interventions appropriate for the situation

– Supporting a diverse multi-cultural workforce that reflects the community, promotes equal opportunity at all levels of ADHS, and creates an inclusive work environment that enables all individuals to perform to their fullest potential free from discrimination

Selective Preference(s):

Bachelor's degree in psychology, social work, counseling with an emphasis in clinical work or rehabilitation may substitute for one year of the required experience. OR Two years of direct patient care and treatment of the mentally ill, developmentally disabled or physically ill and/or incapacitated patient experience, preferably in a behavioral health setting.

Pre-Employment Requirements:

– A State Hospital employee must be able to obtain a valid Level One Fingerprint Clearance Card pursuant to A.R.S. § 41-1758.07 or must apply for a level one fingerprint clearance cars within seven working days after beginning employment.

– High school diploma or GED

– Must be able to obtain and maintain CPR and NVCI certification.

– Driving is required for State Business.

– Employees who drive on state business require possession of and the ability to retain a current, valid state-issued driver's license appropriate to the assignment. Employees who drive on state business are subject to driver's license checks, must maintain acceptable driving records and must complete any driver training (See Arizona Administrative Code R2-10-207.11).

Benefits:

The State of Arizona provides an excellent comprehensive benefits package including:
– Affordable medical and dental insurance plans
– Paid vacation and sick time
– 10 paid holidays per year
– Wellness program and plans
– Life insurance
– Short/long-term disability insurance
– Defined retirement plan
– Award winning Infant at Work program
– Credit union membership
– Transit subsidy
– ADHS Student Assistance Pilot Program

*For a complete list of benefits provided by The State of Arizona, please visit our benefits page*

Retirement:

To help you build a financially secure future, the State makes monthly contributions to finance your retirement benefit. The State will make a contribution to the ASRS in an amount equal to your contribution. In other words, you and the State will each pay 50% of the total cost of the benefit. New State employees have a 27 week wait period for contributions to begin.

Contact Us:

Arizona State Government is an EOE/ADA Reasonable Accommodation Employer. Persons with a disability may request a reasonable accommodation such as a sign language interpreter or an alternative format by calling (602) 542-1085. Requests should be made as early as possible to allow sufficient time to arrange the accommodation. DHS is an Equal Employment Opportunity Employer. All newly hired employees will be subject to E-Verify Employment Eligibility Verification.

Search by job title, location, department, category, etc.    | SEARCH |    | JOBS NEAR ME |

ARIZONA MANAGEMENT SYSTEM (AMS)

All Arizona state employees operate within the Arizona Management System (AMS), an intentional, results-driven approach for doing the work of state government whereby every employee reflects on performance, reduces waste, and commits to continuous improvement with sustainable progress.  Through AMS, every state employee seeks to understand customer needs, identify problems, improve processes, and measure results.

State employees are highly engaged, collaborative and embrace a culture of public service.

The State of Arizona is an Equal Opportunity/Reasonable Accommodation Employer.

*If this position requires driving or the use of a vehicle as an essential function of the job to conduct State business, then the following requirements apply: Driver's License Requirements*



Applicant instructions are available here.

Having trouble applying for a position? Email hrisservicedesk@azdoa.gov or call 602-542-4700 for assistance.

If you have questions regarding the information in a job posting, please view the specific job posting for the contact information.

**EXHIBIT G**

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Michael R. Sheldon, C.E.O.
Arizona State Hospital
2500 East Van Buren Street
Phoenix, Arizona 85008



9590 9402 7796 2152 7475 19

2. Article Number *(Transfer from service label)*
7015 0640 0003 6970 2563

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☑ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
Jen Bartush    6 20 24

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
■ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

USPS TRACKING #



9590 9402 7796 2152 7475 19

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•



MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**EXHIBIT H**



**ARIZONA DEPARTMENT OF HEALTH SERVICES**

ARIZONA STATE HOSPITAL

**Governing Body Regular Session (Open Meeting) Minutes**
**Friday, May 24, 2024 10:00 a.m.**
**Civil Auditorium/Google Meet**

**Voting Members Present:**
Kathy Bashor, Consumer Advocate
Joel Conger, Mental Health Public Expert
Jennie Cunico, Chair, ADHS Cabinet Executive Officer / Executive Deputy Director
Kelsey Difiore, Mental Health Public Expert
Calvin Flowers, MD, Chief Medical Officer
George C. Galliher III, Consumer Advocate
Emily Jenkins, Legal Expert
Jason LaForest, ASH Deputy Chief Financial Officer
Kristina Sabetta, Consumer Advocate
Steven Scott, Mental Health Public Expert
Michael Sheldon, MPA, ADHS Deputy Director, ASH Chief Executive Officer
Eddie Sissons, Consumer Advocate

**Voting Members Absent:**
Dr. James Clark, Psychiatrist
Kimberly Craig, Mental Health Public Expert
Sue Davis, Family Member of Past Service Recipient
Dan Haley, Consumer Advocate
Maria Radulovic, FNP, Medical Staff Representative

**Other Staff Present:**
Jen Bartush, Executive Staff Assistant, ASH
Trevor Cooke, BS, Chief Quality Officer, ASH
Michele Dunsworth, MSN, RN, Chief Nursing Officer, ASH
Margaret McLaughlin, MS, CHC, Chief Compliance Officer, ASH

**Non-Voting Members Present:**
Laurie Goldstein – IOC Chairperson

**Non-Voting Members Absent:**
N/A

**Members of the Public:**
Crystal Dawn Fox
Twila Dawn Lake

Approved:
*Jennie Cunico*

Date: 7/26/2024

# ARIZONA DEPARTMENT
## OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

## Governing Body Regular Session (Open Meeting) Minutes
Friday, July 26, 2024 10:00 a.m.
Civil Auditorium/Google Meet

**Voting Members Present:**
Dr. James Clark, Psychiatrist
Joel Conger, Mental Health Public Expert*
Kimberly Craig, Mental Health Public Expert*
Jennie Cunico, Chair, ADHS Cabinet Executive Officer / Executive Deputy Director
Calvin Flowers, MD, ASH Chief Medical Officer
George C. Galliher III, Consumer Advocate
Emily Jenkins, Legal Expert*
Jason LaForest, ASH Deputy Chief Financial Officer
Kristina Sabetta, Consumer Advocate
Michael Sheldon, MPA, ADHS Deputy Director, ASH Chief Executive Officer

**Voting Members Absent:**
Kathy Bashor, Consumer Advocate
Kelsey Difiore, Mental Health Public Expert
Dan Haley, Consumer Advocate
Maria Radulovic, FNP, ASH Medical Staff Representative
Steven Scott, Mental Health Public Expert
Eddie Sissons, Consumer Advocate

**Other Staff Present:**
Jen Bartush, ASH Executive Staff Assistant
Trevor Cooke, BS, ASH Chief Quality Officer
Erica Waldridge, ASH Deputy Chief Human Resources Officer*

**Non-Voting Members Present:**
Laurie Goldstein – IOC Chairperson

Note: Individuals attending remotely are identified with an "*"

**Non-Voting Members Absent:**
N/A

**Members of the Public:**
N/A

Approved: _____   Date: _9/27/24_

# SignalHire

Overview   Analytics   Work Experience   Education   Current Company Info

Why SignalHire?   Pricing   Companies   Profiles   Sign In   Sign Up

Type First and Last n...

## Jen Bartush's email & phone opt-out

**Current Position:**
Executive Assistant to the CEO |
Governing Body Secretary –
Arizona State Hospital at Arizona
Department of Health Services
**Experience:**
32 years
**Location:**
Greater Phoenix Area

Last updated 2025-03-14

### How to contact Jen Bartush

J**@azdhs.gov

+1-***-***-8865



Sign Up to Get Free Contacts

## Analytics

According to LinkedIn Jen Bartush started working on 1993, then the employee has changed 7 companies and 7 jobs. On average, Jen Bartush works for one company for 4 years. Jen Bartush has been working as a Executive Assistant to the CEO | Governing Body Secretary – Arizona State Hospital for Arizona Department of Health Services for 456 days. If you are interested in this candidate, contact him directly by using contact details provided by SignalHire.

## Work Experience

○ Executive Assistant to the CEO | Governing Body Secretary – Arizona State Hospital at Arizona Department of Health Services
  Jan 2024 – Current

● Grants Coordinator | Executive Assistant to Founder, President and CEO at HUE Technologies
  Feb 2022 – Current

● Executive Assistant to the CEO at Southwest Human Development
  May 2023 – Jan 2024

Hello!
How can we help you?

1

## CERTIFICATE OF SERVICE

2    I certify that on April 4th, 2025, a copy of the foregoing document was deposited in

3 the U.S. mail, addressed to:

4

5    Ann Hobart and Jordan Kendall
Assistant Attorneys General
6    Arizona Attorney General's Office
2005 N. Central Avenue
7    Phoenix, Arizona 85004

8    *Attorneys for Defendants*

9

10

11                                                          Matthew Phillip Solan

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056