

1

**MATTHEW PHILLIP SOLAN**

2   501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056

3   Tel:    1.970.FOX.9611
Fax:    1.970.844.1733

4   Email: legal@fox-ranch.com

5   *Plaintiff in propria persona*

6                  **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8   Matthew Phillip Solan                    Case no. CV24-02061-PHX-JJT-DMF
*Plaintiff,*

9
*v.*                                         **PLAINTIFF'S REPLY IN SUPPORT OF**

10                                           **HIS MOTION FOR A PRELIMINARY**
**INJUNCTION**

11  State of Arizona, *et al.,*
*Defendants.*

12

13      COMES NOW Plaintiff Matthew Phillip Solan ("Plaintiff") and states in support of his Motion for

14  a Preliminary Injunction (Doc. 17) ("MPI") as follows:

15      Plaintiff filed his First Amended Complaint (Doc. 6) ("FAC") on November 18, 2024. The

16  Court screened the FAC and allowed Plaintiff's Title II, RA, libel, and false light claims to proceed.

17  On March 17, 2025, Plaintiff filed the pending MPI asking the Court to restrain and enjoin the State

18  from excluding Plaintiff's service dog Foxy ("Foxy") from ASH. Defendants Sheldon, Bowen,

19  Carter, and Coleman responded in opposition to the MPI. These Defendants are not parties in

20  interest under the ADA/RA claims and have no business responding to the MPI. Their response

21  should be summarily stricken. The State's response is properly made, but entirely devoid of merit:

22  **I.   Plaintiff is Highly Likely to Succeed on the Merits**

23      To obtain a preliminary injunction under Fed. R. Civ. P. 65, a party must show "that he is likely

24  to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

25  relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

26  Winter v. Natural Res. Def. Council, Inc., 555 U.S. at 20 (2008). Plaintiff has clearly demonstrated

27  his entitlement to a preliminary injunction under all four prongs of the *Winters* test. However,

28  Defendants falsely assert the MPI "does not clear *Winter*'s threshold inquiry." Doc. 25 at 4:17-25.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA, 85008-6056

The FAC challenges the State's July 5, 2024 denial letter ("Denial Letter"), which is based "on the same therapeutic, security, financial, and staffing concerns raised in the previous lawsuit." Doc. 8 at 5:5-6. In their MTD, the State incorporates its claims from ASH's 2022 particularized assessment letter ("Assessment Letter") nearly verbatim in an attempt to bolster their Denial Letter. Plaintiff challenged the substantive basis of both Denial Letter and Assessment Letter in his MPI. Instead of arguing the merits of Plaintiff's claims, Defendants proffer various legal fallacies to attack Foxy's status as a service animal and Plaintiff's right to litigate the operative Title II and RA claims.

In Solan v. Arizona State Hospital, CV-20-02209-PHX-JJT (MHB) ("CV-20-02209"), Plaintiff charged ASH with violating the ADA by its refusal to modify its policies and procedures to allow Foxy to live with Plaintiff at ASH's forensic psychiatric hospital. Plaintiff's ADA claims, and Defendants' current ADA defenses are nearly identical to those raised in CV-20-02209. This Court previously held that "Plaintiff has demonstrated that he is likely to succeed on the merits of his ADA claim," CV-20-02209, Doc. 84 at 12:14-15. To the extent that any of the circumstances present in CV-20-02209 have materially changed, the changes operate in Plaintiff's favor. For example, Plaintiff no longer has a roommate, Foxy takes no medication, she has been undergoing continual maintenance training, and nearly every patient on Plaintiff's treatment unit, and half the forensic patient population testified that Foxy's presence would be "highly beneficial" to their rehabilitation. *See* Exhibit A. Other than the absurd claim that Plaintiff might rape, murder, and eat Foxy, the State has raised no affirmative defenses besides those adjudicated in Plaintiff's favor in CV-20-02209.

The State attempts argue that Plaintiff should be collaterally estopped from challenging the propriety of ASH's 2022 assessment letter, but for the reasons set forth below, the State's argument not only fails, but positively demonstrates that the State's defenses, rather than Plaintiff' claims, are barred by the doctrine of issue preclusion.

## A. Collateral Estoppel Does Not Validate Defendants' Flawed Assessment

Defendants claim that "[a]ccording to Solan, Defendants cannot rely on the 2022 particularized assessment relating to Foxy to exclude her clone from ASH in 2025 because, he argues, the assessment did not comply with the Court's order in CV-20-02209." Defendants argue "[t]he issue preclusion doctrine bars this argument…because Solan explicitly requested that this Court dismiss

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1    CV-20-02209 with prejudice, and this Court granted that request." Defendants' misapply the

2    doctrine of issue preclusion, and ignore the true grounds for the 2023 dismissal, *viz.*, that the Court

3    lost subject matter jurisdiction when Foxy's prior embodiment perished.

4        "Issue preclusion, also known as collateral estoppel, bars the relitigation of an issue where four

5    conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually

6    litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the

7    issue; and (4) the issue was necessary to decide the merits." Janjua v. Neufeld, 933 F.3d 1061 (9th

8    Cir. 2019); The party asserting collateral estoppel "bears the burden of showing with clarity and

9    certainty what was determined by the prior judgment." Clark v. Bear Stearns & Co., Inc., 966 F.2d

10   1318, 1321 (9th Cir. 1992). "It is not enough that the party introduce the decision of the prior court;

11   rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to

12   pinpoint the exact issues previously litigated." Id. (quoting United States v. Lasky, 600 F.2d 765,

13   769 (9th Cir.), cert. denied, 444 U.S. 979 (1979)).  Defendants have not met the necessary burden to

14   establish issue preclusion, and the tenuous arguments they proffer collapse spectacularly under

15   scrutiny. Ironically, defense preclusion does apply to nearly all of Defendants' affirmative defenses,

16   under the very same logic Defendants attempt to apply against Plaintiff.

17       *i.*    **Actual Litigation of the Issue**

18       "Unlike claim preclusion, also known as res judicata, issue preclusion requires that an issue must

19   have been 'actually and necessarily determined by a court of competent jurisdiction' to be

20   conclusive in a subsequent suit." Janjua, *supra* (quoting Montana v. United States, 440 U.S. 147,

21   153 (1979).) To determine if an issue was actually litigated, the courts look "to the record of the

22   prior proceeding to determine whether an issue was in fact raised, contested, and submitted for

23   determination." Id.

24       In *Janjua*, the 9th Circuit rejected the plaintiff's argument "that an issue should be considered

25   actually litigated if it was implicitly raised or if the parties had a full and fair opportunity to raise it,"

26   explaining that such a standard "would conflate the separate requirements that an issue be actually

27   decided in the prior proceedings and necessary to decide the merits." Id. "An issue is actually

28   litigated [w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1 | determination, and is determined." Wabakken v. Cal. Dep't of Corrs. & Rehab., 801 F.3d 1143,
2 | 1148 (9th Cir. 2015); Restatement (Second) of Judgments § 27, cmt. (d) (1982) ("When an issue is
3 | properly raised, by the pleadings or otherwise determination and is determined, the issue is actually
4 | litigated…"). The Particular Assessment was never filed with the Court, never submitted for
5 | adjudication, and never judicially determined in CV-20-02209, nor could it have been.

6 | **ii.    Full and Fair Opportunity to Litigate**

7 | In deciding whether a party has had a "full and fair" opportunity to litigate, the Ninth Circuit has
8 | held that a court "must make a practical judgment based on at least two considerations": (1) a
9 | comparison of the procedures in the prior and subsequent actions; and (2) a consideration of "the
10 | parties' incentives to litigate in the two actions." Maciel v. Comm'r, 489 F.3d 1018, 1023 (9th Cir.
11 | 2007) ("If a party had good reason not to contest an issue vigorously during the first action and did
12 | not, in fact, vigorously contest the issue, that party generally should be entitled to relitigate the issue
13 | during the second action.").

14 | Defendants argue that Plaintiff "did not challenge ASH's compliance with the Court's
15 | preliminary injunction Order while CV-20-02209 was pending, and he lost the issue when he
16 | voluntarily stipulated to dismiss his prior case with prejudice." This is nonsense. What was
17 | adjudicated in CV-20-02209 were the State's affirmative defenses, and they were *all* decided in
18 | Plaintiff's favor. The fact of the matter is that Plaintiff could not have contested the Particularized
19 | Assessment in CV-20-02209. The Court did invite Plaintiff to "again move for preliminary
20 | injunctive relief," if he was dissatisfied with the Particularized Assessment. And Plaintiff did begin
21 | preparing with counsel to do just that. While awaiting discovery of documents necessary to
22 | challenge the Particularized Assessment (including the affidavit of Dr. Morris, which was never
23 | actually disclosed), Foxy abruptly passed away in her sleep. Defendants also omit the fact that they
24 | stipulated to this dismissal: "pursuant to Rule 41(a)(1)(A)(ii), the parties agree and stipulate for
25 | dismissal of this matter with prejudice, each party to bear its own coasts and fees, *on the basis that*
26 | *Plaintiff's service dog, 'Foxy,' passed away and the matter therefore is moot.*" CV-20-02209, Doc.
27 | 92 at 1. *Emphasis added.* The issue of whether the Particularized Assessment complied with the
28 | ADA was simply never reached; the issue become moot, and was never resolved on the merits.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Further, contrary to the State's assertion, Plaintiff had not arranged to have Foxy cloned before CV-20-02209 was dismissed, but had merely preserved her genetic material. *See* FAC at 19, ¶ 97. Plaintiff did not possess the fiscal resources necessary to pursue cloning services at that time, and had not decided whether to wait until discharge from ASH, or attempt to initiate the cloning while confined. When it became clear that ASH was refusing to treat Plaintiff's autism, and was simply warehousing him with no discharge plan, Plaintiff decided to liquidate his homestead to pay for the cloning. It was not until July, 2023 that Plaintiff had sufficient funds in hand, and not until August, 2023 that Plaintiff actually arranged to have Foxy cloned. *See* FAC at 20, ¶ 104; *see also* Exhibit B.

For the foregoing reasons, Plaintiff is not barred by the doctrine of issue preclusion from challenging the State's Particularized Assessment, or its regurgitated logic in the Denial Letter. On the other hand, the State is collaterally estopped from raising the same affirmative defenses that were litigated and rejected by the Court in its previous injunction. CV-20-02209, Doc. 84.

**B. Defendants Offer No  Substantive Arguments Against Foxy Living With Plaintiff**

As Defendants cannot rescue their doomed defenses by invoking the doctrine of issue preclusion, they must substantively rebut Plaintiff's verified statements which plainly demonstrate Plaintiff's entitlement to accommodations for Foxy. Defendants assert that "Solan's scattershot attempts to controvert ASH's particularized assessment are superficial, conclusory, and ineffectual," but Defendants' claim is laughable. Defendants put forward no substantive arguments against Plaintiff's statements of fact in the MPI. Instead, Defendants hang their hat on the illogical proposition that the Particularized Assessment *per se* forecloses Plaintiff's right to an individualized assessment of his 2024 accommodation request. Absent such foreclosure, Defendants' defenses entirely collapse.

**C. Defendants' Tether Argument Is Self-Contradicting**

Defendants next argue that Plaintiff "fails to explain why he would be unable to use a tether because of a disability or why using a tether would interfere with Foxy's clone's ability to safely and effectively perform work or tasks for Solan." Doc. 25 at 7:2-4. Defendants claim this is "fatal to Solan's Motion." Doc. 25 at 7:11. This argument is frivolous. Defendants are the ones arguing that Plaintiff cannot use a tether because tether would be unsafe for people with psychiatric disabilities: "leashes and harnesses are ligatures that ASH policy, in adherence and consistent with definitions

1  from licensure and the Joint Commission, classifies as contraband. This means that they are not
2  approved for patient possession or use, even under staff supervision, because patients may use
3  ligatures to harm themselves or others." Doc. 15 at 7:26-27, 8:1-3. This policy violates the ADA. 28
4  C.F.R. 35.139(b) requires an individualized assessment to determine if a direct threat actually exists.

5      Plaintiff is confined at ASH for the sole purpose of receiving treatment for his neuropsychiatric
6  disabilities. If there is any validity in ASH's ligature policy, Plaintiff's inability to use a leash is a
7  direct result of his disability-related confinement. Defendants cannot have their cake and eat it too.
8  Either Plaintiff can safely possess a leash at ASH, and the argument is moot, or Plaintiff's
9  possession of a leash is an actual safety risk, and Defendants' latest argument is self-contradicting.
10  At any rate, Defendants' argument does not show that their abridgement of 28 C.F.R. § 35.136(d)
11  was not misleading, or that ASH's ligature policy preempts the ADA's service animal mandate.

12      **D. Foxy is an Individually Trained Service Animal**

13      Defendants argue Plaintiff "fails to explain what work or tasks Foxy's clone was individually
14  trained to do for him, much less how that training was accomplished. Accordingly, he has failed to
15  show that she is a service animal." Doc. 25 at 7:4-6. Defendants similarly argue that Plaintiff "has
16  not alleged facts to suggest that, like Foxy, he personally trained Foxy's clone to perform tasks or
17  work for him that are directly related to his psychiatric disabilities. Doc. 25 at 8:6-6. Defendants
18  plainly misstate the record. Plaintiff did not train Foxy; she was trained by All Dogs Unleashed and
19  Joseph Cowsert. Defendants pretend the testimony set forth in Plaintiff's verified pleading, and in
20  the declarations of Plaintiff, Mr. Cowsert, and Brad Smith, does not exist. This testimony does exist,
21  and clearly shows the extent of Foxy's task training. Defendants have failed to rebut any of it.

22      Foxy's task training includes deep pressure therapy ("DPT"), alerting, grounding, and social
23  buffering work. FAC at 21:10-16, 25:3-22, 26:1; *see also* FAC at 90-91 [Ex. J], 93-98 [Ex. K].
24  These are common autism and PTSD service animal functions. They require Foxy to detect a stress
25  response or adverse emotional state in Plaintiff, and respond by physically placing herself in contact
26  with and applying pressure to Plaintiff by leaning against or sitting on him (in the case of DPT),
27  nudging or yipping at Plaintiff (in the case of her basic alerting tasks), presenting herself to Plaintiff
28  and encouraging him to touch her fur as a sensory anchor (in the case of her grounding tasks), and

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1  gently interposing herself in between Plaintiff and others (in the case of her work as a social buffer).

2  Each of these actions constitute valid work or tasks under the ADA. 28 C.F.R. Pt. 35, App. A, p. 616.

3      A service dog is "any dog that is individually trained to do work or perform tasks for the benefit

4  of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other

5  mental disability." 28 C.F.R. Pt. 35, App. A, p. 614. "Psychiatric service animals can be trained to

6  perform a variety of tasks that assist individuals with disabilities to detect the onset of psychiatric

7  episodes and ameliorate their effects." Id. It is "the fact that the animal is trained to respond to the

8  individual's needs that distinguishes an animal as a service animal." Id. at 616. For example, "if a

9  service animal senses that a person is about to have a psychiatric episode and it is trained to respond

10  for example, by nudging, barking, or removing the individual to a safe location until the episode

11  subsides, then the animal has indeed performed a task or done work on behalf of the individual with

12  the disability, as opposed to merely sensing an event." Id.

13      Notwithstanding, the burden to prove Foxy's training has never rested on Plaintiff. Title II

14  requires that "[a] public entity shall not require documentation, such as proof that the animal has

15  been certified, trained, or licensed as a service animal." 28 C.F.R. 35-136(j). Despite this clear

16  prohibition on Defendants demanding proof of Foxy's training, Defendants now ask the Court to

17  "deny Plaintiff's Motion" on the purported grounds that "he has not established" that "Foxy's clone

18  is a service animal." Doc. 25 at 11:10-11. Defendants request should be denied and reproved.

19  **E. Defendant's Analysis of Plaintiff's Cited Cases is Deeply Flawed**

20      Defendants attack Plaintiff's citations, arguing "[c]ontrary to Solan's Motion, *Del Amo* did not

21  involve residency in a locked psychiatric facility or an injunction of any kind." This is not true. *Del*

22  *Amo's* plaintiff was repeatedly admitted to Del Amo's inpatient psych ward between 2015 and 2018:

23        "C.L. has been voluntarily admitted to inpatient mental health treatment at the facility

24        owned, leased and/or operated by Defendant Del Amo Hospital, Inc…on certain occasions

25        from 2015 to the present. C.L. alleges that on each of her stays…for in-patient treatment,
      [Del Amo] denied her reasonable accommodation or modification of its policies when the

26        hospital refused to permit [her service dog] Aspen to accompany her…."

27  C.L. v. Del Amo Hospital, Inc., 8:18-cv-00475-DOC-DFM, Doc. 1 (C.D. Cal. 2018). Further, after

28  two remands from the 9th Circuit, the *Del Amo* Court issued a permanent injunction:

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

> "Defendant Del Amo Hospital Inc., including its officers and employees, are permanently
> restrained and enjoined from denying entry and accompaniment of Plaintiff C.L.'s service
> dog when C.L. is admitted for in-patient treatment… Pursuant to the Court's Order (Dkt.
> No. 293), Plaintiff is the prevailing party in this action."

Id at Doc. 297 (issued May 6, 2024); Exhibit C. Defendants also take issue with the *Tamara* case: "Tamara did involve a brief (13-day) stay in a locked psychiatric ward, but the Plaintiff in that case used a service dog for independence and mobility following back surgeries, not to perform work or tasks related to her psychiatric disabilities." This argument is meritless. Psychiatric service animals are entitled to the same protections under Title II as animals trained to provide physical support. Defendants' attempt to discriminate against psychiatric services animals clearly evinces their intent to discriminate against Plaintiff on the basis of his psychiatric and neuropsychiatric disabilities.

## II. Foxy's Supplemental Training As a Therapy Dog Does Not Invalidate Her Existing Training or Preempt Her Status as a Service Animal

Defendants complain about the fact that Foxy has received additional certification as a therapy dog. Defendants attempt to argue that Foxy's supplemental training is "at odds with his demand for relief in this Motion, which is predicated on the assumption that Foxy's clone is a service animal (not a therapy dog) who has been individually trained to perform tasks or work for Solan specifically." Plaintiff is not seeking an order for AAT in the MPI. Plaintiff discusses ASH's AAT denial, as well as Sheldon's capricious denials of visitation between Plaintiff, Foxy Mr. Cowsert, to demonstrate the State's cruel and arbitrary obstruction of Plaintiff's attempts keep even minimal therapeutic contact with Foxy.

Additionally, Defendants' assertion that Foxy cannot be a service animal because Mr. Cowert applied for as a therapy dog certification for her, is an obvious logic fallacy. The record clearly shows Foxy was trained to serve as Plaintiff's service animal before Plaintiff requested her accompaniment at ASH in June, 2024. Defendant's faulty logic parallels their assertion that Foxy cannot be a service animal because her predecessor was Plaintiff's familiar, and fails for the reason.

Moreover, the Court noted in its 2022 injunction that, "given the now multi-year separation from Plaintiff and attendant loss of her daily trainings with Plaintiff, it is not clear whether Foxy would still be a suitable service dog for Plaintiff." To resolve this concern, maintain Foxy's public access

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1  etiquette training, and to ensure Foxy would indeed be comfortable living in a healthcare setting,
2  Plaintiff asked Mr. Cowsert to apply for certification from Alliance of Therapy Dogs ("ATD").
3  Foxy passed ATD's auditing, which proved she is competent to safely and comfortably operate in
4  such places. ATD's report shows Foxy's aptitude for navigating residential wards and bringing joy
5  residents thereof. This in no way contradicts Plaintiff's testimony that Foxy is his service animal.

6  **III. Remaining Factors of the Winters Test**

7     **A. Irreparable Harm**

8     Defendants claim Plaintiff has "not established that denying this [MPI] would likely lead to
9  irreparable harm." Doc 25 at 11:3-4. But in support of their position, Defendants argue only that the
10 irreparable harm Plaintiff is suffering "assumes that Foxy's clone is a service animal, which has not
11 been established." Id at 11:10-11. Defendants' make no substantive arguments to show why this is
12 so. Conversely, Plaintiff has demonstrated that Foxy is his service animal, and that he will continue
13 to suffer irreparable harm unless the State is restrained from excluding Foxy from ASH.

14    **B. Balance of the Equities**

15    The Court previously held, and Defendants now admit, that accommodating Foxy would be a
16 "minor administrative inconvenience required by law." Doc. 25 at 11:15-16 (Internal quotes
17 omitted); CV-20-02209, Doc. 84 at 9:15-16. However, Defendants argue Plaintiff's balancing of
18 this minor inconvenience against his unnecessarily prolonged hospitalization and involvement in the
19 criminal justice system "assumes a likelihood of success on the merits of his ADA and Rehab Act
20 claims that he has not established and reflects a fundamental failure to the consequences of his own
21 actions and choices." Doc 25 at 11:15-21. Defendant's argument fails because Plaintiff has clearly
22 demonstrated likelihood of success on the merits of his ADA and RA claims.

23    Plaintiff is not sure what "reflects a fundamental failure to the consequences of his own actions
24 and choices" means. It appears Defendants are claiming that Plaintiff's continued confinement at
25 ASH and involvement in the criminal justice system are a personal choice. Plaintiff did not chose to
26 be subjected to criminal proceedings, tortured in county jail for 408 days, or involuntarily confined
27 at ASH without meaningful treatment for over 5 years. Plaintiff was found guilty except insane
28 because, "at the time of the commission of the criminal act [he] was afflicted with a mental disease

MATTHEW PHILIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

1   or defect of such severity that [he] did not know the criminal act was wrong." A.R.S. § 13-502(A).

2   As a result, the sentence was suspended, and Plaintiff was "placed under the jurisdiction of the

3   superior court and committed to [ASH] pursuant to section 13-3992..." Id at (D). Such commitment

4   was supposed to be "for a period of treatment." A.R.S. § 13-3992(A). However, Defendants have

5   not provided, and do not deny failing to provide Plaintiff any meaningful treatment. *See* Hospital

6   Clinical Improvement and Human Resource Plan at Option F, p. 41 (Doc. 24 at 32 [Ex. C]); Doc. 26

7   (ignoring Plaintiff's response in Doc. 24 that ASH has failed to treat him).

8   **C. Public Interest**

9       Defendants attack Plaintiff's assertion that it is always in the public interest to prevent the

10  violation of a party's constitutional rights. Doc. 25 at 11:12-15. Defendants claim "[t]he rights that

11  he purports to vindicate are statutory, however, not constitutional, and he has failed to establish the

12  likelihood that they have been violated." Id. It is clear from this statement that Defendants

13  misapprehend the first principles of American jurisprudence. The right to a service animal

14  accommodation is not a "statutory right," as Defendants assert; 28 CFR § 35.136(a)—the wellspring

15  from which Plaintiff's ADA claim flows—does not grant any rights. On the contrary, it limits the

16  government's power to interfere with Plaintiff natural and inherent right to self-determination.

17      Plaintiff does not yield his sovereignty to the agencies that serve him. Doc. 6 at 62:6-7.

18  Notwithstanding, while individual sovereignty is generally delegated to our public agencies through

19  the State and Federal Constitutions, all power so delegated is fixed by operation of those constituting

20  instruments, "[a]nd the law is the definition and limitation of [that] power." Yick Wo v. Hopkins,

21  118 U.S. 356 (1886). Indeed, "in our system, while sovereign powers are delegated to the agencies

22  of government, sovereignty itself remains with the people, by whom and for whom all government

23  exists and acts...the fundamental rights to life, liberty, and the pursuit of happiness, considered as

24  individual possessions, are secured by those maxims of constitutional law which are the monuments

25  showing the victorious progress of the race in securing to men the blessings of civilization under the

26  reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the

27  government of the commonwealth 'may be a government of laws and not of men.' For, the very

28  idea that one man may be compelled to hold his life, or the means of living, or any material right

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." Id.

Plaintiff's right of possession in Foxy is a private property right vested in him pursuant to Foxy's Bill of Sale. Plaintiff's right to accompaniment by Foxy on public property is a natural and inherent right encompassed within the rights to life, liberty, and the pursuit of happiness. Plaintiff's disabilities impair his independent functioning and preclude his ability to exercise these fundamental rights without substantial assistance. The vehicle Plaintiff has elected to effect such assistance, is Foxy. The power to make this election is reserved under Art. II, §33 of the Arizona Constitution.

Congress's purpose in enacting the ADA was to "invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment…in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). Plaintiff's disability rights are secured, not created, by the ADA, and the power to enforce those right against the State is vested in this Court pursuant to ADA through the 14th Amendment. The rights Plaintiff seeks to vindicate are natural, inherent, and constitutionally protected, and he has clearly established the likelihood that they have been violated. It is accordingly in the public interest to vindicate these rights. Accord United States v. Raines, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."); Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

## CONCLUSION

Plaintiff is not collaterally estopped from challenging Defendants' pretended justifications for denying accommodations for Foxy; neither does Plaintiff's challenge fundamentally rely on the 2022 Particularized Assessment—the Court's 2022 injunction elucidates the State's obligations under the ADA, and the Denial Letter shows the State is violating them. For the foregoing reasons, and for reasons manifest on the face of the record, the Court should grant the requested injunction.

**SIGNED, SEALED, AND DATED** this 26th day of April, 2025.



**Matthew Phillip Solan**
Plaintiff in *Pro. Per.*

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**EXHIBIT A**

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| GARY Sherrill | *signature* | COTTONWOOD |
| RAYMOND, CHRISTOPHER | *signature* | COTTONWOOD |
| *illegible* | *signature* | Cottonwood |
| Matthew P. Solan | *signature* | Cottonwood |
| Benjamin Griffith | *signature* | Cottonwood |
| Michelle Perce | *signature* | Cottonwood |
| Vidal Ramirez | *signature* | Cottonwood |
| Michael Steele | *signature* | Cottonwood |
| Nicholas Oakes | *signature* | Cottonwood |
| Gavin MacFarlane | *signature* | cottonwood |
| LeRaymond Hollins | *signature* | Cottonwood |
| JAke Perez | *signature* | Cottonwood |
| S. FRASER COOK | *signature* | Cottonwood |
| Arthur Hernandez | *signature* | Cottonwood |
| | | |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| Mireya Lopez | | Sago |
| Casey Harris | | Sago |
| Rickel Guerin | Rickey Guerin | Sago |
| Clifford Gant | | Sago |
| Jill Long | | Sago |
| Terri Sides | Terri | Sago |
| Mishelle Halsted | | Sago |
| Allison W. | | Sago |
| Adam Stargazer | A. Stargazer | Sago |
| Jimmy McMullin | | Sago |
| Michael Pena | | Sago |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| Michael Moynihan | | Piñon |
| Suy Hungerford | | Piñon |
| RAMON | Joseph Sinkard | Piñon |
| Joe S | | Piñon |
| JOSHUA W | JMW | Piñon |
| PAUL Nick Delich | | Piñon |
| Juan Garcia | | Piñon |
| Jeffery Munk | | Piñon |
| Octavia Rogers | | Piñon |
| Mr. Charleston Edmark, Esq. | BY TC EDMARK ESQ. | " " |
| Peter R. Sheman | | Piñon |
| Robert Ony | | Piñon |
| Anthony Walters | | Piñon |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| Eric Sicard | *signature* | Saguaro |
| David McCarthy | *signature* | Saguaro |
| Jennifer Boulder | *signature* | Saguaro |
| PEDRO PICOS | *signature* | Saguaro |
| Lauren Levinson | *signature* | Saguaro |
| Robert A. Ystava | *signature* | Saguaro |
| Gloria Reyes | *signature* | Saguaro |
| Gilfred Lino Benallice | *signature* | Saguaro |
| JAMES PACHECO | *signature* | Saguaro |
| Chris Fortier | *signature* | For Cats |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not

 less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| David Mann | | Sycumore |
| Nathaniel Monti | | Sycamore |
| JARDON J | | Sycamore |
| Mark Volne | | Sycamore |
| Jerry Wells | | Sycamore |
| Jon M. Wallace | Jon Wallace | Sycamore |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| Dwarka T. Baron | Dwarka T. Baron | Mohave |
| Douglas Bartlett | Douglas Bartlett | Mohave |
| Robert Brown | Robert Brown | Mohave |
| David Brstein | David Brstein | mohave |
| Brandon Torres | Bunny Fox | Mohave |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## VERIFIED PETITION FOR ANIMAL ASSISTED THERAPY SERVICES

WE, the undersigned patients of the Arizona State Hospital ("ASH"), hereby present our verified petition to the State of Arizona. We request that ASH provide Animal Assisted Therapy ("AAT") services to us, as soon, and as often as practicable, but in any event not



less than once per month. We affirm that AAT services would be highly beneficial to us and to our rehabilitation, and request that ASH's AAT service be provided through Foxy, the Alliance of Therapy Dogs certified therapy animal depicted to the left.

IN TESTIMONY WHEREOF, we declare under penalty of perjury that the foregoing is true and correct.

WITNESS our hands this 20th day of March, 2025.

| PATIENT NAME | SIGNATURE | TREATMENT UNIT |
|---|---|---|
| W. Gray McCarthy | | CRU |
| Bradley Ware | Bradley Ware | CRU |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**EXHIBIT B**



## CANINE CLONING CONTRACT

This Canine Cloning Contract ("Agreement"), by and between Genetic Reflections LLC, a Texas limited liability company D B A  V i a G e n  P e t s ("ViaGen Pets") and __Matthew Phillip Solan__ ("Owner"), is entered into as of __August, 11 2023__ ("Effective Date") (ViaGen Pets and Owner are sometimes referred to below individually as a "Party" and collectively as the "Parties").

## **BACKGROUND**

WHEREAS, ViaGen Pets engages in the business of canine nuclear transfer and embryo transfer for the purpose of producing cloned animals. A cloned animal is an animal in which the DNA has been transferred by somatic cell nuclear transfer into the egg cell of another animal, and then implanted into a surrogate mother.

WHEREAS Owner wishes to contract with ViaGen Pets, subject to the terms of this Agreement, to provide one or more cloned animals (each, a "Cloned Puppy") from the animal(s) identified in Appendix 1 hereto (the "Animal(s)"), pursuant to the terms of this agreement;

## **AGREEMENT**

Now therefore, ViaGen Pets and Owner hereby agree as follows:

1.      Tissue Samples; Deposit; and Services.

      a.      Within ten days from the Effective Date, Owner will, in accordance with instructions provided by ViaGen Pets:

        (1)      provide ViaGen Pets with one or more tissue samples from each Animal, such tissue samples to be taken and delivered in the manner, of a quality, and in a quantity as required by ViaGen Pets (the "Tissue Samples"); and

        (2)      pay ViaGen Pets a deposit in the amount set forth in Schedule A to be produced by ViaGen Pets under this Agreement (the "Deposit").

      b.      ViaGen Pets will determine the acceptability of Tissue Samples and may reject any Tissue Samples in its sole discretion. Tissue samples not rejected within 20 days after receipt will be deemed accepted. Upon receipt of the Deposit by ViaGen Pets and the receipt and acceptance of the Tissue Samples, ViaGen Pets will use commercially reasonable efforts to create the number of Cloned Puppies set forth on Appendix 1 hereto within 1 year of the effective date. In the event of a failed cloning attempt in the first year, ViaGen Pets will make an additional cloning attempt constituting a new order by Owner and will apply the Deposit to the cost of the additional cloning attempt in accordance with Schedule A.

2.    Cloned Puppy Pricing and Payment Schedule. For each Cloned Puppy or litter of Cloned Puppies ordered by Owner under this Agreement, Owner will make payment to ViaGen Pets according to Schedule A. The total amount due in Schedule A may be subject to State and Local sales tax, and if applicable, it will be billed to Owner as part of the final billing. The Cloned Puppy or Cloned Puppies will be picked up at ViaGen Pets' New York location, and will be subject to a New York sales tax rate of 8%. In the event the Cloned Puppy or Cloned Puppies are delivered to the Owner, state and local sales tax rate of the city in which the delivery is made may apply. If Owner fails to pay any amount due hereunder by its due date, Owner agrees to pay ViaGen Pets a finance charge equal to the lesser of the maximum interest rate amount allowed by law or 1.5% per month of the     entire outstanding balance of the past due payment.

3.    Excess Cloned Puppies. Owner may take delivery however Owner is not obligated to take delivery of any cloned puppies born in excess of the number ordered, if applicable. Any cloned puppies not accepted by Owner for any reason will become the sole property of ViaGen Pets.

4.    Limitation on Cloning Activities. No research or testing will be performed on any Cloned Puppies created pursuant to this Agreement, except for typical veterinary purposes. ViaGen Pets will not create Cloned Puppies from the Tissue Samples provided by Owner outside this agreement, nor shall ViaGen Pets make any further cloned puppy of any Cloned Puppies created pursuant to this Agreement. ViaGen Pets will not sell or lease or conduct research with any Tissue Sample supplied by Owner or any Cloned Puppy created pursuant to this Agreement. ViaGen Pets acknowledges that its sole use of the Tissue Sample provided by Owner is for the purpose of creating a Cloned Puppy or Cloned Puppies exclusively for the use and enjoyment of Owner.

5.    No Warranties; Limitation of Liability.

a.    OWNER ACKNOWLEDGES THAT VIAGEN PETS DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT OR FITNESS FOR A PARTICLULAR PURPOSE. Additionally, Owner acknowledges that ViaGen Pets disclaims any warranty that: (i) VIAGEN PETS will be able to successfully produce any Cloned Puppy, (ii) any Cloned Puppy will possess or manifest any specific traits, behaviors, characteristics or capabilities, or (iii) ViaGen Pets or Owner will be able to import or export the Cloned Puppy to or from any country, including the United States or Canada.

b.    OWNER ACKNOWLEDGES THAT IN NO EVENT WILL VIAGEN PETS BE LIABLE TO OWNER FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS OR INTERRUPTION OF BUSINESS, OR FOR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, EVEN IF VIAGEN PETS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. OWNER FURTHER ACKNOWLEDGES THAT IN NO CASE WILL VIAGEN PETS BE LIABLE FOR ANY REPRESENTATION OR WARRANTY MADE BY OWNER TO ANY THIRD PARTY. OWNER FURTHER ACKNOWLEDGES THAT IN NO EVENT WILL VIAGEN PETS BE LIABLE FOR ANY LOSS, DAMAGE OR DESTRUCTION OF ANY

TISSUE SAMPLE FURNISHED BY OR ON BEHALF OF OWNER REGARDLESS OF THE CAUSE OF SUCH LOSS, DAMAGE OR DESTRUCTION.

c.     Liability of ViaGen Pets for any and all claims, including claims of contract, negligence and strict liability, will not exceed the price paid to ViaGen Pets, as applicable, for the service giving rise to such claim.

6.     Representations of Owner. Owner represents and warrants that (a) it is the empowered representative or the exclusive, lawful owner of the Animals and the Tissue Samples, (b) it has sufficient rights to use, and to permit ViaGen Pets and its subcontractors to use, the Animals and Tissue Samples as specified and limited by this Agreement (for the sole purpose of producing a Cloned Puppy or Cloned Puppies for the exclusive use and enjoyment of Owner), (c) has the full capacity and authority to enter this Agreement, (d) the Tissue Samples originated in Canada or the USA or, if Owner delivers the Tissue Samples to VIAGEN PETS's office in Canada or the USA, such Tissue Samples are lawfully within Canada or the USA or will be shipped to Canada or the USA in accordance with all applicable Canadian or United States law (e) it will immediately inform ViaGen Pets of any change in ownership of the Cultured Cells by signing a Transfer Agreement and (f) it will identify in this contract if cell lines for cloning efforts have been genetically manipulated (i.e. transgenic or gene edited) prior to shipment to lab and nuclear transfer.

7.     Indemnification.

a.     Owner agrees to defend, indemnify and hold harmless ViaGen Pets, its affiliates and their respective officers, directors, agents and employees ("Indemnitees") from and against any and all third-party claims, demands, suits or proceedings ("Claim(s)"), and any and all damages, liabilities, losses, settlements and costs (including, without limitation, reasonable attorneys' fees and costs), arising out of any such Claim, to the extent based on (a) any breach (or any claim that, if true, would be a breach) of the representations set forth in Section 6 hereto; (b) any testing, marketing, distribution, sale, transfer, use, treatment or other disposition of the Cloned Puppy(ies) by Owner after the Cloned Puppy(ies) have been released to Owner; or (c) failure on the part of Owner or its employees, agents, contractors or distributors to comply with any laws or regulations applicable to the Animal, Tissue Sample(s) and/or Cloned Puppy(ies).

b.     ViaGen Pets will give Owner prompt notice in writing of any Claim, and ViaGen Pets, as applicable, agrees to give Owner reasonable assistance necessary to enable Owner to carry on the defense of such Claim. ViaGen Pets may participate in any defense or settlement of such Claim, at its cost and expense. Owner will not make any settlements hereunder in a manner that would adversely affect ViaGen Pets, as applicable, without first obtaining ViaGen Pets' prior written consent.

8.     Term and Termination. The term of this Agreement will continue until the earlier of: (i) 13 months after the Effective Date, (ii) delivery of all Cloned Puppies, as set forth on Appendix 1 hereto, or (iii) termination of this Agreement, as permitted in this Section 8. Sections 5, 7, 8, 9, and 10 will survive any termination of this Agreement.

a.     Termination by ViaGen Pets. ViaGen Pets may terminate this Agreement at any time without cause upon providing Owner with written notice of termination, provided, however, that if ViaGen Pets fails to make commercially reasonable efforts to clone as set forth in

Section 1(b) hereof prior to such termination ViaGen Pets will refund the applicable Deposit where this Agreement is terminated prior to delivery of an ordered Cloned Puppy. Return of the Deposit (refundable only in the event ViaGen Pets fails to make commercially reasonable efforts under Section 1(b) hereof) will be Owner's sole and exclusive remedy for termination by ViaGen Pets under this Section 8(a). Upon such termination, ViaGen Pets will have no right to use, sell or reproduce or allow others to use, sell or reproduce, any Cloned Puppy produced from the applicable Tissue Sample, but otherwise ViaGen Pets will have the right, without limitation, to determine the appropriate home for any healthy Cloned Puppy not accepted by Owner.

b.     Termination by Owner. Owner may terminate this Agreement by providing 30 days written notice to ViaGen Pets prior to such termination, provided, however, that in such event Owner agrees to pay ViaGen Pets for the cost of labor, materials and expenses incurred by ViaGen Pets in performance of this Agreement through the date of termination that are in excess of the amount of the Deposit. Owner will pay ViaGen Pets all amounts due under this Section 8(b) within thirty (30) days of the date of ViaGen Pets' invoice. In the event of termination by Owner pursuant to this Section 8(b), ViaGen Pets will halt any further work to produce Cloned Puppies from the Tissue Samples provided by Owner, except that ViaGen Pets may continue to provide appropriate care for, and deliver, any Cloned Puppy or Cloned Puppies in gestation at the time of termination. Any such healthy Cloned Puppies will be made available for Owner to pick up, and if not accepted and paid for in full by Owner, ViaGen Pets will have the right to determine the appropriate home for the Cloned Puppies.

9.     Property Rights. The Parties' respective property rights in and to the Tissue Samples and Cloned Puppies will be as follows:

a.     Tissue Samples. Owner will be the sole and exclusive owner of the Tissue Samples at all times during the term of this Agreement and, subject to this Section 9(a), following termination or expiration of this Agreement.

b.     Cloned Puppies. Upon payment to ViaGen Pets of all sums owed by Owner under this Agreement, Owner shall be the sole and exclusive owner of all Cloned Puppies produced under this Agreement and accepted by Owner in accordance with this Agreement. In no event will ViaGen Pets have any obligation to refund to Owner any portion of any prior payment for a Cloned Puppy determined to be in good health and made available for Delivery to Owner in accordance with Schedule A (with the Deposit being nonrefundable in any event except as set forth in Section 8(a)).

10.     Miscellaneous.

a.     Notices. Any notice permitted or required to be given hereunder will be in writing, addressed to the person at the address set forth in the signature page of this Agreement or such other person or address as either party shall specify in writing to the other and will be deemed "delivered" five business days after the date when placed in the United States mail, designated as "certified signature required," postage prepaid, to the addresses stated on the signature page to this Agreement.

b.     Applicable Law. This Agreement will be governed by the laws of the State of Texas, without regard to conflict-of-law principles. Each of the Parties irrevocably

consents to the exclusive personal jurisdiction of the federal and state courts located in Texas, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal and state courts located in Texas, such personal jurisdiction will be nonexclusive. If any dispute arises between the Parties with respect to this Agreement which leads to a proceeding to resolve such dispute, the prevailing Party will be entitled to receive reasonable attorneys' fees, expert witness fees and out-of-pocket costs incurred in such proceeding, in addition to any other relief.

     c.    Mediation. Notwithstanding the foregoing, the Parties agree that prior to initiating any legal proceedings against the other, the Parties will engage a neutral mediator who will be charged with assisting the parties to reach a mutually agreeable resolution of all contested matters. The mediation will take place in Texas, USA and will be conducted in the English language. The mediator will be chosen by mutual agreement of the Parties and the mediator's fees will be borne equally by the Parties. In the event that the Parties cannot agree to a mediator, each Party will choose a mediator and the two mediators will together choose a third mediator who will conduct the mediation. The costs of the two mediators chosen to choose the third mediator will be borne equally by the Parties. The Parties agree to participate in the mediation in good faith.

     d.    Amendment. The parties hereto may amend, modify or alter any of the provisions of this Agreement, but only by a written instrument duly executed by both parties hereto. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, heretofore or contemporaneously made with respect to such subject matter are expressly merged in and made a part of this Agreement.

     e.    Waiver. The failure of a party to enforce at any time for any period any of the provisions hereof will not be construed as a waiver of such provisions or of the rights of such party thereafter to enforce each such provision.

     f.    Force Majeure. Neither party will be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement, other than an obligation to make payments hereunder, when such failure or delay is caused by or results from fire, floods, embargoes, government regulations, prohibitions or interventions, war, acts of war (whether war be declared or not), acts of terrorism, insurrections, riots, civil commotions, strikes, lockouts, acts of God or any other cause beyond the reasonable control of the affected party to anticipate, prevent, avoid or mitigate.

     g.    Transferability; Successors and Assigns. Neither Party may, without the prior written consent of the other Party, assign or transfer this Agreement or any obligation incurred hereunder, except that ViaGen Pets may, without the consent of Owner, transfer this Agreement by merger, reorganization, consolidation, or sale of all or substantially all of its assets. Any attempt to transfer this Agreement in contravention of this Section will be void and of no force and effect. The Parties intend this Agreement to bind any and all of the Parties' successors, heirs, and permitted assigns.

h.      Severability. If for any reason a provision of this Agreement, or portion thereof, is finally determined to be unenforceable under applicable law, that provision, or portion thereof, will nonetheless be enforced, as to circumstances, persons, places and otherwise, to the maximum extent permissible by applicable law so as to give effect to the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

i.      Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but which collectively will constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**VIAGEN PETS**

Signature: _Melain Rodriguez_

Printed Name: __Melain Rodriguez__

Title: __Client Service Manager__

Date: __8/14/2023__

**OWNER**

Signature: _____

Printed Name: _Matthew Phillip Solan_

Date: _____August 11, 2023_____

Address for Notices to ViaGen Pets:

> ViaGen Pets
> 715 Discovery Blvd., Suite 410
> Cedar Park, TX 78613

Address for Notices to Owner:

> Matthew Phillip Solan
> 3471 South Apollo Avenue
> Williams, Arizona 86046

*Sealed with my personal seal:*



## APPENDIX 1

| Identification of Animal to be Cloned | Number of Cloned Puppies |
|---|---|
| Name: **Foxy** <br> Breed: **Pomeranian mix – See Attachment "A"** <br> Sex: **Female** <br> Color/Markings: **Orange w/Mask– See Attachment "B"** <br> Adult Weight: **13-15 lbs.** | As many as are born in litter |

### Procedures

The following procedures may be performed on the puppy or puppies at the appropriate age, as needed, at no additional charge. Please mark your preference and any comment below.

**Tail Docking (Optional):** As per the breed standards as set by the American Kennel Club, tail docking may be indicated in certain dog breeds. If you would like to have your puppy's tail docked, this procedure can be done while your puppy is in our care. Tail docking is performed by a veterinarian at 2 to 5 days of age and involves surgically shortening the tail to a pre-determined length. There are guidelines in regard to tail length for individual breeds, but we would like as much input from you as possible to make certain that we dock the tail to your desired length. Photos can be helpful in demonstrating tail length.

**Front Dewclaw removal (Optional):** Front Dewclaws are digits that almost all dogs have higher up on the inside of the front legs. Dewclaws are vestigial digits and do not serve a purpose in modern dogs as they did in ancient canines. Because they can catch on things and tear, some veterinarians recommend removal of front declaws in certain dogs. If you would like your puppy's front declaws removed, we are able to remove them while they are in our care. Front Dewclaw removal is done with a local anesthesia at 2 to 5 days of age.

**Hind Dewclaw removal (Optional):** Most puppies are born with four digits (toes) on their hind paws but occasionally puppies are born with one or more dewclaws on their hind legs. These hind dewclaws are higher up on the inside of the hind legs and are often very loose and dangly. Hind dewclaws are a desired trait in some breeds (e.g. Great Pyrenees) but are considered a fault in most breeds. As such, they are generally removed in most breeds, even in many breeds where forelimb dewclaws are not removed. Hind Dewclaw removal is performed with a local anesthetic at 2 to 5 days of age.

**Vaccinations (Required):** While in our care, puppies will receive our required initial vaccinations for Canine Parvovirus, Canine Distemper Virus, Canine Adenovirus, Canine Parainfluenza Virus and Bordetella bronchiseptica (Kennel Cough).

| | YES | NO | Comments |
|---|---|---|---|
| Would you like to have your puppy's tail docked? If yes, please provide photos or description of preferred tail length. | | ✗ | |
| Would you like the Front Dewclaws removed? | | ✗ | |
| Would you like the Hind Dewclaws removed if present? | | ✗ | |
| Has your dog ever had an allergic reaction to a vaccination? If yes, please provide details. | | ✗ | |

Page 7 of 10

## SCHEDULE A

### 2023 Cloning Rates Applicable to the First Ordered Cloned Puppy

Total price for one cloned litter, with a guarantee of at least one puppy, will be $50,000, payable according to the following schedule:

1. $25,000 due upon contract execution ("Deposit"). Unless Owner has earlier terminated this Agreement without cause, the Deposit is refundable to Owner if Delivery (defined below) is not completed.

2. $25,000 ("Final Payment") and applicable sales tax referenced in Paragraph 2 are due when delivery of a puppy, determined to be in good health and verified by a third party to be a genetic match to the animal identified in Appendix 1, is made to Owner at no later than 12 weeks of age ("Delivery"). The Genetic Preservation Initiation fee and annual Storage fees for this particular cell line will be applied towards the Final Payment. For purposes of this Agreement a puppy is in good health if it is free from nongenetic debilitating disease and abnormal physical appearance not present in the Tissue Sample donor. It is the responsibility of the Owner to have the puppy examined by a licensed veterinarian no later than seventy two (72) hours after Delivery of the puppy to Owner and any disputes as to the health of the puppy will be decided in accordance with the process set forth below. If Owner has paid the full price in advance, then ViaGen Pets will refund the Final Payment in the event it has not successfully delivered a litter of Cloned Puppies to Owner prior to the termination of this Agreement.

  2.1. If there is a question concerning good health of a puppy, good health will be determined by veterinarians representing ViaGen Pets on the one hand and Owner on the other. Each Party will be responsible for payment of the fees of the veterinarian chosen by them.

  2.2. If such veterinarians fail to agree on the issue of health, ViaGen Pets and Owner will agree upon a third licensed veterinarian and the fees of such veterinarian will be shared equally by ViaGen Pets and Owner.

  2.3. The resulting panel of three veterinarians will conduct any tests, investigations, or examinations they deem necessary, and will, by majority vote, determine the validity of the issue of health.

  2.4. ViaGen Pets will complete and sign a Bill of Sale to release any property rights which ViaGen Pets may have possessed under applicable law, to allow Owner to pursue registration of the Cloned Puppy or Cloned Puppies as Owner may desire, and to confirm transfer of liability and responsibility for the health of the puppy to Owner.

## CERTIFICATION OF IDENTITY

The undersigned, hereinafter referred to as "Owner", hereby certifies that he is the Owner named in that one certain Canine Cloning Contract ("Agreement"), dated____August 11, 2023____ is to provide one or more clones from the animal identified in Appendix 1 of the Agreement (the "Animal"). The undersigned further certifies as follows:

1. Appendix 1 of the Agreement accurately identifies the Animal.

2. In accordance with instructions provided by ViaGen Pets a veterinarian selected by Owner has performed a biopsy from the Animal. Owner has provided ViaGen Pets with the resulting tissue from the Animal and delivered them in the manner, of a quality, and in a quantity as required by ViaGen Pets.

3. Owner (a) is the lawful owner of the Animal and the tissue samples collected from the Animal and provided to ViaGen Pets, (b) has sufficient rights to use, and to permit ViaGen Pets to use, the Animal and tissue samples as contemplated by the Agreement and (c) has the full capacity and authority to enter the Agreement and provide this certification.

4. The Tissue Samples provided from the Animal originated in Canada or the US or, if Owner delivers the Tissue Samples to VIAGEN PETS' office in Canada or the US, such Tissue Samples are lawfully within Canada or the US or will be shipped to Canada or the US in accordance with all applicable Canadian or United States law.

5. This certification is made for the purpose of inducing ViaGen Pets to deliver one or more Clones of the Animal to Owner.

6. Owner acknowledges that ViaGen Pets will rely upon the completeness and accuracy of the statements contained herein. Owner will indemnify and hold harmless ViaGen Pets and their partners, employees, agents and subcontractors from and against all losses, costs, liabilities and expenses that may arise from any inaccuracy or incompleteness of the statements contained herein.

_____
(Signature)

*Sealed with my personal seal:*

_____
        Matthew Phillip Solan
(Name)

_____
        August 11, 2023
(Date)

## OPTIONAL

## General Property Photography Release

I hereby authorize Genetic Reflections, LLC, a Texas limited liability company, DBA "ViaGen Pets," to publish photographic and video images taken of my personal property, described as my companion animal,_____ Foxy_____, and any cloned companion animals produced, for use in ViaGen Pets' company publications and media publications. This consent shall include any and all photographic and video images taken by ViaGen Pets and those provided by    me to ViaGen Pets. I authorize ViaGen Pets to use these photographic and video images in company and media publications, including those that are printed, published online, or created in video form I agree that photographs or video of my pet may be used for any lawful purpose, including, for example, such purposes as publicity, illustration, advertising, web content and social media. Client information will be confidential.

I attest that I have full authorization to consent to publication of these photos. Further, I hereby release and hold harmless ViaGen Pets from any claim, right, or expectation of privacy or confidentiality associated with the above-specified images.

I further acknowledge that neither I nor any other party who may share ownership of the property described above (whether in the past or future), will receive financial compensation of any type associated with the taking or publication of these photographs or participation in ViaGen Pets publications. I acknowledge and agree that publication of said photos confers no rights of ownership or royalties whatsoever and that participation is voluntary.

I hereby release ViaGen Pets, its contractors, its employees and any third parties involved in the creation or publication of marketing materials in media, online and in print from liability for any claims by me or any third party in connection with my participation.

**Authorization**

Printed Name: _____ Matthew Phillip Solan___

Signature:_____    Date: _____ August 11, 2023_____

Street Address: _____    3471 South Apollo Avenue_____

City:_____ Williams_____ State: Arizona  Zip: _____ 86046_____

*Sealed with my personal seal:*



Page 10 of 10

# ATTACHMENT A

Foxy
Registration: N/A

✄ WISDOM PANEL™

Sample ID: ENFYMQP
Test Date: 12/19/2021
Essential

# DNA Test Report

## Owner Info

**First Name**
Matthew

**Last Name**
Solan

## Pet Info

**Registered Name**
Foxy

**Date of Birth**
11/1/2005

**Nickname (Call Name)**
Foxy

**Sample ID**
ENFYMQP

**Sex**
Female

**Registration**
N/A

**Microchip ID**
N/A

**Tattoo ID**
N/A

✄ WISDOM PANEL™

# DNA Test Report

## Ancestry Results

**Companion**

51% Pomeranian

3% Poodle (Toy and Miniature)

**Terrier**

45% Chihuahua

1% American Hairless Terrier

Foxy
Registration: N/A

✂ WISDOM PANEL™

# DNA Test Report

Sample ID: ENFYMQP
Test Date: 12/19/2021
Essential

## Health Conditions Tested

| Genetic Condition | Gene | Risk Variant | Copies | Result |
|---|---|---|---|---|
| Canine Leukocyte Adhesion Deficiency (CLAD), type III | FERMT3 | Insertion | 0 | Clear |
| Canine Scott Syndrome | ANO6 | G>A | 0 | Clear |
| Complement 3 Deficiency | C3 | Deletion | 0 | Clear |
| Factor VII Deficiency | F7 | G>A | 0 | Clear |
| Factor XI Deficiency | FXI | Insertion | 0 | Clear |
| Glanzmann Thrombasthenia Type I | ITGA2B | C>T | 0 | Clear |
| Glanzmann Thrombasthenia Type I (Discovered in Great Pyrenees) | ITGA2B | C>G | 0 | Clear |
| Hemophilia A (Discovered in Old English Sheepdog) | FVIII | C>T | 0 | Clear |
| Hemophilia A (Discovered in the Boxer) | FVIII | C>G | 0 | Clear |
| Hemophilia A (Discovered in the German Shepherd Dog - Variant 1) | FVIII | G>A | 0 | Clear |
| Hemophilia A (Discovered in the German Shepherd Dog - Variant 2) | FVIII | G>A | 0 | Clear |
| Hemophilia A (Discovered in the Havanese) | FVIII | Insertion | 0 | Clear |
| Hemophilia B | FIX | G>A | 0 | Clear |
| Hemophilia B (Discovered in the Airedale Terrier) | FIX | Insertion | 0 | Clear |
| Hemophilia B (Discovered in the Lhasa Apso) | FIX | Deletion | 0 | Clear |
| May-Hegglin Anomaly | MYH9 | G>A | 0 | Clear |
| MDR1 Medication Sensitivity | MDR1/ABCB1 | Deletion | 0 | Clear |
| P2RY12-associated Bleeding Disorder | P2RY12 | Deletion | 0 | Clear |
| Prekallikrein Deficiency | KLKB1 | T>A | 0 | Clear |
| Severe Combined Immunodeficiency | PRKDC | G>T | 0 | Clear |
| Severe Combined Immunodeficiency (Discovered in Frisian Water Dogs) | RAG1 | G>T | 0 | Clear |
| Trapped Neutrophil Syndrome | VPS13B | Deletion | 0 | Clear |

Foxy

Registration: N/A

Sample ID: ENFYMQP
Test Date: 12/19/2021
Essential

## ✄ WISDOM PANEL™

# DNA Test Report

## Health Conditions Tested (continued)

| Genetic Condition | Gene | Risk Variant | Copies | Result |
|---|---|---|---|---|
| von Willebrand's Disease, type 1 | VWF | G>A | 0 | Clear |
| von Willebrand's Disease, type 2 | VWF | T>G | 0 | Clear |
| von Willebrand's Disease, type 3 (Discovered in the Kooiker Hound) | VWF | G>A | 0 | Clear |
| von Willebrand's Disease, type 3 (Discovered in the Scottish Terrier) | VWF | Deletion | 0 | Clear |
| von Willebrand's Disease, type 3 (Discovered in the Shetland Sheepdog) | VWF | Deletion | 0 | Clear |
| X-Linked Severe Combined Immunodeficiency (Discovered in the Basset Hound) | IL2RG | Deletion | 0 | Clear |
| X-Linked Severe Combined Immunodeficiency (Discovered in the Cardigan Welsh Corgi) | IL2RG | Insertion | 0 | Clear |

Foxy

Registration: N/A

**✄ WISDOM PANEL™**

Sample ID: ENFYMQP

Test Date: 12/19/2021

Essential

# DNA Test Report

## Coat Color

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Fawn | ASIP | $a^y$ | 1 | Fawn possible |
| Recessive Black | ASIP | a | 0 | No effect |
| Tan Points | ASIP | $a^t$ | 1 | Tan points possible |
| Dominant Black | CBD103 | $K^B$ | 0 | No effect |
| Mask | MC1R | $E^m$ | 1 | Dark Muzzle possible |
| Recessive Red (Variant 1) | MC1R | $e^1$ | 0 | No effect |
| Widow's Peak (Discovered in the Afghan Hound and Saluki) | MC1R | $E^G$ | 0 | No effect |
| Chocolate (Variant 1) | TYRP1 | $b^c$ | 0 | No effect |
| Chocolate (Variant 2) | TYRP1 | $b^s$ | 1 | Black features likely, chocolate possible |

## Coat Patterns

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Piebald | MITF | $s^p$ | 1 | White markings possible |
| Merle | PMEL | M | 0 | No effect |
| Harlequin | PSMB7 | H | 0 | No effect |
| Saddle Tan | RALY | - | 1 | Saddle possible |

## Coat Length and Curl

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Long Hair (Variant 1) | FGF5 | $lh^1$ | 2 | Long coat |
| Curly Coat | KRT71 | C | 0 | No effect |

Foxy
Registration: N/A

✄ WISDOM PANEL™

# DNA Test Report

Sample ID: ENFYMQP
Test Date: 12/19/2021
Essential

## Hairlessness

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Hairlessness (Discovered in the Chinese Crested Dog) Linkage test | FOXI3 | $Hr^{ce}$ | 0 | No effect |
| Hairlessness (Discovered in the American Hairless Terrier) | SGK3 | $hr^{aht}$ | 0 | No effect |
| Hairlessness (Discovered in the Scottish Deerhound) | SKG3 | $hr^{sd}$ | 0 | No effect |

## Shedding

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Reduced Shedding | MC5R | sd | 1 | Occasional shedder |

## More Coat Traits

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Hair Ridge | FGF3, FGF4, FGF19, ORAOV1 | R | 0 | No effect |
| Furnishings | RSPO2 | F | 0 | No effect |
| Albino | SLC45A2 | $c^{al}$ | 0 | No effect |

## Head Shape

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Short Snout (Variant 2) | BMP3 | - | 2 | Shortened |
| Short Snout (Variant 1) | SMOC2 | - | 1 | Shortened snout |

## Eye Color

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Blue Eyes | ALX4 | - | 0 | No effect |

Foxy

Registration: N/A

≋ WISDOM PANEL™

# DNA Test Report

## Ears

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Floppy Ears | MSRB3 | - | 0 | Pricked ears more likely |

## Extra Toes

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Hind Dewclaws (Discovered in Asian breeds) | LMBR1 | DC-1 | 0 | No effect |
| Hind Dewclaws (Discovered in Western breeds) | LMBR1 | DC-2 | 0 | No effect |

## More Body Features

| Genetic Trait | Gene | Variant | Copies | Result |
|---|---|---|---|---|
| Back Muscle and Bulk | ACSL4 | - | 0 | No effect |
| High Altitude Adaptation | EPAS1 | - | 0 | No effect |
| Short Legs | FGF4 | - | 0 | Medium to long legs |
| Short Tail | T-box | T | 0 | Full tail length likely |

# ATTACHMENT B











**EXHIBIT C**

JS-6

1

2

3

4

5

6

7

8

9
UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10

| 11 | C.L., an individual; | CASE NO. 8:18-cv-00475-DOC (DFMx) |
|---|---|---|
| 12 | | |
| 13 | Plaintiff, | |
| | v. | |
| 14 | | **PERMANENT INJUNCTION** |
| 15 | DEL AMO HOSPITAL, INC., a California corporation, | |
| 16 | | |
| 17 | Defendants. | |

18

19       Pursuant to this Court's Order re Mootness and Permanent Injunction (Dkt.

20   No. 293), IT IS HEREBY ORDERED and DECREED that:

21

22       Defendant Del Amo Hospital Inc., including its officers and employees, are

23   permanently restrained and enjoined from denying entry and accompaniment of

24   Plaintiff C.L.'s service dog when C.L. is admitted for in-patient treatment. Del

25   Amo Hospital shall forthwith distribute this Order to all current employees.

26

27       This injunction binds Defendant Del Amo Hospital Inc. and all other entities

28   through which it may act.

1    This Order shall become effective immediately and shall remain in effect in
2    perpetuity or until this Court orders otherwise.

3

4    Failure to comply with the terms of this Order may result in civil or criminal
5    sanctions for contempt of this Court. The Court hereby retains jurisdiction to
6    enforce all provisions of this Order. Any successful action or motion by Plaintiff
7    to enforce this Order shall entitle Plaintiff to reasonable attorneys' fees and costs
8    for such enforcement.

9

10   Pursuant to the Court's Order (Dkt. No. 293), Plaintiff is the prevailing party
11   in this action. The Parties are hereby ordered to meet and confer in an effort to
12   resolve Plaintiff's attorneys' fees and costs, and if a resolution is not forthcoming,
13   Plaintiff shall file a motion seeking fees and costs no later than thirty (30) days
14   following entry of this Order.

15

16   This Order may be modified only upon motion to the Court and for good
17   cause shown.

18

19   IT IS SO ORDERED.

20

21   Date: May 6, 2024                    _David O. Carter_____

22                                        Hon. David O. Carter
                                          United States District Judge
23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that on April 26th, 2025, copies of the foregoing document were deposited with Arizona State Hospital Staff in a seal envelope, with postage prepaid, addressed to:

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003


Ann Hobart and Jordan Kendall
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004

*Attorneys for Defendants*

Matthew Phillip Solan