SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan, | No.  CV-24-02061-PHX-JJT (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| Arizona, State of, *et al.*, | |
| Defendants. | |

Plaintiff Matthew Phillip Solan, who is confined in the Arizona State Hospital (ASH), brought this *pro se* civil rights action pursuant to the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and state tort law. Defendants have filed a Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 15.) Plaintiff was informed of his rights and obligations to respond (Doc. 16), and the Motion is fully briefed. (Docs. 24, 26.) Also before the Court is Plaintiff's Motion for Preliminary Injunction, in which Plaintiff seeks to enjoin the State from excluding his trained service animal from ASH. (Doc. 17.) The Motion for Preliminary Injunction is also fully briefed. (Docs. 25, 27.)

The Court will deny both Motions.

## I.    Background

On March 12, 2020, Plaintiff was convicted of aggravated assault in the Coconino County Superior Court and was sentenced to a 7.5-year prison term, but because he was found Guilty Except Insane, he was instead committed to ASH. (*See* Doc. 8 at 3.)

Since his arrival at ASH, this is the second lawsuit Plaintiff has filed under the ADA and RA challenging the State's denial of his request to have a trained service dog stay with him. In 2020, Plaintiff filed *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT (DMF) (*Solan I*), in which he sued to have his previous service dog, a 17-pound, 12-year-old Pomeranian mix, "Foxy," who had assisted him with his disabilities prior to his arrest and pretrial detention, stay with him at ASH. During that litigation, Foxy passed away, and on January 26, 2023, the parties stipulated to the dismissal of *Solan I* with prejudice on the ground that Foxy's passing made the matter moot. (*Solan I* at Doc. 94.) On January 27, 2023, the Court granted the Stipulation and dismissed *Solan I* with prejudice. (*Id.* at Doc. 95.)

On August 14, 2024, Plaintiff filed this action and paid the filing and administrative fees. (Doc. 1.) Plaintiff sues the State of Arizona and several individual Defendants, including Arizona Department of Health Services (ADHS) Deputy Director/ASH Superintendent and Chief Executive Officer Michael R. Sheldon, former ADHS Deputy Director/ASH Superintendent and Chief Executive Officer Aaron Bowen, and Behavioral Health Technicians Lea'cher Carter and Unique Coleman based on their denials of Plaintiff's renewed requests for a service animal and their alleged false and defamatory statements against him. (Doc. 6.)

On screening the 17-count First Amended Complaint (FAC) under 28 U.S.C. § 1915A(a), the Court determined Plaintiff stated ADA and RA claims against the State in Counts One and Four and state law tort claims for invasion of privacy/false light against Defendants Sheldon, Bowen, Carter, and Coleman in Count Eleven and defamation against Defendants Carter and Coleman in Count Twelve. (Doc. 8.) The Court required these Defendants to answer the claims against them and dismissed the remaining claims and Defendants. (*Id.*)

## II.    Plaintiff's Allegations

Plaintiff is a 35-year-old man who suffers from numerous disabilities, including Autism Spectrum Disorder (ASD), Post Traumatic Stress Disorder (PTSD), and Chronic

Inflammatory Response Syndrome (CIRS). (Doc. 8 ¶ 8.) These impairments substantially limit many of Plaintiff's major life activities. (*Id.* ¶ 9.) Prior to his confinement at ASH, Plaintiff utilized his service dog, Foxy, to help manage the effects of his ASD and other mental health conditions. (*Id.* ¶¶ 16, 63.) In 2019, Plaintiff was arrested and confined to a county detention facility without Foxy, and he was subsequently committed to ASH without Foxy. (*Id.* ¶ 66.)

After arriving at ASH, Plaintiff requested an accommodation to have Foxy live with him as a service animal. (*Id.* ¶ 67.) ASH's former Chief Compliance Officer, Margaret McLaughlin, denied the request, citing the secure nature of ASH, unspecified health and safety concerns, and vague administrative burdens. (*Id.*) Plaintiff challenged the denial internally several times, but his request for an accommodation was repeatedly denied, so he filed his previous lawsuit, *Solan I*. (*Id.* ¶¶ 68.)

In *Solan I*, Plaintiff also filed a Motion for Preliminary Injunction challenging ASH's denial of his service animal request and requesting that ASH be ordered to admit service dogs unless or until it is proven by substantial evidence that a particular dog poses a direct threat to the health and safety of others that cannot be mitigated by reasonable accommodations. (*Id.* ¶ 69; *Solan I*, Doc. 24.) The Court found Plaintiff had shown a likelihood of success on the merits of his ADA and RA claims and he had met the remaining *Winter* factors, including a showing of irreparable harm, required for granting injunctive relief. (Doc. 6 ¶ 75; *Solan I*, Doc. 84.) As narrowly drawn relief, the Court ordered ASH to conduct a particularized assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital[1] in accordance with the ADA and the relevant Code of Federal Regulations to determine,

---

[1] The Forensic Hospital is one of three facilities on the ASH campus; it is a licensed hospital that provides care and treatment for patients committed to ASH pursuant to Arizona Revised Statutes § 13-502(D) upon being found Guilty Except Insane. (Doc. 6 ¶ 52.)

1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital; and

2) whether Foxy specifically (as distinct from "service dogs" generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them, including the probability that injury will actually occur.

(Doc. 6 ¶ 77; *Foxy I*, Doc. 84 at 18–19.)

The Court further ordered that, "[u]pon conclusion of this assessment, Defendant shall inform Plaintiff, in writing, whether it will permit Foxy to accompany him while at the Forensic Hospital, and [it must] include therewith a detailed discussion of the above-ordered assessment." (Doc. 6 ¶ 78; *Foxy I*, Doc. 84 at 19.)

Several days before the 45-day period for ASH to complete the Court-ordered assessment elapsed, Defendant Bowen issued a Particularized Assessment letter, which was subsequently provided to Plaintiff. (Doc. 6 ¶ 81.) The letter "did not attempt to explain how Foxy, specifically as distinct from other service dogs generally, would be disruptive to the health and safety of other patients on Plaintiff's treatment unit." (*Id.* ¶ 82.) It also did not include "an assessment of individual patients at Plaintiff's housing unit, the effect Foxy may have on them, or the probability that injury would actually occur to them." (*Id.* ¶ 83.) The letter did enumerate policies that may need to be altered, but it did not explain why any of these alterations were required or how the alterations would impose a substantial burden on the State. (*Id.* ¶ 84.)

The letter also made defamatory attacks on Plaintiff's character and falsely accused Plaintiff of making statements that showed he had engaged in or intended to engage in sexual conduct with Foxy. (*Id.* ¶¶ 85–89.) These accusations were categorically false, had no evidentiary support, and had never been raised during Plaintiff's treatment at ASH or in any of the State's pleadings prior to the Court's Order requiring that ASH conduct the

Particularized Assessment. (*Id.* ¶¶ 89−92.) Plaintiff began working with attorney Holly R. Gieszl to challenge the letter, and Gieszl filed a notice of appearance in *Solan I*. (*Id.* ¶ 93.)

On July 13, 2022, Plaintiff was notified that Foxy passed away. (*Id.* ¶ 94.) After receiving this news, Plaintiff contacted Foxy's caretakers and directed them to take Foxy's body to her veterinarian to be biopsied for potential cloning. (*Id.* ¶¶ 94, 97.) The veterinarian performed biopsies of Foxy's extracted ear cartilage, which were sent the same day to Genetic Reflections, LLC ("ViaGen"). (*Id.* ¶¶ 95−96.)

On July 15, 2022, Plaintiff entered a genetic preservation and cell storage contract with ViaGen, with the intention of cloning Foxy. (*Id.* ¶ 97.) On October 27, 2022, ViaGen notified Plaintiff that Foxy's genetic materials had been cultured and cryogenically preserved. (*Id.* ¶ 98.) To raise money for the cloning, Plaintiff asked his general agent, Joseph Cowsert, to remove Plaintiff's vehicles and other belongings from Plaintiff's "homestead," and he contacted his real estate agent, Jerry Brown, to sell his house and 1/3 of the land. (*Id.* ¶¶ 99−100.) He also commissioned Martin Land Surveyors to conduct a 3-way split of the land. (*Id.* ¶ 101.)

On January 26, 2023, Plaintiff stipulated to the dismissal of *Solan I* on the ground that Foxy's passing mooted his claims in that action. (*Solan I*, Doc. 94.)

In July 2023, Plaintiff accepted a cash offer for his home and the subdivided 1/3 plat of land, and Mr. Cowsert handled the sale. (*Id.* ¶¶ 102−103.) On August 11, 2023, Plaintiff entered a canine cloning contract with ViaGen and paid a $25,000.00 down payment. (*Id.* ¶ 104.) On November 9, 2023, a cloned puppy was born at ViaGen's facility in Rochester, New York, and Plaintiff gave her the same name, Foxy (hereinafter, "Foxy II"). (*Id.* ¶ 105.)[2] Plaintiff paid the remaining balance of his contract to ViaGen, and on January 9, 2024, a ViaGen agent flew Foxy II from Rochester, New York, to Phoenix, Arizona, and hand delivered her to Mr. Cowsert. (*Id.* ¶ 106.) On January 13, 2024, ViaGen issued a bill of sale to Plaintiff, conveying all rights and interests in Foxy II to Plaintiff. (*Id.* ¶ 107.)

---

[2] Even though Plaintiff continues to use the name Foxy, to avoid confusion with the facts in *Solan I*, the Court will refer to Foxy's clone as "Foxy II."

Plaintiff directed Mr. Cowsert to care for and train Foxy II, and over the next several months, Mr. Cowsert performed the puppy's basic housetraining and saw to her veterinary visits and vaccinations. (*Id.* ¶ 109.) Mr. Cowsert subsequently contracted with All Dogs Unleashed in Prescott, Arizona, to provide Foxy II multi-week live-in training in basic obedience and foundational service animal skills. (*Id.* ¶ 110.) On May 16, 2024, Foxy II successfully completed the training. (*Id.*)

Over the next few weeks, Mr. Cowsert continued Foxy II's task training based on instructions from All Dogs Unleashed. (*Id.* ¶ 111.) He trained Foxy II to perform Deep Pressure Therapy (DPT) and to act as a social buffer—tasks intended to help Plaintiff with grounding and coping with the effects of his neurodevelopmental disabilities and PTSD. (*Id.* ¶¶ 111−112.) After several weeks, Foxy II could consistently perform DPT, basic alerting tasks, and operate peaceably in public as a social buffer. (*Id.* ¶ 112.) She was also trained to do tasks directly related to Plaintiff's disabilities. (*Id.* ¶ 113.)

On June 11, 2024, Plaintiff applied for and received a service animal license for Foxy II from Coconino County, and at Plaintiff's request, the County assigned the same dog number and service dog tag number to Foxy II that had previously been assigned to Foxy. (*Id.* ¶¶ 114−115.) Foxy II is now a healthy, 17-pound, young adult Pomeranian mix. (*Id.* ¶ 116.)

On June 13, 2024, Plaintiff mailed a reasonable accommodation request to Defendant Sheldon via certified mail to notify ASH that Foxy had been cloned and Foxy II was now a professionally trained service dog, and to request a reasonable accommodation under the ADA for Foxy II's services. (*Id.* ¶¶ 117−19.) Plaintiff discussed how Foxy had previously helped him overcome self-isolation and had enabled him to engage socially, travel, and start a business. (*Id.* ¶ 120.) Plaintiff clarified that Foxy II was healthy, fully vaccinated, and well-trained, and he highlighted his substantial investment in Foxy II's cloning and training. (*Id.* ¶ 121.)

On July 5, 2024, ASH administrators responded to Plaintiff's request with a one-page denial letter. (*Id.* ¶¶ 122−23.) The letter stated that ASH extensively reviewed the

ADA regulations on service animals when considering Plaintiff's request, and it "w[ould] not modify its existing policies, practices and/or procedures to allow for a service animal at the Forensic Hospital." (*Id.* ¶ 123.) It listed the following reasons:

> • The Hospital has legitimate concerns that, based on your own personal statements, your past relationships and interactions with a "service animal" have not only been counter-therapeutic, but also inappropriate (sexual in nature). In no way will the Hospital facilitate such illicit and illegal behaviors.
>
> • The Facilities maintained by the Hospital, including the Forensic Hospital, are secure facilities and not accessible to the general public. Furthermore, the Hospital ONLY provides health care services at its facilities to individuals who are under court order for treatment (i.e., the Hospital does not provide health care services to the public at large).
>
> • There are legitimate medical and safety reasons to exclude a service animal from the Hospital.
>
> • The presence of a service animal within an [ASH] facility would require the alteration of services, programs, and/or activities and would fundamentally alter many typical functions of the Hospital[; and,]
>
> • The proper handling of a service animal, including the toileting, feeding, grooming and veterinary care could not feasibly be provided at the sole responsibility of the patient. Such activities would require additional staff resources and coordination.

(*Id.* ¶ 124; Doc. 6 at 86.)

ASH's assertion that Plaintiff intends to or has ever stated an intent to have sexual relations with Foxy II is patently false, and the assertion that the presence of a service animal would be counter therapeutic is unsupported and contrary to prevailing academic literature pertaining to animal therapy for persons with ASD. (Doc. 6 ¶¶ 125, 126.)

After ASH denied his accommodation request, Plaintiff submitted a Special Visit Request Form to have a visit on his birthday, July 17, 2024, from attorneys Holly Gieszl and Josh Mozell, Mr. Cowsert, and Foxy II. (*Id.* ¶ 128.) After two weeks passed without a

response, Ms. Gieszl sent an email to Assistant Attorney General Erin Cohen, and on July 11, 2024, Cohen emailed back ASH's response, which stated, "Josh and Holly are approved. The dog is not allowed on our grounds." (*Id.* ¶¶ 130−31.) Consequently, Ms. Gieszl and Mr. Mozell attended the visit, but Mr. Cowsert and Foxy II were excluded. (*Id.* ¶ 133.)

On October 5, 2024, Brad Smith, the owner of All Dogs Unleashed, evaluated Foxy II and her training status and opined,

> it is my professional opinion that Foxy [II] demonstrates a consistent ability to perform DPT and alerting tasks, provide grounding support, and serve as a social buffer for her handler. Foxy [II] possesses all the qualities expected of a service dog, including acute sensitivity to her handler's emotional states, exceptional adaptability to stress, and the ability to remain focused and calm in disruptive situations. . . . Foxy [II] performs well on and off leash, consistently responds to her handler's verbal and nonverbal commands, and is fully housetrained. She displays no signs of aggression, and enjoys being picked up and handled by her trainers and strangers alike. . . . Overall, Foxy [II] is a friendly and well-adjusted animal, and has acquired the necessary skills and temperament to effectively assist her handler. I accordingly certify that Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan.

(*Id.* ¶ 134; Doc. 6 at 90−91 (Smith Decl.) ¶¶ 7−9.)

Mr. Cowsert also testified,

> Foxy [II] has been fully trained in advanced obedience and essential service animal skills, and [she] continues to receive ongoing training maintenance under my supervision, and under the advice and guidance of All Dogs Unleashed, to maintain and advance her skills as a service animal. . . . She performs tasks that are crucial for assisting Mr. Solan in managing the effects of his neurodevelopmental disabilities. . . . Foxy [II] is individually trained to perform Deep Pressure Therapy Work, which historically has been instrumental in helping Mr. Solan cope with sensory processing and mitigating sensory overstimulation. . . . Foxy [II] is fully housetrained, very quiet,

and gets along exceptionally well with all human and non-human animals she's come in contact with.

(Doc. 6 ¶ 135; Doc. at 93-98 (Cowsert Decl.) ¶¶ 19−20, 23.)

Defendants' continued interference with Foxy II has destroyed Plaintiff's therapeutic relationship with his providers, further impairing his treatment. (Doc. 6 ¶ 136.) Defendants Bowen, Sheldon, Carter, and Coleman all falsely accused Plaintiff of engaging in or planning to engage in illegal sexual activities with Foxy II. (*Id.* ¶ 279.) Defendant Bowen published the 2022 Particularized Assessment, and Defendant Sheldon published the July 2024 denial letter, both of which contained statements that implicated Plaintiff in bestiality and animal abuse, while knowing or negligently failing to ascertain that these statements were false. (*Id.* ¶ 289.) Plaintiff has never had sexual relations with Foxy or any other animal and has never claimed to have had or intended to have such relations. (*Id.* ¶ 287.) Plaintiff has never been treated for zoophilic or other disorder related to animal abuse, and ASH has never treated, attempted to treat, or suggested that Plaintiff be treated for any such disorder. (*Id.* ¶ 288.) Numerous times in 2024, Defendants Carter and Coleman openly and in front of Plaintiff and other ASH patients "made various lewd and defamatory statements about Plaintiff and Foxy" and commented on Plaintiff's genitals. (*Id.* ¶¶ 137−38.) Plaintiff repeatedly tried to set the record straight; however, all or some of these Defendants continued to make knowingly false statements that were highly offensive and cast Plaintiff in a false light. (*Id.* ¶¶ 280−81.)

While separated from Foxy II, Plaintiff has experienced "distress, anguish, and heightened mental health symptoms, including hyper-vigilance, nightmares, flashbacks, sensory overload, increased anxiety, suicidal ideation, and self-injurious stimming behavior, without his service animal present to perform the tasks that alleviate these symptoms." (*Id.* ¶ 144.) Plaintiff has also been forced to pay expenses to board Foxy II with Mr. Cowsert past the time needed for her training. (*Id.* ¶ 143.)

On numerous occasions since Plaintiff informed Defendants that the original Foxy had been cloned and retrained as a service animal, Plaintiff has engaged in self-injurious

behaviors, including head banging and hair pulling, that could have been prevented or immediately interrupted by Foxy II. (*Id.* ¶ 145.) Despite this, Defendants have dismissed Plaintiff's injuries and attacked Foxy II's status, claiming Plaintiff's reports of self-harm, anxiety, and suicidal ideation from not having his "personal pet" with him were not supported by any recorded instances of self-harming behavior. (*Id.* ¶ 146.)

## III.    Legal Standards

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)). In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where the plaintiff is a pro se prisoner, the court must "construe the pleadings liberally and [] afford the petitioner the benefit of any doubt." *Hebbe v. Pliler,* 627 F.3d 338, 342 (9th Cir. 2010).[3]

---

[3] Although Plaintiff is not a prisoner at ASH, pursuant to 28 U.S.C. § 1915A(c), "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violation of criminal law," so these standards apply.

Generally, when deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). If a court considers evidence outside the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). A court may, however, consider documents incorporated by reference in the complaint or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment. *Id.*

A Rule 12(b)(6) motion to dismiss is almost never an appropriate response when the Court has already screened a prisoner complaint pursuant to 28 U.S.C. § 1915A(b) and directed the defendants to respond. The standard for dismissal under Rule 12(b)(6) is identical to the standard under 28 U.S.C. § 1915A(b) ("fail[ure] to state a claim upon which relief may be granted"). After the Court has screened a prisoner complaint pursuant to § 1915A(b), a Rule 12(b)(6) motion to dismiss should be granted only if the defendants can convince the Court that reconsideration is appropriate. Reconsideration is appropriate only if the district court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

## IV.    Discussion

Defendants' Motion to Dismiss constitutes an untimely motion for reconsideration of the Court's screening Order, wherein the Court dismissed multiple claims and Defendants for failure to state a claim but found that, liberally construed, Plaintiff stated ADA and RA claims against the State in Counts One and Four and state law tort claims for invasion of privacy (false light) and defamation against Defendants Bowen, Sheldon, Carter, and Coleman in Counts Eleven and Twelve. (Doc. 8 at 20.) *See* LRCiv 7.2(g)(2)

1    (motion for reconsideration must be filed no later than 14 days from date of the Order that
2    is subject of the motion).

3          Even considering Defendants' untimely arguments, Defendants have not shown that
4    the Court committed clear error in that Order.

5          **A.    ADA and RA Claims**

6          Under Title II of the ADA, "no qualified individual with a disability shall, by reason
7    of such disability, be excluded from participation in or be denied the benefits of the
8    services, programs, or activities of a public entity, or be subjected to discrimination by any
9    such entity." 42 U.S.C. § 12132. The RA "is materially identical to and the model for the
10   ADA, except that it is limited to programs that receive federal financial assistance."
11   Because the ADA has a broader scope, the Ninth Circuit analyzes both Acts under an ADA
12   standard. *See Armstrong v. Davis*, 275 F.3d 849, 862 (9th Cir. 2001); *Zuckle v. Regents of*
13   *the University of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no
14   significant difference in analysis of the rights and obligations created by the ADA and the
15   Rehabilitation Act. Thus, courts have applied the same analysis to claims brought under
16   both statutes." ) (internal citations omitted).

17         To state a claim under Title II of the ADA, a plaintiff must show: (1) he is a
18   "qualified individual with a disability"; (2) he was either excluded from participation in or
19   denied the benefits of a public entity's services, programs or activities, or was otherwise
20   discriminated against by the public entity; and (3) such exclusion, denial of benefits, or
21   discrimination was by reason of his disability. *See* 42 U.S.C. § 12132; *Does 1-5 v.*
22   *Chandler*, 83 F.3d 1150, 1154-55 (9th Cir. 1996).

23         Defendants do not argue that Plaintiff fails to allege sufficient facts to show he is a
24   "qualified individual with a disability" or that ASH is a public entity through which he
25   qualifies to receive services. In any event, Plaintiff's allegations in the FAC are sufficient
26   to make these required showings. (*See* Doc. 6 ¶¶ 8 (alleging his disabilities and
27   impairments), ¶¶ 22−24 (alleging ASH's status as a public entity), ¶¶ 57−57 (alleging his
28   qualifications, i.e, court order, to receive mental health services from ASH).) Defendants'

1  arguments instead pertain to whether Plaintiff can show he was denied the benefits and
2  services of ASH and, if so, whether he can show the State discriminated against him
3  because of his disabilities.

4       As to the first prong, Defendants argue that a service animal is not necessary for
5  Plaintiff to participate in and benefit from ASH's services, so Plaintiff has not been denied
6  these benefits. (Doc. 15 at 6−7.) This argument is without merit because the Court must
7  take Plaintiff's allegations as true at the pleading stage, and Plaintiff has alleged sufficient
8  facts from which to plausibly infer he needs a service animal to participate in and benefit
9  from ASH's programs and services. He alleges, for instance, that he previously utilized his
10 service dog, Foxy, to help him manage the effects of his severe mental disabilities and that,
11 without this continued assistance, he "has been unable to effectively engage in any of the
12 treatment programs and services offered by ASH." (Doc. 6 ¶¶ 63, 65.) He also alleges that,
13 without this assistance, "his ability to engage in treatment programs ha[s] severely
14 declined." (*Id.* ¶ 70.) These allegations, taken as true, are sufficient to show that, without a
15 service animal, Plaintiff is being denied benefits and services he could otherwise receive
16 from ASH, but for his disabilities, and the State's denial of his request for Foxy II
17 discriminates against him because of those disabilities.

18      Defendants' arguments to the contrary rely on the State's findings in the 2022
19 Particularized Assessment, which the Court ordered the State to produce in *Solan I*. (*See*
20 Doc. 15 at 8−14.) Plaintiff attached that assessment to the First Amended Complaint
21 (Doc. 6 at 64−69), so the Court may consider it here. *Ritchie*, 342 F.3d at 907–08; Fed. R.
22 Civ. P. 10 ("A copy of a written instrument that is an exhibit to a pleading is part of the
23 pleading for all purposes"). Defendants' arguments, however, miss the mark because they
24 merely attack the merits of Plaintiff's claims, not whether Plaintiff alleges sufficient facts,
25 taken as true, to state a claim. Defendants argue, for example, that the State "cannot ignore
26 information that Solan's relationship with Foxy may be abusive or risk enabling such
27 abuse," and in support, they cite to statements Plaintiff allegedly made about his
28 relationship with Foxy that were included in the 2022 Particularized Assessment. (Doc. 15

at 11−13.) This argument is unpersuasive because, taking Plaintiff's allegations as true, as the Court must, Plaintiff never made these statements. (*See* Doc. 6 ¶¶ 89−90, 287.) Moreover, the State did not claim he made them until after the Court ordered it to produce the 2022 Particularized Assessment. (*Id.* ¶ 90.) Drawing all reasonable inferences in Plaintiff's favor, the State contrived these falsehoods about Plaintiff's relationship with Foxy merely to shore up its denial of Plaintiff's request after-the-fact. Although the State may ultimately prevail in showing this was not the case, the State's factual disagreements with Plaintiff on this issue simply have no place in a motion to dismiss at the pleading stage, when the Court must credit Plaintiff's allegations and construe the facts in his favor.

Defendants' remaining arguments based on the 2022 Particularized Assessment fare no better. Defendants proffer the State's other enumerated findings therein to argue that the denial of Plaintiff's request for a service animal was legitimate and not discriminatory. For instance, they point out that the ADA has a tethering requirement for service animals, which they say is at odds with the State's policy prohibiting ASH patients from possessing a tether, and they argue that the State cannot reasonably alter this policy to accommodate Plaintiff's request. (Doc. 15 at 7−8.) Although the State's reasoning on this and the other issues raised in the 2022 Particularized Assessment may be sound, Defendants once again merely raise factual disputes about whether a given accommodation is reasonable under the ADA, which does not call for the dismissal of Plaintiff's claims. To satisfy pleading requirements, Plaintiff need not show he will ultimately prevail on his claims, he need only allege sufficient facts that "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Plaintiff has met that threshold here. The Court will deny Defendants' Motion to Dismiss Counts One and Four.

### B.    State Law Tort Claims

Defendants move to dismiss Plaintiff's state law invasion of privacy (false light) and defamation claims for failure to state a claim based on insufficiency of the pleadings as to all Defendants and on statute of limitations grounds as to Defendant Bowen only. (Doc. 15 at 14−17.)

1        **1.    Sufficiency of Plaintiff's Pleadings**

2        Defendants argue that Plaintiff fails to allege sufficient facts to show when and to

3   whom Defendants made the alleged false statements accusing Plaintiff of sexual intentions

4   toward Foxy; that Defendants knew or had reason to know the statements were false; or

5   that Defendants addressed or published the statements broadly enough to establish the

6   public component of these claims. (*Id.*)[4] Once again, the Court found otherwise on

7   screening, so Defendants' arguments merely constitute an untimely challenge to the

8   Court's screening order and raise factual disputes.

9        Even addressing these arguments, Plaintiff alleged specific, graphic examples of

10  accusatory or mocking statements Defendants Carter and Coleman allegedly made in front

11  of Plaintiff and other ASH patients "[o]n numerous occasions throughout 2024." (Doc. 6

12  ¶¶ 137−38.) Plaintiff did not need to allege specific dates or list who was present to infer

13  from these facts that Carter and Coleman regularly engaged in this alleged conduct in front

14  of others. Moreover, the crass nature of the alleged statements is sufficient to infer

15  Defendants had no legitimate therapeutic reason to engage in such conduct and therefore

16  made these comments only to publicly shame Plaintiff. Plaintiff's allegation that any

17  suggestion he had sexual intentions toward Foxy was patently false is likewise enough to

18  infer that Defendants either knew their statements were false, or at the very least, acted "in

19  reckless disregard for the truth." *Desert Palm*, 343 P.3d at 450.

20       Plaintiff also alleged that Defendants Bowen and Sheldon published the 2022

21  Particularized Assessment and 2024 denial letter (respectively), implicating Plaintiff in

22

23  ───────────────

24       [4] To state a claim for false light, "a plaintiff must show (1) the defendant, with
    knowledge of falsity or reckless disregard for the truth, gave publicity to information
25  placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed
    would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm
26  Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015). Similarly, to state
    a claim for defamation, a plaintiff must show that the defendant published a false and
27  defamatory communication "(a) know[ing] that the statement is false and it defames the
    other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to
28  ascertain them." Restatement (Second) of Torts § 580(B) (1977).

bestiality and animal abuse, despite Plaintiff having no history of being treated for these issues or of ASH making any attempts to treat Plaintiff for any such alleged disorders. (*Id.* ¶¶ 85−92, 289−290.) Plaintiff alleged that these claims "were made up by the State after it lost the motion for a preliminary injunction [in *Solan I*]; they were never brought up beforehand . . . during the course of Plaintiff's so-called mental health treatment at ASH," and "[n]ot a single member of any of Plaintiff's ASH treatment teams ever asked Plaintiff if he touched Foxy inappropriately or if he intended to; this topic has never come up in treatment[; was] entirely contrived by the State [and was] a deliberate attempt to divert attention from Plaintiff's valid claims and derail his litigation." (*Id.* ¶¶ 90.) These allegations are sufficient to infer that Defendants Bowen and Sheldon knew these parts of their published assessments were false and pretextual.

Taken together, Plaintiff alleges sufficient facts to show that the above Defendants publicly stated or published highly offensive, defamatory statements about Plaintiff, either in reckless disregard for the truth or knowing they were false. Whether they disseminated these statements to enough people for Plaintiff to ultimately prevail on the publicity element of his claims and whether Defendants acted in deliberate disregard to the truth or were aware their statements were false are factual disputes that cannot be resolved on a motion to dismiss. Defendants have not shown that the Court clearly erred when it found that, liberally construed, Plaintiff adequately stated false light claims against Defendants Bowen, Sheldon, Carter, and Coleman in Count Eleven and defamation claims against Defendants Bowen and Sheldon in Count Twelve.

### 2.    Statute of Limitations

Unlike the above arguments, Defendants' argument that Plaintiff's claim against Defendant Bowen must be dismissed on statute of limitations grounds is an affirmative defense, so the Court did not rule on this issue when screening the FAC, and it is properly before the Court in Defendants' Motion to Dismiss.

When the statute of limitations forms the basis of a motion to dismiss for failure to state a claim, the motion can be granted if the running of the statute is apparent on the face

of the complaint, and "the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); *see also TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). When deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

In Arizona, actions "for injuries done to the character or reputation of another by libel or slander" must be brought "within one year after the cause of action accrues." Ariz. Rev. Stat. § 12-541. Further, "a cause of action 'accrues' when a plaintiff knows or reasonably should have known of a defendant's [tortious] conduct." *Vega v. Morris*, 905 P.2d 535, 538 (Ariz. Ct. App. 1995) (citations omitted).

Plaintiff's allegations regarding Defendant Bowen's false and defamatory conduct are that Bowen "published the [2022 Particularized Assessment] knowing the same contained statements [that] implicated Plaintiff in bestiality and animal abuse, and knowing and/or negligently failing to ascertain that such statements were false." (Doc. 6 ¶ 289.) Plaintiff alleges that Bowen issued the 2022 Particularized Assessment "several days before the 45-day period [set by the Court to complete the assessment] elapsed," and Bowen "directed an ASH grievance investigator to deliver it to Plaintiff." (*Id.* ¶ 81.)

The Court ordered the State to produce the 2022 Particularized Assessment on March 22, 2022, so adding 45 days from the date of that Order, Defendant Bowen was required to complete the assessment by May 6, 2022. Plaintiff does not specifically allege when Bowen completed the assessment or when Plaintiff received it from the ASH grievance investigator, but based on his allegations that Bowen completed the assessment several days before the 45 days elapsed, it is reasonable to infer that Bowen completed it prior to May 6, 2022, and Plaintiff received it and became aware of Bowen's allegedly false and defamatory statements regarding his purported sexual conduct or intentions toward Foxy on or about the same time.

Defendants argue from these inferences that Plaintiff had until May 6, 2023 to file his claim against Defendant Bowen, but because he did not do so until he filed the FAC on November 18, 2024, his claim is untimely. (Doc. 15 at 15.) Plaintiff does not dispute that he received the 2022 Particularized Assessment by May 6, 2022. He states in his Response that Bowen "had a grievance investigator deliver the particularized assessment letter to Plaintiff in a sealed envelope around May 4th, 2022." (Doc. 24 at 16.) He argues, though, that his claims against Bowen did not accrue then because he was not yet aware that Bowen had publicly disseminated the false and defamatory statements until around May 22, 2024, just after Plaintiff announced that Foxy II had completed her training. (Doc. 24 at 16.) According to Plaintiff, this is when Defendants Coleman and Carter "started publicly accusing Plaintiff of engaging in oral sex with Foxy," and Plaintiff first began to suspect that Bowen had circulated the 2022 Particularized Assessment among ASH staff. (*Id.*) Plaintiff argues that his suspicions were then confirmed on July 5, 2024, when Defendant Sheldon issued his July 5, 2024 denial letter based on the same allegedly false and defamatory findings Bowen included in the 2022 Particularized Assessment. (*Id.*) Based on this timeline, Plaintiff argues that his claims against Bowen did not accrue until July 5, 2024. (*Id.*)

Defendants do not address these arguments in their Reply. Instead, they characterize Plaintiff as arguing only that, "because the court did not immediately screen the false light claim against Defendant Bowen, [that claim] need not be timely." (Doc. 26 at 9.) Defendants misconstrue Plaintiff's argument, which has nothing to do with when the Court screened Plaintiff's claims against Bowen. Rather, Plaintiff argues that, although he became aware of Bowen's false and defamatory statements pertaining to his intentions toward Foxy in May 2022, he was not yet aware he had suffered an injury based on false light/defamation because he had no reason to know or suspect that Bowen had disseminated these statements until May or June 2024. (Doc. 24 at 16.)

Construing the allegations in Plaintiff's favor, it is not clear on the face of the FAC that Plaintiff's claims against Defendant Bowen accrued any earlier than 2024. Plaintiff

alleges that Bowen's false statements in the 2022 Particularized Assessment, accusing him of having sexual intentions towards Foxy, had never previously been raised or addressed by ASH staff. (Doc. 6 ¶¶ 90−91, 287−88.) And he alleges, "on numerous occasions throughout 2024," Defendants Carter and Coleman began accusing him of the same falsehoods. (*Id.*) Absent further factual development, it is reasonable to infer, that, until he began hearing these accusations outside the confines of the 2022 Particularized Assessment, Plaintiff did not know or have reason to believe Bowen disseminated the alleged false and defamatory statements in that assessment to ASH staff or that Plaintiff had suffered a reputational injury. Because the Court cannot conclude on the face of the pleadings that Plaintiff's false light and defamation claims against Bowen accrued before Plaintiff experienced public shaming from ASH staff in 2024, the Court cannot find that these claims, filed in November 2024, are untimely. Accordingly, the Court will deny Defendants' Motion to Dismiss these claims on statute of limitations grounds.

**V.     Plaintiff's Motion for Preliminary Injunction**

Plaintiff moves "for a preliminary injunction restraining Defendant [the State] from excluding Plaintiff's service animal Foxy [II] from [ASH]." (Doc. 17 at 1.)

**A.     Legal Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When the government opposes a preliminary injunction, "[t]he

third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Further, under the Prison Litigation Reform Act,[5] injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction). A court may also consider

---

[5] Although Plaintiff is not a "prisoner" for purposes of his ADA claim, he is a prisoner for purposes of the PLRA. *See* Doc. 11 at 1-2 n.1 (noting that pursuant to 28 U.S.C. § 1915A(c), "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violation of criminal law . . . .").

evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). Further, when evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Camenisch*, 451 U.S. at 395.

**B.     Likelihood of Success on the Merits**

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. As such, to prevail on his ADA claim, Plaintiff must demonstrate (1) that he is a qualified individual within the meaning of the ADA, (2) that Defendant is a public entity, and (3) that Defendant discriminated against him or that he was otherwise denied the benefits of Defendant's services, programs, or activities. *Duffy v. Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996).

There is no dispute between the parties as to either Plaintiff's status as a qualified individual with a disability or as to ASH's status as a public entity. Accordingly, the Court's discussion will be limited to whether Plaintiff has met his burden of showing that the State discriminated against him or that he was otherwise denied the benefits of ASH's services, programs, or activities.

"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 130(b)(7)(i). Further, the ADA does not "require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Id*. § 35.150(a)(3). However, when a public entity refuses to make a requested accommodation on the above bases, the decision "must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service,

program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion." *Id.* Additionally, while "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* § 35.130(h).

With regard to service animals, "[g]enerally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." *Id.* § 35.136(a). Where a service animal is permitted, it "shall be under the control of its handler," and the public entity "is not responsible for the care or supervision of [the] service animal." *Id.* §35.136(d), (e).

Both parties rely on the purported sufficiency/insufficiency of the State's 2022 Particularized Assessment in *Solan I* to support their arguments regarding Plaintiff's likelihood of success on the merits of his ADA claim. Plaintiff argues that the State cannot rely on the 2022 Particularized Assessment to show it complied with the ADA in this action because that assessment was "from another administration and for a different service animal," and even if the State could rely on its now 3-year-old assessment to show compliance with the ADA in this action, the 2022 Particularized Assessment does not show this because it "never constituted a particularized assessment within the framework set by the Court." (Doc. 17 at 7.) The State argues that Plaintiff is barred by collateral estoppel from challenging the sufficiency of the 2022 Particularized Assessment because he did not do so in *Solan I*, so he "lost the issue when he voluntarily stipulated to dismiss his prior case with prejudice." (Doc. 25 at 6.)

### a.    Collateral Estoppel/Issue Preclusion

The doctrine of collateral estoppel, otherwise known as issue preclusion, provides that "the determination of a question directly involved in one action is conclusive as to that question in a second suit" because "[o]nce a court has decided an issue, it is 'forever settled as between the parties,' thereby 'protect[ing]' against 'the expense and vexation attending

multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent verdicts.'" *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147 (2015) (citations omitted). "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.* at 146 (citation omitted). Issue preclusion applies if (1) there was a full and fair opportunity to litigate the issue in a previous action; (2) the issue was actually litigated in that action; (3) there was a final judgment on the merits; and (4) the person against whom collateral estoppel is asserted was a party or in privity with a party in the previous action. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008).

There is no question that Plaintiff was a party to *Solan I*. Plaintiff also had a full and fair opportunity to litigate the sufficiency of the 2022 Particularized Assessment in that action because he acknowledges he received it within 45 days of the Court's preliminary injunction Order (*see* Doc. 6 ¶ 81; Doc. 24 at 16), and the Court stated in that Order, "[i]f Plaintiff is again dissatisfied with Defendant's determination at the end of the above-described assessment, he may again move for preliminary injunctive relief." (*Solan I*, Doc. 84 at 16.) Thereafter, several months passed between Plaintiff's receipt of the 2022 Particularized Assessment and the Court's dismissal of *Solan I*, which shows that Plaintiff could have litigated the sufficiency of the 2022 Particularized Assessment in that action. For collateral estoppel to apply, however, it is not enough simply to show that the parties had a full and fair opportunity to litigate an issue in the prior action; rather, they must have actually litigated the issue. *Kendall*, 518 F.3d at 1050. Moreover, the issue must be one that "was necessary to decide the merits." *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019); *see Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) ("the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action").

1    The State appears to argue that, because a dismissal with prejudice equates to a

2    judgment on the merits, thereby precluding a plaintiff from raising the same claims in a

3    future lawsuit, it necessarily serves as a judgment on the merits of every underlying issue,

4    whether litigated or not, as long as the issue could have been raised in that action. (*See*

5    Doc. 25 at 5−6.) This is simply not the case. "Unlike claim preclusion . . . issue preclusion

6    requires that an issue must have been 'actually and necessarily determined by a court of

7    competent jurisdiction' to be conclusive in a subsequent suit." *Janjua*, 933 F.3d at 1065

8    (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). Additionally, "[t]he party

9    asserting preclusion bears the burden of showing with clarity and certainty what was

10   determined by the prior judgment." *Clark*, 966 F.2d 1318, 1321 (9th Cir. 1992). Thus, "[i]t

11   is not enough that the party introduce the decision of the prior court; rather, the party must

12   introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the

13   exact issues previously litigated." *Id.* (quoting *United States v. Lasky,* 600 F.2d 765, 769

14   (9th Cir. 1979).) The State has not carried its burden of showing the parties ever litigated

15   the sufficiency of the 2022 Particularized Assessment in *Solan I* or that the Court made any

16   rulings on it that were essential to the dismissal of that action. The parties Stipulation to

17   dismiss *Solan I* with prejudice clearly stated the dismissal was "on the basis that Plaintiff's

18   service dog, 'Foxy', passed away and the matter therefore is moot." (Doc. 94 at 1.)

19   Dismissal on this basis did not require any admission by Plaintiff or any ruling from the

20   Court on the sufficiency of the 2022 Particularized Assessment. Quite simply, the Court

21   was not previously presented with this assessment and therefore could not have made any

22   judgments regarding it that would have any preclusive effect here.

23          The State's collateral estoppel argument is additionally flawed because, not only

24   has there been no judicial determination regarding the sufficiency of the 2022

25   Particularized Assessment to support the State's denial of Plaintiff's accommodation

26   request in *Solan I*, but the issue currently before the Court is not whether that assessment

27   was sufficient to exclude the original Foxy in that action but whether the State has sufficient

28   reasons to exclude Foxy II in this action. Contrary to the State's mischaracterization (*see*

Doc. 25 at 6), the 2024 denial letter in this action does not refer to or incorporate by reference the 2022 Particularized Assessment.

In short, the State may argue that the 2022 Particularized Assessment was sufficient to deny Plaintiff's accommodation request in *Solan I* and that this assessment is equally relevant to the merits of Plaintiff's current ADA claim, but it cannot simply invoke Plaintiff's voluntary dismissal of *Solan I* with prejudice as a preclusive finding in its favor on these issues. Plaintiff is free to argue both that the 2022 Particularized Assessment does not apply here and that it is, moreover, inadequate to support the denial of a service animal under the ADA.

### b.      Analysis

Plaintiff argues that he is likely to succeed on the merits of his ADA claim because "the ADA provides 'clear, strong, consistent, enforceable standards' precluding hospitals from discriminating against persons who use service dogs," and he argues, the State denied his request for an accommodation "without making any effort to modify its practices or policies, and without conducting a valid, particularized assessment of Plaintiff's needs or request." (Doc. 17 at 6.) He argues that the 2022 Particularized Assessment did not satisfy this obligation because it "did not address how Foxy . . . would be disruptive to the health or safety of other patients," and it instead, "weaves a fictional narrative about how Foxy and Plaintiff would be harmful to each other." (*Id.* at 8−9.)[6]

---

[6] In his Motion, Plaintiff confusingly invokes, without reference, arguments Defendants made in their Motion to Dismiss. (*See* Doc. 17 at 7, 9, 10−11.) The Motion for Preliminary Injunction therefore reads more like a sur-reply to the Motion to Dismiss than a stand-alone Motion. In its Response, the State also relies almost entirely on its flawed collateral estoppel argument to show Plaintiff is unlikely to succeed on the merits of his ADA claim, and apart from making blanket references to the Motion to Dismiss and the 2022 Particularized Assessment (*see* Doc. 25 at 6), the State largely fails to substantively address the merits of that claim. Because the Court may rely on any materials currently before it when addressing a motion for preliminary injunction, and there is no way to make sense of Plaintiff's Motion for Preliminary Injunction or the parties' briefing thereto without relying extensively on the Motion to Dismiss briefing, the Court incorporates relevant portions of that briefing into its discussion here.

1    As discussed supra, Plaintiff has alleged sufficient facts, taken as true, to state an

2    ADA claim based on the State's denial of his request to have Foxy II live with him as a

3    service animal at ASH. Nonetheless, the State has also presented convincing reasons to

4    find that Plaintiff is unlikely to prevail on the merits of this claim.

5    As a threshold matter, the State argues that Plaintiff cannot show that the State

6    denied him any benefits based on his disabilities because, it argues, having a service animal

7    is not necessary for Plaintiff to participate in or benefit from ASH's services, programs,

8    and activities. (Doc. 15 at 6.) The State points out that Plaintiff admitted in an interview

9    during the 2022 Particularized Assessment that he does not need a service animal for any

10   physical limitations. (Doc. 15 at 6.) It also argues that having a service animal would not

11   help Plaintiff with his mental disabilities but would, instead, hinder Plaintiff's ability to

12   benefit from the mental health services ASH is designed to provide. (*Id.*) The State

13   explained this position in the 2022 Particularized Assessment, wherein it referred to the

14   opinion of Plaintiff's then-treating psychiatrist, Dr. Stephen Morris, M.D. (*Id.*) Dr. Morris

15   stated he believed Plaintiff's reliance on a service animal would impede the purpose of his

16   commitment to ASH, which was, "in part, to learn how to better get along with people."

17   (*Id.*; Doc. 6 at 65.) Dr. Morris noted that Plaintiff admitted to liking animals better than

18   people, and he opined it was necessary to Plaintiff's treatment that he

19   
20   
21            learn how to deal with people in spite of his [ASD]. He tells
            me that he had the dog as a transition object to remove himself
            from the codependent relationship he had with his mother . . .
22            Now my suggestion to him is to move even further and drop
            the transition object. He is realizing he is not as disabled as he
23            thought he was and is realizing capabilities he didn't know he
            had. A transition object is no longer needed. . . . and [I do] not
24            believe that a service animal is clinically appropriate for
            [Plaintiff].

25   (*Id.* at 65−66.)

26   Although Plaintiff may disagree with this assessment, Dr. Morris' opinion provides

27   a strong basis to question whether Plaintiff needs a service animal to benefit from the

28   mental health services provided by ASH, as Plaintiff claims, or whether having a service

animal will instead impede his ability to receive those benefits. On the limited record currently before the Court, the Court cannot conclude that Plaintiff is likely to prevail in meeting this prong of his ADA claim.

In the alternative, even if Plaintiff can show that the tasks Foxy II is specially trained to render—i.e., DPT, alerting, and social buffering—are necessary for him to benefit from his mental health treatment at ASH and that having a service animal will not hinder his treatment, as Dr. Morris suggests, Plaintiff cannot prevail on the merits of his ADA claim if the State can show that permitting Foxy II to stay with him will "fundamentally alter the nature of the service, program, or activity" ASH provides. 28 CFR § 130(b)(7)(i).

Here, the State's documented concerns about Plaintiff's suspected sexual intentions toward Foxy in the 2022 Particularized Assessment and reiterated in the July 2024 denial letter appear sufficient, on their own, to make this showing. Nothing in the ADA requires an entity to knowingly facilitate animal abuse or counter-therapeutic behaviors, particularly where, as here, the benefits and services at issue are expressly intended to advance Plaintiff's mental health treatment.

As discussed, Plaintiff strongly denies he ever had or intended to have sexual contact with Foxy. He alleges in the FAC that the State's statements to that effect constitute "an outrageous, defamatory attack on Plaintiff's character and the nature of his relationship with Foxy." (Doc. 6 ¶ 18.) In his Motion for Preliminary Injunction, he likewise categorically dismisses the State's assertions, claiming "ASH relies entirely on wild speculation to justify its wrongful denial." (Doc. 17 at 9.) He also characterizes the State's assertions as "false and clearly speculative claims of animal abuse," "inane" and "contrived," and "nothing more than a bad-faith attempt to evade ADA compliance and justify the State's ongoing discrimination." (*Id.* at 9, 12, 13.)

The Court has already determined that the lack of any prior diagnoses or treatment for Plaintiff's purported inappropriate relations with Foxy permits the plausible inference that this alleged reason for denying Plaintiff's request is pretextual. Looking beyond the pleadings, however, the State cites multiple statements Plaintiff made during his treatment

at ASH, suggesting, as the State explained in its 2022 Particularized Assessment, that Plaintiff's relationship with Foxy "may be abusive or risk enabling such abuse." (Doc. 15 at 11−13; Doc. 6 at 68.) As more fully set forth in that assessment, these statements were taken from Plaintiff's progress notes or incident reports between December 2020 and December 2021. They include Plaintiff's description of Foxy on December 2, 2020 as a "co-sovereign" and "like a wife"; his statements on May 8, 2021 that he intended to marry Foxy, and that "ASH can't stop me from marrying her"; his statements on April 24, August 23, November 11, December 12, and December 22, 2021 that he either had or desired to have inappropriate sexual contact with Foxy, including that he and Foxy "put our tongues in each other's mouth," that he was saving himself for Foxy, "who has not consented to intercourse as of yet," that he could not wait to touch his "baby Pomeranian," and that he wanted to order Viagra to have sex with his dog. (Doc. 6 at 68−69.) In one instance, on September 1, 2021, Plaintiff also purportedly told his treatment team that he identified as a Pomeranian, which was why he referred to Foxy as his fiancé. (*Id.* at 69.)

The regularity and specificity of the above statements suggest that the State's concerns that, if permitted to have Foxy II live with him at ASH, Plaintiff would have an inappropriate, counter-therapeutic relationship with his service animal are not merely speculative or contrived, as Plaintiff claims. In his Response to Defendants' Motion to Dismiss, Plaintiff argues that "all of the State's examples are either completely fabricated, or taken out of context," and he disputes the State's interpretation of some of these statements. (Doc. 24 at 12.) He argues, for instance, that his statements regarding "marriage" to Foxy and his intent to have a "manumission ceremony"[7] are merely

---

[7] The 2022 Particularized Assessment notes that,

> [o]n June 14, 2021, you enlisted a number of your peers to participate in a "manumission" ceremony in which you referred to Foxy as a "woman" and a "private person incarnate" . . . and you explained that "[m]anumission was used in ancient Rome for releasing a slave to the freedom of a municipality, it

references to "symbolic rituals" that have "no carnal or sexual connotation," but are "meant to invest Foxy with personhood" in keeping with Plaintiff's protected religious beliefs. (Doc. 24 at 12−13.) He also argues that all his proffered statements were recorded by Behavioral Health Technicians, who are not "medical professionals" but merely assistants who work under the direct supervision of Registered Nurses. (*Id.* at 14.) But he does not expressly deny making any of the statements in the 2022 Particularized Assessment or address the more explicit statements set forth above. He also makes no attempt to explain how, if he made these statements, they were taken out of context and do not justify the State's concerns that having Foxy II live with him at ASH would permit him to engage in counter therapeutic and potentially abusive conduct with Foxy II.

On this record, the Court is not persuaded that the State's asserted concerns about this potential outcome are merely speculative or pretextual. And if it can prove its concerns are well founded, the State is also likely to prevail in showing that facilitating such conduct would "fundamentally alter the nature of the service, program, or activity [ASH] provides." 28 C.F.R. § 35.130.

In summary, the Court cannot conclude that Plaintiff is likely to prevail on showing, contrary to the views of an ASH psychiatrist, that he requires a service dog to live with him at ASH to benefit from the mental health programs and services ASH provides. But even if Plaintiff can present sufficient evidence about the nature of the assistance he requires and is especially likely to receive from a trained service animal to make this showing, the Court cannot conclude that he is likely to prevail in showing the State improperly denied his request based on its belief that he would have inappropriate sexual contact with his service dog. The Court therefore need not address the alleged insufficiency of the State's other stated reasons for denying Plaintiff's request. Also, because Plaintiff fails to show he is likely to succeed on the merits of his claim, the Court need not discuss the other *Winter*

---

meant giving freedom to somebody that wasn't considered a person."

(Doc. 6 at 69.)

factors required for obtaining preliminary injunctive relief. Plaintiff's Motion for Preliminary Injunction is denied.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Dismiss (Doc. 15) and Plaintiff's Motion for Preliminary Injunction (Doc. 17), and both Motions are **denied**.

(2)     Defendants must **answer** Counts One, Four, Eleven, and Twelve of the First Amended Complaint (Doc. 6) within the time provided by the applicable provisions of Rule 12(a)(4) of the Federal Rules of Civil Procedure.

Dated this 27th day of May, 2025.

Honorable John J. Tuchi
United States District Judge