Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56(a) and LR Civ 56.1(a), Defendants hereby move for summary judgment on the remaining claims in Plaintiff's First Amended Complaint ("FAC") (doc. 6) as determined in this Court's screening Order under 28 U.S.C. § 1915A(a) (doc. 5). Plaintiff lacks evidence sufficient to establish a triable issue of fact on his claims against (1) Defendant State of Arizona under the Americans with Disabilities Act and the Rehabilitation Act; (2) Individual Defendants Aaron Bowen,

Michael R. Sheldon, Lea'Cher Carter, and Unique Coleman on his false light invasion of privacy claim, and (3) Bowen and Sheldon on his defamation claim. This Motion is supported by Defendants' Separate Statement of Facts in Support of Motion for Summary Judgment ("SOF"), the exhibits attached thereto, and the record in this matter.

## I. Factual Background.

### A. Solan Pleaded Guilty Except Insane to Aggravated Assault and Was Committed to the Arizona State Hospital for Mental Health Treatment.

On February 11, 2020, Plaintiff Matthew Solan pleaded guilty except insane to aggravated assault. (SOF ¶ 1.) Having found a factual basis for the plea and that it was voluntary, the Court accepted Solan's plea agreement. (SOF ¶ 2.) The Court sentenced Solan "to be imprisoned in the Arizona Department of Corrections for the Presumptive term of seven point five (7.5) years, under the jurisdiction of the Psychiatric Security Review Board, committed to the Arizona State Hospital and be given any treatment necessary to treat the Defendant's mental illness." (SOF ¶ 3.) This sentence was to date from March 12, 2020, and Solan was given credit for 407 days of pre-sentence incarceration. (*Id.*)

Solan's pre-sentence incarceration began on January 30, 2019, after he surrendered following an armed standoff with officers of the Coconino County Sheriff's Office that "lasted several hours." (SOF ¶ 4.) Solan's dog Foxy was in his vehicle with him during the standoff. (SOF ¶ 5.) Before exiting the vehicle and surrendering, Solan shot himself in the leg. (*Id.*) January 30, 2019 was the last time that Solan "had physical contact" with Foxy. (SOF ¶ 6.)

Solan was admitted to the Arizona State Hospital ("ASH") on April 1, 2020. (SOF ¶ 7.) His projected discharge date is August 1, 2026. (*Id.*)

ASH has a policy that allows patients like Solan who have been committed to the Forensic Hospital following a plea of guilty except insane ("GEI") to violent felonies to qualify for early release if they can establish that they are no longer a danger to themselves or to others. (SOF ¶ 10.) The policy establishes a sequence of privileges

culminating in Conditional Release to the Community that GEI patients may earn based upon their "adherence to treatment plan, absence of any danger to self or other behaviors, acceptance of redirection from staff, and compliance with Hospital rules." (SOF ¶ 11.)

The policy provides for three successive levels of privileges inside the secure perimeters of the Forensic Hospital: (1) **Remains on Unit ("ROU")**, in which patients are restricted to their residential unit; (2) **1:5 Mall Privileges**, in which patients are allowed to attend rehabilitation and other activities as outlined in their Inpatient Treatment and Discharge Plan ("ITDP") under a one supervisor to five patients level of supervision; and (3) **Independent Mall Privileges**, in which patients may be able to use the mall during posted mall hours for leisure time, fresh air, café, and so on. (SOF ¶ 12.)

After obtaining these on-Hospital grounds privileges, GEI patients may attain six successive stages (three phases, each containing two levels) of conditional release to the community privileges. (SOF ¶ 13.) While passing through these six levels, patients continue to live and be treated at ASH but enjoy progressively greater and more independent access to off-Hospital activities. (*Id.*) ASH allows GEI patients who have acquired Phase 2 privileges or higher to live in the Community Reintegration Unit ("CRU"), which is a 23-bed free-standing unit located off the Forensic Hospital campus, where the majority of GEI patients reside. (SOF ¶ 14.) Ultimately, if a GEI's treatment team and ASH's Special Classification Committee determines that a patient is no longer dangerous and sufficiently stable to remain so after discharge from the hospital, ASH may support the patient's conditional release to the community. (SOF ¶ 15.)

In the nearly six years that Solan has been confined at the Forensic Hospital, full mall is the highest degree of privileges that he has attained. (SOF ¶ 16.) As of this writing he has 1:5 supervision privileges. (*Id.*)

### B. Solan Sued the State to Be Allowed to Have Foxy Live with Him at ASH.

Upon arriving at ASH in April 2020, Solan requested a service animal accommodation for Foxy to live with him at the Forensic Hospital. (SOF ¶ 17.) ASH denied Solan's request, citing security and health and safety concerns, and administrative

burden. (SOF ¶ 18.) Solan filed a lawsuit and Motion for Preliminary Injunction with this Court, *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT (DMF), alleging that ASH's refusal to modify its policies and procedures to allow Foxy to live with him at the forensic psychiatric hospital violated the Americans with Disabilities Act ("ADA"). (SOF ¶ 19.)

On March 22, 2022, the Court granted Solan's motion and ordered ASH to conduct a particularized assessment to determine whether reasonable modifications could be made to its policies and procedures to allow Foxy to live with Solan at ASH "without fundamentally altering ASH's services." (SOF ¶ 20.) ASH conducted the required assessment and, on May 5, 2022, provided Solan with a letter outlining its findings and conclusions ("Particularized Assessment"). (SOF ¶ 21.)

In the Particularized Assessment, ASH set forth six reasons that it was denying Solan's request:

> (1) Even assuming Foxy qualified as a service animal before Solan's index crime and commitment to the Forensic Hospital, ASH did not believe her services were medically necessary in that setting. Solan did not need Foxy to navigate the hospital or to otherwise meet his physical needs, and his treating psychiatrist at the time believed that rather than help him cope with his psychiatric disabilities, having her live in the hospital with him would "get in the way" of his behavioral health treatment.
>
> (2) Even if Foxy qualified as a service animal, Title II requires that while in a public facility she be tethered with a harness, leash, or other tether. However, tethers are ligature risks that in accordance with Hospital policy and Joint Commission regulations, ASH cannot allow at the Forensic Hospital. Therefore, Solan would not be able to control Foxy as Title II requires.
>
> (3) Even if Foxy qualified as a service animal, Title II requires that Solan be solely responsible for her care and supervision while in a public facility. At the Forensic Hospital, however, Solan could not care for Foxy's daily needs without significant assistance from ASH staff. Therefore, Title II does not require ASH to allow her at the Hospital.
>
> (4) Foxy required daily medication for heart disease and osteoarthritis. Consistent with Hospital policy, licensing requirements, and state and federal regulations, however, ASH cannot store or administer veterinary medications. Moreover, one of Foxy's required medications was

> gabapentin, which though not yet a controlled substance in Arizona is nonetheless commonly abused and should not be readily available to Forensic Hospital patients. ASH policy, licensure, and regulatory requirements prohibit Solan from storing and administering *any* medication—much less gabapentin.
>
> (5) Even if Foxy qualified as a service animal, admitting her would fundamentally alter the nature of the Forensic Hospital from an inpatient hospital facility that cares for human beings to one that also must care for an animal. Title II does not require such a fundamental alteration to the Hospital's services, programs, and activities.
>
> (6) Finally, ASH records showed that Solan had expressed to his peers and staff on multiple occasions a desire to marry Foxy and have intimate relations with her. Although Solan minimized or denied making these statements, ASH could not ignore the risk of animal abuse by allowing Foxy at the Forensic Hospital, where at his request, Solan occupied a single room on the Cottonwood Unit.

(SOF ¶ 22.)

In large part, ASH based its conclusions in the Particularized Assessment on the opinions of Solan's then treating psychiatrist, Dr. Stephen Morris, M.D., which were memorialized in an Affidavit dated April 28, 2022. (SOF ¶ 23.) Based on his experience working directly with Solan, and to a reasonable degree of psychiatric certainty, Dr. Morris did not believe that a service animal was clinically appropriate for Solan, for a number of reasons that he detailed. (SOF ¶¶ 24-26.)

ASH also based its conclusions in the Particularized Assessment on Forensic Hospital records documenting statements from Solan suggesting that he may have had feelings toward Foxy that were sexual in nature. (SOF ¶ 27.) For example,

- In a Progress Note dated December 2, 2020, Foxy described Foxy as a "co-sovereign" and "like a wife."

- In a Progress Note dated April 24, 2021, Solan is reported as saying that he and Foxy "put our tongues in each other's mouth."

- In another Progress Note dated April 24, 2021, Solan is reported as saying that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it. He is also reported to have

talked to another patient about sticking his fingers in Foxy's rectum and noted that his hand would not fit because it was too big.

- In a Progress Note dated May 6, 2021, Solan is quoted as saying near the nursing station: "Foxy is my service dog, she is more than a service dog, ASH can't stop me from marrying her. Biden passed a law." Around this time, he applied for a marriage license for him and Foxy.

- On June 14, 2021, Solan enlisted a number of his peers to participate in a "manumission" ceremony, in which he referred to Foxy as a "woman" and a "private person incarnate" and to himself as a "man" and a "private person incarnate."

- On August 23, 2021, Solan reportedly told staff that he was saving himself for his fiancée Foxy, "who[] has not consented to intercourse as of yet."

- On September 1, 2021, Solan reportedly told his treatment team that he identified as a Pomeranian and that is why he refers to Foxy as his fiancée.

- On November 22, 2021, Solan reportedly told his occupational therapist (in a conversation about his inattention to personal hygiene) that Foxy "licks the inside of my mouth and cleans all the gunk from my teeth."

- In a December 12, 2021 Progress Note, Solan is reported to have said that he wanted a Viagra order so he could have sex with his dog.

- In an Incident Report dated December 11, 2021, Solan is reported as saying about Foxy during an On-Unit Open Art Group on the Pinon Unit: (1) "yeah baby, we are the superior breed my little fox"; and (2) "I cannot wait to touch you my baby Pomeranian."

(SOF ¶ 27.)

On July 13, 2022, Solan learned that Foxy had passed away. (SOF ¶ 28.) Six months later, on January 26, 2023, Solan stipulated to dismissal of CV-20-02209 as moot following Foxy's death. (SOF ¶ 29.)

Solan has testified that after ASH denied his request to have Foxy live with him at the Forensic Hospital, he could not "dissociate the staff from their exclusion of Foxy no matter how hard I try. It's just, they've become the other, the enemy, and that has

poisoned every interaction." (SOF ¶ 38.) He has stated that "if he does not get enough money by suing the State 'to forget how they killed Foxy,' then he would 'brutally kill all of them and that is a promise not an idle threat.'" (SOF ¶ 56.)

### C. Solan Sued the State to Have Foxy's Clone Live with Him at ASH and State Employees Individually for False Light Invasion of Privacy and Defamation.

Solan alleges that, through cloning, Foxy was "reincarnated" on November 9, 2023. (SOF ¶ 30.) On June 13, 2024, Solan submitted a request to have Foxy's clone live with him at ASH. (SOF ¶ 31.) ASH denied Solan's request to have Foxy's clone admitted to the Forensic Hospital for a number of reasons, including that "based on [Solan's] own personal statements, [his] past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature)." (SOF ¶ 35.)

On August 14, 2024, Solan filed this lawsuit complaining that ASH's denial violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. (SOF ¶ 36.) In the operative First Amended Complaint filed on November 18, 2024 ("FAC"), Solan also alleged claims for false light invasion of privacy and defamation against former ASH CEO Aaron Bowen, current ASH CEO Michael Sheldon, former ASH Behavioral Health Technician ("BHT") Lea'Cher Carter, and current ASH BHT Unique Coleman ("Individual Defendants"). (SOF ¶ 37.)

## II. Argument.

### A. Summary Judgment Standard.

Defendants are entitled to summary judgment because the evidence demonstrates that Solan has not established the essential elements of his claims and "there is no genuine issue as to any material fact" regarding them. Fed. R. Civ. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz*

*USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Solan cannot rely solely upon unsupported conclusory allegations to create a genuine issue of material fact. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).

**B. The State Is Entitled to Summary Judgment on Solan's ADA and Rehabilitation Act Claims.**

In the FAC, Solan alleged claims under Title II of the ADA (Count One) and the Rehabilitation Act (Count Four). (Doc. 6 at 31-33, 37.) Both statutes require that people with disabilities have an equal opportunity to participate in and benefit from state and local governments' programs, services, and activities. *See* 42 U.S.C. § 12132 (Title II); 29 U.S.C. § 794 (Rehabilitation Act). The Court may analyze Count One and Count Four coextensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

Regulations interpreting Title II require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Generally, a public entity must "modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 35.136(a). In this case, these regulations do not apply, however, because Solan has not shown that Foxy's clone is a service animal or that she is necessary for him to participate in and benefit from the mental health services that ASH provides. On the contrary, the record shows that Solan's obsession with Foxy has caused him to reject those services and abuse the staff that provides them.

**1. Solan lacks evidence that Foxy's clone is a service animal.**

When conducting the Particularized Assessment, ASH assumed that Foxy was a service animal. (SOF Ex. E at DF0588, ¶¶ 1-3, 5.) In this lawsuit, however, Foxy's clone is not entitled to the same assumption. Under the ADA, a "service animal" is "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104. Such work or tasks include "helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors." *Id.*

At his deposition, Solan explained how he had trained Foxy to perform "deep pressure therapy" whereby, "if I was getting stressed out, she would guide me somewhere to sit down and she would jump on me, and sit in my lap. And basically hold me there and get me to ground, you know, use her fur as a grounding anchor when I'm getting really overwhelmed and stressed out." (SOF ¶ 32.) But he also admitted that he had not personally trained Foxy's clone as he had Foxy or been "physically present" for her training. (SOF ¶¶ 33-34.) Solan testified that, before cloning Foxy, he had seen research suggesting that a cloned animal would perform the same tasks and have the same behavioral traits as its genetic donor. (SOF ¶ 33.) That research, however, involved "bomb-sniffing dogs in Korea," not a dog who had been *individually* trained to do work or perform tasks for the benefit of an *individual* with a disability. (*Id.*) In the end, Solan has nothing but his subjective belief that Foxy's clone "reincarnated" Foxy to support the claim that she is a service animal. (Doc. 6 ¶ 105.) His belief is insufficient to create a triable issue on that material fact. *Taylor*, 880 F.2d at 1045. For this reason alone, Solan's ADA and Rehabilitation Act claims should be summarily dismissed.

**2. Solan lacks evidence that Foxy's clone is medically necessary for him to participate in and benefit from ASH's services.**

While conducting the Particularized Assessment, ASH determined that any tasks or work Solan may have trained Foxy to perform were not necessary for him to

participate in and benefit from the Forensic Hospital's services, programs, and activities. (SOF Ex. E at DF0589.) As Solan's then treating psychiatrist, Dr. Stephen Morris, M.D., stated in an affidavit at the time: "[I]n a level one psychiatric hospital there is no need for a service animal simply because services are provided by trained people whose job it is to provide these very things as needed to all patients on a regular basis. There is a 24/7 medical staff for that." (*Id.*; SOF Ex. F at DF0147.) At his recent deposition in this matter, Solan offered testimony that bore out Dr. Morris's observation:

> Every [time] I got really stressed out or was having a meltdown or about to have one, I would ask [Psychiatric Nurse Shift Supervisor] Domenick [Aldrich], he was sort of my go-to staff person. . . . So if I needed somebody to talk to, I'd pull him in the back room and he specifically set it up. You—like, if you need to vent so you don't blow up on the unit or do anything, come get me, you can vent to me, so me and [patient] would both do this. We'd go in there and vent. Sometimes if we were having a meltdown, he'd pull us in there and we could do it just with him. And it was supposed to be a safe environment.

(SOF ¶ 57.)

Moreover, Dr. Morris believed that having Foxy at the Forensic Hospital would actually impede Solan's treatment. He observed that Solan had been committed to the Forensic Hospital,

> in part, to learn how to better get along with <u>people</u> so that he can provide for his own needs without alienating or provoking people or otherwise getting himself into trouble with either the law or with friends or with people who work for him in the future. With this in mind, a beloved therapy animal would only serve to get in the way. He already spends about 4 hours a day alone working on the hospital unit's computer (which he says makes him feel capable and competent), and it wouldn't be helpful for him to spend more time alone with his dog. Matthew has said he likes animals better than people, and he says that people are 'tools' to achieve his needs. This needs a reality check.

(SOF Ex. E at DF0589; SOF F at DF0147.)

Unfortunately, Solan did not take advantage of the salutary check that participating in ASH's programs, services, and activities might have provided to him.

Since at least April 2022, one of his ITDP goals has been to "be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports." (SOF ¶ 9; *see also* SOF ¶¶ 39, 65.) Solan has repeatedly failed to make progress toward this goal, however, because "he doesn't see his behaviors and psychiatric symptoms as problematic for him." (SOF ¶¶ 40, 42; *see also* SOF ¶¶ 39, 42-45, 66.) He has also verbally abused ASH staff with racist epithets and threatened them with physical violence on multiple occasions. (SOF ¶¶ 41, 46-47.)

For example, on May 22, 2024, the Phoenix Police Department opened an investigation into Defendant Lea'Cher Carter's allegation that Solan threw hot coffee in her face, threatened to kill her and her unborn child (she was pregnant at the time), and called her "nigger" several times during the incident. (SOF ¶¶ 48-49.) Immediately following the assault, Solan told Aldrich that he "felt like stomping on [Carter's] head and killing her or her unborn child." (SOF ¶ 50.) (Solan eventually pleaded guilty to disorderly conduct under A.R.S. § 13-2904(A)(1), a class 1 misdemeanor, based on these actions. [SOF ¶ 55].) On July 2, 2025, ASH moved Solan from the Cottonwood Unit to the Mohave Unit and placed him on a therapeutic progression plan after an incident in which he was "verbally aggressive" to Defendant Unique Coleman and "also took a swing at her." (SOF ¶¶ 60-68, 62.) In February 2026 Solan threatened to kill another patient who he accused of assaulting him (despite video evidence to the contrary) "by stomping his head in the ground over and over." (SOF ¶ 69.) This violation of the therapeutic progression plan resulted in Solan losing full-mall privileges and regressing to 1:5 supervision privileges. (SOF ¶¶ 70-71.)

Solan has no evidence to suggest that Foxy's clone, had she been allowed to live with him at ASH, would somehow have been able to "prevent[] or interrupt" his "impulsive or destructive behaviors" such that he could achieve the levels that would allow for his early release to the community. 28 C.F.R. § 36.104. On the contrary, as Dr. Morris warned, Solan's obsession with Foxy and her clone have impeded his

rehabilitation. For this additional reason, the Court should summarily dismiss Solan's ADA and Rehabilitation Act claims in Counts 1 and 4 of the FAC.

### C. The Individual Defendants Are Entitled to Summary Judgment on Solan's False Light Invasion of Privacy and Defamation Claims.

#### 1. Solan lacks sufficient evidence to create a triable issue on his false light claim against any one of the Individual Defendants.

In Count Eleven of the FAC, Solan alleges a claim for false light invasion of privacy against Defendants Bowen, Sheldon, Carter, and Coleman for "falsely" accusing him of "engaging or planning to engage in, inappropriate and illegal sexual activities with Foxy." (Doc. 6 at 50, ¶¶ 279-80.) Solan claims that these statements were "made to or in the presence of ASH staff and/or patients." (*Id.* ¶ 280.)

To survive summary judgment on this claim, Solan must have sufficient admissible evidence to create a triable issue that (1) any one of the Individual Defendants "with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing [Solan] in a false light, and (2) the false light in which [Solan] was placed would be highly offensive to a reasonable person in Solan's position." *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 922 (D. Ariz. 2019). Solan lacks such evidence with respect to each of the Individual Defendants.

***Lea'Cher Carter and Unique Coleman***

Solan bases his false light claim against Carter and Coleman on the allegation that "[o]n numerous occasions throughout 2024," each "made various lewd and defamatory statements about Plaintiff and Foxy, in Plaintiff's presence and in front of other ASH patients, including 'you eat dog p***y' and 'you eat dog a**.'" (Doc. 6, ¶ 137.) Solan also alleges that, "[o]n or about May 22, 2024, Defendant Carter openly made these statements and also declared that Plaintiff's 'd*** is so small you need a magnifying glass to see it.'" (Doc. 6, ¶ 138.)

Solan has no evidence beyond his own allegations that Carter and Coleman ever made such statements. In response to Solan's requests for admissions, Carter and Coleman both denied having done so. (SOF ¶ 53 n.3 & Ex. T [Carter]; SOF ¶ 59 & Ex.

W [Coleman].) And at his deposition, Solan effectively conceded that he had no witnesses to corroborate his version of events. (SOF ¶ 53 n.2.)

On August 26, 2024, Solan filed a grievance with the Arizona Health Care Cost Containment System ("AHCCCS") complaining that Carter had verbally harassed him for months before pressing allegedly false charges that he threw hot coffee in her face and threatened to kill her on May 22, 2024. (SOF ¶ 51.) Specifically, Solan accused Carter of "telling [him] in front of other patients [he was] 'nasty,' that [he] 'eat[s] dog ass,' that [he] 'eat[s] dog pussy,' and that his 'dick is so small you need a magnifying glass to see it.'" (SOF ¶ 52.) He also complained that, as a result of Carter's supposedly false accusations, he suffered "an extremely traumatic arrest by Phoenix PD in [his] ASH bedroom, and over a week of agonizing solitary confinement in the county jail." (*Id.*)

AHCCCS referred Solan's grievance concerning Carter to ASH for investigation. (DOF ¶ 53.) The ASH investigator interviewed Solan and asked him if there were any witnesses to Carter's alleged verbal abuse. Solan responded, "'I'm sure there were, but since this happened along [sic] time ago no one is going to remember.'" (*Id.*) At his deposition, Solan affirmed that this quote "sounds pretty accurate. Either they don't remember it or they're afraid to testify. I've asked other patients if they would testify, and most of them either say I don't remember or I don't want to lose my levels." (*Id.* n.2.) Lacking evidence that Carter or Coleman publicized "lewd and defamatory statements" about him, Solan's false light invasion of privacy claim as to them should be summarily dismissed.

***Aaron Bowen***

Solan alleges that "Bowen published the Particularized Assessment letter knowing the same contained statements which implicated Plaintiff in bestiality and animal abuse, and knowing and/or negligently failing to ascertain the fact that such statements were false." (Doc. 6, ¶ 289.) Even assuming that providing Solan with the report of a court-ordered Particularized Assessment constituted "publication," Defendants argued in their Motion to Dismiss that Solan's false light invasion of privacy

claim was time-barred as to Bowen by A.R.S, § 12-821's one-year statute of limitations. (Doc. 15 at 14-15.) Solan's putative false light claim accrued no later than May 6, 2022, when Solan alleges that he was served with the Particularized Assessment letter. (*Id.*) Therefore, to be timely, Solan would have had to have filed his false light invasion of privacy claim against Bowen no later than May 6, 2023. (*Id.* at 15.) He did not do so until he filed the FAC on November 18, 2024. (Doc. 6.)

This Court rejected Defendants' argument, noting Solan's allegations that he did not have any reason to suspect that Bowen had disseminated allegations of bestiality and animal abuse to ASH staff, and thus caused him reputational harm, until 2024, when he alleged that "Carter and Coleman began accusing him of the same falsehoods." (Doc. 31 at 19.) Thus, on a motion to dismiss, the Court could not conclude that Solan's false light invasion of privacy claim accrued before the "public shaming" that he alleged occurred in 2024. (*Id.*) But now that discovery has closed and, as discussed above, Solan has failed to establish an issue of fact that Carter or Coleman made the allegedly "lewd and defamatory" statements he accused them of making, he has lost the accrual argument, and the Court should find that his false light claim against Bowen is time barred.

Even if it were not, however, Solan has failed to produce evidence to create a triable issue that Bowen's statements in the Particularized Assessment letter were knowingly or recklessly false. The letter states that "ASH has received information that you [Solan] have either touched Foxy inappropriately in the past or contemplate doing so in the future," and proceeds to list ten progress notes and incident reports documenting statements from Solan in which he volunteered that he had engaged in inappropriate conduct or ideation toward Foxy. (SOF Ex. E at DF0592-0593.) In this lawsuit (as well as in the prior lawsuit) Defendants disclosed those records. (SOF ¶ 27.) In denying Solan's preliminary injunction motion in the present matter, this Court found that "[t]he regularity and specificity" of Solan's statements about Foxy I "suggest that the State's concerns that, if permitted to have Foxy II live with him at ASH, Plaintiff would have an

inappropriate, counter-therapeutic relationship with his service animal are not merely speculative or contrived, as Plaintiff contends." (Doc. 31 at 28.) Indeed, ASH's concerns are based on the kind of documentation on which it must rely in order to make treatment decisions regarding the patients in its care. With discovery closed, Solan lacks any evidence to create an issue of fact regarding the authenticity or accuracy of that documentation. For this additional reason, his false light invasion of privacy claim against Bowen should be summarily dismissed.

***Michael R. Sheldon***

Solan alleged that "Sheldon published the Denial Letter knowing the same contained statements which implicated Plaintiff in bestiality and animal abuse, and knowing and/or negligently failing to ascertain the fact that such statements were false." (Doc. 6 at 290.) What he appears to be complaining about is the following statement from ASH's letter denying Solan's request to have Foxy's clone live with him in the Forensic Hospital: "[B]ased on your own personal statements, your past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature). In no way will the Hospital facilitate such illicit and illegal behaviors." (SOF ¶ 35 & Ex X.)

Solan has no evidence to support the allegation that this letter was ever published; it expressly referenced his "Request for Service Animal," was addressed to him alone, and was copied only to ASH's counsel, Assistant Attorney General Erin Cohen. (SOF Ex. X.) He complains that "the State summarily denied" his request "without conducting a particularized assessment of [his] request," implying that ASH under Sheldon's leadership uncritically adopted the findings and conclusions of Bowen's Particularized Assessment letter. (Doc. 6 at 2, ll.) Here again, the record supports a different inference.

- The State denied a request for admission that it "did not conduct a Particularized Assessment of [Solan's] request to be accompanied by Foxy II at ASH," explaining that it did assess his request "and determined, for many of the same reasons previously articulated to Solan in the Particularized Assessment, it could not permit entrance to [his] dog." (SOF Ex. BB at 1-2.)

- In response to an interrogatory asking Bowen to describe the information that he provided to Sheldon "pertaining to [Solan], Foxy I, and/or Foxy II" and when he provided it, Bowen responded: "Defendant Sheldon was on the administration team before he became the ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowen's computer drive and all the files it contained." (SOF Ex. Z at 3.)

- In response to a request for admission, Sheldon admitted that, before ASH issued the Denial Letter, he did not investigate or ask ASH administration to investigate Bowen's conclusions in the Particularized Assessment letter. He explained the admission by stating that he was ASH's CEO "when the Particularized Assessment was conducted and aware of the facts and information supporting its conclusions," including "Solan's treatment notes, progress notes and the incident reports pertaining to Solan." (SOF Ex. AA at 1-2.)

As discussed above, Solan has no evidence to create a triable issue about the authenticity or veracity of the documentation that ASH relied upon in deciding to exclude Foxy and her clone from the Forensic Hospital. Therefore, Solan's false light invasion of privacy claim against Sheldon should be summarily dismissed.

**2. Solan lacks sufficient evidence to create a triable issue on his defamation claim against Bowen and Sheldon.**

In Count Twelve of the FAC, Solan complains that Bowen and Sheldon defamed him with statements contained in the Particularized Assessment letter and the Denial Letter, respectively, which, he alleges, implied that he engaged in "bestiality and animal abuse" with Foxy. (Doc. 6 at 51, ¶¶ 289, 290.)[1] "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt or ridicule, or must impeach plaintiff's honesty, integrity, virtue or reputation." *Breeser v. Menta Group, Inc.*, 934 F. Supp. 2d 1150, 1160-61 (D. Ariz. 2013) (quoting *Godbehere v. Phoenix Newspapers, Inc.,* 783 P.2d 781,787 (Ariz. 1989).) To be liable for defamation against a

[1] Solan also alleged that Carter and Coleman defamed him with their alleged statements about his sexualized conduct with a dog. (Doc. 6 at 26 & 52, ¶¶ 137, 294.) However, the Court has not ordered Carter or Coleman to answer Count Twelve. (*See* Doc. 8 at 21, ¶ 5.)

private individual like Solan, a defendant must publish a false and defamatory communication "(a) know[ing] that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580(B) (1977).[2]

Solan's defamation claims fail for the same reasons his false light invasion of privacy claims fail. As an initial matter, for the reasons discussed above, the claim against Bowen is time barred under A.R.S. § 12-821's one-year statute of limitations. Additionally, Solan has no evidence that ASH publicized the Particularized Assessment letter or Denial Letter. Nor does he have sufficient evidence to create a triable issue that Bowen or Sheldon negligently relied on the veracity of the progress notes and incident reports that formed the basis for their concern that allowing Foxy or her clone to accompany Solan at the Forensic Hospital risked facilitating counter-therapeutic and inappropriate behaviors. For these reasons, Solan's defamation claims against Bowen and Sheldon should be summarily dismissed.

**III. Conclusion.**

For the foregoing reasons, Defendants respectfully request that that the Court grant their Motion and issue summary judgment against Plaintiff on the remaining claims of his First Amended Complaint.

Respectfully submitted this 16th day of March, 2026.

Arizona Attorney General's Office

/s/ Ann Hobart
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

---

[2] "Arizona courts follow the *Restatement (Second) of Torts* absent authority to the contrary." *Koepnick v. Sears Roebuck & Co.*, 762 P.2d 609, 617 (Ariz. App. 1988).

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing this 16th day of March, 2026.

COPY mailed and emailed this 17th day of March, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

COPY of the foregoing mailed this 17th day of March, 2026, to:

The Honorable Deborah M. Fine
U.S. District Court, Suite 321
401 W. Washington Street, SPC 15
Phoenix, AZ 85003-2120

/s/ Jordan Kendall