Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56(a)-(c) and LRCiv 56.1(a), Defendants submit this Separate Statement of Facts in Support of Motion for Summary Judgment.

### A. Solan Pleaded Guilty Except Insane to Aggravated Assault and Was Committed to the Arizona State Hospital for Mental Health Treatment.

1. At a Change of Plea hearing before the Superior Court of Arizona, Coconino County, on February 11, 2020, Plaintiff Matthew Solan pleaded guilty except insane to

aggravated assault in Case No. CR2019-00145. (Ex. A [Solan's Deposition Transcript Excerpts] at 9:19-24; Ex. B [Solan's Dep. Ex. 1 (Minute Entries, DF2613-2623)] at DF2613.)

2. Having found a factual basis for the plea and that the plea was voluntary, the Court accepted Solan's plea agreement. (Ex. B at DF2613.)

3. On the aggravated assault count, the Court sentenced Solan "to be imprisoned in the Arizona Department of Corrections for the Presumptive term of seven point five (7.5) years, under the jurisdiction of the Psychiatric Security Review Board, committed to the Arizona State Hospital and be given any treatment necessary to treat the Defendant's mental illness." (Ex. B at DF2618.) This sentence was to date from March 12, 2020, and Solan was to be given credit for 407 days of pre-sentence incarceration. (*Id.*)

4. Solan's pre-sentence incarceration began on January 30, 2019, after he surrendered following an armed standoff with officers of the Coconino County Sheriff's Office ("CCSO") that "lasted several hours." (Ex. C [Solan's Dep. Ex. 2 (CCSO Incident/Investigation Report, DF0494-0504)] at DF0502-504.)

5. Solan's dog Foxy was in his vehicle with him during the standoff. (Ex. A at 20:1-12; Ex. C at DF0502-504.) Before exiting the vehicle and surrendering, Solan shot himself in the leg. (Ex. A at 21:4-22; Ex. C at DF0504.)

6. January 30, 2019 was the last time that Solan "had physical contact" with Foxy. (Ex. A at 22:1-10.)

7. Solan was admitted to the Arizona State Hospital ("ASH") on April 1, 2020. (Ex. A at 23:18-21.) His projected discharge date is August 1, 2026. (*Id.* at 24:3-6.)

8. In April 2022, following "[o]bservation over two years along with psychological testing," ASH eliminated bipolar disorder and ADHD from Solan's psychiatric diagnosis at the time of his commitment to ASH. According to Dr. Stephen Morris, M.D., Solan's psychiatrist in April 2022, "Matthew becomes enraged and explosive when confronted with people telling him to do things he doesn't want to do.

That. . . is not a manic episode. He is able to focus well and sits for hours working at tedious legal work on a computer. That . . . is not ADHD. The diagnosis of 'unspecified' personality disorder is replaced by narcissistic and antisocial as he evidences a clear disdain for rules, laws, and social norms along with manipulation and deceitfulness, and he also possesses an inflated sense of his own importance with a deep need for attention and admiration and no regard, whatsoever, for others except as tools to obtain his needs. Trichotillomania is added because he plucks his eyebrow out unconsciously when tense." (Ex. CC [Solan Dep. Ex. 14, 04/25/2022 Psychiatric Annual Assessment (DF2645-2653)] at DF2653.)

9. As of April 25, 2022, Solan's long-term treatment goals were (1) "to engage in discussion about his psychiatric symptoms, and share one appropriate communication skill he has used with hospital staff"; and (2) "be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports." (Ex. CC at 2652.)

10. ASH has a policy that allows patients like Solan who have been committed to the Forensic Hospital following a plea of guilty except insane ("GEI") to violent felonies to qualify for early release if they can establish that they are no longer a danger to themselves or to others. (Ex. D [Michael R. Sheldon Declaration], ¶ 2.)

11. The policy establishes a sequence of privileges culminating in Conditional Release to the Community that GEI patients may earn based upon their "adherence to treatment plan, absence of any danger to self or other behaviors, acceptance of redirection from staff, and compliance with Hospital rules." (Ex. D, ¶ 3.)

12. The policy provides for three successive levels of privileges inside the secure perimeters of the Forensic Hospital: (1) **Remains on Unit ("ROU")**, in which patients are restricted to their residential unit; (2) **1:5 Mall Privileges**, in which patients are allowed to attend rehabilitation and other activities as outlined in their Inpatient Treatment and Discharge Plan ("ITDP") under a one supervisor to five patients level of supervision;

and (3) **Independent Mall Privileges**, in which patients may be able to use the mall during posted mall hours for leisure time, fresh air, café, and so on. (Ex. D, ¶ 4.)

13. After obtaining these on-Hospital grounds privileges, GEI patients may attain six successive stages (three phases, each containing two levels) of conditional release to the community privileges. While passing through these six levels, patients continue to live and be treated at ASH but enjoy progressively greater and more independent access to off-Hospital activities. (Ex. D, ¶ 5.)

14. ASH allows GEI patients who have acquired Phase 2 privileges or higher to live in the Community Reintegration Unit ("CRU"), which is a 23-bed free-standing unit located off the Forensic Hospital campus, where the majority of GEI patients reside. (Ex. D, ¶ 7.)

15. Ultimately, if a GEI's treatment team and ASH's Special Classification Committee ("SCC") determines that a patient is no longer dangerous and sufficiently stable to remain so after discharge from the hospital, ASH may support the patient's conditional release to the community. (Ex. D, ¶ 6.)

16. In the nearly six years that Solan has been confined at the Forensic Hospital, full mall is the highest degree of privileges that he has attained. As of this writing he has 1-5 supervision privileges. (Ex. D, ¶ 8.)

**B. Solan Sued the State to Be Allowed to Have Foxy Live with Him at ASH.**

17. Upon arriving at ASH in April 2020, Solan requested a service animal accommodation for Foxy to live with him. (Doc. 6, ¶ 67; Doc. 32, ¶ 67.)

18. ASH denied Solan's request, citing security and health and safety concerns, and administrative burden. (Doc. 6, ¶ 67; Doc. 32, ¶ 67.)

19. Solan filed a lawsuit and Motion for Preliminary Injunction with this Court in *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT (DMF), alleging that ASH's refusal to modify its policies and procedures to allow Foxy to live with him at the Forensic Hospital violated the Americans with Disabilities Act ("ADA") ("CV-20-02209").

20. On March 22, 2022, the Court granted Solan's motion and ordered ASH to conduct a particularized assessment to determine whether reasonable modifications could be made to its policies and procedures to allow Foxy to live with Solan at ASH "without fundamentally altering ASH's services." (Doc. 6, ¶ 76; Doc. 32, ¶ 76.)

21. ASH conducted the required assessment and, on May 5, 2022, provided Solan with a letter outlining its findings and conclusions ("Particularized Assessment"). (Doc. 6, ¶ 81 & Exhibit A [Doc. 6 at 64-69]; Doc. 32, ¶ 81; Ex. E [Particularized Assessment (DF0588-DF0595)].)

22. In the Particularized Assessment, ASH set forth six reasons that it was denying Solan's request:

> (1) Even assuming Foxy qualified as a service animal before Solan's index crime and commitment to the Forensic Hospital, ASH did not believe her services were medically necessary in that setting. Solan did not need Foxy to navigate the hospital or to otherwise meet his physical needs, and his treating psychiatrist at the time believed that rather than help him cope with his psychiatric disabilities, having her live in the hospital with him would "get in the way" of his behavioral health treatment.
>
> (2) Even if Foxy qualified as a service animal, Title II requires that while in a public facility she be tethered with a harness, leash, or other tether. However, tethers are ligature risks that in accordance with Hospital policy and Joint Commission regulations, ASH cannot allow at the Forensic Hospital. Therefore, Solan would not be able to control Foxy as Title II requires.
>
> (3) Even if Foxy qualified as a service animal, Title II requires that Solan be solely responsible for her care and supervision while in a public facility. At the Forensic Hospital, however, Solan could not care for Foxy's daily needs without significant assistance from ASH staff. Therefore, Title II does not require ASH to allow her at the Hospital.
>
> (4) Foxy required daily medication for heart disease and osteoarthritis. Consistent with Hospital policy, licensing requirements, and state and federal regulations, however, ASH cannot store or administer veterinary medications. Moreover, one of Foxy's required medications was gabapentin, which though not yet a controlled substance in Arizona is nonetheless commonly abused and should not be readily available to Forensic Hospital patients. ASH policy, licensure, and regulatory

> requirements prohibit Solan from storing and administering *any* medication—much less gabapentin.
>
> (5) Even if Foxy qualified as a service animal, admitting her would fundamentally alter the nature of the Forensic Hospital from an inpatient hospital facility that cares for human beings to one that also must care for an animal. Title II does not require such a fundamental alteration to the Hospital's services, programs, and activities.
>
> (6) Finally, ASH records showed that Solan had expressed to his peers and staff on multiple occasions a desire to marry Foxy and have intimate relations with her. Although Solan minimized or denied making these statements, ASH could not ignore the risk of animal abuse by allowing Foxy at the Forensic Hospital, where at his request, Solan occupied a single room on the Cottonwood Unit.

(Ex. E at DF0588-89.)

23. In large part, ASH based its conclusions in the Particularized Assessment on the opinions of Dr. Morris, which were memorialized in an Affidavit dated April 28, 2022. (Ex. F [Morris Affidavit (DF0146-0149)] at DF0149.) Based on his experience working directly with Solan, and to a reasonable degree of psychiatric certainty, Dr. Morris did not believe that a service animal was clinically appropriate for Solan, for a number of reasons. (*Id.* at DF0146.)

24. According to Dr. Morris, "[a] major overriding issue here is that in a level one psychiatric hospital there is no need for a service animal simply because services are provided by trained people whose job it is to provide these very things as needed to all patients on a regular basis. There is a 24/7 medical staff for that." (Ex. F at DF0147.)

25. For Dr. Morris, "[a]nother overriding issue is that Matthew is here, in part, to learn how to better get along with <u>people</u> so that he can provide for his own needs without alienating or provoking people or otherwise getting himself into trouble with either the law or with friends or with people who work for him in the future. With this in mind, a beloved therapy animal would only serve to get in the way. He already spends about 4 hours a day alone working on the hospital unit's computer (which he says makes him feel capable and competent), and it wouldn't be helpful for him to spend more time

alone with his dog. Matthew has said he likes animals better than people, and he says that people are 'tools' to achieve his needs. This needs a reality check." (Ex. F at DF0147.)

26. Dr. Morris also considered whether Solan is "sufficiently disabled to require a service animal. Can he, for example, navigate the hospital without the service animal and can he meet his needs without a service animal? In Matthew's case, it's difficult to see medical necessity for a service animal. A lot of people feel good inside when their pet looks at them, but is it medically necessary. As noted above, the necessary part is for Matthew to learn how to deal with people in spite of his autistic spectrum disorder. He tells me that he had the dog as a transition object to remove himself from the "co-dependent" relationship he had with his mother. He feels it has been successful to establish himself in another state attempting to do other things apart from his mother. Now, my suggestion to him is to move even further and drop the transition object. He is realizing he is not as disabled as he thought he was and is realizing capabilities he didn't know he had. A transition object is no longer needed." (Ex. F at DF0148.)

27. ASH also based its conclusions in the Particularized Assessment on Forensic Hospital records documenting statements from Solan suggesting that he may have had feelings toward Foxy that were sexual in nature. (Ex. E at DF0592-0593.) For example,

- In a Progress Note dated December 2, 2020, Solan described Foxy as a "co-sovereign" and "like a wife." (Ex. G [12/02/2020 Progress Note (DF0451-0452) at DF0451.]

- In a Progress Note dated April 24, 2021, Solan is reported as saying that he and Foxy "put our tongues in each other's mouth." (Ex. H [04/24/2021 Progress Note (DF0457)].)

- In another Progress Note dated April 24, 2021, Solan is reported as saying that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it. He is also reported to have talked to another patient about sticking his fingers in Foxy's rectum and noted that his hand would not fit because it was too big. (Ex. I [04/24/2021 Progress Note (DF0458)].)

- In a Progress Note dated May 6, 2021, Solan is quoted as saying near the nursing station: "Foxy is my service dog, she is more than a service dog, ASH can't stop me from marrying her. Biden passed a law." Around this

time, he applied for a marriage license for him and Foxy. (Ex. J [05/06/2021 Progress Note (DF0461)].)

- On June 14, 2021, Solan enlisted a number of his peers to participate in a "manumission" ceremony, in which he referred to Foxy as a "woman" and a "private person incarnate" and to himself as a "man" and a "private person incarnate." (Ex. K [Solan Dep. Ex. 13 (June 14, 2021 Manumission Ceremony [DF0441-DF0445])] at DF0444-0445.)[1]

- On August 23, 2021, Solan reportedly told staff that he was saving himself for his fiancée Foxy, "who[] has not consented to intercourse as of yet." (Ex. L [08/23/2021 Progress Note (DF0466)].)

- On September 1, 2021, Solan reportedly told his treatment team that he identified as a Pomeranian and that is why he refers to Foxy as his fiancée. (Ex. M [09/01/2021 Progress Note (DF0467-0468)] at DF067.)

- On November 22, 2021, Solan reportedly told his occupational therapist (in a conversation about his inattention to personal hygiene) that Foxy "licks the inside of my mouth and cleans all the gunk from my teeth." (Ex. N [11/22/2021 Progress Note (DF0477-0478)] at DF-477.)

- In a December 12, 2021 Progress Note, Solan is reported to have said that he wanted a Viagra order so he could have sex with his dog. (Ex. O [12/12/2021 Progress Note (DF0479-0480)] at DF0479.)

- In an Incident Report dated December 11, 2021, Solan is reported as saying about Foxy during an On-Unit Open Art Group on the Pinon Unit: (1) "yeah baby, we are the superior breed my little fox"; and (2) "I cannot wait to touch you my baby Pomeranian." (Ex. P [12/11/2021 Incident Report (DF0436-0437)] at DF0436.)

28. On July 13, 2022, Solan learned that Foxy had passed away. (Doc. 6 ¶ 94; Doc. 32 ¶ 94.)

29. On January 26, 2023, Solan stipulated to dismissal of his case as moot following Foxy's death. (CV-20-02209, Doc. 94.)

---

[1] At his deposition, Solan described the purpose of the manumission ceremony as follows: "I wanted to show Foxy and the world at large that I respected her as an autonomous, sovereign, free moral agent. And because the word "service dog" inherently implies someone in servitude to another. I said I want Foxy to work with me as my equal, not as my slave. So I'm going to have a ritual to manumit her." (Ex. A at 170:4-171:7.)

### C. Solan Sued the State to Have Foxy's Clone Live with Him at ASH and State Employees Individually for False Light Invasion of Privacy and Defamation.

30. Solan alleges that, through cloning, Foxy was "reincarnated" on November 9, 2023. (Doc. 6, ¶ 105.)

31. On June 13, 2024, Solan submitted a request to have Foxy's clone live with him at ASH. (Doc 6, ¶ 117.)

32. At his deposition, Solan explained how he had trained Foxy to perform "deep pressure therapy" whereby "if I was getting stressed out, she would guide me somewhere to sit down and she would jump on me, and sit in my lap. And basically hold me there and get me to ground, you know, use her fur as a grounding anchor when I'm getting really overwhelmed and stressed out." (Ex. A at 145:5-146:4.)

33. Solan admitted that he had not personally trained Foxy's clone as he had Foxy. (Ex. A at 147:16-17.) He testified, however, that before cloning Foxy, he had seen research on "bomb-sniffing dogs in Korea" suggesting that a cloned animal would perform the same tasks and have the same behavioral traits as its genetic donor. (Ex. A at 147:17-148:14.)

34. Solan further testified that "I haven't been physically present for [Foxy's clone's] training, but I've made sure that she received training to do the same things the original Foxy did for when we get back together." (Ex. A at 149:23-150:1.)

35. ASH denied Solan's request to have Foxy's clone admitted to the Forensic Hospital for a number of reasons, including that "based on [Solan's] own personal statements, [his] past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature)." (Doc. 6, ¶¶ 123-124(a).; Ex. X [07/05/2024 Request for Service Animal Denial (DF2626)].)

36. On August 14, 2024, Solan filed this lawsuit complaining that ASH's denial violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. (Doc. 1.)

37. In the operative First Amended Complaint filed on November 18, 2024, Solan also alleged claims for false light invasion of privacy and defamation against former ASH CEO Aaron Bowen, current ASH CEO Michael Sheldon, former ASH Behavioral Health Technician ("BHT") Lea'Cher Carter, and current ASH BHT Unique Coleman. (Doc. 6 at 50, 51.)

**D. Solan Rejects Treatment and Abuses ASH Staff.**

38. Solan has testified that after ASH denied his request to have Foxy live with him at the Forensic Hospital, he could not "dissociate the staff from their exclusion of Foxy no matter how hard I try. It's just, they've become the other, the enemy, and that has poisoned every interaction." (Ex. A at 166:23-167:2.)

39. One of the long-term goals in Solan's ITDP is that he "will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports." (Ex. Y [Solan Dep. Ex.15, 03/30/2023 Master ITDP Review (DF2654-2658)] at 2656.) At a March 2023 Master ITDP Review, Solan is reported to have "declined to engage in any activity that was 'socializing' and cited 'over stimulation' therefore he has 'no intention of participation.' He also stated that his progress toward a lesser restrictive setting should not be based on his social interactions." (*Id.*) At his deposition, Solan testified that he "generally agree[d] with that statement." (Ex. A at 226:25-227:6.)

40. In Progress Notes from a Psychiatric Monthly Medication Review in January 2024, Solan's then treating psychiatrist Steven Kwoh, M.D., wrote that "Solan was seen with his primary treatment team and his attorney and ASH's attorney to review his ITPD. He is not meeting his goals of symptom reduction, accepting recommended treatment as he doesn't see his behaviors and psychiatric symptoms as problematic for him. He's had multiple threats towards staff this past month. He notes that he will request a visit from his cloned dog, Foxy but has had virtual visits that he enjoys. . . . His attorney claimed Matthew wasn't receiving adequate treatment but was read off several instances where staff did try to provide treatment but he was simply asleep. Matthew said he did

want to be woken up and then said he didn't and in reality he doesn't wake up when offered. To prevent this type of behavior, the hospital implements a policy for the vast majority of patients that the dorms are closed for active treatment time. When educated on this simple fact, he and his attorney said this was a threat and they no longer mentioned there wasn't available treatment as they didn't want their 'special' access to his room to be taken away during active treatment times." (Ex. Q [Solan Dep. Ex. 16, 01/31/2024 Progress Notes (DF1528-1530)] at DF1528-29.)

41. The Progress Notes for Solan's January 2024 Psychiatric Medication Review contain this notation for January 23, 2024: "Staff found [Solan's] device plugged into computer. He stated 'I will kill someone today if they come and touch my shit. I will bash 'staff member' in the head.' Matthew emphasized this by punching [h]is hand into his other hand inches from this writer's face. Matthew stated 'you all can't do shit about those Monkey's [sic] coming on the unit. If you can't do this, if you won't stop them then I will do what I have to do. I will break a neck of an innocent person today so I can get sent to prison and away from all of you.'" (Ex. Q at DF1529.)

42. In the Progress Notes for Solan's February 2024 Psychiatric Medication Review Dr. Kwoh writes that Solan "[t]hreatened to 'break Susan's neck and slam her head into the wall' and ongoing racial derogatory statements. He was offered to be seen with his primary treatment team to review his ITDP but he declined to come because he rather sleep. He is not meeting his goals of symptom reduction, accepting recommended treatment as he doesn't see his behaviors and psychiatric symptoms as problematic for him. He had 2 virtual visits from his cloned dog, Foxy and has another coming up this week. He purposely sleeps during the day and requests treatment members come to see him at night. When educated how it's hospital rules of closing dorms during active treatment time during the day so that patients go to groups and not just sleep all day, he considered this a threat saying it was retaliation but then argues he doesn't receive treatment despite being offered during the day." (Ex. R [Solan Dep. Ex. 17, 02/21/24 Progress Notes (DF1548-DF1549)] at DF1548).)

43. At his deposition, Solan testified that what he "had worked out with the treatment team" was "that I'd be asleep during the day, I wouldn't be interacting with patients. I wouldn't be affected by all the noise on the unit. I'd go in my room during the day, and then at night I'd go [to a room designated as a "quiet space"] and work on the computer and stay out of staff's hair." (Ex. A at 90:22-91:12.)

44. In further Progress Notes for Solan's February 2024 Psychiatric Medication Review Dr. Kwoh writes that Solan "[self] describes himself as an 'asshole' at times but says that's the only way he can advocate for himself and gets what he wants. He admits to purposely threatening others to fashion his team or other around him the way he wants." (Ex. R at 1549.) When asked at deposition whether he described himself as an "asshole" to Dr. Kwoh, Solan said "It's possible." (Ex. A at 244:22-245:8.)

45. In the Progress Notes for the May 2024 Psychiatric Monthly Medication Review, Kindra Ochoa, MSN, APRN, PMHNP-BC, that Solan "was scheduled for his ITDP meeting today at 11 a.m. It is the first time meeting with his new treatment team. However, he was sleeping and refused to get up to participate when the unit RN attempted to wake him." (Ex. S [Solan Dep. Ex. 6, 05/30/2024 Progress Notes (DF1651-1653)] at 1651.)

46. The Progress Notes for the May 2024 Psychiatric Monthly Medication Review contain this notation for May 12, 2024: "[W]hen speaking to a unit RN he asked 'What are you going to do to get all these niggers off the unit? Do I have to hurt someone or stab someone to get it done? No one listens to me. I have asked numerous times to get these niggers out of my sight due to them causing me PTSD. They are the ones who have physically hurt me. Every day with apes working here or living here causes me harm. The hospital knows my triggers and continues to have niggers work here. I am sick and tired of seeing these apes walking around here. Their IQ is less than 70, and they should not be able to work. They do not do shit! I am to the point where am going to hurt someone. I will cause someone physical harm. I will either kill someone or send them to the hospital. It will happen!'" (Ex. S at DF1652.)

47. The Progress Notes for the May 2024 Psychiatric Monthly Medication Review also contain this notation for May 16, 2024: Solan "stated to the unit RN that he hates 'niggers, state employees, police, and crackheads'. He also stated that although the unit RN had been able to 'manage him, he would kill a nigger and bathe in their blood'. He went on to describe in detail how he fantasize about killing and mutilating someone." (Ex. S at DF1652.)

48. On May 22, 2024, the Phoenix Police Department opened an investigation into Defendant Lea'Cher Carter's allegation that Solan threw hot coffee in her face, threatened to kill her and her unborn child (she was pregnant at the time), and called her "nigger" several times during the incident. (Ex. D, ¶ 9.)

49. The PPD Report contained a witness statement from Defendant Unique Coleman, who advised that she witnessed Solan throw coffee on Carter, berate her with racial slurs that included "nigger," and threaten to kill her. (Ex. D, ¶ 10.) Another ASH staff member whom the PPD interviewed stated that she heard Solan say that "that black nigger needs to die," referring to Carter. (*Id.*)

50. Dominick Aldrich, the then Psychiatric Nurse Shift Supervisor on duty on May 22, 2024, filed a report stating that, following the incident, Solan told him that he "felt like stomping on [Carter's] head and killing her or her unborn child." (Ex. D, ¶ 11.) Aldrich advised Solan that "throwing coffee onto another person is assault and is DTO [danger-to-others] behavior" and placed him on "ROU till his behaviors no longer demonstrate[d] DTO behaviors." (*Id.*)

51. On August 26, 2024, Solan filed a grievance with the Arizona Health Care Cost Containment System ("AHCCCS") complaining that Carter had verbally harassed him for months before pressing allegedly false charges that he threw hot coffee in her face and threatened to kill her on May 22, 2024. (Ex. D, ¶ 12.)

52. Specifically, Solan accused Carter of "telling [him] in front of other patients [he was] 'nasty, that [he] 'eat[s] dog ass,' that [he] 'eat[s] dog pussy,' and that his 'dick is so small you need a magnifying glass to see it.'" (Ex. D, ¶ 13.) He also complained that,

as a result of Carter's supposedly false accusations, he suffered "an extremely traumatic arrest by Phoenix PD in [his] ASH bedroom, and over a week of agonizing solitary confinement in the county jail." (*Id.*)

53. AHCCCS referred Solan's grievance concerning Carter to ASH for investigation. (Ex. D, ¶ 14.) The ASH investigator interviewed Solan and asked him if there were any witnesses to Carter's alleged verbal abuse. Solan responded, "'I'm sure there were, but since this happened along [sic] time ago no one is going to remember.'" (*Id.*)[2] Psychiatric Nurse Unit Manager Lance Thomason told the investigator "that there was never any evidence that . . . Carter assaulted [Solan] or was verbally abusive to [him]" and that Solan "never provided any dates, times, or witnesses to support his claim." (*Id.*)[3]

54. Based on Solan's and Thomason's statements, as well as Carter's and Aldrich's written reports of the May 22, 2024, incident, the ASH investigator concluded that Solan's grievance was unsubstantiated. (Ex. D, ¶ 15.) ASH advised Solan of this conclusion and of his right to appeal the decision to AHCCCS. (*Id.*) ASH has no record that Solan ever did so. (*Id.*)

55. On March 12, 2026, Solan pleaded guilty to disorderly conduct under A.R.S. § 13-2904(A)(1), a class 1 misdemeanor, based on his actions on May 22, 2024, in *State of Arizona v. Solan*, Superior Court of Arizona, Maricopa County, Case No. CR2024-135130-001 DT, on March 12, 2026. (Ex. U [03/12/2026 Change of Plea Minute Entry in *State v. Solan* (CR2024-135130-001 DT)].)

---

[2] At his deposition, Solan affirmed that this quote "sounds pretty accurate. Either they don't remember it or they're afraid to testify. I've asked other patients if they would testify, and most of them either say I don't remember or I don't want to lose my levels, which I take it to mean they remember something and don't want to say it." (Ex. A at 131:8-20.)

[3] In her Response to Solan's First Request for Admissions, Carter denied that "she made statements, in the Cottonwood day room, to the effect that [Solan] had engaged in sexual conduct with a dog" or that she "made a verbal statement, in the Cottonwood day room, to the effect that the Plaintiff's penis was so small that you would need a magnifying glass to see it." (Ex. T [Carter's 01/20/2026 Response to Solan's First Request for Admissions] at 1-2.)

56. In a March 7, 2025 Incident Report, Aldrich reported that Solan asked him "to talk for a while because he wanted animal assisted therapy. Matthew was informed that nursing does not provide animal assisted therapy. Matthew discussed how if he does not get enough money by suing the state to 'forget how they killed Foxy', then he would 'brutally kill all of them and that is a promise not an idle threat.'" (Ex. V [Solan Dep. Ex. 7, 03/07/2025 Incident Report (DF0688-0689)] at DF0688.)

57. When asked at his deposition whether he recalled this incident with Mr. Aldrich, Solan responded: "Not this particular one. Every [time] I got really stressed out or was having a meltdown or about to have one, I would ask [Psychiatric Nurse Shift Supervisor] Domenick [Aldrich], he was sort of my go-to staff person. . . . So if I needed somebody to talk to, I'd pull him in the back room and he specifically set it up. You—like, if you need to vent so you don't blow up on the unit or do anything, come get me, you can vent to me, so me and [patient] would both do this. We'd go in there and vent. Sometimes if we were having a meltdown, he'd pull us in there and we could do it just with him. And it was supposed to be a safe environment." (Ex. A at 246:11-248:10.)

58. Asked at this deposition whether he thinks ASH killed Foxy, Solan testified, "In a sense, yes. They killed my relationship with her. They denied her from access to coming here, she died, what, two years, more than two years after I got admitted. I could have spent those two years with her." (Ex. A at 251:10-16.) After adopting Foxy, he "wanted to spend the rest of her life with her. I knew she was—I was going to outlive her. I mean, unless I killed myself. And the State took that away from me. They killed—the day I got arrested, I don't call it getting arrested, but that's what the court system calls it. They took me away from Foxy." (Ex. A at 252:3-9.)

59. In this lawsuit, Solan has alleged that, like Carter, ASH BHT Unique Coleman said to him, in the presence of other patients, "you eat dog p***y" and "you eat dog a**" throughout 2024. (Doc. 6, ¶¶ 137, 294.) Unlike Carter, however, ASH has no record that Solan filed any sort of complaint against Coleman based on allegations that she made any such statements. (Ex. D, ¶ 26.) In her Response to Solan's First Request for

Admissions, Coleman denied that she did so. (Ex. W [Coleman's 01/20/2026 Response to Solan's First Request for Admissions] at 1-2.)

60. Solan's complaints to ASH against Coleman date from after he filed the present lawsuit. On June 21, 2025, he filed a complaint alleging that she threatened to slap him and spit in his ear, which he claimed caused an ear infection. (Ex. D, ¶ 17.) Solan noted that Coleman is a Defendant in this lawsuit and complained that her alleged conduct constituted "felony interference with a party to a federal suit." (*Id.*)

61. On July 3, 2025, Solan filed another complaint alleging that on June 27, 2025, Coleman verbally taunted him, noting that she had been told to call the police "if [he] did anything." (Ex. D, ¶ 18.) According to Solan, Coleman's alleged statements "caused me to have a total meltdown and I cut both my wrists & ankles. The nurse wouldn't help me, so I cut myself some more." (*Id.*)

62. ASH investigated Solan's complaints. Based on multiple interviews and the review of security video, the investigator "determined that on 6/21/25, patient Solan was the one being verbally aggressive and making racial comments towards [Coleman]" and that there was no evidence that she caused Solan to have an ear infection. (Ex. D, ¶ 19.) Moreover, video of the June 27, 2025, incident "shows that patient Solan was the one being verbally aggressive towards BHT Coleman and he also took a swing at her," as documented in an ASH incident report. (*Id.*)

63. On August 1, 2025, ASH notified Solan of its findings and conclusion that his complaints against Coleman were unsubstantiated. (Ex. D, ¶ 20.) ASH also advised Solan that he could appeal this decision to AHCCCS. (*Id.*) Instead, in September 2025, he reasserted his claims and named Coleman as a Respondent in a Notice of Claim against ADHS and the State of Arizona seeking $55,000,000.00. (*Id.*)

64. At a Master ITDP Review on July 3, 2025, because of Solan's recent DTS (danger-to-self) and DTO (danger-to-others) behaviors, his treatment team decided to update his ITDP to implement a therapeutic progression plan and transfer him from the Cottonwood to the Mohave residential unit within the Forensic Hospital. (Ex. D, ¶ 21.)

65. According to the updated ITDP, Solan's long-term psychiatric treatment goals as of July 3, 2025 were (1) "Matthew will meet with his BHMP [Behavioral Health Medical Practitioner] weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro-social behavior. This provider will identify coping skills to address symptoms that hinder him from pro-social behaviors;" and (2) "Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports." (Ex. D, Ex. 7 at DF0930.)

66. Solan did not attend the ITDP Review meeting, disagreed with the updated ITDP, and stated: "I will not be working with you on a progression plan, you can put me on a 1:1 or a 2:1 a 3:1 or beat the shit out of me." (Ex. D, ¶ 22.)

67. The progression plan provides that, so long as Solan refrains from aggressive behaviors (e.g., verbal threats, statements of harm, intimidating others, posturing) and accepts staff redirection without statements of harm to others or posturing at staff, over set periods of time he may pass progressively from ROU, to 1:5, to full mall privileges and more and more computer time. (Ex. D, ¶ 23.)

68. The plan also provides that Solan will be returned to the initial period in the progression if he engages in imminently violent or directly threatening behaviors and will be downgraded to the beginning of the previous period of the plan if he engages in aggressive behavior, i.e., "[i]mpulsive statements of harm, damaging property, throwing food, or other unacceptably aggressive behaviors including the use of hate speech." (Ex. D, ¶ 24.)

69. On February 3, 2026, Solan threatened to kill another patient who he accused of assaulting him (despite video evidence to the contrary) "by stomping his head in the ground over and over." (Ex. D, ¶ 25.)

70. On February 5, 2026, Solan's treatment team met with him to discuss the consequences of his verbal threats to a peer. (Ex. D, ¶ 26.) They informed Solan that, "per his progression plan, he would be reset to the beginning of Period 4 due to statements

of harm." (*Id.*) Solan's treatment team further confirmed that "threats to harm others, and particularly those with a clear plan stated, will not be tolerated." (*Id.*)

71. On February 5, 2026, Solan had attained full-mall privileges. By being reset to the beginning of Period 4, he regressed to 1-5 supervision privileges. (Ex. D, ¶ 27.)

72. Exhibit Z through Exhibit CC hereto are, respectively, Bowen's 01/20/2026 Answers to Solan's First Set of Non-Uniform Interrogatories (Ex. Z); Sheldon's 01/20/2026 Responses to Solan's First Set of Requests for Admissions (Ex. AA); and the State's 01/20/2026 Responses to Solan's First Set of Requests for Admissions (Ex. BB).

Respectfully submitted this 16th day of March, 2026.

Arizona Attorney General's Office

/s/ Ann Hobart
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing this 16th day of March, 2026.

COPY mailed and emailed this 17th day of March, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

COPY of the foregoing mailed this 17th day of March, 2026, to:

The Honorable Deborah M. Fine
U.S. District Court, Suite 321
401 W. Washington Street, SPC 15
Phoenix, AZ 85003-2120

/s/ Jordan Kendall