# EXHIBIT A

**In The Matter Of:**

*Solan vs.*

*The State of Arizona*

---

*Matthew Phillip Solan, Videotaped*

*February 4, 2026*

---

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona 85020*

*602.266.6535 Office 877.266.6535 Toll Free*

*www.glennie-reporting.com office@glennie-reporting.com*

Original File 0202426 MS.txt

**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Matthew Phillip Solan, ) Case No. CV24-02061-JJT-DMF

Plaintiff,

vs.

The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,

Defendants.

VIDEORECORDED DEPOSITION OF MATTHEW PHILLIP SOLAN

February 4, 2026
10:06 a.m.
Phoenix, Arizona

GLENNIE REPORTING SERVICES, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130
602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885



I N D E X


| WITNESS | PAGE |
|---|---|
| MATTHEW PHILLIP SOLAN | |
| By Ms. Hobart | 6 |


INDEX TO EXHIBITS


| Description | | PAGE |
|---|---|---|
| Exhibit 1 | Minute Entries DF2613-2623 | 11 |
| Exhibit 2 | Coconino County Sheriff's Office Incident/Investigation Report DF0494-0504 | 17 |
| Exhibit 3 | Arizona State Hospital Forensic Patient Privileges DF0612-6-21 | 32 |
| Exhibit 4 | Arizona State Hospital investigation DF0731-736 | 45 |
| Exhibit 5 | Complaint, Grievance, and Appeal Form(s) DF0694-705 | 57 |
| Exhibit 6 | Progress Notes DF1651-1653 | 80 |
| Exhibit 7 | QMS Incident Reports DF0688-689 | 96 |


//



INDEX TO EXHIBITS (continued)


| Description | | PAGE |
|---|---|---|
| Exhibit 8 | Progress Notes DF0935 | 98 |
| Exhibit 9 | Letter from Mr. Solan to Kristi Baxter DF0749-750 | 104 |
| Exhibit 10 | Letter to Mr. Solan from Mhya Mitchell DF0725-730 | 124 |
| Exhibit 11 | Progress Notes DF0448-450 | 136 |
| Exhibit 12 | Arizona State Hospital Animal Assisted Activities & Animal Assisted Therapy DF2591-2593 | 155 |
| Exhibit 13 | QMS Incident Reports DF0441-445 | 171 |
| Exhibit 14 | Annual Psychiatric Assessment 04-25-2022 DF2645-2653 | 182 |
| Exhibit 15 | Master ITDP Reviews (Scheduled) DF2654-2658 | 220 |
| Exhibit 16 | Progress Notes DF1528-1530 | 233 |
| Exhibit 17 | Progress Notes DF1548-1549 | 242 |
| Exhibit 18 | QMS Incident Reports DF0680-681 | 253 |




VIDEORECORDED DEPOSITION OF MATTHEW PHILLIP SOLAN

The videorecorded deposition of MATTHEW PHILLIP SOLAN was taken on February 4, 2026, commencing at 10:06 a.m., at Arizona State Hospital, Wildflower Room, 501 North 24th Street, Phoenix, Arizona, before JENNIFER HONN, a Certified Reporter, Certificate No. 50885, for the State of Arizona.

* * * * *

APPEARANCES:

For Plaintiff:

Matthew P. Solan, in propria persona
C/o Arizona State Hospital
501 North 24th Street
Phoenix, Arizona 85008
Legal@fox-ranch.com

For Defendants:

Ann Hobart, Esq.
Jordan Kendall, Esq
Assistant Attorney General
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 North Central Avenue
Phoenix, Arizona 85004
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov

Also Present:

Tony Gonzales, Videographer
Shelby Yates

A. I don't even know what we're getting today so it would probably be 10 minutes at the most.
**Q. Okay. But you don't have -- I mean, you don't have to bolt it. I mean, shall we -- shall we count on, I think we should count on at least a half an hour.**
A. I wouldn't need it, but you can do that if you want. That's --
**Q. Yeah.**
A. It doesn't matter to me.
**Q. Yeah. Everybody can use the ladies' or, you now, the restroom. And so why don't we plan on stopping at about 12 and then restarting again at 12:30.**
A. Okay.
**Q. Will that work? Okay.**
**Now -- now we -- I will get into my questions unless you have any -- any questions about -- about the proceedings here before we begin?**
A. I don't think so.
**Q. Okay. Now, in February 2020, you pled guilty except insane to a charge of aggregated assault; correct?**
A. I don't think it was in February. Might have -- I don't know when the plea agreement was signed. I think the minute entry said March of 2020. It was guilty except insane, yeah, one count of aggravated assault.
**Q. And -- and then you -- you pled guilty -- and**



**could have been February, could have been March --**
A. Somewhere around there.
**Q. -- the order might -- the order might have been in March, I believe. But -- but at any rate -- but at that time you -- you -- you pled guilty --**
A. No.
**Q. -- to a -- to a charge of theft of a means of transportation; correct?**
A. I don't recall what I pled for. Now, I know the minute order found me guilty in that, but I don't recall what I pled for.
**Q. But your -- your understanding is that you were found -- that there was a conclusion that you were guilty of a theft of means of transportation?**
A. Yeah. I think the court concluded that.
**Q. Now, as to the charge of aggravated assault, you were sentenced to imprisonment for seven and a half years at the Arizona Department of Corrections, but under the jurisdiction of the psychiatric security review board.**
A. That's not my understanding. I do know the minute order said something to that effect. Said something to the effect that I was prisoned in DOC, confined in Arizona State Hospital to be given all treatment necessary to treat the defendant's mental illness.



But I don't think that complied with the law at the time and then the law changed in, what was it, 2003. So it's not my understanding that I've ever been under DOC. But I think there was some confusion coming out of that order.
**MS. HOBART:** Can you mark this as Exhibit 1.
(Deposition Exhibit 1 was marked for identification.)
**MS. HOBART:** And for the record, this is a document that is dated February 25, 2020. It's filed in the Superior Court of Arizona in and for the County of Coconino in the State of Arizona versus Matthew Solan. And there are a number of case numbers that this order concerns.
Also for the record the Bates range on this document is from DF2613 to 2623.
**BY MS. HOBART:**
**Q. And on the first page of this document, right at the bottom of the page, the last paragraph, it says, "The defendant offers a plea of guilty except insane to Count II, aggravated assault in CR 2019-0014 [sic], and guilty as to Count I, theft of means of transportation in CR 2019-00357."**
**Do you see --**



A. Yes.
**Q. -- where that's written? Did I read that correctly?**
A. "Defendant offers a plea of guilty except insane to Count II, aggravated assault in CR 2019-00145 and guilty as to Count I, theft of a means of transportation in CR 2019-00357."
**Q. Uh-huh.**
A. Yes, I see that.
**Q. Okay. And then on the next page, it's ordered, scheduling entry of judgment and sentencing on March 12, 2020, at 8:30 a.m. Do you see where that's written?**
A. That's the dates that I remember, yes.
**Q. Okay. So that's -- that's when the entry of judgment and sentencing will be imposed?**
A. Right.
**Q. Okay. Now, if you'll flip to DF2618, can you read the -- what the sentence is? This is at the -- in the middle of the page.**
A. Sure. "Defendant to be imprisoned in the Arizona Department of Corrections for the presumptive term of 7.5 -- 7.5 years under the jurisdiction of the psychiatric security review board, committed to the Arizona State Hospital, and be given any treatment necessary to treat the defendant's mental illness."

A. Okay.
**Q. So if we need to I'll just get out the police report and maybe that would be helpful. So --**
**(Deposition Exhibit 2 was marked for identification.)**
**BY MS. HOBART:**
**Q. What the -- what our court reporter has marked as Exhibit 2 is a -- is an incident investigation report from Coconino County Sheriff's Office in the -- in the criminal matter of 2019-00145, which I believe is the number that we saw that corresponds to the charge of aggravated assault.**
A. This one says 00447 on the first page.
**Q. Well, I'm -- I'm looking at the -- at the -- at the mark --**
A. The 145?
**Q. Yeah, the CR -- this --**
A. That number?
**Q. -- this would be -- this would be the case number.**
A. Right.
**Q. Yeah, this would be a number for the investigation. The case number -- the actual criminal case number would have the CR prefix.**
A. Uh-huh.



**Q. And so it corresponds to the -- if you go back to our Exhibit 1, it's the -- the third from the bottom in the cause numbers -- or third from the top, rather. And that's the one that corresponds I believe to the aggravated assault charge.**
A. Uh-huh.
**MS. HOBART:** Now, if you'll turn -- for the record this collection of information and notes and supplemental notice on this investigation has the Bates number DF0494 to DF0505 -- 0504, excuse me.
**BY MS. HOBART:**
**Q. Now, if you would turn to page DF0498.**
A. Uh-huh.
**Q. I'm sorry. If we look back on -- to DF0497, that's where we get the -- the date of -- of January -- January 30, 2019. And then is the -- is the -- is the time that this -- the time that this narrative begins.**
A. Okay.
**Q. And information regarding your connection with the police begins in, "Investigation continued at about 11:20 in the morning." And there's highlighted text here, "Merle arrived another at my location and we conducted a confrontational with Matthew."**
**Do you understand that to be you, that you're the Matthew?**



A. In this case?
**Q. Yes.**
A. I assume so.
**Q. "The call was audio and video recorded both by my Axon body camera and department-issued digit recorder" -- excuse me, "digital recorder. While on the phone call I heard Merle state, 'I can't have you pulling guns and all that kind of crap.' Matthew responded by saying, 'Then don't make me.'"**
**Okay. "Matthew made statements regarding having a shootout with the police if he was contacted."**
**Do you recall having -- making that statement?**
A. Not specifically. I never agreed that any of this stuff ever happened. I was in the county jail. I was locked in solitary confinement being beaten by the officers and I signed whatever piece of paper they put in front of me to get out of there.
But I never agreed that any of this actually went down the way that the police had developed their narrative.
**Q. Okay.**
A. I believe I've read this before, but I don't think any of this was actually ever adjudicated. I would never could agree that any of this went down the way the police described it.



**Q. Even on the day you were taken into custody?**
A. I mean, there was a standoff and I shot myself.
**Q. Okay.**
A. And I was planning to kill myself, but I didn't want Foxy getting hurt in the car, so --
**Q. Was Foxy in the car with you?**
A. Yeah.
**Q. Was -- was it a car or was it a truck?**
A. Probably the only reason I'm not dead right now.
**Q. Okay. Was it a car or truck?**
A. It was a small Dodge Dakota that we had just bought for a truck.
**Q. Okay. And --**
A. I mean, I drive big trucks. So I consider that, effectively. It's -- I don't think it's even classed as a truck on its registration. It's four cylinder, little tiny thing. I used it as a car.
**Q. Okay.**
A. So I always just called it "the car," because I, you know, driving military trucks and big rigs out on the property, so --
**Q. Gotcha. Gotcha. I'm just not familiar with -- with --**
A. Yeah.
**Q. -- what -- what that -- what size that would be.**

A. Dodge Dakota is about as small as they come.
**Q. Okay. Okay.**
A. Yeah.
**Q. But is it built by -- is it shaped like a pickup?**
A. Yeah, it's shaped like a pickup, but interior and performance-wise, it's basically a sedan.
**Q. Gotcha. Okay. And Foxy was in the car with you at that --**
A. She was in the back seat.
**Q. In the back seat, okay. And why did you shoot yourself in the leg?**
A. I shot myself in the femoral artery to kill myself. Because I had been tortured by the police in jail before. And I figured being dead would be way better than being in jail for false charges.
And I was right. I should have killed myself. I would have been a lot happier than the torture I've experienced in jail in here.
But I mean, if there's any good in me being alive you can thank Foxy for that. At the time she was the only reason I was keeping myself alive.
**Q. Was Foxy always with you?**
A. Pretty much except when I was in jail, which was torture. She saved my life on many occasion.



**Q. Now, assuming -- assuming that this was the day, January 30 of 2019, is that the last day that you would have been in the presence of Foxy?**
A. No. She came to court at all of the hearings and sat right behind me. At one point we got an order for her to sit in my lap when we were at the hearings, but the police objected to it so strongly the judge revoked his own order and told her to just sit behind me.
But -- so that was the last time I had physical contact with the original -- Foxy's original incarnation. I've had no physical contact with the new one. But substantively identical in every respect.
**Q. So in what hearings did -- did Foxy come to the --**
A. Every single pretrial hearing in this case.
**Q. Okay.**
A. Yeah. I don't think she missed any of them. If she did it was only one of them, but I think she was there at every one.
**Q. Who brought her there?**
A. I think it was the woman they're talking about here, Amanda.
**Q. Mm-hmm.**
A. She was driving that day. I left Foxy with my current agent, Joseph Cowsert, for a while. So at the



beginning he might have brought her, but Merle's son, this whole family, they're a bunch of meth addicts and meth dealers, and I didn't feel that she was safe in town, so I had sent her to live with Amanda's mom because she had a bunch of Chihuahuas that Foxy liked playing with.
And she was -- she loved Foxy as much as I do. She was just really obsessed over her little dogs. So I sent Foxy to Flagstaff and from then she would come in with Amanda and Foxy at all the hearings.
**Q. And when we had the -- the first case back in '21 and '22 and I guess into '23 a little bit, that was the woman that --**
A. Yes.
**Q. -- that had Foxy; correct?**
A. Yes.
**Q. The woman in Flagstaff.**
**You were admitted to the Arizona State Hospital on April 20, 2020? Does that sound right?**
A. No. I was here on April 1st, because I remember, because it was April Fools' Day.
**Q. It was. Okay.**
A. Sick joke from the State.
**Q. Okay. Okay.**
A. They told me I'm, quotes, "coming to a



hospital," found out this isn't exactly a hospital. Yeah. April 1st.
**Q. And your -- and your -- well, that make perhaps more sense, because your projected discharge date from the Arizona State Hospital is August 1 of 2026; correct?**
A. Yes.
**Q. So that's essentially --**
A. Yeah. If you subtract the back time the judge gave, it comes out -- and factor in a quarter of a year for the leap years, it's exactly August 1. So yep, so I've been preparing for discharge. But I mean ASH is so understaffed they're not doing anything to prepare me for discharge, so I set up outpatient plans and getting ready. But this whole thing seems to have been for nothing. No treatment here.
**Q. But it sounds like, though, you anticipate that you will -- you will serve the entirety of the sentence here?**
A. Holly's getting off of the case, she's retiring. So I'll probably getting in touch with either another private attorney or the Flagstaff public defender's office. I don't know if anyone else will be able to get anything wrapped up in six months. It's possible, but barring that, yeah, I'll be out of here on April 1 -- or August 1.

But if any -- if I ever said anything similar to this it was when I was having a full-blown meltdown. I don't talk like that. I mean, I -- not in -- not even the words, but I mean, the content, it's just rambling. When I'm having a normal conversation with people, I don't ramble. And I definitely don't use that language.

**Q. Okay. "On May 16, 2024, a social worker was meeting with another patient in the unit conference room and Matthew demanded to use the room. He yelled, 'Get her the fuck out. I need to make a legal call." Matthew was reminded that the room was to be used for staff when needed. He stated, 'Fuck her. I will bang on the door until she fucking leaves.'**

**"Matthew told the unit RN that he always hated that fucking cunt, the social worker, and he wants her dead. He asked if the unit RN could call in a hit and have her killed. He stated to the unit RN that he hates niggers, state employees, police and crack heads. He also stated that although the unit RN had been able to manage him, he would kill a nigger and bathe in her blood.**

**"He went on to describe in detail how he fantasizes" -- "how he fantasizes about killing and mutilating someone."**

A. In the next line it says, "Up all night yelling



on the unit using foul language." I'm not up yelling normally. If I'm yelling and saying things like this, it's during a meltdown. I don't remember saying any of that. But if I had a meltdown, if I got triggered and I just, you know, I don't recall any of this.

**Q. Is the -- is what you had been describing as your quiet place, other than your room? Could it also be called the unit conference room?**

A. No. The unit conference room is the -- so most of the units on this part of the forensic campus, they have the one long dayroom, and then at the end there's two roughly identical-sized group rooms with windows and a door.

And if you're facing the nurses' station looking at them, on all the units I believe the conference room would be on your right, and then the media room would be on your left. And that's where they have TVs, computers, and on the right was the conference room, where they do the ITBP meetings and various, what they called staffings.

**Q. Uh-huh.**

A. Off to the side there was a little tiny room about the size of a closet. It wasn't much bigger than a single patient bathroom here.

And that was originally set up as a quiet space



before I got here. That's what they told me. And then later they put one computer in there and it would be a place where you could turn off the lights, go work on the computer with one person in there, and if you wanted to let someone else in, they could stand, but there was one chair.

So that was what I had worked out with the treatment team, to be I'd be asleep during the day, I wouldn't be interacting with patients. I wouldn't be affected by all the noise on the unit. I'd go in my room during the day, and then at night I'd go there and I'd work on the computer and stay out of staff's hair.

And that worked great until they locked me out of the room and I just didn't have any cope -- that was my last coping tool. I mean, out in public Foxy does wonders for keeping me grounded and out of trouble.

But I've lost all my coping tools and that -- the best thing I could do is stay away from people. And they took that away and there's nothing left.

**Q. So this was made up, what's -- what's here in --**

A. I don't know.

**Q. You could have said this, but --**

A. I don't recall saying -- if I was having a meltdown I could have done any number of things. But I don't recall specifically making any of these particular



statements. And I mean, they're talking about yelling, the whole thing sounds like just rambling.

So if they recorded this accurately, and I don't know how they would. It looks -- when staff aren't recording you, that time the audio recording wasn't working on the camera, somebody went back and typed this up after whatever happened.

If there was a code gray or something, they would come in and type it up, potentially a half an hour later. So I don't know if they added to it. I don't remember saying these things.

**MR. KENDALL:** Ann, we're at 12:07 p.m.

**MS. HOBART:** Okay. Well, we will pick up with May 22, 2024, when we return after lunch.

**THE WITNESS:** Okay.

**MS. HOBART:** Thanks.

**THE VIDEOGRAPHER:** We're off the record. The time is 12:07 p.m.

(Recess from 12:07 to 12:44 p.m.)

**THE VIDEOGRAPHER:** We're back on the record. The time is 12:44 p.m.

**BY MS. HOBART:**

**Q. Okay. Mr. Solan, before our lunch break we were talking about Exhibit 6, and we were about to talk about the entry relating to the events of 5-22-24. And this is**

so we've been in negotiations on how she's going to offload the cases that she's working on for me on to other people.
But I'm handling this one effectively a hundred pro se anyway, so she's just been providing some advice. But I'm mostly handling it, but she's doing the criminal cases -- or case.
**Q. I just want to bring your attention to DF0727.**
A. Definitely didn't see these. These aren't the type of papers that the CJ office returns to us. Everything they return is on this letterhead.
**Q. Right.**
A. I believe I saw this as part of your initial disclosure when I was sifting through it. It's a banker's box filled end to end with papers. Still going through it, but that was the first time I had found out that ASH had even done anything with it. Yeah.
**Q. Okay. Except, you know, he says, "I interviewed the patient on 10-17-24," the patient being you, "in regards to this matter on the Cottonwood unit with quality coordinator Mhya Mitchell, and patient advocate Terra Morgan present."**
**And this was on 10 -- October 17, 2024. Do you not remember having an interview with Damon Broadnax, Mhya Mitchell and Terra Morgan about this matter?**



A. I mean, I met with them all the time for various things. If we talked about it at all it was probably in the context of a few different -- they come and talk me a couple different things at the same time.
**Q. A couple of your different --**
A. It's possible we had had a brief discussion on it, but I wouldn't call it an interview. It was just a -- they asked, I mean, they come in and ask some questions. Sometimes they make it a formal interview. Sometime they'll just run into me in the hall and say, Hey, can we can you a few questions?
**Q. Well --**
A. I don't recall there being a formal interview in this. But they probably did ask some questions.
**Q. Well, patient advocate was there, Terra Morgan. The patient -- according to this --**
A. Uh-huh.
**Q. -- so it sounds somewhat formal. That they would bring in a patient advocate. "And the patient asked me," that is you, "why are you here? AHCCCS should be investigating this."**
A. Yeah. So it's definitely possible they came and asked some questions. I don't recall doing any formal -- because sometimes they'll do an investigation and they'll bring out their phone and they'll record it and they'll



take notes and they'll make a big to-do out of it. Sometimes they'll just, you know, it will be they'll catch me in the hall or stick their head in my bedroom --
**Q. Okay. No, I --**
A. -- I don't remember.
**Q. Okay. You don't remember --**
A. Yeah.
**Q. -- any of this. Okay. Okay. How about this? "He stated that Lea'cher Carter assaulted him and was verbally abusive towards him for a long time. I asked him was there any witnesses to this abuse, and he stated, 'Oh, I'm sure there were, but since this happened a long time ago no one is going to remember.'"**
A. I don't recall saying that. But I mean, that sounds pretty accurate. Either they don't remember it or they're afraid to testify. I've asked other patients if they would testify, and most of them either say I don't remember or I don't want to lose my levels, which I take it to mean they remember something and don't want to say it.
**Q. "I asked him if BHT Carter is still working on the Cottonwood unit and he stated, 'No.'"**
**This is as of October 17, 2024?**
A. My understanding is she -- well, when I came back from jail she was still on the unit, but they had



told her to stay in the nurses' station and not interact with me.
And then like I said, Aquilina would come out and vent about having to be in there listening to Lea'cher just drone on and complain and not want to do any work, so she'd come out and vent to me, and she told me that she had complained repeatedly to her supervisor about Lea'cher's conduct and they eventually moved her to Saguaro.
And so that was sometime around this point. So I think that happened in -- by the end of September or early October, they'd moved her to Saguaro and then we lost communication with her after that.
**Q. Well, I mean, she's -- she's going to testify that she asked to get off of Cottonwood to get away from you?**
A. It's possible, but that's not what Aquilina told me and I asked them to remove her and Aquilina asked them to move her. Because she was harassing me. She was making faces at me through the window, making gestures at me, even though she wasn't allowed on the floor. She was still -- every time I'd walk by she'd be making faces at me and pointing at me and laughing.
She's just been trying to provoke and harass me as long as I've known her. Sometimes she succeeded in

don't think this is what the Arizona taxpayers want to be spending their money on. Spending a quarter million dollars to do what? I'm not getting any treatment here. Nobody is.

**Q. You talk about that your -- your preferred modality -- wait a minute -- where is that? -- well, let's focus on the deep pressure therapy. You said that Foxy provides deep pressure therapy.**

**What is that?**

A. Deep pressure therapy is a task that service dogs can be trained with for autism and PTSD and a few other conditions, where they sense that their handler is getting stressed out and they apply deep pressure, meaning they will sit on their owner or press against them.

So usually when I had Foxy do that, you know, if I was getting stressed out, she would guide me somewhere to sit down and she would jump on me, and sit in my lap. And basically hold me there and get me to ground, you know, use her fur as a grounding anchor when I'm getting really overwhelmed and stressed out.

I could -- she'll sit in my lap and hold me in one place, and I'll put my hands on her and feel her fur and she'll sit in my lap and hold me in one place and I'll put my hands on her and feel her fur, and it's a



grounding anchor.

So deep pressure therapy is what it sounds, a dog goes out of its way to apply pressure to your body and help you ground.

**Q. And how did -- and you -- you taught her to do that?**

A. Yeah. So I read various books on training service animals, and -- and the different things that be could be done for autism and PTSD. And I've been training dogs since I was a teenager. One of my neighbors on Cape Cod would rate -- he was breeding White Wolf and white German Shepherd hybrids, very obstinate, big, strong-willed dogs.

So I learned how to train difficult animals at a young age. And when I adopted Foxy, she was eight years old and just as strong-willed and obstinate as a German Shepherd-Wolf hybrid, but way smarter.

So we started working in 2015 and I already know how to -- how to train a dog, so I just had to learn what tasks would be appropriate for a service animal.

And once I got her a basic set of service animal tasks and was able to start taking her out in public, I mean, I was completely self-isolated before that. I'd spend all day in my aunt's condo, my mom would barely be able to drag me out for half an hour every morning to go



to breakfast, try to get me to socialize, but it just wasn't working.

So when I got Foxy, and I saw how happy she was being around people and going out in public, I wanted to see her smile. So I, you know, I knew I needed help and she wanted to go out in public, and I knew I needed to start working on socialization, so I trained her to be a service animal.

And we started going out in public and it just opened up my world. And we came out to Arizona to start a business and try to start a life where I could be somewhere independent, and she was instrumental in getting me as far as I did.

Ran into a lot of problems. But I wouldn't have gotten anywhere near as without her, she's been amazing.

**Q. Now, you haven't -- you haven't trained Foxy 2?**

A. No. So when I got her cloned I did some research on cloning. There's a paper that came out of Korea, in one of the academic papers. They were training -- I believe they were bomb-sniffing dogs, and one of the problems with training bomb-sniffing dogs or any police dog, is you don't really know if it's qualified for its task until it's gone through lots of expensive training. And it has to pass that end exam.

They were wasting a lot of money training



bomb-sniffing dogs in Korea, because there were a lot of rejects from the program. So they did an experiment. They wanted to see if we cloned a dog, would it carry on its propensities for sniffing and its behavioral traits of its genetic donor.

And they found not only was it just as good as a bomb-sniffing dog, but its personality. Everything about it was almost identical. If it was an alpha it remained an alpha. Its personality traits were -- like they could also not tell the dogs apart from reading this paper.

So, I mean that was a strong incentive to clone Foxy. I worked with lot of dogs in my day and I've never met one that was as smart and as quick and adept at learning as Foxy.

So I -- I sold my house. I put everything on the line to get her back. She's the most valuable thing in my world. And I made myself homeless for her. But it was worth it. And when we got her back, obviously she was a two-month old puppy when she got back to Arizona. I had her flown in from the lab in New York where she was born.

Joseph took custody of her as soon as she got to Arizona and started basic house training, got her vaccines and as soon as she was old enough and fully vaccinated where she wouldn't get sick being around other

dogs, we sent her to training at All Dogs On Leash in Prescott to formalize all of her basic obedience and advanced obedience and get all the groundwork training done for service dog social adequate task training.

And then under their instructions Joseph continued her training to work on all the tasks that I had ahead described to him that Foxy had previously done for me.

And he was able to carry that out. He's old Arizona ranching family, he used to raise coyotes and cows and stuff, going back to the '60s, he's like 75 or something. He's been working with dogs many times longer than I've been alive. And so he's done a good job continuing the training that All Dogs on Leash set him to do.

And he knew Foxy, the original Foxy, he was the first one she went to live with out here when I got arrested in 2019. So, now I haven't trained this Foxy, but I've been deeply involved in the intricacies of her training and care, giving full instructions to All Dogs On Leash and Joseph have been operating as my agents.

They're not doing anything other than under my express direction. So I haven't been physically present for her training, but I've made sure that she received training to do the same things the original Foxy did for



when we get back together, and that it's been maintained because I know the original case, Foxy went to live with Angela and she didn't have her training maintained, but now -- now she does. So she's ready for me when we get back together.

**Q. Which won't be too long now.**

A. Yeah. Could be sooner.

**Q. Litigation is long.**

A. Yeah.

**Q. Litigation is long, as you know.**

A. Yes.

**Q. And there's always appeals?**

A. Yep. Could be sooner if the hospital did the right thing, but I don't expect that either.

**Q. Well I think there's the dispute about what the right thing is.**

A. That's why we're here.

**Q. Exactly. Exactly.**

**Now, you -- you talk about -- I wanted to find that phrase again, that you're interested in treatment modalities of animal-assisted services. Mr. Solan's preferred treatment modalities of animal-assisted services. That's what you described in this paper.**

**So you've made a request to have Foxy 2 admitted to ASH as a therapy dog as opposed to a service animal**



**specifically?**

A. No. I've made multiple different requests for different things, my primary overarching request is that Foxy come and live with me full-time as my autism and PTSD service dog.

Prior to this Foxy's incarnation, I had back in 2021, I believe, filed my first appeal with AHCCCS over the treatment plan not covering appropriate autism services, but the main issue I -- I focused on in that appeal was that ASH had previously had animals as therapy. They had photographs of the patients playing with the dogs up on the wall over at CRU. And -- when I was over there for the COVID recovery unit.

So I complained that ASH was not bringing that back. You know, COVID was wrapping up and they weren't making any plans to get animal therapy, and I had argued successfully that it was an important part of my autism habilitation here, and that ASH should at the very least add it to the treatment plan.

Even if they're claiming it's not available, the Administrative Code says the unavailability of a service isn't an excuse to not add it to the plan, if it's necessary. And the judge agreed with me and said it should be added and that ASH should work towards getting it.



And they did. You know, it took them a while but they got a therapy dog, her name was Starla, and she came in for five or 10 minutes every month or so. And we had positive interactions. She was very old and not in good health, so she basically just sat there and looked depressed the whole time, which I thought was kind of sad, and then a lot of the patients would crowd around her, and, you know, that was kind of stressful for me.

But I did enjoy seeing her and we got along fine. And then she passed away in 2023 and they never brought in another dog. And I started complaining repeatedly about it. Said, look, we know you can find these dogs. Just find one for me.

And then, you know, when Foxy finished her service dog training, Mike Sheldon refused to allow her in here. I brought the lawsuit and one of the decisions I made was to continue her training so she didn't get rusty.

I spent a decent amount of money getting her trained. So I had her -- I had Joseph take her to get a little bit more training and certification as a therapy dog in addition to being a service dog, so she could go into facilities like hospitals and senior centers and to continue providing therapeutic services to other people, so that she could keep up her social etiquette, and

say, well, they're spending all day yelling and then when I do it I get in trouble? And she'd keep, you know, setting it back to me. And I just found that you want to have a dialogue or do you want to keep berating me. And I felt it was not therapeutic. It just felt like she was berating me over things.

**Q. Yeah. And there's a little bit at the beginning of this about -- that whether who was disrespecting whom at the beginning of this progress note. But at any rate you wound up -- you wound up firing her effectively; right?**

A. I wish I could fire people here. I asked them to leave. Sometimes they do and sometimes they don't.

But no, HR fires people, not me. I wish I had that power. Things would be a lot more peaceful here.

**Q. Is it -- is it safe to say that as between the support that you get from -- or got from Foxy 1 and the guidance that you were getting from Ms. Jones that you preferred the comfort that Foxy provided to you to the more challenging --**

A. No. I think that psychotherapy and the services and tasks Foxy provides are two totally different things and play two totally different roles. When I was in outpatient therapy Foxy would always come to the session with me. Usually I'd sit in a chair, it was almost



identical to these chairs except the bar didn't go across the middle.

So we'd walk in, I'd sit down. Foxy would come in, go under the chair, turn around and sit right there, and I'd have my hand on her during the therapy. I'd have something to anchor when we were doing psychotherapy. And I was much better able to participate in the therapy that way.

And if things got really stressed out, I'd reach down and I'd pick her up and put her in my lap and she'd curl up in a ball, and I'd pet her and I'd be able to participate in therapy because I had her there as that sensory anchor. And that thing that would be there to calm me down and if I started getting too worked up she'd get up and turn and turn around and lick me on the face and be like, calm down.

And I was actually able to participate in therapy out in the community with Foxy there. But since I've been here, I don't have that, so it's been really hard to participate in therapy. The therapists just coming and going, a lot of them have been disrespectful to me.

And there is this just overarching anonymity between me and the employees here. I cannot dissociate the staff from their exclusion of Foxy no matter how hard



I try. It's just, they've became the other, the enemy, and that has poisoned every interaction.

But so it's -- there's multiple issues going on here. But it's just not been therapeutic. Foxy is not there to provide that support and there's just -- there's just not a good relationship between me and the State.

I'd love there to be, but that's why I've been fighting so hard to get Foxy in here, because I know as soon as she's here, then my relationship with the State, with its employees would -- would heal because they're -- I mean, she's my life. When they took that away from me, I mean, that's -- there's -- I don't think there's anything anyone could do that would do me more harm than take away the one person that opened up my world for me.

I was completely self-isolated and miserable thinking about killing myself on a daily basis until I met Foxy. And she just opened the world for me and changed all that, and then the State goes and take her away. And I can't have a good relationship with somebody that does that.

In addition to, I don't think the people here are trained to deal with my primary diagnosis anyways, but if she were here I'd be in therapy, I'd probably even be able to participate in some of the groups. Still not all of them, they're still overstimulating, but she'd be



there as my anchor.

So I've been fighting tooth and nail from the day I got here to get that back, so I could try to participate in what meager therapeutic offerings are here. Like you said, that's probably not going to happen until I'm out of here. So for me this whole thing has been a waste of time and taxpayer money, but it didn't have to be that way.

**Q. You mean the lawsuit has been --**

A. No. My -- my presence at ASH. But obviously what Judge Reid had in mind when he sent me here was that I get the help I need. And I get out and I'm successful when I get out. And I believe I will be. I've learned so much about law that I could, you know, I could easily go and pass the bar in another state that doesn't have JD requirements right now.

But, you know, I think I'll do fine as a businessman, I'll have Foxy when I get out. I've been able to start several business and we've made some money doing it since I've been in here, so I think I'll be able to integrate into society okay.

But I don't think I got any therapeutic benefit from being here. I think that this whole thing has been a waste of six years of my life and millions of dollars in taxpayer funds, and if the hospital had just not dug

in their feet from the beginning and said let's try the service dog issue, I think everything here would have been drastically different. I probably would have got through the level system and been out of here in two years. But that's not what happened.
And so it's not just the exclusion of Foxy that I'm suing the State over. It's all of the harm that resulted from that. And the lack of therapeutic benefits. I haven't gotten any benefit from being here. Just layers and layers of new trauma. This isn't what I wanted, this isn't what Judge Reid wanted. And that's why we're here.
**Q. Now, in May of 2021 you proposed to marry Foxy 1 in a ritual that you described as a manumission ceremony. A marriage ceremony and a blood covenant. Do you remember that?**
A. I remember trying to start a manumission ceremony, yeah.
**Q. You don't remember using the term blood covenant?**
A. I probably did. I wouldn't be surprised if I said something like that. It wasn't marriage in the sense that you're using it as. It's marriage in the sense when Christians say married to -- married to Christ. It was a spiritual union. I'm an alchemist, so



we're talking about it from a different perspective.
A manumission was the primary intent of the ritual.
**Q. And what's manumission?**
A. Manumission is -- it was the function by which somebody in slavery or servitude, so under the old Roman law, if somebody was under the control or what are they called, possessed as of another they would be, there were multiple ways to have that, a father would have that over his children. But a master would have that over servants or slaves.
And if a master wanted to liberate and emancipate somebody he had control over, they'd do it through a function of manumission, which was the freeing or liberating of somebody under the control of another.
So my goal in that was to show my respect for Foxy, and how I respect her as a self-determining moral free agent. I used the word sovereign in there. You took offense to that, but that's what I meant by moral free agent. I know law typically looks at animals as property. But there's a burgeoning field of law that's looking at them as free agents.
Traditionally persons were described as either moral or juridical. A legal person, like a corporation, or a moral person like a human being or the Catholic



church calls its entities moral persons in the canon law.
So I wanted to show Foxy and the world at large that I respected her as an autonomous, sovereign, free moral agent. And because the word "service dog" inherently implies someone in servitude to another. I said I want Foxy to work with me as my equal, not as my slave. So I'm going to have a ritual to manumit her.
So Foxy works with me but it's on her own free agency. So it was sort of an occult ritual that was all about my respect for her, and you guys twisted it into something carnal and disgusting that it was never intended to be.
**Q. Okay. Did I already hand it --**
A. The last thing you gave me was 12.
(Deposition Exhibit 13 was marked for identification.)
**BY MS. HOBART:**
**Q. Now, it appears that you asked for the opportunity to have this manumission ceremony on May 5, 2021, you made a call to Jacqueline Bachelier -- oh, and let me -- let me lay a little foundation for this document. It was --**
A. She was the patient rights advocate at the time.
**Q. -- incident report from Jacqueline Bachelier. I don't know how to pronounce. B-a-c-h-e-l-i-e-r.**



**And it's dated, the date of occurrence is May 5, 2021, and the date reported is May 11, 2021.**
**And the Bates numbers on this are DF0441, DF0442 to -- excuse me -- DF0441 to DF0444.**
**And who did you say Jacqueline Bachelier was?**
A. At that time she was still the patient rights advocate. She left when the current one took over.
**Q. Who's the current one?**
A. You brought up her name earlier in one of these other things.
**Q. Okay. Okay.**
A. I forget her name.
**Q. She was the one that was with you when you interviewed about your complaint?**
A. That's what they wrote. I don't remember it, but I think that was the new patients rights advocate.
**Q. Okay. And you -- you apparently left a voicemail. So this I think must be verbatim that she could transpose the -- or transcribe it.**
**"We're having a big ritual and the treatment team is working on it and you should get involved, too. It's on May 17th. It's a big religious ritual. My family's coming, my friends are coming. Foxy's coming. Chris Martel is coming to do some services as a minister. If probably Notary On Wheels will be coming too, because**

agreement to do a couple months at DOC and been out. I did choose to come here to get treatment, but I didn't come to -- choose to come here and sit here for six years without treatment. I would have chosen DOC over that.

No, I believe I have autism. I believe I have severe PTSD that's almost completely unmitigated and that ASH has refused to provide sufficient services.

I've been constantly requesting since, you know, one of the issues that's come up in getting PTSD treatment, which I think is the primary issue here, any treatment you provide me has to be, you know, in an autism-aware environment. You can't plunge me into an overstimulating group for PTSD and expect that I'm going to be able to navigate that with my autism, but my autism is also not what got me arrested. My PTSD responses to law enforcement is.

So I said you need to provide PTSD treatment while having somebody that understands autism moderating the environment for me, so I'm not over-stimulated. You've taken away all my coping tools, you've taken my service dog, and you're plunging me into an environment that is so caustic I can't function, and then tell me I refuse treatment when I don't want to go into a group under those circumstances.

In addition to that, you know, there is an issue



of trust, because things that I have said to doctors and psychiatrists have been charted, twisted completely out of context, misquoted, and then used against me in court.

I don't trust these people as my psychiatrist, doing trauma therapy takes a deep level of trust to open up to get to the root of the trauma. And I've simply told them I don't trust you. I want to do it, but you're asking me to show trust that I just don't have.

So one thing I've been repeatedly asking for is let's do your rehab stuff on a one-on-one basis and let's do the psychotherapy with the outpatient team telephonically, like I'll be doing when I get discharged and the administration has just dug their foot -- feet in and said we're not going to let you do telemedicine therapy.

Well, it would solve the trust issue. But they don't want to have that discussion. I mean, I'm trying. I've try every workaround I can think of to get the care I need here. They keep refusing it, then charting that I'm the one refusing. I'm not. I'm begging for help.

I'm going to get out in six months less prepared to reintegrate into society when I got here. I think I'll do all right, but I mean, this is not what I came here for.

**Q. What about the final one on this page, "Patient**



**declined to engage in any activity that was socializing and cited over-stimulation. Therefore he has, quote, no intention of participation. He also stated that his prog was toward a lesser restrictive setting should not be based on his social interactions."**

A. I generally agree with that. I mean, I don't think that's exactly how I put it. I definitely said that I'm not going to engage in any treatment modality that's over-stimulation. It's going to give me more trauma and increase the likelihood that I have some type of, you know, meltdown around other people that could lead to something bad happening or more criminal charges.

I don't want to put myself in that situation and I'm not going to let you put me in that situation. That's what I've told them. I don't have intent to participate in something harmful. If you told me to go jump off a bridge, I wouldn't do it, because it would be harmful.

And I consider being put in an environment that that's overstimulating, getting locked in a room with a bunch of people yelling and not being able to leave when I -- I've gone into these settings, you know, because they said, oh, you can go check it out. If you don't like it, you can come back to the unit. And then staff refused to let me leave.



And I was just panicking the whole time until somebody let me out the door. I just can't put myself in that. It's not that I don't want the content of the groups. I don't want to be stuck in an environment where I'm going to be plunged into panic and have no escape from it.

And they were putting on the treatment plan that I had to cooperate in these groups in order to move forward towards discharge, and I said, look, the law says that I can be discharged when I am in, you know, stable remission or when I'm not posing an imminent threat.

You can't say, you know, socializing in overstimulating environments is a condition of my discharge. That violates my constitutional right to liberty of locomotion. You're supposed to be basing my confinement on my imminent level of dangerousness.

And they asked me if we could put this on a behavioral plan. I said no. I don't think that's reasonable. I think you should be providing me treatment in a way that's conducive to working with somebody with autism and who's very sensitive to sensory over-stimulation and not tying my release to the fact that you can't accommodate me.

So I've been very clear on that, but it's not been a denial of treatment. It's been a denial of

Holly remembers her saying that. But if it was, it wasn't enough, and then they just took it by the way they put me to a unit where I'm not comfortable at all.

**Q. Well, that was because you were engaged in self-harm and threatening harm to others. That's why you got moved over there, isn't it?**

A. It's the reason you take away some of these accommodations, because they're hurting themselves because they need an accommodation? That doesn't make any sense.

I was getting over-stimulated, triggered, threatened and harassed by staff, and engaged in self-harm, so you take away the rest of my coping tools, take away my stuffed animals, move me to a unit that's far more overstimulating, force me to have a roommate, and then pat the person who's abusing me on the back and give her back her job. I don't know what kind of world you live in, but that doesn't seem right to me.

**Q. I think you actually testified a little differently about -- about Mohave at the beginning of the day? So --**

A. There are good things and bad things about it.

**Q. Everybody's getting tired. Everybody's getting tired.**

A. I'm definitely doing better on Mohave at



managing the symptoms they're complaining about. I've been working really hard on it, but I'm suffering more than ever.

(Deposition Exhibit 17 was marked for identification.)

**BY MS. HOBART:**

**Q. What has been marked as Exhibit 17 is another psychiatric monthly medication review, again by Dr. Steven Kwoh.**

**And it is -- the date on this is February 21, '24, so it's just I think a month later than Exhibit 16.**

**Yeah. And the Bates numbers on this are DF1548, DF1549. The progress note: "Progress towards treatment goals. Matthew Solan. Threatened to break Susan's neck and slam her head into the wall in ongoing racial derogatory statements. He was offered" -- "he has offer" -- "he has offer" -- "he was offered to be seen with his primary treatment team to review his ITPD, but he declined to come because he" -- "because he'd rather sleep. He is not meeting his goals of symptom reduction accepting recommended treatment, as he doesn't see his behaviors and psychiatric symptoms is problematic for him.**

**"He had two virtual visits from his clone dog, Foxy, and has another coming up this week. He purposely**



**sleeps during the day and requests treatment. Members come to see him at night.**

**"When educated how it's hospital rules of closing dorms during active time, during the day so that patients go to groups and not just sleep all day. He considered this a threat, saying it was retaliation, but then argues he doesn't receive treatment despite being offered during the day."**

**So this is -- this is -- this is the way Dr. Kwoh was seeing that what you, you know, how you and Holly were framing it.**

A. That's what he's written here.

**Q. Yeah.**

A. I don't agree with him. I mean, a lot of times they'd hold a treatment meeting and I'd find out about it later in the day when I woke up and the nursing staff were, like, we figured you wouldn't want to be woken up so we didn't even bother to come get you.

I don't know if I refused or not. But even if I were awake during the day, there's -- they're not offering treatment other than in these large groups, and you're right, I won't go to those. They're going to cause me more harm than good.

And I keep saying as soon as you're ready to start providing treatment in a setting that's not overly



stimulating and harmful, I want to go to all of them. I came here to get better. And you just complained about fiscal resources. I get how they're trying to spin it, but that is not the reality of the situation.

**Q. Who is -- do you know who Susan is?**

A. She was the lead tech on Cottonwood until she retired, I don't know, two or three year ago.

**Q. The lady behavioral tech?**

A. Yeah.

**Q. Did you -- did you say you were going to break Susan's neck?**

A. I don't remember saying that.

**Q. And slam her head into the wall?**

A. Susan was nice. She was probably one of the nicest techs there. Wouldn't have been anything that would have come out of my mouth during normal, rational conversation. Like I said, if I'm having a complete meltdown don't remember what I said, you know, but I don't have anything against Susan. Susan was a sweet old lady. She was one of the nicest techs there. I don't know.

**Q. Okay. On DF1549, Dr. Kwoh writes: "Self-describes himself as, quote/unquote, asshole at times and says that's the only way he can advocate for himself and get what he wants. He admits to purposely**

**threatening others to fashion his team or other around him the way he wants. He is eating and sleeping well. Insight poor. Doesn't accept recommendations or recommended treatment or attend available groups offered. Judgment poor. Makes verbal threats."**

**Do you remember, have you described yourself as an asshole to Dr. Kwoh?**

A. I don't recall. It's possible. I don't really remember many of my interactions with him. We'd meet -- like we only meet at ITPB reviews, Holly would usually be there. It would be kind of formal and adversarial, and then he'd say he has to go somewhere and rush us out at the 15-minute mark, and that was basically the limits of my interactions with him.

**Q. So you didn't have any -- you didn't have any --**

A. Not that I can recall.

**Q. -- individual time?**

A. No. No. I mean unless he had some specific thing he'd need to come in and bring to my attention or let me know about a schedule, we never like met and did therapy or anything.

**THE VIDEOGRAPHER:** When we get to a good point can we take a five-minute break? We're almost out of memory card.

**MS. HOBART:** Sound good. I think -- I



think I'm probably only going to have maybe one more exhibit and so -- but that's good. That's good. I will take the opportunity to -- it might not just be five minutes is the thing.

**THE VIDEOGRAPHER:** We're off the record. The time is 4:11 p.m.

(Recess from 4:11 p.m. to 4:14 p.m.)

**THE VIDEOGRAPHER:** We are back on the record. The time is 4:13 p.m.

**BY MS. HOBART:**

**Q. Okay. I think I will reach back and ask you to dig out Exhibit 7, which I took out of sequence. But we didn't actually talk about it. That's it. That's it.**

**And for the record Exhibit 7 is an incident report from -- from Domenick Aldrich dated March 7, 2025. And it's just described as basic information in the heading, but also a description of incident or reportable event.**

**And I will just read it. "Matthew" -- "Matthew asked this writer to talk for a while because he wanted animal-assisted therapy. Matthew was informed that nursing does not provide animal-assisted therapy. Matthew discussed" -- "discussed how if he does not get enough money by suing the State to forget how they killed Foxy, then he would brutally kill all of them, and that**



**is a promise, not an idle threat.'**

**"Matthew was noticeably upset as he was clenching his first and was told that this conversation was not going to be continued as he was upset. Matthew said he was always upset and he was just" -- "and he was just having a conversation. The conversation was concluded and Matthew continued to pace.**

**"Matthew had been offered multiple times during the conversation to utilize an area such as his room in order to decrease simulation. When Matthew had calmed down he again demanded therapy while spinning and flipping his hair in a childlike manner.**

**"Matthew continued on for approximately 45 minutes with minimal redirection from inappropriate topics while petting his stuffed animal."**

**Do you remember this -- a circumstance like this with Mr. Aldrich?**

A. Not this particular one. Every I got really stressed out or was having a meltdown or about to have one, I would ask Domenick, he was sort of my go-to staff person. He was the head nurse and he was one of the few people that could, you know, if I was freaking out he could maintain his composure and not start insulting me or threatening, so he was really the person that me and, you know, Layne, the other person who has autism, we'd



both go to him any time we needed emotional support.

So if I needed somebody to talk to, I'd pull him in the back room and he specifically set it up. You -- like, if you need to vent so you don't blow up on the unit or do anything, come get me, you can vent to me, so me and Layne would both do this.

We'd go in there and vent. Sometimes if we were having a meltdown, he'd pull us in there and we could do it just with him. And it was supposed to be a safe environment.

I mean, you know, and it was. It's a place we could go and blow up and vent and he would listen and wouldn't blow it into something it wasn't.

I don't remember this specific incident, but that's -- that's what he had set it up for was for that purpose.

**Q. Okay.**

A. He wanted it to be that way. He said it would be therapeutic and I think it was.

**Q. But you can appreciate why if you said this, that you will brutally kill all of them, and that is a promise, not an idle threat, as to those who, you know, I guess that would include me, probably not Jordan, he wasn't involved in the first case, but those of us who defended that case, I mean, wouldn't you understand that**

**he would have to report that? That as, you know, a practitioner -- there's other people to protect?**
A. Sure.
**Q. Other than you; right?**
A. Yeah. That's why I'm in a psychiatric hospital. I don't remember that specific making that specific statement. But I'm going to say I didn't either. I don't -- I don't remember. I mean, when Foxy died I was going to kill myself. I mean, that ended my life. My life ended that day.
And, you know, I made the last-second decision to clone her instead of doing that. But the amount of pain and rage that's bottled up in me, whenever I had a meltdown it would come out.
And I've been asking and begging, that's why I keeping asking for trauma therapy, I don't know how to deal with these bottled-up emotions. When they come in they explode sometimes, and that's why Domenick set it up for us to have place to go in there and vent, where other people wouldn't get upset by it.
And he was the only person offering me that environment. Like people on the treatment team wouldn't come. The people that were supposed to be assigned as my therapist wouldn't do it, it was just me and Domenick for the longest time.



**Q. And -- and -- and your -- and your co-patient, who also had --**
A. He would do, Domenick set it up for both of us, he was a little bit lower functioning, but he had meltdowns even more frequently than me, and he had much more violent, both verbally and physical, outbursts.
And Domenick was the guy there to -- to help contain it and he did a good job of it. That's why he got promoted.
**Q. So that -- that was something that ASH was providing you?**
A. Domenick was the only one. The treatment team just -- I appreciate what Domenick did. But it was, like.
**Q. Okay.**
A. It just wasn't enough. This isn't what I came here for. I don't want to have to be getting arrested because I can't control my PTSD and my autism. I chose to not, like I did four months in DOC.
I would have been fine, I wouldn't have gotten killed over there, I might have spent it in solitary, I would have been out with Foxy living my life right now, but I wouldn't have gotten the treatment.
I chose to come here because there was a promise laid on the table for me. That this was how I was going



to get better, so this wouldn't happening. And it -- this has been just more trauma. I would have been better off going DOC, everyone here says you should have just gone to DOC. They're right.
Four months, I could have stomached four months, this -- this hasn't been helpful. I want it to be. I'm begging for it to be. But now I got six months left and I don't have any faith it's going to be. I want it to be. You want it to be. But ASH is not doing it.
**Q. Do you think that ASH killed Foxy?**
A. That's not exactly what I meant when I've said things like that in the past. In a sense, yes. They killed my relationship with her. They denied her from access to coming here, she died, what, two years, more than two years after I got admitted. I could have spent that two years with her. I made a promise when I adopted from the adoption agency that I would take care of her and cherish and -- and ASH forced me to breach that. I mean, I have a lot of respect for Foxy. You guys think that I want to just hurt her and sexually abuse her? Couldn't be farther from the truth. I treat her as a child. She -- she's my baby.
I want, always want to make sure that she's happy and safe and healthy and I -- you know, I made sure to arrange her situation the best I could, and arrange



her finances with her first incarnation and her current to make sure that she's safe. And she is.
But I wanted to spend the rest of her life with her. I knew she was -- I was going to outlive her. I mean, unless I killed myself. And the State took that away from me. They killed -- the day that I got arrested, I don't call it getting arrested, but that's what the court system calls it. They took me away from Foxy.
And, you know, I've said in therapy a lot, my life ended there. What you see now is a shell of what I was and could have been and I'm hoping some day I can get my life back in order, but I mean, what the State did is, I mean, it was a form of, you know, it seemed like a form death of both me and Foxy.
So no, I don't think the State, you know, went there and assassinated her or poisoned her or something, but, you know, they killed a part of me, when they took us apart and then put me through all this hell trying to get her back in here.
I don't see any of this as legitimate, it's just been harm layered upon harm layered upon harm, and I know the State has a lens that they look at this through that I'm a criminal and this is lenient punishment. That's not how I look at it.

not getting it here. That's what I'm here for.
**MS. HOBART:** Okay. Well, I think -- I think that's all I have.
**THE WITNESS:** Okay.
**THE VIDEOGRAPHER:** We are off the record. The time is 4:30 p.m. This concludes the deposition of Matthew Solan.
**THE WITNESS:** I would like to be able to read and sign this deposition.
(Deposition concluded at 4:31 p.m.)



SIGNATURE PAGE

I, MATTHEW PHILLIP SOLAN, a deponent exercising my right to read and sign my deposition taken on February 4, 2026, place my signature hereon and make the following changes on this _____ day of ____________, 20____.

(IF THERE ARE NO CHANGES, WRITE "NONE.")

______________________________
MATTHEW PHILLIP SOLAN

| PAGE | LINE | READS | CHANGE TO | REASON |
|---|---|---|---|---|
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |
| ____ | ____ | ________ | ________ | ________ |



STATE OF ARIZONA ) SS.
)
COUNTY OF MARICOPA )

BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

Pursuant to request, notification was provided that the deposition is available for review and signature.

Dated this February 17, 2026.

______________________________
Jennifer Honn, RPR
Certified Reporter
Arizona CR No. 50885

* * *

I CERTIFY that GLENNIE REPORTING SERVICES, LLC, INC., has complied with the ethical obligations set forth in ACJA 7-206.

______________________________
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. 1035

# EXHIBIT B

VALERIE WYANT, CLERK
2020 FEB 25 PM 4: 10
FILED

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF COCONINO**

| | |
|---|---|
| Ted S. Reed, Judge<br>Division 1<br>Date: February 11, 2020 | Valerie Wyant, Clerk<br>Lauren Wells, Deputy Clerk<br>Jonna Baker, Court Reporter |

**MINUTE ENTRY**

| | |
|---|---|
| STATE OF ARIZONA<br><br>Plaintiff,<br><br>vs.<br><br>**MATTHEW SOLAN,**<br><br>Defendant. | **Cause Nos. CR 2017-00848**<br>**CR 2018-00241**<br>**CR 2019-00145**<br>**CR 2019-00357** |

**ACTION: Case Management Conference**

**APPEARANCES:** Paul Rubin, Deputy County Attorney, is present appearing on behalf of Ammon Barker, for the State. The Defendant is present, appearing in custody, with Counsel John Trebon and Stephen Hauser, Deputy Public Defender.

1:36 p.m. Court is in session.

Defense Counsel provides an update, noting the Parties participated in a Settlement Conference and are prepared to proceed with a Change of Plea hearing today.

The Defendant is sworn. The Court addresses the Defendant and determines that the Defendant understands and agrees to the terms of the Plea Agreement, that the Defendant understands the nature of the charges, the nature and range of possible sentence and that the Defendant understands his constitutional rights and waives them.

Upon stipulation of Counsel, the Court amends the Caption and Page 2, Section 4, of the Plea Agreement to reflect Cause Number: CR 2017-00848. The Court directs Counsel to initial by the changes.

The Defendant offers a plea of **guilty except insane** to: **Count 2: AGGRAVATED ASSAULT** in CR 2019-00145, and **guilty** as to **Count 1: THEFT OF A MEANS OF TRANSPORTATION** in CR 2019-00357. The Court finds a factual basis for the plea and that the plea is voluntary. The Court accepts the Plea Agreement at this time.

Ex No.: 1
Solan, Matthew
02-04-2026 GL
Jennifer Honn, AZ 50885

**IT IS ORDERED** scheduling **entry of Judgment and Sentencing** on **March 12, 2020,** at **8:30 a.m.**, in **Division 1, before the Honorable Ted S. Reed.**

**IT IS FURTHER ORDERED** the Probation Department shall prepare and submit a pre-sentence report.

**ORDERED *revoking*** the Defendant's prior release conditions.

The Court reaffirms that the Defendant's service dog may be present in the courtroom for the Sentencing hearing, but there may not be any contact between the Defendant and the dog. The Court directs Defense Counsel to make arrangements with Court security.

The Defendant is provided with written notice of the next hearing date.

2:01 p.m. Court is adjourned.

cc: County Attorney
Defense Counsel
Public Defender
Pretrial Services
Sheriff's Office
Division 1

COCONINO COUNTY SUPERIOR COURT

Date: 2/26/2020
Time: 11:06 AM
Pages: 1

EDMS Barcode Cover Page

Category

CR

Case Number

S0300CR201900357

Filing Date

2/11/2020

Event Code

1255873

Sequence

97

Party Type

D

Party Number

D-1

Document Id

1613235

Sealed Flag

N

Restricted Flag

N

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF COCONINO

VALERIE WYANT, CLERK
2020 MAR 23 AM 8:17

Ted S. Reed, Judge
Division 1
Date: March 12, 2020

Valerie Wyant, Clerk
Adel Gouhin, Deputy Clerk
Amanda Wiley, Court Reporter

**MINUTE ENTRY**

THE STATE OF ARIZONA,

Plaintiff,

vs.

**MATTHEW SOLAN,**
[DOB: 07/17/1989]

Defendant.

Cause No. **CR 2017-00848**
**CR 2018-00241**
**CR 2019-00145**
**CR 2019-00357**

**ACTION: Sentence of Imprisonment (7.5 years) / Sentence of Standard Probation (2 Years)**

**APPEARANCES:** Ammon Barker, Deputy County Attorney, is present, appearing on behalf of the State. The Defendant, is present, appearing in custody, with Counsel Stephen Hauser, Deputy Public Defender as to **CR 2019-00357, CR 2017-00848 and CR 2018-00241.** Defense Counsel John Trebon is present, appearing in person on behalf of the Defendant as to **CR 2019-00145.**

8:32 a.m. Court is in session.

The Defendant's fingerprint is taken by the Bailiff.

The Defendant is advised of the charge(s) and the determination of guilt.

For the record, the Court has reviewed the Pre-Sentence Report and Pre-Sentence Memorandum filed March 9, 2020.

Counsel and Defendant present statements.

Pursuant to A.R.S. Section 13-607, the Court finds as follows:

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

**WAIVER OF TRIAL**: The Defendant knowingly, intelligently, and voluntarily waived his right to a trial with or without a jury, his right to confront and cross-examine witnesses, his right to testify or remain silent and his right to present evidence and call his own witnesses after having been advised of these rights. The determination of guilt was based upon a plea of **Guilty Except Insane, as to CR 2019-00145, and plea of Guilty as to CR 2019-00357.**

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence.

**IT IS THE JUDGMENT OF THE COURT** that the Defendant is guilty of the crime of:

**As to CR 2019-00145**

**Count 2: AGGRAVATED ASSAULT** a class 3 dangerous, non-repetitive felony in violation of A.R.S. §§ 13-1204(A)(2), 13-1203, 13-701, 13-702, 13-704, 13-801 and 13-804, committed on or about April 8, 2019.

**IT IS THE JUDGMENT OF THE COURT** that the Defendant is guilty of the stated crime, that upon due consideration of all the facts, law and circumstances relevant here, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Arizona Department of Corrections is appropriate.

**THE COURT FURTHER FINDS** that there are circumstances sufficiently substantial to call for a Presumptive term as follows:

The Court finds the following Aggravating circumstances:

1. The Defendant's infliction or threatened infliction of serious physical injury.
2. The Defendant's use or threatened use or possession of a deadly weapon or dangerous instrument during the commission of the crime.
3. The Defendant was convicted of three felonies within the ten years immediately preceding the date of the offense.
4. The physical and emotional harm caused to the victim.
5. The Defendant was on probation when the crime was committed.

The Court finds the following Mitigating circumstances:

1. The Defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired by mental health concerns and that the Defendant plead Guilty Except Insane.

**AS PUNISHMENT, IT IS ORDERED** that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

**As to CR 2019-00145 Count 2**

**STATE v. MATTHEW SOLAN**

**DOB:** [redacted]

**OFFENSE: Count 2 AGGRAVATED ASSAULT**

**FELONY CLASS:** 3

**IN VIOLATION OF A.R.S. SECTIONS:** A.R.S. §§ 13-1204(A)(2), 13-1203, 13-701, 13-702, 13-704, 13-801, & 13-804.

**DATE OF OFFENSE:** 01/29/2019

**SENTENCE:** Defendant to be imprisoned in the Arizona Department of Corrections for the **Presumptive** term of **seven point five (7.5) years, under the jurisdiction of the Psychiatric Security Review Board, committed to the Arizona State Hospital and be given any treatment necessary to treat the Defendant's mental illness.**

**IT IS ORDERED** the Defendant shall continue to be under the jurisdiction of the Psychiatric Review board until the Defendant's sentence is complete.

This offense is:

1. Dangerous.
2. Non-Repetitive.

This sentence is to date from **March 12, 2020**. The Defendant is to be given **credit** for **four-hundred and seven (407)** days of pre-sentence incarceration.

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

**ORDERED** the Court shall retain jurisdiction of all matters not specifically delegated to the Psychiatric Security Review Board for the duration of the presumptive sentence.

**ORDERED** that an attorney be appointed to represent the Defendant in any Psychiatric Security Review Board proceedings.

**ORDERED** that a hearing pursuant to A.R.S. §§ 13-3994(F) occur no earlier than 120 from March 12, 2020.

**ORDERED** that the Defendant shall not be held in confinement for more than 2 years without a hearing before the Psychiatric Security Review Board to determine if the Defendant should be released or conditionally released or transferred to the Arizona Department of Corrections for the remainder of the Defendant's sentence.

**ORDERED** the Clerk shall copy and sent to the Arizona State Hospital any medical or psychiatric reports previously filed.

**ORDERED** the State shall furnish the Arizona State Hospital with copies of the Defendant's entire criminal history, police reports or other reports which may aid the Defendant's evaluation.

**As to Count CR 2019-00357:**

**Count 1: THEFT OF MEANS OF TRANSPORTATION,** a class 5 non-dangerous, non-repetitive felony in violation of A.R.S. §§ 13-1814(A)(1), 13-1801, 13-607, 13-701, 13-702, 13-801 and 13-804 committed on or about September 13, 2017.

The Court finds the following Aggravating circumstances:

1. The financial harm caused to the Victims.
2. The Defendant committed the offense as with the expectation of the receipt of anything of pecuniary value.

The Court finds the following Mitigating circumstances:

1. The Defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired by mental health concerns and that the Defendant suffers from mental illness.
2. The Defendant has no prior felony convictions at the time of this offense.

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

**IT IS ORDERED** placing the Defendant on **Standard Probation** for the term of **two (2) years**, upon release from the Arizona Department of Corrections, and the Arizona State Hospital, under the supervision of the Adult Probation Department of this Court, in accordance with the formal Judgment and Order suspending sentence and the standard terms and conditions of probation signed by the Court.

**AS ADDITIONAL TERMS OF PROBATION**:

**ORDERED** the Defendant shall comply with Terms 1-15, 20, and 21 of Conditions of Probation.

**ORDERED** the Defendant is to be given **credit** for **four-hundred and six (406)** days of pre-sentence incarceration.

**ORDERED** the Defendant shall be subject to deferred incarceration up to one hundred twenty (120) days in the county jail or up to sixty (60) hours of community restitution as a sanction, at the discretion of the Court upon recommendation from the Adult Probation Department.

**ORDERED** the Defendant shall not have any contact with the victim unless approved in writing by the Adult probation Department and authorized by Law Enforcement.

**ORDERED** the Defendant must participate and cooperate in any counseling or assistance as directed by the Adult Probation Department including a mental health evaluation and any recommended treatment.

**PROBATION SURCHARGE**

**ORDERED** that the Defendant shall pay a Probation Surcharge, pursuant to statute, in the amount of **$20.00** for each cause number.

**TIME PAYMENT FEE**

**ORDERED** that the Defendant shall pay a time payment fee in the amount of **$20.00**. Should the Defendant pay all penalties, fine and/or assessments in full this date, said fee is not applicable.

**SUPERVISION FEE**

**ORDERED** the Defendant shall pay a monthly probation services fee to the Clerk of the Superior Court in the amount of **$25.00** per month during the term of probation.

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

## COST OF DEFENSE

**ORDERED** that the Defendant shall pay **$100.00** toward the cost of his attorney. Said cost to be paid at a rate to be determined by the Adult Probation Department.

The Defendant is advised concerning his rights of review after conviction and written notice of the rights is provided.

**ORDERED** exonerating any bond.

**ORDERED** cause numbers **CR 2017-00848 & CR 2018-00241** are dismissed in their entirety.

**ORDERED** authorizing the Sheriff of Coconino County to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth therein.

**ORDERED** authorizing the Sheriff of Coconino County to contact the Arizona State Hospital admissions office to coordinate a date for the Defendant's admission and transport the Defendant to the Arizona State Hospital.

**ORDERED** the Defendant shall submit to DNA testing for law enforcement identification purposes.

**ORDERED** the Arizona State Hospital is hereby authorized to initiate Civil Commitment proceedings if appropriate within the Defendant's term of commitment.

**ORDERED** that the Clerk of the Court shall remit to the Department of Corrections a copy of this Order together with all pre-sentence reports, probation violation reports, medical and psychological reports relating to this cause.

The written terms and conditions of probation are handed to the defendant for explanation, acceptance and signature. Defendant agrees to the stated waiver of right to extradition. The Defendant is advised concerning the consequences of failure to abide by the conditions of probation.

State v. Matthew Solan
Cause No. CR 2017-00848 / CR 2018-00241 / CR 2019-00145 / CR 2019-00357
March 12, 2020

**FILED:** Notice of Rights of Review after Conviction, signed by Defendant.

**ISSUED:** Order of Confinement.

[ ]

[redacted]

**Ted S. Reed**
**Judge of the Superior Court**
**Division 1**

[ Fingerprint ]

cc: County Attorney
Defense Counsel
Sheriff's Department
DOC (2) / Defendant c/o CCSO
Adult Probation
Financial Clerk

COCONINO COUNTY SUPERIOR COURT

Date: 3/23/2020
Time: 8:26 AM
Pages: 1

EDMS Barcode Cover Page

Category

CR

Case Number

S0300CR201900357

Filing Date

3/12/2020

Event Code

1256225

Sequence

107

Party Type

D

Party Number

D-1

Document Id

1621667

Sealed Flag

N

Restricted Flag

N

# EXHIBIT C

CONFIDENTIAL

CR2019-00145

# Coconino County Sheriff's Office

*Jim Driscoll, Sheriff*

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

**Case Number:** S19-00447

## Incident Information

| Date/Time Reported | Officer | Supervisor | | |
|---|---|---|---|---|
| 01/30/2019 10:43 | (1004929) MCGUIRE, JACOB RAY | (1066915) TOZER, BRIAN L | | |
| **Incident Location** | | **Location Comment** | | |
| [redacted] | | | | |
| **Case Status** | **Case Status Date** | **Location Type** | **Felony/Misd/NC** | **DV Related** |
| CLOSED/CLEARED (21,22) | 01/30/2019 | RESIDENCE/HOME | FELONY | N |
| **Case Disposition** | **Disposition Date** | **Investigator Assigned** | | |
| CLEARED BY ADULT ARREST | 01/30/2019 | (1004929) MCGUIRE, JACOB RAY | | |

## Charges

| # | Charge Type | Description | Statute | DV | Att/Com |
|---|---|---|---|---|---|
| 1 | State | KIDNAP-APPREHENSION OF INJURY | 13-1304A4 | N | ☐ Att ☑ Com |
| 2 | State | AGG ASSAULT - DEADLY WPN/DANG INST | 13-1204A2 | N | ☐ Att ☑ Com |
| 3 | State | WEAPON - POSS WPN BY PROIB PERSON | 13-3102A4 | N | ☐ Att ☑ Com |
| 4 | State | WEAPONS - DISCHARGE IN CITY LIMITS | 13-3107A | N | ☐ Att ☑ Com |
| 5 | State | PUBLIC ORDER - DISORDERLY CONDUCT - WEAPON/INSTRUMENT | 13-2904A6 | N | ☐ Att ☑ Com |
| 6 | State | RESIST ARREST-RISK PHYS INJ | 13-2508A2 | N | ☐ Att ☑ Com |

## Victims

| Seq. # | Type | Name(Last, First, M) | AKA |
|---|---|---|---|
| 1 | VICTIM | HAMBERGER, MERLE BRUCE | |

[redacted]



Ex No.: 2
Solan, Matthew
02-04-2026 GL
Jennifer Honn, AZ 50885

000001

DF 0494

CONFIDENTIAL

# Coconino County Sheriff's Office

*Jim Driscoll, Sheriff*

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

### Victims

| Seq. # | Type | Name(Last, First, M) | AKA |
|---|---|---|---|
| 2 | VICTIM | STATE OF ARIZONA 2019 | |

| Race | Sex | DOB | SSN | Height | Weight | Hair | Eyes | Age | Victim of Crimes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0 | | | | 3,4,6 |

| Address | Cell Phone | Home Phone |
|---|---|---|
| | | |

| Employer Name/Address | Business Phone |
|---|---|
| | |

### Arrested

| Seq. # | Type | Name(Last, First, M) | AKA |
|---|---|---|---|
| 1 | ARRESTED | SOLAN, MATTHEW P | |

| Race | Sex | DOB | SSN | Height | Weight | Hair | Eyes | Age |
|---|---|---|---|---|---|---|---|---|
| W | M | [redacted] | [redacted] | 5'07" | 150 - 180 | BRO | BRO | [redacted] |

| Address | Cell Phone | Home Phone |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

| Employer Name/Address | Business Phone |
|---|---|
| NONE | |

| Physical Characteristics | Scars, Marks, Tatoos or other distinguishing features |
|---|---|
| | |

### Other Persons Involved

| Seq. # | Type | Name (Last, First, M) | AKA |
|---|---|---|---|
| 1 | INVOLVED, OTHER | HERNANDEZ, AMANDA RENEE | |

| Race | Sex | DOB | SSN | Height | Weight | Hair | Eyes | Age |
|---|---|---|---|---|---|---|---|---|
| W | F | [redacted] | [redacted] | 502 | 227 | BLK | BRO | [redacted] |

| Address | Cell Phone | Home Phone |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

| Employer Name/Address | Business Phone |
|---|---|
| IN-HOME CARE PROVIDER | |

CONFIDENTIAL

**Coconino County Sheriff's Office**
*Jim Driscoll, Sheriff*

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

### Vehicles

| Seq. # | Year | Color | Style | Make | Model |
|---|---|---|---|---|---|
| 1 | 1998 | BLACK | PICKUP | DODGE | DAKOTA |

| VIN | License Plate Type | License / State | License Year | Owner |
|---|---|---|---|---|
| [redacted] | PASSENGER CAR | [redacted] | 2019 | SOLAN, MATTHEW P |

| Status | Status Date | Vehicle Value |
|---|---|---|
| SUSPECT | 01/30/2019 | |

Vehicle Notes

### Assisting Officers

(1044882) MEYER, TRISTAN G
(1030567) SMITH, ROBERT
(1044307) STOPPE, TYLER DANIEL
(1067411) WAIBEL, BENJAMIN CURTIS
(1038685) MACARTHUR, ALEXANDRIA LEE ✓
(1067135) THRAILKILL, BEN NOLAN
(1047497) NEUFELD, AMANDA LAVONNE
(1058684) WHITE, NICOLE
(1081564) SANDORF, NICHOLAS DAVID
(1004050) GREYEYES, JEREMAIYAH
(1061996) DEFASSIO, ELIJAH JOHNATHAN
(1040954) LURKINS, JASON
(1070196) GILLILAND, REX E
(1066915) TOZER, BRIAN L ✓

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

# Incident/Investigation Report

Case Number: S19-00447

## Notes/Narratives

NARRATIVE

PATROL DR S19-00447
DEPUTY JACOB MCGUIRE #75
C219: 01/31/2019

ASSIGNMENT:

On 01/30/2019 at approximately 1022 hours, I was advised to contact Merle HAMBERGER reference him needing to speak with the deputy at the substation in Williams. Matthew SOLAN was later arrested for aggravated assault, kidnapping, weapons misconduct; prohibited possessor, disorderly conduct with a weapon, and other charges.

INVESTIGATION

On the above date at approximately 1026 hours, I attempted contact with MERLE over the phone. Due to being in an area with poor cell phone reception, the call was lost. I attempted to contact MERLE at 1029 two times and at 1031 again and was unable to have an uninterrupted conversation with MERLE. I requested Deputy Alexandria MACARTHUR #78, who was at the Williams substation, to check in the parking lot to see if MERLE was in the parking lot. At approximately 1040 hours, Deputy MACARTHUR cleared without making contact with MERLE in the parking lot of the substation. Being in a better cell phone reception area, I attempted to contact MERLE again and was able to speak with him. The following conversation was partially recorded with my department issued digital recorder and this is a synopsis of the interview.

INTERVIEW: Merle HAMBERGER:

MERLE stated that he, Amanda HERNANDEZ and MATTHEW went to Wal Mart in Flagstaff. While there at the Wal Mart, Amanda purchased 100 rounds of .380 ammunition for MATTHEW. MATTHEW and MERLE then drove to Donald SCHUBERT'S residence, later identified as 1639 W Antelope Lane in Junipine Estates. MATTHEW is renting a room at the house from DONALD. While at the residence, MATTHEW told MERLE to help him plan a cross-country trip to Massachusetts and Florida to which MERLE stated he could not take the trip with MATTHEW and wanted to leave the residence. MERLE stated the road trip was being planned because MATTHEW believed his probation would be revoked due to a recent Trespassing incident. MATTHEW wanted to leave the state in order to avoid arrest. MERLE stated several times he was going to leave the residence and he wanted to leave the residence but MATTHEW would not let him leave. At some point during the evening, MATTHEW pointed a metallic compact .380 caliber semi automatic pistol at MERLE and threatened to kill him if he did not help MATTHEW drive on the road trip. MATTHEW also refused to let MERLE leave at the time, stating he could not leave until they finished what MATTHEW was planning. MERLE also informed me MATTHEW threatened several other individuals including MERLE'S family and DONALD, the owner of the property, if MERLE refused to help him. Out of fear for his safety and the safety of others, MERLE stayed at the residence. MERLE also gave me information on the house where the event occurred. He stated the residence where the incident occurred is on Antelope Lane in Junipine Estates but he did not know the exact address. MERLE stated it was the third house on the left on Antelope Lane from Buck Ridge and was blue in color. There should be multiple vehicles out front including a spray painted black Ford Bronco and a spray painted black Dodge Dakota. MERLE believed DONALD and MATTHEW may be at the property at the time. I requested MERLE contact DONALD by phone to ensure DONALD'S safety. This concluded my

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

## Notes/Narratives

interview with MERLE

At approximately 1057 hours, I contacted MATTHEW'S Probation Officer Sidney KARINARO. She informed me MATTHEW is on felony probation and is a prohibited possessor as a term of his probation. I informed her of the information I received and she requested periodic updates at the time.

LIEUTENANT NOTIFICATION:

At 1103 hours, I notified Lieutenant Brian TOZER #10 and briefed him on the situation. Lieutenant TOZER requested I contact the probation officer and request they respond to the scene to assist.

SERGEANT NOTIFICATION:

At 1112 hours, I notified Sergeant Ethan MITKOWSKI #34 and briefed him on the situation.

INVESTIGATION CONTINUED:

At 1120 hours, I recontacted MERLE and confirmed DONALD was safe. MERLE informed me MATTHEW may not be at the residence anymore. I requested MERLE meet me at the intersection of State Route 64 and Espee Road for a confrontational call with MATTHEW to possibly gain information on the incident which occurred last night and also determine MATTHEW'S location. At 1144 hours, MERLE arrived at my location and we conducted a confrontational call with MATTHEW. The call was audio and video recorded both by my Axon body camera and department issued digital recorder. While on the phone call, I heard MERLE state, "I can't have you pulling guns and all that kind of crap." MATTHEW responded by saying, "Then don't make me." MATTHEW made statements regarding having a shootout with police if he was contacted. During same phone call, MATTHEW stated he was driving his black Dodge Dakota in Williams to the Foot Works from the Circle K. At 1145 hours, I requested dispatch send an attempt to locate to the Williams Police Department for this case advising the subject would be armed and dangerous and to stop and hold for CCSO for further investigation.

At 1155 hours, Williams PD informed the Sheriff's Office they had a visual of the subject at Foot Works and they were not making contacts until Sheriff's Office deputies were on scene. At 1157 hours, I drove by the Foot Works and saw a black Dodge Dakota, unoccupied, matching the description given to me by MERLE. I met with Williams PD officers to the east of Memorial Park and briefed on the situation. At approximately 1201 hours, MATTHEW got back into the Dakota but did not drive. At 1203 hours, MATTHEW got out of the vehicle and walked to the Family Dollar north across Route 66. I repositioned my vehicle to obtain a better view of the subject walking across the street. When I drove by the Dodge Dakota, I was able to obtain its license plate number of CHW0713. The vehicle returned to Matthew SOLAN.

At approximately 1213 hours, MATTHEW walked back across Route 66 towards the Dodge Dakota. I was advised the subject was going to the passenger side of vehicle. Approximately three minutes later, a male subject and a female subject approached MATTHEW'S vehicle. They were later identified as Marcus XAVIER and AMANDA. At 1217 hours, the vehicle backed out of the Foot Works parking lot and began traveling westbound on Railroad Avenue and turned in a turnaround to go eastbound on Route 66. Based on the information available to me, I ordered Deputy Benjamin THRAILKILL #106 to conduct a felony stop on the vehicle carrying MATTHEW as a passenger on Route 66 at Safeway.

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

# Incident/Investigation Report

Case Number: S19-00447

## Notes/Narratives

At approximately 1220 hours, AMANDA complied with demands to exit the vehicle and was detained. MATTHEW then refused commands to exit the vehicle. I informed MATTHEW he was being detained for felony crimes including aggravated assault with a firearm and kidnapping. During this time, MATTHEW stated several times he wanted to hurt himself and he did not want to live. The driver side door of the vehicle was opened and MATTHEW reached over and closed the door. Deputies on scene repeatedly gave orders to MATHEW, and he was refusing to comply. MATTHEW opened the door and stepped out of the vehicle. While he was outside of the vehicle facing law enforcement, he yelled, "You can kill me but I'm not coming with you." He also stated several times he is planning to commit suicide and he would not be arrested. During this time deployed my rifle and maintained a low ready stance to the vehicle due to the reports that MATTHEW was armed and threatened use of the firearm and threatened to get in a shootout with police.

When MATTHEW exited the vehicle, I put my rifle away and aimed my Taser at MATTHEW; however, due to the angle between my position and MATTHEW, with his vehicle blocking and the distance between, there was no clear opportunity for Taser deployment. I then put my Taser away when MATTHEW reentered the vehicle and redeployed my rifle. While in the vehicle, MATTHEW started the vehicle. The passenger in the rear passenger area of the vehicle attempted to exit the vehicle. The individual was compliant when demanded to show his hands to law enforcement. He was also compliant when given orders to walk back to our vehicle and at 1223 hours, he was detained by Deputy Jeremaiyah GREYEYES #108.

At 1225 hours, I requested medics stage due to the repeated threats of suicide by MATTHEW. Lieutenant Brian TOZER #10 arrived on scene. I briefed him on the situation and he requested me to move to flank the passenger side of the vehicle near the Safeway to prevent civilian access to the scene. I stood by in this location until relieved by Deputy GREYEYES.

INTERVIEW: Donald SCHUBERT:

At 1251, I contacted DONALD by phone. DONALD stated MATTHEW stays at his property in Junipine Estates from time to time but no one was at the house at the time of the phone call. DONALD confirmed MERLE and MATTHEW were at the house last night but did not know what occurred because he went to sleep. DONALD stated he has never seen MATTHEW with a gun but has been told MATTHEW has a smaller pistol. MERLE stated to DONALD MATTHEW made threats to MERLE with the handgun. DONALD stated MATTHEW sometimes displays paranoid thoughts and behaviors. MATTHEW also told DONALD MATTHEW would get in a shootout with police if he had to and DONALD believes MATTHEW does have a gun in his possession.

At 1321 hours, I moved the two detainees, MARCUS and AMANDA, from the patrol vehicles where there being held to Deputy GREYEYES' patrol vehicle and moved to the incident command post to interview both subjects. At 1325 hours, I moved AMANDA'S handcuffs to the front of her person and conducted an interview.

INTERVIEW: Amanda HERNANDEZ:

AMANDA stated she knew MATTHEW for approximately 3 to 4 months due to a relationship her boyfriend and MATTHEW started while they were in jail. She stated she has worked at MATTHEW'S ranch several times and that was the plan for today. AMANDA stated MATTHEW wants her to drive him to an unknown location but stated it was "A thousand miles." She told MATTHEW she could not drive him due to prior obligations. Last night, AMANDA stated she, MERLE and MATTHEW were in Flagstaff. First, they went to pay her fines and get her driver's license reinstated and MATTHEW paid for those expenses. Then, the

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

## Notes/Narratives

three went to Wal Mart where AMANDA purchased .380 and 9 millimeter ammunition. The 9 millimeter was for MARCUS' gun and the .380 is for MATTHEW'S gun. MATTHEW has told her in the past he possessed a gun and wanted AMANDA to buy him ammunition for the gun. AMANDA stated she has never seen the gun. MERLE then dropped MATTHEW and his dog off at the vet and MERLE took AMANDA to drop her off at her house. AMANDA stated MERLE and MATTHEW went to DON'S house, referring to DONALD in Junipine Estates. MERLE told AMANDA the following: MATTHEW held MERLE hostage due to an argument over taking him on a cross-country trip. AMANDA stated inside the pickup truck was a pellet gun in the center console and pepper spray on the passenger side. She also stated there was what appeared to be a lockbox for a gun in the bed of the truck. AMANDA mentioned that she had two children, a 15-year-old and a three-year-old, at an apartment on the other side of Williams at the Red Roof Inn. She stated she was comfortable with her 15-year-old staying with her other child and did not request any assistance for her children.

MIRANDA:

At approximately 1336 hours, I issued MARCUS his Miranda warning from my department issued Miranda card. MARCUS stated he understood his rights and did not request an attorney at any time.

INTERVIEW: Marcus XAVIER:

I moved MARCUS' handcuffs to the front of his person and spoke with MARCUS. MARCUS stated he did not know MATTHEW before today. He and AMANDA met MATTHEW at the Family Dollar and then walked to the car. When they got into the car and started driving away, he noticed a Sheriff's vehicle behind him and then the traffic stop occurred.

INVESTIGATION CONTINUED:

During my interview, I was informed by Lieutenant TOZER Detective Tristan MEYER #57 was standing by at the Williams substation to conduct further interviews on the two subjects MARCUS and AMANDA. I then transported MARCUS and AMANDA to the Williams substation and stood by while Detective MEYER interviewed both. Both subjects were later released without charges.

I then stood by while Detective MEYER interviewed MERLE. I then remained in and around the scene until 1950 hours after the conclusion of the incident. Reference all supplemental reports for further details.

ENCLOSURES:

1. MVD information for Matthew
2. MVD information from Merle
3. MVD information for Amanda
4. MVD information for Marcus
5. MVD information for Donald
6. MVD information for vehicle bearing Arizona [redacted]

DISPOSITION:

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

# Incident/Investigation Report

Case Number: S19-00447

## Notes/Narratives

Referred to Criminal Investigations.

CONTINUATION

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

# Incident/Investigation Report

Case Number: S19-00447

## Supplement Information

| Supplement Date | Supplement Officer | | Supervisor | | |
|---|---|---|---|---|---|
| 01/30/2019 00:00:00 | (1070196) GILLILAND, REX E | | (1070196) GILLILAND, REX E | | |
| Contact Name | | | Location Comment | | |
| Case Status: CLOSED/CLEARED (21,22) | | Case Status Date: 01/30/2019 | Location Type | Felony/Misd/NC: FELONY | DV Related: N |
| Case Disposition: CLEARED BY ADULT ARREST | | Disposition Date: 01/30/2019 | Investigator Assigned: (1004929) MCGUIRE, JACOB RAY | | |

## Supplement Notes

PATROL DR # S19-00447 (A)
COMMANDER REX GILLILAND #6
C219/6: 01/31/2019

ASSIGNMENT:

Wednesday January 30, 2019 I responded to an armed subject who had barricaded himself in a vehicle within the City of Williams.

INVESTIGATION:

Wednesday January 30, 2019 Lt. TOZER advised me that deputies had a received a report from Merle HAMBURGER alleging he was the victim of an armed kidnapping and named Matthew SOLAN as the suspect. Tozer explained they were in the early stages of the investigation and would be attempting to locate SOLAN at his home.

At approximately 1232 hrs, TOZER contacted me and advised deputies/officers had located and stopped SOLAN'S truck in Williams in front of the Safeway. Two passengers exited or were taken out of the truck and SOLAN barricaded himself in the truck. Tozer reported that SOLAN had stated he had a gun and was going to kill himself or he would make police kill him. Tozer informed me that SOLAN had not presented or shown a gun at this point.

I immediately responded to the scene from Flagstaff.

Upon arrival, I met with Lt. TOZER and obtained a briefing. The suspect was seated behind the steering wheel of a faded black or faded ddark gray pick up. Deputy A. MAC ARTHUR had her patrol vehicle parked behind the suspect truck. MAC ARTHUR was talking with the suspect from a position of her patrol truck. There were two other marked patrol vehicles also behind the suspect vehicle.

Per Tozer, we had a loose perimeter set up around the suspect truck. TOZER reported the Williams Police Department had locked down the nearby school and Safeway store.

I requested an ambulance or medics to place on stand-by. I was not comfortable that we had a secured perimeter, so TOZER and

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

## Supplement Notes

myself ordered more officers and directed them to unsecured locations. I was concerned that we had no way to physically block or prevent the suspect from driving away, so I ordered stop sticks (or tire deflation device/ spikes) be deployed in front of the suspect vehicle.

TOZER had already requested the Flagstaff Police Departments joint tactical operations team. We maintained the perimeter while MAC ARTHUR continued to talk to or try to talk to SOLAN out.

Tactical members arrived on scene and took position on the perimeter. The tactical team leader, Lt. S. MANSFIELD arrived on scene. Team negotiators arrived on scene and made contact with SOLAN.

A tactical vehicle was brought in and pulled up in front of SOLAN'S truck to block him in and prevent him for going mobile. It was reported when SOLAN saw the tactical vehicle, he started to drive away. The tactical vehicle was used to stop his vehicle. It was reported that SOLAN presented a handgun and held it to his own head.

Over the next several hours, negotiators continually tried to get SOLAN to surrender and exit the vehicle.

At some point, I overheard dispatch state that an attorney who was some how connected to SOLAN had called into dispatch. I asked dispatch to contact that attorney and ask him to call me. My intent was to try and get the assistance of the attorney to convince SOLAN to surrender.

Minutes late, I received a call from Andrew MARCANTEL. MARCANTEL said he had received a call from SOLAN asking if he would take a retainer to represent him. MARCANTEL made some statement that SOLAN had said something to the effect of, once being represented, he would talk with negotiators to surrender. I asked if he would assist us in convincing or talking SOLAN into surrendering and exiting the vehicle. MARCANTEL said he wanted this to end peacefully and without injury to SOLAN. In subsequent calls with MARCANTEL, he said he had told SOLAN he would represent him.

Some time later, negotiators reported SOLAN wanted to the talk with the commander of the Sheriff's Office. I entered the van with negotiators. Det. MARTINET was talking with SOLAN, who was asking to speak with me and asking to be taken to the hospital. MARTINET put the phone on speaker and I was able to talk with SOLAN.

I told SOLAN that if he came out, I would assure that we would transport him to the hospital to get help. SOLAN then requested that his service dog be allowed to go with him, and I assured SOLAN that we would take his dog with him. SOLAN then asked that his dog be allowed to sit in his lap and I assured SOLAN we would allow his dog to sit on his lap.

I overheard SOLAN tell MARTINET that he was thinking of shooting himself to assure he would be taken to the hospital. MARTINET continually told him not to shoot himself and that I had promised to have him transported to the hospital. After providing SOLAN assurance to his three requests, I exited the van and had no further negotiations with SOLAN.

SOLAN refused to surrender after we meet and agreed to his requests. He continued to barricade himself and refused to come out or surrender.

After an extended period of time with negotiators trying to talk SOLAN out, I met with the MANSFIELD and discussed options to

CONFIDENTIAL

Coconino County Sheriff's Office
Jim Driscoll, Sheriff

911 E Sawmill Rd
Flagstaff, AZ 86001
928.774.4523
800.338.7888

## Incident/Investigation Report

Case Number: S19-00447

## Supplement Notes

resolve this incident should SOLAN refuse to surrender.

After a substantial amount of time, negations were not making any progress and SOLAN refused to come out. He was told that we were ordering him out of the truck and he had a time limit, and if he refused, tear gas would be disbursed in his truck.

We continued to hold our positions with no action until that time had expired. Prior to the time expiring, SOLAN then shot himself in the leg and exited the vehicle. He was provided immediate medical attention, then transported to Flagstaff Medical Center.

ENCLOSURE:

None

DISPOSITION:

This officer conducted no further investigation. The case will be referred to Criminal Investigations for follow up.

# EXHIBIT D

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,

Plaintiff,

vs.

The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,

Defendants.

Case No: CV24-02061-JJT-DMF

**DECLARATION OF MICHAEL R. SHELDON**

I, Michael R. Sheldon, am a Defendant in this case and hereby state, under penalty of perjury, that I am over 18 years of age and am competent to provide the information

contained in this Declaration. The following information is true to the best of my knowledge, information and belief, and if called upon to testify in this matter, I would testify as follows:

1. I am the Chief Executive Officer for the Arizona State Hospital ("ASH"). I have been in this role since May 7, 2022. Prior to that, I was ASH's Chief Operating Officer and a Bureau Chief for the Division of Behavioral Health Services at the Arizona Department of Health Services ("ADHS"). I have been employed at ADHS throughout the period that Plaintiff Matthew Solan has been a patient at ASH's Forensic Hospital.

2. ASH has a policy that allows patients like Solan who have been committed to the Forensic Hospital following a plea of guilty except insane ("GEI") to violent felonies to qualify for early release if they can establish that they are no longer a danger to themselves or to others. (Ex. 1 [Forensic Patient Privileges Policy (Solan Dep. Ex. 3 [DF0612-062])].)

3. The policy establishes a sequence of privileges culminating in Conditional Release to the Community that GEI patients may earn based upon their "adherence to treatment plan, absence of any danger to self or other behaviors, acceptance of redirection from staff, and compliance with Hospital rules." (Ex. 1 at D0614.)

4. The policy provides for three successive levels of privileges inside the secure perimeters of the Forensic Hospital: (1) **Remains on Unit ("ROU")**, in which patients are restricted to their residential unit until their treatment team reviews their progress and considers 1:5 privileges inside the secure mall permissible; (2) **1:5 Mall Privileges**, in which patients are allowed to attend rehabilitation and other activities as outlined in their Inpatient Treatment and Discharge Plan ("ITDP") under a one supervisor to five patients

level of supervision; and (3) **Independent Mall Privileges**, in which patients may be able to use the mall during posted mall hours for leisure time, fresh air, café, and so on. (Ex. 1 at DF0614.)

5. After obtaining these on-Hospital grounds privileges, GEI patients may attain six successive stages (three phases, each containing two levels) of conditional release to the community privileges. While passing through these six levels, patients continue to live and be treated at ASH but enjoy progressively greater and more independent access to off-Hospital activities. (Ex. 1 at DF0614-616.)

6. Ultimately, if a GEI's treatment team and ASH's Special Classification Committee ("SCC") determines that a patient is no longer dangerous and sufficiently stable to remain so after discharge from the hospital, ASH may support the patient's conditional release to the community. (Ex. 1 at DF0616-617.)

7. ASH allows GEI patients who have acquired Phase 2 privileges or higher to live in the Community Reintegration Unit ("CRU"), which is a 23-bed free-standing unit located off the Forensic Hospital campus, where the majority of GEI patients reside.

8. In the nearly six years that Solan has been confined at the Forensic Hospital, Independent Mall Privileges is the highest degree of privileges that he has attained. As of this writing he has 1:5 supervision privileges.

9. On May 22, 2024, the Phoenix Police Department opened an investigation into former lead Behavioral Health Technician ("BHT") Lea'Cher Carter's allegation that Solan threw hot coffee in her face, threatened to kill her and her unborn child (she was pregnant at the time), and called her "nigger" several times during the incident. (Ex. 2

[Phoenix Police Department Report of the 05/22/2024 Incident ("PPD Report") (DF2686-DF2692)] at DF2691.)

10. The PPD Report contained a witness statement from BHT Unique Coleman, who advised that she witnessed Solan throw coffee on Carter, berate her with racial slurs that included "nigger," and threaten to kill her. (Ex. 2 at DF2691-2692.) Another ASH staff member whom the PPD interviewed stated that she heard Solan say that "that black nigger needs to die," referring to Carter. (*Id.* at DF2692.)

11. Dominick Aldrich, the then Psychiatric Nurse Shift Supervisor on duty on May 22, 2024, filed a report stating that, following the incident, Solan told him that he "felt like stomping on [Carter's] head and killing her or her unborn child." Ex. 3 [Aldrich Incident Report re: 05/22/2024 Incident (DF2700-2701)] at 2700.) Aldrich advised Solan that "throwing coffee onto another person is assault and is DTO [danger to others] behavior" and placed him on "ROU till his behaviors no longer demonstrate[d] DTO behaviors." (*Id.*)

12. On August 26, 2024, Solan filed a grievance with the Arizona Health Care Cost Containment System ("AHCCCS") complaining that Carter had verbally harassed him for months before pressing allegedly false charges that he threw hot coffee in her face and threatened to kill her on May 22, 2024. (Ex. 4 [Solan's 08/26/24 Complaint re: 05/22/2024 Incident (Solan Dep. Ex. 9 [DF0749-0750])].)

13. Specifically, Solan accused Carter of "telling [him] in front of other patients [he was] 'nasty," that [he] 'eat[s] dog ass,' that [he] 'eat[s] dog pussy,' and that his 'dick is so small you need a magnifying glass to see it.'" (Ex. 4 at DF0750.) He also complained that, as a result of Carter's supposedly false accusations, he suffered "an extremely

traumatic arrest by Phoenix PD in [his] ASH bedroom, and over a week of agonizing solitary confinement in the county jail." (*Id.*)

14. AHCCCS referred Solan's grievance concerning Carter to ASH for investigation. (Ex. 5 [ASH's Investigation re: 05/22/2024 Incident (Solan Dep. Ex. 10 [DF0725-DF0730])] at DF0725, 0727.) The ASH investigator interviewed Solan and asked him if there were any witnesses to Carter's alleged verbal abuse. Solan responded, "'I'm sure there were, but since this happened along [sic] time ago no one is going to remember.'" (*Id.* at 727-28.) Psychiatric Nurse Unit Manager Lance Thomason told the investigator "that there was never any evidence that . . . Carter assaulted [Solan] or was verbally abusive to [him]" and that Solan "never provided any dates, times, or witnesses to support his claim." (*Id.* at 728.)

15. Based on Solan's and Thomason's statements, as well as Carter's and Aldrich's written reports of the May 22, 2024, incident, the ASH investigator concluded that Solan's grievance was unsubstantiated. (Ex. 5 at 728.) ASH advised Solan of this conclusion and of his right to appeal the decision to AHCCCS. (*Id.* at 730.) ASH has no record that Solan ever did so.

16. I am aware that, in this lawsuit, Solan has alleged that, like Carter, ASH BHT Unique Coleman said to him, in the presence of other patients, "you eat dog p***y" and "you eat dog a**" throughout 2024. (Doc. 6, ¶¶ 137, 294.) Unlike Carter, however, ASH has no record that Solan filed any sort of complaint against Coleman based on allegations that she made any such statements.

17. Solan's complaints to ASH against Coleman date from after he filed this lawsuit. On June 21, 2025, he filed a complaint alleging that she threatened to slap him

and spit in his ear, which he claimed caused an ear infection. (Ex. 6 [ASH's Investigation of Solan's June-July 2025 Complaints Against Coleman (Solan Dep. Ex. 5 [DF0694-0705])] at DF0696.) Solan noted that Coleman is a Defendant in this lawsuit and complained that her alleged conduct constituted "felony interference with a party to a federal suit." (*Id.*)

18. On July 3, 2025, Solan filed another complaint alleging that on June 27, 2025, Coleman verbally taunted him, noting that she had been told to call the police "if [he] did anything." (Ex. 6 at DF0694.) According to Solan, Coleman's alleged statements "caused me to have a total meltdown and I cut both my wrists & ankles. The nurse wouldn't help me, so I cut myself some more." (*Id.*)

19. ASH investigated Solan's complaints. Based on multiple interviews and the review of security video, the investigator "determined that on 6/21/25, patient Solan was the one being verbally aggressive and making racial comments towards [Coleman]" and that there was no evidence that she caused Solan to have an ear infection. (Ex. 6 at DF0699-0700.) Moreover, video of the June 27, 2025, incident "shows that patient Solan was the one being verbally aggressive towards BHT Coleman and he also took a swing at her," as documented in an ASH incident report. (*Id.* at DF0700.)

20. On August 1, 2025, ASH notified Solan of its findings and conclusion that his complaints against Coleman were unsubstantiated. (Ex. 6 at DF0701-0705.) ASH also advised Solan that he could appeal this decision to AHCCCS. (*Id.* at DF0704.) Instead, in September 2025, he reasserted his claims and named Coleman as a Respondent in a Notice of Claim against ADHS and the State of Arizona seeking $55,000,000.

21. At a Master ITDP Review on July 2, 2025, because of Solan's recent DTS (danger-to-self) and DTO (danger-to-others) behaviors, his treatment team decided to update his ITDP to implement a therapeutic progression plan and transfer him from the Cottonwood to the Mohave residential unit within the Forensic Hospital. (Ex. 7 [07/02/2025 Master ITDP Review (DF0927-0932)] at DF0930-931.)

22. Solan did not attend the ITDP Review meeting, disagreed with the updated ITDP, and stated: "I will not be working with you on a progression plan, you can put me on a 1:1 or a 2:1 a 3:1 or beat the shit out of me." (Ex. 7 at DF0927, 0931.)

23. The progression plan provides that, so long as Solan refrains from aggressive behaviors (e.g., verbal threats, statements of harm, intimidating others, posturing) and accepts staff redirection without statements of harm to others or posturing at staff, over set periods of time he may pass progressively from ROU, to 1:5, to full mall privileges and more and more computer time. (Ex. 8 [07/03/2025 Therapeutic Progression Plan (DF2579-2590)].)

24. The plan also provides that Solan will be returned to the initial period in the progression if he engages in imminently violent or directly threatening behaviors and will be downgraded to the beginning of the previous period of the plan if he engages in aggressive behavior, i.e., "[i]mpulsive statements of harm, damaging property, throwing food, or other unacceptably aggressive behaviors including the use of hate speech." (Ex. 8 at DF79.)

25. On February 3, 2026, Solan threatened to kill another patient who he accused of assaulting him (despite video evidence to the contrary) "by stomping his head in the ground over and over." (Ex. 9 [02/03/2026 Incident Report [DF2707-2708] at DF2702.)

26. On February 5, 2026, Solan's treatment team met with him to discuss the consequences of his verbal threats to a peer. (Ex. 10 [02/05/2026 Incident Report (DF2710-2711)]. They informed Solan that, "per his progression plan, he would be reset to the beginning of Period 4 due to statements of harm." (*Id.* at DF2710.) Solan's treatment team further confirmed that "threats to harm others, and particularly those with a clear plan stated, will not be tolerated." (*Id.*)

27. On February 5, 2026, Solan had attained full-mall privileges. By being reset to the beginning of Period 4, he regressed to 1-5 supervision privileges.

**DATED** this __9th_ day of March, 2026.

Michael R. Sheldon
Chief Executive Officer
Arizona State Hospital

# EXHIBIT 1

| ARIZONA DEPARTMENT OF HEALTH SERVICES<br>**ARIZONA STATE HOSPITAL** | **LEVEL** | **REFERENCE CODE** | **EFFECTIVE DATE** |
|---|---|---|---|
| | II | Provision of Care, Tx, Services (PC) | December 23, 2024 |
| **TITLE:** | **FORENSIC PATIENT PRIVILEGES** | | |
| **SUPERSEDES:** | Forensic Patient Privileges, approved 7/22/24 | | |
| **REVIEW CYCLE:** | Three Years | **GOVERNING BODY APPROVAL:** | No |

**PURPOSE**

To establish privileges for patients admitted to the Forensic Hospital.

**POLICY**

The Arizona State Hospital (ASH) provides optimal patient care and active treatment to enhance the rehabilitative process for forensic patients. On and off-grounds privileges for forensic patients shall not interfere with active treatment, legal appointments, medical appointments, or other important therapeutic activities. Patients who are admitted under Restoration to Competency are not eligible for any privilege level outside of the secure perimeter, as they are considered to be "in custody" and awaiting trial.

**APPLICABILITY**

All clinical treatment team members, Chief Medical Officer (CMO), Chief Executive Officer (CEO), Hospital Security personnel, Special Classification Committee (SCC) Members and Hospital Surveillance Unit.

**DEFINITIONS**

**Forensic Patient** is a patient with a legal status of Title 13, Not Guilty by Reason of Insanity (NGRI), Guilty Except Insane (GEI), or Restoration to Competency (RTC).

**Global Positioning Satellite (GPS)** is an ankle bracelet worn by designated forensic patients which provides electronic tracking.

**GPS Tracking Unit** is the team monitoring forensic patients on and off campus by electronic means.

**Surveillance** is the physical monitoring of forensic patients, which may include line of sight observation.

**Treatment Team** consists of the patient's Behavioral Health Medical Professional (BHMP), psychologist, licensed nurse, social worker, rehabilitation representative, mental health program specialists, and community case manager, and may include others.

**ATTACHMENTS**

1. List for Specific Off-Grounds Activities – Escorted
2. Tobacco Free Philosophy Statement
3. Surveillance System Equipment Rules/Global Positioning Satellite (GPS) Tracking Informed Consent
4. Patient Weekly Schedule



Ex No.: 3
Solan, Matthew
02-04-2026 GL
Jennifer Honn, AZ 50885

DF0612

5. Patient Sign Out/In Sheet
6. Off-Grounds Pass
7. Risk Assessment Readiness Checklist

## GENERAL GUIDELINES

1. **Process**: Patients who are admitted under GEI or NGRI rulings are to be placed at ASH for both treatment and security. As such, once the patient is considered to be non-dangerous, he/she can be referred to either the Superior Court consideration of release.

2. **Privilege Hours:** Patients should not be granted privileges during times when they are scheduled to be engaged in active treatment, legal appointments, medical appointments, or other important therapeutic activities, unless the off-unit privileges are used to attend therapeutic activities or serve another therapeutic purpose as indicated on the Inpatient Treatment and Discharge Plan (ITDP).

3. **Mall Privilege Hours**: Will be posted on each unit and will be consistent for all units.

4. **Responsibility**: Patients are responsible for their own behavior. If an incident of inappropriate behavior occurs (while either on independent or escorted grounds privileges), the treatment team will address the patient's behavior with him/her by the next business day and take the incident into consideration for potential revocation/downgrading of current privileging and in future privileging decisions.

5. **Contracting with Patients**: For staff-escorted privileges, patients will make a verbal contract with the staff member before going out on grounds, agreeing that they will all stay together. They will also sign written contracting around communicable disease safety.

6. **Accountability**: Staff will be held accountable if they are not following protocols, such as not having patients within eyesight.

7. **Radios and Cell Phones**: Radios shall be taken at all times for on-grounds activities. Cell phones from Hospital Security shall be taken at all times for off-grounds activities.

8. **Eyesight and Proximity**:

   **Outside the facility**: Maximum ratio for staff escorting patients will be 1:3. The three patients must be within eyesight and no more than 10 feet in proximity to the escorting staff member.

   **Inside the facility**: Maximum ratio for staff escorting patients will be 1:5. Escorting staff must have the five patients within eyesight and in close proximity (no more than 15 feet) at all times. Staff shall contact the unit immediately and wait for assisting staff to arrive if any patient is not within eyesight. If a member of the group needs to use the restroom in any building, then the remaining group members must stand just outside the restroom with staff continuing to monitor.

9. **Signing Out**: Patients leaving the unit on 1:5 staff ratio will sign out, and staff escorting the patients will initial on the Patient Sign Out/In Sheet (Attachment 5) that they are escorting the patients. Patients leaving the unit to and from activities or independent forensic mall privileges will sign out, and staff will initial the Patient Sign Out/In Sheet to acknowledge.

10. **Community Reintegration Unit (CRU)**: Patients will utilize the designated sign-out board when leaving/returning to the treatment unit.

11. **GPS:** All GEI forensic patients will wear a GPS device when engaged in activities outside the Forensic Hospital perimeter. NGRI patients, under certain conditions, may be expected to wear GPS devices when outside of the secure forensic perimeter. Those forensic patients who do not have off-grounds privileges shall be transported in ankle and/or wrist transport safety devices when escorted to clinics away from the Forensic Hospital.

12. **Progression:** Occasionally there will be exceptions to these guidelines for some patients who can progress through privileges faster than the guidelines provide. These patients can be reviewed with forensic management staff for exception consideration. The SCC, with consent and approval of the CMO and CEO, shall make the final decision on an exception.

13. **Pandemic Response:** The hospital reserves the right to temporarily suspend any and all passes, outings, or other visits external to the hospital campus by forensic patients in response to a pandemic, epidemic or other communicable disease outbreak that may jeopardize the safety, health and well-being of patients and/or staff. The Administration will follow applicable guidance from the Centers for Disease Control and state epidemiologists when determining if and when passes/outings to the community should be suspended and/or can be subsequently resumed.

## PROCEDURE

### A. GEI FORENSIC PATIENTS

1. Patients admitted to the hospital under GEI may be granted off unit/on Hospital grounds privileges as listed in the guidelines below. The treatment team shall determine the level of privileges as follows:

    a. **Inside Secure Perimeter:** Stable clinical status, adherence to treatment plan, absence of any danger to self or other behaviors, acceptance of redirection's from staff, and compliance with Hospital rules will be required to earn, keep and progress through different levels of privileges. The treating provider should update the patient's privilege level by initiating the order as follows: "Discontinue previous privilege orders" and order current level of privileges. The levels listed below, and their time-frames, are considered to be guidelines.
    b. **Remains On Unit:** Patients are restricted to the unit until the treatment team reviews their progress and considers 1:5 privileges inside the secure mall.
    c. **1:5 Mall Privileges:** The attending provider, in consultation with treatment team members will advance the patient to 1:5 privileges. Patients are allowed to attend rehabilitation and other activities as outlined in their ITDP while on 1:5 level.
    d. **Independent Mall Privileges:** The attending provider, in consultation with treatment team members, may advance the patient to the independent mall privileges level. Patients may be able to use the mall during posted mall hours for leisure time, fresh air, café, etc.

2. For any GEI forensic patient that is not compliant with his/her treatment and who does not meet the criteria for a Title 36 court order for treatment, the clinical team will send the case to the CMO, the ASH Legal Department and the Attorney General's Office for a review of available options, including being remanded to the Department of Corrections to carry out the term of his/her sentence.

### B. CONDITIONAL RELEASE LEVELS 1-6

1. There are three phases of conditional release to the Hospital, wherein the patient continues to reside and be treated at the Arizona State Hospital: Conditional Release to the Hospital, Staff Passes (Phase 1);

Conditional Release to the Hospital, Approved Others (Phase 2); and Conditional Release to the Hospital, Self Passes (Phase 3). There are two levels within each phase.

2. The SCC, CMO, and CEO must approve all requests for a change in Conditional Release Phase/Level. Patient movement within approved phases may occur at the clinical team level if both levels within a phase have been approved.

3. Following approval of the CMO and CEO, Hospital support for the request for a Conditional Release Phase/Level is communicated to the patient by the treatment team, and the SCC report as well as the proposed Conditional Release Plan as forwarded to the patient's attorney by the Legal Department Manager. It is the responsibility of the patient's legal representation to petition the court for a hearing.

4. Following approval of the Court and receipt of the approval order, the treating provider should update the patient's privilege level by initiating the order as follows:

   a. Discontinue previous privilege orders.
   b. Privilege level "X" approved Court and CEO.
   c. The order must specify the purpose for this level of privilege.

5. The patient's ITDP will be updated to reflect implementation and progress as outlined in the approved Conditional Release Plan.

6. Discuss the patient's ability to manage each level at each ITDP scheduled review or more frequently, as appropriate.

7. In those cases where significant others are inaccessible, and this represents a barrier to progression through the privilege levels, the clinical team may request a modified phase progression in their request to the SCC.

8. Definitions of levels are as follows:

   a. **Phase 1 Privilege Level 1:** The first level of Conditional Release to the Hospital, Staff Passes.
      i. Requires a 1:1 staff to patient ratio,
      ii. Treatment team must recommend the outings,
      iii. Patient must successfully complete the number of passes contained in the Conditional Release Plan.

   b. **Phase 1 Privilege Level 2:** The second level of Conditional Release to the Hospital, Staff Passes.
      i. Requires a 1:3 staff to patient ratio,
      ii. Treatment team must recommend the outings,
      iii. Patient must successfully complete the number of passes contained in the Conditional Release Plan.

   c. **Phase 2 Privilege Level 3:** The first level of Conditional Release to the Hospital, Approved Others Passes.
      i. Allows passes with significant others and/or family who have been approved by the SCC, CMO, CEO, and Court,
      ii. Treatment team must approve the outings,
      iii. Duration of these passes will be detailed in the Conditional Release Plan, but not to exceed eight (8) hours,

iv. Patient must successfully complete the number of passes specified in the Conditional Release Plan.
v. Visiting a patient on another unit does not require the use of the patient's approved number of passes specified in the Conditional Release Plan

d. **Phase 2 Privilege Level 4:** The third level of Conditional Release to the Hospital, Approved Others Passes.
   i. Allows passes with significant others and/or family who have been approved by the SCC, CMO, CEO, and Court,
   ii. Treatment team must approve the outings,
   iii. Duration of these passes should not exceed forty-eight (48) hours,
   iv. Patient must successfully complete the number of passes specified in the Conditional Release Plan.
   v. Visiting a patient on another unit does not require the use of the patient's approved number of passes specified in the Conditional Release Plan

e. **Phase 3 Privilege Level 5:** The first level of Conditional Release to the Hospital, Self Passes.
   i. Allows independent passes,
   ii. Treatment team must approve passes and destinations,
   iii. Duration of these passes will be detailed in the Conditional Release Plan,
   iv. Passes occur in specified frequency,
   v. Patient must successfully complete the number of passes specified in the Conditional Release Plan.
   vi. Visiting a patient on another unit does not require the use of the patient's approved number of passes specified in the Conditional Release Plan.

f. **Phase 3 Privilege Level 6:** The second level of Conditional Release to the Hospital, Self Passes.
   i. Allows independent passes,
   ii. Treatment team must approve the destinations and the passes,
   iii. Duration of these passes may not exceed 12 hours, and
   iv. Passes occur in specified frequency.
   v. Visiting a patient on another unit does not require the use of the patient's approved number of passes specified in the Conditional Release Plan

## C. CONDITIONAL RELEASE TO THE COMMUNITY

1. A patient whom the treatment team and the SCC has determined to be no longer dangerous, and who is believed to be sufficiently stable to remain so after release from the hospital under the terms of a Conditional Release Plan, may seek approval of the CEO/CMO for Hospital support for Conditional Release to the Community. If such support is given, the treatment team will inform the patient of the Hospital's support of a request for discharge from the Hospital, and the SCC report and CR plan will be shared with the patient's attorney by the Legal Department Manager. It is the responsibility of the patient's legal representation to petition the court for a hearing. Conditional Release to the Community results in the Hospital no longer being the treating provider for the patient. The Conditional Release to the Community Plan will specify, at a minimum:

   a. The frequency and specifics of outpatient monitoring by case monitoring services,
   b. The name of the outpatient psychiatrist, and the frequency of follow up visits,
   c. The name of outpatient substance abuse/therapy providers and frequency of visits, if indicated,
   d. The name, address and type of residential placement,

e. The name and specifics of any employment,
f. The type and frequency of self-help (AA/NA) services and meetings, if indicated,
g. The specifics of any approved visits outside of the geographical area.

## D. CONDITIONAL RELEASE PLANS

1. Conditional Release Plans are initially prepared by the treatment team and reflect the specifics of the privileges requested. The Conditional Release Plan is presented to the SCC for consideration. Following the approval of the SCC, the plan, with supporting documents, is brought by the CMO to the CEO for discussion and review. If the CMO and CEO approve Hospital support for the plan, and it is included with the SCC report in transmittal to the patient's attorney.

2. **Conditional Release to the Hospital, Staff Passes** (Phase 1 Levels 1-2): At this phase a Conditional Release Plan is implemented for therapeutic passes to the community in the presence of one hospital staff member to one or up to three patients for staff to patient ratios of 1:1, 1:2, or 1:3.

3. **Conditional Release to the Hospital, Staff Passes specifies**:

   a. The type of outing,
   b. Staff to patient ratios,
   c. Frequency of these outings,
   d. Duration of the outings,
   e. Number of passes for each level,
   f. Required amount of time (in calendar days) for each level,
   g. The implementation of GPS monitoring and conditions,
   h. The frequency of substance abuse monitoring,
   i. The prohibition of visiting establishments that serve alcohol, and
   j. A description of Levels 1-2 and what these levels entail.

4. **Conditional Release to the Hospital, Approved Others Passes** (Phase 2 Levels 3-4): This phase adds to the conditions in the Staff Passes Conditional Release Plan. All of the elements listed above in the Conditional Release to the Hospital, Staff Passes must be included as well as the elements below.

5. **The Approved Others Conditional Release Plan typically specifies**:

   a. The clinical basis and plan for the Hospital staff-to-patient ratio for staff-escorted passes:

      i. That all previously approved escorted community privileges specified in the Staff Passes Conditional Release Plan remain in effect, including a staff to patient ratio of 1:3.
      ii. The duration, number, and frequency of staff-escorted passes.
      iii. Required amount of time before moving to next level.

   b. The clinical basis and plan for gradual progression from Levels 3-4:

      i. Typically off-grounds passes commence with an approved other for up to 8 hours for a specified number of days.
      ii. After the specified days, the plan indicates how successful completion of level 3-4 is determined.
      iii. Passes with sponsors and case managers are allowed for AA/NA meetings or other therapeutic activities as determined by the treatment team.

iv. A description of what constitutes Levels 3-4.

c. How the approved others have been identified, and their involvement in the patient's program: It is expected that the treatment team will ensure that all approved others have been engaged in the treatment of the patient, and have been educated about their role and unique responsibilities as an approved other. Additionally, approved others must have a valid driver's license; be educated about the patient's diagnoses and reason for hospitalization; and living with independence rather than with someone who is supervising them. Approved others may be removed from a patient's plan per decision of the treatment team with CMO-CEO approval, or by CMO/CEO, for any concerning issues or behaviors.

6. <u>Conditional Release to the Hospital, Self Passes</u> (Phase 3 Levels 5-6): This phase adds to the conditions in the Approved Others Conditional Release Plan. All of the elements listed above in the Conditional Release to the Hospital, Approved Others must be included as well as the elements below.

7. <u>The Self Passes Conditional Release Plan typically specifies</u>:

a. The duration, number, time course, and frequency of staff-escorted passes,
b. The duration, number, time course, and frequency of Approved Other Passes, and
c. A description of the clinical basis and plan for gradually progressing the patient from level 5-6:

i. Independent passes do not exceed the specified number of hours for both levels,
ii. A description of level 5-6, and
iii. The nature and frequency of urine drug screens.

**E. <u>NGRI FORENSIC PATIENTS</u>**

1. NGRI patients have been found not guilty by reason of insanity and are under the jurisdiction of the Superior Court until the court releases the patient unconditionally. Because the nature of the crime was not a factor in the imposition of an NGRI finding and the imposition of the Superior Court's oversight remains indefinite, the administration stratifies NGRI patients according to the following schema:

a. <u>High Risk</u>: Those patients whose index crime includes murder or attempted murder of any degree, or those patients who have demonstrated escape or violence in the Hospital in the past year.

b. <u>Medium Risk</u>: Those patients who have committed a non-murder (or attempted murder) crime against a person or a crime involving the use of a weapon within the past 10 years. This category would also include those patients who have exhibited violence or Absent With Out Leave (AWOL) attempts within the past three years.

c. <u>Low Risk</u>: Those patients who have committed any non-murder (or attempted murder) crime not noted above and involving a person that occurred more than 10 years past or any crime involving property and who do not present an AWOL risk.

2. NGRI patients in the high or medium risk categories will be fitted with a GPS device when outside of the secure forensic perimeter.

3. NGRI patients with a concomitant Title 36 commitment order may be considered for placement in the Civil Hospital. The SCC may approve high-risk patients for consideration with final approval by the CEO. Patients with an NGRI status shall be considered for placement in the Civil Hospital only upon approval of the SCC and the CEO.

4. NGRI patients housed in the Forensic Hospital shall be subject to the level of privileges noted for GEI patients and shall follow the procedure for approval of privileges under **PROCEDURE** with the following modifications:

   a. All outside perimeter privileges (Forensic or Civil) must be approved by the Superior Court before implementation;
   b. Low risk NGRI patients are eligible for fast progression of privileges and Conditional Release Plan

5. Following approval for privileges level from the SCC and CEO, the Legal Department will ascertain if further approval is required from the Superior Court.

## F. STEPS IN APPROVAL OF PRIVILEGES

1. The treatment team shall complete the Risk Assessment Readiness Checklist (Attachment 7) to evaluate the patient's readiness for a violence risk assessment in consideration of increased privileges.. The team will then present the checklist and discuss the case with the SCC.

2. If the SCC and CEO give approval for the patient to have a risk assessment, the treatment team can move forward with referring the patient for a risk assessment. After the risk assessment is completed, the treatment team will review the assessment, and when they determine the patient is ready for advancement in privileges, the attending provider will prepare a report to SCC. he attending BHMP/psychologist shall prepare a report for the SCC detailing the patient's history, crime, behavioral health condition, clinical stability, attendant risks, and privileges requested.

3. The patient shall be reviewed in SCC, and SCC shall discuss the treatment team's recommendations, weighing all relevant clinical and risk factors with respect to the requested privileges.

4. The recommendation of the SCC, with respect to the requested privileges, shall be brought by the CMO to the CEO for discussion and consideration.

5. If approved as supported by the CMO and CEO, the treatment team shall communicate this decision to the patient.

6. The Legal Department Manager shall forward the SCC report and CR plan to the patient's attorney indicating Hospital support for the specific CR plan.

7. If the Court approves the motion and the presented Conditional Release Plan, the treatment team shall proceed with implementation of the patient's approved plan and passes after the patient is fitted with a functioning GPS ankle monitor and staff-accompaniment has been arranged.

8. If the Court orders a phase which is different or above that requested by the team and supported by the Hospital, the attending BHMP/Psychologist shall confer with the CMO and CEO before implementing any aspect of the Court order. However, all orders of the Court shall be adhered to.

9. The treatment team shall ensure that the patient is <u>not</u> allowed to leave Hospital grounds:

a. Without a functioning GPS device,
b. Without having an approved monitoring grid entered into the Hospital GPS monitoring system, and
c. Without staff accompaniment as described above.

10. The attending BHMP/Psychologist shall routinely order and monitor urine drug screens during this process if there is a suspected chemical dependency predilection.

11. In the event that the clinical team suspends or reduces the patient's privilege level due to an infraction involving substance abuse, aggression, noncompliance with programming, or other rule violation or concerning behaviors, the clinical team must notify the CMO for consideration of notifying the Court of the request that the Conditional Release Plan be suspended or reduced. The clinical team shall contact the Legal Department to place the matter on the agenda for the next SCC meeting. Patients may have their privileges suspended in the interest of safety while any internal Hospital or Court processes are occurring.

## G. GLOBAL POSITIONING SYSTEMS (GPS) AND STAFF ACCOMPANIMENT

1. GPS offers treatment teams the ability to verify the location of a patient to determine whether the patient is within location parameters approved by the treatment team. All forensic patients who leave the secure Hospital campus must be fitted with a functional GPS device, the same as noted above for NGRI patients. The Surveillance System Equipment Rules/Global Positioning Satellite (GPS) Tracking Informed Consent (Attachment 3) is utilized to document the patient's agreement to abide by the rules of the surveillance equipment program and to provide the patient with basic instruction on the equipment.

## H. DOCUMENTATION REQUIREMENTS FOR OFF-GROUND PASSES, GROUP AND INDIVIDUAL

1. For all escorted group activities, a List for Specific Off-Grounds Activities-Escorted form (Attachment 1) will be completed by the staff who will be escorting the patients. The completed form will include a list of the patients participating in the activity and a list of alternate patients that may participate in the activity.

   a. The escorting staff will also have a copy of each participating patient's current face sheet and a written description of their clothing.
   b. After a BHMP has signed off on the list, no other patients will be added to the list.

2. The Psychiatric Nurse Unit Manager or designated Charge Nurse will retain the original "List for Specific Off-Grounds Activities - Escorted" and provide copies to Hospital Security Control and the primary responsible staff member escorting the patients.

3. Hospital staff and the patient and/or escort shall complete their respective sections of the Off-Grounds Pass form (Attachment 6) prior to a patient leaving on pass and upon the patient's return from pass.

4. Prior to the patient leaving on pass, a qualified staff member will complete Section A of the Off-Grounds Pass form.

   a. The partially completed Off-Grounds Pass form will be distributed as follows:

      i. Original – is given to the patient and escort for return with the patient at the end of the pass.

ii. Copy 2 – is given to the patient and escort to leave with Hospital Security Control when the patient departs the hospital.

iii. Copy 3 – is placed in the progress note section of the patient's health record until the patient returns from the pass.

b. Staff will review the General and Specific Instruction sections with the patient and his/her escort, as applicable, and obtain their initials next to each instruction as acknowledgement of understanding.
c. If applicable, staff will instruct the patient and his/her escort on the patient's medication(s) and how they are to be taken/given. Staff will instruct escorts to return all provided medication bottles to the nurse upon returning the patient to the hospital.
d. Staff will review and complete the Tobacco-Free Philosophy Statement (Attachment 2) with the patient and escort (if applicable).
e. Staff will review the Responsibility Statement (Attachment 6) and ensure it is understood and signed by the person escorting the patient on the pass.

5. Upon the patient's return from pass, the qualified staff member will obtain the original copy of the Off-Grounds Pass form from the patient/escort and complete section "B" of the pass form.

   a. If the original form is not returned with the patient, copy 3 will replace it and be completed and maintained in the patient's health record as if it was the original.

# EXHIBIT 2

PHOENIX POLICE DEPARTMENT (0723)

# Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 202400000749301 | 202400749301 |
| Report Type: Incident Report | Page 1 of 7 |
| Date / Time Occurred: 05/22/2024 14:00 to | Date / Time Reported: 05/22/2024 14:29 |

| ARR/SUB Suspects | Additional Suspects | Unknown Suspects | Victims | Other Persons | Vehicles | Items | Evidence Count | Leoka Count | Related Report # |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 1 | 2 | | | | | |

☐ Arson Related | Arson Code | Damage Value | ☐ Bias Crime | ☐ Gang Involved | ☐ Domestic Violence

## Incident Details

| Squad | Clearance Disposition | Cleared by Exception | Exceptional Clearance Date |
|---|---|---|---|
| 72D | | | |

| Situation Found | Status |
|---|---|
| RESULTED IN BODY CAMERA ACTIVATION | |

| Location Given By Dispatcher | Cargo Theft |
|---|---|
| 501 N 24TH ST | |

## Incident Address

Street Address: 501 N 24TH ST

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85008 | UNITED STATES OF AMERICA (USA) |

## Administrative Info

| Reporting Officer | Serial # |
|---|---|
| ZWEMKE, NICHOLAS | 10887 |

## OFFENSE

☑ Primary Offense

Offense Description: ASSAULT-APPREHENSION OF PHYSICAL INJURY

| Offense/Statute Code | Severity | Attempted/Completed | Premise Type |
|---|---|---|---|
| 13-1203A2 010 | MISDEMEANOR | COMPLETED | HOSPITAL |

| Circumstances | Bias | Bias 2 |
|---|---|---|
| | ANTI BLACK | |
| **Bias 3** | **Bias 4** | **Bias 5** |
| | | |
| **Criminal Activity 1** | **Criminal Activity 2** | **Criminal Activity 3** |
| NONE/UNKNOWN | | |
| **Offender Using 1** | **Offender Using 2** | **Offender Using 3** |
| NOT APPLICABLE | | |

| # Premise Entered | Home Invasion | Domestic Violence | Gang Activity |
|---|---|---|---|
| | | | |

| Primary Gang Type | Primary Gang Name |
|---|---|
| | |
| **Secondary Gang Type** | **Secondary Gang Name** |
| | |

| Drug Related | Drug Type | Drug Origin | Drug Precursors |
|---|---|---|---|
| | | | |

MO Panel

| | | |
|---|---|---|
| Entry Type | Entry Area | Entry Method |
| Entry Point 1 | Entry Point 2 | Exit Point 1 |
| Exit Point 2 | Target Area | Property Target 1 |
| Property Target 2 | Property Target 3 | Victim Target |
| Time of Day | Victim Activity | Action 1 to Premises |
| Action 2 to Premises | Action 3 to Premises | Action 1 on Victim |
| Action 2 on Victim | Action 3 on Victim | Other Action 1 |
| Other Action 2 | Other Action 3 | Solicited Offered 1 |
| Solicited Offered 2 | Solicited Offered 3 | Weapon 1 |
| Weapon 1 Auto | Weapon 2 | Weapon 2 Auto |
| Weapon 3 | Weapon 3 Auto | Arson |
| Precipitating Circumstance | Instrument Used | |

Comments

PUBLIC RECORDS
Released pursuant to
A.R.S. 39-121, Et. Seq.

PHOENIX POLICE DEPARTMENT (0723)
# Incident Report

Incident Number: 202400000749301
CFS Incident #: 202400749301
Report Type: Incident Report

Date / Time Occurred: 05/22/2024 14:00 to
Date / Time Reported: 05/22/2024 14:29

**SUSPECT** ☑ Known ☐ Unknown ☐ ARR/SUB

Name (Last, First Middle): SOLAN, MATTHEW P
Suffix:
Nickname:
Race: WHITE
Sex: MALE
SSN: [redacted]
Date of Birth: [redacted] 1989
Age: 34
Age Range: to
Age At Time Of Incident: 34
Height: 5'10"
Weight: 190
Driver's License #: [redacted]
DL State: ARIZONA
DL Class:
DL Restrictions:
Primary Language:
Place of Birth:
Citizenship:
Ethnicity: NON-HISPANIC
Marital Status:
S B Check Result:
ICE Contact Date:
ICE Phone #:
ICE Response:
Preferred:
Home Phone: [redacted]
Cell Phone:
Email Address:
Additional Email or Social Media Handle:
Social Media Types:

**Suspect Home Address**

Street Address: [redacted]
City: PHOENIX
State: ARIZONA
Zip: 85008
Country Code: UNITED STATES OF AMERICA (USA)
Place Name:

**Mailing Address**

Street Address:
City:
State:
Zip:
Country Code:

**Suspect Employment Information**

☐ Student ☐ Homeless
Employer / School:
Occupation:
Work Phone:
Street Address:
City:
State:
Zip:
Country Code:
Hours of Employment:
Days Off:

**Details**

Hair Color: UNKNOWN OR COMPLETELY BALD
Hair Length: LONG
☐ Glasses
Eye Color: UNKNOWN
Build:
Facial Hair:
Facial Hair Color:
Voice:
Complexion:
Teeth:

Clothing Description:
Misc 1:
Misc 2:
Trademarks of Suspect:
Injury 1:
Injury 2:
Injury 3:
Injury 4:
Injury 5:
☐ Hospitalized
Hospital Facility:
Resident: UNKNOWN

**MO Panel**

Entry Type:
Entry Area:
Entry Method:
Entry Point:
Exit Point:
Target Area:
Property Target 1:
Property Target 2:
Property Target 3:
Victim Target:
Time of Day:
Victim Activity:
Action 1 on Victim:
Action 2 on Victim:
Action 3 on Victim:
Action 1 to Premises:
Action 2 to Premises:
Action 3 to Premises:

PHOENIX POLICE DEPARTMENT (0723)

# Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 202400000749301 | 202400749301 |
| Report Type: Incident Report | Page 3 of 7 |
| Date / Time Occurred: 05/22/2024 14:00 to | Date / Time Reported: 05/22/2024 14:29 |

| | | |
|---|---|---|
| Other Action 1 | Other Action 2 | Other Action 3 |
| Solicited Offered 1 | Solicited Offered 2 | Solicited Offered 3 |
| Weapon 1 | Weapon 2 | Weapon 3 |
| Weapon 1 Type | Weapon 2 Type | Weapon 3 Type |
| Weapon 1 Caliber | Weapon 2 Caliber | Weapon 3 Caliber |
| Weapon 1 Color | Weapon 2 Color | Weapon 3 Color |
| Arson | Precipitating Circumstance | Instrument Used |

Comments

## Gang Information

☐ Primary Gang | Primary Gang Name | Primary Gang Membership Info

Primary Gang Location Info | Rival Gang Name

Colors/Logos

☐ Secondary Gang | Secondary Gang Name | Secondary Gang Membership Info

Secondary Gang Location | Rival Gang Name

Colors/Logos

☐ Clothing or Colors ☐ Gang Tattoos ☐ Paraphernalia or Photographs ☐ Self Proclamation ☐ Witness Testimony/Statement ☐ Written/Electonic Correspondance

Other

## Guardian Information

☐ Guardian Notified | Guardian Notified By | Guardian Notified On

Guardian Of | Guardian Relationship

## Associated Offenses

Offense: ASSAULT-APPREHENSION OF PHYSICAL INJURY ☑ Associated With Suspect

**VICTIM**

Victim Type: INDIVIDUAL

Name (Last, First Middle): CARTER, LEACHER JASMINE ZHANE

| Suffix | Nickname | Race | Sex | SSN | Date of Birth | Age | Age Range |
|---|---|---|---|---|---|---|---|
| | | BLACK | FEMALE | [redacted] | [redacted]/1995 | 29 | to |

| Infant Type | Height | Weight | Driver's License # | DL State | Primary Language | Age At Time Of Incident |
|---|---|---|---|---|---|---|
| | 5'07" | 150 | [redacted] | ARIZONA | | 29 |

| Will Prosecute? | Can Identify Suspect? | Victims' Rights Decision | Victims' Rights Pamphlet provided. | Consular Notified? | Place of Birth |
|---|---|---|---|---|---|
| UNKNOWN | YES | VICTIM REQUESTS RIGHTS | ☐ Yes ☑ No | | |

| Citizenship | Ethnicity | Marital Status | Preferred | Home Phone | Cell Phone |
|---|---|---|---|---|---|
| [redacted] | NON-HISPANIC | | | | [redacted] |

Email Address | Additional Email or Social Media Handle | Social Media Types

## Victim Home Address

Street Address: [redacted]

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85041 | UNITED STATES OF AMERICA (USA) |

## Employment Information

☐ Student ☐ Homeless | Employer / School | Occupation

PHOENIX POLICE DEPARTMENT (0723)

# Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 202400000749301 | 202400749301 |
| Report Type: Incident Report | Page 4 of 7 |
| Date / Time Occurred: 05/22/2024 14:00 to | Date / Time Reported: 05/22/2024 14:29 |

College Name | On Campus: ☐ Yes ☐ No | Work Phone: [redacted] | Hours of Employment

Street Address: [redacted]

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85008 | UNITED STATES OF AMERICA (USA) |

## Details

| Hair Color | Eye Color | Build | Resident | Teeth |
|---|---|---|---|---|
| BLACK | BROWN | | | |

Injury 1 | Injury Description

Injury 2 | Injury 3 | Injury 4 | Injury 5

Victim Condition | Victim-Offender Code

A. Assault/Homicide ☐ Yes ☐ No | A. Assault/Homicide Circumstance 1 | A. Assault/Homicide Circumstance 2

Justifiable Homicide ☐ Yes ☐ No | Justifiable Homicide Circumstance

☐ Victim Hospitalized | Hospital Facility | Hospital Description

Under Influence Alcohol? ☐ Yes ☐ No ☐ Unknown | Under Influence Drugs? ☐ Yes ☐ No ☐ Unknown | DV Frame of Action | Domestic Violence Victim Transported ☐ Yes ☐ No

Violation of Protective Order ☐ Yes ☐ No | Cohabitant ☐ Yes ☐ No

## Victim Suspect Relationships

| Suspect | Relationship |
|---|---|
| Suspect:1 SOLAN, MATTHEW | VICTIM WAS ACQUAINTANCE |

## Gang Information

☐ Primary Gang | Primary Gang Name | Primary Gang Membership Info

Primary Gang Location Info | Rival Gang Name

Colors/Logos

☐ Secondary Gang | Secondary Gang Name | Secondary Gang Membership Info

Secondary Gang Location | Rival Gang Name

Colors/Logos

☐ Clothing or Colors ☐ Gang Tattoos ☐ Paraphernalia or Photographs ☐ Self Proclamation ☐ Witness Testimony/Statement ☐ Written/Electonic Correspondance

Other

## Guardian Information

☐ Guardian Notified | Guardian Notified By | Guardian Notified On

Guardian Of | Guardian Relationship

## Associated Offenses

Offense: ASSAULT-APPREHENSION OF PHYSICAL INJURY | ☑ Associated With Victim

**OTHER PERSON** | Person Type

| Name (Last, First Middle) | Suffix |
|---|---|
| COLEMAN, UNIQUE LASHAY | |

PHOENIX POLICE DEPARTMENT (0723)

# Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 202400000749301 | 202400749301 |
| Report Type: Incident Report | Page 5 of 7 |
| Date / Time Occurred: 05/22/2024 14:00 to | Date / Time Reported: 05/22/2024 14:29 |

Primary Language: | Nickname: | Race: BLACK | Sex: FEMALE | SSN: [redacted] | Date of Birth: [redacted]/1992 | Age: 31 | Age Range: to

Height: 5'03" | Weight: 189 | Driver's License #: [redacted] | DL State: ARIZONA | Can Identify Suspect?

Place of Birth: | Citizenship: | Ethnicity: NON-HISPANIC | Marital Status:

ICE Contact Date: | ICE Phone #: | ICE Response:

Home Phone: [redacted] | Cell Phone: [redacted] | Email Address: | Additional Email or Social Media Handle: | Social Media Types:

## Other Person Home Address

Street Address: [redacted]

City: PHOENIX | State: ARIZONA | Zip: 85042 | Country Code: UNITED STATES OF AMERICA (USA)

## Employment Information

☐ Student ☐ Homeless | Employer / School: [redacted] | Occupation: NURSE

Street Address: [redacted]

City: PHOENIX | State: ARIZONA | Zip: 85008 | Country Code: UNITED STATES OF AMERICA (USA)

## Details

Work Phone: | Hours of Employment: | Hair Color: BLACK | Hair Length: | ☐ Glasses

Eye Color: BROWN | Build: | Facial Hair: | Voice: | Complexion:

Resident: | Teeth:

## Gang Information

☐ Primary Gang | Primary Gang Name: | Primary Gang Membership Info:

Primary Gang Location Info: | Rival Gang Name:

Colors/Logos:

☐ Secondary Gang | Secondary Gang Name: | Secondary Gang Membership Info:

Secondary Gang Location: | Rival Gang Name:

Colors/Logos:

☐ Clothing or Colors ☐ Gang Tattoos ☐ Paraphernalia or Photographs ☐ Self Proclomation ☐ Witness Testimony/Statement ☐ Written/Electonic Correspondance

Other:

## Guardian Information

☐ Guardian Notified | Guardian Notified By: | Notified Method: | Guardian Notified On:

Guardian Of: | Guardian Relationship:

---

**OTHER PERSON** | Person Type: WITNESS

Name (Last, First Middle): HACKETT, TABITHA Y | Suffix:

Primary Language: | Nickname: | Race: WHITE | Sex: FEMALE | SSN: [redacted] | Date of Birth: [redacted]1979 | Age: 44 | Age Range: to

Height: 5'09" | Weight: 145 | Driver's License #: [redacted] | DL State: ARIZONA | Can Identify Suspect?

Place of Birth: | Citizenship: [redacted] | Ethnicity: NON-HISPANIC | Marital Status:

ICE Contact Date: | ICE Phone #: | ICE Response:

PHOENIX POLICE DEPARTMENT (0723)

# Incident Report

| | |
|---|---|
| Incident Number 202400000749301 | CFS Incident # 202400749301 |
| Report Type Incident Report | Page 6 of 7 |
| Date / Time Occurred 05/22/2024 14:00 to | Date / Time Reported 05/22/2024 14:29 |

| Home Phone | Cell Phone | Email Address | Additional Email or Social Media Handle | Social Media Types |
|---|---|---|---|---|
| | [redacted] | | | |

**Other Person Home Address**

Street Address: [redacted]

| City | State | Zip | Country Code |
|---|---|---|---|
| EL MIRAGE | ARIZONA | 85335 | UNITED STATES OF AMERICA (USA) |

**Employment Information**

☐ Student ☐ Homeless

Employer / School:

Occupation: NURSE

Street Address: [redacted]

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85008 | UNITED STATES OF AMERICA (USA) |

**Details**

| Work Phone | Hours of Employment | Hair Color | Hair Length | ☐ Glasses |
|---|---|---|---|---|
| | | RED OR AUBURN | | |

| Eye Color | Build | Facial Hair | Voice | Complexion |
|---|---|---|---|---|
| BROWN | | | | |

Resident Teeth

**Gang Information**

☐ Primary Gang Primary Gang Name Primary Gang Membership Info

Primary Gang Location Info Rival Gang Name

Colors/Logos

☐ Secondary Gang Secondary Gang Name Secondary Gang Membership Info

Secondary Gang Location Rival Gang Name

Colors/Logos

☐ Clothing or Colors ☐ Gang Tattoos ☐ Paraphernalia or Photographs ☐ Self Proclomation ☐ Witness Testimony/Statement ☐ Written/Electonic Correspondance

Other

**Guardian Information**

☐ Guardian Notified Guardian Notified By Notified Method Guardian Notified On

Guardian Of Guardian Relationship

Narrative Information

ON 5/22/2024 AT 1817 HOURS I ARRIVED AT THE STATE HOSPITAL LOCATED AT 501 N 24TH ST AND MADE CONTACT WITH THE CALLER LEACHER CARTER WHO I IDENTIFIED BY HER ARIZONA MVD PHOTO.

SHE ADVISED ME THAT ONE OF THE PATIENTS AT THE COTTON WOOD FORENSIC UNIT OF THE HOSPITAL, MATTHEW SOLAN, HAD BECOME VERBALLY AGGRESSIVE WITH HER AND WANTED TO SPEAK TO HIS LAWYER. SHE TOLD HIM IT WOULD BE ALRIGHT TO DO SO AND THEN HE THREW HIS COFFEE AT HER, SO IT GOT ON HER FACE. HE WAS CONTROLLED BY OTHER WORKS AND HE YELLED AT HER SAYING HE WAS GOING TO KILL HER AND HER UNBORN BABY (SHE IS PREGNANT). HE ALSO CALLED HER "NIGGER" SEVERAL TIMES DURING THE INCIDENT. SHE DESIRES PROSECUTION IN THE MATTER. SHE HAD NO VISIBLE INJURIES AND HAD CLEANED HERSELF OFF. I GAVE HER THE REPORT NUMBER.

I THEN MADE CONTACT WITH A NURSE WHO WAS PRESENT DURING THE INCIDENT, WHO I IDENTIFIED BY HER ARIZONA MVD PHOTO AS UNIQUE COLEMAN. SHE ADVISED ME SHE WITNESSED MATTHEW THROW THE COFFEE ON LEACHER AND THEN BERATE HER WITH RACIAL SLURS THAT INCLUDED "NIGGER." SHE ALSO HEARD HIM

THREATEN TO KILL LEACHER.

I THEN MADE CONTACT WITH TABITHA HACKETT, ANOTHER NURSE WHO I IDENTIFIED BY HER ARIZONA MVD PHOTO. SHE ADVISED ME THAT SHE WAS NOT PRESENT FOR THE COFFEE THROWING INCIDENT, BUT DID HEAR MATTHEW SAY "THAT BLACK NIGGER NEEDS TO DIE."

MEDICAL PERSONAL WERE ABLE TO CONFIRM THE SPELLING OF MATTHEW'S NAME AND HIS DATE OF BIRTH. HE IS WHITE.

EOR 10887.

Public Narrative

# EXHIBIT 3

# QMS · Incident Reports

## Incident Report: ASH-2024-1911

Incident Report · Basic Information

| | | | |
|---|---|---|---|
| **Report Status** | IR - Pending Review | | |
| **IR Created By** | Domenick Aldrich | **Are you a Behavioral Health Technician** | ○ Yes ◉ No |
| **Supervisor Dept** | Nursing | **Report Review Supervisor** | Lance Thomason |
| **Date of Occurrence** | 5/22/2024 01:30 | **Systemic Incident Report** | ○ Yes ◉ No |
| **Date Reported** | 5/22/2024 03:00 | **High Profile or Potential Media Involvement** | ○ Yes ◉ No |
| **Facility / Unit** | Forensic Campus | Cottonwood | |
| **Location of Incident** | Hallway | | |

**Hospital Emergency Codes**

| | | | | |
|---|---|---|---|---|
| ☐ Medical Alert | ☐ Code Blue | ☐ Code Red | ☐ Code Green | ☐ Code Silver |
| ☑ Code Gray | ☐ Code Yellow | ☐ Code Black | ☐ Code Orange | ☐ None |

**Description of Incident or Reportable Event**

At approximately 1330 a code gray was called for patient Matthew S. At arrival of the code BHT Lea cher C. described that Matthew had thrown coffee onto her and immediately went into his room without escort. When I approached his room he stated "I'm calm and not hurting anyone you cant go hands on." Matthew was told that throwing coffee onto another person is assault and is DTO behavior. Matthew was placed on ROU till his behaviors no longer demonstrate DTO behaviors. Matthew stated that he "felt like stomping on Lea cher's head and killing her or her unborn child." Matthew has recently described himself as not being able to control his rage because he has what he describes as PTSD. Matthew has no current medications available for aggression. Matthew was encouraged to stay in his room and reduce external stimuli. Phoenix Police were notified regarding the assault at approximately1430.

**Type of Incident**

| # | Type of Incident |
|---|---|
| 1 | Assault - All Other Types |
| 2 | On grounds law enforcement action related to a patient |
| 3 | Patient refusing redirection |

**Patients**

| ID | Patient Name | Assigned Location | Involvement |
|---|---|---|---|
| [redacted] | Matthew Solan | Forensic Campus / Cottonwood | Unspecified |

## Staff

| ID | Staff Name | Title | Assigned Location | Involvement |
|---|---|---|---|---|
| 145047 | TAMARA MAY | SECURITY OFFICER LEAD | Forensic Campus / Unspecified | Witness |
| 203184 | SERGIO MEDEL | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Unspecified | Witness |
| 204502 | LEA'CHER CARTER | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Cottonwood | Victim |
| 154831 | DOMENICK ALDRICH | PSYCHIATRIC NURSE SHIFT SPVSR | Forensic Campus / Cottonwood | Witness |
| 151692 | RAPHAEL DOH | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Saguaro | Witness |
| 233406 | JOPHILLE TAGLE | NURSE | Forensic Campus / Cottonwood | Witness |
| 159214 | DESMOND ENONGENE | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Unspecified | Witness |
| 230086 | INANNA NISSAN | PSYCHIATRIC NURSE | Forensic Campus / Unspecified | Witness |

## Witness/Other Person

## Objects

## 3rd Party Notification

| ID | Notified Party | Notification Details |
|---|---|---|
| 1883 | Phoenix PD | Lea cher notified phoenix PD regarding assault. |

## Attachments

## Reviews

| ID | Department | Assigned User | Review Type | Determination |
|---|---|---|---|---|
| 177220 | Nursing | Lance Thomason | Supervisor Review | Not Reviewed |
| 177221 | Quality Management | Any Supervisor | Quality Management Review | Not Reviewed |

# EXHIBIT 4

Per Me Reges Regnant

MATTHEW PHILLIP SOLAN
501 NORTH 24TH STREET
PHOENIX, AZ 85008

RECEIVED
SEP - 5 2024
AHCCCS/DHCS/
BHGA

August 26, 2024

**SEND VIA U.S. MAIL TO:** Kristi Baxter, Investigator
AHCCCS/BHGA
801 E. Jefferson St., M.D. 6100
Phoenix, Arizona 85034

**Re: Docket No. B102423S0068**

Dear Ms. Baxter,

I appreciate the work you are putting into this ongoing investigation. Unfortunately, the abuse at ASH continues unabated, and I now fear that I am at immanent risk of harm. I respectfully request that you contact me to discuss the ongoing investigation, and to review what other protective measures may be available.

On August 26, 2024, I received your extension request notification letter dated July 26, 2024. The assault occurred in October of last year, and I am still trying to process the traumatic experience. However, ASH is now admittedly refusing to treat my Autism and PTSD, and has arbitrarily seized many of my coping tools. My PTSD has become markedly worse since the October assault by ASH campus security, and another assault against my person by ASH BHT Lea'cher Carter on May 22, 2024.

This second assault included Lea'cher charging up to me, getting up in my face, throwing her arms back, and demanding that I hit her so she could "call security on [my] ass," because she was "sick of [my] shit." This followed months of her bombarding me with sexual harassment, belittlement, and emotional abuse, including telling me in front of other patients that I am "nasty," that I "eat dog ass," that I "eat dog pussy," and that my "dick is so small you need a magnifying glass to see it." After I reported Lea'cher's conduct to her supervisors, and asked them to make reports with APS, (which they subsequently refused to do,) Lea'cher called the Phoenix PD and lied to law enforcement, falsely claiming that I had thrown hot coffee in her face and threatened to kill her. She pressed false charges against me, resulting in an extremely traumatic arrest by Phoenix PD in my ASH bedroom, and over a week of agonizing solitary confinement in the county jail.

As a direct result of the foregoing incidents, my mental health continues to decline, and I am now suffering from recurrent flashbacks and nightmares from earlier trauma, which these events have caused me to relive. And because of the flashbacks and nightmares, which had all but subsided until these assaults, I am now sleeping at most 3-4 hours a day, and my physical health is degrading rapidly. In fact, numerous nurses have mentioned that I have large black circles around my eyes, and ASH is reporting that I am engaging in self-harm. I don't necessarily see this as self-harm, but my autism-related stimming behaviors, such as head banging and hair pulling, have certainly worsened due to the increased stress, and removal by ASH of yet more of my coping tools.

Therefore, I implore you to review this docket and the additional information I have provided, and render such aid as you are able, in order to protect me from the ongoing abuse I am suffering at ASH. Please contact me at your earliest convenience; and if you are able, I would like to meet with you again at ASH.

Finally, please consider this letter a procedural protest pursuant to A.A.C. R9-21-410(C) over ASH's continued practice of delivering your letters to me a month after you've delivered them to ASH's G&A officer, Tim Stanley.

Thank you for your assistance in these regards.

Respectfully,

**Matthew Phillip Solan**

# EXHIBIT 5

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

September 12, 2024

Matthew Solan
2500 E. Van Buren Street, Cottonwood Unit
Phoenix, Arizona 85008

**Re: Acknowledgement Letter**
**Docket Number: H091224S0438G**

Dear Mr. Solan:

The Arizona State Hospital, Office of Complaints, Grievances and Appeals (ASH, OCGA) received your (grievance) on (9/12/2024) and it has been assigned an OCGA case docket number. A copy of your original (grievance) is attached for your records.

Our office will conduct a preliminary review of your (grievance). If necessary, an Investigator will contact you for additional information. When the Investigator's review is completed, you will receive a decision letter providing the findings and outcome of the review.

If you have any questions regarding this letter, the review process or the status of your case, please call ASH OCGA at 602-220-6146.

Respectfully,

Mhya Mitchell

Mhya Mitchell
Quality Coordinator
Office of Complaints, Grievances and Appeals
Arizona State Hospital

**CGA Investigative Report**

Docket Number: H091224S0438G

Date of Report: 10/25/24

Investigator: Damon Broadnax

Nature of Report: Investigation Summary Report

---

The following report is a summary of my investigation into the above referenced case docket number. It briefly describes the investigation and contains findings of fact, conclusions, and recommendations (if necessary).

| | |
|---|---|
| **Filer:** | Matthew Solan |
| **Patient:** | Matthew Solan |
| **SMI:** | Yes |
| **Special Assistance:** | No |
| **Docket Number:** | H091224S0438G |
| **Agency:** | Arizona State Hospital (ASH) |
| **Investigator:** | Damon Broadnax |
| **Date of Complaint/Grievance:** | 10/11/24 |
| **Rights Violation:** | No |

**Grievance Issue :**

As directed by AHCCCS BCGA, this grievance was opened in response to these specific parts of a procedural irregularity protest and specific parts of the letter the patient sent to AHCCCS. The patient said in the letter, “The abuse of ASH continues and now I fear that I’m at imminent risk of harm.” “Another assault against my person by BHT Leacher Carter on May 22nd 2024. This renders such aid as you are able in order to protect me from the ongoing abuse I am suffering”.

**Conclusion:**

I interviewed the patient on 10/17/24, in regards to this matter on the Cottonwood Unit with Quality Coordinator, Mhya Mitchell and Patient Advocate, Terra Morgan present. The patient asked me, “why are you here, AHCCCS should be investigating this”. I advised him that AHCCCS sent his case back to the CGA department to investigate. He stated that, “Leacher Carter assaulted him and was verbally abusive towards him for a long time. I asked him was there any witnesses to this abuse and he stated, “I’m sure there were, but since this happened along time

ago no one is going to remember". I asked him if BHT Carter is still working on the Cottonwood Unit and he stated, "no". I asked him if everything had been ok since she's been off of the unit and he stated, "yes for the most part". The patient stated that he was assaulted by the BHT on May 22, 2024. I reviewed the related ASH Incident Report #2024-1909. The report states that on May 22. 2024, Solan began yelling and cussing at BHT Carter, then he threw a cup of coffee at her face. I also reviewed related Progress Notes written by the Psychiatric Nurse Shift Supervisor, Domenick Aldridge on May 22, 2024. The notes show that Aldridge reminded Solan that throwing coffee onto another person is an assault and is DTO behavior. Solan stated to Aldridge that he felt like, "stomping on the staffs head and killing her unborn child".

I interviewed Psychiatric Nurse Unit Manager (PNUM), Lance Thomason on 10/23/24. He stated that there was never any evidence that Behavioral Health Technician (BHT), Carter assaulted the patient or was verbally abusive to the patient. He stated that the patient never provided any dates, times or witnesses to support his claims. He stated that BHT Carter transferred over to the Saguaro Unit in August of 2024. He stated that the patient has not made him aware of any ongoing abuse on the Cottonwood Unit.

**Decision:**

During the investigation it was determined that there was no evidence to support Solan's allegation of abuse on 5/22/24, or on a continuing basis. During my interview of Solan on 10/17/24, on the Cottonwood Unit, he stated that, "for the most part everything has been fine since Behavioral Health Technician Leacher Carter left the unit In August of 2024". I also reviewed relevant Incident Reports, Progress Notes and I interviewed the PNUM and there were no findings in the documentation or the interview with the PNUM. This grievance is unsubstantiated.

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

October 30, 2024
Matthew Solan
2500 E. Van Buren Street, Cottonwood Unit
Phoenix, Arizona 85008

**Re: Decision Letter**
**Docket Number:**H091224S0438G

Dear Ms. Solan:

The Arizona State Hospital's Office of Complaints, Grievances, and Appeals (ASH/OCGA) conducted an investigation regarding your allegations. As directed by AHCCCS BCGA, this grievance was opened in response to these specific parts of a procedural irregularity protest and specific parts of the letter that you sent to AHCCCS. You stated in the letter that, "The abuse of ASH continues and now I fear that I'm in imminent risk of harm". "Another assault against my me by a BHT on May 22nd 2024. This renders such aid as you are able in order to protect me from the ongoing abuse I am suffering".

**FINDINGS:**
The assigned Investigator interviewed you on 10/17/24, in regards to this matter with the Quality Coordinator and the Patient Advocate present. You asked the Investigator "why are you here, AHCCCS should be investigating this?". The Investigator advised you that AHCCCS sent your case back to the ASH CGA department to investigate. You stated that, "the Behavioral Health Technician (BHT) assaulted you on 5/22/24, and that she had been verbally aggressive for a long time". The Investigator asked you if there were any witnesses to the abuse and you stated, I'm sure there were, but since this happened along time ago no one is going to remember". The Investigator asked you if the BHT is still working on the Cottonwood Unit and you stated "no". The Investigator asked you if everything has been ok since the BHT's been off of the unit and you stated, "for the most part, yes".

The Investigator reviewed ASH Incident Report #2024-1909. The report states that on 5/22/24, you threw a cup a cup of coffee at the BHT's face. The Investigator reviewed related Progress Notes written by the Psychiatric Nurse Shift Supervisor on 5/22/24. The notes show that he reminded you that throwing coffee onto another person is an assault and is Danger to Others behavior (DTO). You stated to him that, "I feel like stomping on the staffs head and killing her unborn child". The assigned Investigator interviewed the Cottonwood Unit Psychiatric Nurse Unit Manager on 5/23/24, in regards to this matter. He stated that, "there was never any evidence

that the BHT assaulted you or was verbally abusive towards you". He stated that, "you never provided any dates, times, or witnesses to support your claims. He stated that, "the BHT transferred over to the Saguaro Unit in August of 2024". He stated that, "you have not made him aware of any ongoing abuse issues on the Cottonwood Unit".

**CONCLUSION**:
During the investigation it was determined that there was no evidence to support your allegation of abuse on 5/22/24, or on a continuing basis. On 10/17/24, you advised the Investigator that, "for the most part everything has been fine since the BHT left the Cottonwood Unit in August of 2024". The Investigator reviewed relevant Incident Reports, Progress Notes and he interviewed the PNUM and there were no findings in the documentation or the interview with the PNUM to support your allegations. Based on the aforementioned findings, this grievance is unsubstantiated.

If you should disagree with the above decision, you may file an appeal with the Arizona Health Care Cost Containment System/Office of the General Counsel/Behavioral Health Grievance and Appeals (AHCCCS/BHGA). The appeal must be in writing and received within thirty (30) days from your receipt of this letter. If you choose to appeal this decision, please list the specific grounds on which you base your claim. All grounds for appeal must be set out individually and clearly stated. Please send your appeal to: AHCCCS Behavioral Health Grievance and Appeals 801 E. Jefferson Street, Mail Drop 6100 Phoenix, AZ 85034.

To obtain information about advocacy services available to inform customers about grievance and appeal processes, you may contact the Office of Human Rights at (602) 364-4585 or 1 (800) 922-1447, the Arizona Center for Disability Law at (602) 274-6287 or 1(800) 927-2260, or the Human Rights Committee at (602) 364-4577.

If you should have any questions regarding this letter or the grievance process, please feel free to contact me at 602-220-6146.

Respectfully,

Tim Stanley
Manager
Office of Complaints, Grievances, and Appeals
Arizona State Hospital

Cc: Arizona Health Care Cost Containment System/Office of Human Rights
Arizona Department of Administration/Independent Oversight Committee (redacted)

# EXHIBIT 6

ARIZONA DEPARTMENT OF HEALTH SERVICES

**Arizona State Hospital**
2500 East Van Buren Street
Phoenix, Arizona 85008

**COMPLAINT, GRIEVANCE, AND APPEAL FORM**

**Date:** 7/3/2025

**Patient Name:** Matthew Solan **Unit:** Mohave

Do you have a Guardian? ☐ Yes ☒ No If yes, please provide the following information as notification is required.
Name of Guardian: ______ Contact #: ______

**Name of filer (if other than patient):** ______ Contact #: ______
Relationship to patient: ☐ Legal Guardian; ☐ Parent; ☐ Designated Representative; ☐ Advocate ☐ Social Worker; ☐ Doctor; ☐ Peer; ☐ Tech; ☐ Nurse; ☐ Friend; ☐ Other ______

**Date of occurrence:** ______ **Time of occurrence:** 6:20 pm? **Location of occurrence:** Cottonwood

**Description of Complaint, Grievance, or Appeal** (*Please write clearly and provide as much detailed information as possible, including any other attempts to resolve the problem. Use the back of the form or attach additional pages if needed*):

I am filing a [choose one]: ☐ complaint ☒ SMI grievance ☐ appeal

At shift change, Unique Coleman, who had been working on the Saguaro unit, after being removed from Cottonwood for assaulting me, burst onto the unit, walked up to me, and began laughing at me, taunting me, and told me she was coming back, and would continue to harass me and was told by "them" (presumably ASH admin.) to call the police on me if I did anything. This caused me to have a total meltdown and I cut both my wrists & ankles. The nurse wouldn't help me, so I cut myself some more. Unique's actions were sadistic & were retaliatory and manifestly antitherapeutic.

**What solution do you want?**

Protection from retaliation. Trauma therapy. Termination of Unique Coleman. Comprehensive AHCCCS Corrective Action Plan. Trauma therapy. Trauma therapy. Trauma therapy & Trauma therapy

ARIZONA DEPARTMENT OF HEALTH SERVICES

**Arizona State Hospital**
2500 East Van Buren Street
Phoenix, Arizona 85008

## COMPLAINT, GRIEVANCE, AND APPEAL FORM

**Date:** 7/3/2025

**Patient Name:** Matthew Solan **Unit:** Mohave

Do you have a Guardian? ☐ Yes ☒ No If yes, please provide the following information as notification is required.
Name of Guardian: ______ Contact #: ______

**Name of filer (if other than patient):** ______ Contact #: ______
Relationship to patient: ☐ Legal Guardian; ☐ Parent; ☐ Designated Representative; ☐ Advocate
☐ Social Worker; ☐ Doctor; ☐ Peer; ☐ Tech; ☐ Nurse; ☐ Friend; ☐ Other ______

**Date of occurrence:** ______ **Time of occurrence:** ______ **Location of occurrence:** ______
**Description of Complaint, Grievance, or Appeal (*Please write clearly and provide as much detailed information as possible, including any other attempts to resolve the problem. Use the back of the form or attach additional pages if needed*):**
I am filing a [choose one]: ☐ complaint ☒ SMI grievance ☐ appeal After Unique Coleman Screamed in my ear on 6/21/2025, I got an ear infection & my ear started bleeding. I was told that was no on-call doctor 5p 24 nurses and suffered 3 days of ear pain befor See Dr Kochler & getting ear drops. After going to the ER which Said continue the drops, Dr. Allanie (sic?) canceled the order & my infection came back

**What solution do you want?**
1 To have Dr Allahbe have no access to my care at ASH - no involvement whatsoever
2 Medical Board Complaint form & filing assistance including a patient advocate help me fill out the form & mail it
③ Trauma therapy
④ ENT appointment in < 1 week from today (less than)



DF0695

ARIZONA DEPARTMENT OF HEALTH SERVICES

**Arizona State Hospital**
2500 East Van Buren Street
Phoenix, Arizona 85008

# COMPLAINT, GRIEVANCE, AND APPEAL FORM

**Date:** 6/21/2025

**Patient Name:** Matthew Solan **Unit:** Cottonwood

Do you have a Guardian? ☐ Yes ☒ No If yes, please provide the following information as notification is required.
Name of Guardian: ______ Contact #: ______

**Name of filer (if other than patient):** ______ Contact #: ______
Relationship to patient: ☐ Legal Guardian; ☐ Parent; ☐ Designated Representative; ☐ Advocate
☐ Social Worker; ☐ Doctor; ☐ Peer; ☐ Tech; ☐ Nurse; ☐ Friend; ☐ Other ______

**Date of occurrence:** 6/21/2025 **Time of occurrence:** 12:30 **Location of occurrence:** Med window

**Description of Complaint, Grievance, or Appeal** (***Please write clearly and provide as much detailed information as possible, including any other attempts to resolve the problem. Use the back of the form or attach additional pages if needed***):

I am filing a [choose one]: ☐ complaint ☒ SMI grievance ☐ appeal After being told to stay away from me by RN Matt BHT Unique Coleman pushed past Matt ran up to me, screamed & spit in my ear. Matt pulled her away from ~~[illegible]~~ me and told Matt she wanted to slap the shit out of me. Unique Coleman is a defendant in my federal lawsuit. This is felony interference with a party to a federal suit.

**What solution do you want?**

1. Injunction against harrassment against Unique Coleman
2. Criminal charges
3. Trauma Therapy
4. Protection from retaliation
5. Retraining of Staff

**CGA Investigative Report**

Docket Number: H070725S0563G

Date of Report: 7/29/25

Investigator: Damon Broadnax

Nature of Report: Investigation Summary Report

---

The following report is a summary of my investigation into the above referenced case docket number. It briefly describes the investigation and contains findings of fact, conclusions, and recommendations (if necessary).

| | |
|---|---|
| **Filer:** | Matthew Solan |
| **Patient:** | Matthew Solan |
| **SMI:** | Yes |
| **Special Assistance:** | No |
| **Docket Number:** | H070725S0563G |
| **Agency:** | Arizona State Hospital (ASH) |
| **Investigator:** | Damon Broadnax |
| **Date of Complaint/Grievance:** | 7/17/25 |
| **Rights Violation:** | No |
| **Investigation Completed** | 7/25/25 |

**Grievance/Complaint:**

The patient's grievance read, "at shift change Unique Coleman who had been working on the Saguaro unit after being removed from Cottonwood for assaulting me, burst on to the unit walked up to me and began laughing at me. She taunted me and told me that, "she was coming back and will continue to harass me and was told by presumably Admin, to call the police on me if I did anything. This caused me to have a total meltdown and I cut both of my wrists and ankles. The nurse would not help me, so I cut myself. Unique's actions were mostly non-therapeutic, sad and were retaliatory. He said that, after Unique Coleman screamed in my ear on 6/21/25, I got an ear infection and my ear started bleeding. I was told that there was no on call doctor, so I suffered in pain for 3 days until Dr. Prabhu ordered ear drops. After going to the ER, Dr. Amante cancelled my ear drops and my ear infection came back. After being told to stay away from RN Matt Taylor, Unique Coleman pushed past Matt and screamed and spit in my ear. Matt pulled her away from me and she told Matt that, "she wanted to slap the shit out of me".

**Summary of Investigation**

I interviewed patient Matthew Solan on 7/10/25, in regards to this matter in the Mohave conference room. He said that on 6/27/25, Behavioral Health Technician (BHT) Monique was not supposed to be on the Cottonwood unit and she came into the dayroom at around shift change. He said that he was about to make policy reports and she started laughing at him. He said that her harassing him and laughing at him caused him to have a meltdown. He said that afterwards, he pulled a sign off of a door, then he went into the bathroom and sliced his arm up. He said that the next day, he was on the mall and she started towards him laughing at him. He said that she also screamed in his ear and I got an ear infection because of it. He said that Dr. Prabhu ordered ear drops for him and after he came back from the ER, Dr. Amante cancelled the ear drops. He said that after being told to stay away from him on 6/21/25, Unique pushed passed RN Matt and screamed and spit in his ear. He said that Matt pulled her away from him and she told Matt that she wanted to "slap the shit out of me".

I interviewed Registered Nurse (RN) Matt Taylor on 7/11/25, in the Cottonwood nursing station in regards to thus matter. He said that on 6/21/25, patient Matthew Solan said that Unique assaulted him by yelling in his ear. He said that the patient never complained about any ear pain or hearing loss. He said that on the morning of 6/21/25, the patient and staff were having a heated conversation, so I separated them. He said that Matthew called her, "a nigger and a fucking cunt". He said that the patient was verbally aggressive and had been making racial slurs that morning. He said that at on or around 1230 hours on 6/21/25, patient [redacted] was asking me a question about his virtual visit. He said patient Solan said, "check the books I bet you that it was Unique that screwed up your visit because she is a lying bitch". He said Monique came back onto the unit shortly after and Matthew said, "there goes that lying bitch right there". He said that Monique turned around and I asked her to just go into the nursing station, which she did.

I interviewed Nurse Practitioner (NP) Caroline Ndoati in regards to this matter on 7/11/25, in regards to this matter. She said on 6/22/25, she went to the Cottonwood Unit to go see patient Matthew, because he had been placed on sick call for multiple complaints. She said one in regards to redness on his elbow that he indicated to nursing was a bee bite and he later said it was a spider bite. She said the patient was sleeping when she arrived on the unit, so she did not wake him up.

I interviewed Dr. Prabhu on 7/11/25, in regards to this matter. She said that on 6/23/25, she came to see Solan on the Cottonwood Unit. She said that he said that the redness in his elbow was all better. She said that he claimed that a staff yelled at his ear and stuck a finger in his ear

that caused bleeding and infection. She said per video interaction, staff did not touch Matthews ear, she said the staff did seem to come close to his ear and said something, and prior to that the patient was calling her cuss words. She said that Matthew wanted ear drops as his ear canal seems itchy and discomforted, and he denies hearing loss. She said the ear drops are only supposed to be used for 4-5 days, so when the weekend came, the patient's order had expired and he assumed that Dr. Amante cancelled the order. She said on 6/30/25 the patient said that he still needs the ear drops, so I placed another order in for the ear drops. The original order for the ear drops began on 6/23/25 and ended on 6/27/25. She said that on 6/25/25, PA Maria Radoluvich sent him to Valley Wise ER, because he complained of left knee pain, and she also had them check his ears. The doctor said that the patient's ears were fine and that he should continue to take the ear drops that he was prescribed at ASH. Dr. Prabhu said that there is always an OD on call at ASH.

I interviewed Cottonwood patient [redacted] in regards to this matter on 7/13/25. She stated that, "I do not want to get involved in this matter".

Interviewed Behavioral Health Technician (BHT) Unique Coleman 0n 7/17/25, in regards to this matter in the Cottonwood conference room. She said on 6/21/25, the patient was getting in her face mocking her, making racial remarks towards her. She said he called me "a nigger and a fucking cunt on two separate occasions that day". She said that, "I never told him that Administration told me to call the police on him. She said that he was being disrespectful to all black staff that worked on the Cottonwood Unit on 6/21/25. She said that RN Matt Taylor advised the patient to leave his staff alone on several different occasions and he continued to follow us and call us racial names. She said that on 6/27/25, she came on to the Cottonwood Unit to get her schedule at approximately 1755 hours, and patient Solan approached her in the dayroom posturing at her and yelling at her. She said that Registered Nurse (RN) David stepped in between us and Matthew took a swing at her. She said after the patient took a swing at her, she left the unit. She said that she was never told that she could not come on the Cottonwood Unit.

On 7/13/25, I interviewed RN David Zimmerman in regards to this matter. He said that on 6/27/25, at approximately 1755 hours, Unique came onto the unit and patient Solan immediately started posturing at her and lunging at her. He said, "I stepped in between them and tried to calm the patient down". He said that the patient continued to yell and make threats towards the staff and took a swing at her. He said that, "I then asked the BHT to leave the unit and she left the unit". This is all documented in ASH Incident Report 2025-2133.

I interviewed Psychiatric Nurse Unit Manager (PNUM) Dominick Aldridge on 7/13/25, in regards to this matter. He said that BHT unique was never advised that she had to stay off of the Cottonwood Unit.

It was determined that on 6/21/25, patient Solan was the one being verbally aggressive and making racial comments towards the female BHT. The BHT did get close to his ear when they were having a verbal altercation, but there is no evidence that she caused the patient to have

an ear infection. There is no evidence that the patient advised any nurses on 6/21/25, that he had an ear infection. On 6/22/25, the patient was placed on sick call for redness on his elbow. NP Ndoati came to the Cottonwood to see him on 6/22/25, and was unable to assess him because he was sleeping. Dr. Prabhu accessed the patient on 6/23/25, and the patient reported that his ears were itchy and had discomfort so she prescribed ear drops for the patient. The patient went to Valley Wise ER on 6/25/25, and the doctor told the patient that his ears were fine, and that he should just continue to take the ear drops. Dr. Amante never cancelled the order for the ear drops, but the ear drop order had expired because it was only supposed to be for 4-5 days. Dr. Prabhu re-wrote the order for the ear drops on 6-30-25.

On 6-27-25, I reviewed video of the incident that occurred in the Cottonwood day room at approximately 1755 hours. The video shows that patient Solan was the one being verbally aggressive towards BHT Coleman and he also took a swing at her. This incident was documented in ASH Incident Report #2025-2133. The PNUM Aldridge stated during an interview with me on 7/13/25, that Coleman was never told that she could not come back on the Cottonwood Unit.

There is no evidence that the patient's SMI rights were violated in relation to this grievance. The investigation regarding this grievance was completed on 7/25/25, and the results were presented to the ASH Complaints Grievances and Appeals Committee on 7/29/25. The Committee approved the decision in this case. The decision is that your grievance is unsubstantiated.

**Decision:** Unsubstantiated.

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

August 1, 2025

Matthew Solan
Arizona State Hospital
2500 E. Van Buren Street, Mohave Unit
Phoenix, Arizona 85008

Re: **Decision Letter**
**Docket Number:** H070725S0563G

Dear Mr. Solan

The Arizona State Hospital Office of Complaints, Grievances and Appeals (ASH, OCGA) received your grievance on 7/7/25. In your grievance you stated, "at shift change Unique Coleman who had been working on the Saguaro unit after being removed from Cottonwood for assaulting me, burst on to the unit walked up to me and began laughing at me. She taunted me and told me that, "she was coming back and will continue to harass me and was told presumably by Admin to call the police on me if I did anything. This caused me to have a total meltdown and I cut both of my wrists and ankles. The nurse would not help me, so I cut myself. Unique's actions were mostly non- therapeutic, sad and retaliatory. After Unique Coleman screamed in my ear on 6/21/25, I got an ear infection and my ear started bleeding. I was told that there is no on call doctor, so I suffered in pain for 3 days until Dr. Prabhu ordered ear drops. After going to the ER, Dr. Amante cancelled my ear drops and my ear infection came back. After being told to stay away from RN Matt Taylor, Unique Coleman pushed past Matt and screamed and spit in my ear. Matt pulled her away from me and she told Matt, 'she wanted to slap the shit out of me'".

**FINDINGS:**

The assigned Investigator interviewed you on 7/10/25, in regards to this matter. You said that, on 6/27/25, Behavioral Health Technician (BHT) Unique was not supposed to be on the

Cottonwood unit and she came into the dayroom at around shift change. You said that, "I was about to make policy reports and she started laughing at you". You said that her harassing you and laughing at you caused you to have a meltdown. You said that afterwards, you pulled a sign off of a door, then went into the bathroom and sliced your arm. You said that the next day, "I was on the mall and she started towards me and laughing at me". You said that patient Kay Kunes witnessed her laughing at you. You said that she also screamed in your ear and you got an ear infection because of it. You said that Dr. Prabhu ordered ear drops for you and after you came back from the ER, he cancelled your ear drops and you got an ear infection again because of it. You said that after Unique was told to stay away from you on 6/21/25, she pushed past Registered Nurse (RN) Matt and spit in your ear. You said that Matt pulled her away from you, and she told Matt that she wanted to, "slap the shit out of you".

The assigned Investigator interviewed the RN on 7/11/25, in regards to this matter. He said that on 6/21/25, you approached him and said that, "Unique assaulted you, by yelling in your ear". He said that, "you never complained about any ear pain or hearing loss". He said that on the morning of 6/21/25, you and the staff were having a heated conversation, so he separated the both of you. He said that, "you called her a nigger and a fucking cunt". He said that you were verbally aggressive and had been making racial slurs that morning. He said that on or around 1230 hours on 6/21/25, patient Nicholas Oaks was asking me a question about his virtual visit. He said that you said, "check the books because Monique is a lying bitch". He said that Monique entered the dayroom shortly after and you said, "there goes that lying bitch right there". He said that Monique then turned around and I asked her to go into the nursing station, which she did.

The assigned Investigator interviewed the Nurse Practitioner (NP), in regards to this matter on 7/11/25. She said that on 6/22/25, "I went to the Cottonwood unit to assess you, because you had been placed on sick call for multiple complaints". She said one was in regards to the redness on your elbow, that you indicated to nursing was a bee bite and you later said that it was a spider bite. She said that you were sleeping when she arrived on the unit, so she did not wake you up.

The assigned Investigator interviewed Dr. Prabhu on 7/11/25, in regards to this matter. She said that on 6/23/25, she came to see you on the Cottonwood unit. She said that you advised her that the redness on your elbow was all better. She said that you claimed that a staff yelled in your ear then stuck a finger in your ear that caused bleeding and infection. She said that she reviewed video and did not witness the staff touch your ear. She said that the staff did seem to come close to your ear and said something and prior to that, you had been calling her cuss words. She said that she ordered ear drops, because you said that your ear canal is itchy and discomforted. She said that you denied hearing loss. She said that the ear drops were only supposed to be taken for 4-5 days, so when the weekend came, your order had expired and you assumed that the other doctor cancelled the order. She said that on 6/30/25, you requested more ear drops, so she

placed an order in for you to get more ear drops. She said that the original order for the ear drops began on 6/23/25, and ended on 6/27/25. She said that on 6/25/25, a Nurse Practitioner sent you to Valley Wise ER, because you complained of left knee pain and she also had them check your ears. The doctor advised you that your ears were fine and that you could continue to take the ear drops that were prescribed at ASH. She said that there is always an OD on call at ASH.

The assigned Investigator interviewed a Cottonwood patient in regards to an incident that you alleged occurred on the forensic mall. The patient said that they do not want to be involved in this matter.

The assigned Investigator interviewed a BHT, in regards to this matter on 7/17/25. She said that on 6/21/25, you were getting in her face and saying racial remarks to her. She said that, you called her, “a nigger and a fucking cunt on two separate occasions that day”. She said that, “I never told Matthew that Administration told me to call the police on him”. She said that you were being disrespectful to all black staff that worked on the Cottonwood unit on 6/21/25. She said that the RN advised you to leave staff alone on several different occasions and you continued to follow us around and call us racial names. She said that on 6/27/25, “I came on the Cottonwood unit to get my schedule at approximately 1755 hours and you approached her in the dayroom posturing at her and yelling at her”. She said that the RN stepped in between us and you took a swing at her but did not hit her. She said that she left the unit after you swung at her. She said that, “I was never told that I could not come on the Cottonwood unit”.

The assigned Investigator interviewed another RN on 7/13/25, in regards to this matter. He said that on 6/27/25, at approximately 1755 hours, the referenced BHT came on the Cottonwood unit and you immediately started posturing at her and lunging at her. He said that, “I stepped in between Matthew and the staff in an attempt to calm you down”. He said that you continued to yell and make threats towards the staff and took a swing at her. He said that, “I then asked the BHT to leave the unit and she followed my direction. He said that this is all documented in ASH Incident Report 2025-2133.

The assigned Investigator interviewed the Psychiatric Nurse Unit Manager (PNUM) on 7/13/25, in regards to this matter. He said that the BHT was never told that she had to stay off of the Cottonwood unit.

**CONCLUSION:**

During the investigation it was determined that, on 6/21/25, you were the one being verbally aggressive towards the BHT. The video shows that she did get close to your ear when you and

her were having a verbal altercation, but there is no evidence that she caused you to have an ear infection. On 6/22/25, you were placed on sick call for redness on your elbow. The on- call doctor came to see you on the Cottonwood unit, but was unable to see you due to you being a sleep at the time. The doctor assessed you on 6/23/25, and you reported that your ears were itchy with discomfort. You were given ear drops on 6/23/25. On 6/25/25, you went to Valley Wise ER. The doctor checked your ears and told you that they were fine and that you can continue to take the ear drops that ASH prescribed. The ASH doctor never cancelled the order for the ear drops. The order expired on 6/27/25, because it was only supposed to be taken for 4-5 days. An ASH doctor re-wrote the order on 6/30/25.

There is no evidence that your SMI rights were violated in relation to this grievance. The investigation regarding this grievance was completed on 7/25/25, and the results were presented to the ASH Complaints, Grievance and Appeals Committee on 7/29/25. The committee approved the decision in this case. The decision is that your grievance is unsubstantiated.

If you should disagree with the above decision, you may file an appeal with the Arizona Health Care Cost Containment/Behavioral Health Grievance and Appeals (AHCCCS/BHGA). The appeal must be in writing and received within thirty (30) days from your receipt of this letter. If you choose to appeal this decision, please list the specific grounds on which you base your claim. All grounds for appeal must be set out individually and clearly stated. Please send your appeal to: AHCCCS/BHGA Behavioral Health Grievance AND Appeals 801 E. Jefferson Street, Mail Drop Box To obtain information about advocacy services available to inform customers about grievance and appeals processes, you may contact the Office of Human Rights at (602) 364-4585 or 1 (800) 922-1447, the Arizona Center for Disability Law at (602) 364-4585 or 1 (800) 922-1447, the Arizona Center for Disability Law at (602) 274-6287 or 1 (800) 927-2260, or the Human Rights Committee at (602) 364-4577.

If you should have any questions regarding this letter or the grievance process, please feel free to contact me at 602-220-6146.

Respectfully,

*Tim Stanley*

Tim Stanley
Manager

Office of Complaints, Grievances and Appeals
Arizona State Hospital

Cc: File

# EXHIBIT 7

Date Created: 07/03/2025 at 02:00 PM MST
Form Name: Master ITDP Reviews (Transfer)
Client's Name: SOLAN,MATTHEW (000035310)
Client's DOB: [redacted]

Arizona State Hospital
Phoenix, AZ

## Master ITDP Reviews (Transfer)

**Select Master ITDP:**

(CURRENT) Entry Date: 2025-05-12 --- Entry Time: 08:32 AM --- Entered By: Phillip Brei - Health Plan Coordinator --- Plan Date: 05/12/2025 --- Plan ID: TXC67337.00001

**Date of Review:**

07/02/2025

**Review Duration (minutes):**

15

**Does Patient have a specific projected Discharge Date?:**

Yes

**Projected Discharge Date:**

08/01/2026

**Patient in Attendance?:**

No

**BHMP:**

Yes

**BHMP Name:**

Kindra Ochoa, APRN, PMHNP-BC

**Att. Psych:**

N/A

**Nurse:**

Yes

**Nurse Name:**

Jaime Cuesta, RN

**SW:**

Arizona State Hospital
Phoenix, AZ

Yes

**SW Name:**

Jelome Carlos, LMSW

**Rehab:**

Yes

**Rehab Name:**

Azer Sevillano, CTRS

**Psychologist:**

Yes

**Psychologist Name:**

Dr. Julianna Vroman, Psy D

**Therapist:**

No

**PCP:**

N/A

**Other(s):**

Yes

**Other Name(s) or Information:**

Pierre Coleman, Lead BHT

**RBHA:**

Yes

**RBHA Name:**

AzCH/Care1st

**Telephonic/Virtual:**

Yes

**Invited Prior to Review?:**

Yes

**Guardian:**

Arizona State Hospital
Phoenix, AZ

N/A

**CM:**

N/A

**OHR:**

N/A

**Family:**

No

**Invited Prior to Review?:**

No

**Attorney:**

Yes

**Attorney Name:**

Holly Gieszl

**Telephonic/Virtual:**

Yes

**Invited Prior to Review?:**

Yes

**DDD:**

N/A

**Other(s):**

N/A

**Link LTG's:**

Yes

**Summary of Transfer Review (Brief Explanation):**

Date of Last Review: 05/09/2025

Long Term Goals:

Arizona State Hospital
Phoenix, AZ

(PSYCHIATRIC ISSUE) Matthew will meet with his BHMP weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro-social behaviors. This provider will identify coping skills to address symptoms that hinder him from pro-social behaviors

BHMP: a progression plan will be implemented due to pt's DTS/DTO behaviors

Psychology: pt's psychology related goal will remain the same at this time, psychology staff to be updated.

(PSYCHIATRIC ISSUE) Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports.

TSI: pt is not meeting this goal. his TSI goal will remain the same at this time.

SW: pt is working with social work staff to discuss his discharge plan.

(MEDICAL ISSUES) Matthew's overall health and hygiene will improve as evidenced by improvement in BMI, lipids, BP, and his appearance in the next 90 days.

Medical: no changes at this time.

**ITDP Requires Changes or Update?:**

Yes

**LTG (BHMP/Attending Psychologist to provide changes):**

Yes

**STG/Interventions:**

Yes

**Staff Responsible for Communicating Changes:**

BHMP, Psychologist

**Staff Name Changes:**

Arizona State Hospital
Phoenix, AZ

Yes

**Other Recommended Changes:**

Yes

**Change Unit Name To:**

Mohave

**Other Information:**

ITDP fully reviewed. This transfer review shall serve as the patient's July review.

**Patient Ready for Discharge?:**

No

**Not Discharge Ready:**

Maintain ALL Current Barriers

**Not Ready for Discharge Information:**

Discharge Barriers/Treatment Barriers/Risk Factors: History of not complying with supervised probation, Limited engagement with community resources, Historical difficulties separating his delusions from reality, History of impulsive and reckless behavior, Three other felony convictions preceding index offense, Preoccupation with litigious actions.

Patient reports, "ASH is unable to treat the patient's primary condition due to institutional, staffing, and funding limitations".

**Plan (check all that apply):**

ITDP to be updated as applicable, Next ITDP Review to be scheduled-60 day, SW to review ITDP updates with Patient

**Patient is in Agreement with Updated ITDP?:**

No

**Brief Explanation:**

Pt denied and stated "I will not be working with you on a progression plan, you can put me on a 1:1 or a 2:1 or a 3:1 or beat the shit out of me"

**Guardian is in Agreement with Updated ITDP?:**

N/A

Date Created: 07/03/2025 at 02:00 PM MST
Form Name: Master ITDP Reviews (Transfer)
Client's Name: SOLAN,MATTHEW (000035310)
Client's DOB: [redacted]

Arizona State Hospital
Phoenix, AZ

**Brief Explanation:**

Patient remains his own guardian.

**Draft/Final:**

Final

---

Electronically Signed by: JELOME CARLOS LMSW on 07/03/2025 at 02:00 PM MST Author

# EXHIBIT 8

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

**Patient: Matthew Solan**
**Patient ID:** [redacted]

Unit staff will initiate a therapeutic progression plan due to Matthew's recent aggressive behaviors (e.g., verbal threats, statements, and behaviors of harm, intimidating others, and violence towards others) and his level of risk of serious harm. As progression occurs, the treatment team will continue to recommend additional interventions to address aggressive behaviors. The goal for Matthew is to demonstrate pro-social behaviors when feeling triggered or overwhelmed.

## Information for staff:

- **Matthew will be *immediately* moved to beginning of Period 1 if he engages in *any* of the following severely dangerous target behaviors:**
  - **Imminently violent or directly threatening behaviors:** Actual or attempted physical harm of staff or other patients; directed and clear statements of premeditated intent to harm staff, their families, other patients; making or using items as weapons; posturing toward others.

- **Matthew will be *immediately* downgraded to the beginning of the previous period if he engages in *any* of the following target behaviors:**
  - **Aggressive behavior:** Impulsive statements of harm, damaging property, throwing food, or other unacceptably aggressive behaviors including the use of hate speech.
  - **Violations of major hospital policies that impact the safety of staff or other patients, including but not limited to refusal to comply with staff direction**

- Staff will offer Matthew **2 verbal prompts** to redirect from aggressive behavior and/or refusal to comply with staff redirection (Verbally indicate "Prompt 1," "Prompt 2".)
- Nursing staff will assess Matthew for safety (with the charge nurse making the final decision) before he leaves the unit for any reason and return him immediately if needed.
- The treatment team will review Matthew's progress in his therapeutic progression plan every two weeks.
- All privileges are contingent upon staff availability.
- Matthew will cooperate with a search before beginning each new level and random safety searches.
- Matthew will have the option to be escorted to the Mohave patio daily, based on his clinical presentation and per staff's availability.
  - If, under nursing discretion, he is considered to be an imminent danger to others, Matthew will not be allowed to go to the patio.

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Period 1:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew must meet the following criteria for **at least 7 days (1 week) prior to advancing to Period 2**:

- Matthew will refrain from aggressive behaviors (e.g., verbal threats, statements of harm, intimidating others, posturing).
- Matthew will accept staff redirection without statements of harm to others or posturing at staff.
- Matthew will not destroy, modify, or manipulate any patient or state property.
- Matthew will have the opportunity to request a meeting with his treatment team up to once weekly, as clinically appropriate. Unit staff will be available for support and redirection 24/7.
- Matthew will comply with his modified room order per this progression plan.
  - May have up to 5 pairs of clothes, two stuffed animals, one pair of sheets, one blanket, one weighted blanket, 2 pillow cases, and 2 pillows.
  - One manila envelope for legal papers.
- Matthew will comply with his COS order. The determination of HR vs. LOS will depend on the reason for reset to period one.
- Matthew will comply with unit guidelines, hospital policies, and patient responsibilities.

**Period 2:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 3:**

**All Period 1 specifications continue with the following additions/alterations.** This time is intended to encourage physical wellness and broaden therapeutic activities**:**

- Matthew will be offered one walk, up to **15** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will be offered the opportunity to be escorted by a 1:1 staff member to one "pop run," on Fridays when he displays safe behaviors, directly to the vending/cafe and back to the unit.
- Matthew will have the opportunity to use the small group room (during open hours only) for **one** hour on the day shift and **one** hour on the night shift to utilize the computer.
  - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and check-out process

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Period 3:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 4.**

**All Period 1 and 2 specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **20** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will have the opportunity to use the small group room (during open hours only) for **two** hours on the day shift and **two** hours on the night shift to utilize the computer
    - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and checkout process
- May have Anbernic and charging cord, must be stored at the nursing station, must use the check-in and check-out process.
- Matthew may check out a pen, a shaver, a nail, or toenail clippers and may use them in line of sight of staff and turn them in promptly after using.
- May have a room key
- He will be offered one rehab group daily with a staff escort to and from groups, when rehab groups are offered.

**Period 4:** Matthew will be granted 1:5 privileges. Matthew will have to meet the following criteria for **at least 28 days (4 weeks) before he can advance to Period 5.**

**All previous specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **30** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew may participate in daily pop-runs.

**Period 5:** Matthew will be granted full mall privileges.

**All previous specifications continue with the following additions/alterations:**

- Matthew will have to meet the following criteria for at least 28 days (4 weeks) before he can advance to Period 6.

## Criteria for Discontinuation of Plan:

When aggressive behaviors have been adequately addressed or it is determined that modifications are no longer needed to address said behaviors, this plan will be discontinued. This plan will be revised as needed.

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

Therapeutic Progression Plan written by: Mohave Treatment team
Date the Therapeutic Progression Plan was implemented: 7/3/2025
Date the Therapeutic Progression Plan was last updated: 7/22/2025
Date of Discontinuation of Therapeutic Progression Plan: TBD

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

**Patient: Matthew Solan**
**Patient ID:** [redacted]

Unit staff will initiate a therapeutic progression plan due to Matthew's recent aggressive behaviors (e.g., verbal threats, statements, and behaviors of harm, intimidating others, and violence towards others) and his level of risk of serious harm. As progression occurs, the treatment team will continue to recommend additional interventions to address aggressive behaviors. The goal for Matthew is to demonstrate pro-social behaviors when feeling triggered or overwhelmed.

## Information for staff:

- **Matthew will be *immediately* moved to beginning of Period 1 if he engages in *any* of the following severely dangerous target behaviors:**
  - **Imminently violent or directly threatening behaviors:** Actual or attempted physical harm of staff or other patients; directed and clear statements of premeditated intent to harm staff, their families, other patients; making or using items as weapons; posturing toward others.

- **Matthew will be *immediately* downgraded to the beginning of the previous period if he engages in *any* of the following target behaviors:**
  - **Aggressive behavior:** Impulsive statements of harm, damaging property, throwing food, or other unacceptably aggressive behaviors including the use of hate speech.
  - **Violations of major hospital policies that impact the safety of staff or other patients, including but not limited to refusal to comply with staff direction**

- Staff will offer Matthew **2 verbal prompts** to redirect from aggressive behavior and/or refusal to comply with staff redirection (Verbally indicate "Prompt 1," "Prompt 2".)
- Nursing staff will assess Matthew for safety (with the charge nurse making the final decision) before he leaves the unit for any reason and return him immediately if needed.
- The treatment team will review Matthew's progress in his therapeutic progression plan every two weeks.
- All privileges are contingent upon staff availability.
- Matthew will cooperate with a search before beginning each new level and random safety searches.
- Matthew will have the option to be escorted to the Mohave patio daily, based on his clinical presentation and per staff's availability.
  - If, under nursing discretion, he is considered to be an imminent danger to others, Matthew will not be allowed to go to the patio.

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

**Period 1:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew must meet the following criteria for **at least 7 days (1 week) prior to advancing to Period 2**:

- Matthew will refrain from aggressive behaviors (e.g., verbal threats, statements of harm, intimidating others, posturing).
- Matthew will accept staff redirection without statements of harm to others or posturing at staff.
- Matthew will not destroy, modify, or manipulate any patient or state property.
- Matthew will have the opportunity to request a meeting with his treatment team up to once weekly, as clinically appropriate. Unit staff will be available for support and redirection 24/7.
- Matthew will comply with his modified room order per this progression plan.
  - May have up to 5 pairs of clothes, two stuffed animals, one pair of sheets, one blanket, one weighted blanket, 2 pillow cases, and 2 pillows.
  - One manila envelope for legal papers.
- Matthew will comply with his COS order. The determination of HR vs. LOS will depend on the reason for reset to period one.
- Matthew will comply with unit guidelines, hospital policies, and patient responsibilities.

**Period 2:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 3:**

**All Period 1 specifications continue with the following additions/alterations.** This time is intended to encourage physical wellness and broaden therapeutic activities**:**

- Matthew will be offered one walk, up to **15** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will be offered the opportunity to be escorted by a 1:1 staff member to one "pop run," on Fridays when he displays safe behaviors, directly to the vending/cafe and back to the unit.
- Matthew will have the opportunity to use the small group room (during open hours only) for **one** hour on the day shift and **one** hour on the night shift to utilize the computer.
  - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and check-out process. Must be checked in by 2300.

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Period 3:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 4.**

**All Period 1 and 2 specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **20** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will have the opportunity to use the small group room (during open hours only) for **two** hours on the day shift and **two** hours on the night shift to utilize the computer
    - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and checkout process.
- May have Anbernic and charging cord, must be stored at the nursing station, must use the check-in and check-out process. Must be checked in by 2300.
- May have MP3, charging cord and headphones, must be stored at the nursing station, must use the check-in and check-out process. Must be checked in by 2300.
- Matthew may check out a pen, a shaver, a nail, or toenail clippers and may use them in line of sight of staff and turn them in promptly after using.
- May have a room key
- He will be offered one rehab group daily with a staff escort to and from groups, when rehab groups are offered.

**Period 4:** Matthew will be granted 1:5 privileges. Matthew will have to meet the following criteria for **at least 28 days (4 weeks) before he can advance to Period 5.**

**All previous specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **30** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew may participate in daily pop-runs.
- Matthew will have the opportunity to use the small group room (during open hours only) for **three** hours on the day shift and **three** hours on the night shift to utilize the computer
    - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and checkout process. Must be checked in by 2300.

**Period 5:** Matthew will be granted full mall privileges.

**All previous specifications continue with the following additions/alterations:**

- Matthew will have to meet the following criteria for at least 28 days (4 weeks) before he can advance to Period 6.

ARIZONA DEPARTMENT
OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

- Matthew will follow unit guidelines regarding the use of the computer room.

## Criteria for Discontinuation of Plan:

When aggressive behaviors have been adequately addressed or it is determined that modifications are no longer needed to address said behaviors, this plan will be discontinued. This plan will be revised as needed.

Therapeutic Progression Plan written by: Mohave Treatment team
Date the Therapeutic Progression Plan was implemented: 7/2/2025
Date the Therapeutic Progression Plan was last updated: 8/12/2025
Date of Discontinuation of Therapeutic Progression Plan: TBD

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Patient: Matthew Solan**
**Patient ID:** [redacted]

Unit staff will initiate a therapeutic progression plan due to Matthew's recent aggressive behaviors (e.g., verbal threats, statements, and behaviors of harm, intimidating others, and violence towards others) and his level of risk of serious harm. As progression occurs, the treatment team will continue to recommend additional interventions to address aggressive behaviors. The goal for Matthew is to demonstrate pro-social behaviors when feeling triggered or overwhelmed.

## Information for staff:

- **Matthew will be *immediately* moved to beginning of Period 1 if he engages in *any* of the following severely dangerous target behaviors:**
    - **Imminently violent or directly threatening behaviors:** Actual or attempted physical harm of staff or other patients; directed and clear statements of premeditated intent to harm staff, their families, other patients; making or using items as weapons; posturing toward others.

- **Matthew will be *immediately* downgraded to the beginning of the previous period if he engages in *any* of the following target behaviors:**
    - **Aggressive behavior:** Impulsive statements of harm, damaging property, throwing food, or other unacceptably aggressive behaviors including the use of hate speech.
    - **Violations of major hospital policies that impact the safety of staff or other patients, including but not limited to refusal to comply with staff direction**

- Staff will offer Matthew **2 verbal prompts** to redirect from aggressive behavior and/or refusal to comply with staff redirection (Verbally indicate "Prompt 1," "Prompt 2".)
- Nursing staff will assess Matthew for safety (with the charge nurse making the final decision) before he leaves the unit for any reason and return him immediately if needed.
- The treatment team will review Matthew's progress in his therapeutic progression plan every two weeks.
- All privileges are contingent upon staff availability.
- Matthew will cooperate with a search before beginning each new level and random safety searches.
- Matthew will have the option to be escorted to the Mohave patio daily, based on his clinical presentation and per staff's availability.
    - If, under nursing discretion, he is considered to be an imminent danger to others, Matthew will not be allowed to go to the patio.

**<u>Period 1:</u>** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew must meet the following criteria for **at least 7 days (1 week) prior to advancing to Period 2**:

- Matthew will refrain from aggressive behaviors (e.g., verbal threats, statements of harm, intimidating others, posturing).
- Matthew will accept staff redirection without statements of harm to others or posturing at staff.
- Matthew will not destroy, modify, or manipulate any patient or state property.
- Matthew will have the opportunity to request a meeting with his treatment team up to once weekly, as clinically appropriate. Unit staff will be available for support and redirection 24/7.
- Matthew will comply with his modified room order per this progression plan.
    - May have up to 5 pairs of clothes, two stuffed animals, one pair of sheets, one blanket, one weighted blanket, 2 pillow cases, and 2 pillows.
    - One manila envelope for legal papers.
- Matthew will comply with his COS order. The determination of HR vs. LOS will depend on the reason for reset to period one.
- Matthew will comply with unit guidelines, hospital policies, and patient responsibilities.

**<u>Period 2:</u>** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 3:**

**All Period 1 specifications continue with the following additions/alterations.** This time is intended to encourage physical wellness and broaden therapeutic activities**:**

- Matthew will be offered one walk, up to **15** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will be offered the opportunity to be escorted by a 1:1 staff member to one "pop run," on Fridays when he displays safe behaviors, directly to the vending/cafe and back to the unit.
- Matthew will have the opportunity to use the small group room (during open hours only) for **one** hour on the day shift and **one** hour on the night shift to utilize the computer.
    - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and check-out process. Must be checked in by .

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Period 3:** Matthew will remain on unit (ROU) except for unit patio time, unless engaging in aggressive behaviors. Matthew will have to meet the following criteria for at least **7 days (1 week) before he can advance to Period 4.**

**All Period 1 and 2 specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **20** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew will have the opportunity to use the small group room (during open hours only) for **two** hours on the day shift and **two** hours on the night shift to utilize the computer
  - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and checkout process.
- May have Anbernic and charging cord, must be stored at the nursing station, must use the check-in and check-out process. Must be checked in by 2330.
- May have MP3, charging cord and headphones, must be stored at the nursing station, must use the check-in and check-out process. Must be checked in by 2330.
- Matthew may check out a pen, a shaver, a nail, or toenail clippers and may use them in line of sight of staff and turn them in promptly after using.
- May have a room key
- He will be offered one rehab group daily with a staff escort to and from groups, when rehab groups are offered.

**Period 4:** Matthew will be granted 1:5 privileges. Matthew will have to meet the following criteria for **at least 28 days (4 weeks) before he can advance to Period 5.**

**All previous specifications continue with the following additions/alterations:**

- Matthew will be offered one walk, up to **30** minutes daily M-F, per nursing discretion and availability, which shall **not** be substituted with any other activities.
- Matthew may participate in daily pop-runs.
- Matthew will have the opportunity to use the small group room (during open hours only) for **three** hours on the day shift and **three** hours on the night shift to utilize the computer
  - Matthew will be able to use his hard drive while in the computer room, must be stored in the nursing station, must use the check-in and checkout process. Must be checked in by 23:30.

**Period 5:** Matthew will be granted full mall privileges.

**All previous specifications continue with the following additions/alterations:**

- Matthew will have to meet the following criteria for at least 28 days (4 weeks) before he can advance to Period 6.

ARIZONA DEPARTMENT
OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

- Matthew will follow unit guidelines regarding the use of the computer room.

**Period 6:** Matthew will be granted access to the computer as stated in the unit guidelines. He will also be eligible for employment in the Skills Training, Empowerment, and Progress (S.T.E.P.) program.

**All previous specifications continue with the following additions/alterations:**

- Matthew will remain on a probationary period of his progression plan with the above-mentioned privileges.

Matthew's behaviors will be continuously monitored and evaluated while on Period 6. Determination of whether Matthew has met the discontinuation criteria will be made through a collaborative agreement between the treatment team and nursing management.

## Criteria for Discontinuation of Plan:

When aggressive behaviors have been adequately addressed or it is determined that modifications are no longer needed to address said behaviors, this plan will be discontinued.

*This plan will be revised as needed.

Therapeutic Progression Plan written by: Mohave Treatment team
Date the Therapeutic Progression Plan was implemented: 7/2/2025
Date the Therapeutic Progression Plan was last updated: 11/05/2025
Date of Discontinuation of Therapeutic Progression Plan: When approved by the treatment team and nursing management.

# EXHIBIT 9

# QMS · Incident Reports

## Incident Report: ASH-2026-0384

### Incident Report · Basic Information

| | | | |
|---|---|---|---|
| **Report Status** | IR - Closed, Other | | |
| **IR Created By** | Mary Schultz | **Are you a Behavioral Health Technician** | ○ Yes ◉ No |
| **Supervisor Dept** | Nursing | **Report Review Supervisor** | Jasmine Bills |
| **Date of Occurrence** | 2/3/2026 09:30 | **Systemic Incident Report** | ○ Yes ◉ No |
| **Date Reported** | 2/3/2026 09:30 | **High Profile or Potential Media Involvement** | ○ Yes ◉ No |
| **Facility / Unit** | Forensic Campus | Mohave | |
| **Location of Incident** | dayroom | | |

### Hospital Emergency Codes

- [ ] Medical Alert
- [ ] Code Blue
- [ ] Code Red
- [ ] Code Green
- [ ] Code Silver
- [ ] Code Gray
- [ ] Code Yellow
- [ ] Code Black
- [ ] Code Orange
- [x] None
- [ ] Code White

### Description of Incident or Reportable Event

Around 0925 this writer was called into the small group therapy room by BHT Desmond E. Patient Matthew Solan was visibly agitated and demanding to call the police because he was assaulted by [redacted]. Matthew S reported to this nurse he was threatened by [redacted] and was assaulted three times by [redacted] chest bumping him in an aggressive manner three times. Matt stated he has PTSD and feels he is in imminent danger because staff refuse to protect him after witnessing the incident. Matt also stated he has a restraining order against [redacted] that states [redacted] should not be on the same unit as him. Matt threatened to kill [redacted] if he came at him again. Matt voiced and motioned that he would kill him by stomping his head in the ground over and over. This writer and BHT Desmond E attempted to de-escalate Matt without success. Matt refused to answer when asked about pain, visual assessment showed no injuries or signs of pain congruent with 0/10 on FACES scale. Matt refused PRN medications but stated he would need to be "knocked out" with meds if [redacted] tries anything because he would kill him. Matt called the police non-emergency line with BHT Desmond E present.
Report from staff and video review by security shows that [redacted] stepped in front of Matt's path but his hands were down at his side and no contact was made. Around 1000, Matthew S was escorted off the unit to speak to police about the incident. Pain follow up on Matt S was unable to be completed within the allotted hour due to him being off the unit speaking with police, however upon his return to the unit around 1020 he stated he was "fine" denied pain congruent with 0/10 on FACES scale.
Upon assessment around 0935, [redacted] denied pain congruent with 0/10 on the FACES scale. Follow up around 1030 he continued to deny pain congruent with 0/10 on the FACES scale.

### Type of Incident

| # | Type of Incident |
|---|---|
| 1 | Patient refusing redirection |

| | |
|---|---|
| 2 | Patient threatening staff |
| 3 | Other significant, unusual or irregular event |

## Patients

| ID | Patient Name | Assigned Location | Involvement |
|---|---|---|---|
| [redacted] | [redacted] | Forensic Campus / Mohave | Antagonist |
| [redacted] | Matthew Solan | Forensic Campus / Mohave | Victim |

## Staff

| ID | Staff Name | Title | Assigned Location | Involvement |
|---|---|---|---|---|
| 226538 | MARY SCHULTZ | PSYCHIATRIC NURSE | Forensic Campus / Mohave | Clinical - Nursing |
| 301222 | RAYETTE XANDER | BEHAVIORAL HEALTH TECH 2 | Forensic Campus / Mohave | Witness |
| 159214 | DESMOND ENONGENE | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Mohave | General Assistance |

## Witness/Other Person

## Objects

## 3rd Party Notification

## Attachments

## Reviews

| ID | Department | Assigned User | Review Type | Determination |
|---|---|---|---|---|
| 210254 | Nursing | Jasmine Bills | Supervisor Review | Reviewed - No Recommendations 2/3/2026 6:27:44 PM |
| 210255 | Quality Management | Any Supervisor | Quality Management Review | Reviewed - No Recommendations 2/4/2026 11:10:19 AM |
| 210322 | Quality Management | Terra Morgan | Additional Review | Reviewed - No Recommendations 2/6/2026 7:10:36 AM |
| 210323 | Medical | Jonathan C. Frank | Additional Review | Notify Only - Not Required 2/4/2026 7:13:52 AM |
| 210324 | Social [redacted] | Jelome S. Car[redacted] | Additional Review | Not Reviewed |
| 210325 | Psychology | Courteney Tully | Additional Review | Notify Only - Not Required 2/4/2026 7:14:21 AM |
| 210331 | Social Work | Zoe Tselos | Additional Review | Reviewed - No Recommendations 2/4/2026 8:38:17 AM |
| 210340 | Executive Management Team | Michael Sheldon | Additional Review | Notify Only - Not Required 2/4/2026 7:22:37 AM |

# EXHIBIT 10

# QMS · Incident Reports

## Incident Report: ASH-2026-0429

### Incident Report · Basic Information

| | | | |
|---|---|---|---|
| **Report Status** | IR - Closed, Other | | |
| **IR Created By** | Courteney Tully | **Are you a Behavioral Health Technician** | ○ Yes ◉ No |
| **Supervisor Dept** | Psychology | **Report Review Supervisor** | David Joslyn |
| **Date of Occurrence** | 2/5/2026 11:00 | **Systemic Incident Report** | ○ Yes ◉ No |
| **Date Reported** | 2/5/2026 15:33 | **High Profile or Potential Media Involvement** | ○ Yes ◉ No |
| **Facility / Unit** | Forensic Campus | Mohave | |
| **Location of Incident** | Mohave Conference Room | | |

**Hospital Emergency Codes**

- ☐ Medical Alert
- ☐ Code Blue
- ☐ Code Red
- ☐ Code Green
- ☐ Code Silver
- ☐ Code Gray
- ☐ Code Yellow
- ☐ Code Black
- ☐ Code Orange
- ☐ None
- ☐ Code White

**Description of Incident or Reportable Event**

I, along with the PMHNP, covering social worker, nurse, and BHT, met with Matthew in the conference room of his assigned unit to discuss the verbal threats he made against a peer on 02/03/26 (see incident report). Matthew denied he made verbal threats to harm his peer and reported he was “having a PTSD reaction” and fears for his peer’s safety in the event of a future “PTSD” reaction. Matthew was informed that, per his progression plan, he would be reset to the beginning of Period 4 due to statements of harm. Matthew accused the treatment team of punishing him for having a “PTSD” reaction, and he was assured that regression in the progression plan is for safety purposes, rather than punishment; moreover, threats to harm others, and particularly those with a clear plan stated, will not be tolerated. Matthew stated he intends to file board complaints against the members of the treatment team, and he stated he refuses to continue working with his current team. He also demanded to speak to his attorney, and he was provided the conference room to speak to them in private. We will continue to meet with Matthew as indicated in his ITDP.

**Type of Incident**

| # | Type of Incident |
|---|---|
| 1 | Actual or threat of legal action |

### Patients

| ID | Patient Name | Assigned Location | Involvement |
|---|---|---|---|
| [redacted] | Matthew Solan | Forensic Campus / Mohave | Antagonist |

## Staff

| ID | Staff Name | Title | Assigned Location | Involvement |
|---|---|---|---|---|
| 208150 | CONOR SULLIVAN | SOCIAL WORKER | Forensic Campus / Mohave | Clinical - Other |
| 159214 | DESMOND ENONGENE | BEHAVIORAL HEALTH TECH LEAD | Forensic Campus / Mohave | General Assistance |
| 237381 | JONATHAN FRANK | PSYCHIATRIC NURSE PRACTITIONER | Forensic Campus / Mohave | Clinical - Prescribing |
| 178537 | JAIME CUESTA | PSYCHIATRIC NURSE | Forensic Campus / Mohave | Clinical - Nursing |
| 302926 | COURTENEY TULLY | PSYCHOLOGY INTERN (FTE) | Forensic Campus / Unspecified | Clinical - Other |

## Witness/Other Person

## Objects

## 3rd Party Notification

## Attachments

## Reviews

| ID | Department | Assigned User | Review Type | Determination |
|---|---|---|---|---|
| 210517 | Psychology | David Joslyn | Supervisor Review | Reviewed - No Recommendations 2/5/2026 7:25:41 PM |
| 210518 | Quality Management | Any Supervisor | Quality Management Review | Reviewed - No Recommendations 2/6/2026 9:25:58 AM |
| 210560 | Executive Management Team | Michael Sheldon | Additional Review | Notify Only - Not Required 2/6/2026 7:18:29 AM |
| 210561 | Medical | Jonathan C. Frank | Additional Review | Notify Only - Not Required 2/6/2026 7:18:48 AM |
| 210562 | Nursing | Yonatan Raymond | Additional Review | Notify Only - Not Required 2/6/2026 7:19:05 AM |