**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel: 1.970.FOX.9611
Fax: 1.970.844.1733
Email: legal@fox-ranch.com
*Plaintiff in propria persona*

FILED / RECEIVED / LODGED / COPY
JUN 29 2026
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,
*Plaintiff,*
*v.*
State of Arizona, *et al.*,
*Defendants.*

Case no. CV24-02061-PHX-JJT-DMF

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Court previously ordered that "Plaintiff may file a dispositive motion on the date of filing his response to Defendants' pending motion for summary judgment." (Doc. 97 at 2.) Plaintiff accordingly moves for Summary Judgment against Defendants State of Arizona (the "State"), Michael R. Sheldon ("Sheldon"), Aaron Bowen ("Bowen") Lea'Cher Carter ("Carter"), and Unique Coleman ("Coleman") (collectively, "Defendants"). This Motion is supported by Plaintiff's Statement of Facts in Support of his Motion for Summary Judgment ("SOF"), which is filed herewith and hereby incorporated by reference.

## I. FACTUAL BACKGROUND

Plaintiff is a 36-year-old man who suffers from numerous disabilities, including Autism Spectrum Disorder ("ASD"), Post-Traumatic Stress Disorder ("PTSD"), and Chronic Inflammatory Response Syndrome ("CIRS"). (SOF, ¶ 1.) On March 12, 2020, Plaintiff was committed to the Arizona State Hospital ("ASH") for a period of treatment after being adjudicated guilty except insane. (SOF, ¶ 2.) Prior to his confinement at ASH, Plaintiff utilized his former service dog, Foxy (hereinafter "Foxy I") to help manage the effects of his ASD and other mental health conditions. (SOF, ¶ 3.) Upon arriving at ASH, Plaintiff requested an accommodation to have Foxy I live with him as a service animal. (SOF, ¶ 4.) Plaintiff's request for an accommodation was repeatedly denied, so he filed *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT (DMF) (*Solan I*), in which he sued to have Foxy I, stay with him at ASH. (SOF, ¶ 5.) In *Solan I*, Plaintiff also filed a Motion for Preliminary Injunction challenging ASH's

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

denial of his service animal request and requesting that ASH be ordered to admit service dogs unless or until it is proven by substantial evidence that a particular dog poses a direct threat to the health and safety of others that cannot be mitigated by reasonable accommodations. (SOF, ¶ 6; *Solan I*, Doc. 24.) The Court found that Plaintiff had shown a likelihood of success on the merits of his ADA and RA claims and he had met the remaining *Winter* factors, including a showing of irreparable harm, required for granting injunctive relief. (SOF, ¶ 7; *Solan I*, Doc. 84.) The Court ordered ASH to conduct a particularized assessment in accordance with the ADA and the relevant Code of Federal Regulations to determine "1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital; and 2) whether Foxy specifically (as distinct from 'service dogs' generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them, including the probability that injury will actually occur." (SOF, ¶ 8; *Solan I*, Doc. 84 at 18–19.)

Several days before the 45-day period for ASH to complete the Court-ordered assessment elapsed, Bowen issued a Particularized Assessment letter, which was subsequently provided to Plaintiff. (SOF, ¶ 9.) The letter "did not attempt to explain how Foxy [I], specifically as distinct from other service dogs generally, would be disruptive to the health and safety of other patients on Plaintiff's treatment unit." (SOF, ¶ 10.) It also did not include "an assessment of individual patients at Plaintiff's housing unit, the effect Foxy [I] may have on them, or the probability that injury would actually occur to them." (SOF, ¶ 11.) The letter did enumerate policies that may need to be altered, but it did not explain why any of these alterations were required or how the alterations would impose a substantial burden on the State. (SOF, ¶ 12.) On July 13, 2022, Plaintiff was notified that Foxy passed away. (SOF, ¶ 13.) Plaintiff contacted Foxy I's caretakers and directed them to take Foxy I's body to her veterinarian to be biopsied for potential cloning. (SOF, ¶ 14.) The veterinarian performed biopsies of Foxy I's extracted ear cartilage, which were sent the same day to Genetic Reflections, LLC ("ViaGen"). (SOF, ¶ 15.) On July 15, 2022, Plaintiff entered a genetic preservation and cell storage contract with ViaGen, with the intention of cloning Foxy I. (SOF, ¶ 16.) To raise money for the cloning, Plaintiff sold his house. (SOF, ¶ 17.)

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

On August 11, 2023, Plaintiff entered a cloning contract with ViaGen and paid a $25,000.00 down payment. (SOF, ¶ 18.) On November 9, 2023, a cloned puppy was born at ViaGen's facility in Rochester, New York, and Plaintiff gave her the same name, Foxy (hereinafter, "Foxy II"). (SOF, ¶ 19.) Plaintiff paid the remaining balance of his contract to ViaGen, on January 9, 2024, a ViaGen agent flew Foxy II from New York to Arizona, and hand delivered her to Mr. Cowsert. (SOF, ¶ 20.) Plaintiff directed his agent, Joseph Cowsert to care for and train Foxy II, and over the next several months, Cowsert performed the puppy's basic housetraining and saw to her veterinary visits and vaccinations. (SOF, ¶ 21.) Cowsert subsequently contracted with All Dogs Unleashed in Prescott, Arizona ("ADU") to provide Foxy II multi-week live-in training in basic obedience and foundational service animal skills. (SOF, ¶ 22.)

On May 16, 2024, Foxy II successfully completed ADU's training. (SOF, ¶ 23.) Over the next few weeks, Cowsert finished Foxy II's task training based on instructions from All Dogs Unleashed. (SOF, ¶ 24.) He trained Foxy II to perform deep pressure therapy ("DPT"), alerting, grounding, and social buffering work—tasks intended to help Plaintiff with grounding and coping with the effects of his neurodevelopmental disabilities and PTSD. (SOF, ¶ 25.) These were tasks Foxy I performed which substantially improved Plaintiff's independence, quality of life, and access to therapy services. (SOF, ¶ 26.) They are not natural canine behaviors; they are specially trained tasks that require Foxy II to detect a stress response or adverse emotional state in Plaintiff, and respond by physically placing herself in contact with and applying pressure to Plaintiff by leaning against or sitting on him (in the case of DPT), nudging or yipping at Plaintiff (in the case of her basic alerting tasks), presenting herself to Plaintiff and encouraging him to touch her fur as a sensory anchor (in the case of her grounding tasks), and gently interposing herself in between Plaintiff and others (in the case of her work as a social buffer). (SOF, ¶ 27.)

After talking with Cowsert and evaluating Foxy II's training, ADU's owner, Brad Smith ("Smith") testified that it was his "professional opinion that Foxy [II] demonstrates a consistent ability to perform DPT and alerting tasks, provide grounding support, and serve as a social buffer for her handler. Foxy [II] possesses all the qualities expected of a service dog, including acute sensitivity to her handler's emotional states, exceptional adaptability to stress, and the ability to remain focused and calm in disruptive situations." (SOF, ¶ 28.) He confirmed "Foxy [II] performs well on and off leash, consistently responds to her handler's verbal and nonverbal commands, and is fully housetrained. She displays no signs of

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

aggression, and enjoys being picked up and handled by her trainer and strangers alike. Overall, Foxy [II] is a friendly and well-adjusted animal, and has acquired the necessary skills and temperament to effectively assist her handler." (SOF, ¶ 29.) Smith certified that "Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan." (SOF, ¶ 30.) The Alliance of Therapy Dogs ("ATD") subsequently certified Foxy II to work in hospitals and extended its $5,000,000 liability coverage to her, and confirmed she could be safely handled, was clean and well groomed, did not bark at people or dogs, showed no signs of aggression, accepted stroking of her head, body, and tail, touching of her paws, scratching and petting of her throat, holding of her ears, and being held, and demonstrated appropriate skills to interact with people in animal assisted functions. (SOF, ¶ 31-35.)

While Foxy II was training at ADU, Plaintiff notified patients and staff on the ASH Cottonwood unit he would soon be requesting an accommodation for Foxy II to accompany him at ASH. (SOF, ¶ 36.) Every Cottonwood patient stated they were OK with Foxy II living on the unit. (SOF, ¶ 37.) Half of the ASH Forensic Hospital population later testified that interacting with Foxy II would be beneficial to their rehabilitation. (SOF, ¶¶ 38-39.) Plaintiff's treatment team also confirmed that having a "trained service animal" was Plaintiff's primary strength. (SOF, ¶ 40.) Carter and Coleman, on the other hand, began harassing Plaintiff and berating him with false allegations that he had engaged in bestiality. (SOF, ¶¶ 41-59.) On May 22, 2024, Carter and Coleman loudly proclaimed, in front of the other Cottonwood patients, that Plaintiff "eat[s] dog p****" and "dog a**." Id. Carter asked Plaintiff, loudly, and in front of other patients, "does Foxy really like it when you stick your nasty d*** in her?" (SOF, ¶ 46.) Plaintiff informed Carter he had not had sex with Foxy, and that it would be physically impossible for him to do so with a small lapdog. Carter responded that Plaintiff could have sex Foxy because his "d*** is so small you'd need a magnifying glass to see it." (SOF, ¶ 46.) Carter and Coleman repeatedly made similar statements in front of other patients, on multiple separate occasions before and after May 22, 2024. (SOF, ¶ 47.)

On June 13, 2024, Plaintiff wrote to Sheldon to notify ASH that Foxy I had been cloned and that Foxy II was now a professionally trained service dog, and to request a reasonable accommodation under the ADA for Foxy II's services. (SOF, ¶ 60.) Plaintiff's letter discussed how Foxy I previously helped him overcome self-isolation and had enabled him to engage socially, travel, and start a business. (SOF, ¶ 61.) Plaintiff clarified that Foxy II was healthy, fully vaccinated, and well-trained, and he highlighted

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

his substantial investment in her cloning and training. (SOF, ¶ 62.) On July 5, 2024, ASH's administrators responded to Plaintiff's request with a one-page denial letter. (SOF, ¶ 63.) The letter stated that ASH extensively reviewed the ADA regulations on service animals when considering Plaintiff's request, and "w[ould] not modify its existing policies, practices and/or procedures to allow for a service animal at the Forensic Hospital." (SOF, ¶ 64.) The ASH administration proffered various purported justifications for its denial of Plaintiff's request, citing the secure nature of ASH, unspecified health and safety concerns, unspecified fundamental alteration concerns, an unsupported assertion that the "proper handling of a service animal, including the toileting, feeding, grooming and veterinary care could not feasibly be provided at the sole responsibility of the patient," and the blatantly false claim that "based on [Plaintiff's] own personal statements, [Plaintiff's] past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature)." (SOF, ¶ 65; Doc. 6 at 86.) On June 22, 2024, Plaintiff also submitted a request to have a visit on his birthday, July 17, 2024, from attorneys Holly Gieszl and Josh Mozell, Cowsert, and Foxy II. (SOF, ¶66.) ASH responded, "[n]o dogs allowed on campus," and its attorney responded, "Josh and Holly are approved. The dog is not allowed on our grounds." (SOF, ¶ 67.) As Cowsert had no one to watch Foxy II and could not leave her in Plaintiff's truck in 110 degree weather, they were both excluded from visitation. (SOF, ¶ 68.)

Foxy II's services are essential to Plaintiff's independent functioning, and her work is undeniably therapeutic to Plaintiff. (SOF, ¶¶ 69-70.) Defendants' continued interference with Foxy II has destroyed Plaintiff's therapeutic relationship with his providers, further impairing his treatment. (SOF, ¶ 71.) While separated from Foxy II, Plaintiff has experienced distress, anguish, and heightened mental health symptoms, including hyper-vigilance, nightmares, flashbacks, sensory overload, increased anxiety, suicidal ideation, cutting, head banging, and other self-injurious behaviors that would have been ameliorated, prevented, or interrupted by Foxy II. (SOF, ¶¶ 72-73.) Despite this, Defendants dismissed Plaintiff's injuries and attacked Foxy II's status, claiming Plaintiff's self-harm, anxiety, and suicidal ideation from not having his "personal pet" with him were not supported by any recorded instances of self-harming behavior. (SOF, ¶ 74.) Once discovery closed, Defendants changed their defensive posture: instead of claiming Foxy II's *presence* would get in the way of Plaintiff's treatment, Defendants now assert Plaintiff's fixation on Foxy II's *absence* has interfered with his treatment. (Doc. 65 at 8, 11.)

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

## II. ARGUMENT

### A. Summary Judgment Standard.

Under Rule 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]…which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57. "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omittied).

### B. Plaintiff is Entitled to Summary Judgment on his ADA/RA Claims

Plaintiff states claims under Title II of the ADA ("ADA") and the Rehabilitation Act ("RA") (Doc. 6 at 31-33, 37.) Plaintiff is entitled to summary judgment on these claims as the evidence demonstrates Defendants have not established the essential elements of their affirmative defenses, there is no genuine issue as to any material fact regarding those defenses, and Plaintiff is entitled to prevail as a matter of law.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

The goal of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." See *What Constitutes "Service Animal" and Accommodation Thereof, Under Americans with Disabilities Act (ADA)*, 75 A.L.R. Fed. 2d 49, 1; *see also* 42 U.S.C. § 12101 *et seq*. "One way the ADA and the associated regulations assist the disabled in achieving equal access is giving persons with disabilities the right to be accompanied by a service animal." 75 A.L.R. Fed. 2d at 1. Therefore, "a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 35.136(a), and a service animal "may accompany its handler to such areas as…inpatient…rooms…clinics, rehabilitation therapy areas, the cafeteria and vending areas…restrooms, and all other areas of the facility where healthcare personnel, patients, and visitors are permitted." 28 C.F.R. Pt. 35 App. A at 625. "It is intended that the broadest feasible access be provided to service animals in all…hospitals." 28 C.F.R. Pt. 36, App. C.

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 CFR § 35.130(a). The language of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(a) is disjunctive: a disabled individual shall not "be denied the benefits of the services, programs, or activities of a public entity, ***or*** be subjected to discrimination by any public entity." Exclusion of a service dog, absent a valid exception to the general inclusion rule, is discrimination *per se*, as intentional deprivation of service dog diminishes individual independence. *Sullivan By & Through Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 961 (E.D. Cal. 1990); *Tamara v. El Camino Hospital*, 964 F.Supp. 2d 1077, 1083 (N.D. Cal. 2013); CV20-02209, Doc. 84 at 13. A state hospital therefore improperly discriminates if it "fails to make reasonable accommodations for a person with a service animal." *Tamara*, 964 F.Supp. 2d 1077, 1083.[1]

Thus, to prevail on a claim for failure to allow access to a service dog under Title II of the ADA, a plaintiff must prove (a) that he is a qualified individual with a disability; (b) that the defendant is a public entity; and (c) that the plaintiff was either excluded from participation in or denied the benefits of a

[1] While *Tamara* was brought under Title III of the ADA, Title II entities "have the same legal obligations as title III entities to make reasonable modifications in policies, practices, or procedures to allow service animals." 28 C.F.R. Pt. 35, App. A at 613.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

public entity's services, programs or activities, or was otherwise discriminated against by the public entity, in the following manner: (i) the plaintiff uses the assistance of a service animal; and (ii) the defendant refused entry to the service animal. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(a), 35.136; *Tamara*, 964 F. Supp.2d 1077. The Court may analyze Plaintiff's ADA and RA claims coextensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts," *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021), and because Defendants admit that the State, through ASH, is a recipient of federal financial assistance within the meaning of the RA. (SOF, ¶ 86.)

**1. Plaintiff is a Qualified Individual With a Disability and the State is a Public Entity.**

The State admits Plaintiff has exhausted his administrative remedies for the purposes of the PLRA. (SOF, ¶ 79,) It also admits Plaintiff suffers from ASD and PTSD, does not contest that Plaintiff suffers from CIRS (SOF, ¶¶ 82-83,) and admits Plaintiff is a qualified individual with a disability under the ADA and RA (SOF, ¶¶ 84-85.) The State is a public entity under the ADA. *See* 42 U.S.C. § 12132(1).

**2. Foxy II is a Service Animal.**

The ADA defines a service animal as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability," including a psychiatric disability, where the work or tasks are "directly related to the individual's disability." *C. L. v. Del Amo Hosp., Inc.*, 992 F.3d 901 (9th Cir. 2021). The ADA "does not require a service dog to perform a particular number of trained tasks or amount of work," and "[t]he regulations do not specify by whom the dog must be trained. Rather, the statute defines a service dog by the outcome of training—what the dog is capable of doing to ameliorate an individual's disability." Id. "Psychiatric service animals can be trained to perform a variety of tasks that assist individuals with disabilities to detect the onset of psychiatric episodes and ameliorate their effects." 28 C.F.R. Pt. 35, App. A, p. 616. Ultimately, "[t]he test is a functional one: can the dog consistently help the person with a disability meet the challenges of life by assisting in the person's activities of daily living?" *C. L.*, 992 F.3d 901. Plaintiff hired ADU and Cowsert to train Foxy II to perform the same tasks Foxy I previously performed, and provided detailed information and directives on how Plaintiff expected Foxy II to perform. (SOF, ¶ 23-29.) As a result of her training, Foxy II is individually train to perform DPT, alerting, grounding, and social buffering tasks for Plaintiff. Therefore, "Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan." (SOF, ¶ 30.)

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**3. ASH Refused Entry to Foxy II Without Conducting the Required Assessment**

The Denial Letter "did not refer to or incorporate by reference the 2022 Particularized Assessment," (Doc. 31 at 25:1-2.), and Defendants admit "ASH denied Plaintiff's [2024] accommodation request without an updated assessment." (SOF, ¶ 88.) Defendants have not produced any admissible evidence to show the existence of any direct threat; Bowen and Sheldon both testified they though it sufficient to mitigate any risks that "may" exist "completely" by the total exclusion of Foxy. (SOF, ¶¶ 91, 99.) That is grossly inconsistent with the ADA's risk assessment framework. They also testified that ASH was "not required to accommodate any dog," assess Foxy individually, or assess fundamental alteration or direct threat before barring Foxy from even visiting Plaintiff at ASH. (SOF, ¶¶ 89-103.) Defendants have produced no evidence that they consulted Plaintiff, his family, Foxy II's trainers or veterinarians, or any qualified experts to determine if Foxy II was a service animal, if she could be safely admitted to live with Plaintiff at ASH, if any legitimate risks existed, or if any of their other concerns were real, or mitigatable.

**4. The State Has Not Proven Fundamental Alteration or Direct Threat**

The State raises two defense to Plaintiff's ADA claim: (1) allowing Foxy II to live with Plaintiff at ASH would "fundamentally alter the nature of" ASH's "service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i), and (2) Plaintiff poses a direct threat to his service animal. 28 C.F.R. § 35.139(a), Fundamental alteration and direct threat are affirmative defenses. 28 C.F.R. §§ 35.136(a), 35.139(b); *Lentini*, 370 F.3d at 845; *Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243 (9th Cir. 1999).

The State did not preserve the defenses of fundamental alteration or direct threat in their Answer, so these defenses are not available to it now. *See* Fed. R. Civ. P. 8(c)(1), 12(b). Moreover, "the fundamental alteration test has no application to cases of facial discrimination." *Lovell v. Chandler,* 303 F.3d 1039 (9th Cir. 2002). Hospitals must "take the necessary steps to accommodate service animals and to ensure that individuals with disabilities are not separated from their service animals," and "that the broadest feasible access be provided to service animals in all...hospitals." *Id.* Part 36 Appx. C, § 36.302 (citing H.R. Rep. No. 101-485(II), at 106 (1990), H.R. Rep. No. 101-485(III), at 59 (1990)); *see also Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). Since Plaintiff brought *Solan I* in 2020, ASH still has not implemented any written service animal policy. (SOF, ¶ 147.) On the contrary, Defendants are adamant that ASH "will not modify its existing policies, practices and/or procedures to

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

allow for a service animal." (SOF, ¶ 64.) Rather than striving to provide service animals the "broadest feasible access," ASH has implemented a total, hospital-wide service dog ban that facially discriminates against disabled individuals who use service dogs, and has advanced one pretext after another to obscure its blanket ban and justify its ongoing discrimination. (SOF, ¶¶ 104-109, 147.)

Even if the fundamental alteration defense was available, "whether an accommodation causes a fundamental alteration is 'an intensively fact-based inquiry.'" *Lentini*, 370 F.3d at 845 (quoting *Martin v. PGA Tour, Inc.*, 204 F.3d 993, 999 (9th Cir. 2000)). The elements of fundamental alteration the State must establish are: (a) the nature of ASH's services, programs, and activities; and (b) that admitting Foxy II would fundamentally alter nature of ASH's services, programs, or activities, *i.e.*, change an "essential aspect," a "fundamental character," an "essential attribute" or an "indispensable feature" of ASH. 28 C.F.R. § 35.130(b)(7)(i); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-687 (2001); *Tamara*, 964 F. Supp.2d 1077. Defendants have not established the nature of ASH's services, programs, and activities, and have failed to produce evidence that Foxy II's presence would alter an essential aspect, fundamental character, essential attribute, or indispensable feature of any ASH's programs, services, or activities.

Defendants merely speculate that Foxy II may not be medically necessary for Plaintiff to participate in and benefit from the mental health services that ASH provides. When assessing a request to admit a service animal, a public entity may not consider "the nature or extent of a person's disability," (28 C.F.R. § 35.136(f),) and only *after* the public entity "properly excludes a service animal under [28 C.F.R.] § 35.136(b)" must it "give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises." 28 C.F.R. § 35.136(c). A service animal is properly excluded under 28 C.F.R. § 35.136(b) only if (1) the animal is out of control and the animal's handler does not take effective action to control it, or (2) the animal is not housebroken. 28 C.F.R. § 35.136(b). The State has not claimed either exception, nor can it: ASH staff has never met Foxy II. SOF, ¶ 63. As the Court has previously held, "to the extent that Foxy's presence or behavior was so disruptive as to fundamentally alter ASH's services, programs, or activities, ASH would have grounds for removing Foxy. But merely speculating that Foxy's presence would cause such an alteration without reference to any specific concerns…is insufficient under the ADA." *Solan I*, Doc. 84 at 12.

The ADA authorizes Foxy II to accompany Plaintiff to all areas of ASH "where healthcare personnel,

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

patients, and visitors are permitted." 28 C.F.R., Pt. 35 App. A at 625. Whether or not ASH staff are able to perform the same tasks Foxy II would otherwise perform is not a permitted inquiry when determining if Foxy II must be admitted. As the DOJ Administrative Guidance states, "[s]ervice animals must be allowed in patient rooms and anywhere else in the hospital the public and patients are allowed to go. They cannot be excluded on the grounds that staff can provide the same services." [2] The DOJ's administrative guidance on ADA compliance is entitled to deference. *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904 (9th Cir. 2019).

Speculative concerns that a service dog might affect treatment in a psychiatric hospital do not rise to the level of a fundamental alteration. *Tamara*, 964 F. Supp. 2d 1077, 1084. The decision to balance the benefits the service dog provides against any loss in quality of services is the sole choice of the service dog user. *Sullivan*, 731 F. Supp. at 961; *see also* 42 U.S.C. § 12201(d). "[D]eference must be shown to the manner in which a handicapped person chooses to overcome the limitations created by [his] disabling condition." *Sullivan*, 731 F. Supp. 947, 958. "[A]s long as [those] choices…are reasonable, the [ADA/RA] both protects those choices from scrutiny, and prohibits discrimination against the disabled person on the basis of those choices." Id.

The State's psychologist, Dr. Amanda Brimlow opined that, as a result of Plaintiff's ASD, he "has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships...While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers." (SOF, ¶ 110, 112) However, Sheldon reported to the Arizona Legislature[3] that ASH "is not able to meet the needs of patients with Autism." (SOF, ¶ 111.) The State's new psychologist, Courtney Tully, added to Plaintiff's treatment plan that "Psychology staff will increase patient access to services by offering autism-informed communication and environmental accommodations," (SOF, ¶ 112-116,) but ASH's providers have instead avoided Plaintiff, encouraged him to seek appropriate services "after" discharge. (SOF, ¶ 117-

[2] DOJ administrative guidance, "Frequently Asked Questions about Service Animals and the ADA," https://www.ada.gov/regs2010/service_animal_qa.html.

[3] *See* Arizona Department of Health Services, Clinical Improvement and Human Resource Plan (Sept. 1, 2023), https://www.azdhs.gov/documents/director/agency-reports/clinical-improvement-and-human-resource-plan-09-01-2023.pdf.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

123.) Unwilling to wait to receive the benefits of autism-informed services, Plaintiff established a relationship with Sam McCulloch at Radiant Sun Therapy in Flagstaff ("McCulloch"), and began participating in telemedicine therapy with McCulloch. (SOF, ¶ 124.) Unlike ASH, McCulloch specializes in treating ASD. (SOF, ¶ 125.) McCulloch's treatment plan states that Plaintiff "will work to make connections with the right supports, including regular therapy, and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition," and "participate in therapy and have close contact with his support animal." (SOF, ¶ 126.)

Defendants have produced no admissible evidence that Foxy II would be anything but benefical to Plaintiff's mental health treatment. Plaintiff previously utilized Foxy I to help him manage the effects of his severe disabilities, and to enlarge his access to community services. (SOF, ¶¶ 69-70.) Dr. Morris would have known this, had he bothered to ask. (SOF, ¶ 127.) But it would seem that he did know, as he later contradicted his affidavit by affirming that having a "trained service dog" was Plaintiff's foremost "patient strength" and reccomending animal therapy (SOF, ¶¶ 128-130.) Plaintiff's goal is "to make connections with the right supports, including regular therapy, and access to his service animal (Foxy) to manage stress, [and] process emotions," (SOF, ¶¶ 69-70, 126,) not to learn how to "get along" without her. Defendants' concern that Plaintiff's response to treatment is being be negatively impacted by his Autism-related fixation over Foxy II's exclusion, could easily resolved by simply *not excluding* Foxy II.

Exclusion of a service dog must be based on the best available evidence and circumstances individual to the animal in question, not fears or generalizations, speculation or unfounded assumptions. 28 C.F.R. § 130(h). ASH has the ability "to determine, on a case-by case basis, whether a particular service animal can be excluded based on that particular animal's actual behavior or history—not based on fears or generalizations about how an animal or breed might behave. This ability to exclude an animal whose behavior or history evidences a direct threat is sufficient to protect health and safety." 28 C.F.R. Pt. 35, App. A, pp. 618-619. Defendants' animal abuse and ligature concerns are grossly speculative, and have nothing to do with Foxy II's behavior. These concerns implicate direct threat, not fundamental alteration, and must be analyzed under the ADA's direct threat framework. When assessing whether Plaintiff posed a direct threat to the health or safety of Foxy, ASH was required to "make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 35.139(b).

A health care provider, in particular, has a duty to assess risk based on "the objective, scientific information available to him and others in his profession." *Bragdon*, 524 U.S. at 649; *Chalk*, 840 F.2d at 707-708. A subjective belief in the existence of a risk, even one made in good faith, will not shield the decision maker from liability. *Bragdon*, 524 U.S. at 649. Decisions must be made upon "particularized facts using the best available objective evidence as required by the regulations." *Echazabal v. Chevron*, 336 F.3d 1023, 1028 (9th Cir. 2003). Defendants do not receive special deference merely because they are health care providers. *Bragdon*, 524 U.S. at 649. In the summary judgment context, a courts must "weigh the risks and alternatives," to determine "whether a genuine issue of material fact exists as to the reasonableness of the accommodation." *Nunes*, 164 F.3d 1243. Courts are adjured to consider factors such as (a) the nature of the risk, (b) the duration of the risk, (c) the severity of the risk and (d) the probabilities that the risk will eventuate, causing varying degrees of harm. *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287 (1987); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).

Defendants admit they did not assess the likelihood of animal abuse actually occurring. (SOF, ¶¶ 89-103.) Bowen "reviewed and interpreted the treatment notes, progress notes, and incident notes pertaining to Plaintiff and Foxy," and personally decided that those notes "indicate there ***may*** have been an inappropriate relationship between him and his dog, Foxy, and that there ***may*** be a risk of future abuse." (SOF, ¶ 131.) Defendants admit Plaintiff "has never been treated for a zoophilic disorder or other disorder related to animal abuse," knew ASH "had never treated, attempted to treat, or suggested that Plaintiff be treated for any such disorder," (SOF, ¶ 141,) and admit Plaintiff's providers have not opined that Plaintiff is or was at risk of abusing Foxy I or Foxy II. (SOF, ¶¶ 132-133) Defendants produced no evidence that they assessed if a tether would pose a genuine safety risk, or if they considered alternatives, such as voice control, which 28 C.F.R. § 35.136(d) authorizes, and which Foxy II's trainers testified would be sufficient to control her. (SOF, ¶¶ 25-29.) Plaintiff is an ecocentrist, a therian, and a practitioner of esoteric fox magic; he is eccentric, outspoken, and his Autism-related idiosyncrasies make him difficult to get along with. (SOF, ¶¶ 134-136). That does not give ASH carte blanche to violate the ADA.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**C. Plaintiff is Entitled to Summary Judgment on Claims Against Carter and Coleman**

To prevail on a false light claim, a plaintiff must prove "(1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438 (Ariz. Ct. App. 2015). A statement "is 'highly offensive' if a reasonable person in the same or similar circumstances would feel seriously upset or embarrassed by the statement." *Godbehere v. Phoenix Newspapers, Inc.,* 783 P.2d 781, 786 (1989). Carter and Coleman falsely accused Plaintiff of bestiality in front of numerous patients, in the closed institutional community where Plaintiff lives and receives treatment. Plaintiff personally heard Carter and Coleman tell him "you eat dog p***y" and "you eat dog a**" in front of numerous patients on May 22, 2024 and in the weeks before and after. (SOF, ¶ 43.) Carter also told Danial Alvarez that Plaintiff "f***s dogs." (SOF, ¶ 137.) These statements are highly offensive. Carter and Coleman have produced no admissible evidence that they did not make the statements Plaintiff has testified they made.

Carter has not testified at all in these proceedings, and stipulated that her responses to Plaintiff's interrogatories are inadmissible. (Doc. 80 at 4.) The Court accepted her stipulation not to use them. (Doc. 96.) On March 12, 2025, after more than a year and a half of defending against Carter's false aggravated assault charges, in which Carter claimed Plaintiff had thrown hot coffee in her face, the Maricopa County Superior Court found Plaintiff had not thrown hot coffee in Carter's face, but that Carter had "harassed Mr. Solan in front of other patients, talking loudly with allegations that he engaged in acts of bestiality with his service dog, Foxy." (SOF, ¶¶ 57-59.) Carter is collaterally estopped from claiming she did not loudly allege in front of other patients that Plaintiff engaged in acts of bestiality with Foxy.

Coleman merely asserts that she "heard Plaintiff speak of sexual conduct between himself and his dog." (SOF, ¶ 139.) But "truth is an affirmative defense." *Turner v. Devlin,* 174 Ariz. 201 (1993). "[T]he burden of proving falsity lies only on those plaintiffs who are defamed by speech that is a matter of public concern." *Id.* Carter and Coleman failed to preserve the defense of truth in their Answer, so it is not available to them now. *See* Fed. R. Civ. P. 8(c)(1), 12(b). Even if it were, Plaintiff has never told anyone that he "eats dog p***y," "eats dog a**," or "f***s dogs," (SOF, ¶ 141.,) and Carter and Coleman have produced no admissible evidence to support a finding that Plaintiff has engaged in any of those activities.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**D. Plaintiff is Entitled to Summary Judgment on his Claims Against Bowen and Sheldon**

"False light invasion of privacy is recognized in Arizona as a tort separate from defamation." *Desert Palm Surgical Grp., P.L.C.,* 236 Ariz. at 579–80 (citing *Godbehere*, 162 Ariz. at 340). Although they both involve dissemination of information, the interests protected by each action differ significantly. A defamation claim seeks to compensate damage to reputation caused by the publication of false information. See *Reed v. Real Detective Pub. Co.,* 63 Ariz. 294, 305 (1945). To be defamatory, a publication must generally be false and bring the defamed person into disrepute, contempt or ridicule, or must impeach the plaintiff's honesty, integrity, virtue or reputation. See *Phx. News., Inc. v. Choisser,* 82 Ariz. 271, 275–76 (1957). To prevail on a defamation claim, a plaintiff must generally prove a defendant published a false and defamatory communication "(a) know[ing] that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580(B) (1977); *Peagler v. Phoenix Newspapers, Inc.,* 560 P.2d 1216, 1222 (Ariz. 1977). On the other hand, "[t]he gravamen of [a privacy] action…is the injury to the feelings of the plaintiff, the mental anguish and distress caused by the publication." *Reed,* 63 Ariz. at 305. The remedy is available "to protect a person's interest in being let alone and is available when there has been publicity of a kind that is highly offensive." *Godbehere,* 162 Ariz. at 343 (citation omitted). A plaintiff may recover in the absence of reputational damage, as long as the publicity is unreasonably offensive and attributes false characteristics. Id. "However, to qualify as a false light invasion of privacy, the publication must involve 'a major misrepresentation of the plaintiff's character, history, activities or beliefs,' not merely minor or unimportant inaccuracies.'" Id. (quoting Restatement § 652E cmt. c).

To be defamatory, a publication generally must be false, (though defamation by implication is recognized in Arizona,) and truth is a defense. See *Choisser,* 82 Ariz. at 275–76. Meanwhile, "[a] false light cause of action may arise when something untrue has been published about an individual or when the publication of true information creates a false implication about the individual." *Godbehere,* 162 Ariz. at 341 (citation omitted). In the later case, "the false innuendo created by the highly offensive presentation of a true fact constitutes the injury." Id. (citing Restatement § 652E). False light also differs from defamation with respect to "publicity" and "publication." Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

substantially certain to become one of public knowledge." *Hart v. Seven Resorts, Inc.,* 190 Ariz. 272, 280 (Ct. App. 1997) (citing Restatement § 652D cmt. a). However, "any publication…even of small circulation…or statement made in an address to a large audience, is sufficient." Id "Published," in cases of defamation, requires only that a statement be communicated to a single third party. Id.

The trial court decides whether a statement is capable of bearing a defamatory meaning, and the jury then decides whether the defamatory meaning of the statement was in fact conveyed. *Yetman v. English,* 168 Ariz. 71 (1991). "But, in some cases imputations are so clearly innocent or so clearly defamatory that the court is justified in determining the question itself." *Id.*; *Rogers v. Mroz*, 502 P.3d 986, 990 (Ariz. 2022). Bowen's 2022 Particularized Assessment letter stated "ASH has received information that you have either touched Foxy inappropriately in the past or contemplate doing so in the future…ASH cannot ignore the risk that allowing Foxy to reside at the Forensic Hospital would enable you to abuse her…Animal abuse is a criminal act and ASH will not facilitate such crimes." (SOF, ¶ 107.) The 2024 Denial Letter stated Plaintiff's relationship with his service animal was "sexual in nature," and that ASH would not "facilitate such illicit and illegal behaviors." (SOF, ¶ 65.) These statements are clearly defamatory. Moreover, Bowen and Sheldon knew ASH never treated, attempted to treat, or suggested Plaintiff be treated for any zoophilic disorder, (SOF, ¶ 94,) and knew none of Plaintiff's providers had claimed Plaintiff was at risk sexually abusing Foxy I or Foxy II. (SOF, ¶ 132-133.)

A plaintiff typically must show damages, but damages are presumed when the statement is defamatory *per se*. *Peagler*, 560 P.2d at 1222. Bowen and Sheldon have, in no uncertain terms, accused Plaintiff of raping his service dog. "Accusing someone of rape is defamatory per se because rape is a serious and shocking felony." *Hawks v. Seery,* No, CV-21-00092-DGC, Doc. 62 at 16 (D. Ariz. Aug. 13, 2023) (citing *Ismail v. Montchak*, No. B284163, 2019 WL 2949863, at *4 (Cal. Ct. App. July 8, 2019); *Hansen v. Stoll*, 130 Ariz. 454, 457 (Ariz. Ct. App. 1981) (statements of crimes involving moral turpitude are defamatory *per se*.) Neither Bowen nor Sheldon deny making the statements at issue; they instead assert their statements were based on inferences Bowen personally drew from disputed treatment notes. (SOF, ¶¶ 89-100, 131-133.) Bowen and Sheldon failed to preserve the affirmative defense of truth in their Answer, so it is not available to them now. *See* Fed. R. Civ. P. 8(c)(1), 12(b). They have also failed to produce any admissible evidence showing Plaintiff engaged or intended to engage in bestiality.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Bowen's administrative team met frequently, and was made "aware of the matters pertaining to Foxy I." (SOF, ¶ 142.) The team was composed of Bowen, Sheldon, and numerous high ranking government officials. (SOF, ¶ 143.) Bowen also "provided Sheldon a copy of his computer drive and all the files it contained" when he resigned. (SOF, ¶ 142.) ASH's Unit Managers were also on the administrative team, and were regularly apprised of decisions affecting ASH's treatment units. (SOF, ¶ 144.) ASH is a closed institutional community; Bowen and Sheldon knew or reasonably should have known that scandalous statements, such as those at issue in this case would quickly spread through the ASH rumor-mill and become public knowledge among patients and staff. That is exactly what happened here. (SOF, ¶ 145.)

Bowen and Sheldon each had a duty to assess risk based on particularized facts and objective, scientific information. The Court enjoined ASH to conduct an individualized assessment and explicitly instructed ASH not to rest its conclusions on speculation. (*Solan I,* Doc. 84 at 11-12, 18-19.) Bowen admits he did not assess the nature, duration, or severity of the purported risk that the Plaintiff would have sexual relations with Foxy I, the probability sexual contact would actually occur, or whether treatment services might mitigate the alleged risk, and instead decided to exclude Foxy I solely because a risk "may" have existed. (SOF, ¶ 131.) Sheldon adopted Bowen's "findings" without performing any assessment or fact-checking. (SOF, ¶¶ 88, 98-103.) "Negligence is the appropriate standard," where, as here, "there has not been any allegation that the plaintiff is a public figure." *Specialists v. Tri-City Cardiology,* 222 Ariz. 383, 387–88 (Ct. App. 2009). The failure of both Bowen and Sheldon to conduct a Court-ordered and ADA mandated risk assessment before falsely accusing Plaintiff of bestiality was, at best, negligent.

## III. CONCLUSION AND REQUEST FOR RELIEF

Plaintiff has demonstrated that no genuine dispute exists as to any material fact, and that he is entitled to prevail as a matter of law on all of his operative claims. Plaintiff has also produced evidence negating one or more of the elements essential to each of Defendants' affirmative defenses, and has shown Defendants lack sufficient evidence to carry their ultimate burden of persuasion at trial.

**WHEREFORE,** Plaintiff respectfully requests the Court enter summary judgment in his favor as to each of the operative claims on which the Court determines Plaintiff is entitled to summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of June, 2026.

**Matthew Phillip Solan**

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

## CERTIFICATE OF SERVICE

**I CERTIFY** that copies of the foregoing document were delivered to Arizona State Hospital staff on June 23, 2026, in sealed packages, with sufficient postage affixed, for forwarding to:

Ann Hobart and Jordan Kendall
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, AZ 85004
*Attorneys for Defendants*

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003

**DATED** June 23, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056