FILED LODGED
RECEIVED COPY
JUN 29 2026
CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA
BY DEPUTY

**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel: 1.970.FOX.9611
Fax: 1.970.844.1733
Email: legal@fox-ranch.com
*Plaintiff in propria persona*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan<br>*Plaintiff,*<br><br>*v.*<br><br>State of Arizona, *et al.*,<br>*Defendants.* | Case no. CV24-02061-PHX-JJT-DMF<br><br>**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY** |

Pursuant to Fed. R. Civ. P. 56(a)-(c) and LRCiv 56.1(a), Plaintiff hereby submit this Statement of Facts in Support of his Motion for Summary Judgment.

## DEFINITIONS

a. "ASH" refers to the Arizona State Hospital, a hospital run by Defendant State of Arizona.

b. "FAC" refers to Plaintiff's First Amended Complaint filed November 18, 2026 (Doc. 6).

c. "Foxy I" refers to Plaintiff's former service animal who passed away in 2022.

d. "Foxy II" refers to Plaintiff's current service animal subject of the instant case.

e. "Solan Decl." refers to attached declaration of Matthew Solan (Exhibit A).

f. "Smith Decl." refers to declaration Brad Smith attached to the FAC at 90-91.

g. "Cowsert Decl." refers to the declaration of Joseph Cowsert attached to the FAC at 93-98.

h. "Solan I" refers to Plaintiff's prior action, *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT (MHB) (D. Ariz. 2020).

## STATEMENT OF FACTS

1. Plaintiff is a 36-year-old man who suffers from numerous disabilities, including Autism Spectrum Disorder ("ASD"), Post-Traumatic Stress Disorder ("PTSD"), and Chronic Inflammatory Response Syndrome ("CIRS"). *See* FAC, ¶ 1; Solan Decl., ¶ 2; Exhibit G.



MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

2. On March 12, 2020, Plaintiff was committed to the Arizona State Hospital ("ASH") for a period of treatment after being adjudicated guilty except insane. He was admitted to ASH on April 1, 2020. *See* FAC, ¶ 67; Doc. 8 at 3; Solan Decl., ¶ 3.
3. Prior to his confinement at ASH, Plaintiff utilized his former service dog, Foxy I, to help manage the effects of his ASD and other mental health conditions. *See* FAC, ¶ 63; Solan Decl., ¶ 4.
4. Upon arriving at ASH, Plaintiff requested an accommodation to have Foxy I live with him as a service animal. *See Solan I* at 9; Doc. 31 at 2; Solan Decl., ¶ 5.
5. Plaintiff's request for an accommodation was repeatedly denied, so he filed *Solan I*, in which he sued to have Foxy I, stay with him at ASH. *See* FAC, ¶ 67; Solan Decl., ¶ 6.
6. Plaintiff also filed a Motion for Preliminary Injunction challenging ASH's denial of his service animal request and requesting that ASH be ordered to admit service dogs unless or until it is proven by substantial evidence that a particular dog poses a direct threat to the health and safety of others that cannot be mitigated by reasonable accommodations. *See Solan I*, Doc. 24.
7. The Court found that Plaintiff had shown a likelihood of success on the merits of his ADA and RA claims and he had met the remaining *Winter* factors, including a showing of irreparable harm, required for granting injunctive relief. *See Solan I*, Doc. 84.
8. The Court ordered ASH to conduct a particularized assessment in accordance with the ADA and the relevant Code of Federal Regulations to determine "1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital; and 2) whether Foxy specifically (as distinct from 'service dogs' generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them, including the probability that injury will actually occur." *See Solan I*, Doc. 84 at 18–19; Solan Decl., ¶ 8.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

9. Several days before the 45-day period for ASH to complete the Court-ordered assessment elapsed, Defendant Aaron Bowen issued a Particularized Assessment letter, which was subsequently provided to Plaintiff. *See* FAC, ¶ 81; FAC at 64-69; Solan Decl., ¶ 9.
10. The letter "did not attempt to explain how Foxy [I], specifically as distinct from other service dogs generally, would be disruptive to the health and safety of other patients on Plaintiff's treatment unit." *See* FAC, ¶ 82; FAC at 64-69; Solan Decl., ¶ 10.
11. It also did not include "an assessment of individual patients at Plaintiff's housing unit, the effect Foxy [I] may have on them, or the probability that injury would actually occur to them." *See* FAC, ¶ 83; FAC at 64-69; Solan Decl., ¶ 11.
12. The letter did enumerate policies that may need to be altered, but it did not explain why any of these alterations were required or how the alterations would impose a substantial burden on the State. *See* FAC, ¶ 84; FAC at 64-69; Solan Decl., ¶ 12.
13. On July 13, 2022, Plaintiff was notified that Foxy passed away. *See* FAC, ¶ 94; Solan Decl., ¶ 13.
14. After receiving this news, Plaintiff contacted Foxy I's caretakers and directed them to take Foxy I's body to her veterinarian to be biopsied for potential cloning. *See* FAC, ¶ 95; Solan Decl., ¶ 14.
15. The veterinarian performed biopsies of Foxy I's extracted ear cartilage, which were sent the same day to Genetic Reflections, LLC ("ViaGen"). *See* FAC, ¶ 96-97; Solan Decl., ¶ 15.
16. On July 15, 2022, Plaintiff entered a genetic preservation and cell storage contract with ViaGen, with the intention of cloning Foxy I. *See* FAC, ¶ 97; Solan Decl., ¶ 16.
17. To raise money for the cloning, Plaintiff sold his house. *See* FAC, ¶¶ 99-103; Solan Decl., ¶ 17; Cowsert Decl., ¶¶ 11-13.
18. On August 11, 2023, Plaintiff entered a cloning contract with ViaGen and paid a $25,000.00 down payment. *See* FAC, ¶ 104; Solan Decl., ¶ 18; Doc. 27 at 21-44.
19. On November 9, 2023, Foxy I's clone was born at ViaGen's Rochester, New York facility. Plaintiff gave her the name Foxy. *See* FAC, ¶ 105; FAC at 71. Solan Decl., ¶ 19; Cowsert Decl., ¶ 15.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

20. Plaintiff paid the remaining balance of his contract to ViaGen, and around January 9, 2024, a ViaGen agent flew Foxy II from New York to Arizona, and hand delivered her to Mr. Cowsert. *See* FAC, ¶ 106; FAC at 73; Solan Decl., ¶ 20; Cowsert Decl., ¶ 16.

21. Plaintiff directed Mr. Cowsert to care for and train Foxy II, and over the next several months, Mr. Cowsert performed Foxy II's basic housetraining and saw to her veterinary visits and vaccinations. *See* FAC, ¶ 108-109; Solan Decl., ¶ 21; Cowsert Decl., ¶¶ 16, 23.

22. Mr. Cowsert subsequently contracted with All Dogs Unleashed in Prescott, Arizona ("ADU") to provide Foxy II multi-week live-in training in basic obedience and foundational service animal skills. *See* FAC, ¶ 110; Solan Decl., ¶ 22; Cowsert Decl., ¶ 18.

23. On May 16, 2024, Foxy II successfully completed ADU's training. *See* FAC, ¶ 110; Solan Decl., ¶ 23; Cowsert Decl., ¶ 18.

24. Over the next few weeks, Mr. Cowsert finished Foxy II's task training based on detailed instructions from Plaintiff and training guidance from All Dogs Unleashed. *See* FAC, ¶ 111; Solan Decl., ¶ 24; Cowsert Decl., ¶ 19.

25. Cowsert trained Foxy II to perform deep pressure therapy ("DPT"), alerting, grounding, and social buffering work—tasks intended to help Plaintiff with grounding and coping with the effects of his neurodevelopmental disabilities and PTSD, and confirmed that Foxy II is fully housetrained, very quiet, and gets along with everyone, is very tolerant of loud noises and being handled and carried around, is well received by everyone, and is perfectly well behaved in stores and public places, on and off leash. *See* FAC, ¶ 111-112; Solan Decl., ¶ 25; Smith Decl., ¶ 5; Cowsert Decl., ¶ 19-24.

26. DPT, alerting, grounding, and social buffering are tasks Plaintiff had trained Foxy I to perform, and which substantially improved Plaintiff's independence, quality of life, and access to therapy services. *See* Solan Decl., ¶ 26; Smith Decl., ¶ 5; Exhibit B, ¶¶ 16, 19-20.

27. DPT, alerting, grounding, and social buffering work are not natural canine behaviors, they are specially trained tasks that required Foxy I, and require Foxy II to detect a stress response or adverse emotional state in Plaintiff, and respond by physically placing herself in contact with and applying pressure to Plaintiff by leaning against or sitting on him (in the case of

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

DPT), nudging or yipping at Plaintiff (in the case of her basic alerting tasks), presenting herself to Plaintiff and encouraging him to touch her fur as a sensory anchor (in the case of her grounding tasks), and gently interposing herself in between Plaintiff and others (in the case of her work as a social buffer). *See* Solan Decl., ¶ 27.

28. After talking with Mr. Cowsert and evaluating Foxy II's training, ADU's owner, Brad Smith ("Smith") testified that it was his "professional opinion that Foxy [II] demonstrates a consistent ability to perform DPT and alerting tasks, provide grounding support, and serve as a social buffer for her handler. Foxy [II] possesses all the qualities expected of a service dog, including acute sensitivity to her handler's emotional states, exceptional adaptability to stress, and the ability to remain focused and calm in disruptive situations." *See* Smith Decl., ¶ 7.

29. Smith confirmed that "Foxy [II] performs well on and off leash, consistently responds to her handler's verbal and nonverbal commands, and is fully housetrained. She displays no signs of aggression, and enjoys being picked up and handled by her trainer and strangers alike. Overall, Foxy [II] is a friendly and well-adjusted animal, and has acquired the necessary skills and temperament to effectively assist her handler." *See* Smith Decl., ¶ 8.

30. Smith therefore certified that "Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan." *See* Smith Decl., ¶ 9.

31. The Alliance of Therapy Dogs ("ATD") is a nonprofit organization that certifies animal therapy teams, which was under contract with the Arizona Department of Health Services to provide animal therapy services to patients at ASH. *See* Exhibit H; Solan Decl., ¶¶ 28, 90.

32. ATD provided volunteer animal therapy services to Plaintiff at ASH between 2022 and 2023. *See* Exhibit I; Solan Decl.,¶ 29.

33. ATD certified Foxy II to work in hospitals and extended its $5,000,000 liability coverage to her. *See* Doc. 17 at 63-66, 68; Solan Decl., ¶ 30; Exhibit H.

34. ATD's auditor, Robin Petrillo, reported that Cowsert "put in a lot of time and energy in training [Foxy II] and it shows…Foxy [II] did well in a hospice environment. She was able to sit on the bed and brought love and joy." *See* Doc. 17 at 63-67; Solan Decl., ¶ 31.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

35. Petrillo confirmed that Foxy II could be safely handled, was clean and well groomed, did not bark any people or other dogs, showed no signs of aggression, accepted stroking of her head, body, and tail, touching of her paws, scratching and petting of her throat, holder her hears, and being held; and demonstrated appropriate skills to interact with people in animal assisted functions. *See* Doc. 17 at 63-67; Solan Decl., ¶ 32.

36. While Foxy II was training at ADU, Plaintiff notified patients and staff on the ASH Cottonwood unit he would soon be requesting an accommodation for Foxy II to accompany him at ASH. *See* Solan Decl., ¶ 33.

37. Plaintiff spoke to every patient on the Cottonwood unit, and asked them if they were OK with Foxy II living on the unit. Every Cottonwood patient told Plaintiff they supported Foxy II living on the unit. *See* Solan Decl., ¶ 34.

38. 61 patients living in the ASH Forensic Hospital later declared under penalty of perjury that interacting with Foxy II would be "highly beneficial" to them and their rehabilitation. *See* Doc. 27 at 13-19; Solan Decl., ¶ 35.

39. In May 20, 2022 the funded capacity of the ASH Forensic Hospital is 143 patients, and the average head count at the Forensic Hospital was 114 patients. *See* Exhibit J; Solan Decl., ¶¶ 36, 90.

40. On July 1, 2024, Plaintiff's treatment team confirmed having a "trained service animal" was Plaintiff's foremost patient strength, and recommended animal therapy. *See* Exhibit K; Solan Decl., ¶¶ 27, 90.

41. Starting around the beginning of May, 2024, Carter and Coleman began harassing Plaintiff and berating him with false allegations that he had engaged in bestiality. *See* FAC, ¶¶ 136-139; Doc. 82, Ex. A, ¶¶ 2-5; Solan Decl., ¶ 38.

42. On May 22, 2024, Lea'cher Carter and Unique Colman began taking turns harassing Plaintiff and loudly proclaiming, in front of the other ASH Cottonwood unit patients, that Plaintiff is "nasty" and that he eats "dog p****" and "dog a**." *See* FAC, ¶ 138; Doc. 82, Ex. A, ¶ 2; *See* Solan Decl., ¶ 39.

43. Carter and Coleman repeatedly made similar statements in front of other patients, on multiple

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

separate occasions before and after May 22, 2024, including loudly asking Plaintiff "is it true you eat dog p***y?" and "do you eat dog a**?" and loudly taunting Plaintiff and stating that he eats "dog p****" and "dog a**." *See* Solan Decl., ¶ 40.

44. On May 22, 2024, Plaintiff complained to nursing supervisor Dominick Aldrich that Carter and Coleman were sexually harassing him. Aldrich pulled Carter and Coleman into the unit nurses station and talk to them. Aldrich later came out and told Plaintiff he had directed them to stay away from and stop harassing him. *See* Doc. 82, Ex. A, ¶ 3; Solan Decl., ¶ 41.

45. After Aldrich spoke to Carter and Coleman on May 22, 2024, Coleman temporarily stopped harassing Plaintiff, but Carter continued harass Plaintiff and accuse him of having sex with Foxy. *See* Doc. 82, Ex. A, ¶ 4; Solan Decl., ¶ 42.

46. After Aldrich directed to Carter to stop harassing Plaintiff on May 22, 2024, Carter asked Plaintiff, "does Foxy really like it when you stick your nasty d*** in her?" *See* Doc. 82, Ex. A, ¶ 5; Solan Decl., ¶ 42.

47. When Plaintiff explained to Carter that he never had sex with Foxy, never would, and that what she was suggesting was physically impossible, Carter loudly insisted Plaintiff could have sex with Foxy because Plaintiff's "d*** is so small you'd need a magnifying glass to see it." *See* Doc. 82, Ex. A, ¶ 5; FAC, ¶ 138; Solan Decl., ¶ 43.

48. Plaintiff informed Carter that if she did not stop harassing him he was going to sue her for defamation. Carter laughed loudly at Plaintiff said, "come, on lets go call Holly so you can sue me." *See* Solan Decl., ¶ 44.

49. Plaintiff instead asked Coleman to let him in the conference room so he could call his attorney, Holly Gieszl. Carter stood up and demanded that she be the one to let Plaintiff into the conference room. Carter continued to hurl insults at Plaintiff while walking with him to the conference room. *See* Doc. 82, Ex. A, ¶ 6; Solan Decl., ¶ 45.

50. After Plaintiff called his attorney, he went to the Cottonwood unit dining room to get coffee. Carter saw Plaintiff in the room and began walking towards him and yelling. Plaintiff tried to walk away from Carter, but she followed, yelling "I'm sick of yo s***!". Carter then threw up her hands and said, "come on, attack me so I can call security on yo dumb a**." *See* Doc.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

82, Ex. A, ¶ 7; Solan Decl., ¶ 46.

51. Plaintiff exited the dining room sought out Aldrich to complain of Carter's ongoing harassment, but could not find him. Plaintiff approached Coleman and asked her to find Aldrich. Coleman responded, "boy, I ain't gettin' him, you go find him!" *See* Doc. 82, Ex. A, ¶ 8; Solan Decl., ¶ 47.

52. Carter then approached Plaintiff and started yelling at him. Plaintiff panicked and threw down a cup of melted ice cubes from his morning iced coffee, and went to his room. Carter called a code gray, and Aldrich came to Plaintiff's room a few moments later and told Plaintiff to stay there for a while. *See* Doc. 82, Ex. A, ¶ 9; Solan Decl., ¶ 48.

53. The same day, Carter falsely reported to Phoenix PD that Plaintiff threw a cup of hot coffee in her face, and did so because she is black. *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 49.

54. Without interviewing Plaintiff, Phoenix PD's bias crimes section pressed aggravated assault charges against him, falsely claiming that he assaulted Carter by throwing a full cup of hot coffee in her face, and that he did so because of an "anti-african american bias." *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 50.

55. Plaintiff was maliciously prosecuted on Carter's false charges for nearly two years. *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 51. Carter eventually admitted Plaintiff never threw hot coffee in her face, and her charges were eventually dismissed with prejudice. *See* Doc. 103, Ex. F, ¶¶, 3; Solan Decl., ¶ 52; Exhibit F.

56. Plaintiff maintained he did not assault Carter, and agreed to plead guilty to disorderly conduct to stop the prosecutor from harassing him. Id.

57. At the March 12, 2026 change of plea hearing in that case, Plaintiff listened as the factual basis of the disorderly conduct charge was read into the record by his attorney:

> "I need to provide a bit of background because of procedural issues in the case, and errors in the police report that led to the State amending the original indictment. Mr. Solan was admitted to the Arizona State Hospital on April 1, 2020. His intake assessment that day was completed by a psychiatrist, Dr. Steven Kwoh, who is now the chief medical officer at the state hospital. Dr. Kwoh noted that Mr. Solan was designated SMI under A.R.S.



Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

36-550. That is the first thing in Mr. Solan's medical record. And it was the first page in the medical records that Detective McDermott received from the hospital. A designation of SMI means that Mr. Solan suffered a metal disability that is so severe and persistent that long-term functional capacities in the activities of daily living, interpersonal relationships, employment, and recreation are affected. Mr. Solan's qualifying mental health disorder for SMI designation is autism and schizoaffective disorder. In December of 2024, Dr. Brim low, a staff psychologist updated the diagnosis, and schizoaffective disorder was eliminated and replaced with post-traumatic stress disorder, PTSD. She found persistent deficits in social communication and social interaction. She found that these deficiencies were indicative of the substantial functional limitations related to Mr. Solan's autism diagnosis. In September of '25, Dr. Kwoh deemed Mr. Solan permanently disabled due to his SMI status and the severity of his mental and cognitive disorders. Mr. Solan additionally is indigent. His family posted bail and retained me to represent him. Due to his SMI status and his substantial, permanent disability, he in not able to work and has no means of support. This is important to the factual basis we ultimately arrived at as the plea in this matter. On May 22, 2024, Mr. Solan had a difficult interaction with a behavioral health technician [Lea'Cher Carter], who was not assigned specifically to him, but worked on the floor. Well call her BHJT-1. Over a period of time, she harassed Mr. Solan in front of other patients, talking loudly with allegations the he engaged in bestiality with his service dog Foxy. Mr. Solan reached out to a second BHT [Unique Coleman], we will call her BHT-2, and asked her to summon the nurse and ask the nurse to remove BHT-1. Mr. Solan was yelling and waving his arms. This was in the dayroom, and he did so in a manner that disturbed the peace and quiet of the staff and patients on the unit. He also tossed a partially full cup of cold coffee – not hot coffee – maybe an inch or so of coffee, on a nearby table, and same of the cold coffee splashed on the two BHTs."

*See* Doc. 103, Ex. F at 2; Doc. 103, Ex. F, ¶ 5; Solan Decl., ¶¶ 53, 90; Exhibit F.

58. The prosecutor made no specific objections the Superior Court did not strike any portion of



Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

the factual basis. *See* Doc. 103, Ex. G, ¶ 5; Solan Decl., ¶ 35; Exhibit F.

59. The State "did not have any additions or corrections to the factual basis," and "[t]he Court "accepted the Factual Basis." *See* Doc. 103, Ex. F, ¶ 6; Solan Decl., ¶¶ 34, 90; Exhibit F.

60. On June 13, 2024, Plaintiff wrote to Sheldon to notify ASH that Foxy I had been cloned and Foxy II was now a professionally trained service dog, and to request a reasonable accommodation under the ADA for Foxy II's services. *See* FAC at 81-84; Solan Decl., ¶ 36.

61. Plaintiff's letter discussed how Foxy I previously helped him overcome self-isolation and had enabled him to engage socially, travel, and start a business. *See* Id.

62. Plaintiff clarified that Foxy II was healthy, fully vaccinated, and well-trained, and he highlighted his substantial investment in her cloning and training. *See* Id.

63. On July 5, 2024, without meeting Foxy II, consulting Plaintiff, Plaintiff's his family, or Foxy II's trainers, ASH's administrators responded to Plaintiff's request with a one-page denial letter ("Denial Letter"). *See* FAC at 86; Solan Decl., ¶ 37; FAC, ¶ 122, Doc. 31, ¶ 90.

64. The Denial Letter stated that ASH extensively reviewed the ADA regulations on service animals when considering Plaintiff's request, and "will not modify its existing policies, practices and/or procedures to allow for a service animal at the Forensic Hospital." *See* FAC at 86; Solan Decl., ¶ 38; FAC, ¶ 123.

65. The Denial Letter listed the following purported reasons for the denial:

- "The Hospital has legitimate concerns that, based on your own personal statements, your past relationships and interactions with a "service animal" have not only been counter-therapeutic, but also inappropriate (sexual in nature). In no way will the Hospital facilitate such illicit and illegal behaviors.
- The Facilities maintained by the Hospital, including the Forensic Hospital, are secure facilities and not accessible to the general public. Furthermore, the Hospital ONLY provides health care services at its facilities to individuals who are under court order for treatment (i.e., the Hospital does not provide health care services to the public at large).
- There are legitimate medical and safety reasons to exclude a service animal from the Hospital.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

- The presence of a service animal within an [ASH] facility would require the alteration of services, programs, and/or activities and would fundamentally alter many typical functions of the Hospital[; and,]
- The proper handling of a service animal, including the toileting, feeding, grooming and veterinary care could not feasibly be provided at the sole responsibility of the patient. Such activities would require additional staff resources and coordination."

*See* FAC, ¶ 124; FAC at 86; Solan Decl., ¶ 38.

66. On June 22, 2024, Plaintiff also submitted a Special Visit Request Form to have a visit on his birthday, July 17, 2024, from attorneys Holly Gieszl and Josh Mozell, Mr. Cowsert, and Foxy II. *See* FAC, ¶ 128; Solan Decl., ¶ 39.

67. After two weeks passed without a response, Ms. Gieszl sent an email to Assistant Attorney General Erin Cohen, and on July 11, 2024, Cohen emailed back ASH's response, which stated, "Josh and Holly are approved. The dog is not allowed on our grounds." ASH also returned Plaintiff's visit request form marked "No are dogs allowed on campus." *See* FAC, ¶¶ 129-132; FAC at 88; Solan Decl., ¶ 40.

68. Plaintiff discussed the option of Mr. Cowsert visiting Plaintiff without Foxy II, but Mr. Cowsert informed Plaintiff that it would a 2 day ordeal for him to come to Phoenix, and he had nobody to watch Foxy II. It was also over 110 degrees in Phoenix on July 17, 2024, and Foxy II could not stay in Plaintiff's truck while Mr. Cowsert was inside ASH. As a result, Mr. Cowsert and Foxy II were both excluded from visiting Plaintiff at ASH on his birthday. *See* FAC at 88; Solan Decl., ¶ 41.

69. Foxy II's services are essential to Plaintiff's independent functioning, and her work is undeniably therapeutic to Plaintiff. Prior to his confinement by the State of Arizona, Foxy I enabled Plaintiff to function independently and participate meaningfully in outpatient therapy for the first time in over 20 years of attending therapy. *See* Solan Decl., ¶ 42.

70. Plaintiff's mother, Arlene Solan, provided a declaration to impeach Dr. Morris' testimony. Mrs. Solan's declaration corroborates Plaintiff's assertion that Foxy I's presence was therapeutic and that her work and tasks enlarged Plaintiff's independent functioning and

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

enabled Plaintiff to access needed behavioral health services. Mrs. Solan states:

"I am Matthew Solan's mother. He was adopted at 11 days old. Matthew has lived with disabilities his entire life. He attended a special-needs pre-school from ages 3 through 4 and required substantial support in elementary school. Matthew had an IEP starting in kindergarten and an assigned aid through the third grade. In the fourth grade, Matthew was diagnosed with an Autism Spectrum disorder. In the fifth grade, Matthew was removed from public school and placed in a special needs school for autistic children. In the sixth grade, Matthew continued to decompensate, so my husband and I removed Matthew from school and homeschooled him. He received his GED in 2009 at age 20. Matthew completed a 3D animation certificate program through Boston University in 2012, but required substantial accommodations to finish it. Matthew moved into his aunt's vacant condominium in 2012 and lived there until 2015. During this time, he became very reclusive. He was obsessed with computers and programming. I had difficulty getting him to go out and socialize. On January 5, 2015, I drove Matthew to Brattleboro, Vermont to pick up his first dog, Foxy. Initially, I did not want Matthew to have a dog. When I saw how much she helped him, I was glad. Matthew began teaching Foxy to perform tasks that helped him manage his autism. Matthew and Foxy lived together at the condo from January to August 2015. He was suffering from mold-related illnesses while at the condominium. Matthew expressed a desire to move to Arizona. My husband and I bought him a house near Williams, AZ, hoping the dry climate would help him heal from his illnesses. He could live independently with our continued support. Matthew came back to Massachusetts in 2016 and returned to Arizona by 2017. While in Massachusetts in 2015 and 2016, I stayed with Matthew and Foxy several hours a day to help with various living activities. I also took them out to socialize. We would go out to restaurants and thrift stores several times a week. Matthew always took good care of Foxy and attended to her needs. I watched him walk her, cook for her, bathe her in the sink and pamper her. Matthew stopped talking through his stuffed fox toys and began using Foxy as a social buffer, which enabled him to communicate more effectively. I

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

have never seen Matthew mistreat Foxy, raise his voice at her, hit her or do anything to cause her any harm. I never saw any indication that Matthew was inappropriate with Foxy in any way. When Matthew was training Foxy, I watched him exclusively employ positive reinforcement techniques. He showered her with praise and positive attention, using healthy training treats, such as chicken bits, which he would prepare for that purpose. While I continued to provide Matthew financial support, Foxy enabled Matthew to function independently for the first time, leave the house to socialize and take on more and more responsibilities. I took Matthew to all of his therapy appointments between 1993 and 2016. Prior to 2016, I accompanied Matthew because, if I did not, he would not even go in. Before acquiring Foxy as a service dog, Matthew could not effectively engage in any therapy. He would argue with the therapists and could not focus on what they were asking him to do. After Foxy started coming to his sessions, he was able to begin engaging with his therapist. When Matthew became overwhelmed, Foxy would jump in his lap without prompting and Matthew would bury his face in her fur to calm down. After several months of attending therapy with Foxy, Matthew was able to start participating in the sessions without me. While Matthew has been confined at the Arizona State Hospital, I have spoken with him on the phone almost every day. Since being separated from Foxy, Matthew has become more withdrawn and cynical. Matthew was devastated by the death of Foxy in 2022, after which he drastically decompensated and became even more withdrawn and verbally aggressive. Matthew decided to sell his house in Williams, AZ so he could get the funds to clone Foxy, hoping this would calm him down. Since the cloned Foxy was delivered to Arizona in 2024, I have paid approximately $200 weekly for Foxy's food and care. I have also paid for all of Foxy's veterinary expenses and other needs. I will continue to pay for Foxy, but once Matthew is able, I am holding him responsible to pay all of Foxy's expenses. From what I have heard from Matthew and others, I do not believe the Arizona State Hospital has improved Matthew's situation, nor his mental health." *See* Exhibit B; Solan Decl., ¶¶ 43, 90.

71. ASH's exclusion of Foxy II and Defendants' attacks on Plaintiff's relationship with Foxy I

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

and Foxy II has irreparably destroyed Plaintiff's therapeutic relationship with his ASH treatment providers, further impairing his treatment. *See* FAC, ¶ 136; Solan Decl., ¶ 44.

72. While separated from Foxy II, Plaintiff has experienced distress, anguish, and heightened mental health symptoms, including hyper-vigilance, nightmares, flashbacks, sensory overload, increased anxiety, suicidal ideation, cutting, head banging, and other self-injurious behaviors. *See* FAC, ¶¶ 144-145; Solan Decl., ¶ 45.

73. Had Foxy II been present, she could have help Plaintiff ground, ameliorated his symptoms, and prevent or immediately interrupted his self-injurious behaviors. *See* FAC, ¶ 145; Solan Decl., ¶ 46; Cowsert Decl., ¶ 20; Smith Decl., ¶ 5.

74. Despite this, Defendants have dismissed Plaintiff's injuries and attacked Foxy II's status, falsely claiming Plaintiff's reports of self-harm, anxiety, and suicidal ideation from not having his "personal pet" with him were not supported by any recorded instances of self-harming behavior. *See* FAC, ¶ 146; FAC at 103-107; Solan Decl., ¶¶ 47.

75. On or about August 12, 2024, Plaintiff served notices of his claims against the State of Arizona, Michael Sheldon, Aaron Bowen, Unique Coleman, and Lea'cher Carter, demanding $33,000,000 in damages for ASH's exclusion of Foxy II and the public dissemination of defamatory statements made about me by the individual defendants. *See* FAC, ¶ 139, FAC at 100-101; Doc. 103 at 10-24; Solan Decl., ¶ 48.

76. On or about August 14, 2024, Plaintiff filed CV24-02061-PHX-JJT-DMF. *See* Doc. 1.

77. On or about October 13, 2024, Plaintiff filed an administrative complaint/grievance with ASH's. Complaints, Grievances, and Appeals office. ASH summarily dismissed the complaint stating, "In regards to your request to have your personal dog visit or live with you at ASH, this issue cannot be handled through the Hospital's internal complaint process, due to the litigation history…Based on the findings of this investigation, your complaint is dismissed." *See* FAC, ¶ 141; Solan Decl., ¶ 49.

78. On November 18, 2024, Plaintiff filed his Verified First Amended Complaint in in this matter. Plaintiff certified the statements made in the Verified First Amended Complaint were true and correct under penalty of perjury. *See* FAC at 62.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

79. In their Answer (Doc. 32,) has admitted that Plaintiff has exhausted his administrative remedies for the purposes of the PLRA. *See* FAC, ¶ 142; Doc. 32, ¶ 142.
80. Defendants admitted that Plaintiff served notice of his claims on the State of Arizona and the individual Defendants in this matter. *See* FAC, ¶ 139, Doc. 32, ¶ 139.
81. Defendants also admit that they "failed to pay, adjust, rebut, or respond to" Plaintiff's aforementioned notice of claim. *See* FAC, ¶ 140, Doc. 32, ¶ 140.
82. Defendants admit that Plaintiff suffers from multiple disabilities, including Autism Spectrum Disorder and Post-traumatic Stress Disorder. *See* FAC, ¶ 8, Doc. 32, ¶ 8.
83. Defendants do not contest that Plaintiff suffers from CIRS, (FAC, ¶ 8; Doc. 32, ¶ 8,) and Plaintiff's medical records show that he does. See Exhibit G; Solan Decl., ¶ 90.
84. Defendants admit that Plaintiff is a qualified individual with a disability for the purposes of the Americans with Disabilities Act. *See* FAC, ¶ 12, Doc. 32, ¶ 12.
85. Defendants admit that Plaintiff is a qualified individual with a disability, also known as a handicapped person, for the purposes of Section 504 of the Rehabilitation Act. *See* FAC, ¶ 201, Doc. 32, ¶ 201.
86. Defendants admitted the State, through ASH receives federal financial assistance within the meaning of Section 504 of the RA. *See* FAC, ¶ 200, Doc. 32, ¶ 200.
87. Defendants admit that ASH denied Plaintiff's accommodation request and stated that "[t]he Hospital has extensively reviewed the Americans with Disabilities Act (ADA) regulations on service animals as part of its consideration of your initial and most recent request," and that the ASH administration proclaimed that "[t]he Hospital will not modify its existing policies, practices and/or procedures to allows for a service animal at the Forensic Hospital." *See* FAC, ¶ 123, Doc. 32, ¶ 123, FAC at 86.
88. Defendants admitted that "ASH denied Plaintiff's accommodation request without an updated assessment." *See* Doc. 32, ¶ 122.
89. When asked in an interrogatory what the assessed duration and severity of the purported risk of Plaintiff having sexual relations with Foxy I was, Bowen testified that he was "not required to conduct a separate assessment to determine the risk that Solan would engage in sexual

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

conduct with his dog Foxy." *See* Exhibit M at 1-2; Solan Decl., ¶ 90.

90. When asked in an interrogatory what reasonable modifications to ASH's policies, practices, or procedures, or provision of auxiliary aides or services he considered to mitigate the purported risk of animal abuse, Bowen testified he and "ASH generally, are not required to accommodate a dog and had no grounds to do so." *See* Exhibit M at 2; Solan Decl., ¶ 90.

91. When asked in an interrogatory what current medical or other objective evidence was reviewed, prior to issuance of the Particularized Assessment, to determine the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy I if she were admitted to ASH, the probability that such sexual conduct would actually occur, and whether and what reasonable modifications of policies, practices, or procedures, or provision of auxiliary aides or services might mitigate any risk of abuse, Bowen testified that he was "not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through ASH's exclusion of Foxy." *See* Exhibit M at 2-3; Solan Decl., ¶ 90.

92. The Superior Court order committing Plaintiff to ASH states Plaintiff is to be "committed to the Arizona State Hospital and given any treatment necessary to treat [his] mental illness." *See* <u>https://apps.supremecourt.az.gov/publicaccess/minutes.aspx</u>, search "Court" for "Coconino County Superior" and "Case Number" for "CR-201900357"; select hyperlink for "3/12/2020 Minute Entry").

93. Under the latest version of the Diagnostic and Statistical Manual, Version 5 Text Revision ("DSM-V-TR"), *Other Specified Paraphilic Disorder* (Diagnostic Code F65.89) is set forth as a diagnosable mental health disorder, and states that "[e]xamples of presentations that can be specified using the 'other specified' designation include, but are not limited to, recurrent and intense sexual arousal involving…***zoophilia*** **(animals)…**that has been present for at least 6 months and causes marked distress or impairment in social, occupational, or other

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

important areas of functioning." (Emphasis added.) *See* Exhibit P; Solan Decl., ¶ 90.

94. Defendants admit that Plaintiff "has never been treated for a zoophilic or other disorder related animal abuse, and Bowen and Sheldon knew or should have known that ASH had never treated, attempted to treat, or suggested Plaintiff be treated for any such disorder," *See* FAC at ¶ 288, Doc. 32 at 18, ¶ 187 ("Answering paragraph 288 of Plaintiff's First Amended Complaint Defendants admit this allegation.").

95. When asked in an interrogatory, after determining that accommodating Foxy I would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications to policies, practices, or procedures, or auxiliary aides or services were considered a possible means of mitigate the purported fundamental alteration, and how, and on what basis did you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary services, Bowen testified that he, "and the ASH generally, are not required to accommodate a dog and no grounds to do so." *See* Exhibit M at 3.

96. When asked in an interrogatory, what direct threat did you determine Foxy I, specifically, as opposed to service dogs generally, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion, Bowen testified that "[t]he ASH was not required to identify a direct threat that Solan's dog, Foxy would pose." *See* Exhibit M at 4; Solan Decl., ¶ 90.

97. When asked in an interrogatory, on what basis was it determined that accommodating a food visit, animal therapy session, or other visitation between Plaintiff and Foxy I would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation where you could lawfully deny Plaintiff's request for a visit with Foxy I, Bowen testified, "[a]nimals are not allowed to visit patient at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH." *See* Exhibit M at 4; Solan Decl., ¶ 90.

98. When asked in an interrogatory what the assessed duration and severity of the purported risk

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

of Plaintiff having sexual relations with Foxy II was, Sheldon testified that he was "not required to conduct a separate assessment to determine the risk that Solan would engage in sexual conduct with his dog Foxy." *See* Exhibit N at 1-2; Solan Decl., ¶ 90.

99. When asked in an interrogatory what reasonable modifications to ASH's policies, practices, or procedures, or provision of auxiliary aides or services he considered to mitigate the purported risk of abuse to Foxy II, Sheldon testified "ASH was not required to conduct a separate assessment to determine potential modifications of ASH's policies to mitigate the risk that Solan would abuse his dog, Foxy, when that risk was completely mitigated through ASH's justified exclusion of Foxy." *See* Exhibit N at 2; Solan Decl., ¶ 90.

100. When asked in an interrogatory what current medical or other objective evidence was reviewed between June 12, 2024 and July 6, 2024, to determine the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy II if she were admitted to ASH, the probability that such sexual conduct would actually occur, and whether and what reasonable modifications of policies, practices, or procedures, or provision of auxiliary aides or services might mitigate any risk of abuse, Sheldon testified that he was "not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through ASH's exclusion of Foxy." *See* Exhibit N at 2-3; Solan Decl., ¶ 90.

101. When asked in an interrogatory, when determining that accommodating Foxy II would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications to policies, practices, or procedures, or auxiliary aides or services were considered a possible means of mitigate the purported fundamental alteration, and how, and on what basis did you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary services, Sheldon testified that he, "and the ASH

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

generally, are not required to accommodate a dog and no grounds to do so." *See* Exhibit N at 3; Solan Decl., ¶ 90.

102. When asked in an interrogatory, on what basis was it determined accommodating a food visit between Plaintiff, his attorney, Foxy II, and Foxy II's caretaker would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation where you could lawfully deny Plaintiff's request for a visit with Foxy II, Sheldon testified, "[a]nimals are not allowed to visit patient at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH." *See* Exhibit N at 4; Solan Decl., ¶ 90.

103. When asked in an interrogatory, what direct threat did you determine Foxy II, specifically, as opposed to service dogs generally, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion, Sheldon testified that "[t]he ASH was not required to identify a direct threat that Solan's dog, Foxy would pose." *See* Exhibit N at 4-5; Solan Decl., ¶ 90.

104. In *Solan I*, the State argued that ASH "is not responsible for the care or supervision of a service animal," that "given the nature of the Forensic Hospital and the strict safety protocols its patient population requires, Plaintiff could not feasibly perform any of the tasks involved in caring for his service animal independently," and that such tasks would require; assistance from ASH employees;" that "for health and safety reasons, patients are not allowed to keep food or hygiene items in their dormitories," that "any time Plaintiff needed to take the dog for exercise or outside to relieve herself, ASH staff would need to be summoned and would need to escort Plaintiff during the entirety of the time that Plaintiff would be outside of his dormitory performing these tasks," and that "[a]ny time Plaintiff's service animal would require offsite veterinary treatment, ASH staff would be needed to physically deliver the service animal to Plaintiff's family member or friend who would be transporting the animal to the veterinarian's office;" that "[a] small dog likely would be disruptive to patients and interfere with their ability to comply with the strict programming requirements of the Forensic Hospital," that "[it] could also be very distracting for staff to have to control and

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

manage patients while a small dog moved throughout the facility, which would create opportunities for patients to engage in harmful behaviors toward staff members, other patients, or themselves; that ASH deals "with violent criminal populations face very unique and complicated logistical challenges and security concerns that are not present in the psychiatric ward of a private hospital," and that "[b]ased on Plaintiff's asserted worldview and beliefs, it is doubtful that his refusal to participate in treatment is solely a result of not having his service animal, or that he would behave any differently if he had her with him." *Solan I*, Doc. 33 at 4-9.

105. The Court rejected all of the State's arguments, found that ASH violated the ADA, and enjoined ASH to conduct a proper particularized assessment. *Solan I*, Doc. 84.

106. Forced to justify its unlawful conduct within the remaining possible defenses provided by the ADA, ASH attempted to shoehorn its denial into the fundamental alteration defense by asserting that Plaintiff's former psychiatrist, "Dr. Stephen Morris, M.D., has stated in an affidavit that…there is no need for a service animal [at ASH] simply because services provided by trained people whose job it is to provide these very things s needed to all patients on a regular basis," that having Foxy at ASH "would impede [Plaintiff's] treatment," and that he did "not believe that a service animal [was] clinically appropriate". ASH asserted that based on Dr. Morris's opinion, it "must deny [Plaintiff's] request to have Foxy [I] live with [Plaintiff] at ASH." FAC at 65; Solan Decl., ¶ 85.

107. ASH further asserted that it "cannot ignore multiple reports (and your own admissions) that you have inappropriate feelings for Foxy [I]. Nor can it risk that allowing Foxy [I] to reside at the Forensic Hospital would enable you to abuse her in the private room on the Cottonwood Unit that ASH has provided you at your request. Animal abuse is a criminal act and ASH will not facilitate such crimes. For this additional reason, ASH must deny your request to have Foxy live with you at the Hospital." FAC at 69; Solan Decl., ¶ 85.

108. Bowen resigned on the day the Court-ordered assessment was due, and Sheldon took over as CEO of ASH. *See* Solan Decl., ¶ 50.

109. On the same day Dr. Morris was schedule for deposition, he resigned as well, and ASH's

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

current CMO, Dr. Steven Kwoh, took over Plaintiff's care. Solan Decl., ¶ 51.

110. The latest version of the Diagnostic and Statistical Manual, Version 5 Text Revision ("DSM-V-TR") describes the criteria for an Autism diagnosis:

> "Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities. Because symptoms change with development and may be masked by compensatory mechanisms, the diagnostic criteria may be met based on historical information, although the current presentation must cause significant impairment."

*See* DSM-V-TR at page 37; Exhibit O; Solan Decl., ¶¶ 52, 90.

111. On September 1, 2023, Sheldon issued the report to the Arizona Legislature mandated pursuant to Ariz. Laws. 2022, Ch. 359, ¶ 3.[1] In this report, Sheldon stated:

> "As previously indicated, individuals with a Neurocognitive…or a Neurodevelopmental Disorder (i.e., Autism Spectrum Disorder or an Intellectual Disability) require specialized treatment due to the complexity of the behaviors and symptoms that are associated with these disorders. Furthermore, when these disorders are combined with a Serious Mental Illness, the need for specialized care is compounded and oftentimes leads to longer hospitalizations and difficulty discharging to a less-restrictive setting. While preparing this Plan, the Hospital reviewed the prevalence of Neurocognitive Disorders and Neurodevelopmental Disorders across its existing patient population. It should be noted that for both the Civil and Forensic campuses, individuals that had either a Neurocognitive Disorder, a Neurodevelopmental Disorder, or a combination, have been

[1] *See* Arizona Department of Health Services, Clinical Improvement and Human Resource Plan (Sept. 1, 2023), https://www.azdhs.gov/documents/director/agency-reports/clinical-improvement-and-human-resource-plan-09-01-2023.pdf.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

hospitalized for a significantly longer time period than their peers. Specifically, 32.5% of Civil patients and 12.2% of Forensic patients had at least one of these diagnoses and have an average length of stay 2.9 years longer than their peers without a Neurocognitive or Neurodevelopmental Disorder." Id. at 27. Sheldon further stated in his report, "Beyond the above-cited issue with the Hospital's current licensure restrictions, the Hospital is not able to meet the needs of patients with Autism, DD/ID, dementia/neurocognitive disorder, or substance use disorder as primary diagnosis. Appropriately meeting the needs of these populations takes whole teams with specialized training. The Hospital's current allocation meets its needs for the treatment of severe general primary psychiatric illnesses (such as schizophrenia, bipolar disorder, depression, etc.). ASH can address other issues mentioned ift hey are *secondary* conditions, as all clinical staff have basic abilities to address these issues when minor or secondary. Antisocial personality disorder (which is a disqualifying diagnosis for Title 36 court ordered treatment and has no evidence-based treatments for the diagnosis), cannot be treated by ASH regardless of the specialized staff hired."

*See* Doc. at 27; Solan Decl., ¶¶ 53, 85.

112. Around November, 2024, Plaintiff complained to his ASH psychologist, Dr. Amanda Brimlow, that ASH was refusing to accommodate his Autism and that she should write a report to the Superior Courts stating that ASH should transfer him to a facility that can treat Autism or release him. Dr. Brimlow told Plaintiff she agreed that ASH was not able to accommodate his Autism, and on December 30, 2024. Dr. Brimlow, wrote a letter stating:

"Per his records (Dr. Kamean-Silva, in 2000), Mr. Solan was diagnosed with autism when he was 11 years old, and required services in school to address his unique needs. He has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships. It is this writer's opinion that he still meets the criteria for an Autism Spectrum Disorder diagnosis as an adult. He was psychologically evaluated by Dr. Wirth in 2022, and his diagnosis of Autism Spectrum Disorder was retained. Mr. Solan has persistent deficits in social

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

> communication and social interaction across multiple contexts. While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers. He has a history of lacking social-emotional reciprocity, and interest in others which has led to difficulties in developing and maintaining relationships with others. He has presented with an inflexible adherence to routine, as evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and making demands of the staff and his treatment team despite hospital policies. He has expressed hyperreactivity to sensory input while he has been a patient at Arizona State Hospital. He will sleep during the day to avoid noises, states that he requires soundproofing materials to be installed on the unit, and will not attend social groups with others due to being "overstimulated." It is important to note that when Mr. Solan feels his needs are not being met appropriately, he will say racial slurs and threaten to harm or kill others. This is indicative of the substantial functional limitations related to his Autism diagnosis and deficits in appropriate social interactions with others."

*See* Doc. 24 at 22-23; Solan Decl., ¶¶ 54, 85.

113. Around the end of June, 2025, Plaintiff again complained to Dr. Brimlow that ASH was still refusing to accommodate his Autism and that ASH should transfer him to a facility that can treat Autism or release him. Dr. Brimlow informed Plaintiff that she had recently been advocating for him, and requesting that the ASH administration allow Plaintiff to receive outpatient therapy, as ASH cannot accommodate his needs. When Plaintiff was transferred from ASH's Cottonwood unit to the Mohave unit on July 2, 2025, Dr. Brimlow was suddenly removed from Plaintiff's treatment team without explanation. *See* Solan Decl., ¶ 55.

114. On July 2, 2025, Julianna Vroman replaced Dr. Brimlow as Plaintiff's psychologist, but she refused to work with Plaintiff and refused to discuss accommodations for Plaintiff's Autism. *See* Solan Decl., ¶ 56.

115. On or about November, 2025 Vroman was abruptly removed from Plaintiff's treatment team. Kindra Ochoa informed Plaintiff that Vroman is "no longer employed at ASH." Solan Decl., ¶ 57. Ochoa later informed Plaintiff that Vroman was not a licensed psychologist and

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

that the ASH administration had terminated her for misrepresenting her qualifications. *See* Solan Decl., ¶ 58.

116. Plaintiff went without meeting with a licensed psychologist until about May 2026, when Courtney Tully, previously an unlicensed intern, notified Plaintiff that she had received her PhD in psychology and was employed by ASH to work with Plaintiff as his psychologist. *See* Solan Decl., ¶ 59. Dr. Tully met with Plaintiff in May, 2026, and informed him that she was replacing Vroman's psychology goal on Plaintiff's treatment plan with the following:

> "Psychology staff will offer a minimum of three documented opportunities for Matthew to participate in treatment planning within a 3 month time frame. Psychology staff will increase patient access to services by offering autism-informed communication and environmental accommodations (clear agenda prior to meeting, predictable meeting structure, reduced sensory stimulation in the environment including dim lighting, direct and literal communication style, and/or extra processing time for responses."
>
> *See* Solan Decl., ¶ 60.

117. Plaintiff has begged every treatment team he's had at ASH to provide him access to the same treatment services the other patients have access to, and to accommodate his Autism by providing the content of those treatment groups on a one-on-one or small group basis to reduce the sensory overstimulation and enable Plaintiff to participate without experiencing the extreme distress the group environments cause him. *See* Solan Decl., ¶ 61.

118. The members of every single treatment team Plaintiff has had at ASH, including, but not limited to Dr. Morris, Dr. Kwoh, Kinda Ochoa, and Dr. Tulley, and have told Plaintiff that they agree that one-on-one or small group accommodations are necessary, but the ASH administration will not provide them with the staff resources to make such an accommodation. *See* Solan Decl., ¶ 62.

119. Instead of increasing environmental accommodations to help Plaintiff cope with the effects of his ASD, ASH has continually removed accommodations and services that Plaintiff previously relied on, including seizing Plaintiff's previously-approve noise cancelling headphones, turning off the bathtubs Plaintiff used for grounding, excluding

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Plaintiff's service animals, seizing Plaintiff's stuffed foxes and designating them "contraband," transferring Plaintiff from Cottonwood unit (which ASH's former CMO stated was an accommodation for Plaintiff's Autism) to the far overstimulating Mohave unit, and cancelling Plaintiff's single-room accommodation. *See* Solan Decl., ¶ 63.

120. ASH's failures to treat Autism are so pervasive that they have become public knowledge. *See* Footone 1, *supra*; Exhibit P.

121. When Plaintiff and his attorney appealed ASH's treatment plan in 2024 for its failure to accommodate Plaintiff's needs, Plaintiff and his attorney suggested several changes to the treatment plan's language, including:

1. The treatment team, in conjunction with the patient, his legal counsel, and the hospital administration will determine, in the next 21 days, if the hospital will be able to secure sufficient staff resources and funding to begin treating the patient's Autism Spectrum Disorder in a manner that complies with generally accepted standards of autism care and the patient's unique needs. If the hospital is able to secure sufficient staff and fiscal resources, the hospital and the treatment team will fully implement the remaining goals and services stipulated in this plan no later than November 9, 2024. If the hospital is unable to acquire sufficient staff resources and funding, or the hospital administration refuses to allocate sufficient staff and/or fiscal resources as needed to treat the patient's Autism Spectrum Disorder, or if the treatment team is otherwise unable to acquire the majority of the services stipulated in this plan by November 9th, the treatment team will meet with the patient and his legal counsel and assist them in preparing a petition to the Superior Court to either (a) transfer the patient to a private facility specializing the treatment of Autism Spectrum Disorders, or (b) conditionally release the patient to his caretaker, Joseph Cowsert.
2. Patient and his legal counsel will work closely with the treatment team in selecting treatment services necessary to facilitate the patient's ASD habilitation and PTSD therapy at ASH. The treatment team and hospital administration will locate, acquire, and provide to the patient all services, supports, accommodations, and environmental

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

modifications determined by the treatment team in conjunction with the patient and his legal team to be necessary for the patient's effectual habilitation and trauma therapy. The hospital shall not exclude any identified service, support, accommodation, or environmental modification on the basis that the same is not presently available at ASH, or is deemed hospital administration as unnecessary, too expensive, or an administrative burden, but shall add the same whether presently available or not, and shall continually make a good faith effort to acquire the same until the next ITDP review. If, after 30 days, a needed service, support, accommodation, or environmental modification is still unavailable, the treatment team shall, at the next ITDP review, provide a written report to the patient and his legal team detailing the reason the same is still unavailable, the date it is expected to become available, and/or hospital's plan to provide a sufficient alternate.

3. The patient will be provided Animal Assisted Therapy (AAT) services, as defined by the hospital's animal therapy policy, at least twice a week as part of his ASD habilitation and PTSD therapy If the hospital is unable to secure a therapy dog within 30 days, AAT will be facilitated using the patient's own service dog, Foxy, not less than once a week, contingent only on her caretaker's availability. If the patient's service dog is used to facilitate the patient's animal therapy, the service shall be conducted in the PSRB lobby, or in such other secured area of the forensic hospital as the hospital shall determine safe and appropriate.

In response, Plaintiff's providers wrote:

1. Matthews requests cannot be fulfilled by this provider as she does not have the ability to acquire staff.
2. It is outside of the treatment teams ability to alter habilitation/environment modifications. What is available is ensuring that Matthew has a safe place to turn to when he feels triggered such as his room, a quite room, or walking on the patio.
3. The treatment team does not have the ability to offer animal assisted therapy, does not have personnel trained to provide animal assisted therapy. The forensic

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

hospital does not have volunteers available to perform.

See Exhibit Q; Solan Decl., ¶¶ 64, 90.

122. At no time before or after Dr. Tully added as a treatment goal that ASH will increase Plaintiff's access to services by offering autism-informed communication and environmental accommodations, did ASH actually offer Plaintiff autism-informed communication and environmental accommodations. *See* Solan Decl., ¶ 65.

123. Instead, Plaintiff's treatment team has largely avoided him and told him to seek needed services after discharging from ASH. *See* Solan Decl., ¶ 66.

124. Unwilling to wait until discharge to receive the benefits of Autism-informed treatment services, Plaintiff established a relationship with Sam McCulloch at Radian Sun Therapy in Flagstaff and began participating in telemedicine therapy with him. *See* Solan Decl., ¶ 67.

125. Unlike ASH, McCulloch specializes in treating ASD. *See* Id.

126. McCulloch created a treatment plan for Plaintiff and provided a copy to Plaintiff on May 26, 2026. *See* Solan Decl., ¶ 68. McCulloch's treatment plan states:

"Presenting Problem: Matt presents challenges with managing stress and sensory overwhelm. These symptoms are related to his Autism disorder, and also contribute, and can trigger PTSD symptoms, interfering with description making and his physical, mental, and emotional safety. Goal: Matt's goal is to transition out of the State hospital, find stability economically, secure safe housing, ands reconnect with his business and his passion. Matt will work to make connections with the right supports including regular therapy and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition. Objective: Matt will learn and practice skills to help with managing stress and developing awareness and self-care around his sensory system. Matt will participate in therapy and have close contact with his support animal. Matt will also seek out additional supports as needed to treat his PTSD."

*See* Exhibit R; Solan Decl., ¶¶ 68, 90.

127. Dr. Morris allegedly opined in 2022 that Foxy I "would only serve to get in the way" of Plaintiff's treatment at ASH. SOF, ¶¶ 22, 25. That is not what he told Plaintiff throughout

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

2020 to early 2022; Dr. Morris told Plaintiff that he supported Plaintiff having Foxy I at ASH, but that it was an "administrative decision" to exclude her. *See* Solan Decl., ¶ 69.

128. However, Dr. Morris affirmed in no less than 21 of Plaintiff's ASH treatment and discharge plans that having a "trained service dog" was Plaintiff's foremost "patient strength." *See* Solan Decl., ¶ 70.

129. In September, 2025, ASH disclosed all of Plaintiff's treatment plans up to that date. Between 2021 and September, 2025, in 85 separate treatment plans, Plaintiff's providers, including Dr. Moris, Dr. Stephen Jaffe, Dr. Mohammad Bhatti, Dr. Seven Kwoh, Dr. Diana Walyat, and R.N. Kindra Ochoa each stated that Plaintiff having a "trained service dog" was his primary patient strength. *See* Solan Decl., ¶ 71.

130. At least 54 of the disclosed treatment plans also recommend "animal therapy" as a therapeutic intervention. *See* Solan Decl., ¶ 72.

131. Bowen asserted that he "reviewed and interpreted the treatment notes, progress notes, and incident notes pertaining to Plaintiff and Foxy," and determined that those notes "indicate there may have been an inappropriate relationship between him and his dog, Foxy, and that there may be a risk of future abuse." *See* Exhibit S at 3; Solan Decl., ¶ 90.

132. Bowen also admitted that, to the best of his knowledge, none of the licensed providers, who served as members of Plaintiff's treatment team had testified or produced any record while employed at ASH, indicating that they believed Plaintiff had sexual relations with Foxy I or was likely to have sexual relations with Foxy I if she were to accompany Plaintiff at ASH. *See* Exhibit S at 1-2; Solan Decl., ¶ 90.

133. Sheldon admitted that, to the best of his knowledge, none of the licensed providers, who served as members of Plaintiff's treatment team had testified or produced any record while employed at ASH, indicating that they believed Plaintiff had sexual relations with Foxy I or was likely to have sexual relations with Foxy I if she were to accompany Plaintiff at ASH. *See* Exhibit T at 1-2; Solan Decl., ¶ 90.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

134. As Plaintiff has repeatedly stated, he is an ecocentist,[2] a therian,[3] and a practitioner of esoteric fox magic.[4] *See* Solan Decl., ¶ 73; Doc. 17 at 76, ¶ 5, 81. Plaintiff's totem animal is the fox. *See* Solan Decl., ¶ 73. Nearly every art-school project he completed involved anthropomorphic fox characters. *See* Id.; Exhibit U (Plaintiff standing next to a 3d rendering of a two anthropomorphic fox characters he designed as part of his final 3d-animation project at Boston University's Center for Digital Imaging an Arts in 2012). Plaintiff role-plays online as a fox, (*see* Exhibit V, Plaintiff's fursona "Emperor Fox,") and built his entire corporate ethos and branding around foxes, the archetypal Foxy, and the vulpine aesthetic form:




Fig. 1.




Fig. 2.

*See* Exhibits W at §6; Solan Decl., ¶ 73; *see also* https://www.fox-ranch.com.

---

[2] *See, e.g.,* Arne Næss, The Shallow and the Deep, Long-Range Ecology Movement: A Summary, 16 Inquiry 95 (1973). DOI: https://doi.org/10.1080/00201747308601682; Bill Mollison, *Permaculture*; J. Russell Smith, *Tree Crops, a Permanent Agriculture* (1953); David Favre, *Equitable Self-Ownership of Animals,* 50 Duke Law Jour. 473 (2000).

[3] *See, e.g.,* Plante, Reysen, Roberts Gerbasi (2018) *"Animals Like Us": Identifying with Nonhuman Animals and Support for Nonhuman Animal Rights,* Anthrozoös, 31:2, 165-177, DOI: https://doi.org/10.1080/08927936.2018.1434045 ; Roberts, Plante, Gerbasi & Reysen (2015) *The Anthrozoomorphic Identity: Furry Fandom Members' Connections to Nonhuman Animals,* Anthrozoös, 28:4, 533-548, DOI: https://doi.org/10.1080/08927936.2015.1069993; Roberts, Plante, Gerbasi, & Reysen, *Clinical Interaction with Anthropomorphic Phenomenon: Notes for Health Professionals about Interacting with Clients Who Possess This Unusual Identity* (2015) DOI: 10.1093/hsw/hlv020; Maase, *Keeping the Magic: Fursona Identity and Performance in the Furry Fandom* (2015). *Masters Theses & Specialist Projects.* Paper 151. https://digitalcommons.wku.edu/theses/1512

[4] Jason Read, *Fox Magic or The Book of the Nine-Tailed Fox,* Handbook of Chinese Witchcraft and Alchemy in the Fox Tradition (2021); Frans Bardon, *Initiation into Hermetics* (1956); Karen A. Smyers, *The Fox and the Jewel,* Shared and Private Meanings in Contemporary Japanese Inari Worship (1999); Angelo De Gubernatis, *Zoological Mythology,* Vol. 2 (1872).

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

135. The fact Plaintiff likes foxes and foxlike Pomeranians "better than people" is not going to change. More accurately, Plaintiff refuses alter his personal mythos to conform to the expectations of a body politic he is fundamentally at odds with. See FAC, at 62:6-7; Solan Decl., ¶ 74. Plaintiff's affinity for foxes, including Foxy II, is a fundamental aspect of his sincerely held religious beliefs and philosophical worldview. *See* Id. ASH has any right to try and "fix" this aspect of Plaintiff's identity, and ASH's unjustified exclusion of Foxy I and Foxy II, and appalling attacks on Plaintiff's relationship with them has only furthered Plaintiff's disdain for humanity and alienation from ASH's providers. *See* Id.; Cowsert Decl., ¶¶ 32-33; FAC, ¶¶ 136-138, 145-146, 175, 279-283, 295-296, 333-335; Doc. 17 at 84-85.

136. Plaintiff is eccentric, outspoken, and his Autism-related neuroatypicalites have clearly rubbed many people the wrong way. *See* Solan Decl., ¶ 75. Plaintiff is difficult to get along with and has autism meltdowns where he screams, yells, and says things that offend others. *See* Id. Plaintiff does not like people, and has not shied from announcing his opinion that humans have made themselves into a cancer upon the face of the earth. *See* Id. But the virtues and demerits of Plaintiff's neuro-divergent idiosyncrasies are not on trial here; the question at bar is whether the State properly excluded Foxy II from ASH and whether Plaintiff was defamed. The answer is that Defendants falsely accused Plaintiff of abusing his beloved service animals in order to evade their obligations under the ADA. FAC at 64-69 and 86; Doc. 15 at 11-13, Doc. 65 at 4-6; Solan Decl., ¶¶ 1-84.

137. Daniel Alverez, another Autistic patient who previously resided on the Cottonwood unit, witnessed Carter abusing Plaintiff. ASH revoked Alvarez' level, and like his mental health continued to deteriorated after being moved to a lower functioning unit. *See* Solan Decl., ¶ 76. Feeling there was nothing left for him to loose, Alvarez agreed to testify about Carter's abuse. In his declaration, Alvarez states:

> "I have been diagnosed with an Autism Spectrum Disorder (Asperger's Syndrome) from childhood, but ASH currently has me diagnosed with a Schizoaffective Disorder…I worked really to hard progress through ASH's privilege system and get my Levels. I was moved to ASH's Cottonwood unit in 2023 because Cottonwood was ASH's pre

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

community reintegration unit and I had been given conditional release to privilege Level 1....Lea'Cher Carter [] was a Behavioral Health Technician [] on the Cottonwood unit when I was living there...I always felt uneasy around Carter, and she would intentionally trigger me when I was feeling paranoid. Carter was always rude, hateful and mean to me, and to all the patients she didn't like. She would give me dirty looks and mad dog me at random times for no reason.... She harassed other patients too and made nasty comments about them. One time she told me that Matthew Solan "fucks dogs." I complained to Nurse Supervisor Domenick Aldrich [] about Carter's treatment of me around May, 2024. Domenick told me "if it was up to me, she'd be gone," but he didn't do anything to protect me from her harassment... I complained to my therapist and Cottonwood RN Jessica, but they didn't do anything to help me either. I filed a grievance against Carter around May or June of 2024, but after I did that, she started harassing me more...Carter told me "if you don't listen to me, I'll get you moved the fuck off this unit...Carter's abuse put me in a sad state and made me feel scared. She was really scary and I felt helpless because I didn't do anything to her and the hospital was letting her treat me like trash. To escape the abuse, I kicked off my ankle monitor and broke a table so ASH would move me off the Cottonwood. I got all my privileges revoked and was transferred to the Sycamore unit, where I have remained ever since. I took me over a year to get even part of my privileges back. I felt it was hopeless and didn't even try for a long time... Lea'cher Carter really hurt me, and I personally witnessed her verbally and emotionally abuse Matthew Solan too. I feel that Carter should not be allowed to work with the mentally ill anymore, and hope that the Courts will protect patients from her abuse in the future."

*See* Doc. 8, Ex. I, ¶ 8; Solan Decl., ¶ 76; Exhibit E, ¶ 8.

138. Plaintiff served requests for admissions and interrogatories on Defendants Carter and Coleman on December 16, 2026. *See* Doc. 59 at 6-11; Doc. 68 at 42-50.

139. In Coleman's response to Plaintiff's first set of interrogatories, Coleman does not deny that she accused Plaintiff of eating "dog p***y" or "dog a**" in front of other ASH

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Cottonwood patients. *See* Exhibit X at 2; Solan Decl., ¶ 90. Instead, Coleman testified that she "has heard Plaintiff state that his dog, Foxy, is his wife and has heard Plaintiff speak of sexual conduct between himself and his dog." *See* Id.

140. Plaintiff never told Coleman or stated in her presence that Foxy was his wife, and never told Coleman or spoke in her presence of sexual conduce between himself and his dog. *See* Solan Decl., ¶ 77.

141. Plaintiff has never engaged in sexual conduct with a dog, has never told anyone that he had engaged in sexual conduct with a dog, has never told anyone that he had a desire or intent to engage in sexual conduct with a dog, and has no interest in engaging in sexual conduct with a dog. *See* Solan Decl., ¶ 78. Plaintiff certainly never told anyone that he "eats dog p***y," "eats dog a**," or "f***s dogs." *See* Solan Decl., ¶ 79.

142. When Bowen was asked in an interrogatory to describe all information and records he provided to Sheldon pertaining to Plaintiff, Foxy I, and/or Foxy II, Bowen testified that "Sheldon was on the administrative team before he became ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to Solan and his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowens' computer drive and all the files it contained." *See* Exhibit M at 3; Solan Decl., ¶ X.

143. According to public records, the ASH administration in March, 2022 was composed of CEO Bowen, COO Sheldon, CFO Ryan Rodney, CMO Katharine Woods, CNO Nancy Regan, CQO Lisa Wynn, CCO Margaret McLaughlin, CSO William Bugbee, and ADHS Director Don Herrington. *See* Exhibit Y; Solan Decl., ¶ 80.

144. In or about 2024, Domenick Aldrich, a Psychiatric Nursing Unit Manager ("PNUM") informed Plaintiff that he, and all the other ASH PNUMs were on the "administrative team," and were regularly apprised of decisions by the higher-ups affecting the ASH treatment units. *See* Solan Decl., ¶ 81.

145. ASH is a closed institutional community. Scandalous statements and tabloid-worthy newsbytes spread rapidly through the ASH rumor-mill and quickly become public knowledge among patients and staff; it is inconceivable to Plaintiff that Bowen and Sheldon

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

would not be aware of this. *See* Solan Decl., ¶ 82.

146. A year after Carter and Coleman began promoting the ASH administration's propaganda and announcing Plaintiff "eats dog p***y," "eats dog a**," and "f***s dogs," the effects of Defendants' defamation could still be felt both on and off of Plaintiff's treatment unit. For example, while over half of the Forensic Hospital population testified that Foxy II's presence would be beneficial to their rehabilitation, only 5 patients on the Mohave unit signed the March, 2025 animal therapy petition, as many patients believed that Foxy II had been abused, and therefore did not want her to visit. See Exhibit C, D; Solan Decl., ¶ 83; Doc. 27 at 18.

147. Since Plaintiff brought the *Solan I* case, ASH still has not implemented any written service animal policy. *See* Solan Decl., ¶ 84; Exhibit Z. ASH's unwritten policy implicates a hospital-wide, blanket service animal ban. *See* FAC. at 88; Exhibit N at 4.

**RESPECTFULLY SUBMITTED** this 23rd day of June, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008
Tel: +1.970.369.9611
legal@fox-ranch.com
*Plaintiff in Pro. Per.*

**I CERTIFY** that copies of the foregoing document were delivered to Arizona State Hospital staff on June 23, 2026, in sealed envelopes, with proper postage affixed, for forwarding to:

Ann Hobart and Jordan Kendall
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, AZ 85004
*Attorneys for Defendants*

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003

Matthew Phillip Solan

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**EXHIBIT A**

**DECLARATION OF MATTHEW PHILLIP SOLAN**

I, Matthew Phillip Solan, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.

2. I am a 36-year-old man. I suffer from multiple disabilities that substantially limit many of my major life activities. My disabilities include Autism Spectrum Disorder ("ASD"), Post-Traumatic Stress Disorder ("PTSD"), and Chronic Inflammatory Response Syndrome ("CIRS").

3. On March 12, 2020, I was committed to the Arizona State Hospital ("ASH") for a period of treatment after being adjudicated guilty except insane. I was admitted to ASH on April 1, 2020, and remain confined in ASH as of the date hereof.

4. Prior to my pretrial confinement commitment to ASH, I utilized my former service dog, Foxy (hereinafter "Foxy I"), to help me manage and ameliorate the effects of my ASD, PTSD and other mental health conditions.

5. Upon arriving at ASH, I requested that ASH allow Foxy I live with me as a reasonable accommodation for my disabilities.

6. ASH repeatedly denied my accommodation request, so I filed *Solan v. Arizona State I*, CV-20-02209-PHX-JJT (MHB) (D. Ariz. 2020) (hereinafter "*Solan I*"), in which he sued to have Foxy I, stay with me at ASH.

7. I also filed a Motion for Preliminary Injunction challenging ASH's denial of my service animal request and requesting that ASH be ordered to admit service dogs unless or until it is proven by substantial evidence that a particular dog poses a direct threat to the health and safety of others that cannot be mitigated by reasonable accommodations.

8. The Court ordered ASH to conduct a particularized assessment in accordance with the ADA and the relevant Code of Federal Regulations to determine 1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy I while housed at the Forensic Hospital; and 2) whether Foxy I

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

specifically (as distinct from 'service dogs' generally) would be disruptive to the health or safety of other patients at my current housing unit, including my roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at my current housing unit and the effect Foxy I may have on them, including the probability that injury will actually occur.

9. Several days before the 45-day period for ASH to complete the Court-ordered assessment elapsed, Defendant Aaron Bowen issued a Particularized Assessment letter, which was subsequently provided to me.

10. The letter did not attempt to explain how Foxy I, specifically as distinct from other service dogs generally, would be disruptive to the health and safety of other patients on my treatment unit

11. The letter also did not include an assessment of individual patients at my housing unit, the effect Foxy I may have on them, or the probability that injury would actually occur to them.

12. The letter did enumerate policies that may need to be altered, but it did not explain why any of these alterations were required or how the alterations would impose a substantial burden on the State.

13. On July 13, 2022, I was notified that Foxy I had passed away.

14. After receiving this news, I contacted Foxy I's caretakers and directed them to take Foxy I's body to her veterinarian to be biopsied for potential cloning.

15. Foxy I's veterinarian performed biopsies of Foxy I's extracted ear cartilage, which were sent the same day to Genetic Reflections, LLC ("ViaGen").

16. On July 15, 2022, I entered a genetic preservation and cell storage contract with ViaGen, with the intention of cloning Foxy I.

17. To raise money for the cloning Foxy I, sold my house.

18. On August 11, 2023, I entered a cloning contract with ViaGen and paid their required $25,000.00 down payment.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

19. On November 9, 2023, Foxy I's clone was born at ViaGen's Rochester, New York facility. Plaintiff gave her the name Foxy (hereinafter "Foxy II").

20. I paid the remaining balance of my contract to ViaGen, and on or about January 9, 2024, a ViaGen agent flew Foxy II from New York to Arizona, and hand delivered her to my agent, Joseph Cowsert ("Mr. Cowsert").

21. I directed Mr. Cowsert to care for and train Foxy II, and over the next several months, Mr. Cowsert performed Foxy II's basic housetraining and saw to her veterinary visits and vaccinations. I scheduled most Foxy II's veterinary visits over the phone, spoke with the veterinarian before and after the visits, and my mother paid the bill over the phone with her credit card.

22. At my direction, Mr. Cowsert contracted with All Dogs Unleashed in Prescott, Arizona ("ADU") to provide Foxy II multi-week live-in training in basic obedience and foundational service animal skills. I paid for the training out of the funds remaining from the sale of my house.

23. On May 16, 2024, Foxy II successfully completed ADU's training. I spoke to Mr. Cowsert and ADU's staff to verify the training, and ADU sent me Foxy II's certificate

24. Over the next few weeks, Mr. Cowsert finished Foxy II's task training based on detailed instructions I provided and training guidance from ADU.

25. Cowsert trained Foxy II to perform deep pressure therapy ("DPT"), alerting, grounding, and social buffering work—tasks intended to help me with grounding and coping with the effects of my neurodevelopmental disabilities and PTSD. Cowert confirmed to me that Foxy II was fully housetrained, very quiet, and was getting along with everyone; that she was tolerant of loud noises and being handled and carried around, was well received by everyone, and was perfectly well behaved in stores and public places, on and off leash.

26. Foxy II's DPT, alerting, grounding, and social buffering are tasks that I had trained Foxy I to perform for me. These tasks substantially improved my independence, quality of life, and access to outpatient therapeutic services.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

27. I have been training dogs since I was a teenager. I have trained all sorts of dogs, from wolf-hybrids to Chihuahuas. Between 2015 and 2016, I trained Foxy I to perform deep pressure therapy (DPT), alerting, grounding, and social buffing work and tasks for me. These are not natural canine behaviors. They are specially trained tasks that required Foxy I, and require Foxy II to detect a stress response or adverse emotional state in me, and respond by physically placing herself in contact with and applying pressure to me by leaning against or sitting on me (in the case of DPT), nudging or yipping at me (in the case of her basic alerting tasks), presenting herself to me and encouraging me to touch her fur as a sensory anchor (in the case of her grounding tasks), and gently interposing herself in between me and others (in the case of her work as a social buffer).

28. The Alliance of Therapy Dogs ("ATD") is a nonprofit organization that certifies animal therapy teams, which was under contract with the Arizona Department of Health Services to provide animal therapy services to patients at ASH.

29. ATD's volunteers provided animal therapy services to me at ASH between 2022 and 2023 through a therapy dog named Starla.

30. ATD certified Foxy II to do therapy work in hospitals and extended its $5,000,000 liability coverage to her. I helped facilitate Mr. Cowsert's contact with ATD, mandatory background check, and Foxy II's medical screening, Mr. Cowsert's brought Foxy II to training and auditing sessions conducted by ATD's volunteer tester, Robin Petrillo.

31. Ms. Petrillo provided us a report reported that stated Mr. Cowsert had "put in a lot of time and energy in training [Foxy II] and it shows…Foxy [II] did well in a hospice environment. She was able to sit on the bed and brought love and joy."

32. Ms. Petrillo's report also confirmed that Foxy II could be safely handled, was clean and well groomed, did not bark any people or other dogs, showed no signs of aggression, accepted stroking of her head, body, and tail, touching of her paws, scratching and petting of her throat, holder her hears, and being held; and demonstrated appropriate skills to interact with people in animal assisted functions.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

33. While Foxy II was training at ADU, I notified other patients and staff on the ASH Cottonwood unit I would soon be requesting an accommodation for Foxy II to accompany my at ASH

34. I spoke to every patient on the Cottonwood unit, and asked them if they were OK with Foxy II living on the unit. Every Cottonwood patient told me they supported Foxy II living on the unit.

35. 61 patients living in the ASH Forensic Hospital later declared under penalty of perjury that interacting with Foxy II would be "highly beneficial" to them and their rehabilitation.

36. ASH records that I have reviewed from May 20, 2022 indicate that the funded capacity of the ASH Forensic Hospital is 143 patients, and the average head count at the Forensic Hospital was 114 patients.

37. On June X, 2024, My ASH treatment team confirmed that having a "trained service animal" was my primary strength.

38. Starting around the beginning of May, 2024, Carter and Coleman began harassing me and berating me with false allegations that I had engaged in bestiality.

39. On May 22, 2024, Lea'cher Carter and Unique Colman began taking turns harassing me and loudly proclaiming, in front of the other ASH Cottonwood unit patients, that I am "nasty" and that I eat "dog p****" and "dog a**."

40. Carter and Coleman repeatedly made similar statements in front of other patients, on multiple separate occasions before and after May 22, 2024, including loudly asking me in front of other patients, "is it true you eat dog p***y?" and "do you eat dog a**?" and loudly taunting me and stating that I eat "dog p****" and "dog a**."

41. On May 22, 2024, I complained to Cottonwood unit nursing supervisor Dominick Aldrich that Carter and Coleman were sexually harassing me. Aldrich pulled Carter and Coleman into the unit nurses station and talk to them. Aldrich later came out and told me he had directed them to stay away from me and stop harassing me.

42. After Aldrich spoke to Carter and Coleman on May 22, 2024, Coleman temporarily stopped harassing me, but Carter continued harass me and accuse me of having sex with

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Foxy. Carter then asked me, "does Foxy really like it when you stick your nasty d*** in her?"

43. When I explained to Carter that I never had sex with Foxy, never would, and that what she was suggesting was physically impossible, Carter loudly insisted I could have sex with Foxy because, according to Carter, my "d*** is so small you'd need a magnifying glass to see it."

44. I then informed Carter that if she did not stop harassing him I was going to sue her for defamation. Carter laughed loudly at me said, "come, on lets go call Holly so you can sue me."

45. I instead asked Coleman to let me in the conference room so I could call my attorney, Holly Gieszl. Carter stood up and demanded that she be the one to let me into the conference room. Carter continued to hurl insults at me while walking with me to the Cottonwood unit conference room.

46. After I called my attorney, I went to the Cottonwood unit dining room to get coffee. Carter saw me in the room and began walking towards me and yelling. I tried to walk away from Carter, but she followed, yelling "I'm sick of yo s***!". Carter then threw up her hands and said, "come on, attack me so I can call security on yo dumb a**."

47. I left the dining room sought out Aldrich to complain of Carter's ongoing harassment, but I could not find him. I approached Coleman and asked her to find Aldrich. Coleman responded, "boy, I ain't gettin' him, you go find him!"

48. Carter then approached me and started yelling at me. I panicked and threw down a cup of melted ice cubes from my morning iced coffee, and went to my room. Carter called a code gray, and Aldrich came to my room a few moments later and told me to stay there for a while.

49. The same day, Carter falsely reported to Phoenix PD that I threw a cup of hot coffee in her face, and did so because she is black.

50. Without interviewing me, Phoenix PD's bias crimes section pressed aggravated assault charges against me, falsely claiming that I assaulted Carter by throwing a full cup of hot

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

coffee in her face, and that he did so because of an "anti-african american bias."

51. I was maliciously prosecuted on Carter's false charges for nearly two years.

52. I maintained that I did not assault Carter. Carter eventually admitted that I had not thrown hot coffee in her face, and I agreed to plead guilty to disorderly conduct to stop the prosecutor from harassing me.

53. At the March 12, 2026 change of plea hearing in that case, Plaintiff listened as the factual basis of the disorderly conduct charge was read into the record by his attorney:

"I need to provide a bit of background because of procedural issues in the case, and errors in the police report that led to the State amending the original indictment. Mr. Solan was admitted to the Arizona State Hospital on April 1, 2020. His intake assessment that day was completed by a psychiatrist, Dr. Steven Kwoh, who is now the chief medical officer at the state hospital. Dr. Kwoh noted that Mr. Solan was designated SMI under A.R.S. 36-550. That is the first thing in Mr. Solan's medical record. And it was the first page in the medical records that Detective McDermott received from the hospital. A designation of SMI means that Mr. Solan suffered a metal disability that is so severe and persistent that long-term functional capacities in the activities of daily living, interpersonal relationships, employment, and recreation are affected. Mr. Solan's qualifying mental health disorder for SMI designation is autism and schizoaffective disorder. In December of 2024, Dr. Brim low, a staff psychologist updated the diagnosis, and schizoaffective disorder was eliminated and replaced with post-traumatic stress disorder, PTSD. She found persistent deficits in social communication and social interaction. She found that these deficiencies were indicative of the substantial functional limitations related to Mr. Solan's autism diagnosis. In September of '25, Dr. Kwoh deemed Mr. Solan permanently disabled due to his SMI status and the severity of his mental and cognitive disorders. Mr. Solan additionally is indigent. His family posted bail and retained me to represent him. Due to his SMI status and his substantial, permanent disability, he in not able to work and has no means of support. This is important to the factual basis we ultimately arrived at as the plea in this

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

matter. On May 22, 2024, Mr. Solan had a difficult interaction with a behavioral health technician [Lea'Cher Carter], who was not assigned specifically to him, but worked on the floor. Well call her BHJT-1. Over a period of time, she harassed Mr. Solan in front of other patients, talking loudly with allegations the he engaged in bestiality with his service dog Foxy. Mr. Solan reached out to a second BHT [Unique Coleman], we will call her BHT-2, and asked her to summon the nurse and ask the nurse to remove BHT-1. Mr. Solan was yelling and waving his arms. This was in the dayroom, and he did so in a manner that disturbed the peace and quiet of the staff and patients on the unit. He also tossed a partially full cup of cold coffee – not hot coffee – maybe an inch or so of coffee, on a nearby table, and same of the cold coffee splashed on the two BHTs."

34. The prosecutor made no specific objections the Superior Court did not strike any portion of the factual basis.

35. The Court asked the prosecutor if the State had any additions or corrections to the factual basis. The prosecutor responded, "No, your Honor." The Court accepted the factual basis.

36. On June 13, 2024, I wrote to Defendant Michael Sheldon to notify ASH that Foxy I had been cloned and Foxy II was now a professionally trained service dog, and to request a reasonable accommodation under the ADA for Foxy II's services. My letter discussed how Foxy I previously helped me overcome self-isolation and had enabled me to engage socially, travel, and start a business. It also clarified that Foxy II was healthy, fully vaccinated, and well-trained, and he highlighted his substantial investment in her cloning and training.

37. On July 5, 2024, without meeting Foxy II, consulting Plaintiff, Plaintiff's his family, or Foxy II's trainers, ASH's administrators responded to Plaintiff's request with a one-page denial letter ("Denial Letter").

38. The Denial Letter listed the following purported reasons for the denial:

- "The Hospital has legitimate concerns that, based on your own personal statements, your past relationships and interactions with a "service animal" have not only been counter-therapeutic, but also inappropriate (sexual in nature). In no way will the Hospital facilitate such illicit and illegal behaviors.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

- The Facilities maintained by the Hospital, including the Forensic Hospital, are secure facilities and not accessible to the general public. Furthermore, the Hospital ONLY provides health care services at its facilities to individuals who are under court order for treatment (i.e., the Hospital does not provide health care services to the public at large).
- There are legitimate medical and safety reasons to exclude a service animal from the Hospital.
- The presence of a service animal within an [ASH] facility would require the alteration of services, programs, and/or activities and would fundamentally alter many typical functions of the Hospital[; and,]
- The proper handling of a service animal, including the toileting, feeding, grooming and veterinary care could not feasibly be provided at the sole responsibility of the patient. Such activities would require additional staff resources and coordination."

39. I also submitted a Special Visit Request Form to have a visit on my birthday, July 17, 2024, from attorneys Holly Gieszl and Josh Mozell, Mr. Cowsert, and Foxy II.

40. After two weeks passed without a response, I asked Ms. Gieszl email to Assistant Attorney General Erin Cohen, and on July 11, 2024, Ms. Gieszl notified me that Cohen had emailed her back ASH's response, which stated, "Josh and Holly are approved. The dog is not allowed on our grounds." ASH also returned my visit request form marked "No are dogs allowed on campus."

41. I discussed the option of Mr. Cowsert visiting me without Foxy II, but Mr. Cowsert informed me that it would a 2 day ordeal for him to come to Phoenix, and that he had nobody to watch Foxy II. It was also over 110 degrees in Phoenix on July 17, 2024, and Foxy II therefor could not stay inside my truck while Mr. Cowsert was inside ASH visiting with me. As a result, Mr. Cowsert and Foxy II were both excluded from visiting me at ASH on my birthday.

42. Foxy II's services are essential to my independent functioning, and her work is undeniably therapeutic to me. Prior to my confinement by the State of Arizona, Foxy I enabled me to function independently and participate meaningfully in outpatient therapy for the first time

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

in over 20 years of attending therapy. ASH's former psychiatrist, Dr. Stephen Morris purportedly claimed in an affidavit that Foxy I would have impeded my treatment, but nothing could have been further from the truth.

43. My mother, Arlene Solan, provided a declaration to impeach Dr. Morris' testimony. Her declaration corroborates my assertion that Foxy I's presence was therapeutic and that Foxy I's work and tasks enlarged my ability to function independently and enabled me to access needed behavioral health services. My mother said to me, and later stated provided in her declaration:

"I am Matthew Solan's mother. He was adopted at 11 days old. Matthew has lived with disabilities his entire life. He attended a special-needs pre-school from ages 3 through 4 and required substantial support in elementary school. Matthew had an IEP starting in kindergarten and an assigned aid through the third grade. In the fourth grade, Matthew was diagnosed with an Autism Spectrum disorder. In the fifth grade, Matthew was removed from public school and placed in a special needs school for autistic children. In the sixth grade, Matthew continued to decompensate, so my husband and I removed Matthew from school and homeschooled him. He received his GED in 2009 at age 20. Matthew completed a 3D animation certificate program through Boston University in 2012, but required substantial accommodations to finish it. Matthew moved into his aunt's vacant condominium in 2012 and lived there until 2015. During this time, he became very reclusive. He was obsessed with computers and programming. I had difficulty getting him to go out and socialize. On January 5, 2015, I drove Matthew to Brattleboro, Vermont to pick up his first dog, Foxy. Initially, I did not want Matthew to have a dog. When I saw how much she helped him, I was glad. Matthew began teaching Foxy to perform tasks that helped him manage his autism. Matthew and Foxy lived together at the condo from January to August 2015. He was suffering from mold-related illnesses while at the condominium. Matthew expressed a desire to move to Arizona. My husband and I bought him a house near Williams, AZ, hoping the dry climate would help him heal from his illnesses. He could live independently with our continued support.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Matthew came back to Massachusetts in 2016 and returned to Arizona by 2017. While in Massachusetts in 2015 and 2016, I stayed with Matthew and Foxy several hours a day to help with various living activities. I also took them out to socialize. We would go out to restaurants and thrift stores several times a week. Matthew always took good care of Foxy and attended to her needs. I watched him walk her, cook for her, bathe her in the sink and pamper her. Matthew stopped talking through his stuffed fox toys and began using Foxy as a social buffer, which enabled him to communicate more effectively. I have never seen Matthew mistreat Foxy, raise his voice at her, hit her or do anything to cause her any harm. I never saw any indication that Matthew was inappropriate with Foxy in any way. When Matthew was training Foxy, I watched him exclusively employ positive reinforcement techniques. He showered her with praise and positive attention, using healthy training treats, such as chicken bits, which he would prepare for that purpose. While I continued to provide Matthew financial support, Foxy enabled Matthew to function independently for the first time, leave the house to socialize and take on more and more responsibilities. I took Matthew to all of his therapy appointments between 1993 and 2016. Prior to 2016, I accompanied Matthew because, if I did not, he would not even go in. Before acquiring Foxy as a service dog, Matthew could not effectively engage in any therapy. He would argue with the therapists and could not focus on what they were asking him to do. After Foxy started coming to his sessions, he was able to begin engaging with his therapist. When Matthew became overwhelmed, Foxy would jump in his lap without prompting and Matthew would bury his face in her fur to calm down. After several months of attending therapy with Foxy, Matthew was able to start participating in the sessions without me. While Matthew has been confined at the Arizona State Hospital, I have spoken with him on the phone almost every day. Since being separated from Foxy, Matthew has become more withdrawn and cynical. Matthew was devastated by the death of Foxy in 2022, after which he drastically decompensated and became even more withdrawn and verbally aggressive. Matthew decided to sell his house in Williams, AZ so he could get the funds to clone Foxy, hoping this would calm him

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

down. Since the cloned Foxy was delivered to Arizona in 2024, I have paid approximately $200 weekly for Foxy's food and care. I have also paid for all of Foxy's veterinary expenses and other needs. I will continue to pay for Foxy, but once Matthew is able, I am holding him responsible to pay all of Foxy's expenses. From what I have heard from Matthew and others, I do not believe the Arizona State Hospital has improved Matthew's situation, nor his mental health."

44. ASH's exclusion of Foxy II and the Defendants and other ASH employees attacks on my relationship with Foxy I and Foxy II have irreparably destroyed my therapeutic relationship with ASH's treatment providers, further impairing my treatment.

45. While separated from Foxy II, I have experienced distress, anguish, and heightened mental health symptoms, including hyper-vigilance, nightmares, flashbacks, sensory overload, increased anxiety, suicidal ideation, cutting, head banging, and other self-injurious behaviors.

46. Foxy I helped me to ground and self-regulate, and interrupted my impulsive and self-harming behaviors. For example, when I got my Ford F800 stuck in the mud at Fox Ranch, I started freaking out, screaming, and banging my head into the window of the truck. Foxy I immediately jumped into my lap, pushed my arm out of the way, and started licking my face. I pushed her off and told her to get off me, but she kept coming back, pushing my arm out of the way, and licking my face until I stopped banging my head into the window. I got out of the truck, ran around the truck, picked up Foxy I and apologized to her I for yelling. Had Foxy I not been there, I would have seriously harmed myself and probably broken the window with my head. I have done that before. Had Foxy II been present when at ASH when I was panicking and engaging in self harming behaviors, she would have been able to help me ground, ameliorated my symptoms, and prevented or immediately interrupted my self-injurious behaviors. That is what Foxy I was trained to do and that is what I spend thousands of dollars ensuring Foxy II was capable of doing.

47. Despite this, ASH have dismissed my injuries and attacked Foxy II's status, (calling her my "personal pet,") falsely claiming that my reports of self-harm, anxiety, and suicidal ideation from not having Foxy II me were not supported by any recorded instances of self-harming

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

behavior. My ASH medical records contain a substantial number of reported incidents of dysregulation and self-harm.

48. On or about August 12, 2024, I served notices of my claims against the State of Arizona, Michael Sheldon, Aaron Bowen, Unique Coleman, and Lea'cher Carter, demanding $33,000,000 in damages for ASH's exclusion of Foxy II and the public dissemination of defamatory statements made about me by the individual defendants.

49. On or about October 13, 2024, I filed an administrative complaint/grievance with ASH's. Complaints, Grievances, and Appeals office. ASH summarily dismissed the complaint stating, "In regards to your request to have your personal dog visit or live with you at ASH, this issue cannot be handled through the Hospital's internal complaint process, due to the litigation history…Based on the findings of this investigation, your complaint is dismissed."

50. Bowen resigned on or about the day the Court-ordered assessment was due in *Solan I*, and Sheldon took over as CEO of ASH at that time.

51. On the same day Dr. Morris was schedule for deposition in *Solan I*, he resigned as well, and ASH's current CMO, Dr. Steven Kwoh, took over Plaintiff's care.

52. The latest version of the Diagnostic and Statistical Manual, Version 5 Text Revision ("DSM-V-TR") describes the criteria for an Autism diagnosis:

> "Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities. Because symptoms change with development and may be masked by compensatory mechanisms, the diagnostic criteria may be met based on historical information, although the current presentation must cause significant impairment."

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

53. On September 1, 2023, Sheldon issued the report to the Arizona Legislature pursuant to Ariz. Laws. 2022, Ch. 359, ¶ 3.[1] In this report, Sheldon stated, in pertinent part:

"As previously indicated, individuals with a Neurocognitive…or a Neurodevelopmental Disorder (i.e., Autism Spectrum Disorder or an Intellectual Disability) require specialized treatment due to the complexity of the behaviors and symptoms that are associated with these disorders. Furthermore, when these disorders are combined with a Serious Mental Illness, the need for specialized care is compounded and oftentimes leads to longer hospitalizations and difficulty discharging to a less-restrictive setting. While preparing this Plan, the Hospital reviewed the prevalence of Neurocognitive Disorders and Neurodevelopmental Disorders across its existing patient population. It should be noted that for both the Civil and Forensic campuses, individuals that had either a Neurocognitive Disorder, a Neurodevelopmental Disorder, or a combination, have been hospitalized for a significantly longer time period than their peers. Specifically, 32.5% of Civil patients and 12.2% of Forensic patients had at least one of these diagnoses and have an average length of stay 2.9 years longer than their peers without a Neurocognitive or Neurodevelopmental Disorder." Id. at 27. Sheldon further stated in his report, "Beyond the above-cited issue with the Hospital's current licensure restrictions, the Hospital is not able to meet the needs of patients with Autism, DD/ID, dementia/neurocognitive disorder, or substance use disorder as primary diagnosis. Appropriately meeting the needs of these populations takes whole teams with specialized training. The Hospital's current allocation meets its needs for the treatment of severe general primary psychiatric illnesses (such as schizophrenia, bipolar disorder, depression, etc.). ASH can address other issues mentioned ift hey are *secondary* conditions, as all clinical staff have basic abilities to address these issues when minor or secondary. Antisocial personality disorder (which is a disqualifying diagnosis for Title 36 court ordered treatment and has no evidence-based

[1] *See* Arizona Department of Health Services, Clinical Improvement and Human Resource Plan (Sept. 1, 2023), https://www.azdhs.gov/documents/director/agency-reports/clinical-improvement-and-human-resource-plan-09-01-2023.pdf.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

treatments for the diagnosis), cannot be treated by ASH regardless of the specialized staff hired."

54. Around November, 2024, I complained to my ASH psychologist, Dr. Amanda Brimlow, that ASH was refusing to accommodate my Autism and that she should write a report to the Superior Court stating that ASH should transfer me to a facility that can treat Autism or release me. Dr. Brimlow told me she agreed that ASH was not able to accommodate my Autism, and on December 30, 2024. Dr. Brimlow, gave me a letter stating:

"Per his records (Dr. Kamean-Silva, in 2000), Mr. Solan was diagnosed with autism when he was 11 years old, and required services in school to address his unique needs. He has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships. It is this writer's opinion that he still meets the criteria for an Autism Spectrum Disorder diagnosis as an adult. He was psychologically evaluated by Dr. Wirth in 2022, and his diagnosis of Autism Spectrum Disorder was retained. Mr. Solan has persistent deficits in social communication and social interaction across multiple contexts. While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers. He has a history of lacking social-emotional reciprocity, and interest in others which has led to difficulties in developing and maintaining relationships with others. He has presented with an inflexible adherence to routine, as evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and making demands of the staff and his treatment team despite hospital policies. He has expressed hyperreactivity to sensory input while he has been a patient at Arizona State Hospital. He will sleep during the day to avoid noises, states that he requires soundproofing materials to be installed on the unit, and will not attend social groups with others due to being "overstimulated." It is important to note that when Mr. Solan feels his needs are not being met appropriately, he will say racial slurs and threaten to harm or kill others. This is indicative of the substantial functional limitations related to his Autism diagnosis and deficits in appropriate social interactions with others."

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

55. Around the end of June, 2025, I again complained to Dr. Brimlow that ASH was still refusing to accommodate my Autism and that ASH should transfer me to a facility that can treat Autism or release me. Dr. Brimlow informed me that she had recently been advocating for mw, and requesting that the ASH administration allow mw to receive outpatient therapy, as ASH cannot accommodate my needs. When I was transferred from ASH's Cottonwood unit to the Mohave unit on July 2, 2025, Dr. Brimlow was suddenly removed from my treatment team without explanation.

56. On July 2, 2025, Julianna Vroman replaced Dr. Brimlow as my psychologist, but she refused to work with me and refused to discuss accommodations for my Autism.

57. In or around November, 2025 Vroman was abruptly removed from my treatment team. The head of my treatment team, Kindra Ochoa, informed me that Vroman is "no longer employed at ASH."

58. Ochoa later informed me that Vroman was not a licensed psychologist and that the ASH administration had terminated her for misrepresenting her qualifications.

59. After Vroman was removed, I went without meeting with a licensed psychologist until about May 2026, when Courtney Tully, previously an unlicensed intern, notified me that she had received her PhD in psychology and was employed by ASH to work with me as my psychologist.

60. Dr. Tully met with me in May, 2026, and informed him that she was replacing Vroman's psychology goal on my ASH treatment plan with the following language:

> "Psychology staff will offer a minimum of three documented opportunities for Matthew to participate in treatment planning within a 3 month time frame. Psychology staff will increase patient access to services by offering autism-informed communication and environmental accommodations (clear agenda prior to meeting, predictable meeting structure, reduced sensory stimulation in the environment including dim lighting, direct and literal communication style, and/or extra processing time for responses."

61. I have begged every treatment team I've had at ASH to provide me access to the same treatment services the other patients have access to, and to accommodate my Autism by

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

providing the content of those treatment groups on a one-on-one or small group basis to reduce the sensory overstimulation and enable me to participate without experiencing the extreme distress the group environments cause me.

62. The members of every single treatment team I have had at ASH, including, but not limited to Dr. Morris, Dr. Kwoh, Kinda Ochoa, and Dr. Tulley, and have told me that they agree that one-on-one or small group accommodations are necessary, but that the ASH administration will not provide them with the staff resources needed to make such an accommodation.

63. Instead of increasing environmental accommodations to help me cope with the effects of my ASD, ASH has continually removed accommodations and services that I previously relied on, including seizing my previously-approve noise cancelling headphones, turning off the bathtubs I used for grounding, excluding my service animals, seizing my stuffed foxes and designating them "contraband," transferring me from the Cottonwood unit (which ASH's former CMO stated was an accommodation for Plaintiff's Autism) to the far overstimulating Mohave unit, and cancelling my single-room accommodation.

64. When my attorney, Holly Geiszl and I appealed ASH's treatment plan in 2024 for its failure to accommodate mu Autism-related needs, we suggested several changes to the treatment plan's language, including:

   1. The treatment team, in conjunction with the patient, his legal counsel, and the hospital administration will determine, in the next 21 days, if the hospital will be able to secure sufficient staff resources and funding to begin treating the patient's Autism Spectrum Disorder in a manner that complies with generally accepted standards of autism care and the patient's unique needs. If the hospital is able to secure sufficient staff and fiscal resources, the hospital and the treatment team will fully implement the remaining goals and services stipulated in this plan no later than November 9, 2024. If the hospital is unable to acquire sufficient staff resources and funding, or the hospital administration refuses to allocate sufficient staff and/or fiscal resources as needed to treat the patient's Autism Spectrum Disorder, or if the treatment team is otherwise unable to acquire the majority of the services stipulated in this plan by November 9th,

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

the treatment team will meet with the patient and his legal counsel and assist them in preparing a petition to the Superior Court to either (a) transfer the patient to a private facility specializing the treatment of Autism Spectrum Disorders, or (b) conditionally release the patient to his caretaker, Joseph Cowsert.

2. Patient and his legal counsel will work closely with the treatment team in selecting treatment services necessary to facilitate the patient's ASD habilitation and PTSD therapy at ASH. The treatment team and hospital administration will locate, acquire, and provide to the patient all services, supports, accommodations, and environmental modifications determined by the treatment team in conjunction with the patient and his legal team to be necessary for the patient's effectual habilitation and trauma therapy. The hospital shall not exclude any identified service, support, accommodation, or environmental modification on the basis that the same is not presently available at ASH, or is deemed hospital administration as unnecessary, too expensive, or an administrative burden, but shall add the same whether presently available or not, and shall continually make a good faith effort to acquire the same until the next ITDP review. If, after 30 days, a needed service, support, accommodation, or environmental modification is still unavailable, the treatment team shall, at the next ITDP review, provide a written report to the patient and his legal team detailing the reason the same is still unavailable, the date it is expected to become available, and/or hospital's plan to provide a sufficient alternate.

3. The patient will be provided Animal Assisted Therapy (AAT) services, as defined by the hospital's animal therapy policy, at least twice a week as part of his ASD habilitation and PTSD therapy If the hospital is unable to secure a therapy dog within 30 days, AAT will be facilitated using the patient's own service dog, Foxy, not less than once a week, contingent only on her caretaker's availability. If the patient's service dog is used to facilitate the patient's animal therapy, the service shall be conducted in the PSRB lobby, or in such other secured area of the forensic hospital as the hospital shall determine safe and appropriate.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

In response to these points, my treatment providers wrote:

1. Matthews requests cannot be fulfilled by this provider as she does not have the ability to acquire staff.
2. It is outside of the treatment teams ability to alter habilitation/environment modifications. What is available is ensuring that Matthew has a safe place to turn to when he feels triggered such as his room, a quite room, or walking on the patio.
3. The treatment team does not have the ability to offer animal assisted therapy, does not have personnel trained to provide animal assisted therapy. The forensic hospital does not have volunteers available to perform.

65. At no time before or after Dr. Tully added as a treatment goal that ASH will increase my access to services by offering autism-informed communication and environmental accommodations, did ASH actually offer me autism-informed communication and environmental accommodations.

66. Instead, my treatment team has largely avoided me and has told me to seek needed services "after" I discharge from ASH on August 1, 2026.

67. I was not willing to wait until after discharge from ASH to receive the benefits of Autism-informed treatment services, so I reached out to my circle of attorneys and agents and asked for a referral to an outpatient provider. Sam McCullough at Radian Sun Therapy in Flagstaff, Arizona was recommended. I requested and received a copy of his online profile, which indicated he specialized in treating Autism spectrum disorders. I reached out to McCullough around April, 2026 and confirmed his qualifications. I have since established a relationship with McCulloch and began participating in telemedicine therapy with him.

68. McCulloch created a treatment plan for me and provided a copy to me on May 26, 2026. That treatment plan states:

"Presenting Problem: Matt presents challenges with managing stress and sensory overwhelm. These symptoms are related to his Autism disorder, and also contribute, and can trigger PTSD symptoms, interfering with description making and his physical, mental, and emotional safety. Goal: Matt's goal is to transition out of the State hospital,

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

find stability economically, secure safe housing, ands reconnect with his business and his passion. Matt will work to make connections with the right supports, including regular therapy, and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition. Objective: Matt will learn and practice skills to help with managing stress and developing awareness and self-care around his sensory system. Matt will participate in therapy and have close contact with his support animal. Matt will also seek out additional supports as needed to treat his PTSD."

69. Dr. Morris allegedly opined in 2022 that Foxy I "would only serve to get in the way" of my treatment at ASH. But that is not what he told me throughout 2020 to early 2022; Dr. Morris repeatedly told me that he supported me having Foxy I live with me at ASH, but that it was an "administrative decision" to exclude her, and I should focus on treatment without her as there was nothing he could do to get her in.

70. Dr. Morris nevertheless affirmed in at least 21 of my ASH treatment and discharge plans that having a "trained service dog" was my foremost "patient strength."

71. In September, 2025, ASH disclosed all of my treatment plans up to that date. Between 2021 and September, 2025, in 85 separate treatment plans, my providers, including Dr. Moris, Dr. Stephen Jaffe, Dr. Mohammad Bhatti, Dr. Seven Kwoh, Dr. Diana Walyat, and R.N. Kindra Ochoa each stated that having a "trained service dog" was my primary patient strength.

72. At least 54 of the disclosed treatment plans also recommend "animal therapy" as a therapeutic intervention for me.

73. As I have has repeatedly stated, I am an ecocentist, a therian, and a practitioner of esoteric fox magic. Plaintiff's totem animal is, and has for decades been the fox. Nearly every art-school project I completed involved anthropomorphic fox characters, including my final 3d-animation project I completed at Boston University's Center for Digital Imaging an Arts in 2012. I role-plays online as a fox. The name of my fursona is Emperor Fox. I have also built his the entire Fox Ranch Company corporate ethos and branding around foxes, the archetypal Foxy, and the vulpine aesthetic form.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

74. The fact I like foxes and foxlike Pomeranians "better than people" is not going to change. More accurately, I refuse alter my personal mythos to conform to the expectations of a body politic I am fundamentally at odds with. My affinity for foxes, including Foxy II, is a fundamental aspect of my sincerely held religious beliefs and philosophical worldview. ASH has any right to try and "fix" this aspect of my identity, and ASH's unjustified exclusion of Foxy I and Foxy II, and appalling attacks on my relationship with them, has only furthered my disdain for humanity and alienation from ASH's providers.

75. Without I doubt I am eccentric, outspoken, and my Autism-related neuro-atypicalites have clearly rubbed many people the wrong way. I can be very difficult to get along with, and I have autism meltdowns where I scream, yell, and say things that offend others. I do not like people, and have not shied from announcing my opinion that humans have made themselves a cancer upon the face of the earth. But the virtues and demerits of my neuro-divergent idiosyncrasies are not on trial. ASH is supposed to hire treatment professionals who understand Autism and work with me to accommodate my needs and help me lean new compensatory tools. ASH's providers have instead attacked my character, slandered and belittled me, denied all my reasonable accommodation requests, and falsely claimed that I am refusing treatment while simultaneously admitting that they cannot treat my primary diagnosis of Autism.

76. Daniel Alvarez is another Autistic patient who previously resided on the Cottonwood unit with me. Alvarez witnessed Carter abusing and sexually harassing me, and was also subjected to Carter's abuse. Initially, Alvarez told me he could not testify because he was afraid of retaliation, but after ASH revoked Alvarez's privileges, and his mental health continued to deteriorated after being moved to a lower functioning unit, Alvarez agreed to testify about Carter's abuse. Alvarez explained to me what Carter had done and said to him, and provided a declaration that confirmed what he told me. Alvarez stated, in pertinent part:

> "I have been diagnosed with an Autism Spectrum Disorder (Asperger's Syndrome) from childhood, but ASH currently has me diagnosed with a Schizoaffective Disorder…I worked really to hard progress through ASH's privilege system and get my Levels. I was

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

moved to ASH's Cottonwood unit in 2023 because Cottonwood was ASH's pre community reintegration unit and I had been given conditional release to privilege Level 1…Lea'Cher Carter [] was a Behavioral Health Technician [] on the Cottonwood unit when I was living there…I always felt uneasy around Carter, and she would intentionally trigger me when I was feeling paranoid. Carter was always rude, hateful and mean to me, and to all the patients she didn't like. She would give me dirty looks and mad dog me at random times for no reason…. She harassed other patients too and made nasty comments about them. One time she told me that Matthew Solan "fucks dogs." I complained to Nurse Supervisor Domenick Aldrich [] about Carter's treatment of me around May, 2024. Domenick told me "if it was up to me, she'd be gone," but he didn't do anything to protect me from her harassment…I complained to my therapist and Cottonwood RN Jessica, but they didn't do anything to help me either. I filed a grievance against Carter around May or June of 2024, but after I did that, she started harassing me more…Carter told me "if you don't listen to me, I'll get you moved the fuck off this unit…Carter's abuse put me in a sad state and made me feel scared. She was really scary and I felt helpless because I didn't do anything to her and the hospital was letting her treat me like trash. To escape the abuse, I kicked off my ankle monitor and broke a table so ASH would move me off the Cottonwood. I got all my privileges revoked and was transferred to the Sycamore unit, where I have remained ever since. I took me over a year to get even part of my privileges back. I felt it was hopeless and didn't even try for a long time... Lea'cher Carter really hurt me, and I personally witnessed her verbally and emotionally abuse Matthew Solan too. I feel that Carter should not be allowed to work with the mentally ill anymore, and hope that the Courts will protect patients from her abuse in the future."

77. I never told Coleman or Coleman, or stated in their presence that Foxy was my wife, and I never spoke the presence of either of them, or elsewhere, of sexual conduce between myself and my dog.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

78. I have never engaged in sexual conduct with a dog, I have never told anyone that I had engaged in sexual conduct with a dog, I have never told anyone that I had a desire or intent to engage in sexual conduct with a dog, and I have no interest in engaging in sexual conduct with a dog.

79. I have certainly never told anyone that I "eat dog p***y," "eat dog a**," or "f*** dogs."

80. According to ASH public records I reviewed, the ASH administration in March, 2022 was composed of CEO Bowen, COO Sheldon, CFO Ryan Rodney, CMO Katharine Woods, CNO Nancy Regan, CQO Lisa Wynn, CCO Margaret McLaughlin, CSO William Bugbee, and ADHS Director Don Herrington.

81. In or about 2024, Domenick Aldrich, a Psychiatric Nursing Unit Manager ("PNUM") informed me that he, and all the other ASH PNUMs were on the "administrative team," and were regularly apprised of decisions by the higher-ups affecting the ASH treatment units.

82. ASH is a closed institutional community. Scandalous statements and tabloid-worthy newsbytes spread rapidly through the ASH rumor-mill and quickly become public knowledge among patients and staff. It is inconceivable to me that Bowen, Sheldon, Coleman, or Carter would not be aware of this.

83. A year after Carter and Coleman began publicly proclaiming that I "eat dog p***y," "eat dog a**," and "f*** dogs," the effects of their statements could still be felt both on and off of my treatment unit. For example, while over half of the Forensic Hospital population testified that Foxy II's presence would be beneficial to their rehabilitation, only 5 patients on the Mohave unit signed my March, 2025 animal therapy petition. In 2025 ASH Independent Oversight Committee member Nicholas Oakes told me that multiple patients on the ASH Mohave unit believed that Foxy II had been abused, and therefor did not want her to visit the hospital. My current roommate, Dwarka Baron, confirmed that this was the case in early March, 2025, and that he had advised Oakes this fact in 2025. However, since I have been living on the Mohave unit, now the patients there have gotten to know me better, none of them believe that Foxy was abused. Instead, they believe I care deeply for Foxy and spend way too much money pampering her.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

84. ASH released its entire policy set to me in 2021 and 2023, and ASH placed its latest policy set online at the ADSH/ASH website. I instructed my father on how to scrape all of the PDF policy documents from ASH's website, and he sent them to me on a flash memory drive in early 2026. I have extensively reviewed ASH's policies and it is clear that ASH still has not implemented any written service animal policy.

## DOCUMENT CERTIFICATIONS

85. Doc. 6, Ex. A, B, C, D, E, F, H, I, J, L, and M are a true and correct copies of the original documents.
86. Doc. 17, Ex. B, C, D, E, F, G, I, J, K, L, M, and N are true and correct copies of the original document.
87. Doc. 24, Ex. A, B, C, and D are true and correct copies of the original document.
88. Doc. 82, Ex. A is a true and correct copy of the original document.
89. Doc. 103, Ex. F is a true and correct copy of the original document.
90. Exhibits B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, and Z are a true and correct copy of the original documents.
91. Exhibit U contains true and correct copies of the photograph of me at Boston University's Center for Digital Imaging and Arts, a photograph of the print of the foxes from my final school project, and screenshots of the video from my final school project.
92. Exhibit W contains a printout of my fursona, Emperor Fox.
93. I own the copyrights in the images contained in exhibits U and V.
94. Fox Ranch Company owns the copyrights to the Fox Ranch Company logo and official seal exhibited at Solan Decl., ¶ 134.

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED** on the 23rd day of June, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008
Tel: +1.970.369.9611



Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**EXHIBIT B**

# DECLARATION OF ARLENE A. SOLAN

I, Arlene A. Solan, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.
2. I am Matthew Solan's mother. He was adopted at 11 days old.
3. Matthew has lived with disabilities his entire life. He attended a special-needs pre-school from ages 3 through 4 and required substantial support in elementary school.
4. Matthew had an IEP starting in kindergarten and an assigned aid through the third grade.
5. In the fourth grade, Matthew was diagnosed with an Autism Spectrum disorder.
6. In the fifth grade, Matthew was removed from public school and placed in a special needs school for autistic children.
7. In the sixth grade, Matthew continued to decompensate, so my husband and I removed Matthew from school and homeschooled him. He received his GED in 2009 at age 20.
8. Matthew completed a 3D animation certificate program through Boston University in 2012, but required substantial accommodations to finish it.
9. Matthew moved into his aunt's vacant condominium in 2012 and lived there until 2015. During this time, he became very reclusive. He was obsessed with computers and programming. I had difficulty getting him to go out and socialize.
10. On January 5, 2015, I drove Matthew to Brattleboro, Vermont to pick up his first dog, Foxy. Initially, I did not want Matthew to have a dog. When I saw how much she helped him, I was glad. Matthew began teaching Foxy to perform tasks that helped him manage his autism.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

11. Matthew and Foxy lived together at the condo from January to August 2015. He was suffering from mold-related illnesses while at the condominium.

12. Matthew expressed a desire to move to Arizona. My husband and I bought him a house near Williams, AZ, hoping the dry climate would help him heal from his illnesses. He could live independently with our continued support.

13. Matthew came back to Massachusetts in 2016 and returned to Arizona by 2017.

14. While in Massachusetts in 2015 and 2016, I stayed with Matthew and Foxy several hours a day to help with various living activities. I also took them out to socialize. We would go out to restaurants and thrift stores several times a week.

15. Matthew always took good care of Foxy and attended to her needs. I watched him walk her, cook for her, bathe her in the sink and pamper her.

16. Matthew stopped talking through his stuffed fox toys and began using Foxy as a social buffer, which enabled him to communicate more effectively.

17. I have never seen Matthew mistreat Foxy, raise his voice at her, hit her or do anything to cause her any harm. I never saw any indication that Matthew was inappropriate with Foxy in any way.

18. When Matthew was training Foxy, I watched him exclusively employ positive reinforcement techniques. He showered her with praise and positive attention, using healthy training treats, such as chicken bits, which he would prepare for that purpose.

19. While I continued to provide Matthew financial support, Foxy enabled Matthew to function independently for the first time, leave the house to socialize and take on more and more responsibilities.

20. I took Matthew to all of his therapy appointments between 1993 and 2016. Prior to 2016, I accompanied Matthew because, if I did not, he would not even go in. Before acquiring Foxy as a service dog, Matthew could not effectively engage in any therapy. He would argue with the therapists and could not focus on what they were asking him to do. After Foxy started coming to his sessions, he was

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

able to begin engaging with his therapist. When Matthew became overwhelmed, Foxy would jump in his lap without prompting and Matthew would bury his face in her fur to calm down. After several months of attending therapy with Foxy, Matthew was able to start participating in the sessions without me.

21. While Matthew has been confined at the Arizona State Hospital, I have spoken with him on the phone almost every day. Since being separated from Foxy, Matthew has become more withdrawn and cynical. Matthew was devastated by the death of Foxy in 2022, after which he drastically decompensated and became even more withdrawn and verbally aggressive.

22. Matthew decided to sell his house in Williams, AZ so he could get the funds to clone Foxy, hoping this would calm him down.

23. Since the cloned Foxy was delivered to Arizona in 2024, I have paid approximately $200 weekly for Foxy's food and care. I have also paid for all of Foxy's veterinary expenses and other needs. I will continue to pay for Foxy, but once Matthew is able, I am holding him responsible to pay all of Foxy's expenses.

24. From what I have heard from Matthew and others, I do not believe the Arizona State Hospital has improved Matthew's situation, nor his mental health.

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED** this 10th day of June, 2026.

*Arlene A. Solan* [signature]

**Arlene A. Solan**
45 Morse Street
Westborough, MA 01581
Telephone 508-284-6508
aasolan@hotmail.com

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**EXHIBIT C**

# DECLARATION OF NICHOLAS PHILIP OAKES

I, Nicholas Philip Oakes, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.
2. I reside on the Cottonwood unit of the Arizona State Hospital ("ASH").
3. On or about March 20, 2025, 61 patients across the 7 units of the ASH forensic hospital, including myself, signed verified petitions.
4. The petitions requested that ASH provide Animal Assisted Therapy ("AAT") services to us, and affirmed that AAT services would be highly beneficial to us and to our rehabilitation.
5. The petitions also requested that ASH's AAT service be provided through Matthew Solan's service dog Foxy, who has been certified the Alliance of Therapy Dogs to do Animal Assisted Therapy with hospital patients.
6. Dwarka Baron is a patient who resides on ASH's Mohave unit.
7. On March 24th, 2025, at 4:30 p.m., Dwarka Baron told me that multiple patients on his unit claimed Foxy had been abused, and therefore did not want to have her visit them. As a result, we only collected 5 signatures on the Mohave unit.

I declare under penalty of perjury that the foregoing is true and correct.

**DATED** this 31st day of March, 2025.

Nicholas Philip Oakes, MBA

**EXHIBIT D**

# DECLARATION OF DWARKA BARON

I, Dwarka Baron, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.
2. I am a patient confined on the Mohave unit of the Arizona State Hospital.
3. Matthew Solan and I share a two-patient bedroom on the Mohave unit.
4. I have been Mr. Solan's roommate since the fall of 2025.
5. Prior to Mr. Solan transferring to the Mohave, staff on our unit had been spreading rumors among the patients that Mr. Solan sexually abused Foxy and that he threw a cup of hot coffee in a female BHT's face. It seemed to me that staff was trying to pit the patients against Mr. Solan.
6. In March of 2025, I signed a petition asking ASH to provide animal therapy services to us using Mr. Solan's service dog, who had also been accredited to do animal therapy work in hospitals.
7. I tried to get other patients to sign the petition, because I wanted animal therapy.
8. A large number of patients on the Mohave unit refused to sign the petition, and told me they had heard Mr. Solan's service dog had been abused, and they did not want an abused dog to do animal therapy with them.
9. As a result, only 5 people on the Mohave unit signed the petition.
10. I have talked to Mr. Solan about Foxy at length. I don't believe that Mr. Solan abuses her. I think he cares deeply for Foxy, and spends lots of money indulging her.

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED** on June 23, 2026.

Dwarka F. Baron

**Dwarka Baron, Declarant**
501 North 24th Street
Phoenix, AZ 85008
(602) 244-1331

**EXHIBIT E**

# DECLARATION OF DANIEL ALVAREZ

I, Daniel Alvarez, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years old and competent to testify about the following matters.
2. I am a patient living on the Sycamore unit of the Arizona State Hospital ("ASH").
3. I have been diagnosed with an Autism Spectrum Disorder (Asperger's Syndrome) from childhood, but ASH currently has me diagnosed with a Schizoaffective Disorder.
4. I worked really to hard progress through ASH's privilege system and get my Levels. I was moved to ASH's Cottonwood unit in 2023 because Cottonwood was ASH's pre community reintegration unit and I had been given conditional release to privilege Level 1.
5. Lea'Cher Carter ("Carter") was a Behavioral Health Technician ("BHT") on the Cottonwood unit when I was living there.
6. I always felt uneasy around Carter, and she would intentionally trigger me when I was feeling paranoid. Carter was always rude, hateful and mean to me, and to all the patients she didn't like. She would give me dirty looks and mad dog me at random times for no reason.
7. I was told by BHT Michelle that Carter told her she hated me because I was immature. Michelle didn't like the way Carter was abusing the patients.
8. She harassed other patients too and made nasty comments about them. One time she told me that Matthew Solan "fucks dogs."
9. I complained to Nurse Supervisor Domenick Aldrich ("Domenick") about Carter's treatment of me around May, 2024. Domenick told me "if it was up to me, she'd be gone," but he didn't do anything to protect me from her harassment.
10. I complained to my therapist and Cottonwood RN Jessica, but they didn't do anything to help me either. I filed a grievance against Carter around May or June of 2024, but after I did that, she started harassing me more.

11. Carter told me "if you don't listen to me, I'll get you moved the fuck off this unit."

12. Carter's abuse put me in a sad state and made me feel scared. She was really scary and I felt helpless because I didn't do anything to her and the hospital was letting her treat me like trash. To escape the abuse, I kicked off my ankle monitor and broke a table so ASH would move me off the Cottonwood. I got all my privileges revoked and was transferred to the Sycamore unit, where I have remained ever since. I took me over a year to get even part of my privileges back. I felt it was hopeless and didn't even try for a long time.

13. I fully reaffirm the statements I made in my August 2, 2024 declaration. Lea'cher Carter really hurt me, and I personally witnessed her verbally and emotionally abuse Matthew Solan too. I feel that Carter should not be allowed to work with the mentally ill anymore, and hope that the Courts will protect patients from her abuse in the future.

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED** on February 17, 2026.

[signature]
**Daniel Alvarez**

Arizona State Hospital
501 North 24th Street
Phoenix, AZ 85008

(602) 244-1331
Sycamore Unit

**EXHIBIT F**

**DECLARATION OF HOLLY R. GIESZL**

1. I represented Matthew Solan throughout his criminal case, State v. Solan, CR-2024-135130-001 from July 26, 2024, until March 26, 2026 ("Mr. Solan's Matter.")

2. My standard practice in every case, except the simplest misdemeanors, was to prepare a written Factual Basis for the client's plea and read from that document at the change of plea proceeding.

3. In Mr. Solan's Matter, a more detailed Factual Basis was provided because of two unusual features of the case. First, the Detective seemingly ignored the fact that Mr. Solan was designated Seriously Mentally Ill ("SMI"), an important fact that came out in discovery and that motivated the assigned prosecutor to drop the case to a misdemeanor. Second, after one of the status conferences, the alleged victim acknowledged to the prosecutor that Mr. Solan did not throw a full cup of hot coffee in her face. Nonetheless that was the information included in the Detective's reports.

4. We did not determine whether the victim mis-reported "hot coffee" to the Detective or whether the detective made an erroneous report.

5. Attached is a copy of the Factual Basis that I provided in the Solan Matter at the Change of Plea and Sentencing on March 12, 2026.

6. The proceeding was held in the Maricopa County Superior Court courtroom at the Arizona State Hospital. The State did not have any additions or corrections to the Factual Basis.

7. The Court accepted the Factual Basis, Mr. Solan entered a plea of guilty to disorderly conduct, and the matter was dismissed with prejudice on March 26, 2026.

Dated this 22nd day of May 2026.

[signature]

Holly R Gieszl

**FACTUAL BASIS --- SOLAN 3-26-26**

I need to provide a bit of background because of procedural issues in the case, and errors in the police report that led to the State amending the original indictment.

Mr. Solan was admitted to the Arizona State Hospital on April 1st, 2020. His intake assessment that day was completed by a psychiatrist, Dr. Steven Kwoh, who is now the chief medical officer at the state hospital. Dr. Kwoh noted that Mr. Solan was designated SMI under A.R.S. 36-550. That is the first thing in Mr. Solan's medical record, and it was the first page in the medical records that Detective McDermott received from the hospital.

A designation of SMI means that Mr. Solan suffered a mental disability that is so severe and persistent that long-term functional capacities in the activities of daily living, interpersonal relationships, employment, and recreation are affected. Mr. Solan's qualifying mental health disorder for SMI designation is autism and schizoaffective disorder.

In December of 2024, Dr. Brimlow, a staff psychologist
updated the diagnoses, and schizoaffective disorder was eliminated and replaced with post-traumatic stress disorder, PTSD. She found persistent deficits in social communication and social interaction. She found that these deficiencies were indicative of the substantial functional limitations related to Mr. Solan's autism diagnosis.

In September of '25, Dr. Kwoh deemed Mr. Solan permanently disabled due to his SMI status and the severity of his mental and cognitive disorders. Mr. Solan additionally is indigent. His family posted bail and retained me to represent him. Due to his SMI status and his substantial, permanent disability, he is not able to work and has no means of support. This is important to the factual basis of what we ultimately arrived at as a plea in this matter.

On May 22nd, 2024, Mr. Solan had a difficult interaction with a behavioral health technician, who was not assigned specifically to him, but worked on the floor. We will call her BHT-1. Over a period of time, she harassed Mr. Solan in front of other patients, talking loudly with allegations that he engaged in acts of bestiality with his service dog, Foxy. Mr. Solan reached out to a second BHT, we will call her BHT-2, and asked her to summon the nurse and ask the nurse to remove BHT-1.

Mr. Solan was yelling and waiving his arms. This was in the dayroom, and he did so in a manner that disturbed the peace and quiet of the staff and patients on the unit. He also tossed a partially full cup of cold coffee – not hot coffee - maybe an inch or so of coffee, on a nearby table, and some of the cold coffee splashed on the two BHTs.

**EXHIBIT G**

RIVER OF LIFE
MEDICAL
HEALTH FOR YOUR WHOLE BEING

Re: Matthew Solan

To whom it may concern,

Matthew Solan became my patient while I was Medical Director of Groton Wellness in Groton, MA. Matthew first contacted me in September 2016.

After examination and evaluation of his symptoms and medical history, extensive blood testing showed that he has a chronic mold/toxicity syndrome, from which he has suffered for a long period of time. This syndrome can produce symptoms and behaviors which are the underlying cause of many mental health disorders.

Matthew received many treatments, including, therapies to remove help his body remove the toxicity from his body. Removal of exposure to toxins by changes to his environment, including the use of current high-tech air filtration, has been effective in improving his situation. Continued vigilance, by removal of body toxins and support of his immune system, is required for continued improvement.

Since Matthew's chronic mold toxicity syndrome is caused by the environment, treatments focusing on eliminating the cause of this imbalance is medically advised. I do not advise the use of any standard antipsychotic medications at this time since the goal is to address the underlying cause of the toxic encephalopathy.
Z77.118 Contact with environmental toxin
K90.9 Intestinal Permeability/Leaky Gut
M35.9 Autoimmune Disease
R65.10 Chronic Inflammatory Response Syndrome

We had a follow-up today, 2/27/2017, and will have another follow-up 3/27/2017.

2/27/2017

Dr. Daniel S. Cagua-Koo, MD. MPH
River of Life Medical
617-596-1092
NPI: 1114120656

**EXHIBIT H**

Alliance of Therapy Dogs

sharing smiles and joy™

**Affiliation Agreement**

**Between Alliance of Therapy Dogs and** Arizona Department of Health Services (ADHS)

This Affiliation Agreement is made between Alliance of Therapy Dogs and ADHS. Responsibilities are outlined below.

Alliance of Therapy Dogs will provide:

Volunteers - Certified therapy dog teams (dog and handler).

Insurance - ALLIANCE provides liability insurance that protects Volunteers from claims of others for injury, illness, and property damage resulting from therapeutic visitation with their dogs. This coverage does not protect Volunteers or their dogs from injury or illness as a result of participation in this program. Coverage applies to the ATD certified handler/dog team functioning as a therapy dog team. Volunteers are covered by ALLIANCE's insurance policy only when ALLIANCE is the primary insurance and there is no other insurance (whether from the facility or another organization) in effect while they are visiting. By signing this you will be given Additional insured Status under the Blanket additional Insured Endorsement and Blanket Waiver of Rights of Recovery. No other additional Insured status or Waiver will be available."

Alliance will provide a Certificate of Insurance upon execution of this agreement.

ADHS will provide:

Space - Meeting rooms or spaces to the agreed upon specifications.
Scheduling - Scheduling of programs(s), event(s) or spaces required. ___________ will inform volunteers of schedule and changes thereto.
Volunteer Communication - ________ will apprise volunteers of the rules and requirements of the program/event.
Publicity - Signage and appropriate publicity associated with the program/event, as applicable.

Alliance of Therapy Dogs Representative — Date: 11/21/2021

Representative — Date: 12/28/2021

DF2594

Woolington Agency LLC

1557 South Street
Wheatland, WY 82201
Office 307-322-9129
Fax 307-322-2426

To: Alliance of Therapy Dogs Members

From: Will de Ryk, Agent
Woolington Agency LLC

Date: April 1, 2024

I'm pleased to offer Alliance of Therapy Dogs an insurance policy that provides coverage to members in good standing.

The policy provides liability insurance that protects you from claims of others for injury or illness and property damage resulting from therapeutic visitation with your dog. This coverage does not protect you or your dog from injury or illness as a result of participation.

Policy Information

- Commercial General Liability Occurrence Form
- Excess Liability Occurrence Form
- $5,000,000 Per Occurrence
- $5,000,000 Aggregate
- $5,000 Deductible Each Occurrence for Bodily Injury and Property Damage
- Defense Costs are Included Within the Limit of Liability
- Includes All Dog Breeds

This coverage pertains to registered handlers and dogs at therapeutic visits while representing Alliance of Therapy Dogs. Events can be held in all 50 states, U.S. territories and possessions, Puerto Rico and Canada. The intent of the policy is to cover Alliance of Therapy Dogs members while doing their volunteer pet therapy visits. Coverage is not extended to visits, contact, or activities that are a part of a member's employment or unrelated to Alliance of Therapy Dogs.

In order to answer specific questions regarding covered activities, please refer to the Member Guidelines. Alliance of Therapy Dogs further defines "therapeutic contact" as petting, brushing, holding, throwing, fetching, and walking. If you are unsure if an activity meets these guidelines, please contact the Alliance of Therapy Dogs corporate office for clarification. To protect your rights to coverage, all guidelines must be followed. Coverage is not provided for damages caused by intentional acts or as a result of an Alliance of Therapy Dogs member acting outside the scope of, or not in compliance with, the Alliance of Therapy Dogs rules and regulations, Part I, II, and III. Both the dog and handler must be registered and dues current. Exception to any guidelines may only be authorized in writing by the Alliance of Therapy Dogs Board of Directors.

I sincerely hope you enjoy your therapy visit. Please be confident that the Alliance of Therapy Dogs Board of Directors and I are committed to providing a quality insurance program at the lowest cost possible.

I know you are very important to those individuals you visit.

Sincerely,

Will de Ryk, Agent
Woolington Agency LLC

**EXHIBIT I**



# STARLA

Breed: Welsh Corgi/Basenji Mix
Gender: Female
Birthday: 06/10/2007
Color: Tan/White
Certification: Alliance of Therapy Dogs

Fun Facts: She is the best everything! Dancer, smoocher, snorer, carrot-eater, snuggler!

Owned and loved by: Joleene [redacted]

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Progress Notes

Report Dates: 04/20/20 to 07/15/25

**Patient Name:** SOLAN,MATTHEW **ID:** 35310 **Episode:** 1 **D.O.B.:** 07/17/89
**Age:** 36 **Sex:** Male **Admission Date:** 04/01/20

**Written By:** Lily Godinez - RT2
**Note Type:** Rehab

**Written On:** 03/30/22
**Note Time:** 05:27 PM

**Progress Note For:** New Service

**Group/Individual Interventions:** Individual

**Service Description:** ENCOUNTER (**ENC**)

**Service Date:** 03/30/22
**Service Duration:** 15

**Service Program:** Forensic Rehabilitation
**Practitioner:** GODINEZ,LILY
**Independent Note Date:**

**Goal/Intervention that is Addressed in Progress Note**
Problems-> Psychiatric Issue
Long Term Goal(s)-> Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports.
Short Term Goal(s)-> Matthew will attend 1 Therapeutic Social Intervention (TSI) weekly, in order for him to demonstrate healthy social interactions and develop interpersonal skills.

Interventions-> Rehab will offer Therapeutic Social Interventions (TSI's) weekly, in order for Matthew to demonstrate healthy social interactions and to develop interpersonal skills.

**Progress Note**

S: Not applicable as this is a weekly summary note.

O: Matthew attended the following Therapeutic Social Interventions from 3/19/22 - 3/25/22:

3/19/2022 Pet Therapy for 0.25 hours. Patient engaged in a conversation with the volunteer and pet the therapy dog. Patient was observed to show a picture of his dog to the therapy dog. Patient asked the volunteer what her credentials were to bring a dog on campus. Patient became frustrated saying he wanted to sue administration for not allowing his dog on campus. Patient was redirected and no further redirections were needed.

A: This therapist reviewed Matthew's participation. He engaged in 1 Therapeutic Social Interventions during this time period for a total of .25 hours. Patient did meet his goal of 1 group per week. Patient demonstrated some progress as evidenced by attendance and participation in the groups listed above.

P: Rehab will continue to offer and encourage patient to attend Therapeutic Social Interventions in order for him to demonstrate healthy social interactions and develop interpersonal skills.

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Progress Notes

Report Dates: 04/20/20 to 07/15/25

**Patient Name:** SOLAN,MATTHEW **ID:** 35310 **Episode:** 1 **D.O.B.:** 07/17/89
**Age:** 36 **Sex:** Male **Admission Date:** 04/01/20

**Written By:** Kindra Ochoa - MSN, APRN, PMHNP-BC
**Note Type:** Psychiatry

**Written On:** 02/27/25
**Note Time:** 09:29 AM

**Progress Note For:** New Service

**Group/Individual Interventions:** Individual

**Service Description:** ENCOUNTER (**ENC**)

**Service Date:** 02/26/25
**Service Duration:** 20

**Service Program:** Forensic Rehabilitation
**Practitioner:** OCHOA,KINDRA
**Independent Note Date:**

**Progress Note**

N: This writer briefly met with Matthew per his request. He sent a certified letter to this writer and the treatment team to reply with approval of his dog "foxy" to volunteer on the forensic campus as an assisted therapy animal. This writer informed Matthew that the team has approved and supports his request for animal-assisted therapy, however, creating a program and approving the animal is up to administration. He insisted that the team submit an answer either way and had 3 weeks to reply to his demand or it would be considered a "denial". This writer informed him again that the team does not coordinate a program or approve the animals and would be up to administration. This writer informed him I would check in with the rehab director, legal, and administration for an update.

A/P: This writer will email a copy of the certified letter to legal and administration to clarify the response needed from the treatment team.

---

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

**EXHIBIT J**

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

**Governing Body (Open Meeting) Minutes**
**Friday March 25, 2022 10:00 a.m. - 12:00 p.m.**
**D-198/Google Meet**

| | |
|---|---|
| ***Voting Members Present:***<br>ADHS Interim Director – Don Harrington – via phone<br>Chief Executive Officer – Aaron Bowen, Psy.D. - via phone<br>Chief Medical Officer – Kate Woods, DO – via phone<br>Chief Finance Officer – Ryan Rodney, CPA - via Phone<br>Mental Health Professional – Cheryl Karp, Ph.D. - via Phone<br>Medical Staff Member – Stephen Jaffe, M.D. - via Phone<br>Family Member of Service Recipient – Sue Davis - via Phone<br>Legal System Advocate – Emily Jenkins | ***Non-voting Members Present:***<br>Chief Nursing Officer – Nancy Regan, RN, CNO,<br>Chief Operating Officer – Mike Sheldon, MPA<br>Chief Compliance Officer – Margaret McLaughlin, M.S.<br>Human Resources Assistant Chief – Levada Coker<br>Executive Staff Assistant – Annie Avadisian |
| **Voting Absent Members:**<br>Consumer Advocate – Sue Gilbertson | **Non-Voting Members Absent:**<br>Chief Quality Officer – Lisa Wynn, B.S.<br>Chief Security Officer - William Bugbee |
| **ADHS Guests and Members of the Public:**<br>Lauri Goldstein - IOC Chair - Via phone | |
| Approved: [signature] | 5-20-22<br>Date |

| Item | Discussion | Decision/Recommendation | Person Responsible for Follow Up |
|---|---|---|---|
| Call to Order | Meeting Chair Dr. Bowen called the Governing Body (GB) meeting to order at 10:03 a.m. and announced that Eight of the Nine members present constituted a quorum to conduct business. | Call to order | |
| Introduction | Dr. Bowen introduced new GB Member Emily Jenkin<br>Dr. Bowen informed the GB members that Mike Sheldon is the Deputy CEO and Shanda Payne is the new COO. | | |
| Approval of Minutes: | The Governing Body (GB) reviewed January 28, 2022, GB Meeting Minutes as presented in the Meeting Packet. | Sue Davis moved and Ryan Rodney seconded the Motion to approve the January 28, 2022 meeting minutes. The Motion carried. | |
| **Chief Executive Officer Report: Dr. Bowen, CEO** | **Dr. Bowen presented the CEO report:**<br><br>**Census Information:**<br>The Hospital licensed and funded beds at the Hospital are still **260** (117 on the Civil Campus & 143 on the Forensic Campus). The *"Average Daily Census Report"* is attached to this report (**Attachment 1**); this report is run on the 25th of each month and shows the data for the preceding month. The combined census on the day this report was created was 224; 104 patients in the Civil Hospital and 120 in the Forensic Hospital. The overall census has been above 220 since the last Governing Body meeting two months ago; the increase is due to an increased number of civil patients being admitted (we had 98 at the time of the last meeting and now we have 104). Demographic information for the Civil and Forensic patients is provided in **Attachment 2.**<br><br>**Hospital Wide Updates Not Covered in Other Reports:**<br>**COVID-19:** Governing Body members have been receiving weekly email updates about COVID and we will discuss the current state of COVID during the meeting. However, it should be noted that the United States | | |

**EXHIBIT K**

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | **Unit:** Cottonwood | | |
| **Plan Date:** 07/01/24 **Plan End Date:** 06/30/25 | **Projected Discharge Date:** 08/01/26 | | |

**Legal Status**

**Legal Status:** Title 13.3994 Guilty Except Insane **Effective Date:** 03/12/20

| **Diagnosis** | |
|---|---|
| **Description:** (F84.0) Autistic spectrum disorder | **Ranking:** Primary |
| **Description:** (F60.2) Antisocial personality disorder | **Ranking:** Secondary |
| **Description:** (E78.1) Hypertriglyceridemia | **Ranking:** Secondary |
| **Description:** (E66.9) Obesity (BMI 30.0-34.9) | **Ranking:** Secondary |
| **Description:** (Z91.199) Medical non-compliance | **Ranking:** Secondary |
| **Description:** (F60.81) Narcissistic personality disorder | **Ranking:** Tertiary |
| **Description:** (F63.3) Trichotillomania | **Ranking:** No Entry |

**Reason for Admission:**

Mr. Matthew Solan (DOB: 07/17/1989) was admitted to the Arizona State Hospital on 04/01/2020, after being adjudicated Guilty except Insane (GEI) for one count of Aggravated Assault (a Class 3 Felony) with a presumptive sentence of 7.5 years (expiration date: 08/1/2026). Per reports, Mr. Solan threatened to kill his caretaker and his caretaker's family, after the caretaker refused to drive Mr. Solan from Arizona to Massachusetts and Florida. Per reports, Mr. Solan had plans to travel to Massachusetts to harm his parents, who reside in Massachusetts, and then go to Disney World in Florida with his service animal. Mr. Solan reportedly placed a gun to his caretaker's head, and physically grabbed his caretaker's arm, when the caretaker attempted to leave. After the incident was reported to the Coconino County Sheriff's Office, Officers attempted to apprehend Mr. Solan during a high-risk traffic stop. Per repor Mr. Solan remained in the passenger seat of the car, while the two other passengers obeyed officers' directive to exit the vehicle. Per reports, Mr. Solan made various suicidal remarks, and a multi-hour standoff with Mr. Solan ensued. During the standoff, Mr. Solan reportedly held a handgun under his chin in an upward motion. Mr. Solan reports that h eventually shot himself in the left leg, before exiting the vehicle.

Reports confirm Mr. Solan was on probation at the time of his index offense. Reports also indicate that Mr. Solan had three other felony convictions preceding this offense. Mr. Solan has reportedly been ordered for two years of standard probation, upon release from the Arizona Department of Corrects and the AzSH, for a Theft of Means of Transportatic (a Class 5 Felony) charge.

**Patient Strengths:**

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 07/01/24 | **Plan End Date:** 06/30/25 | **Projected Discharge Date:** 08/01/26 | | |

Strengths: Has a trained service dog, Intelligent, good historian, articulate, creative, inquisitive, studious, insight of his triggers, excellent advocate for himself, knowledgeable about previous treatment and legalities, parents are a long-ter financial support, has a caretaker, hold a GED and some college credit in design, interactive media, and 3D animatior and wants to continue learning about law and continue his higher education, holds interest in computer science, digita arts, homesteading.

**Discharge Barriers/Treatment Barriers/Risk Factors:**

History of not complying with supervised probation, Limited engagement with community resources, Historical difficulties separating his delusions from reality, History of impulsive and reckless behavior, Three other felony convictions preceding index offense, Preoccupation with litigious actions.

**Discharge Goals:**

Patient discharge plans ultimately remain under the jurisdiction of the Superior Court. All factors impacting patient's potential for discharge include compliance with hospital expectations and engaging in GEI programming.

**After Care Plan:**

Upon discharge, patient will likely benefit from a 24 hour supervised placement, before transitioning to a less-restricti options of care. This is due to patient history of limited compliance to medication regimen or advised structural programming, such as probation, when in the community. It should also be noted that Mr. Solan would likely benefit from intensive case management with routine medication management/monitoring available, rehab programming, therapy, vocational programming and education programming related to his mental illness. Mr. Solan's aftercare plan subject to change based on his progression through the GEI Program and needs at the time of discharge.

**Cultural/Spiritual Preferences Relative to Treatment:**

Patient provided written documentation to update his cultural preferences on 2.5.2021 to the following, "Patient identifies as a Scientologist and Christian Scientist; Inasmuch, institutional psychiatry is a repugnant to patient's spiritual beliefs. Additionally, patient has limited training in naturopathic medicine and prefers naturopathic remedies over the patent medicines wherever drugs are indicated."

**Identified Natural Supports for the Patient:**

Patient notes that he is financially supported by his family that supports his living expenses. Patient expressed he is an "allodial proprietor and business owner in Williams, Arizona and has a full time, concierge/chauffeur/caretaker who manages patient's propriety and will take care of patient upon discharge. Patient identifies his service dog Foxy as his primary support."

**Stable Medical Conditions Currently Being Monitored at this Time:**

History of hypertriglyceridemia, migraine, ongoing health maintenance

***See Nursing Care Plan for all acute care that requires treatment for less than 30 days.***

## Psychiatric Issue

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES
ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 07/01/24 | **Plan End Date:** 06/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Psychiatric Issue ...(CONTINUED)...

### Long Term Goal

Matthew will verbalize 3
triggers related to PTSD and how he coped with each trigger.

| | | | |
|---|---|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 07/01/24 | **Target Date:** 07/01/25 | **Status:** Revised | **Date Closed:** |

### Short Term Goal

Matthew with work with his
treatment team in identifying treatment recommendations that are appropriate and obtainable.

| | | | |
|---|---|---|---|
| **Is This Part of a Behavior Plan?** | No | | |
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 07/01/24 | **Target Date:** 10/31/24 | **Status:** Revised | **Date Closed:** |

### Intervention

Matthew may have access to
animal services therapy, when it is available at ASH. It is not a current service offered within ASH. However, his treatment team is currently looking into services that would be obtainable.

| | | | |
|---|---|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 07/01/24 | **Target Date:** 10/31/24 | **Status:** Revised | **Date Closed:** |

### Intervention

The Primary nurse will meet with Matthew at least once a month to assess his mental status and provide education on medications.

| | | | |
|---|---|---|---|
| **Responsible Staff** | Soliz,Aqualina (Primary) or assigned Nursing Staff | | |
| **Date Opened:** 03/21/22 | **Target Date:** 10/31/24 | **Status:** Continued | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

**EXHIBIT L**

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Progress Notes

Report Dates: 04/20/20 to 07/15/25

**Patient Name:** SOLAN,MATTHEW **ID:** 35310 **Episode:** 1 **D.O.B.:** 07/17/89
**Age:** 36 **Sex:** Male **Admission Date:** 04/01/20

**Written By:** Kindra Ochoa - MSN, APRN, PMHNP-BC
**Note Type:** Psychiatric Monthly Medication Review

**Written On:** 06/27/24
**Note Time:** 04:12 PM

**Progress Note For:** New Service

**Group/Individual Interventions:** Individual

**Service Description:** ENCOUNTER (**ENC**)

**Service Date:** 06/27/24
**Service Duration:** 60

**Service Program:** Forensic Rehabilitation
**Practitioner:** OCHOA,KINDRA
**Independent Note Date:**

**Goal/Intervention that is Addressed in Progress Note**
Problems-> Psychiatric Issue
Long Term Goal(s)-> Matthew will be in sustained remission in his psychiatric symptoms related to Autistic Spectrum Disorder, Mixed Personality Disorder With Narcissistic and Antisocial Features, Trichotillomania, and Unspecified Mood Disorder.
Short Term Goal(s)-> Matthew will accept recommended treatment and participate in routine evaluations.

**Progress Note**

Matthew was seen today by his treatment team for his ITDP. AzSH attorney; Erin and Matthews attorney; Holly joined virtually. Matthew and this writer will be changing his Long-term goal, Matthew feels that even if the goal is unrealistic or unobtainable it should be listed in his ITDP as it's what "he needs". The team discussed ensuring that he is successful in meeting his goals, as that the goals should be written as such. Matthew's biggest concern is for his environment and the factors that negatively impact his ASD diagnosis. He suggested that the entire building be re-made, this writer and team reminded him again that that is not an obtainable goal and out of the capability for the team to change. Matthew was asked to reflect on the factors within his environment that realistically could change. Matthew stated 4 things in particular and listed them as such: 1. Additional soundproofing for the unit as the loudness is a sensory issue and "triggers him", 2. Requests a white noise generator or wireless headphones for the TV (wireless headphones have Bluetooth capabilities which is considered contraband), 3. 1:1 group, 4. Targeting the auto-immune variant that triggers his ASD. Matthew discusses trauma therapy and how he would like to start that again as his PTSD has been "left untreated and none of the treatment teams have done anything about it". Matthew reports that all of his coping skills have been destroyed due to his environment and he has been forced to be "rude and inappropriate at times to staff". His rationale for being inappropriate and threatening staff is that we do not provide him with the right environment, we are legally required to do so by the ADA, and not providing him with the right environment, forces him to act how he acts, and that it therefore all of our fault. Matthew demands that his intervention regarding animal therapy services be changed as its ordered by a judge to have it added to his ITDP. Matthew is offered a scheduled time and date to meet with members of his team to continue to modify his treatment team to ensure that he is successful, he is open to this as long as it's later in the day when he is not sleeping. Matthew states that he will not comply with any of his medical goals, he doesn't even know why medical goals are on a behavioral plan and feels it's unnecessary. At the end of the meeting, Matthew's lawyer Holly speaks and doesn't understand how AzSH cannot provide him with the service she is "ordered to receive". Holly states that upon his sentencing the judge ordered that AzSH shall provide treatment for his

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Progress Notes

Report Dates: 04/20/20 to 07/15/25

**Patient Name:** SOLAN,MATTHEW **ID:** 35310 **Episode:** 1 **D.O.B.:** 07/17/89
**Age:** 36 **Sex:** Male **Admission Date:** 04/01/20

diagnosis and that AzSH has not done that he is worse!" she states that "she doesn't understand how we cannot offer the things that he needs" and that its "so simple" and that its "not rocket science". Holly continued to discuss legal issues and matters that were inappropriate for the treatment team meeting and out of scope. Holly was re-directed to discuss legal matters with AzSH attorney, and the meeting had gone 45 minutes over and needed to come to an end. Holly stated that something needed to be done or the hospital needed to make a referral for a facility that could provide appropriate services. Matthew stated that Holly had not filed for conditional release as he does "not want to spend $15,000 for the hospital to show up and fight against him". He states "Yeah I could probably win and get a conditional release, but it would cost me a fortune". He states that the treatment team would say he is DTO and argue against him and that if the treatment team would agree that he is not DTO, then he would ask her to file a conditional release". This writer asked him if he felt that he was not a DTO, he has the right to hire an independent evaluator for a risk assessment, and he stated that they were too expensive. He asked this writer what my decision would be regarding DTO, this writer stated that his behaviors when threatening staff and pouring hot coffee into their face suggest otherwise. He admits that his behaviors have been inappropriate, however, his intent and following should be taken into consideration. Matthew denies AVH, denies DTO/DTS/AWOL behaviors. Matthew agreed to the changes recommended to this providers short term and long term goal, but did not agree with his treatment plan.
Labs:
Refuses UDS, no recent labs ordered
Diagnoses:
Autistic Spectrum Disorder
Mixed Personality Disorder With Narcissistic and Antisocial Features
Trichotillomania
Unspecified Mood Disorder
PTSD
DTS Risk:
High - recent head-banging behaviors
DTO Risk:
High - recent DTO verbal threats to kill anyone who touches his belongings, recent threats to staff on the unit, and recently attempted to punch a nurse through the medication window. Threatened to kill a nurse and her children if he couldn't use the meeting room immediately to make a legal call when the treatment team was meeting with patients.
AWOL Risk:
Moderate in hospital - saying he shouldn't be here but has not attempted to AWOL.
Plan-
Will continue to attempt to meet with Matthew to review his ITDP
Will discuss therapy options with Matthew
Will schedule times to meet with Matthew and make additional recommendations for changes to his ITDP.

**Is Patient on Two or More Antipsychotics?** No

**Were Any New Medications Started?** No

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

# ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

## Progress Notes

Report Dates: 04/20/20 to 07/15/25

**Patient Name:** SOLAN,MATTHEW **ID:** 35310 **Episode:** 1 **D.O.B.:** 07/17/89
**Age:** 36 **Sex:** Male **Admission Date:** 04/01/20

**Written By:** Fatima Samuel - RN
**Note Type:** Nurse
**Written On:** 06/28/25
**Note Time:** 08:27 PM

**Progress Note For:** New Service

**Group/Individual Interventions:** Individual

**Service Description:** ENCOUNTER (**ENC**)

**Service Date:** 06/28/25
**Service Duration:** 4

**Service Program:** Forensic Rehabilitation
**Practitioner:** SAMUEL,FATIMA
**Independent Note Date:**

**Progress Note**

Patient Mathew was seen with bilateral cuts on his hands and one on the hand was carved written foxy. He also had cuts on his legs that did not appear to be fresh or actively bleeding. I asked him how it happened and he said he " carved Foxy's name." He denied pain, 0/10 on the FACES pain scale when assessed. Matthew reported that one cut was from yesterday and another was two days ago.
He said he used the room identification card(s) (room numbers engraved on them) to cut himself and are known to be sharp. This writer informed the hospital supervisor (PNC) and the OD, On call Doctor informed telephonically. So the hospital supervisor (PNC) ordered security to search his room. The security came and searched all the unit and his room for one missing room identification placard but Matthew stated he threw it in the trash when it was not located. On call Doctor ordered for Sterilize patient room with no new orders.
All Matthew's possessions were taken out and kept in the nurses station. Mattew would not give a few of the electronic things and one of his stuffed toys . Code Gray was called in 1833 for Mattew .So Mattew gave all the electronic goods but still he wanted to keep the stuffed toy. Doctor was called again so he gave the permission to keep it. Code gray was cleared in 1851. Matthew remains on COS/LOS for DTO/DTS per provider order.

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

**EXHIBIT M**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,

Plaintiff,

vs.

The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,

Defendants.

Case No: CV24-02061-JJT-DMF

**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT AARON BOWEN**

Defendant Aaron Bowen, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Aaron Bowen as follows.

**Interrogatory Number 1:** At the time you issued the Particularized Assessment Letter, what was the assessed duration and severity of the purported risk that the [sic] you relied on to conclude that Plaintiff was at risk of having sexual relations with Foxy I, if she were admitted to live at ASH with Plaintiff as his service animal under the ADA?

**ANSWER: Bowen was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, it is Solan's statements, recorded in treatment notes, progress notes, and incident reports, that indicate there is a risk that he would engage in sexual conduct with Foxy if provided the chance to do so. See also DF588-DF595.**

**Interrogatory Number 2:** When you determined that ASH could not accommodate Foxy I, what reasonable modifications to ASH's policies practices, or procedures, or provision of auxiliary aids or services did the [sic] you consider to mitigate the purported risk of abuse to Foxy I by the Plaintiff, at the time the Particularized Assessment Letter, that the [sic] you determined would be inadequate to effectively mitigate such risk, and on what basis did the [sic] you determine such modifications, aids, or services would be inadequate to mitigate the purported risk?

**ANSWER: Bowen objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that he determined whether to accommodate a dog or not. Bowen, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 3:** What current medical or other objective evidence was reviewed, prior to issuing the Particularized Assessment Letter, to determine the nature, duration, and severity of the purported risk that the Plaintiff would have sexual relations with Foxy I if she were admitted to ASH, the probability that such sexual contact would actually occur, and whether and what reasonable modifications of policies practices, or procedures or the provision of auxiliary aids or services might mitigate any risk of abuse?

**ANSWER: Bowen was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that**

**Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through the ASH's exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 4:** When the [sic] you determined that accommodating Foxy I would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications or policies practices, or procedures, or auxiliary aids or services did the [sic] you consider as possible means of mitigating the purported fundamental alteration, and how, and on what basis did the [sic] you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary aids or services?

**ANSWER: Bowen objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that he determined whether to accommodate a dog or not. Bowen, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 5:** Describe all information and Records you provided to ASH's current CEO, Michael R. Sheldon pertaining to Plaintiff, Foxy I, and/or Foxy II, and the approximate dates on which the information and/or Records were so conveyed.

**ANSWER: Defendant Sheldon was on the administration team before he became the ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to Solan and his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowen's computer drive and all the files it contained.**

**Interrogatory Number 6:** On what dates did the Plaintiff engage in Animal Assisted Therapy or Animal Assisted Activities at ASH, and what was the therapeutic outcome for the Plaintiff in each of those animal-human interactions? Describe the animal(s) with whom the therapy and/or activities were conducted, and the level of contact the Plaintiff had with such animal(s).

**ANSWER: Bowen lacks the information or knowledge necessary to respond to this interrogatory. As far as a further response is required, Bowen does not believe Solan participated in animal assisted therapy or animal assisted activities at the ASH while Bowen was CEO.**

**Interrogatory Number 7:** On what basis did you determine that accommodating a food visit, animal therapy session, or other visitation between Plaintiff and Foxy I would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation by which you could lawfully deny Plaintiff's request to have a food visit with Foxy I?

**ANSWER: Animals are not allowed to visit patients at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH.**

**Interrogatory Number 8:** When you made the decision to exclude Foxy I from ASH, what direct threat did you determine Foxy I specifically, as opposed to service dogs generically, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion?

**ANSWER: Th**

**Solan's statements indicating a risk that he would commit animal abuse. Please see DF146-DF149 and DF588-DF595.**

**Interrogatory Number 9:** How many empty beds, and how many and [sic] single-patient bedrooms were there at ASH's Community Reintegration Unit in April of 2022?

**ANSWER: Bowen objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Bowen lacks information or knowledge to answer this interrogatory. Subject to these objections, Bowen states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

**Interrogatory Number 10:** Approximately how many hours a day did patients at ASH's Community Reintegration Unit have access to the secured outdoor area surrounding the Community Reintegration Unit building with, and without a staff escort, in April of 2022?

**ANSWER: Bowen objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Bowen lacks information or knowledge to answer this interrogatory. Subject to these objections, Bowen states that patients must receive Court approval before they can be housed on ASH's CRU. Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

# VERIFICATION

I, Aaron Bowen, hereby declare under penalty of perjury that I am a Defendant and a former employee of the State of Arizona Department of Health Services, that I have reviewed Defendant Aaron Bowen's Answers to Plaintiff Matthew Solan's First Set of Interrogatories to Defendant Aaron Bowen mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

01/20/2026

Date

Aaron Bowen

**EXHIBIT N**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,

Plaintiff,

vs.

The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,

Defendants.

Case No: CV24-02061-JJT-DMF

**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MICHAEL R. SHELDON**

Defendant Michael R. Sheldon, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Michael R. Sheldon as follows.

**Interrogatory Number 1:** At the time the Denial Letter was issued on July 5, 2024, what was the assessed duration and severity of the purported risk that the ASH Administration relied on to conclude that Plaintiff was at risk of having sexual relations

with Foxy II, if she were admitted to live at ASH with Plaintiff as his service animal under the ADA?

**ANSWER: The ASH was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, it is Solan's statements, recorded in treatment notes, progress notes, and incident reports that indicate there is a risk that he would engage in sexual conduct with Foxy if provided the chance to do so. See DF 441-DF482 and DF588-D595.**

**Interrogatory Number 2:** What reasonable modifications to ASH's policies practices, or procedures, or provision of auxiliary aids or services did the ASH Administration consider to mitigate the purported risk of abuse to Foxy II by Plaintiff, at the time the Denial Letter was issued on July 5, 2024, that the ASH Administration determined would be inadequate to effectively mitigate such risk, and on what basis did the ASH Administration determine such modifications, aids, or services would be inadequate to mitigate the purported risk?

**ANSWER: The ASH determined it could not admit Foxy and provided the reasons for that in its Denial Letter. See DF2626. The ASH was not required to conduct a separate assessment to determine potential modifications of ASH's policies to mitigate the risk that Solan would abuse his dog, Foxy, when the risk was completely mitigated through ASH's justified exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 3:** What current medical or other objective evidence was reviewed between June 12, 2024 and July 6, 2024 to determine the nature, duration, and severity of the purported risk that the Plaintiff would have sexual relations with Foxy II if she were admitted to ASH, the probability that such sexual contact would actually occur, and whether and what reasonable modifications of policies practices, or procedures or the provision of auxiliary aids or services might mitigate any risk of abuse?

**ANSWER: Sheldon was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through the ASH's exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 4:** When the ASH Administration determined that accommodating Foxy II would result in a fundamental alteration to the nature of the services provided at ASH, what reasonable modifications or policies practices, or procedures, or auxiliary aids or services did the ASH Administration consider as possible means of mitigating the purported fundamental alteration, and how, and on what basis, did the ASH Administration determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary aids or services?

**ANSWER: Sheldon objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that the ASH determined whether to accommodate a dog or not. Sheldon, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 5:** What is and was the nature, extent, and certification status of training in the treatment and/or habilitation of Autism Spectrum Disorder possessed by each of the members of the Plaintiff's treatment team, as it is currently composed, and as it was composed on July 5, 2024?

**ANSWER: Solan's current treatment team, consisting of: Jonathan Frank, Psychiatric Provider; Jelome Carlos, Social Work; Joseph McKellar, Rehabilitation; Shelia Holmes, Medical Provider; Jasmine Bills, Nursing; and Marcet Roberts, Nursing, is fully capable and qualified to treat his Autism. Each of**

**the individuals listed have received extensive education and training to provide treatment for patient's needs, including the needs of patient's with Autism.**

**Interrogatory Number 6:** On what dates did the Plaintiff engage in Animal Assisted Therapy or Animal Assisted Activities at ASH, and what was the therapeutic outcome for the Plaintiff in each of those animal-human interactions? Describe the animal(s) with whom the therapy and/or activities were conducted, and the level of contact the Plaintiff had with such animal(s).

**ANSWER: The ASH does not provide animal assisted therapy. It is believed that Solan has participated in animal assisted activity sometime between 2022 and 2023. Animal assisted activity, as provided between 2022 and 2023, consisted of a registered community volunteer and her dog sporadically visiting with patients. These visits only lasted a short amount of time and patients were not allowed to be alone with either the community volunteer or her dog. Sheldon lacks the personal knowledge necessary to answer when Solan may have participated in animal assisted activities.**

**Interrogatory Number 7:** On what basis did you determine that accommodating a food visit between the Plaintiff, his attorney, Foxy II, and Foxy II's caretaker would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation by which you could lawfully deny Plaintiff's request to have a food visit with Foxy II?

**ANSWER: Animals are not allowed to visit patients at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH.**

**Interrogatory Number 8:** When the ASH Administration made the decision to exclude Foxy II from ASH, what direct threat did the ASH Administration determine Foxy II specifically, as opposed to service dogs generically, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion?

**ANSWER: The ASH was not required to identify a direct threat that Solan's dog, Foxy, would pose. The ASH excluded Foxy because: (1) Even if Foxy qualified as a service animal, she is not medically necessary; (2) Even if Foxy qualified as a service animal, she would be required to be on a tether and that would be a ligature risk not allowed at the ASH; (3) Even if Foxy qualified as a service animal, Solan could not be solely responsible for her and would require significant support from ASH staff; (4) Even if Foxy qualified as a service animal, admitting her would fundamentally alter the nature of the ASH; and (5) ASH cannot ignore Solan's statements indicating a risk that he would commit animal abuse. Please see DF146-DF162, DF441-DF482, DF588-DF595.**

**Interrogatory Number 9:** How many empty beds, and how many and [sic] single-patient bedrooms are there at ASH's Community Reintegration Unit presently, and how many empty beds, and how many and [sic] single-patient bedrooms were there at ASH's Community Reintegration Unit there [sic] on July 5, 2024?

**ANSWER: Sheldon objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Sheldon lacks information or knowledge to answer this interrogatory. Subject to these objections, Sheldon states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

**Interrogatory Number 10:** Approximately how many hours a day do patients at ASH's Community Reintegration Unit have access to the secured outdoor area surrounding the Community Reintegration Unit building with, and without a staff escort?

**ANSWER: Sheldon objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Sheldon lacks personal knowledge sufficient**

**to answer this interrogatory. Subject to these objections, Sheldon states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

## VERIFICATION

I, Michael R. Sheldon, hereby declare under penalty of perjury that I am a Defendant and the Chief Executive Officer for the State of Arizona Department of Health Services and am authorized to make this verification, that I have reviewed Defendant Michael R. Sheldon's Answers to Plaintiff Matthew Solan's First Set of Interrogatories to Defendant Michael R. Sheldon mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

January 20, 2026
Date

By ______________________
Michael R. Sheldon

**EXHIBIT O**

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

TEXT REVISION

# DSM-5-TR™

AMERICAN PSYCHIATRIC ASSOCIATION

# Neurodevelopmental Disorders

The neurodevelopmental disorders are a group of conditions with onset in the developmental period. The disorders typically manifest early in development, often before the child enters school, and are characterized by developmental deficits or differences in brain processes that produce impairments of personal, social, academic, or occupational functioning. The range of developmental deficits or differences varies from very specific limitations of learning or control of executive functions to global impairments of social skills or intellectual ability. Once thought to be categorically defined, more recent dimensional approaches to measurement of the symptoms demonstrate a range of severity, often without a very clear boundary with typical development. Diagnosis of a disorder thus requires the presence of both symptoms and impaired function.

The neurodevelopmental disorders frequently co-occur with one another; for example, individuals with autism spectrum disorder often have intellectual developmental disorder (intellectual disability), and many children with attention-deficit/hyperactivity disorder (ADHD) also have a specific learning disorder. The neurodevelopmental disorders also frequently co-occur with other mental and behavioral disorders with onset in childhood (e.g., communication disorders and autism spectrum disorder may be associated with anxiety disorders; ADHD with oppositional defiant disorder; tics with obsessive-compulsive disorder). For some neurodevelopmental disorders, the clinical presentation includes behaviors that are more frequent or intense when compared with those of normal children of the same developmental age and gender, as well as deficits and delays in achieving expected milestones. For example, autism spectrum disorder is diagnosed only when the characteristic deficits of social communication are accompanied by excessively repetitive behaviors, restricted interests, and insistence on sameness.

Intellectual developmental disorder is characterized by deficits in general mental abilities, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience. The deficits result in impairments of adaptive functioning, such that the individual fails to meet standards of personal independence and social responsibility in one or more aspects of daily life, including communication, social participation, academic or occupational functioning, and personal independence at home or in community settings. Global developmental delay, as its name implies, is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning. The diagnosis is used for individuals younger than 5 years who are unable to undergo systematic assessments of intellectual functioning, and thus the clinical severity level cannot be reliably assessed. Intellectual developmental disorder may result from an acquired insult during the developmental period from, for example, a severe head injury, in which case a neurocognitive disorder also may be diagnosed.

The communication disorders include language disorder, speech sound disorder, social

(pragmatic) communication disorder, and childhood-onset fluency disorder (stuttering). The first three disorders are characterized by deficits in the development and use of language, speech, and social communication, respectively. Social communication disorder is characterized by deficits in both verbal and nonverbal communication skills that result in



social impairment and are not better explained by low abilities in structural language, intellectual developmental disorder, or autism spectrum disorder. Childhood-onset fluency disorder is characterized by disturbances of the normal fluency and motor production of speech, including repetitive sounds or syllables, prolongation of consonants or vowel sounds, broken words, blocking, or words produced with an excess of physical tension. Like other neurodevelopmental disorders, communication disorders begin early in life and may produce lifelong functional impairments.

Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities. Because symptoms change with development and may be masked by compensatory mechanisms, the diagnostic criteria may be met based on historical information, although the current presentation must cause significant impairment.

Within the diagnosis of autism spectrum disorder, individual clinical characteristics are noted through the use of specifiers (with or without accompanying intellectual impairment; with or without accompanying structural language impairment; associated with a known genetic or other medical condition or environmental factor; associated with a neurodevelopmental, mental, or behavioral problem), as well as specifiers that describe the severity of autistic symptoms. These specifiers provide clinicians with an opportunity to individualize the diagnosis and communicate a richer clinical description of the affected individuals. For example, many individuals previously diagnosed with Asperger's disorder would now receive a diagnosis of autism spectrum disorder without language or intellectual impairment.

ADHD is a neurodevelopmental disorder defined by impairing levels of inattention, disorganization, and/or hyperactivity-impulsivity. Inattention and disorganization entail inability to stay on task, seeming not to listen, and losing materials necessary for tasks, at levels that are inconsistent with age or developmental level. Hyperactivity-impulsivity entails overactivity, fidgeting, inability to stay seated, intruding into other people's activities, and inability to wait—symptoms that are excessive for age or developmental level. In childhood, ADHD frequently overlaps with disorders that are often considered to be "externalizing disorders," such as oppositional defiant disorder and conduct disorder. ADHD often persists into adulthood, with resultant impairments of social, academic, and occupational functioning.

Specific learning disorder, as the name implies, is diagnosed when there are specific deficits in an individual's ability to perceive or process information for learning academic skills efficiently and accurately. This neurodevelopmental disorder first manifests during the years of formal schooling and is characterized by persistent and impairing difficulties with learning foundational academic skills in reading, writing, and/or math. The individual's performance of

Engaging in transvestic behaviors can interfere with, or detract from, heterosexual relationships. This can be a source of distress to men who wish to maintain conventional marriages or romantic partnerships with women.

## Differential Diagnosis

**Transvestism.** Individuals with transvestism experience recurrent and intense sexual arousal from cross-dressing. Unless the fantasies, sexual urges, or behaviors involving cross-dressing are accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning, a diagnosis of transvestic disorder is not warranted.

**Fetishistic disorder.** This disorder may resemble transvestic disorder, in particular, in men with fetishism who put on women's undergarments while masturbating with them. Distinguishing transvestic disorder depends on the individual's specific thoughts during such activity (e.g., are there any ideas of being a woman, being like a woman, or being dressed as a woman?) and on the presence of other fetishes (e.g., soft, silky fabrics, whether these are used for garments or for something else).

**Gender dysphoria.** Individuals with transvestic disorder do not report an incongruence between their experienced gender and their assigned gender or a desire to be of the other gender; and they typically do not have a history of childhood cross-gender behaviors, which would be present in individuals with gender dysphoria. Individuals with a presentation that meets full criteria for transvestic disorder as well as gender dysphoria should be given both diagnoses.

## Comorbidity

Transvestic disorder is often found in association with other paraphilias. The most frequently co-occurring paraphilias are fetishistic sexual interests or behavior and masochistic sexual interests or behavior. One particularly dangerous form of masochistic sexual interests or behavior, *autoerotic asphyxia,* is associated with transvestic sexual interests or behavior in a substantial proportion of fatal cases.



# Other Specified Paraphilic Disorder

**F65.89**

This category applies to presentations in which symptoms characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the paraphilic disorders diagnostic class. The other specified paraphilic disorder category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific paraphilic disorder. This is done by recording "other specified paraphilic disorder" followed by the specific reason (e.g., "zoophilia").

Examples of presentations that can be specified using the "other specified" designation include, but are not limited to, recurrent and intense sexual arousal involving *telephone scatologia* (obscene phone calls), *necrophilia* (corpses), *zoophilia* (animals), *coprophilia* (feces), *klismaphilia* (enemas), or *urophilia* (urine) that has been present for at least 6 months and causes marked distress or impairment in social, occupational, or other important areas of functioning. Other specified paraphilic disorder can be specified as in remission and/or as occurring in a controlled environment.

## Unspecified Paraphilic Disorder

**F65.9**

This category applies to presentations in which symptoms characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the paraphilic disorders diagnostic class. The unspecified paraphilic disorder category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for a specific paraphilic disorder, and includes presentations in which there is insufficient information to make a more specific diagnosis.

**EXHIBIT P**



# OVERWHELMED

## Autistic patients say they are not receiving accommodations at the Arizona State Hospital

Illustrations by Theo Grace Guest
Story by Athena Ankrah and Amy Silverman

KJZZ is part of the Mental Health Parity Collaborative, a group of newsrooms that are covering stories on mental health care access and inequities in the U.S. The partners on this project include The Carter Center and newsrooms in select states across the country.

Theo Grace Quest (@theoquest.jpg) is an illustrator, comic artist and graphic designer.

Athena Ankrah is Assistant Producer of KJZZ's The Show; learn more at AthenaAnkrah.weebly.com

Michel Marizco is Fronteras Desk Senior Editor for KJZZ.

Amy Silverman is Executive Producer of KJZZ's The Show; you can learn more about her work at amy-silverman.com


MATT SOLAN IS A PATIENT AT ARIZONA STATE HOSPITAL.
THE HOSPITAL, OFTEN NICKNAMED ASH, PROVIDES CARE FOR PEOPLE WITH SERIOUS MENTAL ILLNESSES.
CELEBRITY THEATER
SKY HARBOR
ASH
PIERCE
THERE ARE TWO WAYS TO END UP AT ASH:
IF YOU COMMIT A CRIME AND ARE FOUND "GUILTY BUT INSANE" YOU'LL GO TO THE FORENSIC UNIT.
IF YOU ARE VERY ILL BUT HAVE NOT BEEN FOUND GUILTY OF A CRIME, YOU'LL GO TO THE CIVIL UNIT.
Forensic Hospital
Civil Treatment
MATT HAS BEEN IN THE FORENSIC UNIT SINCE 2020. HE HAS BEEN DIAGNOSED WITH AUTISM AND TWO PERSONALITY DISORDERS.
MATT TOLD US THAT HE IS NOT GETTING GOOD CARE.



MEDICAL PROFESSIONALS OBSERVE THAT SOME PATIENTS HAVE A "DUAL DIAGNOSIS" – SERIOUS MENTAL ILLNESS PLUS AUTISM.
AUTISM
SERIOUS MENTAL ILLNESS
EXAMPLES:
• SCHIZOPHRENIA
• BIPOLAR DISORDER
• SCHIZO-AFFECTIVE DISORDER
AUTISM CAN MEAN MANY THINGS FOR MANY PEOPLE. THAT'S WHY IT'S OFTEN CALLED A SPECTRUM.
FOR MATT, IT MEANS HE'S EASILY OVERSTIMULATED. SOME THINGS THAT HELP HIM:
THERAPY DOGS
BATHS
HEADPHONES
DENIED
ASH HAS NOT LET HIM HAVE A DOG
THEY CUT OFF WATER TO THE BATHTUBS
AND RECENTLY THEY TOOK AWAY HIS HEADPHONES


THE WHOLE PLACE IS MADE OUT OF CINDER BLOCKS. IT'S A GIANT ECHO CHAMBER THAT AMPLIFIES NOISE.
NO MATTER WHERE I GO IN HERE, I CAN'T ESCAPE THE SENSORY OVERSTIMULATION.
I AM OUT OF COPING TOOLS, AND THIS HAS FORCED ME TO SWITCH TO A NOCTURNAL SCHEDULE, TO AVOID ALL OF THE TRIGGERS.
AZ STATE LAW REQUIRES ASH TO PROVIDE AUTISM SERVICES. THEY'VE ADMITTED THEY DO NOT DO THAT.
MIKE SHELDON
CEO of ASH
MATT ISN'T ALONE IN HIS STRUGGLES, HE INTRODUCED US TO OTHER PATIENTS WITH SIMILAR CHALLENGES.
THE STATE REPEATEDLY REFUSED TO GRANT INTERVIEWS OR LET US TAKE A TOUR OF ASH. THEY SENT A STATEMENT YOU CAN READ AT THE END OF THE COMIC.


THE ARIZONA STATE HOSPITAL IS OLDER THAN THE STATE OF ARIZONA.
IT WAS ESTABLISHED IN 1887.
THE ORIGINAL HOSPITAL POPULATION WAS VERY DIFFERENT. OVER THE DECADES, THE QUALITY OF PATIENT CARE HAS VARIED.
DIAGNOSIS: MELANCHOLIA
DIAGNOSIS: SEXUAL PERVERSION
DIAGNOSIS: FEEBLE-MINDED
ASH HAS ALWAYS BEEN SHROUDED IN SECRECY, BUT WE'RE PRETTY SURE* NO JOURNALISTS HAVE BEEN ALLOWED IN SINCE 2019?
* WE ASKED WHEN THE LAST TIME WAS AND DHS DIDN'T ANSWER.


AMY VISITED ONCE IN 1993. SHE RECALLS GOING OUTSIDE INTO THE "YARD" WHERE PATIENTS EXERCISED ON CONCRETE SLABS. THERE WAS CHAIN LINK EVERYWHERE, EVEN OVERHEAD.
LAWYERS, ADVOCATES AND FAMILIES OF PATIENTS SAY:
CONDITIONS AT ASH ARE BAD.
IN 2021, A MAN STOLE SCISSORS FROM A CRAFT WORKSHOP, HID IN A BATHROOM, AND STABBED HIMSELF. HE DIED.
THE SAME YEAR, A MAN SHOVED A BURRITO DOWN HIS THROAT AND CHOKED TO DEATH. A STAFF MEMBER WAS IN THE ROOM.


SOME PEOPLE BELIEVE THE VIOLENCE WOULD DECREASE IF PATIENTS WITH AUTISM WERE GIVEN ACCOMMODATIONS.
SENSORY TOY
CHEWING GUM
WEIGHTED BLANKET
SOMMER WALTER IS ONE OF THOSE PEOPLE. IN 2017, SHE WAS WATCHING THE NEWS WHEN SHE SAW A FAMILIAR FACE.
DARREN?!
HER HALF-BROTHER, DARREN BEACH, HAD BEEN ARRESTED FOR SETTING A FIRE AT THE ONE-N-TEN BUILDING. THEY HAD LOST TOUCH, BUT SOMMER KNEW DARREN WASN'T HOMOPHOBIC.
CAM 3
THE FIRE RELATED TO HIS SCHIZOPHRENIA.
SINCE THEN, DARREN HAS BEEN IN AND OUT OF ASH, JAIL, AND SHELTERS. THE STATE WOULDN'T COMMENT BUT SOMMER TOLD US HIS STORY.


DARREN WAS DIAGNOSED WITH AUTISM AS A KID. HIS SYMPTOMS MAKE THINGS HARD FOR HIM, INCLUDING AT ASH.
CAN I GET SOME HELP?
INSTEAD OF GIVING HIM SERVICES FOR AUTISM, ASH DECIDED HE ISN'T AUTISTIC.
YOU'RE FINE, BE QUIET!
SOMMER ASKED DARREN TO DESCRIBE HIS TIME AT ASH.
IT WAS HUMILIATING.
I THOUGHT I WAS GOING TO GET HELP AND CHANGE MY LIFE. THEY MADE ME FEEL LIKE I WASN'T HUMAN.
THEY DIDN'T LISTEN TO ME WHEN I ASKED FOR HELP. I CALLED ALL THE HOTLINES, FILED GRIEVANCES, BUT NO ONE CARED.
I GOT WORSE. THEY OVERMEDICATED ME, TOOK MY PRIVILEGES AWAY AND I WAS PUNISHED EVEN WHEN I TRIED TO BE GOOD.
DARREN ISN'T SOMMER'S ONLY RELATIVE WITH AUTISM. BOTH OF HER SONS HAVE THE DIAGNOSIS.
RYAN, 18
• SOME LANGUAGE USE
• GENTLE
ETHYN, 20
• NO LANGUAGE USE
• USUALLY GENTLE, CAN BE AGGRESSIVE


YEARS AGO, SOMMER DECIDED SHE'D NEVER CALL THE POLICE WHEN ETHYN GETS VIOLENT.
SHE TAKES MATTERS INTO HER OWN HANDS TO KEEP HIM SAFER.
I CAN SEE THAT YOU'RE FEELING FRUSTRATED. I'M HERE TO HELP!
SAFETY GOGGLES
ETHYN IS A BIG GUY AND HARD TO COMMUNICATE WITH, BUT HE'S VERY LOVING AND SWEET.
HE LIKES TO WATCH SESAME STREET
1, 2, 3!
PLAY WITH TODDLER TOYS
AND PLAY IN THE BACKYARD.
SOMMER WANTS HER FAMILY TO HAVE CARE AND TO BE SAFE.


DARREN IS CURRENTLY AT VALLEYWISE, THE COUNTY HOSPITAL, WHERE THEY PROVIDE SOME ONE-ON-ONE STAFF FOR AUTISTIC PATIENTS.
HE'S ON A WAITLIST FOR HOUSING PLACEMENT, BUT HIS CRIMINAL HISTORY AND BEHAVIORAL ISSUES MAKE THIS COMPLICATED.
SOMMER DOES ADVOCACY WORK, BUT SHE'S NOT SURE IT WILL MAKE A DIFFERENCE.
SHE WORRIES ABOUT WHAT WILL HAPPEN TO RYAN, ETHYN, AND DARREN WHEN SHE DIES.
DARREN BEACH GUARDIANSHIP
PHARMACY RECEIPT:
- INSULIN
- TEST STRIPS
SOMMER PRAYS SHE OUTLIVES ALL THREE OF THEM.
TIME TO CHECK YOUR BLOOD SUGAR, ETHYN.
2:00

# AZDHS STATEMENT

**We asked lots of specific questions about individual patients, general practices and policies. Here's the statement we were provided by the Arizona Department of Health Services, which operates the Arizona State Hospital:**

*Michael Sheldon, CEO of the Arizona State Hospital (ASH) and his staff are dedicated to providing individualized care to achieve the best outcomes for all patients. ASH is licensed, accredited, and certified to provide inpatient services to individuals with a primary psychiatric condition (for example, schizophrenia or bipolar disorder).*

*ASH is able to, and regularly does, accommodate and provide treatment for secondary and tertiary conditions that are not psychiatric in nature, including neurological and developmental conditions; however, as a psychiatric hospital, ASH would not be a recommended treatment setting for someone who did not present with a primary psychiatric condition.*

*To ensure quality care and promote patient recovery, ASH has options for patients who need support in sensory regulation. Quiet rooms, weighted blankets, and noise-cancelling headphones are incorporated into care plans for patients when clinically indicated. We work with a vendor that specializes in equipment that cannot be tampered with or used for self-harm, so staff are able to implement these accommodations for patients quickly and safely.*

*In cases where a person's primary psychiatric condition has been stabilized, and their secondary or tertiary condition has become the primary driver of the patient's behaviors, ASH works within its resources to provide services to meet the individual's needs.*

*ASH works diligently and continuously to improve quality care for our patients. There are many pathways for patients to file grievances with internal and external entities and ASH works promptly to address all patient concerns.*

# RESOURCES

**Link Center** | https://acl.gov/TheLinkCenter
a federal center that focuses on research and information about the dual diagnosis of serious mental illness and intellectual and developmental disabilities

**Association for the Chronically Mentally Ill** | https://acmionline.com
an Arizona-based organization devoted to advocacy around services, support and housing for people with serious mental illness.

**Arizona Mad Moms** | https://arizonamadmoms.com
an Arizona-based organization devoted to advocacy around services, support and housing for people with serious mental illness.

**Autism Society of Greater Phoenix** | https://phxautism.org
a local organization devoted to advocacy related to autism.

**Arizona Independent Oversight Committees** | https://ioc.az.gov
committees created by state law, devoted to monitoring activity at the Arizona State Hospital as well as state services for people with intellectual and developmental disabilities and other vulnerable populations. Membership application is open to the public.

**Arizona Department of Health Services Inspection Reports**
https://www.azdhs.gov/licensing/index.php#azcarecheck
AZCARECHECKS allows you to search inspection reports and enforcement actions regarding everything from childcare facilities to marijuana dispensaries – including long term care facilities for vulnerable populations and medical facilities including the Arizona State Hospital.

**We'd love to hear from you!**
If you have a story you want to share, questions or just want to talk, please reach out to Amy Silverman and Athena Ankrah at KJZZ. You can email us at asilverman@kjzz.org and aankrah@kjzz.org. You can also call or text us at 480-205-1687.



**OVERWHELMED** is a special investigative series on autistic patients at the Arizona State Hospital produced by KJZZ, the National Public Radio member station in Phoenix, Arizona. KJZZ's Athena Ankrah and Amy Silverman spent six months speaking to incarcerated patients inside the hospital, and their families and lawyers outside, in what they described as a secretive and psychologically damaging institution for patients with autism. Silverman and Ankrah also reviewed hundreds of pages of state audits, inspection reports, meeting minutes and medical records, watched legislative testimony and interviewed medical professionals and autism specialists from across the country.

To hear and read other versions of this story, go to *kjzz.org/overwhelmed*.

**EXHIBIT Q**

ARIZONA DEPARTMENT
OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Legal Status

**Legal Status:** Title 13.3994 Guilty Except Insane **Effective Date:** 03/12/20

| **Diagnosis** | |
|---|---|
| **Description:** (F84.0) Autistic spectrum disorder | **Ranking:** Primary |
| **Description:** (F60.2) Antisocial personality disorder | **Ranking:** Secondary |
| **Description:** (E78.1) Hypertriglyceridemia | **Ranking:** Secondary |
| **Description:** (E66.9) Obesity (BMI 30.0-34.9) | **Ranking:** Secondary |
| **Description:** (Z91.199) Medical non-compliance | **Ranking:** Secondary |
| **Description:** (F60.81) Narcissistic personality disorder | **Ranking:** Tertiary |
| **Description:** (F63.3) Trichotillomania | **Ranking:** No Entry |

**Reason for Admission:**

Mr. Matthew Solan (DOB: 07/17/1989) was admitted to the Arizona State Hospital on 04/01/2020, after being adjudicated Guilty except Insane (GEI) for one count of Aggravated Assault (a Class 3 Felony) with a presumptive sentence of 7.5 years (expiration date: 08/1/2026). Per reports, Mr. Solan threatened to kill his caretaker and his caretaker's family, after the caretaker refused to drive Mr. Solan from Arizona to Massachusetts and Florida. Per reports, Mr. Solan had plans to travel to Massachusetts to harm his parents, who reside in Massachusetts, and then go to Disney World in Florida with his service animal. Mr. Solan reportedly placed a gun to his caretaker's head, and physically grabbed his caretaker's arm, when the caretaker attempted to leave. After the incident was reported to the Coconino County Sheriff's Office, Officers attempted to apprehend Mr. Solan during a high-risk traffic stop. Per repor Mr. Solan remained in the passenger seat of the car, while the two other passengers obeyed officers' directive to exit the vehicle. Per reports, Mr. Solan made various suicidal remarks, and a multi-hour standoff with Mr. Solan ensued. During the standoff, Mr. Solan reportedly held a handgun under his chin in an upward motion. Mr. Solan reports that h eventually shot himself in the left leg, before exiting the vehicle.

Reports confirm Mr. Solan was on probation at the time of his index offense. Reports also indicate that Mr. Solan had three other felony convictions preceding this offense. Mr. Solan has reportedly been ordered for two years of standard probation, upon release from the Arizona Department of Corrects and the AzSH, for a Theft of Means of Transportatic (a Class 5 Felony) charge.

**Patient Strengths:**

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

Mr. Solan has a trained service dog. He is intelligent, a good historian, articulate, creative, inquisitive, studious, has insight into his triggers, and is an excellent self-advocate. Mr. Solan reports that he "is learned in the law, has a substantial history of successful pro se litigation, has a large and highly involved legal team". He demonstrates knowledge of previous treatment and relevant legal matters. His parents provide long-term financial support, and he "has full time caretaker with experience working with autistic adults". Mr. Solan holds a GED and "and certificates in graphic design, interactive media, and 3D animation". He has expressed a desire to continue his higher education. According to Mr. Solan, he "wants to continue studying law, machine learning, business, permaculture, and restorative agroforestry." He also states that he "owns homes in 3 states, has a limousine, diesel motor coach, and full time driver". Mr. Solan reports having a "growing food forest and functional homestead in Arizona". He adds that he "is an entrepreneur and successful small business owner".

**Discharge Barriers/Treatment Barriers/Risk Factors:**

History of not complying with supervised probation, Limited engagement with community resources, Historical difficulties separating his delusions from reality, History of impulsive and reckless behavior, Three other felony convictions preceding index offense, Preoccupation with litigious actions.
Patient reports, "ASH is unable to treat the patient's primary condition due to institutional, staffing, and funding limitations".

**Discharge Goals:**

Patient discharge plans ultimately remain under the jurisdiction of the Superior Court. All factors impacting patient's potential for discharge include compliance with hospital expectations and engaging in GEI programming.

**After Care Plan:**

Upon discharge, patient will likely benefit from a 24 hour supervised placement, before transitioning to a less-restrictive options of care. This is due to patient history of limited compliance to medication regimen or advised structural programming, such as probation, when in the community. It should also be noted that Mr. Solan would likely benefit from intensive case management with routine medication management/monitoring available, rehab programming, therapy, vocational programming and education programming related to his mental illness. Mr. Solan's aftercare plan subject to change based on his progression through the GEI Program and needs at the time of discharge.

**Cultural/Spiritual Preferences Relative to Treatment:**

Patient provided written documentation to update his cultural preferences on 8/8/2024 to the following, "Patient is a practicing occultist with an extensive background in metaphysics, western magick, and esoterism. The patient subscribes to the fundamental doctrines of Scientology, Christian Science, and oriental fox magick. The patient is trained in traditional herbal medicine, spagyrics, and entheogenic shamanism, and is radically opposed to western medicine and the use of patent pharmaceutical drugs. The patient contends that statism is a religion and a dangerous cult, and does not subscribe to its tenets."

**Identified Natural Supports for the Patient:**

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

Patient identifies his primary support is "his autism service dog, Foxy". Patient reports having a "legal team that is heavily involved in his treatment and ongoing litigation". Patient reports having a "full time driver who has experience working with autistic adults, and who manages the patient's Arizona homestead while he resides inpatient". Patient also identified his "mother and father" as his "long-term financial supports, and the patient has trust funds set up to financially support him and his service dog."

**Stable Medical Conditions Currently Being Monitored at this Time:**

History of hypertriglyceridemia, migraine, ongoing health maintenance

***See Nursing Care Plan for all acute care that requires treatment for less than 30 days.***

## Psychiatric Issue

### Long Term Goal

Matthews proposed long term goal The treatment team, in conjunction with the patient, his legal counsel, and the hospital administration will determine, in the next 21 days, if the hospital will be able to secure sufficient staff resources and funding to begin treating the patient's Autism Spectrum Disorder in a manner that complies with generally accepted standards of autism care and the patient's unique needs. If the hospital is able to secure sufficient staff and fiscal resources, the hospital and the treatment team will fully implement the remaining goals and services stipulated in this plan no later than November 9, 2024. If the hospital is unable to acquire sufficient staff resources anc funding, or the hospital administration refuses to allocate sufficient staff and/or fiscal resources as needed to treat the patient's Autism Spectrum Disorder, or if the treatment team is otherwise unable to acquire the majority of the service: stipulated in this plan by November 9th, the treatment team will meet with the patient and his legal counsel and assist them in preparing a petition to the Superior Court to either (a) transfer the patient to a private facility specializing the treatment of Autism Spectrum Disorders, or (b) conditionally release the patient to his caretaker, Joseph Cowsert. Matthews requests cannot be fulfilled by this provider as she does not have the ability to acquire staff. Matthew will meet with this provider weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro-social behaviors. This provider will identify coping skills to adress symptoms that hinder him from pro-social behaviors.

| | | | |
|---|---|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 07/01/24 | **Target Date:** 08/26/25 | **Status:** Revised | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Psychiatric Issue ...(CONTINUED)...

### Short Term Goal

Matthews proposed short term goal Patient and his legal counsel will work closely with the treatment team in selecting treatment services necessary to facilltate the patient's ASD habilitation and PTSD therapy at ASH. The treatment team and hospital administration will locate, acquire, and provide to the patient all services, supports, accommodations, and environmental modifications determined by the treatment team in conjunction with the patient and his legal team to be necessary for the patient's effectual habilitation and trauma therapy. The hospital shall not exclude any identified service, support, accommodation, or environmental modification on the basis that the same is not presently available at ASH, or is deemed hospital administration as unnecessary, too expensive, or an administrative burden, but shall add the same whether presently available or not, and shall continually make a good faith effort to acquire the same until the next ITDP review. If, after 30 days, a needed service, support, accommodation, or environmental modification is still unavailable, the treatment team shall, at the next !TOP review, provide a written report to the patient and his legal team detailing the reason the same is still unavailable, the date it is expected to become available, and/or hospital's plan to provide a sufficient alternate. It is outside of the treatment teams ability to alter habilitation/environment modifications. What is available is ensuring that Matthew has a safe place to turn to when he feels triggered such as his room, a quite room, or walking on the patio. Matthew will utilize his safe place, a quiet room, and behaviors identifies in his TIPS sheet when feeling triggered, overwhelemed, or emotionally dysregulated.

| | |
|---|---|
| **Is This Part of a Behavior Plan?** | No |
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider |

| **Date Opened:** | **Target Date:** | **Status:** | **Date Closed:** |
|---|---|---|---|
| 07/01/24 | 11/30/24 | Revised | |

### Intervention

Matthews proposed intervention The patient will be provided Animal Assisted Therapy (AAT) services, as defined by the hospital's animal therapy policy, at least twice a week as part of his ASD habilitation and PTSD therapy If the hospital is unable to secure a therapy dog within 30 days, AAT will be facilitated using the patient's own service dog, Foxy, not less than once a week, contingent only on her caretaker's availability. If the patient's service dog is used to facilitate the patient's animal therapy, the service shall be conducted in the PSRB lobby, or in such other secured area of the forensic hospital as the hospital shall determine safe and appropriate The treatment team does not have the ability to offer animal assisted therapy, does not have personnel trained to provide animal assisted therapy. The forensic hospital does not have volunteers available to perform.

| | |
|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider |

| **Date Opened:** | **Target Date:** | **Status:** | **Date Closed:** |
|---|---|---|---|
| 07/01/24 | 11/30/24 | Revised | |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | 
| **Episode:** 1 | | | |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | |

## Psychiatric Issue ...(CONTINUED)...

### Intervention

The Primary nurse will meet with Matthew at least once a month to assess his mental status and provide education on medications.

| | | | |
|---|---|---|---|
| **Responsible Staff** | Soliz,Aqualina (Primary) or assigned Nursing Staff | | |
| **Date Opened:** 03/21/22 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

### Intervention

The assigned psychiatric provider shall meet with the patient at least once a week to discuss SOTA technologies and scientific advancement in ASD and PTSD treatment; provide the patient with sufficient resources, peer reviewed literature, pharmaceutical drug manufacturer's inserts, MSDS I PubChem I etc. datasheets, and phamacodynamic information sheets, as applicable, to enable the patient to provide informed consent to all and any proposed treatment:

| | | | |
|---|---|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 08/26/24 | **Target Date:** 11/30/24 | **Status:** New | **Date Closed:** |

### Intervention

Matthews proposed intervention The assigned psychiatric provider shall meet with the patient at least once a week to assist the patient in developing, testing, and using his biofeedback system and machine learning (ML) model. The treatment team shall approve the patient's property request for a USB biofeedback interface (e.g., a USB SOR, finger-cuff GSR sensor, and EEG headband) for use with biofeedback software on the the patient computers, which shall be checked in and out from the unit charge nurse like other electronic cables. This is out of the scope and procedures for the treatment team to approve. The psychiatric provider is not trained in using or assisting patients in the development of a biofeedback interface.

| | | | |
|---|---|---|---|
| **Responsible Staff** | OCHOA,KINDRA (Primary) or assigned Psychiatric Provider | | |
| **Date Opened:** 08/26/24 | **Target Date:** 11/30/24 | **Status:** New | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | |

## Psychiatric Issue ...(CONTINUED)...

### Long Term Goal

Matthew will be willing to participate in opportunities that enhance his social skills to progress to a less restrictive environment and strengthen his community supports.

| | | | |
|---|---|---|---|
| **Responsible Staff** | CARLOS,JELOME (Primary) or assigned Social Worker<br>MCKELLAR,JOSEPH (Secondary) or assigned Rehab Provider | | |
| **Date Opened:** 02/14/22 | **Target Date:** 08/26/25 | **Status:** Continued | **Date Closed:** |

### Short Term Goal

Matthew will attend 1 Therapeutic Social Intervention (TSI) weekly, in order for him to demonstrate healthy social interactions and develop interpersonal skills.

| | | | |
|---|---|---|---|
| **Is This Part of a Behavior Plan?** | No | | |
| **Responsible Staff** | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| **Date Opened:** 03/19/21 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

### Intervention

Rehab will offer Therapeutic Social Interventions (TSI's) weekly, in order for Matthew to demonstrate healthy social interactions and to develop interpersonal skills.

| | | | |
|---|---|---|---|
| **Responsible Staff** | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| **Date Opened:** 03/19/21 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

### Short Term Goal

Matthew will attend 1 Therapeutic Recovery Intervention (TRI) weekly, in order for him to improve his ability to follow directions and to gain skills for emotional regulation.

| | | | |
|---|---|---|---|
| **Is This Part of a Behavior Plan?** | No | | |
| **Responsible Staff** | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| **Date Opened:** 10/26/21 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 / **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Psychiatric Issue ...(CONTINUED)...

### Intervention

Rehab will offer Therapeutic Recovery Interventions (TRI's) weekly, On-Unit Recovery Group, in order for Matthew to improve his ability to follow directions and to gain skills for emotional regulation.

**Responsible Staff**: MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider

| Date Opened: | Target Date: | Status: | Date Closed: |
|---|---|---|---|
| 10/26/21 | 11/30/24 | Continued | |

### Short Term Goal

Matthew will meet with his social worker to develop a discharge plan and "apply for DDD services and other communi supports and essential services (e.g. psilocybin research program) so the same will be in place for when the patient is discharged.

**Is This Part of a Behavior Plan?** No

**Responsible Staff**: CARLOS,JELOME (Primary) or assigned Social Worker

| Date Opened: | Target Date: | Status: | Date Closed: |
|---|---|---|---|
| 06/27/24 | 11/30/24 | Revised | |

### Intervention

Assigned social worker will meet with the patient at least once a month to assist the patient in developing a discharge plan and obtaining community services to promote a successful community reintegration.

**Responsible Staff**: CARLOS,JELOME (Primary) or assigned Social Worker

| Date Opened: | Target Date: | Status: | Date Closed: |
|---|---|---|---|
| 06/27/24 | 11/30/24 | Revised | |

## Medical Issues

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | | |
|---|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Medical Issues ...(CONTINUED)...

### Long Term Goal

Matthew's overall health and hygiene will improve as evidenced by improvement in BMI, lipids, BP, and his appearanc in the next 90 days.

Matthews his legal counsels proposed Long term goal :Patient will accept testing and treatment for his autoimmune encephalitis[ AE] variant of ASD. The assigned provider shall seek the informed consent of the patient for any propose treatment, and shall provide the patient all and any materials necessary for the patient to formulate informed consent. the hospital cannot provide in-house services needed to treat the patients AE/ASD, the patient shall be referred out to local treatment specialist who specializes in AE and who is trained in integrated medicine.:

This long term goal proposed by Matthew : is outside of the medical providers ability to offer. ASD is being managed b his psychiatric provider and Matthew does not have any medical symptoms that would indicate that he has encephalitis. ASH administration does not approve referral to naturopathic institutes. ASH, ASH providers ASH pharmacy practice allopathic medicine and cannot provide naturopathy or monitor any side effects that might occur du to naturopathic treatment..

| | | | |
|---|---|---|---|
| **Responsible Staff** | Prabhu,Maitreyi (Primary) or assigned Medical Provider | | |
| **Date Opened:** 06/04/24 | **Target Date:** 08/26/25 | **Status:** Revised | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Medical Issues ...(CONTINUED)...

### Short Term Goal

- Matthew will shower at least every other day, wear clean clothes and will not keep any old food cartons/wrappers/trash in
his room to avoid infections
-Matthew will exercise at least 1 time/week, as offered while at ASH for next 30 days
- Matthew will drink at least 6[8 oz] glasses of water each day
-Matthew will cooperate with labs at least once a year to monitor lipids and metabolic status
-Matthew will cooperate with BP , weight checks at least once a month and as needed Matthew will comply with offered treatments such as medications/clinics/tests/vitals as needed
Matthews his legal counsels proposed short term goal was: Patient will be allowed to keep and use his Sychelle water filtration bottle to filter his drinking water. Patient will continue to receive True lime watermelon drink packets . Patient will continue to receive bottled water from dietary department

This short term goal proposed by Matthew : It is outside of the medical providers ability to offer this, as ASH administration has ordered discontinuation of water bottles dispensing and also discontinued use of any outside filtration water bottles. Filtered water is available on the unit for the patient at all times to consume, along with, disposable cups and pink pitchers.

| | |
|---|---|
| **Is This Part of a Behavior Plan?** | No |
| **Responsible Staff** | Prabhu,Maitreyi (Primary) or assigned Medical Provider |

| **Date Opened:** | **Target Date:** | **Status:** | **Date Closed:** |
|---|---|---|---|
| 06/04/24 | 11/30/24 | Revised | |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 | **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Medical Issues ...(CONTINUED)...

### Intervention

Medical provider will assess, educate pt at least once a month and as needed and order meds/clinics as needed. Matthews his legal counsels proposed Intervention 1: Patient shall receive a referral to Silvertree wellness center in Phoenix to be evaluated for treatment of his AE/ASD. The hospital shall pay for the evaluation and any recommended therapeutics. The hospital shal permit and dispense all medications and supplements recommended by Silvertrees doctors, regardless of whether the same exists in hospitals formulary, and shall facilitate all recommended therapies that can be feasibly performed at ASH, and transport the patient to Silvertree for all therapies that cannot be facilitated at ASH.

This intervention proposed by Matthew is outside of the medical providers ability to offer as ASH administration does not approve referral to naturopathic institute. ASH, ASH providers ASH pharmacy practice allopathic medicine and cannot provide naturopathy.or monitor any side effects that might occur due to naturopathic treatment..

Matthews his legal counsels proposed Intervention 2: Patient shall be offered an Epsom salt bath at least 2 times/week and shall be allowed to take a bath at any time in order to help with grounding, relaxation and post exercise soreness. The hospital shall turn the water to the bathtub on the patients unit back on immediately
This intervention proposed by Matthew is outside of the medical providers ability to offer as ASH administration has ordered the provider to discontinue tub bath order and ASH administration has turned off the water to bathtub. Matthew has access to a shower.

| | | | |
|---|---|---|---|
| **Responsible Staff** | Prabhu,Maitreyi (Primary) or assigned Medical Provider | | |
| **Date Opened:** 09/26/22 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

### Short Term Goal

Matthew will participate in at least 15 minutes of cardiovascular or resistance training under the direct supervision of rehab staff.

| | | | |
|---|---|---|---|
| **Is This Part of a Behavior Plan?** | No | | |
| **Responsible Staff** | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider | | |
| **Date Opened:** 07/01/24 | **Target Date:** 11/30/24 | **Status:** Continued | **Date Closed:** |

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

# Individualized Treatment and Discharge Plan

| | | | |
|---|---|---|---|
| **Patient:** SOLAN, MATTHEW (35310) | **DOB:** 07/17/89 | **DOA:** 04/01/20 | **Episode:** 1 |
| **Assigned BHMP:** OCHOA, KINDRA | **Unit:** Cottonwood | | |
| **Plan Date:** 08/26/24 / **Plan End Date:** 07/30/25 | **Projected Discharge Date:** 08/01/26 | | |

## Medical Issues ...(CONTINUED)...

### Intervention

Rehab will offer a fitness 1 to1 weekly.

| | |
|---|---|
| **Responsible Staff** | MCKELLAR,JOSEPH (Primary) or assigned Rehab Provider |

| Date Opened: | Target Date: | Status: | Date Closed: |
|---|---|---|---|
| 06/04/24 | 11/30/24 | Continued | |

## Participants in the ITDP Development

**Name:** OCHOA,KINDRA **Role:** Psychiatric Provider **Plan Author:** No

**Name:** Solan, Matthew **Role:** Patient **Plan Author:** No
**Is Patient/Guardian in agreement with ITDP?** No
**If no, explanation of patient/guardian's non-agreement:** Patient expressed disagreement with his updated ITDP and wishes to escalate his appeal to AHCCCS.

**Name:** HURLES,KRYSTEEANA **Role:** STAFF **Plan Author:** Yes

**Name:** ALDRICH,DOMENICK **Role:** Nursing **Plan Author:** No

**Name:** CARLOS,JELOME **Role:** Social Work **Plan Author:** No

**Name:** BRIMLOW,AMANDA **Role:** Psychology **Plan Author:** No

**Name:** Prabhu,Maitreyi **Role:** Medical Provider **Plan Author:** No

**Name:** MCKELLAR,JOSEPH **Role:** Rehabilitation **Plan Author:** No

*This report contains privileged and confidential information and is intended strictly for use within the Arizona State Hospital. Any unauthorized disclosure or distribution of this information may be a violation of Arizona State and/or Federal Laws.*

EXHIBIT R

| | |
|---|---|
| Client: | Matthew Solan (Matt Solan) |
| DOB: | 07/15/1989 |
| Provider: | Sam McCulloch |
| Provider License: | LPC #23713 |

# Diagnosis and treatment plan

## Diagnosis

F84.0 - Autistic disorder

## Presenting Problem

Matt reports challenges with managing stress and sensory overwhelm. These symptoms are related to his Autism disorder, and also contribute and can trigger PTSD symptoms, interfering with decision making and his physical, mental and emotional safety.

## Goal

Matt's goal is to transition out of the state hospital, find stability economically, secure safe housing and reconnect with his business and his passion. Matt will work to make connections with the right supports including regular therapy and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition.

## Objective

Matt will learn and practice skills to help with managing stress and developing awareness and self care around his sensory system. Matt will participate in therapy and have close contact with his support animal. Matt will also seek out additional supports as needed to treat his PTSD.

Treatment frequency: 1x Per Week

**Provider**

Signed by Sam McCulloch
M.S., LPC
June 3, 2026 at 9:45 am (MST)
IP address: 24.121.53.117

**Client**

Signed by Matthew P. Solan
Client
June 3, 2026 at 12:12 pm (MST)
IP address: 108.49.144.135

**EXHIBIT S**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT AARON BOWEN** |

Defendant Aaron Bowen, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Aaron Bowen as follows.

**Request for Admission No. 1:** To the best of your knowledge, Dr. Stephen Morris never testified or produced any Record stating that he believed Plaintiff's relationship with Foxy I was sexual in nature.

☒ Admit ☐ Deny

Bowen objects to this request for admission on the grounds that it is vague and ambiguous. Specifically, it is unclear what "never testified or produced any Record" means in this context. Moreover, Bowen is unable to admit or deny what another person did or may have done. That said, Plaintiff's treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between Plaintiff and Foxy and that there may be a risk of future abuse. Please also see Defendants' Disclosures including DF441-DF445 and DF448-DF482.

Request for Admission No. 2: To the best of you [sic] knowledge, none of the licensed providers, who served as members of Plaintiff's treatment team while you were CEO of ASH, testified or produced any Record while employed at ASH, before you issued to [sic] Particularized Assessment Letter, that they believed Plaintiff had sexual relations with Foxy I or was likely to have sexual relations with Foxy I if she were to accompany Plaintiff at ASH.

☒ Admit ☐ Deny

Bowen is not aware of any AHS employees that produced a record stating their personal belief as to whether Plaintiff has or desires to engaged in a sexual relationship with his dog, Foxy. However, ASH's employees have recorded Plaintiff's statements to them in which he refers to Foxy as his wife and discusses the sexual nature of his relationship with her. Please see DF441-DF445 and DF448-DF482.

Request for Admission No. 3: Prior to issuing the Particularized Assessment Letter, none of the incident reports or progress notes cited in the Particularized Assessment Letter were interpreted, in writing, by any of the Plaintiff's licensed treatment providers, as indicating that the Plaintiff has had, has intended to have, or is at risk of having sexual relations with Foxy I.

☐ Admit ☒ Deny

Bowen objects to this request for admission on the grounds that it is vague and ambiguous. It is unclear what "were interpreted, in writing" means. The treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between him and his dog, Foxy, and that there may be a risk of future abuse. Prior to, and while preparing, the Particularized Assessment, Bowen reviewed and interpreted the treatment notes, progress notes, and incident notes pertaining to Plaintiff and Foxy. Please also see Defendants' Disclosures including DF441-DF445, DF448-DF482, and DF578-DF587.

Request for Admission No. 4: Before issuing the Particularized Assessment Letter, you did not review any evidence that demonstrated an actual risk that Plaintiff would have sexual relations with Foxy I if she were admitted to live with Plaintiff at ASH.

☐ Admit ☒ Deny

Please see Defendants' Disclosures including DF441-DF445 and DF448-DF482. Plaintiff's statements to various individuals show there is a risk that Plaintiff had or would sexually abuse his dog, Foxy.

Request for Admission No. 5: At the time you issued the Particularized Assessment Letter, what did you determine was the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy I if she were to accompany Plaintiff at ASH.

☐ Admit ☐ Deny

Bowen objects to this request on the basis that it cannot be answered with an admission or a denial. Moreover, Bowen is not required to conduct a separate assessment to determine the severity of the risk that Plaintiff would engage in sexual conduct with his dog. That said, it is Plaintiff's statements, recorded in

**treatment notes, progress notes, and incident reports that indicate the risk. See DF441-DF482.**

**Request for Admission No. 6:** You prohibited the Plaintiff from having a food visit with Foxy I on one or more occasions in 2020 and/or 2021 without conducting any individualized assessment to determine if the Plaintiff visiting with Foxy I for a food visit would pose any risk to the Plaintiff, to Foxy I, or to any other person, or would fundamentally alter the nature of ASH's services.

☒ Admit ☐ Deny

**Defendant objects to this request on the grounds that it is irrelevant to this litigation. ASH policy does not allow patients to have food visits with animals. There is no risk or fundamental alteration assessment necessary to exclude a patient's desired visitor.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

**EXHIBIT T**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,

Plaintiff,

vs.

The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,

Defendants.

Case No: CV24-02061-JJT-DMF

**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT MICHAEL R. SHELDON**

Defendant Michael R. Sheldon, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Michael R. Sheldon as follows.

**Request for Admission No. 1:** After you became CEO of ASH, and before the ASH Administration issued the Denial Letter, you did not conduct, nor did you direct the ASH Administration to conduct an investigation of the conclusions asserted by Aaron Bowen

in his Particularized Assessment Letter, including, but not limited to conducting a review of Plaintiff's patient charts at ASH.

☒ Admit ☐ Deny

**Sheldon was the Chief Operating Officer at the ASH when the Particularized Assessment was conducted and aware of the facts and information supporting its conclusions. Sheldon is, and was aware, of Solan's treatment notes, progress notes, and the incident reports pertaining to Solan. There is and was no reason to investigate the conclusions of the Particularized Assessment.**

**Request for Admission No. 2:** The security camera recordings from the ASH Cottonwood day room and dining area, converting [sic] May 22, 2024, were Altered by an ASH Employee.

☐ Admit ☒ Deny

**The security camera footage at ASH is retained or recoverable for up to about 90 days. After that time, the footage is automatically overwritten by new recordings. If a complaint or an incident occurs at ASH and is reported to administration, then the recordings relevant to the complaint or incident are set aside and saved from automatic deletion.**

**Request for Admission No. 3:** To the best of your knowledge, Dr. Stephen Morris never testified or produced any Record stating that he believed Plaintiff's relationship with Foxy I was sexual in nature.

☒ Admit ☐ Deny

**Defendant objects to this request for admission on the grounds that it is vague and ambiguous. Specifically, it is unclear what "never testified or produced any Record" means in this context. Moreover, Defendant is unable to admit or deny what another person did or may have done. That said, Plaintiff's treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between Plaintiff and Foxy and that there may**

**be a risk of future abuse. Please also see Defendants' Disclosures including DF441-DF445 and DF448-DF482.**

**Request for Admission No. 4:** To the best of your knowledge, none of the licensed providers, who presently or previously served as members of Plaintiff's treatment team, testified or produced any Record prior to June 14, 2025, stating or implying that they the [sic] Plaintiff's relationship with Foxy I or Foxy II was sexual in nature.

☒ Admit ☐ Deny

**Sheldon objects to this request for admission on the grounds that it is vague and ambiguous. ASH employees have not produced a record stating their personal belief as to whether Solan has or desires to engaged in a sexual relationship with Foxy. However, ASH employees have recorded Solan's statements to them in which he refers to Foxy as his wife and discusses the sexual nature of his relationship with her. Please see DF441-DF445 and DF448-DF482.**

**Request for Admission No. 5:** To the best of your knowledge, none of the incident reports or progress notes cited in the Particularized Assessment Letter were interpreted, in writing, by any of the Plaintiff's licensed medical providers, as indicating that the Plaintiff has had, has intended to have, or is at risk of having sexual relations with Foxy I or Foxy II.

☐ Admit ☒ Deny

**Sheldon objects to this request for admission on the grounds that it is vague and ambiguous. It is unclear what "were interpreted, in writing" means. The treatment notes, progress notes, and incident reports regarding Solan indicate there may have been an inappropriate relationship between him and his dog, Foxy, and that there may be a risk of future abuse. The Particularized Assessment contains the result of Dr. Aaron Bowen's, a licensed medical provider and former ASH CEO, review and interpretation of the treatment notes, progress notes, and incident notes pertaining to Solan and Foxy. Please also see Defendants' Disclosures including DF441-DF445, DF448-DF482, and DF578-DF587.**

**Request for Admission No. 6:** Before the Denial Letter was issued, you did not review any evidence that demonstrated an actual risk that the Plaintiff would have sexual relations with Foxy II if she were admitted to live with him at ASH.

☐ Admit ☒ Deny

**Sheldon reviewed the prior Particularized Assessment, Solan's treatment and progress notes, and many incident reports pertaining to Solan before issuing the Denial Letter. Those records indicate that there may have been an inappropriate relationship between Solan and his dog, Foxy, and that there may be a risk of future abuse. Please also see the Particularized Assessment at DF588-DF595 and Defendants' Disclosures including DF441-DF445 and DF448-DF482.**

**Request for Admission No. 7:** You prohibited the Plaintiff from having a food visit with Foxy II on July 17, 2024, without conducting any individualized assessment to determine if the Plaintiff visiting with Foxy II for a food visit would pose any risk to the Plaintiff, to Foxy II, or to any other person, or would fundamentally alter the nature of ASH's services.

☒ Admit ☐ Deny

**Defendant objects to this request on the basis that it is irrelevant and outside the scope of this litigation. Whether a person or an animal is authorized to visit the ASH is not relevant to the issues in this litigation and an individualized assessment is not necessary to deny visitation.**

**Request for Admission No. 8:** ASH was, as of September, 2023, unable to meet the developmental-disability related needs of patients with a primary diagnosis of Autism Spectrum Disorder.

☐ Admit ☒ Deny

**The ASH has been equipped to treat patients with Autism for decades including the times up and around September 2023. The ASH continues to be able to meet the needs of patients with Autism. The ASH employs many qualified providers including psychiatrists, psychologists, nurses, and masters-level**

**therapists who can provide treatment to patients with Autism. Solan, however, continually refuses to receive and participate in treatment.**

**Request for Admission No. 9:** ASH is presently unable to meet the developmental-disability related needs of patients with a primary diagnosis of Autism Spectrum Disorder.

☐ Admit ☒ Deny

**The ASH is able to meet the needs of patients with Autism. The ASH employs many qualified providers including psychiatrists, psychologists, nurses, and masters-level therapists who can treat patients with Autism. That said, Solan is not a patient at the ASH because of an Autism diagnosis—he is a patient because of his other disorders that rendered him guilty except insane. Nevertheless, the ASH seeks to provide treatment for Solan's Autism but he continually refuses to receive and participate in that treatment.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

**EXHIBIT U**






DREAMER'S ARCH

EXHIBIT V



**EXHIBIT W**

Official Records of Coconino County 4039570
Aubrey Sonderegger, Recorder
05/18/2026 12:30 PM Pgs: 2
FOX RANCH ESTATES L C $30.00

WHEN RECORDED, RETURN TO:

FOX RANCH COMPANY
1500 N. GRANT ST., STE. 4529
DENVER, COLORADO 80203

# DECLARATION OF TRUST

## FOX RANCH ESTATE NO. 2

KNOW ALL MEN BY THESE PRESENTS, that FOX RANCH ESTATES L.C., an Arizona limited liability company, as trustee hereunder, hereby publishes and declares that it will, and its successors in trust shall hold all real and personal property conveyed to them as trustees hereunder, IN TRUST, for the benefit of the beneficiaries named in the schedule of beneficial interests maintained by the trustee, upon the following trusts:

*First.* The name of this trust is "FOX RANCH ESTATE NO. 2," and under that name the trustee shall hold all real property the trust. Personal property and funds of the trust may be held in the name of the trust, or that of the trustee.

*Second.* This trust is irrevocable and shall not be amended. The purpose of this trust is to receive, hold, develop, and improve such real property, situated in Flagstaff, Arizona as may hereafter be conveyed to it (the "property"); to lease and/or sell the property; and to turn over annually the rents and profits thereof to the beneficiaries in accordance with their respective interests, as the same may appear, from time to time, on the books of the trustee.

*Third.* The trustee shall at all times have full power and authority to hold, subdivide, develop, lease, sell, convey, pledge, hypothecate, and encumber all or any part or parcel of the trust; to take loans, purchase equipment and materials, hire consultants, contractors, and agents; and to do and perform all other things and acts necessary or convenient for the effective development, management, and disposition of the property.

*Fourth.* Beneficial title in the net income of the trust shall be divided into five shares. The trustee is empowered exchange shares for real property, and to sell, exchange, pledge as collateral, or otherwise dispose of shares to fund the development of the real property of the trust. The trustee shall issue and deliver to each of the beneficiaries a certificate evidencing their respective shares. A beneficiary may assign his or her shares to any person with the consent of the trustee and the holders of a majority of the shares.

*Fifth.* The trustee shall distribute the net income of the trust annually to the beneficiaries at the rate of 10% per share, take 5% as compensation for administration of the trust, and reinvest the remainder in the development, improvement, and reforestation of the property.

Unofficial Copy

*Sixth.* The trustee shall cause to be erected or renovated a least one dwelling house or business edifice upon each non-contiguous parcel acquired by the trust, and shall prioritize, in the construction thereof, permanence, sustainability, and accessibility for Pomeranians, foxes, and amalgamations thereof ("foxes"). If renting out any part or parcel of the trust, the trustee shall permit, without surcharge, the peaceable cohabitation of lessees with foxes.

*Seventh.* Upon the first conveyance of real property to the trust, and issuance of at least half of the authorized shares, the trustee shall call a meeting of the beneficiaries, who shall vote on a general plan for development of the property. The decision of the beneficiaries present at that meeting shall be final, and the trustee shall carry out the plan as proposed without further input from the beneficiaries. Other than the voting franchise set forth in this trust seventh, the beneficiaries shall have no power to control the development of trust property, or to direct the activities of the trustee. Nevertheless, the holders of a majority of the shares may remove a trustee at any time, with or without cause, and appoint its successor.

*Eighth.* Unless sooner terminated by the trustee and all beneficiaries, this Declaration shall remain in full force and effect for a term of ten years from and after the date of its recording, and shall thereafter be automatically renewed and extended in successive periods of one year each, unless and until terminated by an instrument signed by the trustee and holders of a majority of the shares. Prior to termination, the trustee shall liquidate the corpus and make final distribution to the beneficiaries on a *pro rata* basis; but if only one beneficiary remains, the trustee may transfer the corpus as directed by the beneficiary. Any instrument terminating the trust or replacing a trustee shall be recorded in the Coconino County Recorder's Office.

IN WITNESS WHEREOF, said FOX RANCH ESTATES L.C. has caused its name to be signed by its undersigned Manager, thereunto duly authorized, this 5th day of May, 2026.

FOX RANCH ESTATES L.C.:

By: [signature]
Joseph M. Cowsert Jr., Manager

STATE OF ARIZONA )
) ss.
COCONINO COUNTY )

ACKNOWLEDGED before me by Joseph M. Cowsert Jr., as Manager of FOX RANCH ESTATES L.C., this 5th day of May, 2026.

KENDRA L EDENS
Notary Public - Arizona
Coconino County
Commission # 638978
My Commission Expires
11/30/2026

[signature] 11/30/26
Notary Public

Unofficial Copy

**EXHIBIT X**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Unique Coleman, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Unique Coleman, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT UNIQUE COLEMAN** |

Defendant Unique Coleman, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Unique Coleman as follows.

**Interrogatory Number 1:** Have you ever been subject of any disciplinary action or write up, patient or vulnerable adult abuse, neglect, or exploitation investigation or report, incident report, or other misconduct investigation or report, while employed at the Arizona State Hospital, or any other facility? If so, provide the dates, agencies/entities

involved, associated document/report numbers, bases for and outcome of any and all such action/investigation/report.

**ANSWER:** **Coleman has not been subject to a disciplinary action or write up. However, in summer 2025, Plaintiff filed an grievance with the ASH alleging that Coleman yelled in his ear causing an infection and verbally harassed him in June 2025. Following an investigation, the ASH concluded that there was no evidence to support Plaintiff's allegations against Coleman. On the contrary, the evidence showed that on June 27, 2025, Plaintiff was verbally aggressive towards Coleman and took a swing at her. The investigation also revealed that Plaintiff called Coleman the n_ word, a f***ing c***, and a lying b****.**

**Interrogatory Number 2:** On what basis do you believe that the Plaintiff has engaged, attempted to engage, or intended to engage in sexual conduct with a dog?

**ANSWER:** **Coleman has not formed a belief as to whether or not Plaintiff has engaged, attempted to engage, or intends to engage in sexual conduct with a dog. However, Coleman has heard Plaintiff state that his dog, Foxy, is his wife and has heard Plaintiff speak of sexual conduct between himself and his dog.**

**Interrogatory Number 3:** Did ASH R.N. Domenick Andrich, ASH R.N. Aquelina Soliz, or any other ASH nurse, or other ASH personnel, direct you to leave the Plaintiff alone, or to stop harassing the Plaintiff, or anything similar, on or before May 22, 2024 or any time thereafter? Were, when, and by whom were your [sic] told this?

**ANSWER:** **No. Coleman did not harass Plaintiff and no one other than Plaintiff has ever said or implied that she did. To the extent possible, Coleman avoided Plaintiff because he was threatening and verbally abusive toward her. Plaintiff's verbal abuse against Coleman, who is black, included calling her the n_ word, monkey, and slave on a near daily basis.**

**Interrogatory Number 4:** What was the nature and extend [sic] of your training in working with and deescalating individuals on the Autism spectrum as of June 22, 2024?

**ANSWER: Coleman has extensive training in patient care including de-escalation, positive reinforcement, redirection, and skill building. Defendant undergoes annual training on patient care, including caring for those with Autism. Prior to working at the Arizona State Hospital, Coleman worked at ACCEL where she assisted and provided care to individuals with Autism as they worked, went shopping, or otherwise engaged in their communities. Coleman implemented applied behavior analysis (the gold standard of autism treatment and support) principles and techniques in her patient care.**

**Interrogatory Number 5:** What was you [sic] purpose in telling the Plaintiff, on multiple occasions in 2025, that if you received court papers from him, you would rip them up?

**ANSWER: Coleman never told Plaintiff that if she received court papers from him, she would rip them up. Plaintiff threatens most, if not all, Arizona State Hospital staff that he will file complaints against them or sue them. Coleman has previously responded to Plaintiff's threats by telling him she has no money so suing her would be pointless.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

1/20/2026

# VERIFICATION

I, Unique Coleman, hereby declare under penalty of perjury that I am a Defendant and an employee of the State of Arizona Department of Health Services, that I have reviewed Defendant Unique Coleman's Answers to Plaintiff Matthew Plaintiff's First Set of Interrogatories to Defendant Unique Coleman mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

1/26/2026 — Date

Unique Coleman — Unique Coleman

**EXHIBIT Y**

ARIZONA DEPARTMENT OF HEALTH SERVICES

ARIZONA STATE HOSPITAL

## GOVERNING BODY MEETING AGENDA

Pursuant to A.R.S. § 38-431.02, notice is hereby given to the members of the Governing Body of the Arizona State Hospital and to the general public that the Governing Body of the Arizona State Hospital will hold a meeting open to the public on March 25, 2022, beginning at 10:00 a.m. in Conference Room D198, 2500 East Van Buren Street, Phoenix, Arizona, virtually through Google Meet at meet.google.com/qcy-cyzj-ayq. As indicated in the following agenda, the Governing Body of the Arizona State Hospital may vote to go into executive session, which will not be open to the public, to discuss certain matters.

One or more of the Governing Body members may participate in the meeting telephonically/virtually.

Pursuant to A.R.S. § 38-431.03(A)(3), the Governing Body may vote to go into Executive Session to obtain legal advice on any item on the agenda.

Persons with a disability may request a reasonable accommodation, such as a sign language interpreter, by contacting Annie Avadisian at 602-220-6013 (For the hearing/speech impaired, please call 711 for the AZ Relay Service). Requests should be made as early as possible to arrange the accommodation.

| | | |
|---|---|---|
| 1. Call to Order | Don Herrington, Interim ADHS Director, Chair | Tab |
| 2. Approval of Minutes (January 28, 2022) | All | 1 |
| 3. Standing Business - Reports | Don Herrington | |
| A. Chief Executive Officer Report | Aaron Bowen, Psy.D. | 2 |
| B. Chief Finance Officer Report | Ryan Rodney, CPA | 3 |
| C. Chief Medical Officer Report & Direct Consultation | Katharine Woods, DO | 4 |
| D. Chief Operating Officer Report | Mike Sheldon, MPA | 5 |
| E. Chief Nursing Officer Report | Nancy Regan, MBA, BSN, RN | 6 |
| F. Chief Quality Officer Report | Lisa Wynn, BS | 7 |
| G. Chief Compliance Officer Report | Margaret McLaughlin, MS | 8 |
| H. Chief Security Officer Report | William Bugbee | 9 |
| 4. Call to the Public | Don Herrington | |
| 5. Executive Session* <br> A. Executive Session: | Don Herrington | |

| | | |
|---|---|---|
| Discussion, consideration, and possible action on Application for Reappointment to the Medical Staff, re-privileging, and re-credentialing of<br>• Gopi K Vasireddy, DMD<br>• Bryan Roth, DPM<br>• Marisse Lardizabal, DPM<br>• Shaun Daidone, MD<br>• Justin Mickey, PMHNP<br><br>B. Updates on self-reported Sentinel Events<br><br>*The Governing Body may vote to discuss these matters in Executive Session pursuant to A.R.S. § 38-431.03 (A)(1) and A.R.S. § 38-431.03 (A)(2). | | |
| 6. Adjournment | | |

*Members of the Governing Body may not discuss items that are not specifically identified on the Agenda. Pursuant to A.R.S. 38-431.01(H), action taken as a result of public comment will be limited to directing staff to study the matter, responding to any criticism, or scheduling the matter for further consideration and decision at a later date.*

**This Executive Session is authorized under A.R.S. §38-431.03, Subsection (A), Paragraph 1 and 2.*

EXHIBIT Z

# DECLARATION OF MATTHEW PHILLIP SOLAN

I, Matthew Phillip Solan, hereby certify on, information and belief, that the following list of documents comprises the entire set of policy files available on ASH's website as of the last week of February, 2026:

1. Administering Medications.pdf
2. Administrative Separation.pdf
3. Administrator On Call.pdf
4. Admission Process.pdf
5. Adverse Reactions To Medications.pdf
6. Animal Assisted Activities.pdf
7. Approved And Prohibited Abbreviations, Symbols, Initials Etc .pdf
8. Arizona State Hospital Procurement Process.pdf
9. Assessment Of The Patient.pdf
10. Bio-Ethics Committee.pdf
11. Building Renovation And Alteration Requests.pdf
12. Census Management.pdf
13. Civil Patient Privileges.pdf
14. Clinical Alarms.pdf
15. Clinical Oversight And Supervision.pdf
16. Close Observation.pdf
17. Communications Systems Failure.pdf
18. Compensation Overtime Compensatory Time.pdf
19. Confidentiality.pdf
20. Consent Assent For Treatment And Emergency Medical Treatment.pdf
21. Controlled Substances.pdf
22. Culture Of Safety And Employee Code Of Conduct.pdf
23. Death Of A Patient.pdf
24. Delivering And Serving Legal Documents.pdf

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

25. Dental Services.pdf
26. Discharge Review – Discharge Or Release From Hospital.pdf
27. Documentation Requirements In The Health Record Etc.pdf
28. Donations To The Arizona State Hospital.pdf
29. Dress Code.pdf
30. Driving Parking On Hospital Grounds.pdf
31. Duty To Protect.pdf
32. Emergency Codes.pdf
33. Employee Health Program.pdf
34. Employees Ethical Religious Cultural Beliefs Etc.pdf
35. End Of Life Decisions Terminal Care Etc.pdf
36. Exposures To Infections.pdf
37. Fall Assessment Prevention And Management.pdf
38. Fingerprinting Hospital Personnel.pdf
39. Fire Protection Maintenance Program.pdf
40. Forensic Patient Privileges.pdf
41. Forklift Equipment Training And Utilization.pdf
42. General Respiratory Protection.pdf
43. Guardianship And Obtaining A Guardian Conservator.pdf
44. Hand Hygiene.pdf
45. Hazard Communication Program.pdf
46. Health Records.pdf
47. HIV Counseling And Testing.pdf
48. Hospital Identification Badges.pdf
49. Hospital Investigations.pdf
50. Hospital Maintenance Work Orders & Locksmith Requests.pdf
51. Hot Water Temperature.pdf
52. Immobilization Devices For Individuals With Chronic Etc.pdf

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

53. Inappropriate Or Sexual Interaction Between Patients.pdf
54. Incident Reports.pdf
55. Infection Control – Patient Care Areas.pdf
56. Infection Prevention And Control Program.pdf
57. Interim Life Safety Measures (Ilsm).pdf
58. Intern, Student And Residency Programs.pdf
59. Interpreter Services.pdf
60. Involuntary Medication Treatment Plan (Imtp).pdf
61. Judicial Review.pdf
62. Key Control And Lock Repair – Personnel Responsibilities.pdf
63. Laboratory Services.pdf
64. Latex Allergy.pdf
65. Management Of Hospital Policies And Procedures.pdf
66. Management Of Patient Income.pdf
67. Managing Waterborne Pathogens.pdf
68. Medical Equipment – Inventory, Testing, Etc.pdf
69. Medical Instruments Cleaning And Sterilization.pdf
70. Medical Materials.pdf
71. Medical Protective Devices.pdf
72. Medical Staff And Attending Psychologist Documentation.pdf
73. Medication Management.pdf
74. Medication Orders After Hours - Removal Of Medications Etc.pdf
75. Medication Safety.pdf
76. Medication Variances.pdf
77. Medications Brought Into The Hospital By A Patient, Patient's Family.pdf
78. Medications – Automatic Stop Orders.pdf
79. Medications – Discharge.pdf
80. Medications – Pass.pdf

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

81. Non-Emergency Use Of Oxygen.pdf
82. Non-Formulary Drugs – Approval Of And Inclusion.pdf
83. Nondiscrimination In Admission, Treatment And Services.pdf
84. Notice Of Privacy Practices.pdf
85. Nursing Staff Requirements And Delivery Of Patient Care.pdf
86. Opioid Prescribing, Monitoring And Reporting Requirements.pdf
87. Outbreak Investigation And Control.pdf
88. Outside Clinics Medical Facilities - Referral, Continuity Of Care Etc.pdf
89. Outside Practitioners At Arizona State Hospital.pdf
90. Pain Management.pdf
91. Patient Abuse, Neglect, Exploitation, Mistreatment Etc.pdf
92. Patient And Medical Library Services.pdf
93. Patient Care Plans.pdf
94. Patient Complaint, Grievance, And Appeal Processes.pdf
95. Patient Computer And Internet Usage.pdf
96. Patient Identification.pdf
97. Patient Mail, Property, Storage And Contraband.pdf
98. Patient Nutrition, Education And Food Services.pdf
99. Patient Personal Allowance.pdf
100. Patient Point Of Care Testing.pdf
101. Patient Request For Accounting Of Disclosures.pdf
102. Patient Request For Confidential Communications.pdf
103. Patient Request For Restriction Of Uses And Disclosures Etc.pdf
104. Patient Request To Amend Records.pdf
105. Patient Rights And Responsibilities.pdf
106. Patient Transfer Between Treatment Units And Treatment Programs.pdf
107. Patient Visitation.pdf
108. Patient Vouchers.pdf

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

109. Patient's Financial Responsibility For Property Damage.pdf
110. Petition For Court-Ordered Treatment.pdf
111. Pre-Construction Risk Assessment.pdf
112. Processing And Depositing Patient Funds And Vending Machine Refunds.pdf
113. Processing Notification Of Release To Victims, And Other Persons Etc.pdf
114. Public Access To The Arizona State Hospital.pdf
115. Referrals To Professional Services Within Hospital.pdf
116. Rehabilitation Therapy Program.pdf
117. Reimbursement For Employees' Damaged Property.pdf
118. Religious Services.pdf
119. Reporting Of Industrial Injuries And Illness.pdf
120. Reporting Suspected Neglect, Abuse And Exploitation.pdf
121. Request And Disclosure Of Protected Health Information.pdf
122. Research, Research Committee.pdf
123. Respiratory Protection – Tuberculosis Control.pdf
124. Restricting Patient Communication.pdf
125. Revolving Fund – Arizona State Hospital.pdf
126. Safe And Effective Use Of Targeted High-Risk Medications, Etc.pdf
127. Screening And Approval Of Patient Electronic Devices.pdf
128. Searches.pdf
129. Seclusion Or Restraint.pdf
130. Sentinel Events – Root Cause Analysis.pdf
131. Sick Call For Patients.pdf
132. Solicitations From The Public On Behalf Of Arizona State Hospital.pdf
133. Special Classification Committee.pdf
134. Special Education Services.pdf
135. Speciality Clinics.pdf
136. Standard Precautions, Transmission-Based Precautions.pdf

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

137. Staff Development And Training.pdf
138. Surveillance Cameras And Video Recording Equipment.pdf
139. Therapeutic Relationships Between Staff, Patients And Patients' Families.pdf
140. Therapeutic Vocational Training Program.pdf
141. Tobacco-Free Environment.pdf
142. Transporting And Escorting Patients To Appointments.pdf
143. Use Of The Swimming Pool.pdf
144. Utilization Of State Vehicles.pdf
145. Utilization Review By External Specialists.pdf
146. Vaccination Protocols.pdf
147. Verification Of Applicant's Required Credentials.pdf
148. VIP And Public Communications Media Personnel - Regulations.pdf
149. Volunteer Services.pdf
150. Withdrawal Of Patient Funds.pdf

I further certify that I have searched each of the above policy documents for the terms "service animal" and "service dog," and that none of the documents contain either term. I have similarly reviewed ASH's 2022/2023 policy set, and it contains no policies on service animals either.

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED** on the 23rd day of June, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008
Tel: +1.970.369.9611

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056