✓ FILED ___ LODGED
___ RECEIVED ___ COPY
JUN 2 9 2026
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel: 1.970.FOX.9611
Fax: 1.970.844.1733
Email: legal@fox-ranch.com
*Plaintiff in propria persona*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Matthew Phillip Solan,
*Plaintiff,*
*v.*
State of Arizona, *et al.*,
*Defendants.*

Case no. CV24-02061-PHX-JJT-DMF

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Matthew Phillip Solan ("Plaintiff") hereby responds in opposition to the Motion for Summary Judgment (Doc. 65) ("MSJ") and Separate Statement of Facts in Support of Motion for Summary Judgment (Doc. 66) ("SOF") filed by Defendants State of Arizona (the "State"), Michael R. Sheldon ("Sheldon"), Aaron Bown ("Bowen") Lea'Cher Carter ("Carter"), and Unique Coleman ("Coleman") (collectively, "Defendants"). This Response is supported by Plaintiff's Controverting Statement of Facts in Opposition to Defendant's Motion for Summary Judgment ("CSOF"), which is hereby incorporated by reference as if fully set forth herein, attached exhibits, and the record in this matter.

## I. FACTUAL BACKGROUND

On May 16, 2024, Plaintiff's dog, Foxy II, completed professional training at All Dogs Unleashed of Prescott, Arizona ("ADU") to serve as Plaintiff's Autism/PTSD service animal. CSOF, ¶ 77. Plaintiff's agent, Joseph Cowsert ("Cowsert") subsequently resumed custody of Foxy and continued her service animal training. CSOF, ¶ 78. While Foxy II training at ADU, Plaintiff told patients and staff on the ASH Cottonwood unit he would soon be requesting accommodations for Foxy II to accompany him at ASH. CSOF, ¶ 79. Every Cottonwood patient stated they were OK with Foxy living on the unit. CSOF, ¶ 80. Indeed, half of the ASH Forensic Hospital population later testified that interacting with Foxy would be beneficial to their rehabilitation. CSOF, ¶ 81. Plaintiff's treatment team also confirmed, on June 4, 2024, that having a "trained service animal" was one of Plaintiff's primary strengths. CSOF, ¶¶ 82-84.

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Around that time, Carter and Coleman began harassing Plaintiff and berating him with false allegations that he had engaged in bestiality. CSOF, ¶ 85. On multiple separate occasions in May, 2024 Carter and Coleman loudly proclaimed, in front other patients, that Plaintiff was "nasty" and that he "eat[s] dog p****" and "dog a**." CSOF, ¶ 86. On May 22, 2024, Carter and Coleman began tag-teaming Plaintiff, loudly proclaiming, in front of the other ASH Cottonwood unit patients, that Plaintiff "eat[s] dog p****" and "dog a**." Id. Carter asked Plaintiff, loudly, and in front of other patients, "does Foxy really like it when you stick your nasty d*** in her?" CSOF, ¶ 89. Plaintiff told Carter that he had never done such a thing, never would, and that it physically impossible for him to have sex with a small lapdog. Carter responded that Plaintiff could have sex with Foxy II because, according to Carter, Plaintiff's "d*** is so small you'd need a magnifying glass to see it." CSOF, ¶ 90. Plaintiff then informed Carter he intended to sue her for defamation. CSOF, ¶ 91. In response, Carter began taunting Plaintiff and goading him to physically attack her. CSOF, ¶ 92-93. An argument erupted after Plaintiff demanded to speak to Carter's supervisor, and Plaintiff threw a cup containing a few tablespoons of iced coffee on a table. CSOF, ¶ 94-95. Carter subsequently made a police report, falsely claiming Plaintiff threw hot coffee in her face and threatened to kill her because she was black. CSOF, ¶ 96-97.

Carter later admitted Plaintiff had not thrown hot coffee in her face, and her assault charges were dismissed with prejudice. CSOF, ¶ 98. Plaintiff pled guilty to disorderly conduct; but the disorderly conduct was not based on Carter's false allegations. CSOF, ¶ 99. Plaintiff plead guilty to "yelling and waving his arms," and "toss[ing] a partially full cup of cold coffee…maybe an inch or so…on a nearby table." CSOF, ¶ 100. At the March 12, 2026 change of plea hearing, the factual basis of was read into the record. It explained why Plaintiff was yelling and waving his arms: "[Carter] harassed Mr. Solan in front of other patients, talking loudly with allegations that he engaged in acts of bestiality with his service dog Foxy." Id. The State "did not have any additions or corrections to the factual basis," and "[t]he Court "accepted the Factual Basis." CSOF, ¶ 101-102.

On June 13, 2024, Plaintiff submitted a request to have Foxy II live with him at ASH as reasonable accommodation for his disabilities. CSOF, ¶ 103. On July 5, 2024, ASH issued a one-page denial letter ("Denial Letter") denying Plaintiff's request, and stating "[t]he Hospital will not modify its existing policies, practices and/or procedures to allow for a service animal at the Forensic Hospital." CSOF, ¶ 104.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

## II. ARGUMENT

### A. Summary Judgment Standard.

Under Rule 56(c), summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). "In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. A verified complaint may be used as an opposing affidavit under Rule 56, where, as here, the statements it contains are made on the plaintiff's personal knowledge. *Schroeder v. McDonald,* 55 F.3d 454 (9th Cir. 1995). The Court must construe all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

### B. The State is not Entitled to Summary Judgment on Plaintiff's ADA/RA Claims

The goal of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." See *What Constitutes "Service Animal" and Accommodation Thereof, Under Americans with Disabilities Act (ADA)*, 75 A.L.R. Fed. 2d 49, 1; *see also* 42 U.S.C. § 12101 *et seq*. "One way the ADA and the associated regulations assist the disabled in achieving equal access is giving persons with disabilities the right to be accompanied by a service animal." 75 A.L.R. Fed. 2d at 1. Therefore, "a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 35.136(a), and a service animal "may accompany its handler to such areas as…inpatient…rooms…clinics, rehabilitation therapy areas, the cafeteria and vending areas…restrooms, and all other areas of the facility where healthcare personnel, patients, and visitors are permitted." 28 C.F.R. Pt. 35 App. A at 625. "It is intended that the broadest feasible access be provided to service animals in all…hospitals." 28 C.F.R. Pt. 36, App. C.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 CFR § 35.130(a). The language of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(a) is disjunctive: a disabled individual shall not "be denied the benefits of the services, programs, or activities of a public entity, ***or*** be subjected to discrimination by any public entity." Exclusion of a service dog, absent a valid exception to the general inclusion rule, is discrimination *per se*, as intentional deprivation of service dog diminishes individual independence. *Sullivan By & Through Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 961 (E.D. Cal. 1990); *Tamara v. El Camino Hospital*, 964 F.Supp. 2d 1077, 1083 (N.D. Cal. 2013); CV20-02209, Doc. 84 at 13. A state hospital therefore improperly discriminates if it "fails to make reasonable accommodations for a person with a service animal." *Tamara v. El Camino Hospital*, 964 F.Supp. 2d 1077, 1083.[1] Thus, to prevail on a claim for failure to allow access to a service dog under Title II of the ADA, a plaintiff must prove (a) that he is a qualified individual with a disability; (b) that the defendant is a public entity; and (c) that the plaintiff was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity, in the following manner: (i) the plaintiff uses the assistance of a service animal; and (ii) the defendant refused entry to the service animal. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(a), 35.136; *Tamara*, 964 F. Supp.2d 1077; *Does 1-5 v. Chandler*, 83 F.3d 1150, 1154-55 (9th Cir. 1996).

Defendants admit Plaintiff timely filed his notices of claim, (CSOF, ¶ 107,) that they did not respond to the notices, (CSOF, ¶ 108,) and that Plaintiff has exhausted his administrative remedies for the purposes of the PLRA. (CSOF, ¶ 112.) Defendants admit Plaintiff suffers from Autism ("ASD") and Post-traumatic Stress Disorder ("PTSD"), (CSOF, ¶ 113,) that he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA") and Section 504 of Rehabilitation Act of 1973 ("RA"), (CSOF, ¶¶ 114-115,) that the State, through ASH, is a recipient of federal financial assistance within the meaning of the RA, (CSOF, ¶ 116,) that the ASH administration received Plaintiff's request for accommodations, and responded stating "[t]he Hospital will not modify its existing policies, practices, and/or procedures to allow for a service animal at the Forensic Hospital." (CSOF, ¶ 117).

---

[1] While *Tamara* was brought under Title III of the ADA, Title II entities "have the same legal obligations as title III entities to make reasonable modifications in policies, practices, or procedures to allow service animals." 28 C.F.R. Pt. 35, App. A at 613.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Plaintiff does not dispute that ASH sent him the Particularized Assessment in 2022, but every part of that assessment is disputed. CSOF, ¶¶ 21-22. The reasons ASH excluded Foxy I in 2022 are also not relevant here; what matters in this case is the reason ASH excluded Foxy II in 2024. The Denial Letter "did not refer to or incorporate by reference the 2022 Particularized Assessment," (Doc. 31 at 25:1-2.), and Defendants admit "ASH denied Plaintiff's [2024] accommodation request without an updated assessment." CSOF, ¶¶ 118. Bowen and Sheldon both testified that ASH never assessed whether Plaintiff posed an actual risk of abusing Foxy I or Foxy II, (CSOF, ¶¶ 119-124, 128-130) and that ASH was "not required to accommodate any dog," assess Foxy individually, or assess fundamental alteration or direct threat before excluding Foxy from even visiting ASH. CSOF, ¶¶ 125-127, 131-133. Plaintiff nevertheless controverted all statements imputing any prurient intent on his part, (CSOF, ¶ 27,) and has shown Defendants' stated concerns are frivolous. CSOF, ¶¶ 22, 27, 35.

While Defendants claim ASH denied Plaintiff's request to have Foxy II live with him at ASH "for a number of reasons, including that 'based on [Solan's] own personal statements, [his] past relationships and interactions with a 'service animal' have not only been counter-therapeutic, but also inappropriate (sexual in nature),'" the State explicitly narrows its defenses in the MSJ to points: (1) Foxy is not a service animal, and (2) Foxy II would fundamentally alter the nature of the treatment health services ASH allegedly provides Plaintiff. Doc. 65 at 8:12-26. The State does not argue its former "animal abuse" direct threat/fundamental alteration defense in its MSJ, and has therefore forfeited that defense for the purposes of the MSJ. *See* Fed. R. Civ. P. 56(a) (Defendants' MSJ must identify each "defense—or the part of each…defense—on which summary judgment is sought"); *Greenlaw v. United States,* 554 U. S. 237, 243 244 (2008) (courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

**1. Foxy II is a Service Animal.**

Defendants misstate Plaintiff's deposition testimony. Plaintiff explained one of the reasons he elected to clone Foxy I was that the academic record showed cloned dogs carry over behavioral traits from their genetic donors. CSOF, ¶ 134. Plaintiff did not "suggest" that Foxy II, absent training, could "perform the same ***tasks***" he trained Foxy I to performed. Id. Foxy II was separately trained by ADU and Cowsert in 2024 to perform tasks designed to assist Plaintiff with managing his disabilities. Id.

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

The ADA defines a service animal as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability," including a psychiatric disability, where the work or tasks are "directly related to the individual's disability." *C. L. v. Del Amo Hosp., Inc.*, 992 F.3d 901 (9th Cir. 2021). The ADA "does not require a service dog to perform a particular number of trained tasks or amount of work," and "[t]he regulations do not specify by whom the dog must be trained. Rather, the statute defines a service dog by the outcome of training—what the dog is capable of doing to ameliorate an individual's disability." Id. "Psychiatric service animals can be trained to perform a variety of tasks that assist individuals with disabilities to detect the onset of psychiatric episodes and ameliorate their effects." 28 C.F.R. Pt. 35, App. A, p. 616. "[I]f a service animal senses that a person is about to have a psychiatric episode and it is trained to respond for example, by nudging, barking, or removing the individual to a safe location until the episode subsides, then the animal has indeed performed a task or done work on behalf of the individual with the disability, as opposed to merely sensing an event." Id.

Ultimately, "[t]he test is a functional one: can the dog consistently help the person with a disability meet the challenges of life by assisting in the person's activities of daily living?" *C. L.*, 992 F.3d 901. Here, the answer is a resounding "yes." Foxy II's task training includes deep pressure therapy ("DPT"), alerting, grounding, and social buffering work. CSOF, ¶ 135. These were tasks Foxy I performed for Plaintiff which substantially improved his independence, quality of life, and access to therapy. CSOF, ¶ 136. They are not natural canine behaviors; they are specially trained tasks that require Foxy II to detect a stress response or adverse emotional state in Plaintiff, and respond by physically placing herself in contact with and applying pressure to Plaintiff by leaning against or sitting on him (in the case of DPT), nudging or yipping at him (in the case of her basic alerting tasks), presenting herself to Plaintiff and encouraging him to touch her fur as a sensory anchor (in the case of grounding tasks), and gently interposing herself in between Plaintiff and others (in the case of social buffering work). CSOF, ¶ 137.

Plaintiff hired ADU and Cowsert to train Foxy II to perform the same tasks Foxy I had previously performed, and provided detailed information on the tasks Foxy I performed and explicit directives on how Plaintiff expected Foxy II to perform them. CSOF, ¶¶ 134, 138. ADU "laid the foundation for Foxy's service dog training, and Joseph Cowsert completed her task training under [ADU's] guidance, including [DPT] work, alerting tasks, and the ability to provide consistent grounding support and serve

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

as a social buffer for Mr. Solan." CSOF, ¶ 139. Foxy II is "fully trained in advanced obedience and essential service animal skills, and continues to receive ongoing training maintenance under [Cowsert's] supervision, and under the advice and guidance of [ADU] to maintain and enhance her skills as a service animal." CSOF, ¶ 140. Foxy II is trained to assist Plaintiff by performing "tasks that are crucial for assisting [him] in managing the effects of his neurodevelopmental disabilities." CSOF, ¶¶ 136, 141-142. Her DPT work has "historically has been instrumental in helping [Plaintiff] cope with sensory processing and mitigating sensory overstimulation." Id. Foxy II is "fully housetrained, very quiet, and gets along with all human and non-human animals she's come in contact with…[She] is very tolerant of loud noises and being handled and carried around." CSOF, ¶ 142. Foxy II is "well received and is perfectly well behaved in public, on and off leash." Id.

ADU's owner, Brad Smith ("Smith") testified it was his "professional opinion that Foxy [II] demonstrates a consistent ability to perform DPT and alerting tasks, provide grounding support, and serve as a social buffer for her handler. Foxy [II] possesses all the qualities expected of a service dog, including acute sensitivity to her handler's emotional states, exceptional adaptability to stress, and the ability to remain focused and calm in disruptive situations." CSOF, ¶ 143. "Foxy [II] performs well on and off leash, consistently responds to her handler's verbal and nonverbal commands, and is fully housetrained. She displays no signs of aggression, and enjoys being picked up and handled by her trainer and strangers alike. Overall, Foxy [II] is a friendly and well-adjusted animal, and has acquired the necessary skills and temperament to effectively assist her handler." CSOF, ¶ 144. Smith certified that "Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan." CSOF, ¶ 14.

The Alliance of Therapy Dogs ("ATD") also certified Foxy II to work in hospitals, and extended its $5,000,000 liability coverage to her and Cowsert. CSOF, ¶ 146. ATD's auditor, Robin Petrillo, reported that Cowsert "put in a lot of time and energy in training [Foxy II] and it shows…Foxy [II] did well in a hospice environment. She was able to sit on the bed and brought love and joy." CSOF, ¶ 147. ATD certified that Foxy II could be safely handled, was clean and well groomed, did not bark at people or other dogs, showed no signs of aggression, accepted stroking of her head, body, and tail, touching of her paws, scratching and petting of her throat, holding of her ears, and being held; and demonstrated appropriate skills to interact with people in animal assisted functions. CSOF, ¶ 148.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**2. Defendants Conflate Medical Necessity with Fundamental Alteration.**

The State raises one affirmative defense to Plaintiff's ADA claim: allowing Foxy II to live with Plaintiff at ASH would "fundamentally alter the nature of" ASH's "service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *see Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004); *see also Alexander v. Choate*, 469 U.S. 287, 300 (1985). Specifically, Defendants argue Plaintiff has not established Foxy II "is medically necessary for him to participate in and benefit from the mental health services that ASH provides." Doc. 65 at 9. The ADA does not require that a disabled individual who uses a service animal prove the animal is medically necessary to participate a specific service the public entity offers. The questions the ADA asks are whether "a service animal is required because of a disability and what work or tasks the service animal has been trained to perform." 28 C.F.R. § 35.136(f). Plaintiff informed ASH Foxy II was required because of his Autism and PTSD, and explained her task training. CSOF, ¶ 150. The inquiry should have stopped there.

Moreover, fundamental alteration is an affirmative defense. 28 C.F.R. § 35.136(a); *Lentini*, 370 F.3d at 845. Defendants bear the burden of proving affirmative defenses under the ADA, not Plaintiff. *Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243 (9th Cir. 1999). However, "the fundamental alteration test has no application to cases of facial discrimination." *Lovell v. Chandler,* 303 F.3d 1039 (9th Cir. 2002). In passing the ADA, Congress made clear its intent that hospitals "take the necessary steps to accommodate service animals and to ensure that individuals with disabilities are not separated from their service animals," and "that the broadest feasible access be provided to service animals in all…hospitals." *Id.* Part 36 Appx. C, § 36.302 (citing H.R. Rep. No. 101-485(II), at 106 (1990), H.R. Rep. No. 101-485(III), at 59 (1990)); *see also Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). In this case, rather than striving to provide service animals the "broadest feasible access," ASH implemented a total, hospital-wide service dog ban that facially discriminates against disabled individuals who use service dogs, and has advanced one pretext after another to obscure its blanket ban and justify its ongoing discrimination. CSOF, ¶¶ 120, 125, 127, 131, 132, and 151.

But even if the fundamental alteration defense was available to Defendants, the question of "whether an accommodation causes a fundamental alteration is 'an intensively fact-based inquiry.'" *Lentini*, 370 F.3d at 845 (quoting *Martin v. PGA Tour, Inc.*, 204 F.3d 993, 999 (9th Cir. 2000)). The elements of

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

fundamental alteration the State must establish are: (a) the nature of ASH's services, programs, and activities; and (b) that admitting Foxy II would fundamentally alter nature of ASH's services, programs, or activities, *i.e.*, change an "essential aspect," a "fundamental character," an "essential attribute" or an "indispensable feature" of ASH. 28 C.F.R. § 35.130(b)(7)(i); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-687 (2001); *Tamara*, 964 F. Supp.2d 1077. The State has not established those elements, it merely argues that ASH can provide for Plaintiff's treatment-related needs without Foxy II present. But that is neither true, nor a lawful defense. When assessing a request to admit a service animal, a public entity may not consider "the nature or extent of a person's disability," (28 C.F.R. § 35.136(f),) and only *after* the public entity "properly excludes a service animal under [28 C.F.R.] § 35.136(b)" must it "give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises." 28 C.F.R. § 35.136(c). A service animal is properly excluded under 28 C.F.R. § 35.136(b) only if (1) the animal is out of control and the animal's handler does not take effective action to control it, or (2) the animal is not housebroken. 28 C.F.R. § 35.136(b). The State has not claimed either exception, nor can it: ASH staff has never met Foxy II. CSOF, ¶ 152. As the Court has previously held, "to the extent that Foxy's presence or behavior was so disruptive as to fundamentally alter ASH's services, programs, or activities, ASH would have grounds for removing Foxy. But merely speculating that Foxy's presence would cause such an alteration without reference to any specific concerns…is insufficient under the ADA." CV20-02209, Doc. 84 at 12.

The ADA authorizes Foxy II to accompany Plaintiff to all areas of ASH "where healthcare personnel, patients, and visitors are permitted." 28 C.F.R., Pt. 35 App. A at 625. Whether or not ASH staff are able to perform the same tasks Foxy II would otherwise perform is not a permitted inquiry when determining if Foxy II must be admitted. As the DOJ Administrative Guidance states, "[s]ervice animals must be allowed in patient rooms and anywhere else in the hospital the public and patients are allowed to go. They cannot be excluded on the grounds that staff can provide the same services."[2] The DOJ's administrative guidance on ADA compliance is entitled to deference. *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904 (9th Cir. 2019).

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

---

[2] DOJ administrative guidance, "Frequently Asked Questions about Service Animals and the ADA," https://www.ada.gov/regs2010/service_animal_qa.html.

Exclusion of a service dog on fundamental alteration grounds must be based on the best available evidence and circumstances individual to the animal in question, not fears or generalizations, speculation or unfounded assumptions. 28 C.F.R. § 130(h). ASH has the ability "to determine, on a case-by case basis, whether a particular service animal can be excluded based on that particular animal's actual behavior or history—not based on fears or generalizations about how an animal or breed might behave. This ability to exclude an animal whose behavior or history evidences a direct threat is sufficient to protect health and safety." 28 C.F.R. Pt. 35, App. A, pp. 618-619. Defendants' stated animal abuse and ligature concerns are grossly speculative, and have nothing to do with Foxy II's behavior. Defendants admit they did not assess the risk of abuse actually occurring, (CSOF ¶¶ 118, 120-124, 128-130), and clearly never considered viable alternatives to tethering, such as voice control, which 28 C.F.R. § 35.136(d) expressly authorizes, and which Foxy's trainers specifically testified would be feasible. CSOF ¶¶ 142, 144.

A health care provider has a duty to assess risk based on "the objective, scientific information available to him and others in his profession." *Bragdon*, 524 U.S. at 649; *Chalk*, 840 F.2d at 707-708. A subjective belief in the existence of a risk, even one made in good faith, will not shield the decision maker from liability. *Bragdon*, 524 U.S. at 649. Decisions must be made upon "particularized facts using the best available objective evidence as required by the regulations." *Echazabal v. Chevron*, 336 F.3d 1023, 1028 (9th Cir. 2003). Defendants do not receive special deference merely because they are health care providers. *Bragdon*, 524 U.S. at 649. In the summary judgment context, a courts must "weigh the risks and alternatives," to determine "whether a genuine issue of material fact exists as to the reasonableness of the accommodation." *Nunes*, 164 F.3d 1243. Courts are adjured to consider factors such as (a) the nature of the risk, (b) the duration of the risk, (c) the severity of the risk and (d) the probabilities that the risk will eventuate, causing varying degrees of harm. *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287 (1987); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996). Bowen and Sheldon both testified they though it sufficient to mitigate potential risks "completely" by the complete exclusion of Foxy. CSOF ¶¶ 121, 130. That is grossly inconsistent with the ADA's risk assessment framework.

Speculative concerns that a service dog might affect treatment in a psychiatric hospital do also not rise to the level of a fundamental alteration. *Tamara*, 964 F. Supp. 2d 1077, 1084. The decision to balance the benefits the service dog provides against any loss in quality of services is the sole choice of the service

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

dog user. *Sullivan*, 731 F. Supp. at 961; *see also* 42 U.S.C. § 12201(d). "[D]eference must be shown to the manner in which a handicapped person chooses to overcome the limitations created by [his] disabling condition." *Sullivan*, 731 F. Supp. 947, 958. "[A]s long as [those] choices…are reasonable, the [ADA/RA] both protects those choices from scrutiny, and prohibits discrimination against the disabled person on the basis of those choices." Id.

In 2022, Defendants argued that Foxy I's *presence* at ASH would "get in the way" of Plaintiff's treatment. SOF, ¶ 22, 25. Defendants now argue Plaintiff fixating on the *absence* of Foxy II has impaired his treatment. Doc. 32 at 8-21:26 ("the record shows that Solan's obsession with Foxy has caused him to reject those services and abuse the staff that provides them.") Defendants cannot have their cake and eat it too. Moreover, Plaintiff's so-called "obsession" is a textbook symptom of his Autism: "In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities." DSM-V-TR at 37; CSOF, ¶ 153. As Plaintiff's former ASH psychologist, Amanda Brimlow noted, Plaintiff

> "has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships. It is this writer's opinion that he still meets the criteria for an Autism Spectrum Disorder diagnosis as an adult....While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers…He has presented with an inflexible adherence to routine, as evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and making demands of the staff and his treatment team despite hospital policies." CSOF, ¶ 154.

Plaintiff's new ASH psychologist, Courtney Tully, therefore added to Plaintiff's ASH treatment plan:

> "...Psychology staff will increase patient access to services by offering autism-informed communication and environmental accommodations…" CSOF, ¶ 154-158.

Instead, ASH's providers have avoided Plaintiff and encouraged him to seek appropriate services "after" discharge. CSOF, ¶ 159-161. Unwilling to wait to receive the benefits of autism-informed services, Plaintiff established a relationship with Sam McCulloch at Radian Sun Therapy in Flagstaff ("McCulloch"), and began participating in telemedicine therapy with McCulloch. CSOF, ¶ 162. Unlike ASH, McCulloch specializes in treating ASD. CSOF, ¶ 163 Plaintiff's new treatment plan states:

> "Matt will work to make connections with the right supports including regular therapy and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition…Matt will participate in therapy and have close contact with his support animal." CSOF, ¶ 164.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Dr. Morris' opinion that Foxy I "would only serve to get in the way," was also plainly contradicted by his later affirmance that having a "trained service animal" was one of Plaintiff's primary strengths. CSOF, ¶¶ 82, 165. And Plaintiff was not admitted to ASH "learn how to better get along with people." He was admitted because, "at the time of the commission of [his] criminal act[, he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong." A.R.S. § 13-502(A); CSOF, ¶ 166. Plaintiff's GEI-qualifying diagnosis was Schizoaffective disorder, which ASH admits he no longer has. CSOF, ¶¶ 166-168. Plaintiff is an ecocentist, therian, and practitioner of esoteric fox magic. CSOF, ¶¶ 27 (bullet 7,) 169. That Plaintiff "likes dogs better than people" is unlikely to change; it is fundamental aspect of Plaintiff's sincerely held religious beliefs and philosophical worldview. CSOF, ¶ 170. Neither Dr. Morris, nor anyone else at ASH has any right to "fix" this aspect of Plaintiff's identity, and ASH's unjustified exclusion of Foxy and appalling attacks on Plaintiff's relationship with her has only furthered Plaintiff's disdain for humanity and alienation from ASH's providers. CSOF, ¶ 171.

At no time did Dr. Morris inquire with Plaintiff as to how Foxy I could help Plaintiff access ASH's services, or the effect her exclusion was having; Dr. Morris refused to discuss Foxy I with Plaintiff, stating that it was an "administrative decision" to exclude her, and Plaintiff should focus on treatment without her. CSOF, ¶ 172. Dr. Morris lacked a sufficient knowledge to opine on the pros and cons of Foxy I's services. Plaintiff previously utilized Foxy I to help him manage the effects of his severe disabilities, and to enlarge his access to community services. CSOF, ¶¶ 173-174. Plaintiff's mother confirms this:

> "I took Matthew to all of his therapy appointments between 1993 and 2016. Prior to 2016, I accompanied Matthew because, if I did not, he would not even go in. Before acquiring Foxy as a service dog, Matthew could not effectively engage in any therapy. He would argue with the therapists and could not focus on what they were asking him to do. After Foxy started coming to his sessions, he was able to begin engaging with his therapist. When Matthew became overwhelmed, Foxy would jump in his lap without prompting and Matthew would bury his face in her fur to calm down. After several months of attending therapy with Foxy, Matthew was able to start participating in the sessions without me." CSOF, ¶ 175.

Without Foxy II's assistance, Plaintiff has been unable to effectively engage the treatment services offered by ASH. CSOF, ¶¶ 173, 174. Defendants do not deny Plaintiff has been unable to engage in treatment; instead, they argue Plaintiff "has repeatedly failed to make progress toward this goals," because "he doesn't see his behaviors and psychiatric symptoms as problematic for him." That is

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

irrelevant, and simply not true; Plaintiff has been begging for treatment at ASH for over 6 years. CSOF, ¶ 176. Defendants attempt to argue, as proof Foxy II is "not medically necessary," that Plaintiff "verbally abused ASH staff with racist epithets and threatened them with physical violence on multiple occasions." That too is irrelevant, and a classic inversion: the truth is, it is ASH staff who have verbally and physically abused Plaintiff. CSOF, ¶ 175. Nevertheless, Plaintiff has certainly experienced increased ASD and PTSD symptoms since being at ASH. This does not show Foxy II's assistance is unnecessary; is shows the result of ASH's failure treat Plaintiff in the absence of his service animal. Dr. Brimlow opined:

> "It is important to note that when Mr. Solan feels his needs are not being met appropriately, he will say racial slurs and threaten to harm or kill others. This is indicative of the substantial functional limitations related to his Autism diagnosis and deficits in appropriate social interactions with others." CSOF, ¶ 154.

In reality, Plaintiff is unable to participate because ASH refuses to accommodate his Autism-related sensory disabilities. CSOF, ¶¶ 160, 161, 176. Sheldon now conveniently claims ASH "does not admit, and has not admitted, that [it] lacks clinical services for treating Autism," (CSOF, ¶ 179,) but that is grossly inconsistent with his prior statements to the Arizona Legislature[3] that ASH "is not able to meet the needs of patients with Autism." CSOF, ¶ 178. All attempts Plaintiff has made to acquire accommodations for his Autism have been meet with resistance and retaliation by ASH staff. CSOF, ¶¶ 74, 104, 182. The truth is, nobody at ASH has ever observed how Plaintiff would respond to treatment if Foxy II were present. CSOF, ¶ 152. Foxy I was instrumental in facilitating Plaintiff's participation in therapy, (CSOF, ¶¶ 174, 175,) and ASH's providers have repeatedly affirmed having "a trained service animal" is Plaintiff's primary strength, (CSOF, ¶ 180,) and recommended animal therapy. CSOF, ¶ 181.

Plaintiff's primary goal is "to make connections with the right supports, including regular therapy, and access to his service animal (Foxy) to manage stress, [and] process emotions," (CSOF, ¶ 164,) not to learn how to "get along" without Foxy II. Defendants' concern that Plaintiff's response to treatment is being be negativity impacted by his Autism-related "obsession" over Foxy II's exclusion from ASH, could easily resolved by simply *not excluding* Foxy II.

---

[3] *See* Arizona Department of Health Services, Clinical Improvement and Human Resource Plan (Sept. 1, 2023), https://www.azdhs.gov/documents/director/agency-reports/clinical-improvement-and-human-resource-plan-09-01-2023.pdf.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**C. Defendants are Not Entitled to Summary Judgment on Plaintiff's False Light Claim**

To prevail on a false light claim, a plaintiff must prove "(1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438 (Ariz. Ct. App. 2015).

Defendants argue Plaintiff has no evidence Carter or Coleman made the alleged statements because no other witness corroborates his testimony. That is not the Rule 56 standard. The Ninth Circuit has repeatedly held that sworn testimony may defeat summary judgment, even if self-serving and uncorroborated. See *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497–99 (9th Cir. 2015). Plaintiff personally heard Carter and Coleman tell him "you eat dog p***y" and "you eat dog a**," in front of numerous patients on May 22, 2024, and in the weeks before and after. CSOF, ¶¶ 85, 86, 89-90. And Plaintiff did not say he had no witnesses: he said his witnesses were afraid to testify. CSOF, ¶ 183. One witness did come forward, and testified Carter told him that "Matthew Solan f***s dogs." CSOF, ¶ 184.

The responses to Plaintiff' requests for admission to Carter and Coleman were made and signed by Ann Hobart and Jordon Kendal, not Carter and Coleman. CSOF ¶ 186. These responses are hearsay. *See* Fed. R. Evid. 801. Nor has any evidence has been provided to support a finding that Hobart or Kendal had personal knowledge of Carter or Coleman's conduct on the Cottonwood unit. *See* Fed. R. Evid. 602. Hearsay is inadmissible absent an authorized exception. Fed. R. Evid. 802. No exception has been claimed. "Inadmissible hearsay evidence may not be considered on a motion for summary judgment." *Anheuser-Busch v. Natural Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995). Coleman's interrogatory response was made by her, and the Court accepted her verification, (Doc. 96,) but it does not deny Plaintiff's allegations; instead, it asserts Coleman "heard Plaintiff speak of sexual conduct between himself and his dog." CSOF, ¶ 187. Coleman is free to argue truth, but truth is an affirmative defense, and Plaintiff testified he has not had sexual conduct with any dog, and did not tell Coleman he done had so. CSOF, ¶ 188. Carter has not testified at all, (CSOF, ¶ 189,) and conceded her response was inadmissible. Doc. 80 at 4. The Court accepted her stipulation in lieu of sanctions. Doc. 96.

Carter and Coleman falsely accused Plaintiff of bestiality in front of numerous patients, in the closed institutional community where Plaintiff lives and receives treatment. A reasonable jury could conclude

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

their statements were disseminated sufficiently to place Plaintiff in a false light within that community. A statement "is 'highly offensive' if a reasonable person in the same or similar circumstances would feel seriously upset or embarrassed by the statement." *Godbehere v. Phoenix Newspapers, Inc.,* 783 P.2d 781, 786 (1989). A reasonable jury could also conclude that the statements at issue were highly offensive.

Defendants then argue Plaintiff's claims against Bowen accrued in 2022 when Plaintiff received the Particularized Assessment. Plaintiff's false-light injury was not receiving the letter. The injury was the later dissemination of the accusation Plaintiff engaged or intended to engage in bestiality or animal abuse. Plaintiff did not know, and could not have reasonably known the Particularized Assessment's false accusations had been disseminated to ASH staff/patients until May, 2024. Under Arizona's discovery rule, accrual turns on when Plaintiff knew or reasonably should have known of the injury and its cause. *Walk v. Ring,* 202 Ariz. 310 (2002); *Doe v. Roe,* 191 Ariz. 313 (1998). The discovery rule applies where a matter is "published in a manner not likely to come to [the plaintiff's] attention and [the plaintiff] did not have actual or constructive knowledge concerning them on the date they were published." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of America*, 989 P.2d 964, 969 (Ariz. 1995) "[W]hen discovery occurs and when a cause of action accrues are usually questions of fact for the jury." Id.

Bowen and Sheldon also do not deny they made the statements at issue; they merely argue that they relied on old treatment notes, which had not been taken seriously by Plaintiff's providers. CSOF, ¶¶ 119-125. Bowen and Sheldon are free to argue truth as a defense; but again, that creates a triable dispute, as Plaintiff denies he ever had, or stated an interest in having sexual contact with a dog. CSOF, ¶ 27, 189. A reasonable jury could find Defendants' statements were false/falsely implicated Plaintiff in bestiality. Bowen stated his administrative team met frequently, was "aware of matters pertaining to Foxy," and that Sheldon was given Bowen's files pertaining to Foxy. CSOF, ¶ 191. A reasonable jury could infer sufficient dissemination from that evidence. When asked, "what was the assessed duration and severity of the purported risk [of abuse]," and what "alternative services were considered…to mitigate the risk," Bowen and Sheldon testified, "ASH was not required to conduct a separate assessment to determine the severity of the risk," and "ASH was not required to conduct a separate assessment…when the risk was completely mitigated by…exclusion of Foxy" CSOF, ¶¶ 121-130. A reasonably jury could conclude failing to conduct a risk assessment before falsely accusing Plaintiff of bestiality was reckless.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**D. Defendants are Not Entitled to Summary Judgment on Plaintiff's Defamation Claim**

To prevail on a defamation claim, a plaintiff must prove a defendant published a false and defamatory communication "(a) know[ing] that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580(B) (1977); *Peagler v. Phoenix Newspapers, Inc.,* 560 P.2d 1216, 1222 (Ariz. 1977). Plaintiff's claim is not that the Particularized Assessment or Denial Letter were delivered to Plaintiff, but that Bowen and Sheldon disseminated the statements they contained to ASH personnel, eventually reaching ASH's patients. "The trial court decides, in the first instance, whether, under all the circumstances, a statement is capable of bearing a defamatory meaning," and the "jury then decides whether the defamatory meaning of the statement was in fact conveyed." *Yetman v. English,* 168 Ariz. 71 (1991). The Court determined the statements at issue were capable of bearing a defamatory meaning. Doc. 8 at 20. A reasonable jury could find that meaning was conveyed.

Bowen and Sheldon do not deny making the statements at issue. Instead, they assert they based their statements on disputed treatment notes, and argue Plaintiff has not proven the substance of the notes to be false. "Because truth is an affirmative defense, the burden of proving falsity lies only on those plaintiffs who are defamed by speech that is a matter of public concern." *Turner v. Devlin,* 174 Ariz. 201 (1993). Defendants' statements were not matters of public concern, they were matters pertaining to Plaintiff's private mental health treatment. Yet Bowen's 2022 Particularized Assessment did more than neutrally state ASH had treatment concerns. It stated "ASH has received information that you have either touched Foxy inappropriately in the past or contemplate doing so in the future…ASH cannot ignore the risk that allowing Foxy to reside at the Forensic Hospital would enable you to abuse her…Animal abuse is a criminal act and ASH will not facilitate such crimes." The 2024 Denial Letter similarly stated Plaintiff's relationship with his service animal was "sexual in nature," and that ASH would not "facilitate such illicit and illegal behaviors." Bowen and Sheldon therefore bear the burden of proving that Plaintiff engaged in bestiality with Foxy I. They have not done so; rather, Bowen and Sheldon both admit they never independently assessed the veracity of the disputed treatment notes, despite the ADA mandating a particularized assessment. Even if the burden of proving falsity lay with Plaintiff, at summary judgment, Plaintiff's negative averments suffice to create a triable dispute.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Bowen's failure to conduct a risk assessment before issuing the Particularized Assessment, and Sheldon's failure to conduct any assessment before issuing the Denial Letter support at least a negligence finding. CSOF, ¶ 121-130. Bowen and Sheldon were on the administrative team in 2022, the team met frequently, and the team was aware of the matters pertaining to Foxy I. CSOF, ¶ 191. Under Bowen's administration, the administrative team was composed of Bowen, Sheldon, and numerous high ranking government officials. CSOF, ¶ 192. Bowen provided Sheldon a copy of computer drive and all the files it contained when he resigned. CSOF, ¶ 191. Domenick Aldrich, a Psychiatric Nursing Unit Manager ("PNUM") informed Plaintiff all the PNUMs were on the administrative team, and were regularly apprised of decisions affecting the ASH treatment units. CSOF, ¶ 192. A reasonable jury could infer publication and find Defendants' statements were disseminated broadly enough to establish publicity.

For same reasons Bowen's false light accrual argument fails, his statute of limitations argument also fails. Moreover, statute of limitations "is an affirmative defense," (Doc. 31 at 18,) and Bowen bears the burden of proving it. This defense was "properly before the Court in Defendants' Motion to Dismiss," upon which the Court found, "[a]bsent further factual development, it is reasonable to infer, that, until he began hearing these accusations outside the confines of the 2022 Particularized Assessment, Plaintiff did not know or have reason to believe Bowen disseminated the alleged false and defamatory statements in that assessment to ASH staff or that Plaintiff had suffered a reputational injury." Id. at 19. Bowen presents no new facts to refute this finding. Because Bowen has not shown the Court's application of A.R.S. § 12-821 to the *same set of facts* was in error, his untimely request for reconsideration should be denied. See *School Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

## III. CONCLUSION

Defendants' MSJ relies on disputed facts, credibility determinations, stale assessments, post-denial events, and an incorrect interpretation of the ADA. To the extend Defendants' MSJ raises affirmative defenses, Defendants have not carried their required burden of proof. Plaintiff has duly controverted all statements of fact genuinely in dispute; however, Defendants are not entitled to judgment in their favor as a matter of law in any event, and the Court must therefore Defendants' Motion for Summary Judgment.

**RESPECFULLY SUBMITTED** this 23rd day of June, 2026.

**Matthew Phillip Solan**

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**CERTIFICATE OF SERVICE**

**I CERTIFY** that copies of the foregoing document were delivered to Arizona State Hospital staff on June 23, 2026, in sealed packages, with sufficient postage affixed, for forwarding to:

Ann Hobart and Jordan Kendall
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, AZ 85004
*Attorneys for Defendants*

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003

**DATED** June 23, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008