**MATTHEW PHILLIP SOLAN**
501 North Twenty-Fourth Street
Phoenix, Arizona, 85008-6056
Tel: 1.970.FOX.9611
Fax: 1.970.844.1733
Email: legal@fox-ranch.com
*Plaintiff in propria persona*

FILED LODGED RECEIVED COPY
JUN 2 9 2026
CLERK U S DISTRICT COURT DISTRICT OF ARIZONA
BY DEPUTY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan<br>*Plaintiff,*<br><br>*v.*<br><br>State of Arizona, *et al.*,<br>*Defendants.* | Case no. CV24-02061-PHX-JJT-DMF<br><br>**PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 66)** |

Plaintiff Matthew Phillip Solan ("Plaintiff") hereby submits following facts in opposition to the Motion for Summary Judgment (Doc. 65) ("MSJ") and Separate Statement of Facts in Support of Motion for Summary Judgment (Doc. 66) ("SOF") filed by Defendants State of Arizona (the "State"), Michael R. Sheldon ("Sheldon"), Aaron Bowen ("Bowen") Lea'Cher Carter ("Carter"), and Unique Coleman ("Coleman") (collectively, "Defendants").

## PROCEEDURAL AND EVIDENTIARY OBJECTIONS

In an effort to simplify Plaintiff's response to Defendants' SOF, Plaintiff lays out the following procedural and evidentiary objections (each referred to as a "General Objection") to various claims made in Defendants' SOF, including specific citations to the General Objection in the responses below:

A. Plaintiff objects to multiple paragraphs in Defendants' SOF on the ground that they violate Local Rule 56.1, in that they present facts not material to the Court's determination of Defendants' MSJ. They are, at best, "background" facts which "should not be included in the separate statement of facts." L.R.Civ.P. 56.1(a).

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

B. Plaintiff objects to Defendants' reliance on ASH progress notes, incident reports, and police-related statements to prove the truth of alleged statements or events unless and until Defendants establish admissibility and address hearsay within hearsay. See *Orr v. Bank of America,* 285 F.3d 764, 773-74 (9th Cir. 2002); *Fraser v. Goodale,* 342 F.3d 1032, 1036-37 (9th Cir. 2003). Plaintiff does not dispute that certain records may exist, but denies the existence of a record is same as conclusive proof that Plaintiff made the statements therein attributed to him, that the statements were accurately recorded, or that Defendants' defamatory implications were true.

C. Plaintiff objects to multiple paragraphs in Defendants' SOF on the ground that they contain statements which are extraneous or to the Court's determination of Defendant's MSJ. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 (citing 10A Fed. Prac. & Proc. Civ. § 2725 (4th ed.)); *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981) (explaining that facts submitted by an opposing party in a summary judgment motion "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions").

D. Plaintiff objects to multiple paragraphs in Defendants' SOF on the ground that they that rely on inadmissible hearsay. Hearsay includes any statement not sworn to by its declarant, that a party offers as proof. Fed. R. Evid. 801. Hearsay is not admissible except where expressly excepted by law. Fed. R. Evid. 802. "Inadmissible hearsay evidence may not be considered on a motion for summary judgment." *Anheuser-Busch v. Natural Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995).

## ADDITIONAL DEFINITIONS

a. "FAC" refers to Plaintiff's First Amended Complaint filed November 18, 2026 (Doc. 6).
b. "Foxy I" refers to Plaintiff's former service animal who passed away in 2022.
c. "Foxy II" refers to Plaintiff's current service animal subject of the instant case.
d. "Solan Decl." refers to attached declaration of Matthew Solan (Exhibit A).
e. "Smith Decl." refers to declaration Brad Smith attached to the FAC at 90-91.
f. "Cowsert Decl." refers to the declaration of Joseph Cowsert attached to the FAC at 93-98.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

<u>**STATEMENT OF DISPUTED FACTS**</u>

The following numbered paragraphs correspond to those in Defendant's SOF:

1. **Objection:** Undisputed background fact. *See* General Objection A.

   **Objection:** Immaterial. *See* General Objection C.

2. **Objection:** Undisputed background fact. *See* General Objection A.

   **Objection:** Immaterial. *See* General Objection C.

   **Disputed in part:** Plaintiff does not dispute the State's court found the plea voluntary. Plaintiff denies the plea was voluntary and maintains it was exacted under duress.

3. **Objection:** Undisputed background fact. *See* General Objection A.

   **Objection:** Immaterial. *See* General Objection C.

   **Disputed in part:** Plaintiff denies that he is or has ever been "incarcerated."

4. **Objection:** Immaterial. *See* General Objection C.

   **Objection:** Needlessly sensationalizes an irrelevant background fact for the purpose of prejudicing the Court against Plaintiff by grossly misrepresenting Plaintiff's attempted suicide in 2019 as an "armed standoff." *See* Solan Decl., ¶ 2.

   **Disputed:** Plaintiff denies that he is or has ever been "incarcerated." Plaintiff denies that he ever "surrendered." Plaintiff was captured and taken into state custody after he shot himself and collapsed on the ground. *See* Solan Decl., ¶¶ 3, 4.

5. **Objection:** Immaterial to the extent it refers to Foxy I. *See* General Objection C.

   **Disputed:** Foxy II was born on November 9 2023. *See* FAC at 71; Solan Decl., ¶¶ 5, 6. Foxy II was not in Plaintiff's vehicle on January 30, 2019.

6. **Objection:** immaterial to the extent it refers to Foxy I. *See* General Objection C.

   **Disputed:** Foxy II was born on November 9 2023. *See* FAC at 71; Solan Decl., ¶¶ 5, 6. Plaintiff had no contact with Foxy II in 2020.

7. **Objection:** Undisputed background fact. *See* General Objection A.

8. **Objection:** Immaterial. *See* General Objection C.

   **Objection:** Cited record is unauthenticated and not subject to authentication exceptions.

   **Objection:** Scandalous. Included only bias the finder of facts against Plaintiff.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**Objection:** Conjecture. *See* General Objection C. The citer report fails to establish that Dr. Morris had firsthand knowledge of Plaintiff becoming "enraged" or "explosive."

**Objection:** Conjecture. *See* General Objection C. Dr. Morris provides no basis for his concluding Plaintiff disdains rules, laws, or social norms, engages in manipulation or deceitfulness, or has no regard whatsoever for others except as tools to obtain his needs.

**Disputed:** Plaintiff does become enraged and explosive when confronted with people telling him to do things he doesn't want to do. *See* Solan Decl., ¶ 8. He does not have a clear disdain for rules, laws, and social norms. *See* Solan Decl., ¶ 9. He does not engage manipulation or deceitfulness. *See* Solan Decl., ¶ 10. He does not possesses an inflated sense of his own importance with a deep need for attention and admiration and no regard for others except as tools to obtain his needs. *See* Id.

9. **Objection:** Immaterial. Foxy II was not yet born in 2022. *See* General Objection C.

**Objection:** Cited record is unauthenticated and not subject to authentication exceptions.

**Disputed:** These are not and were never Plaintiff's treatment goals. ASH staff made these goals up, and added them to Plaintiff's treatment plan without his consent. Plaintiff and his former attorney, Holly Gieszl, repeatedly informed Plaintiff's treatment team that Plaintiff was not in agreement with the treatment plan, which was memorialized in nearly every treatment plan. *See* Solan Decl, ¶ 12; Exhibit H.

10. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

11. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

12. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

13. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

14. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

15. **Objection:** Immaterial. *See* General Objection C.

Plaintiff lacks sufficient knowledge of ASH's policies to respond.

16. **Objection:** Immaterial. *See* General Objection C.

**Objection:** Assumes facts not in the record. Plaintiff cannot respond because Plaintiff does not what the date and time of "this writing" is. Plaintiff does not dispute that he attained "full mall privilege" within the meaning of ASH's arbitrary privileging system.

17. **Objection:** Generally undisputed background facts. *See* General Objection A

**Disputed in part:** To the extent "Foxy" is taken to mean Foxy II, Foxy II was born on November 9 2023. *See* FAC at 71. Foxy II was not yet born on April 1, 2020, and Plaintiff could not requested a service animal accommodation for her on that date.

18. **Objection:** Undisputed background fact. *See* General Objection A.

**Objection:** Immaterial. *See* General Objection C.

19. **Objection:** Undisputed background fact. *See* General Objection A.

**Objection:** Immaterial. *See* General Objection C.

**Disputed in part:** CV-20-02209 did not pertain to Foxy II.

20. **Objection:** Misleading the Court. ASH was ordered to do far more than that. The Court specifically ordered ASH to "to conduct a particularized assessment of Plaintiff's request to have Foxy accompany him at the Forensic Hospital in accordance with the ADA and the relevant Code of Federal Regulations to determine, 1) whether reasonable modifications to its policies, practices, and procedures could be made that would permit Plaintiff the use of Foxy while housed at the Forensic Hospital; and 2) whether Foxy specifically (as distinct from 'service dogs' generally) would be disruptive to the health or safety of other patients at Plaintiff's current housing unit, including Plaintiff's roommate, based on reasonable judgment that relies on current medical knowledge or the best available objective evidence and includes an assessment of individual patients at Plaintiff's current housing unit and the effect Foxy may have on them, including the probability that injury will actually occur." *See* Doc. 31 at 3-4; Doc. 17 at 36-37.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

21. **Disputed:** Plaintiff does not dispute that ASH provided him "a letter" on or about May 5, 2022, but denies that ASH conduct the "required" assessment. The letter 1) enumerated policies that might need to be altered without explaining why any of those alterations were required or how the alterations would impose a substantial burden, and 2) made numerous unfounded and defamatory allegations on Plaintiff's character and falsely accused him of making statements indicating that he had engaged in or intended to engage in sexual conduct with his former service animal. *See* Solan Decl., ¶ 13. The letter "did not attempt to explain how Foxy, specifically as distinct from other service dogs generally, would be disruptive to the health and safety of other patients on Plaintiff's treatment unit," and "did not include 'an assessment of individual patients at Plaintiff's housing unit, the effect Foxy may have on them, or the probability that injury would actually occur to them;'" it "did enumerate policies that may need to be altered, but it did not explain why any of these alterations were required or how the alterations would impose a substantial burden on the State." *See* Doc. 31 at 4; Solan Decl., ¶ 13.

22. **Objection:** Irrelevant. *See* General Objection C. ASH's purported reasoning for excluding Foxy I in 2020 is not material to question of whether ASH conducted a valid assessment of Plaintiff's request to be accompanied by Foxy II in 2024.

**Objection:** Hearsay. Bowen has not testified to the veracity of the contents of the Particularized Assessment has not shown he had any personal knowledge whatsoever of any of the purported "facts" the Particularized Assessment recites. *See* General Objection B; *see also* General Objection D.

**Responsive to each subparagraph:**

(1) **Objection:** irrelevant. *See* General Objection C. Medical necessity is not a valid inquiry under the ADA. The ADA requires hospitals to allow service animals in patient rooms and anywhere else patients are allowed to go. They cannot be excluded on the grounds that staff can provide the same services.

**Objection:** Irrelevant. *See* General Objection C. Psychiatric service animals are not required not assist their handlers in physically "navigating" hospitals or otherwise

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

providing physical support. A service animal is "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. Pt. 35, App. A, p. 614.

**Objection:** Conjecture. *See* General Objection C. No admissible evidence is cited to support the Bowen's opinion that Plaintiff's former service animal would have gotten "in the way" of Plaintiff's behavioral health treatment.

**Disputed:** Having Foxy I at ASH would not have gotten "in the way" of Plaintiff's behavior health treatment. Having Foxy II at ASH would not have gotten "in the way" and will not get in the way of Plaintiff's behavior health treatment. *See* Solan Decl., ¶ 14.

(2) **Objection:** Irrelevant. *See* General Objection C. Refers to Foxy I. She is not the subject of the instant suit.

**Objection:** Misleading the Court. The ADA does not require service animals to be tethered with a harness, leash, or other tether. Service animals are exempt from tether requirements where the use of a harness, leash, or other tether would interfere with the service animal's safe performance of work or tasks, and may be otherwise under the handler's control (e.g., voice control, signals, or other effective means). 28 C.F.R. § 35.136(d).

**Objection:** Conjecture. *See* General Objection C. Defendants cite no admissible evidence of assessment to determine if Plaintiff's possession of a short leash or other tether would constitute an imminent threat of serious physical harm to Plaintiff or others.

**Objection:** Conjecture. *See* General Objection C. Defendants cite no admissible evidence that Plaintiff would not have been able to control Foxy I without a leash or other tether.

**Disputed:** Foxy I was easily controlled by voice command. *See* Solan Decl., ¶ 15. Foxy II is also controllable by voice command. *See* Smith Decl., ¶ 8; Cowsert Decl.,

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

¶ 24; If tethering was desirable, other materials that could serve as a tether without creating a ligature risk, such as a chain of Velcro strips, would have been sufficient to tether Foxy I, and could just as well tether Foxy II. *See* Solan Decl., ¶ 15. The shoelaces ASH allows Plaintiff to keep are long and sturdy enough to have tethered Foxy I, and likewise could just as well tether Foxy II. *See* Id.

(3) **Objection:** Irrelevant. *See* General Objection C. Refers to Foxy I. She is not the subject of the instant suit.

**Objection:** Misleading the Court. Title II does not require Plaintiff be "solely responsible" for his service animal's care while at ASH. Rather, a "public entity is not responsible for the care or supervision of a service animal." 28 C.F.R. § 35.136(e). The DOJ "recognizes that there are occasions when a person with a disability is confined to bed in a hospital for a period of time. In such an instance, the individual may not be able to walk or feed the service animal. In such cases, if the individual has a family member, friend, or other person willing to take on these responsibilities in the place of the individual with disabilities, the individual's obligation to be responsible for the care and supervision of the service animal would be satisfied." 28 C.F.R., Pt. 35, App. A at 624.

**Objection:** Conjecture. *See* General Objection C. Defendants cite no admissible evidence that Plaintiff could not have cared for Foxy I's daily needs, or that he cannot care for Foxy II's needs at the Forensic Hospital without significant assistance from ASH staff.

**Disputed:** Plaintiff could have easily cared for Foxy I, and can easily care for Foxy II with minimal to no assistance from ASH staff. *See* Solan Decl., ¶ 16. Plaintiff can walk Foxy II, pick up after her, feed her, bathe her, and perform all of her day-to-day maintenance without assistance, just as he did for Foxy I while living alone with her prior to their forced separation. Id. The only assistance Plaintiff would require form ASH staff is accessing ASH's secured outdoor spaces several times each day for toileting and exercise. *See* Id. Opening a door so Plaintiff can access ASH's secured

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

outdoor space is not "care or supervision" of a service animal, it is a normal staff function. *See* Id. If Plaintiff ever became unable to manage Foxy II's care or supervision, Plaintiff's friends would pick her up, and Plaintiff's family, or Foxy II's trust, would pay for her care, just as they do now. *See* Id.

(4) **Objection:** Irrelevant. *See* General Objection C. Foxy I is dead, (*see* Solan Decl., ¶ 5,) and Foxy II takes no medication. *See* Solan Decl., ¶ 17.

**Disputed:** Foxy I never took gabapentin. A vet prescribed it once for her arthritis, but due to the side-effect profile, Foxy I's caretakers chose to manage her arthritis with fish oil, diet, and exercise, which turned out to be sufficient. *See* Solan Decl., ¶ 17. Foxy I's so-called "heart disease" medication was a blood pressure drug made for humans and incidentally used in veterinary practice. *See* Id. Foxy II does not have arthritis or heart disease and does not take any medication. *See* Id. If Foxy II ever became so ill as to need veterinary care, Plaintiff's friends would remove her from ASH, and Plaintiff's family, or Foxy II's trust, would pay for her medical care, just as they do now. *See* Id; Exhibit B, ¶ 23; Exhibit P.

(5) **Objection:** Spurious, frivolous, and illogical. *See* General Objection C. ASH's argument reduces to absurdity: if a allowing service animal into the ASH would alter its nature from an inpatient hospital facility that cares for human beings to one that also must care for an animal, then allowing a service animal into a mechanic's shop would fundamentally alter a garage from a facility that repairs cars to one that must also repair dogs.

**Objection:** Conjecture. *See* General Objection C. ASH cites no admissible evidence that admitting Foxy I  would have fundamentally alter the nature of ASH's services, programs, and activities, nor does it cite admissible evidence that admitting Foxy II would fundamentally alter the nature of ASH's services, programs, and activities.

**Disputed:** Foxy I's presence would not have fundamentally altered the nature of the ASH Forensic Hospital from an inpatient hospital facility that cares for human beings to one that also must care for an animal. *See* Solan Decl., ¶¶ 14-19.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

(6) **Objection:** Scandalous and unduly prejudicial. The probative value of these statements, if any, is grossly outweighed by the substantial risk of undue prejudice these inflammatory hearsay-on-hearsay statements pose. *See* Fed. R. Evid. 403.

**Objection:** Conjecture. *See* General Objection C. Defendants cite no admissible evidence that shows Plaintiff reasonably poses a "risk of animal abuse."

**Objection:** Irrelevant. *See* General Objection C. Foxy I is dead. *See* Solan Decl., ¶ 5.

**Disputed:** Plaintiff never expressed to "peers," staff, or anyone else a desire to have "intimate relations" with Foxy I. *See* Solan Decl., ¶ 18; FAC ¶¶ 89, 287. There was never any risk that Plaintiff would abuse Foxy I, there is no risk that Plaintiff would or will abuse Foxy II; Plaintiff does not abuse animals. *See* Solan Decl., ¶ 18. Instead, Plaintiff treats his service animal with the utmost care and respect. *See* Id.; Cowsert Decl., ¶¶ 27-31; Exhibit B, ¶¶ 17-18; Exhibit C, ¶¶ 7-9; Exhibit D, ¶ 8.

23. **Objection**: Argumentative and self-contradicting. Only one of six sections on the Particularized Assessment where arguably based on Dr. Morris' opinion.

**Objection:** Irrelevant. *See* General Objection C. Dr. Morris did not work with Plaintiff at any time after Foxy II was born, and could not have had any personal knowledge relating to her.

**Objection:** Without admitting to the veracity of Dr. Morris' recounting of the purported discussions he had with Plaintiff, Plaintiff objections to any disclosure by Dr. Morris of discussions between him and Plaintiff during therapy sessions as violating the doctor-patient privilege that existed between Plaintiff and Dr. Morris and which Plaintiff has not waived, does not waive, and does not intend to waive. Defendants have not claimed, let alone proven an exception to the doctor-patient privilege.

**Objection:** Speculative. *See* General Objection C. Dr. Morris' opinion that a service animal would not be "clinically appropriate" is irrelevant to determining whether Foxy II's presence would fundamentally alter the nature of ASH's programs, services, or activities.

**Objection:** Inadmissible as unauthenticated and potentially fraudulent. The affidavit is not authenticated, is not subject of an authentication exemption, and appears to be a forgery.

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Defendant's counsel sent their digital copy of the affidavit to Plaintiff as a PDF. *See* Solan Decl., ¶ 19. Defendant's counsel informed Plaintiff that she was not involved in producing the affidavit, but received it from the private counsel ASH had hired in 2022 to conduct the Particularized Assessment. *See* Id. Upon inspection of the PDF file, Plaintiff discovered (1) the first page was generated by a word processing program and had not been printed and subsequently scanned; (2) the second and third pages were also created a word processing program and had not been printed and subsequently scanned, and used a different typeface as the first page; and (3) the last page containing the jurat was printed, scanned, and used yet another typeface. *See* Id. In other words, the first three pages, containing the body of the affidavit, were prepared separately from the signature page, and later merged together. *See* Id. Plaintiff conferred with Defendants' counsel about this issue in February, 2026, and requested that they disclose a copy of the original document. *See* Id. Defense counsel Ann Hobart informed Plaintiff her office did not have the original. *See* Id. Plaintiff objects to the admissibility of the affidavit unless and until the original document is produced or Dr. Morris personally authenticates the contents of the purported affidavit.

**Disputed:** Foxy I was, and Foxy II is appropriate and necessary for Plaintiff's habilitation. *See* Solan Decl., ¶ 20; Cowsert Decl., ¶¶ 20-22, 32-33; Smith Decl. ¶¶ 7, 9. After purportedly writing the affidavit, Dr. Morris later contradicted its statement that Foxy I "would only serve to get in the way" of Plaintiff's treatment, when Dr. Morris, as Plaintiff's treating psychiatrist, confirmed in the treatment plan he produced for Plaintiff, that Foxy I was one of Plaintiff's "primary strengths," and endorsed Plaintiff's treatment need for animal therapy. *See* Solan Decl., ¶¶ 189-190; Exhibit H.

24. **Objection:** Irrelevant. *See* General Objection C. Service animals must be allowed in patient rooms and anywhere else in a hospital that Plaintiff is allowed to go, and cannot be excluded on the grounds that staff can provide the same services.

**Disputed:** Services Plaintiff requires are ***not*** "provided by trained people whose job it is to provide these very things as needed to all patients on a regular basis." ASH's CEO and former ADHS Director Jennifer Cunico reported to the Arizona Legislature in their report

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

issued pursuant to Ariz. Laws 2022, Chapter 359, Section 3, that ASH "is not able to meet the needs of patients with Autism." *Arizona State Hospital Clinical Improvement and Human Resource Plan* at Option F, page 41. Defendant Sheldon also confirmed that patients with Autism are hospitalized at ASH for significantly longer periods than their peers. *See* Doc. 24 at 32. Specifically, "12.2% of Forensic patients" have a neurocognitive or neurodevelopmental disorder "and have an average length of stay 2.9 years longer than their peers without a Neurocognitive or Neurodevelopmental Disorder." *See* Doc. 24 at 34. ASH's staff have never met Plaintiff's Autism and PTSD related needs. *See* Solan Decl., ¶¶ 21, 187.

25. **Objection:** Irrelevant. *See* General Objection C. The ADA does not require a service animal user to like humans better than dogs before accessing a public entities programs, services, or activities. What a service animal user says he thinks about people is irrelevant to the question of whether a service animal is properly excluded from a public entity's facilities. The amount of time Plaintiff spends on the computer is also irrelevant to the question of whether a service animal is properly excluded from a public entity's facilities.

**Objection:** Conjecture and assumes facts not in evidence. *See* General Objection C. Dr. Morris's purported affidavit cites no evidence that Plaintiff was admitted to ASH to "learn how to better get along with people," that a "beloved therapy animal would only serve to get in the way," or that spending time with his service dog would somehow make him spend less time with people.

**Disputed:** Plaintiff was not admitted to ASH to "learn how to better get along with people," he was admitted to ASH because, "at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong." A.R.S. § 13-502(A). Plaintiff was subsequently committed to ASH for a period of treatment for the Schizoaffective disorder that made him unable to comprehend that his "criminal act was wrong." *See* Solan Decl., ¶ 22. ASH has determined that Plaintiff no longer suffers from a Schizoaffective disorder. *See* Id. Plaintiff did not tell Dr. Morris that he had Foxy I as a transition object to remove himself from the "co-dependent" relationship he had with his mother. *See* Solan Decl., ¶ 23. Plaintiff has no need to "learn how to better

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

get along with people," and even if he did, he refuses. *See* Solan Decl., ¶24. The fact that Plaintiff does not to "like" people has nothing to do with Foxy II. *See* Id. Plaintiff is a radical ecocentist, a therian, and a practitioner of esoteric fox magic. *See* Id. These are fundamental aspects of Plaintiff's deeply held religious beliefs and philosophical worldview. *See* Id. Neither Dr. Morris, nor anyone else at ASH has any right to try and "fix" these aspects of Plaintiff's identity. To the extent Plaintiff's spiritual identity is a "problem" that can or should be "fixed," ASH's unjustified exclusion of Foxy I and II and appalling attacks on Plaintiff's relationship with his service animals has only furthered Plaintiff's disdain for humans and alienation from ASH's treatment providers. *See* Doc. 17 at 84 19-20, 85:4-13; Solan Decl., ¶ 25. Plaintiff denies that separating him from his service animal would help him "deal with people in spite of his autism." Plaintiff has been separated from his service animals for over 7 years, and has not gotten better at "dealing" with people. In fact, Plaintiff is more alienated from society, and the human race generally then at any other time in his life. *See* Solan Decl., ¶ 26. Plaintiff has no intent whatsoever of "getting along" with people, and has instead been rapidly advanced his long-running plans to move to a remote patented mining claim at 12,000 feet in the Rockies with Foxy II after discharge from ASH, precisely to get away from people. *See* Id.

26. **Objection:** Irrelevant. *See* General Objection C. The ADA does not require a service dog to assist its handler with "navigating" a hospital. It is also unclear what "meet his needs" means. The ADA does not requires a service dog to assist in all activities of daily living. That a dog is individually trained to perform work or tasks to assist a disabled individual is sufficient.

**Objection:** Irrelevant. *See* General Objection C. The ADA does not ask if a disabled individual is "sufficiently disabled." It asks if an individual has a "disability." The primary object of attention in cases brought under the ADA is whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of "disability." 28 C.F.R. § 35.101(b).

**Objection:** Irrelevant. *See* General Objection C. Medical necessity is not a permitted inquiry under the ADA when determining if a service must be accommodated. A public entity may

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

"not ask about the nature or extent of a person's disability," but may make two inquiries to determine whether an animal qualifies as a service animal: a public entity "may ask if the animal is required because of a disability and what work or task the animal has been trained to perform." 28 C.F.R. § 35.136(f).

**Objection:** Conjecture. *See* General Objection C. Dr. Morris' ruminations are not admissible statements of fact.

**Objection:** Conjecture. *See* General Objection C. Dr. Morris's purported affidavit cites no evidence whatsoever that Plaintiff "feels it has been successful to establish himself in another state attempting to do other things apart from his mother," that Plaintiff is or was "realizing he is not as disabled as he thought he was and is realizing capabilities he didn't know he had," that Plaintiff used Foxy I as a "transition object," or that a "transition object is no longer needed." that a "beloved therapy animal would only serve to get in the way."

**Objection:** Assumes facts not in evidence. Dr. Morris cites no evidence that Foxy I was, or that Foxy II is Plaintiff's "pet."

**Disputed:** Foxy I was not a "pet" and Foxy II is not a "pet." Foxy (including Foxy I Foxy II, and every future clone of Foxy born in Plaintiff's lifetime,) was, is, and will be Plaintiff's service animal, familiar, and permanent life companion. *See* Solan Decl., ¶ 27. Plaintiff would not have spent $53,500 cloning a "pet." Id. Nor would he have established a dynastic Colorado pet/purpose trust that funds and mandates a perpetual cycle of cloning Foxy, if she were just a "pet." *See* Id.; Exhibit P. Plaintiff did not tell Dr. Morris or anyone else at ASH that he felt he had successfully "established himself in another state attempting to do other things apart from his mother." *See* Solan Decl., ¶ 28. Plaintiff *tried* to established himself in another state, but instead was arrested multiple times, found criminally insane, confined in mental hospital for 6+ years, and certified totally and permanently disabled. *See* Id.; Doc. 24 at 20. Plaintiff is not "established" in Arizona and has no intent of remaining in Arizona. *See* Solan Decl., ¶ 26. Plaintiff denies that he is "realizing capacities he didn't know he had." Plaintiff is, and has long been aware that he is an "autodidactic polymath with an intelligence quotient 3 standard deviations higher than that of the general public," who, "[a]s a child, []

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

found solace in logic, mathematics, and computers." *See* Doc. 17. at 76:14-15; Solan Decl., ¶ 29. Plaintiff also is deeply aware of his disability-related limitations: Plaintiff has "never been able to hold employment," and while he has "performed limited freelance/contract work in the fields of animation and industrial automation, [his] sensory sensitivities and atypical modes of communication have alienated [him] from the vulgar masses." *See* Doc. 17 at 76:21-22, 77:1-3; Solan Decl., ¶ 29.

27. **Objection:** Conjecture. *See* General Objection C. Bowen's opinion that records "suggest" Plaintiff "may have had" feelings for Foxy I is speculative and conjectural. **Objection:** Hearsay. *See* General Objection D; see also *See* General Objection B. The cited records (DF0451-0452, DF0457, DF0458, DF0461, DF0441-DF0445, DF0466, DF0467-0468, DF0477-0478, DF0479-0480, and DF0436-0437) are unauthenticated and not subject to any authentication exception.

**Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. None of authors of the alleged hospital records have testified that Plaintiff actually made any of the statements reported in the records.

**Objection:** Irrelevant. *See* General Objection C. All of the cited notes and reports were made 5-6 years ago, long before Foxy II was even born, and are not "current medical evidence" for the purposes of a direct-threat analysis under the ADA.

**Responsive to each bulleted point:**

- **Objection:** Irrelevant. *See* General Objection C; *see also* General Objection B. Whether or not Plaintiff described his former service animal as a "co-sovereign" or "like a wife" is not material to the Court's determination of Defendants' MSJ.

  **Disputed in part:** Plaintiff does not deny that he called Foxy I a "co-sovereign," or that he said something to the effect that she was "like a wife." Neither statement were intended to convey any sexual connotation. *See* Solan Decl., ¶ 30. Plaintiff considered Foxy I, and considers Foxy II his political equal, (Id.,) and does not yield his sovereignty to the agencies that serve him. *See* FAC at 62:6-7; Solan Decl., ¶ 30. To that end, Foxy I was, and Foxy II is Plaintiff's co-sovereign. Plaintiff also consulted

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Foxy I and deferred to her preferences in many household decisions, meal planning, and hiking routes, and now, as trustee under Foxy II's Colorado pet trust, holds fiduciary duties to defer to Foxy II's wishes in such matters. *See* Solan Decl., ¶ 29; Cowset Decl., ¶ 29. Foxy is someone Plaintiff wishes to share eternity with, to the exclusion of all others, human and canine, and who Plaintiff has pledged to cherish and care for in perpetuity, through the good times and the bad, in sickness and in health. *See* Solan Decl., ¶ 29. To those ends, Foxy I was "like a wife." The progress note cited by Defendants states that Plaintiff told Collin Bennett, his former ASH therapist, that the reason he considered Foxy "like a wife" was that she "has a final say on things." SOF, Ex. G. Plaintiff denies he told Bennett he had any sexual contact or interest in Foxy I. *See* Id.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0457 is not sworn to by its alleged author, Johnathan Tekle and does not establish that Tekle had firsthand knowledge of the statements he alleges Plaintiff made. The note instead indicates that Tekle received the report from unnamed "staff." SOF, Ex. G.

**Disputed:** Plaintiff did not tell Johnathan Tekle or anyone else at ASH that he and Foxy "put our tongues in each other's mouths." *See* Solan Decl., ¶ 31.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0458 is not sworn to by its alleged author, Tabatha Hackett and does not establish that Hackett had firsthand knowledge of the statements she alleges Plaintiff made. The note instead states on its face that unnamed "staff," not Ms. Hackett, "overheard" the alleged statements of Plaintiff. *See* SOF, Ex. I.

**Disputed:** Plaintiff did not tell Tabatha Hackett or anyone else at ASH that if he were to roast Foxy, she would look like a Cornish game hen, but she probably would not taste like it. *See* Solan Decl., ¶ 32. Plaintiff did talk to Tabatha Hackett or anyone else at ASH about sticking his fingers in Foxy's rectum and did not note that his hand would not fit because it was too big. *See* Solan Decl., ¶ 33. In 2023, Hackett

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

apologized to Plaintiff, and told him she had been pressured by the ASH administration in 2021 to write negative reports against him, and that she had stopped doing so when she realized she was being "used." *See* Solan Decl., ¶ 34. Hackett informed Plaintiff on May 28, 2026 that she never made any report that Plaintiff had talked about sticking his fingers in Foxy's rectum. *See* Solan Decl., ¶ 35.

- **Objection:** Hearsay. *See* General Objection D and General Objection B. DF0461 is not sworn to by its alleged author, Harmony Hayes, and does not establish Hayes had firsthand knowledge of the statements she alleges Plaintiff made.

  **Disputed:** Plaintiff did not tell Harmony Hayes that "ASH can't stop [him] from marrying [Foxy I]. Biden passed a law." *See* Solan Decl., ¶ 36.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF441-445 is not is not sworn to by its alleged author, Jacqueline Bachelier.

  **Objection:** Unlawfully acquired evidence. DF444 and DF445 were not provided to ASH by Plaintiff, but were unlawfully seized from Plaintiff's room during a room search. *See* Solan Decl., ¶ 36. The seizure was effected in violation of the 4th Amendment. DF444 and DF445 are inadmissible pursuant to the fruit of the poison tree doctrine.

  **Objection:** Misleading the Court. DF445 does not call Plaintiff's former service animal a "private person incarnate," it calls her a "private person," meaning an entity capable of holding rights or duties that is not a constituent of the State body politic, who was "incarnate circa the sixth day of the month of May, in the year two thousand and six," meaning her birthday was May 6, 2026.

  **Disputed in part:** Plaintiff does not dispute that he left a voicemail for Jaqueline Bacheliers's or sent her the cited demand letter. Plaintiff denies that the ceremonies implicated any sexual intent towards Foxy I and denies that the ceremonies or rituals would have caused any harm to Foxy I. *See* Solan Decl., ¶ 37. Plaintiff's use of "manumission" and "marriage" with respect to the cited ceremony are symbolic terms used in Plaintiff's religious practices. Id. Plaintiff asserted then, as he does now,

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

that those ceremonies and rituals are protected under RLUIPA and the First Amendment. *See* Solan Decl., ¶ 38. Bowen knew this, as Bachelor attached a demand letter from Plaintiff, stating "[w]hile Foxy [I] is a Service Animal, she is also my Familiar and assist in many of my religious rituals and practices. Foxy's presence is REQUIRED for the manumission ceremony…Pursuant to 18 U.S.C. § 2000cc-1(a), ASH CANNOT impose a substantial burden on my…religious exercise. It would be a substantial burden on my religious exercise for ASH to refuse to accommodate this special ceremonial visit..." *See* Id.; SOF Ex. I.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0466 is not sworn to by its alleged author, Jihan McNeal and does not establish that McNeal had firsthand knowledge of the statements she alleges Plaintiff made. The note states on its face the when Plaintiff allegedly made the reported comments unnamed "staff." *See* SOF Ex. L.

**Disputed:** Plaintiff did not McNeal he was "saving himself for his Fiancé Foxy whom has not consented to intercourse as of yet." Solan Decl., ¶ 39. McNeal constantly abused Plaintiff, and repeatedly talked down to him and told him he was a "racist," that "all white people are all racist," and that Plaintiff "is a criminal" who doesn't deserve good food. Id.; Exhibit C, ¶¶ 11-14. McNeal also encouraged another Patient, Roberto Ortega, to assault Plaintiff on July 19, 2021. Solan Decl., ¶ 39; Exhibit C, ¶ 15. Plaintiff was awarded $75,000 in damages against Ortega after he punched Plaintiff in the face while McNeal stood by and watched. Solan Decl., ¶ 39; Exhibit Q.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0467-DF467 is not sworn to by its alleged author, Paulina Avila, and does not establish Avila had firsthand knowledge of the statements she alleges Plaintiff made.

**Disputed:** Plaintiff not did repeatedly tell his treatment team that he identified as a Pomeranian or that Foxy I was his fiancée. *See* Solan Decl., ¶ 40. As a therian, Plaintiff identifies as and with a totem animal; for Plaintiff, that animal is a fox, not a

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Pomeranian. *See* Id. This has been part of Plaintiff's identity long before Plaintiff adopted Foxy I in 2015. *See* Id. For example, nearly every art school project Plaintiff completed involved anthropomorphic fox characters. *See* Id.; Exhibit Z, image 1-2 (Plaintiff standing next to a 3d rendering of a two anthropomorphic fox characters he designed as part of his final 3d-animation project at Boston University's Center for Digital Imaging an Arts in 2012); Exhibit Z, image 3 ("Emperor Fox," Plaintiff's online fursona). Because Plaintiff has talked nonstop about Foxy I every day he has been confined at ASH, some of the other patients began teasing Plaintiff and calling Foxy I his "fiancée." *See* Solan Decl., ¶ 40; Exhibit C, ¶ 10. It became a running joke, but Plaintiff never endorsed the trope as literally true. *See* Id.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0477-DF478 is not sworn to by its alleged author, Lexie Gallagher, and does not establish that Gallagher had firsthand knowledge of the statements she alleges Plaintiff made.

**Disputed in part:** Plaintiff denies that he told Gallagher that that Foxy I "licks the inside of my mouth and cleans all the gunk from my teeth." Solan Decl., ¶ 41. If Plaintiff said anything to even close to that, he was mocking Gallagher, who was harassing Plaintiff over his refusal to use a plastic toothbrush. Id. Both for religious reasons and due to Plaintiff's autism-related sensory sensitivities, Plaintiff uses Miswak sticks instead of plastic bristle toothbrushes. Id. The note recognizes this. ("At the end of the session, patient retrieved his Miswak brushes and demonstrated a cleaning of his teeth with prompting from rehab."). *See* SOF Ex. N.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0479-DF480 is not sworn to by its alleged author, Kenneth Kleman, and does not establish that Kleman had firsthand knowledge of the statements he alleges Plaintiff made.

**Disputed:** The author purportedly states, "[e]arlier this shift, patient was referring to staff as drug addicts and inferring that he wants a Viagra order so he can have sex

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

with his dog and watch rabbits have sex." *See* SOF, ¶ O. Plaintiff never asked for Viagra, never said he wanted to have sex with his dog, never said that he wanted to watch rabbits have sex, and certainly never said he "wanted a Viagra order so he could have sex with his dog and watch rabbits have sex." *See* Solan Decl., ¶ 42. Plaintiff also has no idea how he could "infer" such things without saying them. *See* Id. Plaintiff was 33 years old in December, 2021; then, as now, his reproductive anatomy functions fine without "Viagra." *See* Id. Kleman's note is inane and ridiculous.

- **Objection:** Hearsay. *See* General Objection D; *see also* General Objection B. DF0435-DF4370 is not sworn to by its alleged author, Melissa Taufa.

  **Disputed:** Plaintiff did not tell Taufa that Foxy I was his fiancé. *See* Solan Decl., ¶ 43. Plaintiff never said "yeah baby, we are the superior breed my little fox." *See* Id. If Plaintiff ever said he wanted to "touch" his "baby Pomeranian," he meant it literally: Plaintiff touches Foxy's fur as a sensory anchor; that his part of her "grounding" work. *See* Id.; Cowsert Decl., ¶ 20; Smith Decl., ¶ 7. And as Plaintiff stated at his deposition, "You guys think that I want to just hurt [Foxy] and sexually abuse her? Couldn't be farther from the truth. I treat her as a child. She's my *baby*." Doc. 66-2 at 16 (pg. 251 at 19-22). Plaintiff was not referring to "sexual needs" or "medical needs," as Taufa infers, when he brought up "suing the state" for "not accommodating to [his] needs." *See* Solan Decl., ¶ 43. He was referring to his need for the State to accommodate his Autism. *See* Id.

28. **Objection:** Generally undisputed background fact. *See* General Objection A.
    **Objection:** Immaterial. *See* General Objection C.
29. **Objection:** Undisputed background fact. *See* General Objection A.
    **Objection:** Immaterial. *See* General Objection C.
30. **Objection:** Undisputed background fact. *See* General Objection A.
    **Objection:** Immaterial. *See* General Objection C.
31. **Not disputed.**

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

32. **Not disputed.**

33. **Objection: Irrelevant.** The ADA does not require a service animal user "personally train" their service animal. It only requires that the animal is individually trained.

**Objection:** Conjecture and misleading the Court. Plaintiff's deposition testimony relating to dogs in Korea does not state or "suggest" that Plaintiff believed a cloned animal would perform the same "tasks" as its genetic donor, absent individual training.

**Disputed:** Plaintiff never stated suggested that a cloned animal would perform the same "tasks" as its genetic donor by virtue of being a clone. *See* Solan Decl., 44. There is no indication that somatic cell nuclear transfer cloning replicates neural engrams. The academic record does, however, suggest that a majority of behavioral traits are replicated. All Dogs Unleased and Joseph Cowsert Trained Foxy II. *See* Cowsert Decl., ¶¶ 18-24; Smith Decl. ¶¶ 1-9. In addition to paying $53,500 for Foxy's cloning, over $27,000 for has been paid towards Foxy II's training and training maintenance. *See* Solan Decl., 44. Plaintiff would not authorized the expenditure of tens of thousands of dollars on training Foxy II if he believed Foxy II was born with the same task training as Foxy I. *See* Id.

34. **Objection: Irrelevant.** The ADA does not require a service animal user "personally train" their service animal. It only requires that the animal is individually trained.

**Not disputed.** Plaintiff confirms that he made sure Foxy II "received training to do the same things the original Foxy did for when we get back together." *See* Solan Decl., ¶¶ 139-143; Cowsert Decl., ¶¶ 18-24; Smith Decl. ¶¶ 7-9.

35. **Objection:** Assumes facts not in the record. There is no admissible evidence in the record that Plaintiff personally made statements indicating that his past relationships and interactions with a service animal "have not only been counter-therapeutic, but also inappropriate (sexual in nature)."

**Objection:** Hearsay. *See* General Objection D. ASH's Request for Service Animal Denial (DF2626) was written by Sheldon, who had no firsthand knowledge of Plaintiff making any statements about Foxy I or Foxy II whatsoever. Plaintiff has never spoken to Sheldon about Foxy I or Foxy II. *See* Solan Decl., ¶ 45.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

36. **Disputed.** ASH did not deny Plaintiff's request to have Foxy II live with him at the Forensic Hospital for the reasons Defendants claim. Those reasons are mere pretext for to obscure the fact that ASH has implemented a total service animal ban. *See* Solan Decl., ¶ 45. The cumulative evidence from the last 6+ years of litigation shows ASH making up one excuse after the other to justify its unlawful exclusion. Id. In 2021, ASH argued numerous purported justifications for excluding Foxy I during preliminary injunction briefing. The Court rejected all of ASH's excuses and enjoined ASH to conduct a proper assessment. *See* Id.; *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT-MHB, Doc. 84. Instead, Bowen issued a particularized assessment letter that did not answer the questions posed by the Court in its March 22, 2022 Order (e.g., how would Foxy specifically, as opposed to service dogs generally, harm the patients on Plaintiff's treatment unit; why can't ASH's policies be modified, etc.,) and instead attempted to raise new *post facto* excuses it had never raised in the preceding 2 years of litigation, including that Foxy I was not "medically necessary" and that Plaintiff posed a risk of "animal abuse." *See* FAC at 64-69. Bowen admits he never conducted a risk assessment, and Sheldon admits his administration did not conduct any individualized assessment of Plaintiff's 2024 request whatsoever. *See* Exhibit J at 1-3; Exhibit K at 1-3; FAC, ¶ 122, Doc. 32, ¶ 122.

37. **Objection:** Undisputed background fact. *See* General Objection A.

**Objection:** Immaterial. *See* General Objection C.

38. **Objection:** Undisputed background fact. *See* General Objection A.

**Objection:** Immaterial. *See* General Objection C.

39. **Disputed in part.** Defendants take Plaintiff's deposition testimony out of context. It was not merely ASH's 2020 exclusion of Foxy I that made it so Plaintiff could not "dissociate the staff from their exclusion of Foxy," it was Dr. Morris's betrayal of Plaintiff's trust, the disclosure of information from what Plaintiff believed were private therapy sessions and twisting of that information out of context to support a false narrative hat Plaintiff would abuse Foxy, and all the other abuses Plaintiff has suffered in retaliation for standing on his right to a service animal accommodation, that has alienated Plaintiff from ASH's treatment

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

providers. *See* Solan Decl., ¶ 46. Those abuses are what made them the enemy and poisoned every potentially therapeutic interaction. *See* Id.

40. **Objection:** Hearsay. *See* General Objection D. None of alleged authors of DF2654-2658 have testified that Plaintiff "declined to engage in any activity that was 'socializing' and cited 'over stimulation' therefore he has 'no intention of participation.'"

**Disputed:** Plaintiff never said he had "no intention of participating in activities" that were "socializing." Plaintiff has begged for therapeutic services and has repeatedly requested one-on-one or small groups in lieu of group-based programs due to his Autism-related sensory sensitivities, and he has been continually excluded from participation in social activities due to ASH's refusal to make accommodations for his Autism. *See* Solan Decl., ¶ 47. Plaintiff did not state that his progress toward a less restrictive setting should not be "based on his social interactions." *See* Id. He stated progression to a less restrictive setting should not be based on participation in group therapy, in the absence of accommodations for his Autism-related sensory disabilities which, absent accommodation, preclude his participation. *See* Id.

41. **Objection:** Hearsay. *See* General Objection D. None of the purported authors of the cited Progress Notes have testified to any of the alleged statements contained in those Progress Notes.

**Objection:** Irrelevant. *See* General Objection C. The fact that Plaintiff maintained a nocturnal sleep schedule in 2024 to avoid sensory overstimulation has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Illogical. Plaintiff cannot "refuse to wake up." If staff do not wake Plaintiff up while he was sleeping, then he would not know that they wanted him to wake up, because he would not have been awake.

**Disputed:** Plaintiff's inability in 2024 to meet goals ASH staff set for him was not due to Plaintiff not seeing his "behaviors and psychiatric symptoms as problematic." If Plaintiff was not meeting treatment goals, it was because ASH refused to accommodate his developmental disability related needs. *See* Solan Decl., ¶ 48. Plaintiff did refuse to "wake up when offered."

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Plaintiff has no idea what and "offer" to wake up looks like, but states that he wakes up whenever staff wake him up. *See* Solan Decl., ¶ 49. Plaintiff denies that his attorney told his treatment team that they didn't want their 'special' access to his room taken away. Plaintiff's treatment team set up and encouraged Plaintiff's nocturnal sleep schedule and repeatedly stated to Plaintiff that it was an accommodation for his Autism-related sensory sensitivities. When Plaintiff's attorney asked why Plaintiff was not being given sufficient accommodations to allow him to access ASH's treatment programs, Plaintiff's treatment team threatened to remove the sleep schedule accommodation. Plaintiff's attorney stated that such a threat, if carried out, would be retaliation. *See* Id.

42. **Objection:** Hearsay. *See* General Objection D. The alleged author of DF1529 has not testified that Plaintiff made any of these statements or taken any of these actions.

**Objection:** Hearsay. *See* General Objection D. The cited Progress Note shows that Dr. Steven Kwoh was reporting statements of unnamed "staff" who claimed Plaintiff made these alleged statements. Defendants have provided no evidence that Dr. Kwoh had any firsthand knowledge of the Plaintiff making the alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether or not Plaintiff used violent language or racial epithets during an autism meltdown, or otherwise, has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Disputed:** Plaintiff did not say "I will kill someone today if they come and touch my shit. I will bash 'staff member' in the head." *See* Solan Decl., 51. Plaintiff did not punch his hand

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

into his other hand inches from Dr. Kwoh's face. *See* Id. Plaintiff did not say "I will break a neck of an innocent person today so I can get sent to prison and away from all of you." Id.

43. **Objection:** Hearsay. *See* General Objection D. The alleged author of DF1548-1459 has not testified that Plaintiff made any of these statements or taken any of these actions.

**Objection:** Hearsay. *See* General Objection D. Defendants have provided no evidence Dr. Kwoh had any first-hand knowledge of the Plaintiff making the alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether or not Plaintiff used violent language or racial epithets during an autism meltdown, or otherwise, has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Objection:** Misleading the Court. Plaintiff's ASH treatment team set up and encouraged Plaintiff's nocturnal sleep schedule and repeatedly stated to Plaintiff and his designated representative that it was an accommodation for his Autism-related sensory sensitivities. *See* Solan Decl., 50.

**Disputed:** Plaintiff denies that he threatened to "break Susan's neck and slam her head into the wall" *See* Solan Decl., 51. Plaintiff denies that he declined to attend his ITDP review because he would rather sleep: Plaintiff was sleeping and staff repeatedly chose not wake him up. *See* Solan Decl., 53.

44. **Not disputed.**

45. **Objection:** Hearsay. *See* General Objection D. Dr. Kwoh has not testified that Plaintiff made any of these statements or taken any of these actions.

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**Objection:** Hearsay. *See* General Objection D. Defendants have provided no evidence that Dr. Kwoh had any first-hand knowledge of the Plaintiff making the alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether Plaintiff "self-describes himself as an 'asshole'" or "purposely threatens others to get what he wants" is not material to whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Disputed.** Plaintiff denies that he described himself to Dr. Kwoh that as an "asshole." ASH staff and patients have, from time to time, accused Plaintiff of being an "asshole," and Plaintiff responded with a variation of "so what if I'm an asshole?" *See* Solan Decl., 54. Plaintiff does not threaten others to fashion his treatment team or others around the way he wants. *See* Solan Decl., ¶ 55. If Plaintiff's treatment team or others violate Plaintiff's rights, he sues them. Id. ASH's staff do not like getting sued and retaliate by charting that Plaintiff is "threatening" staff with litigation. For example, when Plaintiff informed RN Mary Shultz in passing that he was bringing a nursing malpractice suit against her, she reported Plaintiff's comment as a "threat," and punished Plaintiff by denying him access to the one socialization group activity he attends for a period of two weeks. *See* Id.

46. **Objection:** Hearsay. *See* General Objection D. The alleged author of DF1651-DF1653 has not testified to any of these alleged facts.

**Objection:** Hearsay. *See* General Objection D. Defendants have provided no evidence that Kindra Ochoa had any first-hand knowledge that Plaintiff "was sleeping and refused to get up to participate when the unit RN attempted to wake him."

**Objection:** Irrelevant. *See* General Objection C. Whether or not Plaintiff "was sleeping and refused to get up" for an ITDP meeting has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Illogical. Assumes the impossible. Plaintiff cannot "refuse" to "wake up" because the state of being asleep inherently requires Plaintiff to be unconscious of his surroundings.

**Disputed:** Plaintiff did not refuse to wake up for a treatment team meeting on May 30, 2024 or at any other time. *See* Solan Decl., ¶53.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

47. **Objection:** Hearsay. *See* General Objection D. The alleged author of DF1652 has not testified that Plaintiff made any of these statements.

**Objection:** Hearsay. *See* General Objection D. The Progress note clearly shows Ms. Ochoa was quoting an unnamed "unit RN" (Registered Nurse). Defendants have provided no evidence that Kindra Ochoa had any first-hand knowledge of Plaintiff making these alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether or not Plaintiff used violent language or racial epithets during an autism meltdown, or otherwise, has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Disputed:** Plaintiff denies making the specific alleged statements. However, if Plaintiff made any statements to that effect on May 12, 2024, they were made while Plaintiff was having a meltdown, were made reference specifically to Carter and Coleman, and were made to RN Domenick Aldrich after Carter and Coleman had been harassing Plaintiff for days and accusing him in front of other patients of engaging in bestiality with Foxy. *See* Solan Decl., ¶ 56. Plaintiff begged Aldrich to keep Carter and Coleman away from him before the situation escalated. *See* Solan Decl., 57. Aldrich told Plaintiff he had reported their conduct and tried multiple times to remove Carter and Coleman from the Cottonwood unit, but the "administration" would not remove them. *See* Id.

48. **Objection:** Hearsay. *See* General Objection D. The alleged author of DF1652 has not testified that Plaintiff made any of these statements.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**Objection:** Hearsay. *See* General Objection D. The Progress note shows Ms. Ochoa was quoting an unnamed "unit RN" (Registered Nurse). Defendants have provided no evidence that Kindra Ochoa had any first-hand knowledge of Plaintiff making these alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether or not Plaintiff used violent language or racial epithets during an autism meltdown, or otherwise, has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

49. **Disputed:** Plaintiff denies making the specific alleged statements. However, if Plaintiff made any statements to that effect on May 12, 2024, they were made while Plaintiff was having a meltdown, were made reference specifically to Carter and Coleman, and were made to RN Domenick Aldrich after Carter and Coleman had been harassing Plaintiff for days and accusing him in front of other patients of engaging in bestiality with Foxy. *See* Solan Decl., ¶ 56. Plaintiff begged Aldrich to keep Carter and Coleman away from him before the situation escalated. *See* Solan Decl., 57. Aldrich told Plaintiff he had reported their conduct and tried multiple times to remove Carter and Coleman from the Cottonwood unit, but the "administration" would not remove them. Id.

50. **Objection:** Hearsay. *See* General Objection D. Sheldon presents no evidence to support a conclusion that he had any firsthand knowledge of what Carter reported to the Phoenix Police Department or why the Department opened an investigation.

**Objection:** Irrelevant. *See* General Objection C. Whether or not the Phoenix Police Opened an investigation into Carter's false allegations has nothing to do with whether Foxy II

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

fundamentally alters the nature of ASH's programs, services, or activities, or whether Carter and Coleman had publically harassed Plaintiff with false accusation of bestiality prior to that time.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Objection:** Misleading the Court. These issues were fully and finally adjudicated on March 12, 2026 in the Maricopa County Superior Court. Defendant admitted Plaintiff did not throw hot coffee in her face. *See* Exhibit F, pg. 1 ¶ 3, 5, pg. 2. The charges that Plaintiff assaulted Carter were dismissed with prejudice. *See* Exhibit F, pg. 1 ¶ 7. Plaintiff was found guilty of disorderly conduct for yelling and disturbing the peace on the Cottonwood unit, and the factual basis states that Plaintiff's outburst was a result of Carter harassing Plaintiff and loudly accusing him, in front of the other patients, of engaging in bestiality with his service dog Foxy. *See* Exhibit F, page 2 Factual Basis.

**Disputed:** Plaintiff never threw hot coffee in Carter's face, never threatened to kill her or her unborn child, and did not call her "nigger" during the incident. *See* Id.; Solan Decl., 58.

51. **Objection:** Hearsay on hearsay on hearsay. *See* General Objection C; *see also* Objection B. The Sheldon presents no evidence to support a conclusion that he had any firsthand knowledge of what Coleman or the other unnamed "staff member" reported to the Phoenix Police Department.

**Objection:** Irrelevant. *See* General Objection C. That Phoenix PD opened an investigation into Carter's false allegations has nothing to do with whether Foxy II fundamentally alters the nature of ASH's programs, services, or activities, or whether Carter and Coleman had publically harassed Plaintiff with false accusation of bestiality prior to that time.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Objection:** Misleading the Court. These issues were fully and finally adjudicated on March 12, 2026 in the Maricopa County Superior Court. Defendant admitted Plaintiff did not throw hot coffee in her face. *See* Exhibit F, pg. 1 ¶ 3, 5, pg. 2. The charges that Plaintiff assaulted Carter were dismissed with prejudice. *See* Exhibit F, pg. 1 ¶ 7. Plaintiff was found guilty of disorderly conduct for yelling and disturbing the peace on the Cottonwood unit, and the factual basis states that Plaintiff's outburst was a result of Carter harassing Plaintiff and loudly accusing him, in front of the other patients, of engaging in bestiality with his service dog Foxy. *See* Exhibit F, page 2 Factual Basis.

**Disputed:** Plaintiff does not dispute that ASH staff made various false and misleading statements to the Phoenix Police about him. Plaintiff did not throw coffee on Carter, did not threatened to kill her or her unborn child, and did not berate Carter racial slurs. *See* Id.; Solan Decl., 58.

52. **Objection:** Hearsay. *See* General Objection D. The Sheldon presents no evidence to support a conclusion that he had firsthand knowledge of what Plaintiff told Aldrich on May 22, 2024.

**Objection:** Irrelevant. *See* General Objection C. Whatever Plaintiff "felt" like doing to Carter after being berated by her with false allegations that he had sexually assaulted his late service animal and having false criminal charges leveled against him, has nothing to do with whether Foxy II's presence fundamentally alters the nature of ASH's programs, services, or activities.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this progress note was admissible and relevant, the Court must exclude it because its

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff made such comments, whether or not they were actually made by Plaintiff, and whether Plaintiff, if he did say such things, said them because he was having an autism meltdown or, or because he actually meant them.

**Objection:** Misleading the Court. These issues were fully and finally adjudicated on March 12, 2026 in the Maricopa County Superior Court. Defendant admitted Plaintiff did not throw hot coffee in her face. *See* Exhibit F, pg. 1 ¶ 3, 5, pg. 2. The charges that Plaintiff assaulted Carter were dismissed with prejudice. *See* Exhibit F, pg. 1 ¶ 7. Plaintiff was found guilty of disorderly conduct for yelling and disturbing the peace on the Cottonwood unit, and the factual basis states that Plaintiff's outburst was a result of Carter harassing Plaintiff and loudly accusing him, in front of the other patients, of engaging in bestiality with his service dog Foxy. *See* Exhibit F, page 2 Factual Basis.

**Disputed:** Plaintiff did not tell Aldrich that he "felt like stomping on [Carter's] head and killing her or her unborn child." *See* Solan Decl., ¶ 59. Plaintiff does not dispute that Aldrich told Plaintiff that throwing hot "throwing coffee onto another person is assault and is DTO [danger-to-others] behavior," but denies that he threw coffee onto another person or engaged in any DTO behaviors. *See* Solan Decl., ¶ 60; Exhibit F, pg. 1 ¶ 3, 5, pg. 2. Plaintiff does believe he was placed on ROU, as he was able to go to the next scheduled pop run, which patients with ROU "Remain On Unit" status cannot do because the soda "pop" machines are "off the unit." *See* Solan Decl., ¶ 59.

53. **Not disputed.**

54. **Not disputed.**

55. **Objection**: Hearsay. *See* General Objection D. Sheldon has not shown that he had any firsthand knowledge that the unnamed ASH investigator interviewed Plaintiff or what was said between Platen and any of ASH's investigators. Sheldon has never be present when Plaintiff talked to any of ASH's investigators. *See* Solan Decl., ¶ 62. Thomason has not testified, and Defendants have presented no evidence that he had any firsthand knowledge

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

of Plaintiff's interactions with Carter. He did not. *See* Id.

**Disputed**: Plaintiff denies that there was "never any evidence" that "Carter assaulted [Solan] or was verbally abusive to [him]." Plaintiff's testimony is "evidence." Daniel Alverez' testimony is "evidence." *See* Exhibit E. And ASH admitted to deleting all its audio and video recordings of Plaintiff's interactions with Carter and Coleman on May 22, 2024 before AHCCCS referred the grievance to ASH. Those audio/video recordings also contain "evidence" of Carter's abuse that ASH admits deleting. *See* Solan Decl., ¶ 62; Doc. 85.

56. **Objection:** Irrelevant. *See* General Objection C. Defendants admitted Plaintiff exhausted his remedies for the purposes of the prison litigation reform act and that he timely served a notice of claim against Carter, and that Defendants did not respond. *See* FAC, ¶¶ 139-142; Doc. 32, ¶¶ 138-142.

**Objection:** Hearsay. *See* General Objection D. Carter's response to Plaintiff's first request for admissions, which Defendants cite in a footnote, is neither signed by nor sworn to by Carter, and Defendants have presented no evidence that the signatory, "Ann Hobart," had any firsthand knowledge of what Carter did or didn't say to Plaintiff.

**Disputed:** ASH never advised Plaintiff this conclusion and of his right to appeal the decision to AHCCCS. *See* Solan Decl., ¶ 63. Nor did AHCCCS advise Plaintiff that it had referred the grievance to ASH. Id. Plaintiff never received any response to his letter to Kristi Baxter from AHCCCS or ASH. Id. Plaintiff assumed that Baxter had simply abandoned him, as he left her multiple voicemails as well, and she never called him back. Id. Plaintiff learned about AHCCCS's referral of the matter to ASH, and ASH's determination thereon, for the first time when Defendants' counsel disclosed the correspondence as part of its initial disclosures. *See* Id.

57. **Objection:** Undisputed background facts. *See* General Objection A.

**Objection:** Irrelevant. *See* General Objection C.

58. **Objection:** Hearsay. *See* General Objection D. Aldrich has not testified Plaintiff made the alleged statements.

**Objection:** Irrelevant. *See* General Objection C. Whether Plaintiff said that he wanted to

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

kill everyone in the State of Arizona on March 7, 2025 is not material to the question of whether Foxy II's presence would fundamentally alter the nature of ASH's programs, service, or activities.

**Objection:** Frivolous. *See* General Objection C. Even if Plaintiff said something like this during an Autism meltdown, Plaintiff lacks the capacity to kill millions people.

**Objection:** Unduly prejudicial and presented only for shock value. Even if the information in this incident report was admissible and relevant, the Court must exclude it because its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. A reasonable juror would likely be shocked and prejudiced against Plaintiff by the allegation what Plaintiff wants to kill the "State," which by definition includes the jurors, whether or not Plaintiff actually said that, and whether or not Plaintiff, if he did say such a thing, said such things because he was having an Autism meltdown or, or because he actually meant it.

**Disputed:** Plaintiff did not tell Aldrich or anyone else at ASH that if he doesn't get enough money suing the state to 'forget how they killed Foxy', to 'forget how they killed Foxy', then he would "brutally kill off of them and that is a promise not an idle threat." *See* Solan Decl., ¶ 64.

59. **Not disputed.**

60. **Not disputed.**

61. **Objection:** Hearsay. Defendants have provided no evidence that Sheldon had any personal knowledge of Plaintiff making or not making grievances against Coleman.

**Objection:** Speculation. *See* General Objection C. Whether or not ASH maintained a record of Plaintiff's grievances against Coleman does not prove Plaintiff did not make them.

**Objection:** Hearsay. *See* General Objection D. Coleman's response to Plaintiff's first request for admissions is neither signed by nor sworn to by Carter, and Defendants have presented no evidence that the signatory, "Jordan Kendall," had any firsthand knowledge of what Coleman did or didn't say to Plaintiff. *See* General Objection D.

**Objection:** Irrelevant. *See* General Objection C. Defendants admitted Plaintiff exhausted his

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

remedies for the purposes of the prison litigation reform act and that he timely served a notice of claim against Coleman, and that Defendants did not respond. *See* FAC, ¶ 139, 142; Doc. 32, ¶ 139, 142.

**Disputed:** While Coleman's harassment was ongoing in 2024, Plaintiff lodged multiple verbal grievances with multiple nurses on the Cottonwood unit, including, but not limited to Dominick Aldrich and Aquelina Soliz. Solan Decl., ¶ 65. The gravamen of these grievances was that Coleman was harassing Plaintiff and loudly accusing him of eating "dog p***y" and "dog a**" in front of other patients. Id. ASH policy permits allows patients to make complaints of abuse verbally or in writing. Id.; Exhibit O.

62. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of June 21, 2025. While Coleman's actions on June 21, 2025 were atrocious, they are immaterial to the operative claims. Plaintiff intends to bring a separate §1983 action against Coleman for what she did to Plaintiffs on June 21, 2025.

**Objection:** Misleading the Court. Plaintiff made multiple grievances against Coleman in 2024. The grievances Plaintiff made against Coleman in 2025 stem from Coleman assaulting and emotionally terrorizing Plaintiff in 2025, not from the events that gave rise to the operative claim against her in the instant suit.

**Disputed:** Plaintiff does not deny that the grievances he made against Coleman in 2025 date from after Plaintiff filed the instant suit. Plaintiff denies that he only made Grievances against Coleman in 2025. As stated *supra*, Plaintiff made multiple grievances against Coleman in 2024 about her harassing and defaming Plaintiff in front of other patients, and those 2024 grievances were made long prior to Plaintiff filing the operative First Amended Complaint. *See* Solan Decl., ¶ 66.

63. **Not disputed.**

64. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of June 27, 2025. While Coleman's actions on June 27, 2025 were atrocious, they are immaterial to the operative claims. Plaintiff intends to bring a separate §1983 action against Coleman for what she did to Plaintiffs on June 27, 2025.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

**Disputed.** Plaintiff was not being "verbally aggressive and making racial comments towards [Coleman]" on June 21, 2025. *See* Solan Decl., ¶ 67. Ample evidence exists that Coleman was attempting to provoke Plaintiff and that Coleman assaulted Plaintiff on June 21, 2025. *See* Solan Decl., ¶ 67-68; Exhibit R. The ASH Independent Oversight Committee found that Coleman's conduct on June 21, 2025 was grossly inappropriate, and that the security video showed Coleman intentionally provoking and assaulting Plaintiff. *See* Exhibit R. By June 27, 2026, Colman had been removed from the Cottonwood unit for assaulting Plaintiff on June 21, 2025. *See* Solan Decl., ¶ 69. On June 27, 2026, Coleman came onto the Cottonwood unit at evening shift change, walked straight up to Plaintiff, and started yelling at and mocking Plaintiff. *See* Solan Decl., ¶ 70; Exhibit R. Plaintiff was not the one who initiated verbal aggression on June 27, 2025; it was Coleman. *See* Id. Plaintiff denies that he "took a swing at" Coleman. *See* Id. After Coleman intentionally provoked him and triggered a massive meltdown, and Plaintiff bashed his head into a table and cut himself 35+ times. *See* Solan Decl., ¶ 71. The ASH Independent Oversight Committee substantiated Plaintiff's claim that on June 27, 2025 Coleman was not supposed to be on the unit, that Colman intentionally provoked Plaintiff, by that her actions caused a "very negative patient outcome." *See* Solan Decl., ¶ 72; Exhibit R.

65. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of June 27, 2025. While Coleman's actions on June 27, 2025 were atrocious, they are immaterial to the operative claims. Plaintiff intends to bring a separate §1983 action against Coleman for what she did to Plaintiffs on June 27, 2025.

**Objection:** Misleading the Court. ASH's purported "findings and conclusions that his complaints against Coleman were unsubstantiated" pertain to Coleman's actions in June of 2025, not her actions in May, 2024 that form the basis of operative claims against her in the instant suit.

**Disputed:** Plaintiff denies that he did not appeal ASH's determination to AHCCCS. He did; AHCCCS summarily denied the appeal without investigating it, and Plaintiff appealed the summary denial to the Office of Administrative hearings. *See* Solan Decl., ¶ 72. ASH's

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

attorney, Erin Cohen, moved to dismiss the appeal on the basis that "no court" had jurisdiction over ASH. Id. Plaintiff vigorously challenged Cohen's motion, and she withdrew it. *See* Id. The appeal remains pending. *See* Id.

66. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of July 2, 2025.

**Disputed:** ASH did not transfer Plaintiff from Cottonwood to Mohave unit because of DTS or DTO behaviors. ASH transferred Plaintiff in retaliation for reporting Coleman's abuse and ASH's failure to protect him to Arizona Adult Protective Services on June 21, 2025. *See* Solan Decl., ¶ 73. The then-head of Plaintiff's treatment team, Kindra Ochoa, told Plaintiff that Sheldon directed her to transfer Plaintiff to Mohave. *See* Id. The stated "treatment goals" are not and were never Plaintiff's treatment goals. ASH staff made these goals up, and added them to Plaintiff's treatment plan without his consent. *See* Solan Decl., ¶ 74. Plaintiff and his former attorney, Holly Gieszl, repeatedly informed Plaintiff's treatment team that Plaintiff was not in agreement with the treatment plan, which was memorialized in nearly every plan. *See* Id.

67. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of July 2, 2025.

**Disputed:** The ITDP review was not held on July 3, 2025, it was held on July 2, 2025, the day Plaintiff was subjected to the retaliatory transfer to Mohave unit. *See* Solan Decl., ¶ 75. Plaintiff attended the July 2, 2025 ITDP review meeting personally, and his attorney, Holly Gieszl, attended telephonically, and thoroughly reproached Ochoa and Sheldon for the retaliatory transfer. *See* Id. The fact that Plaintiff attended the meeting and protested the ITDP changes is recorded in the ITDP itself. *See* Id.; Exhibit H.

68. **Objection:** Irrelevant. *See* General Objection C. What ASH staff wrote in a heavily contested "progression plan" in 2025 a full year after denying entry to Plaintiff's service animal is not material to the question of whether Foxy II's presence would fundamentally alter the nature of ASH's programs, services, or activities.

**Objection:** The progression plan is a unilateral adhesion contract used to chill and punish

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Plaintiff for exercising his right to free speech. The plan states that all of Plaintiff's property can be confiscated and he can be barred from treatment groups and using the computer, even for litigation purposes, if he engages in undefined "hate speech." *See* Solan Decl., ¶ 76; Exhibit P. "Hate speech," regardless of how distasteful, is protected under the First Amendment. Defendants have used this "hate speech" clause to bar Plaintiff from accessing outdoor socialization activities for merely cursing at an employee who was emotionally abusing him. Plaintiff *See* Solan Decl., ¶ 76. Plaintiff has since often avoided talking to staff for fear anything he says will be used to keep him from going to the few outdoor activities he attends in each week. *See* Id. Defendants cannot rely on an unconstitutional "progression plan" to prove anything other than the fact they are violating the United States Constitution.

69. **Objection:** Irrelevant. *See* General Objection C. What ASH staff wrote in a heavily contested "progression plan" in 2025 a full year after denying entry to Plaintiff's service animal is not material to the question of whether Foxy II's presence would fundamentally alter the nature of ASH's programs, services, or activities.

70. **Objection:** The progression plan is a unilateral adhesion contract used to chill and punish Plaintiff for exercising his right to free speech. The plan states that all of Plaintiff's property can be confiscated and he will be barred from treatment groups and using the computer, even for litigation purposes, if he engages in undefined "hate speech." *See* Solan Decl., ¶ 76; Exhibit P. "Hate speech," regardless of how distasteful, is protected under the First Amendment. Defendants have used this "hate speech" clause to bar Plaintiff from accessing outdoor socialization activities for two weeks, after he called his male rehab coordinator, Azer, who had been mocking and teasing Plaintiff, a "bitch." *See* Solan Decl., ¶ 76. Calling a man a "bitch" is not hate speech, its "prison fighting term" Plaintiff learned from other patients. *See* Id. Plaintiff has since often avoided talking to staff for fear anything he says will be used to keep him from going to the few outdoor activities he attends in each week. *See* Id. Defendants cannot rely on an unconstitutional "progression plan" to prove anything other than the fact they are violating the United States Constitution.

**Objection:** not material to the Court's determination of Defendants MSJ or any of the

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

operative claims. As Defendants acknowledge, the present lawsuit predates the imposition of ASH's so-called progression plan.

71. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of February 3, 2026.

**Objection:** Hearsay. *See* General Objection D. Defendants have produced no has provided no evidence that he has first-hand knowledge of what Plaintiff said on February 3, 2026, and nobody but Plaintiff has testified to the events of February 3, 2026.

**Objection:** Defendants have disclosed no video evidence to support Sheldon's assertion despite stating there is "video evidence to the contrary."

**Objection:** Unduly prejudicial and presented for shock value. *See* Fed. R. Evid. 403.

**Disputed:** Plaintiff did not threaten to kill another patient on February 3, 2026. *See* Solan Decl., ¶ 77. Plaintiff had previously been granted a Domestic Violence Order of Protection against Mohave unit patient John Benitez after Benitez threatened to kill Plaintiff. *See* Id.; Exhibit S. On February 3, 2025, Benitez assaulted Plaintiff without provocation and punched patient Robert Dunn in the face. *See* Solan Decl., ¶ 77; Exhibit T. Defendants have disclosed no video evidence despite Sheldon claiming there is "video evidence to the contrary." *See* Solan Decl., ¶ 77. Plaintiff notified the nurse, Mary Shultz, of Benitez's assault, and explained to her his concern that if Benitez punched him in the face, like he had done to Robert Dunn earlier that morning, Plaintiff would be forced to defend himself. *See* Solan Decl., ¶ 78. Plaintiff told Shultz he did not want to get in a fight with Benitez, and pleaded with her to keep Benitez away from him. *See* Solan Decl., ¶ 77. Shultz misreported this is as a "threat." *See Id.* Both Plaintiff and Mr. Dunn pressed charges against Benitez, and Benitez was arrested and charged with assault and violating the Order of Protection. *See* Solan Decl., ¶ 77. Benitez was convicted of violating the protective order. *See* Exhibit U. Plaintiff and Dunn filed civil lawsuits against Benitez seeking damages for his assault/IIED. *See* Maricopa County Superior Court Civil Case Nos. CV2026-007082 and CV2026-007696, respectively.

72. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of February 5, 2026.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**Objection:** Hearsay. *See* General Objection D. Defendants cite no evidence showing Sheldon has first-hand knowledge of what Plaintiff's treatment team said to Plaintiff on February 5, 2026.

**Disputed in part:** Plaintiff does not deny that members of the team made statements to this effect, but Plaintiff denies that he "made threats to harm others" or stated any plan to do so. *See* Solan Decl., ¶ 79.

73. **Objection:** Irrelevant. *See* General Objection C. As Defendants acknowledge, the present lawsuit predates the events of February 5, 2026.

**Objection:** Irrelevant. *See* General Objection C. Plaintiff's purported progression and regression through ASH's arbitrary privilege system has nothing to do with whether Foxy II's presence would fundamentally alter the nature of ASH's programs, services, or activities.

**Disputed:** Plaintiff denies that ASH had any right to impose an arbitrary punishment and suspend his access to treatment services on the basis provided.

74. **Disputed in part.** Plaintiff denies that any of the cited documents purporting to be Defendants' responses to Plaintiff's requests for admissions were made by any of the individual Defendants. Each such document states on its face that it was made by either "Ann Hobart" or "Jordan Kendall" who are not parties to this suit and had not first-hand knowledge of the factual basis of what they were admitting or denying on behalf of their clients.

**STATEMENT OF ADDITIONAL FACTS**

75. Upon Plaintiff's admission ASH on April 1, 2020, ASH excluded Plaintiff's former service animal, Foxy I without conducting the individualized assessment required by the ADA. *See* FAC, ¶ 67; Solan Decl., ¶ 80; *Solan v. Arizona State Hospital*, CV-20-02209-PHX-JJT-MHB, Doc. 84.

76. Prior to his confinement at ASH, Plaintiff utilized his former service dog, Foxy I, to help manage the effects of his ASD and other mental health conditions. *See* Doc. 17 at 77:4-10; Solan Decl., ¶ 81.

77. After Foxy I perished, Plaintiff sold his house and used the funds to clone her. *See* FAC, ¶¶ 95-104; FAC at 72; Doc. 17 at 84:3-7; Solan Decl., ¶ 82; Cowsert Decl., ¶¶ 11-13.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

78. Foxy II was born at ViaGen Pets and Equine's Rochester, New York facility on November 9, 2023. *See* FAC, ¶ 105; FAC at 71. Solan Decl., ¶ 83; Cowsert Decl., ¶ 15.

79. Foxy II completed professional live-in service dog training course at All Dogs Unleashed in Prescott, Arizona on May 16, 2024. *See* FAC, ¶ 110; Solan Decl., ¶ 85; FAC at 75; Smith Decl., ¶¶ 1-9; Cowsert Decl., ¶ 18.

80. After Foxy II finished her training at All Dogs Unleashed, Joseph Cowsert resumed custody of Foxy II and conducted additional task training under the guidance of ADU. *See* FAC, ¶ 111; Solan Decl., ¶ 85; Smith Decl., ¶ 5; Cowsert Decl., ¶ 19-24.

81. While Foxy II was training in May, 2024, Plaintiff began telling patients and staff on the ASH Cottonwood unit that Foxy II would soon be fully trained service animal, and that he was planning to make a new accommodation request for her to live with him at ASH. *See* Solan Decl., ¶ 86.

82. Plaintiff spoke to every patient on the Cottonwood unit, and asked them if they were OK with Foxy living on the unit. Every Cottonwood patient told Plaintiff they supported Foxy living on the unit. *See* Solan Decl., ¶ 87.

83. On March 20, 2025, 61 patients living in the ASH Forensic Hospital declared under penalty of perjury that interacting with Foxy II would be "highly beneficial" to them and their rehabilitation. *See* Doc. 27 at 13-19; Solan Decl., ¶ 88.

84. Between October 27, 2021 and December 21, 2022, Dr. Stephen Morris, as Plaintiff's treating psychiatrist, endorsed 21 ASH treatment plans that confirmed Plaintiff's primary strength was that he had "a trained service animal." *See* Solan Decl., ¶ 89; Exhibit H.

85. Between February 2, 2023 and April 26, 2024, Dr. Steven Kwoh, ASH's current Chief Medical Officer, endorsed 22 treatment plans confirming Plaintiff's primary strength was that he had "a trained service animal." *See* Solan Decl., ¶ 90; Exhibit H.

86. Kindra Ochoa endorsed every one of Plaintiff's treatment plans issued since May 3, 2024, and they all confirm that Plaintiff's primary strength is that he "has a trained service animal." *See* Solan Decl., ¶ 91; Exhibit H.

87. Starting around the beginning of May, 2024, Carter and Coleman began harassing Plaintiff

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

and berating him with false allegations that he had engaged in bestiality. *See* FAC, ¶¶ 136-139; Doc. 82, Ex. A, ¶¶ 2-5; Solan Decl., ¶ 92.

88. On May 22, 2024, Lea'cher Carter and Unique Colman began taking turns harassing Plaintiff and loudly proclaiming, in front of the other ASH Cottonwood unit patients, that Plaintiff is "nasty" and that he eats "dog p****" and "dog a**." *See* FAC, ¶ 138; Doc. 82, Ex. A, ¶ 2; Solan Decl., ¶ 93.

89. On May 22, 2024, Plaintiff complained to nursing supervisor Dominick Aldrich that Carter and Coleman were sexually harassing him. Aldrich pulled Carter and Coleman into the Cottonwood unit nurses station and talk to them Aldrich later came out and told Plaintiff he had directed them to stay away from and stop harassing him. *See* Doc. 82, Ex. A, ¶ 3; Solan Decl., ¶ 94.

90. After Aldrich spoke to Carter and Coleman on May 22, 2024, Coleman temporarily stopped harassing Plaintiff, but Carter continued harass Plaintiff and accuse him of having sex with Foxy. *See* Doc. 82, Ex. A, ¶ 4.

91. After Aldrich directed to Carter to stop harassing Plaintiff on May 22, 2024, Carter asked Plaintiff, "does Foxy really like it when you stick your nasty d*** in her?" *See* Doc. 82, Ex. A, ¶ 5; Solan Decl., ¶ 95.

92. When Plaintiff explained to Carter that he never had sex with Foxy, never would, and that what she was suggesting was physically impossible, Carter loudly insisted Plaintiff could have sex with Foxy because Plaintiff's "d*** is so small you'd need a magnifying glass to see it." *See* Doc. 82, Ex. A, ¶ 5. Solan Decl., ¶ 95.

93. Plaintiff informed Carter that if she did not stop harassing him he was going to sue her for defamation. Carter laughed loudly at Plaintiff said, "come, on lets go call Holly so you can sue me." *See* Solan Decl., ¶ 96.

94. Plaintiff instead asked Coleman to let him in the conference room so he could call his attorney, Holly Gieszl. Carter stood up and demanded that she be the one to let Plaintiff into the conference room. Carter continued to hurl insults at Plaintiff while walking with him to the conference room. *See* Doc. 82, Ex. A, ¶ 6; Solan Decl., ¶ 97.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

95. After Plaintiff called his attorney, he went to the Cottonwood unit dining room to get coffee. Carter saw Plaintiff in the room and began walking towards him and yelling. Plaintiff tried to walk away from Carter, but she followed, yelling "I'm sick of yo s***!". Carter then threw up her hands and said, "come on, attack me so I can call security on yo dumb a**." *See* Doc. 82, Ex. A, ¶ 7; Solan Decl., ¶ 99.

96. Plaintiff exited the dining room sought out Aldirch to complain of Carter's ongoing harassment, but could not find him. Plaintiff approached Coleman and asked her to find Aldrich. Coleman responded, "boy, I ain't gettin' him, you go find him!" *See* Doc. 82, Ex. A, ¶ 8; Solan Decl., ¶ 100.

97. Carter then approached Plaintiff and started yelling at him. Plaintiff panicked and threw down a cup of melted ice cubes from his morning iced coffee, and went to his room. Carter called a code gray, and Aldrich came to Plaintiff's room a few moments later and told Plaintiff to stay there for a while. *See* Doc. 82, Ex. A, ¶ 9; Solan Decl., ¶ 101.

98. The same day, Carter falsely reported to Phoenix Police that Plaintiff threw hot coffee in her face, and did so because she is black. *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 102.

99. Without interviewing Plaintiff, Phoenix PD's bias crimes section pressed aggravated assault charges against him, falsely claiming that he assaulted Carter by throwing coffee in her face, and that he did so because of an "anti-african american bias." *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 103.

100. Plaintiff was maliciously prosecuted on Carter's false charges for nearly two years. *See* Doc. 82, Ex. A, ¶ 10; Solan Decl., ¶ 104. Carter eventually admitted Plaintiff never threw hot coffee in her face, and her charges were eventually dismissed with prejudice. *See* Doc. 103, Ex. F, ¶¶, 3; Solan Decl., ¶ 104; Exhibit F.

101. Plaintiff maintained he did not assault Carter, and agreed to plead guilty to disorderly conduct to stop the prosecutor from harassing him. *See* Solan Decl., ¶ 105.

102. At the March 12, 2026 change of plea hearing in that criminal case, the factual basis of the disorderly conduct charge was read into the record as follows:

"I need to provide a bit of background because of procedural issues in the case,

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

and errors in the police report that led to the State amending the original indictment. Mr. Solan was admitted to the Arizona State Hospital on April 1, 2020. His intake assessment that day was completed by a psychiatrist, Dr. Steven Kwoh, who is now the chief medical officer at the state hospital. Dr. Kwoh noted that Mr. Solan was designated SMI under A.R.S. 36-550. That is the first thing in Mr. Solan's medical record. And it was the first page in the medical records that Detective McDermott received from the hospital. A designation of SMI means that Mr. Solan suffered a metal disability that is so severe and persistent that long-term functional capacities in the activities of daily living, interpersonal relationships, employment, and recreation are affected. Mr. Solan's qualifying mental health disorder for SMI designation is autism and schizoaffective disorder. In December of 2024, Dr. Brim low, a staff psychologist updated the diagnosis, and schizoaffective disorder was eliminated and replaced with post-traumatic stress disorder, PTSD. She found persistent deficits in social communication and social interaction. She found that these deficiencies were indicative of the substantial functional limitations related to Mr. Solan's autism diagnosis. In September of '25, Dr. Kwoh deemed Mr. Solan permanently disabled due to his SMI status and the severity of his mental and cognitive disorders. Mr. Solan additionally is indigent. His family posted bail and retained me to represent him. Due to his SMI status and his substantial, permanent disability, he in not able to work and has no means of support. This is important to the factual basis we ultimately arrived at as the plea in this matter. On May 22, 2024, Mr. Solan had a difficult interaction with a behavioral health technician [Lea'Cher Carter], who was not assigned specifically to him, but worked on the floor. Well call her BHJT-1. Over a period of time, she harassed Mr. Solan in front of other patients, talking loudly with allegations the he engaged in bestiality with his service dog Foxy. Mr. Solan reached out to a second BHT [Unique Coleman], we will call her BHT-2, and asked her to summon the nurse and ask the nurse to remove BHT-1. Mr. Solan

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

was yelling and waving his arms. This was in the dayroom, and he did so in a manner that disturbed the peace and quiet of the staff and patients on the unit. He also tossed a partially full cup of cold coffee – not hot coffee – maybe an inch or so of coffee, on a nearby table, and same of the cold coffee splashed on the two BHTs."

*See* Doc. 103, Ex. F at 2; Doc. 103, Ex. F, ¶ 5; Solan Decl., ¶ 106; Exhibit F.

103. The State "did not have any additions or corrections to the factual basis," and "[t]he Court "accepted the Factual Basis." *See* Doc. 103, Ex. F, ¶ 6; Solan Decl., ¶¶ 107, 109; Exhibit F.

104. The prosecutor made no specific objections the Superior Court did not strike any portion of the factual basis. *See* Doc. 103, Ex. G, ¶ 5; Solan Decl., ¶ 108; Exhibit F.

105. On June 13, 2024, Plaintiff submitted a request to have Foxy II live with him at ASH as a reasonable accommodation for his disabilities. *See* Doc 6 at 81-84; Solan Decl., ¶ 110.

106. On July 5, 2024 ASH CEO Michael R. Sheldon issued a one-page denial letter, in which the summarily denied Plaintiff's request, stating that "[t]he Hospital will not modify its existing policies, practices and/or procedures to allow for a service animal at the Forensic Hospital." *See* FAC at 86; Solan Decl., ¶ 111.

107. When Sheldon moved to dismiss Plaintiff's defamation/false light claims against him, Sheldon argued that he did not write the July 5, 2024 denial letter. Doc. 15 at 17:9-12.

108. In response to Plaintiff's interrogatories to the State, Sheldon admitted that he was responsible for the July 5, 2024 denial letter. *See* Exhibit K.

109. On or about August 12, 2024, Plaintiff served notices of his claims against the State of Arizona, Michael Sheldon, Aaron Bowen, Unique Coleman, and Lea'cher Carter, demanding $33,000,000 in damages for ASH's exclusion of Foxy II and the public dissemination of defamatory statements made about me by the individual defendants. *See* Doc.6, ¶ 139, FAC at 100-101; Solan Decl., ¶ 112.

110. The State of Arizona, Michael Sheldon, Aaron Bowen, Unique Coleman, and Lea'cher Carter admitted that they "failed to pay, adjust, rebut, or respond to" Plaintiff's aforementioned notice of claim. *See* FAC, ¶ 140, Doc. 32, ¶ 140; Solan Decl., ¶ 113.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

111. On or about August 14, 2024, Plaintiff filed CV24-02061-PHX-JJT-DMF. Doc. 1; *See* Solan Decl., ¶ 114.

112. On or about October 13, 2024, Plaintiff filed an administrative complaint/grievance with ASH's. Complaints, Grievances, and Appeals office. ASH summarily dismissed the complaint stating, "In regards to your request to have your personal dog visit or live with you at ASH, this issue cannot be handled through the Hospital's internal complaint process, due to the litigation history…Based on the findings of this investigation, your complaint is dismissed." *See* FAC, ¶ 141; Solan Decl., ¶ 115.

113. On November 18, 2024, Plaintiff filed his Verified First Amended Complaint in in this matter. Plaintiff certified the statements made in the Verified First Amended Complaint were true and correct under penalty of perjury. *See* FAC at 62; Solan Decl., ¶ 116.

114. Defendants admitted that Plaintiff had exhausted his remedies for the purposes of the Prison Litigation Reform Act. *See* FAC, ¶ 142, Doc. 32, ¶ 142; Solan Decl., ¶ 117.

115. Defendants admitted Plaintiff suffers from multiple disabilities, including Autism Spectrum Disorder and Post-traumatic Stress Disorder. *See* FAC, ¶ 8, Doc. 32, ¶ 8; Solan Decl., ¶ 118.

116. Defendants admitted that Plaintiff is a qualified individual with a disability for the purposes of the Americans with Disabilities Act. *See* FAC, ¶ 12, Doc. 32, ¶ 12; Solan Decl., ¶ 119.

117. Defendants admitted that Plaintiff is a qualified individual with a disability, also known as a handicapped person, for the purposes of Section 504 of the Rehabilitation Act. *See* FAC, ¶ 201, Doc. 32, ¶ 201; Solan Decl., ¶ 120.

118. Defendants admitted the State, through ASH receives federal financial assistance within the meaning of Section 504 of the RA. *See* FAC, ¶ 200, Doc. 32, ¶ 200; Solan Decl., ¶ 121.

119. Defendants admitted that ASH denied Plaintiff's accommodation request and stated that "[t]he Hospital has extensively reviewed the Americans with Disabilities Act (ADA) regulations on service animals as part of its consideration of your initial and most recent request," and that the ASH administration proclaimed that "[t]he Hospital will not modify

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

its existing policies, practices and/or procedures to allows for a service animal at the Forensic Hospital." *See* FAC, ¶ 123, Doc. 32, ¶ 123, FAC at 86; Solan Decl., ¶ 122.

120. Defendants admitted that "ASH denied Plaintiff's accommodation request without an updated assessment." *See* Doc. 32, ¶ 122; Solan Decl., ¶ 123.

121. When asked in an interrogatory what the assessed duration and severity of the purported risk of Plaintiff having sexual relations with Foxy I was, Bowen testified that he was "not required to conduct a separate assessment to determine the risk that Solan would engage in sexual conduct with his dog Foxy." *See* Exhibit J at 1-2; Solan Decl., ¶ 124.

122. When asked in an interrogatory what reasonable modifications to ASH's policies, practices, or procedures, or provision of auxiliary aides or services he considered to mitigate the purported risk of animal abuse, Bowen testified he and "ASH generally, are not required to accommodate a dog and had no grounds to do so." *See* Exhibit J at 2; Solan Decl., ¶ 125.

123. When asked in an interrogatory what current medical or other objective evidence was reviewed, prior to issuance of the Particularized Assessment, to determine the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy I if she were admitted to ASH, the probability that such sexual conduct would actually occur, and whether and what reasonable modifications of policies, practices, or procedures, or provision of auxiliary aides or services might mitigate any risk of abuse, Bowen testified that he was "not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through ASH's exclusion of Foxy." *See* Exhibit J at 2-3; Solan Decl., ¶ 126

124. The Superior Court order committing Plaintiff to ASH states Plaintiff is to be "committed to the Arizona State Hospital and given any treatment necessary to treat [his] mental illness." *See* https://apps.supremecourt.az.gov/publicaccess/minutes.aspx, search "Court" for "Coconino County Superior" and "Case Number" for "CR-

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

201900357"; select hyperlink for "3/12/2020 Minute Entry"); Solan Decl., ¶ 127.

125. Under the latest version of the Diagnostic and Statistical Manual, Version 5 Text Revision ("DSM-V-TR"), *Other Specified Paraphilic Disorder* (Diagnostic Code F65.89) is set forth as a diagnosable mental health disorder, and states that "[e]xamples of presentations that can be specified using the 'other specified' designation include, but are not limited to, recurrent and intense sexual arousal involving…***zoophilia*** **(animals)…**that has been present for at least 6 months and causes marked distress or impairment in social, occupational, or other important areas of functioning." (Emphasis added.) *See* Solan Decl., ¶ 128; Exhibit V.

126. Plaintiff "has never been treated for a zoophilic or other disorder related animal abuse, and Bowen and Sheldon knew or should have known that ASH had never treated, attempted to treat, or suggested Plaintiff be treated for any such disorder," *See* FAC at ¶ 288, Doc. 32 at 18, ¶ 187 ("Answering paragraph 288 of Plaintiff's First Amended Complaint Defendants admit this allegation."); Solan Decl., ¶¶ 129-130.

127. When asked in an interrogatory, after determining that accommodating Foxy I would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications to policies, practices, or procedures, or auxiliary aides or services were considered a possible means of mitigate the purported fundamental alteration, and how, and on what basis did you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary services, Bowen testified that he, "and the ASH generally, are not required to accommodate a dog and no grounds to do so." *See* Exhibit J at 3; Solan Decl., ¶ 131.

128. When asked in an interrogatory, what direct threat did you determine Foxy I, specifically, as opposed to service dogs generally, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion, Bowen testified that "[t]he ASH was not required to identify a direct threat that Solan's dog, Foxy would pose." *See* Exhibit J at 4; Solan Decl., ¶ 132.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

129. When asked in an interrogatory, on what basis was it determined that accommodating a food visit, animal therapy session, or other visitation between Plaintiff and Foxy I would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation where you could lawfully deny Plaintiff's request for a visit with Foxy I, Bowen testified, "[a]nimals are not allowed to visit patient at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH." *See* Exhibit J at 4; Solan Decl., ¶ 133.

130. When asked in an interrogatory what the assessed duration and severity of the purported risk of Plaintiff having sexual relations with Foxy II was, Sheldon testified that he was "not required to conduct a separate assessment to determine the risk that Solan would engage in sexual conduct with his dog Foxy." *See* Exhibit K at 1-2; Solan Decl., ¶ 134.

131. When asked in an interrogatory what reasonable modifications to ASH's policies, practices, or procedures, or provision of auxiliary aides or services he considered to mitigate the purported risk of abuse to Foxy II, Sheldon testified "ASH was not required to conduct a separate assessment to determine potential modifications of ASH's policies to mitigate the risk that Solan would abuse his dog, Foxy, when that risk was completely mitigated through ASH's justified exclusion of Foxy." *See* Exhibit K at 2; Solan Decl., ¶ 135.

132. When asked in an interrogatory what current medical or other objective evidence was reviewed between June 12, 2024 and July 6, 2024, to determine the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy II if she were admitted to ASH, the probability that such sexual conduct would actually occur, and whether and what reasonable modifications of policies, practices, or procedures, or provision of auxiliary aides or services might mitigate any risk of abuse, Sheldon testified that he was "not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through ASH's exclusion of Foxy." *See*

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Exhibit K at 2-3; Solan Decl., ¶ 136.

133. When asked in an interrogatory, when determining that accommodating Foxy II would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications to policies, practices, or procedures, or auxiliary aides or services were considered a possible means of mitigate the purported fundamental alteration, and how, and on what basis did you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary services, Sheldon testified that he, "and the ASH generally, are not required to accommodate a dog and no grounds to do so." *See* Exhibit K at 3; Solan Decl., ¶ 137.

134. When asked in an interrogatory, on what basis was it determined accommodating a food visit between Plaintiff, his attorney, Foxy II, and Foxy II's caretaker would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation where you could lawfully deny Plaintiff's request for a visit with Foxy II, Sheldon testified, "[a]nimals are not allowed to visit patient at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH." *See* Exhibit K at 4; Solan Decl., ¶ 138.

135. When asked in an interrogatory, what direct threat did you determine Foxy II, specifically, as opposed to service dogs generally, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion, Sheldon testified that "[t]he ASH was not required to identify a direct threat that Solan's dog, Foxy would pose." *See* Exhibit K at 4-5; Solan Decl., ¶ 139.

136. Defendants misstated Plaintiff's deposition testimony regarding Foxy II's training. When asked if he had personally trained Foxy II, Plaintiff testified:

> "No. So when I got her cloned I did some research on cloning. There's a paper that came out of Korea, in one of the academic papers. They were training–I believe they were bomb-sniffing dogs, and one of the problems with training bomb-sniffing dogs or any police dog, is you don't really know if it's qualified for

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

its task until it's gone through lots of expensive training….So they did an experiment. They wanted to see if we cloned a dog, would it carry on its propensities for sniffing and its behavioral traits of its genetic donor. And they found not only was it just as good as a bomb-sniffing dog, but its personality. Everything about it was almost identical. If it was an alpha it remained an alpha. Its personality traits were–like they could also not tell the dogs apart from reading this paper. So, I mean that was a strong incentive to clone Foxy. I worked with lot of dogs in my day and I've never met one that was as smart and as quick and adept at learning as Foxy. So I sold my house. I put everything on the line to get her back. She's the most valuable thing in my world. And I made myself homeless for her. But it was worth it. And when we got her back, obviously she was a two-month old puppy when she got back to Arizona. I had her flown in from the lab in New York where she was born. Joseph took custody of her as soon as she got to Arizona and started basic house training, got her vaccines and as soon as she was old enough and fully vaccinated where she wouldn't get sick being around other dogs, we sent her to training at All Dogs On Leash in Prescott to formalize all of her basic obedience and advanced obedience and get all the groundwork training done for service dog social etiquette and task training. And then under their instructions Joseph continued her training to work on all the tasks that I had described to him that Foxy had previously done for me. And he was able to carry that out….And so he's done a good job continuing the training that All Dogs on Leash set him to do….So, no, I haven't trained [Foxy II], but I've been deeply involved in the intricacies of her training and care, giving full instructions to All Dogs Unleashed and Joseph who have been operating as my agents. They're not doing anything other than under my express direction. So I haven't been physically present for her training, but I've made sure that she received training to do the same things the original Foxy did for when we get back together, and that it's been maintained because I know the original case, Foxy [I] went to live with

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Angela and she didn't have her training maintained, but [Foxy II] does." *See* Solan Decl., ¶ 140; Doc. 66-2 at 9-10 (Depo. Pg. 147-150).

137. Foxy II's task training includes, and at all times material to this action included deep pressure therapy (DPT), alerting, grounding, and social buffing work. *See* Solan Decl., ¶ 141; Cowsert Decl., ¶¶ 20-22; Smith Decl., ¶¶ 5, 7-9.

138. Foxy I also performed DPT, alerting, grounding, and social buffing work, and her performance of these tasks and work was instrumental to Plaintiff's independent functioning and participation in outpatient therapy, and substantially improved the quality of Plaintiff's life. *See* Solan Decl., ¶ 142. Exhibit B, ¶ 9-10, 14-16, 19-20.

139. Plaintiff testified, on personal knowledge from years of experience training dogs, that the DPT, alerting, grounding, and social buffing work and tasks he had trained Foxy I to perform, and which All Dogs Unleashed and Cowsert trained Foxy II to perform are not natural behaviors of dogs, but are specially trained tasks that required Foxy I, and require Foxy II to detect a stress response or adverse emotional state in Plaintiff, and respond by physically placing herself in contact with and applying pressure to Plaintiff by leaning against or sitting on him (in the case of DPT), nudging or yipping at Plaintiff (in the case of her basic alerting tasks), presenting herself to Plaintiff and encouraging him to touch her fur as a sensory anchor (in the case of her grounding tasks), and gently interposing herself in between Plaintiff and others (in the case of her work as a social buffer). *See* Solan Decl., ¶ 143.

140. Plaintiff hired All Dogs Unleashed and Cowsert to train Foxy II to perform the same tasks Foxy I had previously performed, and provided detailed information on the tasks Foxy I performed and explicit directives on how Plaintiff expected Foxy II to perform them. *See* Solan Decl., ¶ 144; Cowsert Decl., ¶ 18-24; Smith Decl., ¶¶ 1-9.

141. All Dogs Unleashed laid the foundation for Foxy II's service dog training, and Joseph Cowsert completed her task training under their guidance, including DPT work, alerting tasks, and the ability to provide consistent grounding support and serve as a social buffer for Plaintiff. *See* Smith Decl., ¶¶ 3, 5; Cowsert Decl., ¶¶ 18-19.

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

142. Foxy II is fully trained in advanced obedience and essential service animal skills, and has continued to receive ongoing training maintenance under Cowsert's supervision, and under the advice and guidance of All Dogs Unleashed to maintain and enhance her skills as a service animal. *See* Cowsert Decl., ¶ 19; Smith Decl., ¶¶ 5-7.

143. Cowsert testified that "Foxy II is fully housetrained, very quiet, and gets along exceptionally well with all human and non-human animals she's come in contact with," is "very tolerant of loud noises and being handled and carried around," and is "well received by everyone and is perfectly well behaved in public, on and off leash." *See* Cowsert Decl., ¶¶ 23-24.

144. The owner of All Dogs Unleashed, Brad Smith, testified that, based on his work with Foxy, subsequent evaluation, and discussion with Cowsert, it was his "professional opinion that Foxy [II] demonstrates a consistent ability to perform DPT and alerting tasks, provide grounding support, and serve as a social buffer for her handler. Foxy [II] possesses all the qualities expected of a service dog, including acute sensitivity to her handler's emotional states, exceptional adaptability to stress, and the ability to remain focused and calm in disruptive situations." *See* Smith Decl., ¶ 7.

145. Smith further testified that "Foxy [II] performs well on and off leash, consistently responds to her handler's verbal and nonverbal commands, and is fully housetrained. She displays no signs of aggression, and enjoys being picked up and handled by her trainer and strangers alike. Overall, Foxy [II] is a friendly and well-adjusted animal, and has acquired the necessary skills and temperament to effectively assist her handler." *See* Smith Decl., ¶¶ 8-9.

146. Smith therefore certified that "Foxy [II] is a fully trained service dog, and is prepared to serve as such for Mr. Solan." *See* Smith Decl., ¶ 9.

147. Around November, 2024, Cowsert sought additional thereby dog certification for Foxy II from the Alliance of Therapy Dogs ("ATD"), a nonprofit organization that certifies therapy dogs to work in hospital settings. *See* Solan Decl., ¶ 145. Foxy II passed her auditing with flying colors, and she and Mr. Cowsert were certified by ATD as a therapy animal team on

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

January 10, 2025. ATD approved Foxy II to do animal therepy work in hospital settings, and extended its $5,000,000 liability coverage to her and Cowsert; and due to Foxy II's continuous in animal therapy work at the Williams, Arizona Senior Center, ATD renewed Foxy II's certification and insurance coverage through 2026. *See* Solan Decl., ¶ 149; Doc. 17 at 63-67, 69; Exhibit W.

148. ATD's auditor, Robin Petrillo, reported that Cowsert "put in a lot of time and energy in training [Foxy II] and it shows…Foxy [II] did well in a hospice environment. She was able to sit on the bed and brought love and joy." *See* Doc. 17 at 63-67;

149. Petrillo confirmed that Foxy II could be safely handled, was clean and well groomed, did not bark any people or other dogs, showed no signs of aggression, accepted stroking of her head, body, and tail, touching of her paws, scratching and petting of her throat, holder her hears, and being held; and demonstrated appropriate skills to interact with people in animal assisted functions. *See* Doc. 17 at 63-67; Solan Decl., ¶ 147.

150. On June 13, 2024, Plaintiff sent a request for a reasonable accommodation to Sheldon, as CEO of the Arizona State Hospital, requesting that Foxy II accompany him at the Arizona State Hospital. *See* FAC at 81-84; Solan Decl., ¶ 150.

151. Plaintiff explained in his June 13, 2024 request that Foxy II his individually trained service animal, explained her task training, why Foxy II was required because of his disabilities, and attached certifications from Foxy II's veterinarians and trainers as to her health, vaccination, and training status. *See* FAC at 81-84; Solan Decl., ¶ 151.

152. On June 22, 2024, Plaintiff requested a food visit for his birthday with two of his attorneys, "Foxy Solan, my service animal," and Foxy II's caretaker. ASH wrote on the form, "No dogs are allowed on Campus," and Sheldon signed off on the denial ("Approved by CEO"). *See* FAC at 88; Solan Decl., ¶ 152.

153. Besides Plaintiff, nobody at ASH has ever met Foxy I or Foxy II. Solan Decl., ¶ 153.

154. The latest version of the Diagnostic and Statistical Manual, Version 5 Text Revision ("DSM-V-TR") describes the criteria for an Autism diagnosis:

"Autism spectrum disorder is characterized by persistent deficits in social

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities. Because symptoms change with development and may be masked by compensatory mechanisms, the diagnostic criteria may be met based on historical information, although the current presentation must cause significant impairment."

*See* DSM-V-TR at page 37; Solan Decl., ¶ 155; Exhibit V.

155. On December 30, 2024, Plaintiff's former ASH psychologist, Dr. Amanda Brimlow, wrote a letter stating:

"Per his records (Dr. Kamean-Silva, in 2000), Mr. Solan was diagnosed with autism when he was 11 years old, and required services in school to address his unique needs. He has difficulties in communication and behavior, resulting in limited ability to communicate, understand, learn, and participate in social relationships. It is this writer's opinion that he still meets the criteria for an Autism Spectrum Disorder diagnosis as an adult. He was psychologically evaluated by Dr. Wirth in 2022, and his diagnosis of Autism Spectrum Disorder was retained. Mr. Solan has persistent deficits in social communication and social interaction across multiple contexts. While he has been a patient at this hospital, he has continued to struggle with appropriate verbal and nonverbal interactions with staff and peers. He has a history of lacking social-emotional reciprocity, and interest in others which has led to difficulties in developing and maintaining relationships with others. He has presented with an inflexible adherence to routine, as evidenced by continuing to refuse to attend groups, to adhere to a typical daytime schedule, and making demands of the staff and his treatment team despite hospital policies. He has expressed hyperreactivity to sensory input while he has been a

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

> patient at Arizona State Hospital. He will sleep during the day to avoid noises, states that he requires soundproofing materials to be installed on the unit, and will not attend social groups with others due to being "overstimulated." It is important to note that when Mr. Solan feels his needs are not being met appropriately, he will say racial slurs and threaten to harm or kill others. This is indicative of the substantial functional limitations related to his Autism diagnosis and deficits in appropriate social interactions with others."

*See* Doc. 24 at 22-23; Solan Decl., ¶ 156.

156. In June, 2025, Plaintiff complained to Dr. Brimlow that ASH was refusing to accommodate his Autism and that ASH should transfer him to a facility that can treat Autism or release him. Dr. Brimlow informed Plaintiff that she had been advocating for him and requesting that the ASH administration allow Plaintiff to receive outpatient thereby, as ASH cannot accommodate his needs. When Plaintiff was transferred from ASH's Cottonwood unit to the Mohave unit on July 2, 2025, Dr. Brimlow was removed from Plaintiff's treatment team without explanation. *See* Solan Decl., ¶ 157.

157. On July 2, 2025, Julianna Vroman replaced Dr. Brimlow as Plaintiff's psychologist, but she refused to work with Plaintiff and refused to discuss accommodations for Plaintiff's Autism. *See* Solan Decl., ¶ 158.

158. On or about November, 2025 Vroman was abruptly removed from Plaintiff's treatment team. Kindra Ochoa informed Plaintiff that Vroman is "no longer employed at ASH." Solan Decl., ¶ 159. Ochoa later informed Plaintiff that Vroman was not a licensed psychologist and that the ASH administration had terminated her for misrepresenting her qualifications. *See* Solan Decl., ¶ 160.

159. Plaintiff went without meeting with a licensed psychologist until about May 2026, when Courtney Tully, previously an unlicensed intern, notified Plaintiff that she had received her PhD in psychology and was employed by ASH to work with Plaintiff as his psychologist. *See* Solan Decl., ¶ 161 Tully met with Plaintiff in May, 2026, and informed him that she was replacing the psychology goal Vroman had in Plaintiff's treatment plan with the

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

following goal:

> "Psychology staff will offer a minimum of three documented opportunities for Matthew to participate in treatment planning within a 3 month time frame. Psychology staff will increase patient access to services by offering autism-informed communication and environmental accommodations (clear agenda prior to meeting, predictable meeting structure, reduced sensory stimulation in the environment including dim lighting, direct and literal communication style, and/or extra processing time for responses."

*See* Solan Decl., ¶ 162; Exhibit Y.

160. At no time before or after Courtney Tully added as a treatment goal that ASH will increase Plaintiff's access to services by offering autism-informed communication and environmental accommodations, did ASH offer Plaintiff autism-informed communication and environmental accommodations. *See* Solan Decl., ¶ 163.

161. Instead, ASH has continually removed accommodations and services that Plaintiff previously relied on: ASH seizing Plaintiff's previously-approve noise cancelling headphones and declared them as contraband, turned off the bathtubs Plaintiff used to ground and decompress, excluded Plaintiff's service animals, transferred Plaintiff from Cottonwood unit, which ASH's CMO previously stated Plaintiff was housed at as an accommodation for his Autism, to the louder and far overstimulating Mohave unit, and cancelled Plaintiff's single-patient bedroom accommodation. *See* Solan Decl., ¶ 164.

162. Plaintiff has continually requested accommodation for his Autism-related sensory needs and demanded that ASH resume the accommodations previously provided, but ASH's treatment teams have repeatedly told Plaintiff that all of those decisions were made by the ASH administration, that the administration would not listen to them, and that Plaintiff would have to wait until discharge to access to those accommodations. *See* Solan Decl., ¶ 165.

163. Unwilling to wait until discharge to receive the benefits of Autism-informed treatment services, Plaintiff established a relationship with Sam McCulloch at Radian Sun Therapy in Flagstaff and began participating in telemedicine therapy with him. *See* Solan Decl., ¶ 166.

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

164. Unlike ASH, McCulloch specializes in treating ASD. *See* Solan Decl., ¶ 166.

165. McCulloch created a treatment plan for Plaintiff and provided a copy to Plaintiff on May 26, 2026. *See* Solan Decl., ¶ 167. McCulloch's treatment plan states:

> "Presenting Problem: Matt presents challenges with managing stress and sensory overwhelm. These symptoms are related to his Autism disorder, and also contribute, and can trigger PTSD symptoms, interfering with description making and his physical, mental, and emotional safety. Goal: Matt's goal is to transition out of the State hospital, find stability economically, secure safe housing, ands reconnect with his business and his passion. Matt will work to make connections with the right supports including regular therapy and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition. Objective: Matt will learn and practice skills to help with managing stress and developing awareness and self-care around his sensory system. Matt will participate in therapy and have close contact with his support animal. Matt will also seek out additional supports as needed to treat his PTSD."

*See* Solan Decl., ¶ 167; Exhibit I.

166. Dr. Morris allegedly opined in 2022 that Foxy I "would only serve to get in the way" of Plaintiff's treatment at ASH. SOF, ¶¶ 22, 25. That is not what he told Plaintiff throughout 2020 to early 2022; Dr. Morris told Plaintiff that he supported Plaintiff having Foxy I at ASH, but that it was an "administrative decision" to exclude her. *See* Solan Decl., ¶ 168.

167. Plaintiff was admitted to ASH pursuant to a finding by the Coconino County Superior Court that he was guilty except insane. *See* Solan Decl., ¶ 169. Under A.R.S. § 13-502(A), a person is guilty except insane when, "at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong."

168. The condition that made Plaintiff eligible for a GEI commitment to ASH was psychosis resulting from a Schizoaffective disorder. *See* Solan Decl., ¶ 169; Exhibit N.

169. ASH removed Schizoaffective disorder from Plaintiff's list of diagnosis and has not

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

offered treatment, or suggested Plaintiff requires treatment for a Schizoaffective disorder since 2022. *See* Solan Decl., ¶ 170.

170. Plaintiff is an ecocentist, therian, and practitioner of esoteric fox magic. *See* Solan Decl., ¶ 171; Doc. 17 at 76, ¶ 5, 81, ¶ 33.

171. Plaintiff's autism-related eccentricities and do not make him "insane," and the fact he "likes dogs better than people" is not going to change; it is fundamental aspect of his sincerely held religious beliefs and philosophical worldview. *See* Solan Decl., ¶ 172.

172. Neither Dr. Morris, nor anyone else at ASH has any right to try and "fix" this aspect of Plaintiff's identity, and ASH's unjustified exclusion of Foxy and appalling attacks on Plaintiff's relationship with her has only furthered Plaintiff's disdain for humanity and alienation from ASH's providers. *See* Solan Decl., ¶ 173; Cowsert Decl., ¶¶ 32-33; FAC, ¶¶ 136-138, 145-146, 175, 279-283, 295-296, 333-335; Doc. 17 at 84-85.

173. In years Dr. Morris worked with Plaintiff, he never asked how Foxy could improve Plaintiff's access to services, or the effect her exclusion was having; he refused to discuss the matter with Plaintiff, stating that it was an "administrative decision" to exclude Foxy I, and Plaintiff should just focus on treatment without her. *See* Solan Decl., ¶ 168.

174. Dr. Morris may have wished Plaintiff could focus on treatment in the absence of necessary accommodations for his autism, but that never happened. As a direct result of ASH's refusal to sufficiently accommodate his Autism-related needs, the most harmful refusal being ASH's intentional exclusion of Foxy I and Foxy II, Plaintiff has been unable to participate in the gross majority of ASH's treatment programs, service, and activities the entire time he has been confined at ASH. *See* Solan Decl., ¶ 173.

175. Prior to his involuntary confinement by the State of Arizona, Foxy I enabled Plaintiff to function independently from his prior direct family support, and patriciate meaningfully in outpatient thereby for the first time in over 20 years of Plaintiff's mother taking him to see therapists. *See* Solan Decl., ¶ 174.

176. Plaintiff's mother, Arlene Solan, has similarly impeached Dr. Morris' testimony that Foxy I would only serve to get in the way of Plaintiff's treatment. Mrs. Solan stated:

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

"I am Matthew Solan's mother. He was adopted at 11 days old. Matthew has lived with disabilities his entire life. He attended a special-needs pre-school from ages 3 through 4 and required substantial support in elementary school. Matthew had an IEP starting in kindergarten and an assigned aid through the third grade. In the fourth grade, Matthew was diagnosed with an Autism Spectrum disorder. In the fifth grade, Matthew was removed from public school and placed in a special needs school for autistic children. In the sixth grade, Matthew continued to decompensate, so my husband and I removed Matthew from school and homeschooled him. He received his GED in 2009 at age 20. Matthew completed a 3D animation certificate program through Boston University in 2012, but required substantial accommodations to finish it. Matthew moved into his aunt's vacant condominium in 2012 and lived there until 2015. During this time, he became very reclusive. He was obsessed with computers and programming. I had difficulty getting him to go out and socialize. On January 5, 2015, I drove Matthew to Brattleboro, Vermont to pick up his first dog, Foxy. Initially, I did not want Matthew to have a dog. When I saw how much she helped him, I was glad. Matthew began teaching Foxy to perform tasks that helped him manage his autism. Matthew and Foxy lived together at the condo from January to August 2015. He was suffering from mold-related illnesses while at the condominium. Matthew expressed a desire to move to Arizona. My husband and I bought him a house near Williams, AZ, hoping the dry climate would help him heal from his illnesses. He could live independently with our continued support. Matthew came back to Massachusetts in 2016 and returned to Arizona by 2017. While in Massachusetts in 2015 and 2016, I stayed with Matthew and Foxy several hours a day to help with various living activities. I also took them out to socialize. We would go out to restaurants and thrift stores several times a week. Matthew always took good care of Foxy and attended to her

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

needs. I watched him walk her, cook for her, bathe her in the sink and pamper her. Matthew stopped talking through his stuffed fox toys and began using Foxy as a social buffer, which enabled him to communicate more effectively. I have never seen Matthew mistreat Foxy, raise his voice at her, hit her or do anything to cause her any harm. I never saw any indication that Matthew was inappropriate with Foxy in any way. When Matthew was training Foxy, I watched him exclusively employ positive reinforcement techniques. He showered her with praise and positive attention, using healthy training treats, such as chicken bits, which he would prepare for that purpose. While I continued to provide Matthew financial support, Foxy enabled Matthew to function independently for the first time, leave the house to socialize and take on more and more responsibilities. I took Matthew to all of his therapy appointments between 1993 and 2016. Prior to 2016, I accompanied Matthew because, if I did not, he would not even go in. Before acquiring Foxy as a service dog, Matthew could not effectively engage in any therapy. He would argue with the therapists and could not focus on what they were asking him to do. After Foxy started coming to his sessions, he was able to begin engaging with his therapist. When Matthew became overwhelmed, Foxy would jump in his lap without prompting and Matthew would bury his face in her fur to calm down. After several months of attending therapy with Foxy, Matthew was able to start participating in the sessions without me. While Matthew has been confined at the Arizona State Hospital, I have spoken with him on the phone almost every day. Since being separated from Foxy, Matthew has become more withdrawn and cynical. Matthew was devastated by the death of Foxy in 2022, after which he drastically decompensated and became even more withdrawn and verbally aggressive. Matthew decided to sell his house in Williams, AZ so he could get the funds to clone Foxy, hoping this would calm him down. Since the cloned Foxy was delivered to Arizona

Matthew Phillip Solan
501 North Twenty-Fourth Street
Phoenix, Arizona 85008-6056

in 2024, I have paid approximately $200 weekly for Foxy's food and care. I have also paid for all of Foxy's veterinary expenses and other needs. I will continue to pay for Foxy, but once Matthew is able, I am holding him responsible to pay all of Foxy's expenses. From what I have heard from Matthew and others, I do not believe the Arizona State Hospital has improved Matthew's situation, nor his mental health." *See* Exhibit B; Solan Decl., ¶ 175.

177. Plaintiff has begged every treatment team he's had at ASH to provide him access to the same treatment services the other patients have access to, and to accommodate his Autism by providing the same content of the treatment groups on a one-on-one or small group basis reduce the sensory overstimulation and enable Plaintiff to participate without experiencing the extreme distress the group environments cause him. *See* Solan Decl., ¶ X. The members of every single treatment team Plaintiff has had at ASH, including, but not limited to Dr. Morris, ASH CMO Steven Kwoh, Kinda Ochoa, and Courtney Tulley, and have told Plaintiff that they agree that one-on-one or small group accommodations are necessary, but the ASH administration will not provide them the staff resources to make such an accommodation. *See* Solan Decl., ¶ 176-177.

178. In addition to their refusal to accommodate and treat Plaintiff's autism, ASH staff have repeatedly physically, emotionally, and verbally abused and neglected Plaintiff on countless occasions between while Plaintiff has been confined at ASH. *See* Solan Decl., ¶ 178. For example:

- In the spring of 2021, Plaintiff was assaulted by R.N. Cooper. After filing an assault report with AHCCCS, Plaintiff's claim was substantiated, and AHCCCS required ASH to complete a Corrective Action Plan (CAP). *See* Solan Decl., ¶ 179.
- In or about the fall of 2021, Plaintiff was assaulted and battered on two separate occasions by BHT Dorothy Wilson. After filing an assault report with AHCCCS, AHCCCS again substantiated the complaint, and ordered a CAP. *See* Solan Decl., ¶ 180.
- On October 17, 2023, Plaintiff was violently assaulted by Hospital Security while lying in bed, dragged to seclusion, sexually assaulted in the seclusion room, and then

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

unlawfully secluded for over 2 hours. AHCCCS and APS took up the investigation into the physical and sexual abuse. After over 1 and ½ years of investigation, AHCCCS sent Plaintiff a letter stating they could not get the video footage from ASH, and were therefore closing the investigation. *See* Solan Decl., ¶ 181.

- On numerous occasions throughout 2024, Lea'cher Carter and Unique Coleman made various lewd and defamatory statements about Plaintiff and Foxy, in Plaintiff's presence and in front of other ASH patients, including "you eat dog p***y" and "you eat dog a**," and on May 22, 2024, Carter openly made these statements and also declared that my "d*** is so small you need a magnifying glass to see it." *See* Solan Decl., ¶ 182.
- After Plaintiff reported Carter's sexual harassment her supervisor, Carter made a false police report claiming Plaintiff had thrown a full cup of hot coffee in her face and threatened to kill her, rip out her unborn baby, and rape her baby because he was black. Plaintiff was indicted and maliciously prosecuted on Carter's false allegations for nearly 2 years. Carter eventually admitted she had lied, and Carter's charges against Plaintiff were dismissed with prejudice in March of 2026. *See* Solan Decl., ¶ 183.
- On April 26, 2024, Plaintiff was suffering from a migraine headache, and attempted to inform Evelyne Bankuwabo, R.N, the only nurse present, but she was asleep. About 45 minutes later, Plaintiff returned to see the nurse, but she was still sleeping. Plaintiff filed a grievance, and the ASH complaints office substantiated the same in part, claiming that Bankuwabo was not sleeping, but that the BHT failed to report Plaintiff's medical status, forcing Plaintiff to go to bed without migraine treatment. ASH nevertheless terminated Bankuwabu shortly afterwards. *See* Solan Decl., ¶ 184.
- On June 22, 2024, ASH BHT Wiley Bunn punched Plaintiff in the case and shoved him onto the ground while Plaintiff was sitting and talking peacefully with a female BHT. The ASH Independent Oversight Committee investigated the incident, and substantiated Plaintiff's allegations against Bunn. *See* Solan Decl., ¶ 185.
- Later on June 22, 2024, Unique Coleman began yelling at Plaintiff and goading him to attack her. When Plaintiff declined to so, Coleman charged up to Plaintiff, screamed, and

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

spit in his ear. Nicholas Oakes, a member of the ASH IOC was present ant witnessed the assault by Coleman. The ASH Independent Oversight Committee investigated the incident, and substantiated Plaintiff's allegations against Coleman. *See* Solan Decl., ¶ 186.

- On June 27, 2025, Coleman burst onto the Cottonwood unit during shift change, after her shift on Saguaro unit ended, marched up to Plaintiff, and began laughing at Plaintiff, taunting Plaintiff, and telling Plaintiff that she was coming back to the Cottonwood unit, and had been told to make police reports against me any time Plaintiff did "anything." Immediately following the altercation with Coleman, Plaintiff become paranoid and thought the police were coming to kill him. Plaintiff banged his head into the table, pulled a small plastic placard off the door frame, went into the bathroom, and cut both his wrists, arms, and legs with it. Plaintiff made 35 cuts in his body. Staff placed Plaintiff on Close Observation Status for Danger-to-Self behaviors, and assigned a 1-on-1 staff escort to watch over him. The ASH Independent Oversight Committee investigated the incident, and substantiated Plaintiff's allegations, finding Coleman intentionally provoked Plaintiff and caused a "very negative patient outcome." *See* Solan Decl., ¶ 187.

179. On September 1, 2023, Sheldon issued the report to the Arizona Legislature mandated pursuant to Ariz. Laws. 2022, Ch. 359, ¶ 3. In this report, Sheldon stated:

> "As previously indicated, individuals with a Neurocognitive…or a Neurodevelopmental Disorder (i.e., Autism Spectrum Disorder or an Intellectual Disability) require specialized treatment due to the complexity of the behaviors and symptoms that are associated with these disorders. Furthermore, when these disorders are combined with a Serious Mental Illness, the need for specialized care is compounded and oftentimes leads to longer hospitalizations and difficulty discharging to a less-restrictive setting. While preparing this Plan, the Hospital reviewed the prevalence of Neurocognitive Disorders and Neurodevelopmental Disorders across its existing patient population. It should be noted that for both the Civil and Forensic campuses, individuals that had either a Neurocognitive

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

Disorder, a Neurodevelopmental Disorder, or a combination, have been hospitalized for a significantly longer time period than their peers. Specifically, 32.5% of Civil patients and 12.2% of Forensic patients had at least one of these diagnoses and have an average length of stay 2.9 years longer than their peers without a Neurocognitive or Neurodevelopmental Disorder." Id. at 27. Sheldon further stated in his report, "Beyond the above-cited issue with the Hospital's current licensure restrictions, the Hospital is not able to meet the needs of patients with Autism, DD/ID, dementia/neurocognitive disorder, or substance use disorder as primary diagnosis. Appropriately meeting the needs of these populations takes whole teams with specialized training. The Hospital's current allocation meets its needs for the treatment of severe general primary psychiatric illnesses (such as schizophrenia, bipolar disorder, depression, etc.). ASH can address other issues mentioned ift hey are *secondary* conditions, as all clinical staff have basic abilities to address these issues when minor or secondary. Antisocial personality disorder (which is a disqualifying diagnosis for Title 36 court ordered treatment and has no evidence-based treatments for the diagnosis), cannot be treated by ASH regardless of the specialized staff hired."

*See* Id. at 27; Solan Decl., ¶ 188.

180. When Plaintiff asked in an interrogatory, if "the State admits, in September, 2023, that ASH did not offer clinical services to treat Plaintiff's primary diagnosis of Autism Spectrum Disorder, but now claims that ASH provides such services, explain the nature of those services, and provide the dates such services were provided to Plaintiff, and the names and titles of the licensed providers who provided such services to Plaintiff, Sheldon, responding for the State, testified that "Defendant does not admit, and has not admitted, that the ASH lacks clinical services for treating Autism." *See* Solan Decl., ¶ 189.

181. In September, 2025, ASH disclosed all of Plaintiff's treatment plans up to that date. Between 2021 and September, 2025, in 85 separate treatment plans, Plaintiff's providers, including Dr. Moris, Dr. Stephen Jaffe, Dr. Mohammad Bhatti, Dr. Seven Kwoh, Dr. Diana

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

Walyat, and RN Kindra Ochoa each stated that Plaintiff having a "trained service dog" was his primary patient strength in 85. *See* Solan Decl., ¶ 190.

182. At least 54 those plans also recommended "animal therapy" as a therapeutic intervention. *See* Solan Decl., ¶ 191.

183. All attempts Plaintiff has made to acquire sufficient accommodations for his autism have been met with resistance or retaliation. *See* Solan Decl., ¶ 192. For example:

- After Plaintiff appealed his treatment plan in 2021 for its failure to meet his autism-related needs, ASH transferred Plaintiff to another unit and its legal counsel, Erin Cohen, argued before the Administrative Law Judge that the transfer mooted Plaintiff's appeal, as he had a "new" treatment plan. The ALJ rejected ASH's argument, and ordered ASH to add animal therapy to Plaintiff's treatment plan. Since 2023, ASH refused to offer Plaintiff any animal therapy, even when Plaintiff facilitated free access to a certified and licensed animal therapy team. *See* Solan Decl., ¶ 193.
- After Plaintiff appealed his treatment plan in 2023 for its failure to meet his autism-related needs, ASH immediately retaliated by seizing several of Plaintiff's previously approved coping tools. Plaintiff withdrew his appeal, and the retaliation stopped. *See* Solan Decl., ¶ 194.
- After Plaintiff appealed his treatment plan in 2024 for its failure to meet his autism-related needs, ASH's attorney, Erin Cohen pressured the Phoenix PD to arrested Plaintiff on Carter's false hate crime allegations. When Plaintiff's mother paid Plaintiff's bond and Plaintiff returned to ASH, Cohen pressured Coconino County Adult Probation to petition the Superior Court to send Plaintiff to prison. The Presiding Judge of Coconino County, the Honorable Ted Reed, was not amused by Cohen's antics, and summarily dismissed the petition, stating the request was improper. Kindra Ochoa then asked Plaintiff to draft a proposed treatment plan. Plaintiff provided a reasonable, treatment plan proposal, and ASH added some of the proposed language to the plan, while simultaneously stating it could not implement

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

the changes:

- "Matthews proposed long term goal The treatment team, in conjunction with the patient, his legal counsel, and the hospital administration will determine, in the next 21 days, if the hospital will be able to secure sufficient staff resources and funding to begin treating the patient's Autism Spectrum Disorder in a manner that complies with generally accepted standards of autism care and the patient's unique needs. If the hospital is able to secure sufficient staff and fiscal resources, the hospital and the treatment team will fully implement the remaining goals and services stipulated in this plan no later than November 9, 2024. If the hospital is unable to acquire sufficient staff resources and funding, or the hospital administration refuses to allocate sufficient staff and/or fiscal resources as needed to treat the patient's Autism Spectrum Disorder, or if the treatment team is otherwise unable to acquire the majority of the services stipulated in this plan by November 9th, the treatment team will meet with the patient and his legal counsel and assist them in preparing a petition to the Superior Court to either (a) transfer the patient to a private facility specializing the treatment of Autism Spectrum Disorders, or (b) conditionally release the patient to his caretaker, Joseph Cowsert. Matthews requests cannot be fulfilled by this provider as she does not have the ability to acquire staff. Matthew will meet with this provider weekly to address symptoms of Autism Spectrum Disorder that hinder him from pro-social behaviors. This provider will identify coping skills to adress symptoms that hinder him from pro-social behaviors."
- Matthews proposed short term goal Patient and his legal counsel will work closely with the treatment team in selecting treatment services necessary to facilltate the patient's ASD habilitation and PTSD therapy at ASH. The treatment team and hospital administration will locate, acquire, and provide to the patient all services, supports, accommodations, and environmental modifications determined by the treatment team in conjunction with the patient and his legal



MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

team to be necessary for the patient's effectual habilitation and trauma therapy. The hospital shall not exclude any identified service, support, accommodation, or environmental modification on the basis that the same is not presently available at ASH, or is deemed hospital administration as unnecessary, too expensive, or an administrative burden, but shall add the same whether presently available or not, and shall continually make a good faith effort to acquire the same until the next ITDP review. If, after 30 days, a needed service, support, accommodation, or environmental modification is still unavailable, the treatment team shall, at the next !TOP review, provide a written report to the patient and his legal team detailing the reason the same is still unavailable, the date it is expected to become available, and/or hospital's plan to provide a sufficient alternate. It is outside of the treatment teams ability to alter habilitation/environment modifications. What is available is ensuring that Matthew has a safe place to turn to when he feels triggered such as his room, a quite room, or walking on the patio. Matthew will utilize his safe place, a quiet room, and behaviors identifies in his TIPS sheet when feeling triggered, overwhelemed, or emotionally dysregulated.

- Matthews proposed intervention The patient will be provided Animal Assisted Therapy (AAT) services, as defined by the hospital's animal therapy policy, at least twice a week as part of his ASD habilitation and PTSD therapy If the hospital is unable to secure a therapy dog within 30 days, AAT will be facilitated using the patient's own service dog, Foxy, not less than once a week, contingent only on her caretaker's availability. If the patient's service dog is used to facilitate the patient's animal therapy, the service shall be conducted in the PSRB lobby, or in such other secured area of the forensic hospital as the hospital shall determine safe and appropriate The treatment team does not have the ability to offer animal assisted therapy, does not have personnel trained to provide animal assisted therapy. The forensic hospital does not have volunteers available to

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

perform.

- Matthews proposed intervention The assigned psychiatric provider shall meet with the patient at least once a week to assist the patient in developing, testing, and using his biofeedback system and machine learning (ML) model. The treatment team shall approve the patient's property request for a USB biofeedback interface (e.g., a USB SDR (sic), finger-cuff GSR sensor, and EEG headband) for use with biofeedback software on the patient computers, which shall be checked in and out from the unit charge nurse like other electronic cables. This is out of the scope and procedures for the treatment team to approve. The psychiatric provider is not trained in using or assisting patients in the development of a biofeedback interface.
- Matthews his legal counsels proposed Long term goal: Patient will accept testing and treatment for his autoimmune encephalitis[ AE] variant of ASD. The assigned provider shall seek the informed consent of the patient for any proposed treatment, and shall provide the patient all and any materials necessary for the patient to formulate informed consent. If the hospital cannot provide in-house services needed to treat the patients AE/ASD, the patient shall be referred out to a local treatment specialist who specializes in AE and who is trained in integrated medicine. This long term goal proposed by Matthew : is outside of the medical providers ability to offer. ASD is being managed by his psychiatric provider and Matthew does not have any medical symptoms that would indicate that he has encephalitis. ASH administration does not approve referral to naturopathic institutes. ASH, ASH providers ASH pharmacy practice allopathic medicine and cannot provide naturopathy or monitor any side effects that might occur due to naturopathic treatment.

*See* Solan Decl., ¶¶ 195-196; Exhibit G.

184. Plaintiff, his former attorney, Holly Gieszl, Joseph Cowsert, and many ASH patients have personally witnessed Plaintiff's repeated attempts to acquire reasonable

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

accommodations for his Autism, and the retaliation he faced at the hands of ASH for doing so. The patient witnesses have been naturally reluctant to testify, and all of the patients who resided on the Cottonwood unit when Carter and Coleman were berating Plaintiff with false accusations of bestiality repeatedly told Plaintiff they "cannot testify," because they "cannot afford to lose [their] levels." *See* Solan Decl., ¶ 197.

185. Daniel Alverez, another Autistic patient who previously resided on the Cottonwood unit, witnessed Carter abusing Plaintiff. ASH revoked Alverez' level, and like his mental health continued to deteriorated after being moved to a lower functioning unit. *See* Solan Decl., ¶ 198. Feeling there was nothing left for him to loose, Alverez agreed to testify about Carter's abuse. In his declaration, Alverez states:

> "I have been diagnosed with an Autism Spectrum Disorder (Asperger's Syndrome) from childhood, but ASH currently has me diagnosed with a Schizoaffective Disorder…I worked really to hard progress through ASH's privilege system and get my Levels. I was moved to ASH's Cottonwood unit in 2023 because Cottonwood was ASH's pre community reintegration unit and I had been given conditional release to privilege Level 1….Lea'Cher Carter [] was a Behavioral Health Technician [] on the Cottonwood unit when I was living there…. I always felt uneasy around Carter, and she would intentionally trigger me when I was feeling paranoid. Carter was always rude, hateful and mean to me, and to all the patients she didn't like. She would give me dirty looks and mad dog me at random times for no reason…. She harassed other patients too and made nasty comments about them. One time she told me that Matthew Solan "fucks dogs." I complained to Nurse Supervisor Domenick Aldrich ("Domenick") about Carter's treatment of me around May, 2024. Domenick told me "if it was up to me, she'd be gone," but he didn't do anything to protect me from her harassment… I complained to my therapist and Cottonwood RN Jessica, but they didn't do anything to help me either. I filed a grievance against Carter around May or June of 2024, but after I did that, she started harassing me more… Carter told

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

me "if you don't listen to me, I'll get you moved the fuck off this unit… Carter's abuse put me in a sad state and made me feel scared. She was really scary and I felt helpless because I didn't do anything to her and the hospital was letting her treat me like trash. To escape the abuse, I kicked off my ankle monitor and broke a table so ASH would move me off the Cottonwood. I got all my privileges revoked and was transferred to the Sycamore unit, where I have remained ever since. I took me over a year to get even part of my privileges back. I felt it was hopeless and didn't even try for a long time... Lea'cher Carter really hurt me, and I personally witnessed her verbally and emotionally abuse Matthew Solan too. I feel that Carter should not be allowed to work with the mentally ill anymore, and hope that the Courts will protect patients from her abuse in the future."

*See* Doc. 8, Ex. I, ¶ 8; Solan Decl., ¶ 198; Exhibit E, ¶ 8.

186. Plaintiff served requests for admissions and interrogatories on Defendants Carter and Coleman on December 16, 2026. *See* Doc. 59 at 6-11; Doc. 68 at 42-50; Solan Decl., ¶ 199.

187. The responses to Plaintiff' requests for admission to Carter and Coleman were made and signed by Ann Hobart and Jordon Kendal, not Carter and Coleman. *See* Solan Decl., ¶ 199; Exhibit CC.

188. In Coleman's response to Plaintiff's first set of interrogatories, Coleman does not deny that she accused Plaintiff of eating "dog p***y" or "dog a**" in front of other ASH Cottonwood patients. *See* Solan Decl., ¶ 200; Exhibit L at 2. Instead, Coleman testified that she "has heard Plaintiff state that his dog, Foxy, is his wife and has heard Plaintiff speak of sexual conduct between himself and his dog." *See* Id.

189. Plaintiff never told Coleman or stated in her presence that Foxy was his wife, and never told Coleman or spoke in her presence of sexual conduce between himself and his dog. *See* Solan Decl., ¶ 201.

190. Plaintiff has never engaged in sexual conduct with a dog, never told anyone that he had engaged in sexual conduct with a dog, never told anyone that he had a desire or intent to engage in sexual conduct with a dog, and has no interest in engaging in sexual conduct with

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

a dog. *See* Solan Decl., ¶ 202.

191. Carter has not testified at all in these proceedings. *See* Solan Decl., ¶ 203.Defendants' counsel attempted to pass of a set of responses purporting to be Carter's, but signed by counsel and unverified by Carter. *See* Doc. 86 at 64-66. Plaintiff moved for sanctions, and Defendants conceded that Carter's unsigned and unverified interrogatory response was inadmissible. *See* Doc. 80 at 4; Solan Decl., ¶ 203.

192. When Bowen was asked in an interrogatory to describe all information and records he provided to Sheldon pertaining to Plaintiff, Foxy I, and/or Foxy II, Bowen testified that "Sheldon was on the administrative team before he became ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to Solan and his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowens' computer drive and all the files it contained." *See* Exhibit J at 3; Exhibit M; Solan Decl., ¶ 204.

193. According to public records, the ASH administration in March, 2022 was composed of CEO Bowen, COO Sheldon, CFO Ryan Rodney, CMO Katharine Woods, CNO Nancy Regan, CQO Lisa Wynn, CCO Margaret McLaughlin, CSO William Bugbee, and ADHS Director Don Herrington. *See* Exhibit X; Solan Decl., ¶ 205.

194. In or about 2024, Domenick Aldrich, a Psychiatric Nursing Unit Manager ("PNUM") informed Plaintiff the he, and all the other ASH PNUMs were on the "administrative team," and were regularly apprised of decisions by the higher-ups affecting the ASH treatment units. *See* Solan Decl., ¶ 206.

**RESPECTFULLY SUBMITTED** this 23rd day of June, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008
Tel: +1.970.369.9611
legal@fox-ranch.com
*Plaintiff in Pro. Per.*

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**I CERTIFY** that copies of the foregoing document were delivered to Arizona State Hospital staff on June 23, 2026, in sealed envelopes, with proper postage affixed, for forwarding to:

Ann Hobart and Jordan Kendall
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, AZ 85004
*Attorneys for Defendants*

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003

Matthew Phillip Solan

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

perform.

- Matthews proposed intervention The assigned psychiatric provider shall meet with the patient at least once a week to assist the patient in developing, testing, and using his biofeedback system and machine learning (ML) model. The treatment team shall approve the patient's property request for a USB biofeedback interface (e.g., a USB SDR (sic), finger-cuff GSR sensor, and EEG headband) for use with biofeedback software on the patient computers, which shall be checked in and out from the unit charge nurse like other electronic cables. This is out of the scope and procedures for the treatment team to approve. The psychiatric provider is not trained in using or assisting patients in the development of a biofeedback interface.
- Matthews his legal counsels proposed Long term goal: Patient will accept testing and treatment for his autoimmune encephalitis[ AE] variant of ASD. The assigned provider shall seek the informed consent of the patient for any proposed treatment, and shall provide the patient all and any materials necessary for the patient to formulate informed consent. If the hospital cannot provide in-house services needed to treat the patients AE/ASD, the patient shall be referred out to a local treatment specialist who specializes in AE and who is trained in integrated medicine. This long term goal proposed by Matthew : is outside of the medical providers ability to offer. ASD is being managed by his psychiatric provider and Matthew does not have any medical symptoms that would indicate that he has encephalitis. ASH administration does not approve referral to naturopathic institutes. ASH, ASH providers ASH pharmacy practice allopathic medicine and cannot provide naturopathy or monitor any side effects that might occur due to naturopathic treatment.

*See* Solan Decl., ¶¶ 195-196; Exhibit G.

184. Plaintiff, his former attorney, Holly Gieszl, Joseph Cowsert, and many ASH patients have personally witnessed Plaintiff's repeated attempts to acquire reasonable

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

accommodations for his Autism, and the retaliation he faced at the hands of ASH for doing so. The patient witnesses have been naturally reluctant to testify, and all of the patients who resided on the Cottonwood unit when Carter and Coleman were berating Plaintiff with false accusations of bestiality repeatedly told Plaintiff they "cannot testify," because they "cannot afford to lose [their] levels." *See* Solan Decl., ¶ 197.

185. Daniel Alverez, another Autistic patient who previously resided on the Cottonwood unit, witnessed Carter abusing Plaintiff. ASH revoked Alverez' level, and like his mental health continued to deteriorated after being moved to a lower functioning unit. *See* Solan Decl., ¶ 198. Feeling there was nothing left for him to loose, Alverez agreed to testify about Carter's abuse. In his declaration, Alverez states:

> "I have been diagnosed with an Autism Spectrum Disorder (Asperger's Syndrome) from childhood, but ASH currently has me diagnosed with a Schizoaffective Disorder…I worked really to hard progress through ASH's privilege system and get my Levels. I was moved to ASH's Cottonwood unit in 2023 because Cottonwood was ASH's pre community reintegration unit and I had been given conditional release to privilege Level 1….Lea'Cher Carter [] was a Behavioral Health Technician [] on the Cottonwood unit when I was living there…. I always felt uneasy around Carter, and she would intentionally trigger me when I was feeling paranoid. Carter was always rude, hateful and mean to me, and to all the patients she didn't like. She would give me dirty looks and mad dog me at random times for no reason…. She harassed other patients too and made nasty comments about them. One time she told me that Matthew Solan "fucks dogs." I complained to Nurse Supervisor Domenick Aldrich ("Domenick") about Carter's treatment of me around May, 2024. Domenick told me "if it was up to me, she'd be gone," but he didn't do anything to protect me from her harassment… I complained to my therapist and Cottonwood RN Jessica, but they didn't do anything to help me either. I filed a grievance against Carter around May or June of 2024, but after I did that, she started harassing me more… Carter told

Matthew Phillip Solan
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

> me "if you don't listen to me, I'll get you moved the fuck off this unit… Carter's abuse put me in a sad state and made me feel scared. She was really scary and I felt helpless because I didn't do anything to her and the hospital was letting her treat me like trash. To escape the abuse, I kicked off my ankle monitor and broke a table so ASH would move me off the Cottonwood. I got all my privileges revoked and was transferred to the Sycamore unit, where I have remained ever since. I took me over a year to get even part of my privileges back. I felt it was hopeless and didn't even try for a long time... Lea'cher Carter really hurt me, and I personally witnessed her verbally and emotionally abuse Matthew Solan too. I feel that Carter should not be allowed to work with the mentally ill anymore, and hope that the Courts will protect patients from her abuse in the future."

*See* Doc. 8, Ex. I, ¶ 8; Solan Decl., ¶ 198; Exhibit E, ¶ 8.

186. Plaintiff served requests for admissions and interrogatories on Defendants Carter and Coleman on December 16, 2026. *See* Doc. 59 at 6-11; Doc. 68 at 42-50; Solan Decl., ¶ 199.

187. The responses to Plaintiff' requests for admission to Carter and Coleman were made and signed by Ann Hobart and Jordon Kendal, not Carter and Coleman. *See* Solan Decl., ¶ 199; Exhibit CC.

188. In Coleman's response to Plaintiff's first set of interrogatories, Coleman does not deny that she accused Plaintiff of eating "dog p***y" or "dog a**" in front of other ASH Cottonwood patients. *See* Solan Decl., ¶ 200; Exhibit L at 2. Instead, Coleman testified that she "has heard Plaintiff state that his dog, Foxy, is his wife and has heard Plaintiff speak of sexual conduct between himself and his dog." *See* Id.

189. Plaintiff never told Coleman or stated in her presence that Foxy was his wife, and never told Coleman or spoke in her presence of sexual conduce between himself and his dog. *See* Solan Decl., ¶ 201.

190. Plaintiff has never engaged in sexual conduct with a dog, never told anyone that he had engaged in sexual conduct with a dog, never told anyone that he had a desire or intent to engage in sexual conduct with a dog, and has no interest in engaging in sexual conduct with

MATTHEW PHILLIP SOLAN
501 North Twenty-fourth Street
Phoenix, Arizona 85008-6056

a dog. *See* Solan Decl., ¶ 202.

191. Carter has not testified at all in these proceedings. *See* Solan Decl., ¶ 203.Defendants' counsel attempted to pass of a set of responses purporting to be Carter's, but signed by counsel and unverified by Carter. *See* Doc. 86 at 64-66. Plaintiff moved for sanctions, and Defendants conceded that Carter's unsigned and unverified interrogatory response was inadmissible. *See* Doc. 80 at 4; Solan Decl., ¶ 203.

192. When Bowen was asked in an interrogatory to describe all information and records he provided to Sheldon pertaining to Plaintiff, Foxy I, and/or Foxy II, Bowen testified that "Sheldon was on the administrative team before he became ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to Solan and his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowens' computer drive and all the files it contained." *See* Exhibit J at 3; Exhibit M; Solan Decl., ¶ 204.

193. According to public records, the ASH administration in March, 2022 was composed of CEO Bowen, COO Sheldon, CFO Ryan Rodney, CMO Katharine Woods, CNO Nancy Regan, CQO Lisa Wynn, CCO Margaret McLaughlin, CSO William Bugbee, and ADHS Director Don Herrington. *See* Exhibit X; Solan Decl., ¶ 205.

194. In or about 2024, Domenick Aldrich, a Psychiatric Nursing Unit Manager ("PNUM") informed Plaintiff the he, and all the other ASH PNUMs were on the "administrative team," and were regularly apprised of decisions by the higher-ups affecting the ASH treatment units. *See* Solan Decl., ¶ 206.

**RESPECTFULLY SUBMITTED** this 23rd day of June, 2026.

**Matthew Phillip Solan**
501 North 24th Street
Phoenix, AZ 85008
Tel: +1.970.369.9611
legal@fox-ranch.com
*Plaintiff in Pro. Per.*

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056

**I CERTIFY** that copies of the foregoing document were delivered to Arizona State Hospital staff on June 23, 2026, in sealed envelopes, with proper postage affixed, for forwarding to:

Ann Hobart and Jordan Kendall
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, AZ 85004
*Attorneys for Defendants*

Clerk, U.S. District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St., Ste. 130, SPC 1
Phoenix, Arizona 85003

Matthew Phillip Solan

MATTHEW PHILLIP SOLAN
501 NORTH TWENTY-FOURTH STREET
PHOENIX, ARIZONA 85008-6056