**EXHIBIT I**

**Client:** Matthew Solan (Matt Solan)
**DOB:** 07/15/1989
**Provider:** Sam McCulloch
**Provider License:** LPC #23713

# Diagnosis and treatment plan

**Diagnosis**

F84.0 - Autistic disorder

**Presenting Problem**

Matt reports challenges with managing stress and sensory overwhelm. These symptoms are related to his Autism disorder, and also contribute and can trigger PTSD symptoms, interfering with decision making and his physical, mental and emotional safety.

**Goal**

Matt's goal is to transition out of the state hospital, find stability economically, secure safe housing and reconnect with his business and his passion. Matt will work to make connections with the right supports including regular therapy and access to his service animal (Foxy) to manage stress, process emotions, and work through this upcoming transition.

**Objective**

Matt will learn and practice skills to help with managing stress and developing awareness and self care around his sensory system. Matt will participate in therapy and have close contact with his support animal. Matt will also seek out additional supports as needed to treat his PTSD.

**Treatment frequency:** 1x Per Week

**Provider**

Sam McCulloch

Signed by Sam McCulloch
M.S., LPC
June 3, 2026 at 9:45 am (MST)
IP address: 24.121.53.117

**Client**

Matthew P. Solan

Signed by Matthew P. Solan
Client
June 3, 2026 at 12:12 pm (MST)
IP address: 108.49.144.135

**EXHIBIT J**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT AARON BOWEN** |

Defendant Aaron Bowen, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Aaron Bowen as follows.

**Interrogatory Number 1:** At the time you issued the Particularized Assessment Letter, what was the assessed duration and severity of the purported risk that the [sic] you relied on to conclude that Plaintiff was at risk of having sexual relations with Foxy I, if she were admitted to live at ASH with Plaintiff as his service animal under the ADA?

**ANSWER: Bowen was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, it is Solan's statements, recorded in treatment notes, progress notes, and incident reports, that indicate there is a risk that he would engage in sexual conduct with Foxy if provided the chance to do so. See also DF588-DF595.**

**Interrogatory Number 2:** When you determined that ASH could not accommodate Foxy I, what reasonable modifications to ASH's policies practices, or procedures, or provision of auxiliary aids or services did the [sic] you consider to mitigate the purported risk of abuse to Foxy I by the Plaintiff, at the time the Particularized Assessment Letter, that the [sic] you determined would be inadequate to effectively mitigate such risk, and on what basis did the [sic] you determine such modifications, aids, or services would be inadequate to mitigate the purported risk?

**ANSWER: Bowen objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that he determined whether to accommodate a dog or not. Bowen, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 3:** What current medical or other objective evidence was reviewed, prior to issuing the Particularized Assessment Letter, to determine the nature, duration, and severity of the purported risk that the Plaintiff would have sexual relations with Foxy I if she were admitted to ASH, the probability that such sexual contact would actually occur, and whether and what reasonable modifications of policies practices, or procedures or the provision of auxiliary aids or services might mitigate any risk of abuse?

**ANSWER: Bowen was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that**

**Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through the ASH's exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 4:** When the [sic] you determined that accommodating Foxy I would result in a fundamental alteration to the nature of the services provided by ASH, what reasonable modifications or policies practices, or procedures, or auxiliary aids or services did the [sic] you consider as possible means of mitigating the purported fundamental alteration, and how, and on what basis did the [sic] you determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary aids or services?

**ANSWER: Bowen objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that he determined whether to accommodate a dog or not. Bowen, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 5:** Describe all information and Records you provided to ASH's current CEO, Michael R. Sheldon pertaining to Plaintiff, Foxy I, and/or Foxy II, and the approximate dates on which the information and/or Records were so conveyed.

**ANSWER: Defendant Sheldon was on the administration team before he became the ASH's current CEO. The administrative team met frequently and Sheldon was aware of everything pertaining to Solan and his dog, Foxy. Nevertheless, upon becoming the ASH CEO, Sheldon received a copy of Bowen's computer drive and all the files it contained.**

**Interrogatory Number 6:** On what dates did the Plaintiff engage in Animal Assisted Therapy or Animal Assisted Activities at ASH, and what was the therapeutic outcome for the Plaintiff in each of those animal-human interactions? Describe the animal(s) with whom the therapy and/or activities were conducted, and the level of contact the Plaintiff had with such animal(s).

**ANSWER: Bowen lacks the information or knowledge necessary to respond to this interrogatory. As far as a further response is required, Bowen does not believe Solan participated in animal assisted therapy or animal assisted activities at the ASH while Bowen was CEO.**

**Interrogatory Number 7:** On what basis did you determine that accommodating a food visit, animal therapy session, or other visitation between Plaintiff and Foxy I would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation by which you could lawfully deny Plaintiff's request to have a food visit with Foxy I?

**ANSWER: Animals are not allowed to visit patients at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH.**

**Interrogatory Number 8:** When you made the decision to exclude Foxy I from ASH, what direct threat did you determine Foxy I specifically, as opposed to service dogs generically, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion?

**ANSWER: The ASH was not required to identify a direct threat that Solan's dog, Foxy, would pose. The ASH's Particularized Assessment explained the grounds upon which Solan's request to have his dog, Foxy, live with him must be denied. Those reasons include: (1) Even if Foxy qualified as a service animal, she is not medically necessary; (2) Even if Foxy qualified as a service animal, she would be required to be on a tether and that would be a ligature risk not allowed at the ASH; (3) Even if Foxy qualified as a service animal, Solan could not be solely responsible for her and would require significant support from ASH staff; (4) Foxy requires medication that cannot be stored or administered at the ASH per federal and state regulation; (5) Even if Foxy qualified as a service animal, admitting her would fundamentally alter the nature of the ASH; and (6) ASH cannot ignore**

**Solan's statements indicating a risk that he would commit animal abuse. Please see DF146-DF149 and DF588-DF595.**

**Interrogatory Number 9:** How many empty beds, and how many and [sic] single-patient bedrooms were there at ASH's Community Reintegration Unit in April of 2022?

ANSWER: **Bowen objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Bowen lacks information or knowledge to answer this interrogatory. Subject to these objections, Bowen states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

**Interrogatory Number 10:** Approximately how many hours a day did patients at ASH's Community Reintegration Unit have access to the secured outdoor area surrounding the Community Reintegration Unit building with, and without a staff escort, in April of 2022?

ANSWER: **Bowen objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Bowen lacks information or knowledge to answer this interrogatory. Subject to these objections, Bowen states that patients must receive Court approval before they can be housed on ASH's CRU. Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

# VERIFICATION

I, Aaron Bowen, hereby declare under penalty of perjury that I am a Defendant and a former employee of the State of Arizona Department of Health Services, that I have reviewed Defendant Aaron Bowen's Answers to Plaintiff Matthew Solan's First Set of Interrogatories to Defendant Aaron Bowen mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

01/20/2026
Date

Aaron Bowen

**EXHIBIT K**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MICHAEL R. SHELDON** |

Defendant Michael R. Sheldon, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Michael R. Sheldon as follows.

**Interrogatory Number 1:** At the time the Denial Letter was issued on July 5, 2024, what was the assessed duration and severity of the purported risk that the ASH Administration relied on to conclude that Plaintiff was at risk of having sexual relations

with Foxy II, if she were admitted to live at ASH with Plaintiff as his service animal under the ADA?

**ANSWER: The ASH was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, it is Solan's statements, recorded in treatment notes, progress notes, and incident reports that indicate there is a risk that he would engage in sexual conduct with Foxy if provided the chance to do so. See DF 441-DF482 and DF588-D595.**

**Interrogatory Number 2:** What reasonable modifications to ASH's policies practices, or procedures, or provision of auxiliary aids or services did the ASH Administration consider to mitigate the purported risk of abuse to Foxy II by Plaintiff, at the time the Denial Letter was issued on July 5, 2024, that the ASH Administration determined would be inadequate to effectively mitigate such risk, and on what basis did the ASH Administration determine such modifications, aids, or services would be inadequate to mitigate the purported risk?

**ANSWER: The ASH determined it could not admit Foxy and provided the reasons for that in its Denial Letter. See DF2626. The ASH was not required to conduct a separate assessment to determine potential modifications of ASH's policies to mitigate the risk that Solan would abuse his dog, Foxy, when the risk was completely mitigated through ASH's justified exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 3:** What current medical or other objective evidence was reviewed between June 12, 2024 and July 6, 2024 to determine the nature, duration, and severity of the purported risk that the Plaintiff would have sexual relations with Foxy II if she were admitted to ASH, the probability that such sexual contact would actually occur, and whether and what reasonable modifications of policies practices, or procedures or the provision of auxiliary aids or services might mitigate any risk of abuse?

**ANSWER: Sheldon was not required to conduct a separate assessment to determine the severity of the risk that Solan would engage in sexual conduct with his dog, Foxy. That said, Solan's statements, recorded in treatment notes, progress notes, and incident reports were reviewed and indicated that there is a risk that Solan would engage in sexual conduct with Foxy if provided the chance to do so. This risk, however, is completely mitigated through the ASH's exclusion of Foxy. See also DF588-DF595.**

**Interrogatory Number 4:** When the ASH Administration determined that accommodating Foxy II would result in a fundamental alteration to the nature of the services provided at ASH, what reasonable modifications or policies practices, or procedures, or auxiliary aids or services did the ASH Administration consider as possible means of mitigating the purported fundamental alteration, and how, and on what basis, did the ASH Administration determine that the resources available for the use of funding and operating the services, programs, and/or activities of ASH were inadequate to make such modifications or provide such auxiliary aids or services?

**ANSWER: Sheldon objects to this interrogatory as far as it implies that Solan's dog, Foxy, could receive any accommodation or that the ASH determined whether to accommodate a dog or not. Sheldon, and the ASH generally, are not required to accommodate a dog and had no grounds to do so.**

**Interrogatory Number 5:** What is and was the nature, extent, and certification status of training in the treatment and/or habilitation of Autism Spectrum Disorder possessed by each of the members of the Plaintiff's treatment team, as it is currently composed, and as it was composed on July 5, 2024?

**ANSWER: Solan's current treatment team, consisting of: Jonathan Frank, Psychiatric Provider; Jelome Carlos, Social Work; Joseph McKellar, Rehabilitation; Shelia Holmes, Medical Provider; Jasmine Bills, Nursing; and Marcet Roberts, Nursing, is fully capable and qualified to treat his Autism. Each of**

**the individuals listed have received extensive education and training to provide treatment for patient's needs, including the needs of patient's with Autism.**

**Interrogatory Number 6:** On what dates did the Plaintiff engage in Animal Assisted Therapy or Animal Assisted Activities at ASH, and what was the therapeutic outcome for the Plaintiff in each of those animal-human interactions? Describe the animal(s) with whom the therapy and/or activities were conducted, and the level of contact the Plaintiff had with such animal(s).

**ANSWER: The ASH does not provide animal assisted therapy. It is believed that Solan has participated in animal assisted activity sometime between 2022 and 2023. Animal assisted activity, as provided between 2022 and 2023, consisted of a registered community volunteer and her dog sporadically visiting with patients. These visits only lasted a short amount of time and patients were not allowed to be alone with either the community volunteer or her dog. Sheldon lacks the personal knowledge necessary to answer when Solan may have participated in animal assisted activities.**

**Interrogatory Number 7:** On what basis did you determine that accommodating a food visit between the Plaintiff, his attorney, Foxy II, and Foxy II's caretaker would fundamentally alter the nature of ASH's programs, services, or activities, pose a direct threat to any individual, or otherwise result in a situation by which you could lawfully deny Plaintiff's request to have a food visit with Foxy II?

**ANSWER: Animals are not allowed to visit patients at the ASH. There does not need to be a fundamental alteration or pose a direct threat to deny animals from visiting the ASH.**

**Interrogatory Number 8:** When the ASH Administration made the decision to exclude Foxy II from ASH, what direct threat did the ASH Administration determine Foxy II specifically, as opposed to service dogs generically, posed to the patients and staff on Plaintiff's treatment unit, and what evidence did the ASH Administration rely on to make that conclusion?

**ANSWER: The ASH was not required to identify a direct threat that Solan's dog, Foxy, would pose. The ASH excluded Foxy because: (1) Even if Foxy qualified as a service animal, she is not medically necessary; (2) Even if Foxy qualified as a service animal, she would be required to be on a tether and that would be a ligature risk not allowed at the ASH; (3) Even if Foxy qualified as a service animal, Solan could not be solely responsible for her and would require significant support from ASH staff; (4) Even if Foxy qualified as a service animal, admitting her would fundamentally alter the nature of the ASH; and (5) ASH cannot ignore Solan's statements indicating a risk that he would commit animal abuse. Please see DF146-DF162, DF441-DF482, DF588-DF595.**

**Interrogatory Number 9:** How many empty beds, and how many and [sic] single-patient bedrooms are there at ASH's Community Reintegration Unit presently, and how many empty beds, and how many and [sic] single-patient bedrooms were there at ASH's Community Reintegration Unit there [sic] on July 5, 2024?

**ANSWER: Sheldon objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Sheldon lacks information or knowledge to answer this interrogatory. Subject to these objections, Sheldon states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

**Interrogatory Number 10:** Approximately how many hours a day do patients at ASH's Community Reintegration Unit have access to the secured outdoor area surrounding the Community Reintegration Unit building with, and without a staff escort?

**ANSWER: Sheldon objects to this interrogatory on the grounds that it is irrelevant to this litigation. Moreover, Sheldon lacks personal knowledge sufficient**

**to answer this interrogatory. Subject to these objections, Sheldon states that patients must receive Court approval before they can be housed on ASH's Community Reintegration Unit ("CRU"). Furthermore, those patients that receive approval are well-behaved, participate in treatment programs, and earn the privilege to live on a less restrictive unit—Solan does not match the characteristics of a patient in the CRU.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

# VERIFICATION

I, Michael R. Sheldon, hereby declare under penalty of perjury that I am a Defendant and the Chief Executive Officer for the State of Arizona Department of Health Services and am authorized to make this verification, that I have reviewed Defendant Michael R. Sheldon's Answers to Plaintiff Matthew Solan's First Set of Interrogatories to Defendant Michael R. Sheldon mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

January 20, 2026
Date

By [signature]
Michael R. Sheldon

**EXHIBIT L**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Unique Coleman, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Unique Coleman, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT UNIQUE COLEMAN** |

Defendant Unique Coleman, through counsel undersigned, answers Plaintiff's First Set of Interrogatories to Defendant Unique Coleman as follows.

**Interrogatory Number 1:** Have you ever been subject of any disciplinary action or write up, patient or vulnerable adult abuse, neglect, or exploitation investigation or report, incident report, or other misconduct investigation or report, while employed at the Arizona State Hospital, or any other facility? If so, provide the dates, agencies/entities

involved, associated document/report numbers, bases for and outcome of any and all such action/investigation/report.

**ANSWER: Coleman has not been subject to a disciplinary action or write up. However, in summer 2025, Plaintiff filed an grievance with the ASH alleging that Coleman yelled in his ear causing an infection and verbally harassed him in June 2025. Following an investigation, the ASH concluded that there was no evidence to support Plaintiff's allegations against Coleman. On the contrary, the evidence showed that on June 27, 2025, Plaintiff was verbally aggressive towards Coleman and took a swing at her. The investigation also revealed that Plaintiff called Coleman the n_ word, a f***ing c***, and a lying b****.**

**Interrogatory Number 2:** On what basis do you believe that the Plaintiff has engaged, attempted to engage, or intended to engage in sexual conduct with a dog?

**ANSWER: Coleman has not formed a belief as to whether or not Plaintiff has engaged, attempted to engage, or intends to engage in sexual conduct with a dog. However, Coleman has heard Plaintiff state that his dog, Foxy, is his wife and has heard Plaintiff speak of sexual conduct between himself and his dog.**

**Interrogatory Number 3:** Did ASH R.N. Domenick Andrich, ASH R.N. Aquelina Soliz, or any other ASH nurse, or other ASH personnel, direct you to leave the Plaintiff alone, or to stop harassing the Plaintiff, or anything similar, on or before May 22, 2024 or any time thereafter? Were, when, and by whom were your [sic] told this?

**ANSWER: No. Coleman did not harass Plaintiff and no one other than Plaintiff has ever said or implied that she did. To the extent possible, Coleman avoided Plaintiff because he was threatening and verbally abusive toward her. Plaintiff's verbal abuse against Coleman, who is black, included calling her the n_ word, monkey, and slave on a near daily basis.**

**Interrogatory Number 4:** What was the nature and extend [sic] of your training in working with and deescalating individuals on the Autism spectrum as of June 22, 2024?

**ANSWER: Coleman has extensive training in patient care including de-escalation, positive reinforcement, redirection, and skill building. Defendant undergoes annual training on patient care, including caring for those with Autism. Prior to working at the Arizona State Hospital, Coleman worked at ACCEL where she assisted and provided care to individuals with Autism as they worked, went shopping, or otherwise engaged in their communities. Coleman implemented applied behavior analysis (the gold standard of autism treatment and support) principles and techniques in her patient care.**

**Interrogatory Number 5:** What was you [sic] purpose in telling the Plaintiff, on multiple occasions in 2025, that if you received court papers from him, you would rip them up?

**ANSWER: Coleman never told Plaintiff that if she received court papers from him, she would rip them up. Plaintiff threatens most, if not all, Arizona State Hospital staff that he will file complaints against them or sue them. Coleman has previously responded to Plaintiff's threats by telling him she has no money so suing her would be pointless.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

1/20/2026

# VERIFICATION

I, Unique Coleman, hereby declare under penalty of perjury that I am a Defendant and an employee of the State of Arizona Department of Health Services, that I have reviewed Defendant Unique Coleman's Answers to Plaintiff Matthew Plaintiff's First Set of Interrogatories to Defendant Unique Coleman mailed on December 17, 2025, and that the information contained therein is true and accurate to the best of my information, knowledge, and belief.

| | |
|---|---|
| 1/26/2026 | Unique Coleman |
| Date | Unique Coleman |

**EXHIBIT M**

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona, Michael R. Sheldon, Aaron Bowen, Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT AARON BOWEN** |

Defendant Aaron Bowen, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Aaron Bowen as follows.

**Request for Admission No. 1:** To the best of your knowledge, Dr. Stephen Morris never testified or produced any Record stating that he believed Plaintiff's relationship with Foxy I was sexual in nature.

☒ Admit ☐ Deny

**Bowen objects to this request for admission on the grounds that it is vague and ambiguous. Specifically, it is unclear what "never testified or produced any Record" means in this context. Moreover, Bowen is unable to admit or deny what another person did or may have done. That said, Plaintiff's treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between Plaintiff and Foxy and that there may be a risk of future abuse. Please also see Defendants' Disclosures including DF441-DF445 and DF448-DF482.**

**Request for Admission No. 2:** To the best of you [sic] knowledge, none of the licensed providers, who served as members of Plaintiff's treatment team while you were CEO of ASH, testified or produced any Record while employed at ASH, before you issued to [sic] Particularized Assessment Letter, that they believed Plaintiff had sexual relations with Foxy I or was likely to have sexual relations with Foxy I if she were to accompany Plaintiff at ASH.

☒ Admit ☐ Deny

**Bowen is not aware of any AHS employees that produced a record stating their personal belief as to whether Plaintiff has or desires to engaged in a sexual relationship with his dog, Foxy. However, ASH's employees have recorded Plaintiff's statements to them in which he refers to Foxy as his wife and discusses the sexual nature of his relationship with her. Please see DF441-DF445 and DF448-DF482.**

**Request for Admission No. 3:** Prior to issuing the Particularized Assessment Letter, none of the incident reports or progress notes cited in the Particularized Assessment Letter were interpreted, in writing, by any of the Plaintiff's licensed treatment providers, as indicating that the Plaintiff has had, has intended to have, or is at risk of having sexual relations with Foxy I.

☐ Admit ☒ Deny

**Bowen objects to this request for admission on the grounds that it is vague and ambiguous. It is unclear what "were interpreted, in writing" means. The treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between him and his dog, Foxy, and that there may be a risk of future abuse. Prior to, and while preparing, the Particularized Assessment, Bowen reviewed and interpreted the treatment notes, progress notes, and incident notes pertaining to Plaintiff and Foxy. Please also see Defendants' Disclosures including DF441-DF445, DF448-DF482, and DF578-DF587.**

**Request for Admission No. 4:** Before issuing the Particularized Assessment Letter, you did not review any evidence that demonstrated an actual risk that Plaintiff would have sexual relations with Foxy I if she were admitted to live with Plaintiff at ASH.

☐ Admit ☒ Deny

**Please see Defendants' Disclosures including DF441-DF445 and DF448-DF482. Plaintiff's statements to various individuals show there is a risk that Plaintiff had or would sexually abuse his dog, Foxy.**

**Request for Admission No. 5:** At the time you issued the Particularized Assessment Letter, what did you determine was the nature, duration, and severity of the purported risk that Plaintiff would have sexual relations with Foxy I if she were to accompany Plaintiff at ASH.

☐ Admit ☐ Deny

**Bowen objects to this request on the basis that it cannot be answered with an admission or a denial. Moreover, Bowen is not required to conduct a separate assessment to determine the severity of the risk that Plaintiff would engage in sexual conduct with his dog. That said, it is Plaintiff's statements, recorded in**

**treatment notes, progress notes, and incident reports that indicate the risk. See DF441-DF482.**

**Request for Admission No. 6:** You prohibited the Plaintiff from having a food visit with Foxy I on one or more occasions in 2020 and/or 2021 without conducting any individualized assessment to determine if the Plaintiff visiting with Foxy I for a food visit would pose any risk to the Plaintiff, to Foxy I, or to any other person, or would fundamentally alter the nature of ASH's services.

☒ Admit ☐ Deny

**Defendant objects to this request on the grounds that it is irrelevant to this litigation. ASH policy does not allow patients to have food visits with animals. There is no risk or fundamental alteration assessment necessary to exclude a patient's desired visitor.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT MICHAEL R. SHELDON** |

Defendant Michael R. Sheldon, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Michael R. Sheldon as follows.

**Request for Admission No. 1:** After you became CEO of ASH, and before the ASH Administration issued the Denial Letter, you did not conduct, nor did you direct the ASH Administration to conduct an investigation of the conclusions asserted by Aaron Bowen

in his Particularized Assessment Letter, including, but not limited to conducting a review of Plaintiff's patient charts at ASH.

☒ Admit ☐ Deny

**Sheldon was the Chief Operating Officer at the ASH when the Particularized Assessment was conducted and aware of the facts and information supporting its conclusions. Sheldon is, and was aware, of Solan's treatment notes, progress notes, and the incident reports pertaining to Solan. There is and was no reason to investigate the conclusions of the Particularized Assessment.**

**Request for Admission No. 2:** The security camera recordings from the ASH Cottonwood day room and dining area, converting [sic] May 22, 2024, were Altered by an ASH Employee.

☐ Admit ☒ Deny

**The security camera footage at ASH is retained or recoverable for up to about 90 days. After that time, the footage is automatically overwritten by new recordings. If a complaint or an incident occurs at ASH and is reported to administration, then the recordings relevant to the complaint or incident are set aside and saved from automatic deletion.**

**Request for Admission No. 3:** To the best of your knowledge, Dr. Stephen Morris never testified or produced any Record stating that he believed Plaintiff's relationship with Foxy I was sexual in nature.

☒ Admit ☐ Deny

**Defendant objects to this request for admission on the grounds that it is vague and ambiguous. Specifically, it is unclear what "never testified or produced any Record" means in this context. Moreover, Defendant is unable to admit or deny what another person did or may have done. That said, Plaintiff's treatment notes, progress notes, and incident reports regarding Plaintiff indicate there may have been an inappropriate relationship between Plaintiff and Foxy and that there may**

**be a risk of future abuse. Please also see Defendants' Disclosures including DF441-DF445 and DF448-DF482.**

**Request for Admission No. 4:** To the best of your knowledge, none of the licensed providers, who presently or previously served as members of Plaintiff's treatment team, testified or produced any Record prior to June 14, 2025, stating or implying that they the [sic] Plaintiff's relationship with Foxy I or Foxy II was sexual in nature.

☒ Admit ☐ Deny

**Sheldon objects to this request for admission on the grounds that it is vague and ambiguous. ASH employees have not produced a record stating their personal belief as to whether Solan has or desires to engaged in a sexual relationship with Foxy. However, ASH employees have recorded Solan's statements to them in which he refers to Foxy as his wife and discusses the sexual nature of his relationship with her. Please see DF441-DF445 and DF448-DF482.**

**Request for Admission No. 5:** To the best of your knowledge, none of the incident reports or progress notes cited in the Particularized Assessment Letter were interpreted, in writing, by any of the Plaintiff's licensed medical providers, as indicating that the Plaintiff has had, has intended to have, or is at risk of having sexual relations with Foxy I or Foxy II.

☐ Admit ☒ Deny

**Sheldon objects to this request for admission on the grounds that it is vague and ambiguous. It is unclear what "were interpreted, in writing" means. The treatment notes, progress notes, and incident reports regarding Solan indicate there may have been an inappropriate relationship between him and his dog, Foxy, and that there may be a risk of future abuse. The Particularized Assessment contains the result of Dr. Aaron Bowen's, a licensed medical provider and former ASH CEO, review and interpretation of the treatment notes, progress notes, and incident notes pertaining to Solan and Foxy. Please also see Defendants' Disclosures including DF441-DF445, DF448-DF482, and DF578-DF587.**

**Request for Admission No. 6:** Before the Denial Letter was issued, you did not review any evidence that demonstrated an actual risk that the Plaintiff would have sexual relations with Foxy II if she were admitted to live with him at ASH.

☐ Admit ☒ Deny

**Sheldon reviewed the prior Particularized Assessment, Solan's treatment and progress notes, and many incident reports pertaining to Solan before issuing the Denial Letter. Those records indicate that there may have been an inappropriate relationship between Solan and his dog, Foxy, and that there may be a risk of future abuse. Please also see the Particularized Assessment at DF588-DF595 and Defendants' Disclosures including DF441-DF445 and DF448-DF482.**

**Request for Admission No. 7:** You prohibited the Plaintiff from having a food visit with Foxy II on July 17, 2024, without conducting any individualized assessment to determine if the Plaintiff visiting with Foxy II for a food visit would pose any risk to the Plaintiff, to Foxy II, or to any other person, or would fundamentally alter the nature of ASH's services.

☒ Admit ☐ Deny

**Defendant objects to this request on the basis that it is irrelevant and outside the scope of this litigation. Whether a person or an animal is authorized to visit the ASH is not relevant to the issues in this litigation and an individualized assessment is not necessary to deny visitation.**

**Request for Admission No. 8:** ASH was, as of September, 2023, unable to meet the developmental-disability related needs of patients with a primary diagnosis of Autism Spectrum Disorder.

☐ Admit ☒ Deny

**The ASH has been equipped to treat patients with Autism for decades including the times up and around September 2023. The ASH continues to be able to meet the needs of patients with Autism. The ASH employs many qualified providers including psychiatrists, psychologists, nurses, and masters-level**

**therapists who can provide treatment to patients with Autism. Solan, however, continually refuses to receive and participate in treatment.**

**Request for Admission No. 9:** ASH is presently unable to meet the developmental-disability related needs of patients with a primary diagnosis of Autism Spectrum Disorder.

☐ Admit ☒ Deny

**The ASH is able to meet the needs of patients with Autism. The ASH employs many qualified providers including psychiatrists, psychologists, nurses, and masters-level therapists who can treat patients with Autism. That said, Solan is not a patient at the ASH because of an Autism diagnosis—he is a patient because of his other disorders that rendered him guilty except insane. Nevertheless, the ASH seeks to provide treatment for Solan's Autism but he continually refuses to receive and participate in that treatment.**

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT UNIQUE COLEMAN** |

Defendant Unique Coleman, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Unique Coleman as follows.

**Request for Admission No. 1:** On one or more occasions in 2024, you made statements, in the Cottonwood day room, to the effect that Plaintiff had engaged in sexual conduct with a dog.

☐ Admit ☒ Deny

**Request for Admission No. 2:** On one or more occasions in 2024, you made statements, in the Cottonwood day room, to the effect that Plaintiff had engaged in sexual conduct with a dog.

☐ Admit ☒ Deny

**Request for Admission No. 3:** On one or more occasions in 2025, you informed Plaintiff that your boyfriend or husband was in prison and/or a prison gang.

☐ Admit ☒ Deny

**Request for Admission No. 4:** On one or more occasions in 2024 and 2025, R.N. Dominick Aldrich and/or one or more other nurses directed you not to harass the Plaintiff, to leave the Plaintiff alone, or something to similar effect.

☐ Admit ☒ Deny

**Request for Admission No. 5:** Multiple ASH patients made written and/or verbal reports, grievances, and/or complaints of misconduct, harassment, and/or abuse against you in 2024 and 2025.

☐ Admit ☒ Deny

**Request for Admission No. 6:** On June 21, 2025, after being told to stay in the Nurses Station by the Cottonwood Unit Nurse, you approached the Plaintiff, and yelled in his ear.

☐ Admit ☒ Deny

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Jordan Kendall
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

Ann Hobart, Bar No. 019129
Jordan Kendall, Bar No. 038647
Assistant Attorneys General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-8347
(602) 542-7687
Facsimile: (602) 542-7644
Ann.Hobart@azag.gov
Jordan.Kendall@azag.gov
EmploymentLaw@azag.gov

Attorneys for Defendants State of Arizona,
Michael R. Sheldon, Aaron Bowen,
Lea'cher Carter, and Unique Coleman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Phillip Solan,<br><br>Plaintiff,<br><br>vs.<br><br>The State of Arizona; Jennifer L. Cunico; Michael R. Sheldon; Aaron Bowen, Calvin J. Flowers; Steven Kwoh; Kindra Ochoa, Lea'cher Carter, Unique Coleman; John Does 1-100; Jane Does 1-100; Black Corporations 1-10; and White Entities 1-10,<br><br>Defendants. | Case No: CV24-02061-JJT-DMF<br><br>**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT LEA'CHER CARTER** |

Defendant Lea'cher Carter, through counsel undersigned, responds to Plaintiff's First Request for Admissions to Defendant Lea'cher Carter as follows.

**Request for Admission No. 1:** On one or more occasions in 2024, you made statements, in the Cottonwood day room, to the effect that Plaintiff had engaged in sexual conduct with a dog.

☐ Admit ☒ Deny

**Request for Admission No. 2:** On one or more occasions in 2024, you informed Plaintiff that your boyfriend or husband was a drug dealer.

☐ Admit ☒ Deny

**Request for Admission No. 3:** On one or more occasions in 2024, you made a verbal statement, in the Cottonwood day room, to the effect that the Plaintiff's penis was so small that you would need a magnifying glass to see it.

☐ Admit ☒ Deny

**Request for Admission No. 4:** On June 22, 2024, R.N. Dominick Aldrich directed you not to harass the Plaintiff, to leave the Plaintiff alone, or something to similar effect.

☐ Admit ☒ Deny

**Request for Admission No. 5:** On June 22, 2024, while the Plaintiff was talking to Unique Coleman, you approached the Plaintiff and told him to swing at or hit you.

☐ Admit ☒ Deny

**Request for Admission No. 6:** On or shortly after June 22, 2024, you made a report to law enforcement that the Plaintiff threw hot coffee on your face.

☒ Admit ☐ Deny

**Request for Admission No. 7:** The Plaintiff never threw hot coffee on your face.

☐ Admit ☒ Deny

**Request for Admission No. 8:** Multiple ASH patients made written and/or verbal reports, grievances, and/or complaints of misconduct, harassment, and/or abuse against you in 2024.

☐ Admit ☒ Deny

**Request for Admission No. 9:** In 2024, you were reassigned from the ASH Cottonwood unit, where Plaintiff resided, to another ASH treatment unit, after one or more Registered Nurse(s) complained about your conduct.

☐ Admit ☒ Deny

Respectfully submitted this 20th day of January, 2026.

Arizona Attorney General's Office

/s/ Ann Hobart
Ann Hobart
Jordan Kendall
Assistant Attorneys General
Attorneys for Defendants

EMAILED and MAILED
this 20th day of January, 2026, to:

Matthew P. Solan
c/o Arizona State Hospital
501 N. 24th Street
Phoenix, Arizona 85008-6056
legal@fox-ranch.com
Plaintiff

/s/ Jordan Kendall

**EXHIBIT N**

**RONIC Psychological Services, L.L.C.**
*Clinical, Forensic, Neuropsychological, and Psychiatric Specialties*
*13128 North 94th Drive, #203 Peoria, AZ 85381*
*2615 North 4th Street, #2 Flagstaff, AZ 86004*
*141 East Palm Lane, #105 Phoenix, AZ 85012*
Office: 623-977-1869 Direct Number: 623-256-7266 Fax: 623-977-4074
Email: rmastikian@ronicpsych.com Website: www.ronicpsych.com

# Neuropsychological Evaluation
# CONFIDENTIAL

Name: Mathew Solan
DOB: 7/17/89
SSN: N/A
Referred by: Attorneys for Freedom Law Firm
Examiner: Robert H. Mastikian, Psy.D.
Length of Evaluation: 4 Hours
Date of Evaluation: 4//8/19
Date of Report: 5/4/19

## REASON FOR REFERRAL:

Mr. Solan was referred for a neuropsychological evaluation to determine diagnostic clarification and to determine whether he has a severe mental health condition which would help explain his erratic and impulsive behaviors.

## COLLATERAL INFORMATION:

*The following document(s) were provided by Mr. Solan's attorney for the purpose of this evaluation. All available documents were thoroughly reviewed and pertinent information related to answering the referral question was used:*

*Guidance Center - Rule 26.5 - Mental Health Evaluation*
*Psychological Report -by Dr. Lisa Silva Dated October 2000*
*Psychological Evaluation-Dr. Barbara Daley Dated October 2000*
*Psychological Evaluation Dated September 2000*
*Psychoeducational Evaluation Dated September 2000*
*Arbour-Fuller Hospital Discharge Summary from March 2016*
*Fuller Hospital Psychological Evaluation*

## TESTS ADMINISTERED:

Comprehensive Clinical Interview
Comprehensive Test of Nonverbal Intelligence-Second Edition (CTONI-2)
Wide Range Achievement Test-Fifth Edition [Sentence Completion Subtest] (WRAT-5)
Repeatable Battery for the Assessment of Neuropsychological Status-UPDATE (RBANS)
Mini Mental Status Examination (MMSE)
Aggression Questionnaire (AQ)

## EVALUATION PROCESS:

The evaluation was completed in a private room at the Coconino County Jail located in Flagstaff, Arizona, in one session totaling nearly 4 hours. The testing conditions were adequate and without disruptions. The evaluation consisted of a thorough clinical interview, intelligence testing, and neuropsychological testing using objective instrumentation, and a comprehensive review of all available collateral information. Inconsistencies between collateral information and self-report, if discovered, are noted throughout the report.

## LIMITS OF CONFIDENTIALITY:

Mr. Solan indicated that he understood the purpose of the evaluation and the limits of confidentiality. He was informed that the information he provided for the evaluation would be included in a report which would be provided to his attorney. Mr. Solan consented to the evaluation and voluntarily answered all questions.

***Information included in the report is limited to answer the referral questions and is not exhaustive in nature. Most of the information gathered is centered on current functioning unless otherwise clinically indicated. Conclusions made in the report are based on information that was gathered from the client, current test results, behavioral observations, and the documents made available by the client's attorney at the time of the evaluation. Receipt of additional information in the future may lead to a change in findings.***

## ARRIVAL:

Mr. Solan arrived on time for the scheduled appointment. A private room was provided by jail staff. Mr. Solan greeted this evaluator in a cordial manner and he appeared to be somewhat forthcoming during the clinical interview and testing. He was clearly paranoid as he would reservedly answer questions and then question this evaluator as to why the question was asked. This occurred often. The evaluation was completed within 4 hours total with no incident.

## ACCULTURATION ASSESSMENT:

Mr. Solan's racial, ethnic, spiritual, and cultural background was taken into account in accord with the DSM-V Outline for Cultural Assessment. These cultural and spiritual factors were examined and considered throughout the evaluation regarding their influence on presenting problems, levels of functioning, diagnoses, treatment, their relationship to the psychosocial environment, and their impact on the client-examiner relationship. Mr. Solan identified himself as a Caucasian male. He reported English as his primary language. He did not identify with any particular religion except "metaphysics." He reported being single, never married and he has no children. He reported no history of gang affiliation. He denied religious, spiritual, and cultural barriers that may interfere with the testing process.

## BACKGROUND INFORMATION:

Family/Social History:
Mr. Solan reported that he was born in Winchester, Massachusetts. He knew very little about his early developmental history as he was adopted at 9 days. He did not know whether he was born on time or whether he experienced any birth complications or significant health problems or injuries. He claimed that he was never prenatally exposed to illicit drugs, alcohol, or tobacco. He was raised by his adoptive parents from 9 days of age through adulthood. When asked about his relationship status with his parents, Mr. Solan angrily stated "I want nothing to do with either of them." When asked about why, he began rambling incessantly and made reference to them contributing to his current problems with the law. Mr. Solan reported that he did not have any adoptive or biological siblings. When asked about trauma experiences throughout his lifespan, his already angry demeanor immediately intensified as he began to rant, "I think I am a victim of abuse. My victimizers are my mom and my dad. I question if I am a victim of Munchausen by proxy. I just need me and my service dog. I will tell you a story about her. Me and my service dog were violently assaulted by the Coconino County Police Department in 2016. I got 'swatted' by someone in my RV." When asked about what he meant by the term "SWATTED," he went on to explain "that is when people make a false police report and watch while to police raid your house. That is what happened to me." When asked for more details about this claim, he went on to explain "when they showed up, they started beating me and they threw me to the ground and threw my service dog to the side of the road. They jammed a pistol to the back of my neck and they said horrible things to me and then they handcuffed me and they wouldn't let me go until eventually they told me that I was free to go and then they drove me home and then when I got home, they threatened me with everything they could and they railroaded me and told me that they would do the same thing the next time I came into their town."

When asked about who he believed was his main support in life, he smiled and in an almost childlike manner exclaimed, "my service dog Foxy!" He then began to ramble again as he explained "I live on my own property. I have owned the home for three and a half years, but I spent most of my time here or in jail or in mental hospitals. I try to stay off the grid and I work on my property, but people always show up and do things to me and I feel like I am being watched. Sometimes, I will leave my dog behind and I will run out the backdoor and hide in my special hiding place on the property until I think the people are gone." When asked about what he does to pass the time on the property considering his earlier claim of being "off the grid," he went on to explain that he enjoys buying and repairing old trucks and "building a homestead." When asked for more details, he simply stated "I like buying lots of land and things and flipping land and cars." Mr. Solan reported that he is outdoors on a daily basis, but he made it very clear that he always avoids the city because of his paranoia involving the police. He does not have a valid driver's license as it was revoked in 2017. When asked for more details about this, he stated "it was because of the police chase in Massachusetts. I thought they were going to kill me and my service dog, so I took off." He was eventually arrested and his license was revoked, but he could not provide a clear answer as to any other legal consequences related to this conviction.

Daily Routine:
Mr. Solan reported that he typically wakes up at 8 o'clock in the morning. When asked about whether he is capable of attending to his hygienic responsibilities, he explained "that depends on if the water is running." He does not take any medications for psychiatric or medical reasons. He claimed that he is fully capable of independently managing his financial responsibilities, but

this is highly doubtful considering his level of psychiatric instability (profound). He claimed that he is fully capable of doing basic chores around the house with no limitations. He will spend the remainder of his day with his service dog until he ends his day "between 10 o'clock at night and 5 in the morning." When asked about whether he has any trouble sleeping, he went on to explain "yes I do. I have flashbacks to the police beating and my thoughts don't stop. I have fears of falling asleep and paranoid panic attacks. Like I said before, I will get up in the middle of the night if I feel like someone is there and I run and hide in the woods when I panic. The police are after me. This only started once I moved to Arizona. It never happened in Massachusetts."

Education:

Mr. Solan could not provide a clear answer as to his educational background before the 5th grade. He did, however, claim that he was home-schooled from the 5th grade up until age 19 when he received his GED. When asked about why he was home-schooled, he simply stated "I taught myself everything. I was superiorly intelligent and I am a genius or subgenius." When asked about who had determined this, he could not provide a clear answer. When asked about his academic specialties and interests, he stated "I do a lot of design and interactive media animation." Mr. Solan reported that he had a history of receiving IEP services for behavioral problems throughout his schooling, but he could not provide specific details about during which grades he received IEP services. He reported no history of repeating grades. He had a significant history of delinquent and disruptive behavioral problems in school. He reported no history of extracurricular activity involvement as a student. He reported no history of college or trade school experience as an adult.

Employment History/Military History:

When asked about his employment background, Mr. Solan briefly claimed that he completed an internship at a public access television station when he was younger, but he could not provide an answer as to when. He briefly added "I have had lots of odd jobs." The remainder of his employment background is unremarkable.

Legal History:

Mr. Solan reported no juvenile criminal history. As an adult, he went on to explain "at age 26, I was arrested like 15 times for lots of misdemeanors in Massachusetts and then I was finally convicted of a felony. I did a plea agreement and I was forced to taking it. I had a concussion." When asked for more details much of what he explained made no sense. He tangentially explained, "I was charged with probation violation and kidnapping, aggravated assault, and discharging a weapon in city limits. I had gun and I wanted to splatter my brains out in front of my mother for fucking me over." He made brief reference to being in a vehicle traveling to his mother's home with the intention of committing suicide in front of her when he was allegedly pulled over and arrested for illegal weapons possession, but he could not provide an answer as to how the weapon was discharged at this point in the interview. When asked about details regarding his current problems with the law, he could not provide a clear answer as he claimed that he did not know or remember any additional details.

Substance Use History:
Mr. Solan reported no history of illicit drug use or any history of alcohol consumption. He reported no history of abusing prescribed medications and he also reported no history of experimenting with designer street drugs.

Medical History:
Mr. Solan reported that he is not currently being treated with medications for medical reasons. When asked about major medical treatments and procedures, he simply stated "I put a bullet through my leg once because the police and I were in a standoff and I wanted to do a blood sacrifice. I didn't want to shoot myself anywhere else, so I decided to put the gun into my leg and shoot myself." When asked about why he was committing a blood sacrifice, he made vague reference to being involved in some type of cult or spiritual group, which this evaluator could not clearly understand as he refused to provide a clear explanation. He rambled incessantly at this point during the clinical interview. He only made reference to being concussed from an accident early on in Massachusetts, and he could not provide a clear answer as to whether he had ever been diagnosed with a TBI. He claimed that he was diagnosed with a seizure condition 10 years ago. When asked for more details regarding this seizure condition, he stated "it was because of medication complications. I was on lithium and lisinopril and I started having seizures." He reported having difficulties with vision, even though he was not wearing glasses on the date of this evaluation. He made reference to possibly being diagnosed with an astigmatism. He reported having no problems with hearing.

Mental Health Treatment History:
Mr. Solan reported that he was not currently being treated with psychiatric medications. When asked about his psychiatric treatment history, he went on to explain "I have been on medications since I was 5. I remember being on fucking Haldol and Ritalin and a lot more since." When asked about what he had been diagnosed with, he made reference to possibly being diagnosed with bipolar disorder. He also explained "I think they diagnosed me with ADHD, mood problems, and Asperger's too." When asked about who had diagnosed him, he could not provide a clear answer. He stated he was psychiatrically hospitalized for a day at age 12 because "my mom said I hate her." He was involuntarily hospitalized at a psychiatric facility at age 26 while residing in Massachusetts. He reportedly spent three months there before being discharged. When asked about counseling history, he stated "I have been doing it since I was a kid, but I am inconsistent." He has not received counseling services for the past year. He reported no family history of mental illness. At this point, during the evaluation, he sternly stated "I want to make my mother suffer for hurting me." He reported that he has been experiencing suicidal and homicidal ideations since age 27 and when asked about whether he had made any attempts, he stated "no."

Current Mental Health:
When asked about how he had been feeling lately, he stated "I love my service dog Roxie! She is a Pomeranian and I found her in 2016. Besides having her, I feel emotionally and physically tortured." He went on to report symptoms suggestive of panic and depression. He reported having no uncontrollable thoughts of crying. When asked about his self-worth, he proudly exclaimed "it is very good because I am a confident and powerful person." He did, however, report having difficulties with decision making and problems managing his anxiety. He

described his appetite as being good. He reported having chronic difficulties with sleep and he reported having a history of staying up for days. He stated he has nightmares of things he could not recall and recurrent and persistent thoughts and images of police related things. He reported having difficulties with concentration, impulse control, temperament, and hyperactivity. He was not feeling suicidal or homicidal on this date. He reported no auditory or visual hallucinations, but he reported having a decreased need for sleep, racing thoughts, paranoid ideations, and delusional thought processes as he explained "reality is delusional. I am into metaphysics." At this point during the evaluation, he spontaneously claimed that he was diagnosed with an autoimmune disorder and encephalopathy by Dr. Cagua-Koo who he claimed was his doctor while he was residing in Massachusetts. When asked about whether he had received treatment for this autoimmune disorder and encephalopathy, he claimed "I never got a chance to." *It must be noted that this evaluator requested updated lab results from jail medical staff. A CBC/CMP panel was drawn and the results were benign indicating no evidence of bloodworm pathology or any signs of infection.*

***Collateral Information***

*Guidance Center - Rule 26.5 - Mental Health Evaluation:*
According to the documentation, Mr. Solan was evaluated for a rule 26.5 mental health evaluation by Dr. C.J. Margeson. Mr. Solan was examined per order of the Coconino County Superior Court for this rule 26.5 mental health evaluation. The results of Dr. Margeson's examination indicate that Mr. Solan met diagnostic criteria for the following diagnoses: Schizoaffective disorder, bipolar type; autism spectrum disorder; generalized anxiety disorder; trichotillomania; and other specified personality disorder (narcissistic and borderline traits). Dr. Margeson opined that despite medication adherence, "the client is delusional and unable to adequately self-regulate his mood and anxiety. I would recommend that the client meet with the jail psychiatrist to discuss the appropriateness of additional medications to help him manage the full spectrum of his mental illness." Dr. Margeson went on to opine "the client's adherence to medication and treatment recommendations has been variable at best and this has not given him the opportunity to stabilize psychiatrically. If the client is unwilling to relocate to closer proximity to his parents and mental health guardians, additional effort must be put forth by his guardians to coordinate medication adherence in collaboration with Mr. Solan's psychiatric team. Finally, Dr. Margeson opined "the client appears to meet criterion for an SMI qualifying diagnosis. If the client is able to undergo an SMI determination and found to meet that qualification, mental health court would be an appropriate course of action to pursue as it would provide structure and motivation for Mr. Solan to be adherent with medication moving forwarded. Additionally, once he is released from jail, an SMI determination would provide him with the opportunity for a wider array of psychiatric services that he would have otherwise." Dr. Margeson recommended that Mr. Solan be referred to a psychiatric hospital upon his release to establish psychiatric stability and medication adherence.

*Psychological Report -by Dr. Lisa Silva Dated October 2000:*
According to the documentation, Mr. Solan, who was 11 years old at that time, was referred for an evaluation by the director of special education at his school due to concerns school staff had about his behaviors. The evaluation was conducted to determine whether he met diagnostic

criteria for Asperger's disorder or a possible psychotic disorder. Dr. Silva concluded that Mr. Solan met diagnostic criteria for Asperger's disorder at that time.

*Psychological Evaluation-Dr. Barbara Daley Dated October 2000:*
According to the documentation, Mr. Solan was referred for treatment of increased anxiety and behavioral explosiveness secondary to Asperger's syndrome. He was 11 years old at that time. Matthew was having a difficult time in school at that time. Dr. Daley opined "currently, Matthew thinks that he has been kicked out of school for being stupid and bad. It is important that he be reinstated as soon as possible in a manageable format so that he does not lose his motivation and what self-esteem he has remaining. He is a very compelling young man with many strengths to nurture. However, in order to evoke his full potential, he will require considerable accommodations at least in his middle school years."

*Psychological Evaluation Dated September 2000:*
According to the documentation, Matthew was provided with another psychological evaluation while he was a student in the 5th grade because he was having considerable difficulty adjusting to school that year. He was being very oppositional in class and refusing to work. He was displaying very aggressive behaviors towards his peers. Psychometric testing was conducted by the psychologist evaluating him at that time. The psychologist concluded that Matthew met diagnostic criteria for ADHD and a severe mood disorder. He also met diagnostic criteria for Asperger's disorder, but the psychologist had concerns that Matthew may have evidence of an underlying thought disorder as well.

*Psychoeducational Evaluation Dated September 2000:*
According to the documentation, Matthew was referred for a psychoeducational evaluation by his teachers and parents on September 12, 2000, due to behaviors which were impacting his ability to function and learn in school. The goal of the evaluation was to assess his level of cognitive functioning, his level of academic achievements as well as his social and emotional functioning. According to the results of the psychoeducational evaluation, Matthew was diagnosed with significant behavioral modulation issues as well as difficulties with social skills and peer interactions. His emotional functioning was also identified as being deficient; however, his intellectual capabilities were very well developed as he is described as "very intelligent and creative with a history of social and behavioral problems." Academically, he was performing well above grade level in all areas tested, but he had not been able to perform in classroom because of his social and emotional/behavioral difficulties.

*Psychological Evaluation Dated January 1994:*
According to the documentation, Matthew was referred for another psychological evaluation because of behavioral difficulties, which were indicative of ADHD. Mr. Solan was 4 years old at that time. The results of the evaluation indicated that there was more than enough evidence to support the presence of an ADHD diagnosis.

*Fuller Hospital Psychological Evaluation:*
According to the documentation, Mr. Solan was evaluated by a medical provider while in a hospital setting in January of 2016. Psychometric testing was utilized during his time there, his doctor went on to opine "there is a claim made by outsiders that Matthew is a genius and thus he

is being persecuted because of his superior ability. Dr. Kahr requested a WAIS-IV to address that issue. Scores on only indices was a superior 5%, but he is not a genius that requires a 145 IQ and above." It is imperative to note that MMPI-2 was also administered and based on the result of the evaluation, there was evidence to support the presence of a severe thought disorder as the doctor indicates "clinical scales of 8 (schizophrenia), 6 (paranoia), and 4 (psychopathy) were all elevated above the upper cut off for pathology. 8, 6, 4 is a classic profile for paranoid schizophrenia, however, subtle or mitigated by high IQ. It is most likely that Matthew's main issue is psychosis!"

*Arbour-Fuller Hospital Discharge Summary from March 2016:*
According to the documentation, Matthew was admitted to the hospital because "I was afraid of the police." Dr. Polu discharged Mr. Solan with Neurontin 300 mg two times a day, multivitamin tablet once a day, Haldol 5 mg once in the morning, Haldol 10 mg once at bedtime, Benadryl 50 mg capsule two times a day for side effects, melatonin 3 mg at bedtime for sleep. Scripts were written for a one-month supply, no refills. The doctor's prognosis was guarded. Mr. Solan's discharge diagnosis was schizoaffective disorder, bipolar type.

**Mini-Mental Status Exam**
The mini-mental status exam was administered. This is used as a brief screening for orientation, immediate/delayed memory recall, working memory, attention, language, and visual-spatial ability.

| | Claimant's Answer | Points |
|---|---|---|
| What is today's date? | 8th | 1 |
| What is today's year? | 2019 | 1 |
| What is today's month? | April | 1 |
| What day is today? | Monday | 1 |
| What season is it? | Spring | 1 |
| What is the name of this building? | Jail | 1 |
| What floor are we on? | First | 1 |
| What city are we in? | Flagstaff | 1 |
| What county are we in? | Coconino | 1 |
| What state are we in? | Arizona | 1 |
| Apple, Table, Penny (3pts) | Said "Apple, Table, Penny." | 3 |
| Spell WORLD backwards: DLROW (5pts) | Unable to spell word WORLD backwards | 0 |
| Recall: Apple, Table, Penny (3pts) | Could not recall "Apple, Table, or Penny." | 0 |
| Name items: Pen, Paper (2pts) | Correct | 2 |
| Repetition: No ifs ands or buts | Correct | 1 |
| 3 Stage Command: 1) Take the paper in your right hand, 2) Fold it in half, 3) Put it on the table | Performed all 3 steps | 3 |
| Read: Close Your Eyes | Read Correctly | 1 |

| | | |
|---|---|---|
| Write a sentence | Wrote "My service dog is the most amazing fox in the whole world." | 1 |
| Copy Image | Copied Correctly | 1 |
| | | Total Score: 22/30 |

## TEST RESULTS

### *Behavioral Observations*

Mr. Solan is a 29-year-old Caucasian male. He stands 5 feet 8 inches tall and weighs 200 pounds. He had shoulder length brown hair which was poorly groomed and he had brown colored eyes. He was unshaven. He was malodorous. He was dressed in traditional jail attire as he was wearing a blue jumpsuit. He was wearing a belly chain and he had one of his hands shackled to his hip. His right hand was free. His posture and gait were normal and stable, respectively. He had no tattoos on the visible portions of his body. His motor activity was hyperactive. He demonstrated great difficulties with attention, concentration, and memory during the clinical interview and testing. He was alert and oriented x4. His eye contact was variable. His facial expression remained expansive. He demonstrated a cooperative attitude towards the examiner. His mood was irritable and his affect was congruent. His interaction style was manic-like as the speech was rapid with an elevated tone. His speech was also disorganized, tangential and paranoid themed. He endorsed persecutory and conspiratory delusions with his mother and the police department being the identified perpetrators. His thought content was paranoid and his thought processes were fragmented and disjointed. He made very grandiose claims about being a "super genius" or a "SubGenius with very special powers and metaphysical connectivity." There were clear signs of perceptual disturbance and he showed signs and symptoms of grandiose delusional thought content. He presented with a fair fund of knowledge. His insight and judgment were extremely poor. No pain behaviors were observed and he had no problems sitting down or standing up.

### *Intelligence*

Comprehensive Test of Nonverbal Intelligence-Second Edition (CTONI-2)

The CTONI-2 is a standardized, culture-free, norm-referenced nonverbal test of cognitive ability. Subtest standard scores are obtained with a mean of 10 and a standard deviation of 3. It is administered with either oral or pantomimed instructions or both. Three Composite scores are obtained with a mean of 100 and a standard deviation of 15.

| **Subtest Performance** | **Raw Score** | **Scaled Score** | **Descriptive Term** |
|---|---|---|---|
| Pictorial Analogies (PA) | 7 | 4 | ***Poor*** |
| Geometric Analogies (GA) | 13 | 7 | ***Below Average*** |
| Pictorial Categories (PC) | 9 | 6 | ***Below Average*** |
| Geometric Categories (GC) | 11 | 7 | ***Below Average*** |
| Pictorial Sequences (PS) | 16 | 7 | ***Average*** |
| Geometric Sequences (GS) | 14 | 8 | ***Below Average*** |
| **Composite Performance** | **Sum of Scaled Scores** | **Composite Index** | **Descriptive Term** |

| | | | |
|---|---|---|---|
| Pictorial Scale Index | 17 | 71 | ***Poor*** |
| Geometric Scale Index | 22 | 83 | ***Below Average*** |
| Full Scale | 39 | 74 | ***Poor*** |

The Comprehensive Test of Nonverbal Intelligence- Second Edition (CTONI-2) measures analogical reasoning, categorical classifications, and sequential reasoning in two different contexts, pictures or familiar objects. This test is useful for estimating the intelligence of students; in particular, it is useful for helping to understanding cognitive functioning of individuals who have challenges with reading, writing, or object manipulation. No oral responses, reading, writing, or object manipulation are required while taking this test. On today's administration of the CTONI-2, Mr. Solan scored nearly consistently within the *Poor* range of functioning (Full Scale Composite IQ=74). He demonstrated *Below Average* intellectual functioning in Pictorial Nonverbal Intelligence (which measures problem solving and reasoning through the use of pictures or familiar objects). He scored well within the *Poor* range in Geometric Nonverbal Intelligence (which measures problem solving and reasoning through the use of unfamiliar designs).

***Reading Comprehension***

The WRAT5 is an academic skills assessment which measures reading skills, math skills, spelling, and comprehension. The WRAT5 serves as an excellent initial academic achievement evaluation, re-evaluation, or progress measure for any student. The Sentence Completion subtest was used to determine reading level for tests which require adequate reading and comprehension abilities. Based on the test results, it was determined that the client's reading level was *adequate* for the tests which require reading ability.

***Neurocognitive Functioning***

Repeatable Battery for the Assessment of Neuropsychological Status-UPDATE (RBANS)

The RBANS is used by clinicians and neuropsychologists to help screen for deficits in acute-care settings, track recovery during rehabilitation, track progression of neurological disorders, and to screen for neurocognitive status in children, adolescents and adults. RBANS UPDATE can also be used in a variety of ways including: As a stand-alone "core" battery for the detection and characterization of dementia in the elderly; as a neuropsychological "screen battery" when lengthier standardization assessments are either impractical or inappropriate; for repeat evaluations when an alternate form is needed to control for content practice effects; in Clinical Trials to identify inclusion/exclusion criteria as well as efficacy and cognitive side effects. Although RBANS Update was originally developed with a primary focus on assessment of dementia, special group studies are available for Alzheimer's Disease, Vascular Dementia, HIV Dementia, Huntington's Disease, Parkinson's Disease, Depression, Schizophrenia, and Closed Head Injury. The RBANS Update provides a brief, individually administered battery to measure cognitive decline or improvement across these domains: **Immediate Memory** *(List Learning and Story Memory),* **Visuospatial/Constructional** *(Figure Copy and Line Orientation),* **Language** *(Picture Naming and Semantic Fluency),* **Attention** *(Digit Span and Coding)*, and

**Delayed Memory** *(List Recall, List Recognition, Story Memory, and Figure Recall).* The following are Mr. Solan's results:

| *Immediate Memory* | *TOTAL SCORE* | *INDEX SCORE* | *SCALED SCORE* | *INDEX SCORE CLASSIFICATION* |
|---|---|---|---|---|
| 1. List Learning | 20 | ***65*** | 4 | ***Extremely Low*** |
| 2. Story Memory | 12 | | 4 | |
| ***Visuospatial/Constructional*** | | ***72*** | | |
| 3. Figure Copy | 16 | | 2 | ***Borderline*** |
| 4. Line Orientation | 16 | | -- | |
| ***Language*** | | ***87*** | | |
| 5. Picture Naming | 10 | | -- | ***Below Average*** |
| 6. Semantic Fluency | 17 | | 5 | |
| ***Attention*** | | ***53*** | | |
| 7. Digit Span | 8 | | 5 | ***Extremely Low*** |
| 8. Coding | 23 | | 1 | |
| ***Delayed Memory*** | | ***56*** | | |
| 9. List Recall | 3 | | -- | ***Extremely Low*** |
| 10. List Recognition | 14 | | -- | |
| 11. Story Recall | 6 | | 5 | |
| 12. Figure Recall | 13 | | 7 | |
| ***Sum of 9-12 Totals*** | ***22*** | -- | -- | -- |
| ***Sum of Index Scores*** | -- | ***56*** | -- | -- |
| ***TOTAL SCALE SCORE*** | -- | -- | ***333*** | ***Extremely Low*** |

The test results provide substantial evidence to support the presence of profound and diffused cognitive deficits in the areas of Immediate Memory, Visuospatial/Constructional, Attention, Language, and Delayed Memory. Mr. Solan's scores indicate that he has difficulty learning new information and that repetition may not significantly improve recall of verbal information. The results suggest that he has difficulty retrieving information from memory as well (List Learning). Test results further suggest that he has difficulty retrieving verbal information from long-term memory and that repetition may not significantly improve delayed recall of verbal information (List Recall). Mr. Solan's scores are also indicative of an individual who has difficulties recognizing verbal information in long-term memory and that repetition may not significantly improve delayed recognition of verbal information (List Recognition, Story Memory, and Story Recall). Test results also indicate that he has diffused and generalized impairments in visual-perceptual processing as well as motor impairments, visual attention deficits and deficits in visual incidental memory (Figure Copy and Figure Recall). Mr. Solan's scores also indicate the presence of significant impairments in visual acuity and attention, as well as significant impairments in confrontation naming skills (Line Orientation and Picture Naming). His scores

are also indicative of an individual with impaired abilities to retrieve and express verbal information from long-term memory stores and of an individual with significant impairments and auditory acuity and auditory attention/registration (Semantic Fluency and Digit Span). Finally, his scores suggest the presence of processing speed deficits, as well as deficits in brief focused visual attention (Coding).

***Violence Risk Assessment***

Aggression Questionnaire (AQ):

The Aggression Questionnaire is a self-report instrument used to evaluate an individual's aggressive responses and their ability to express those responses in a constructive and appropriate manner. The Aggression Questionnaire is the updated version of the Buss-Durkee Hostility Inventory that was used for assessing anger and aggression over the past 40 years. It is normed on a standardization sample of over 2000 individuals in nonclinical settings. The demographics of the standardization sample are a fairly reliable representation of the United States as a whole.

Mr. Solan produced a *valid* profile. He was consistent with his responses on the AQ. His general level of anger and aggression was tested as being *outside normal limits*, suggesting that he is in a poorly-controlled emotional state. Among the AQ subscales, Mr. Solan produced scores which were *elevated beyond clinically significant levels* on the Physical, Verbal Aggression, Anger, Hostility, and Indirect Aggression scales. As such, he is a ***high risk*** for exhibiting violent behaviors at this time.

## Diagnostic Formulation/Answer to Referral Question

Given the available information, it is safe to conclude that Mr. Solan has been experiencing chronic psychological turmoil since childhood. Individuals with similar thought disorders are inundated by worry, anxiety, tension, and excessive rumination. Their excessive introspection and over ideation may appear confused as well is highly emotional. They are unable to think or concentrate efficiently and their distress is so great that insomnia and suicidal thoughts are highly likely. Similar individuals often report bizarre perceptual disturbances and thought processes and they have difficulties maintaining contact with reality. These individuals are extremely quick to feel criticized, judged, or somehow defective relative to others and they often house extreme paranoid thoughts which interfere with their interpersonal functioning and social relationships. Making matters worse is that his thought disorder appears to have a distinct mood component, which when triggered, exacerbates the symptoms of his thought disorder, consequently leading to even more bizarre and dangerous behaviors. Finally, the symptoms of his thought disorder have worsened to the point where his overall cognitive capabilities have been negatively impacted as evidenced by his current FSIQ score of 74, which is in marked contrast to his historical IQ scores (*High Average* ranges).

Proper community-based interventions can assist Mr. Solan in demonstrating more stable behaviors and reactions. It is imperative that he be directly connected with a mental health judge and that court ordered mental health treatment be pursued for at least one year. There are multiple risk factors that are encompassed in the level of risk to reoffend, but with proper community-based psychiatric care, continued employment, continued education, psychological stability, regulation of impulsivity, and

attaining social support via positive peer groups and encouraging friends and relatives (Webster, Douglas, Eaves, Hart, 1997), Mr. Solan's risk factors for reoffending substantially lowers. If the crime was committed as stated in the available legal documentation, it was clearly influenced by Mr. Solan's untreated thought disorder, his dysfunctional coping strategies, and his inability to exercise forethought prior to executing his behaviors. Therefore, it is recommended that he receive court ordered community-based psychiatric treatment and individual therapy on an outpatient basis as soon as possible, because with proper intervention, ongoing productivity in the community and the development of more prosocial and regulated behaviors are more likely to occur.

## Diagnostic Impression – DSM 5

Schizoaffective Disorder, Bipolar Type

I hope you find this information useful. Please contact me directly if you have any further questions.

Psy.D

Robert H. Mastikian, Psy.D.
Chief Psychologist-Founder RONIC Psychological Services, LLC
Clinical Psychologist- Arizona License #4473

**EXHIBIT O**

| ARIZONA DEPARTMENT OF HEALTH SERVICES<br>**ARIZONA STATE HOSPITAL** | LEVEL | REFERENCE CODE | EFFECTIVE DATE |
|---|---|---|---|
| | II | Administrative (ADM) | May 26, 2022 |

| | | | |
|---|---|---|---|
| **TITLE:** | **PATIENT ABUSE, NEGLECT, EXPLOITATION, MISTREATMENT AND UNPROFESSIONAL CONDUCT BY A STATE OR CONTRACTED EMPLOYEE – IDENTIFICATION, REPORTING AND IMPLEMENTING PERSONNEL ACTIONS** | | |
| **SUPERSEDES:** | Patient Abuse, Neglect, Exploitation, Mistreatment and Unprofessional Conduct by a State or Contracted Employee – Identification, Reporting and Implementing Personnel Actions, approved 5/3/19. | | |
| **REVIEW CYCLE:** | Three Years | **GOVERNING BODY APPROVAL:** | No |

## PURPOSE

To identify actions or omissions constituting patient abuse, neglect, exploitation, mistreatment and/or unprofessional conduct by a state or contracted employee; to establish the guidelines for reporting these events; and to delineate the procedure for implementing immediate and appropriate personnel actions.

## POLICY

The Arizona State Hospital requires that all state and contracted employees identify and report incidents of patient abuse, neglect, exploitation, mistreatment and unprofessional conduct by a state or contracted employee, and those supervisory and administrative personnel immediately implement appropriate personnel actions.

## APPLICABILITY

All Hospital staff, whether state employed or contracted.

## DEFINITIONS

The definitions of patient abuse, neglect, exploitation, mistreatment and unprofessional conduct by a state or contracted employee provided in this policy are not to be construed as all-inclusive or exhaustive.

<u>Abuse</u> means the intentional infliction of physical harm; injury caused by negligent acts or omissions; unreasonable confinement; sexual abuse or sexual assault. Abuse is also defined in Arizona Administrative Code Title 9, Chapter 21 as the infliction of, or allowing another person to inflict or cause physical pain or injury, impairment of bodily function, disfigurement or serious emotional damage which may be evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior. Such abuse may be caused by acts or omissions of an individual having responsibility for the care, custody or control of a patient receiving behavioral health services under Title 9, Chapter 21. Abuse shall also include sexual misconduct, assault, molestation, incest, or prostitution of, or with, a client under the care of personnel of a mental health agency.

**Patient Neglect** examples include, but are not limited to:

1. Sleeping on duty and/or being under the influence of alcohol or drugs to the extent that response to patients' needs or problems could be inadequate;
2. Failure to investigate unusual observations or sounds that may indicate patients' need for protection or control;
3. Intentional failure to take therapeutic action when such action is indicated;
4. Intentional failure to give proper hygienic care;
5. Intentional failure to provide clothing and bedding appropriate to the season;
6. Intentional failure to make patients aware of meal times or to monitor dietary intake; and/or
7. Intentional failure to follow correct procedures when restricting a patient's freedom, resulting in harm or injury.

**Exploitation** means the illegal or improper use of a patient or a patient's resources for another's profit or advantage.

**Mistreatment** includes any intentional, reckless or negligent action or omission which exposes a patient to a serious risk of physical or emotional harm. Mistreatment includes, but is not limited to:

1. Abuse, neglect, or exploitation;
2. Corporal punishment;
3. Any other unreasonable use or degree of force or threat of force not necessary to protect the patient or another person from bodily harm;
4. Infliction of mental or verbal abuse, such as screaming, ridicule, or name calling;
5 Incitement or encouragement of patients or others to mistreat a patient;
6. Transfer or the threat of transfer of a patient for punitive reasons;
7. Restraint or seclusion used as a means of coercion, discipline, convenience, or retaliation;
8. Any act in retaliation against a patient for reporting violations; and/or
9. Commercial exploitation.

**Unprofessional Conduct** examples include, but are not limited to:

1. Failure to report fellow employees who are not alert to patients' needs due to drowsiness, alcohol and/or drugs, or other known or unknown condition.

2. Certain types of words communicated to or in the presence of a patient:

    a. Threatening words that cause a patient to feel fearful or intimidated;
    b. Words of coercion that tend to leave a patient without the freedom to act or to choose because of fear of threat or force;
    c. Words of vulgarity that include curse words, profanities; and/or obscenities; and/or
    d. Words that cause a patient to feel ridiculed, including derogatory nicknames.

3. Certain acts and/or gestures directed at or witnessed by a patient:

    a. Threatening acts or gestures that cause feelings of fear or intimidation;

b. Derogatory acts or gestures that cause a patient to feel ridiculed or scorned;
c. Intentionally violating rules that apply to both personnel and patients but are enforced against patients only; and/or
d. Words, acts, or gestures that show disrespect or lack of concern.

## GENERAL GUIDELINES

1. Inappropriate behaviors by a state or contracted employee toward a patient's family members and/or visitors will be construed as being synonymous as an act of patient abuse, neglect, exploitation, mistreatment and/or unprofessional conduct.

2. All state or contracted personnel are to report any occurrence and/or incident that is believed to constitute patient abuse, neglect, exploitation, mistreatment and/or unprofessional conduct by a state or contracted employee (see Hospital policy, "Reporting Suspected Neglect, Abuse and Exploitation"). Failure to report patient abuse, neglect, exploitation, mistreatment and/or unprofessional conduct by a state or contracted employee constitutes a behavior that in itself is abusive, neglectful and unprofessional, and may result in personnel disciplinary action.

3. The Chief Executive Officer (CEO) shall be apprised immediately of all issues related to patient abuse, neglect, exploitation, mistreatment and/or unprofessional conduct, and will direct the implementation of any personnel actions resulting as a consequence thereof.

4. The Psychiatric Nurse Coordinator (PNC) is to notify the Administrator on Call if the occurrence takes place or is reported after normal working hours, Monday through Friday, weekends, and/or holidays.

5. The Administrator on Call will make the determination as to other administrative and/or clinical personnel requiring notification and will assume administrative responsibility to implement the procedures set forth in this policy.

6. The status of investigations implemented based on this policy will be monitored by the Executive Risk Management Team which meets Monday through Friday except for State recognized holidays.

7. In any instance where information is released and/or notification is given, the methods used must be either confidential oral communication (direct or telephonic) or confidential documents that are delivered by hand, secure email, secure fax, hospital courier or U.S. Mail (certified or first class).

## PROCEDURE

### A. REPORTING AND INVESTIGATING

1. The following will be completed immediately when there is a reported, suspected or witnessed incident of patient abuse, neglect, exploitation, mistreatment or unprofessional conduct by a staff member:

   a. Appropriate steps will be taken to ensure protection of the patient(s);
   b. A verbal report will be provided immediately to the first-line or second-line supervisor;

c. The appropriate Nurse Supervisor or Psychiatric Nurse Unit Manager (PNUM) and the Chief Nursing Officer will be verbally notified of the incident;
d. If after hours, the PNC and the Administrator on Call will be notified of the incident;
e. An Incident Report will be completed;
f. The incident will be documented in the progress note section of the patient's health record. If staff are not authorized to document in a patient's health record, verbally notify the Nurse Supervisor on the patient's treatment unit of the suspected or witnessed incident;
g. The reporting employee's immediate supervisor will verbally notify the accused employee's first-line supervisor; and
h. The accused employee's immediate supervisor will verbally notify the accused employee's second-line supervisor, when applicable.

2. The Behavioral Health Medical Professional (BHMP) or medical provider will be available to assist, as requested.

3. The PNUM or PNC and first-line or second-line supervisor will respond to the scene of the incident or the treatment unit, as appropriate.

4. Hospital Security will be available, as necessary, in securing the area and completing all related reports. Hospital Security will:

   a. Coordinate with the Phoenix Police Department if they have been notified and an investigation occurs;
   b. Assist in investigation procedures whether hospital generated or non-Hospital generated, as required; and
   c. Respond and proceed to the location of the reported incident or the treatment unit, as appropriate.

5. The patient will be examined and circumstances of the incident will be reviewed.

6. An appropriate physical examination will be completed and the results will be documented in the patient's health record to include a statement of the patient's current mental status and whether or not the patient alleges or concurs with the claim of abuse.

7. The patient will be assessed for the immediate need of additional one-to-one attention (e.g., counseling, Close Observation Status, etc.) in order that the patient feels safe and secure; any further actions will be recommended at this time.

8. The CEO or designee will be notified of the circumstances involved in the reported incident.

9. The BHMP or O.D. physician will assist in investigation procedures as required.

10. Notification to Adult Protective Services will be completed in accordance with Hospital policy, "Reporting Suspected Neglect, Abuse and Exploitation".

11. A thorough investigation will be completed.

12. Appropriate personnel action will be taken.

**B. <u>IMPLEMENTING PERSONNEL ACTIONS AS A RESULT OF SUSPECTED OR WITNESSED PATIENT ABUSE</u>**

1. A state or contracted employee who has been accused of suspected or witnessed patient abuse will be removed from the patient area immediately. This removal will remain in effect until clearance is approved by the CEO or designee. The employee may be reassigned or placed on administrative leave as appropriate. This decision will be made by the CEO or Administrator on Call or designee.

2. All preliminary documentation and investigation reports will be reviewed and appropriate personnel action will be implemented, which may include disciplinary action up to and including termination.

3. The completion of investigations will occur in accordance with Hospital policy, "Internal Hospital Investigations".

**EXHIBIT P**

# CERTIFICATION OF TRUST

THIS CERTIFICATION OF TRUST is made by Matthew Phillip Solan, as Trustee of the FOX RANCH COMPANY, a trust created by an indenture dated July 13, 2024 ("Trust").

1. The Trust is an irrevocable pet trust established pursuant to Colorado Revised Statutes § 15-5-408 for the benefit Foxy the Second and her successors.
2. The Trust is established and administered in and under the laws of Colorado.
3. The Settlor of the Trust is Joseph M. Cowsert Jr.
4. The undersigned Trustee is presently the sole trustee of the Trust.
5. The Trust indenture allows trustees to appoint additional and successor trustees.
6. The Trust indenture names George M. Solan of Westborough, Massachusetts as the default successor Trustee.
7. The mailing address of the Trust is Fox Ranch Company, 1500 N. Grant St., Ste. 4529, Denver, Colorado 80203.
8. The Employee Identification Number of the Trust is 33-6400778.
9. Title to assets of the Trust are held under the name "FOX RANCH COMPANY."
10. The powers of the Trustees include, but are not limited to the power to acquire, sell, assign, convey, pledge, encumber, lease, borrow, manage, and deal with real and personal property interests of the Trust; to open, manage, and delegate control over checking, savings, brokerage, and all other types of financial accounts; to make transfers, and deposit and withdraw funds therefrom; to take and give loans; and to issue all lawful forms of debt and equity instruments.
11. The terms of the Trust provide that a third party may rely upon this Certification of Trust as evidence of the existence of the Trust and authority of its Trustees, and is specifically relieved of any obligation to inquire into the terms of this trust or the authority of the Trustees, or to see to the application that a Trustee makes of funds or other property received by the Trustees.
12. The Trust has not been revoked, annulled, set aside, or terminated.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on April 13, 2026.

Matthew Phillip Solan, *Trustee*

**EXHIBIT Q**

Certification Page For: Case No. CV2023002348

Solan Vs. Ortega

DFJ - Default Judgment




This is an exact replica of the electronic court record of the Superior Court in Maricopa County.

Attest: January 22, 2025

Certified Document Number: UIJC-HREH-UWQU-L87L

This certified document can be visually verified at:
within 180 days from the above attest date.
In addition, at any time the court may be contacted directly to visually verify the document.

CLERK OF THE SUPERIOR COURT
FILED
JUN 27 2024 11:00 a.m.
P. Kavanagh, Deputy

**THE GIESZL FIRM**
3200 North Central Avenue, Suite 1500
Phoenix, Arizona 85012
Tel 602-277-0772
Fax 602-704-2052

Holly R. Gieszl, SBN 013845
docket@gieszlfirm.com
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| MATTHEW PHILLIP SOLAN,<br>Plaintiff,<br>vs.<br>ROBERTO COMER ORTEGA,<br>Defendant. | Case Number: CV2023-002348<br>~~ORDER RE:~~<br>~~MOTION FOR~~ DEFAULT JUDGMENT ~~WITHOUT HEARING~~ |

The Court, having received Plaintiff's Motion For Default Judgment Without Hearing, and good cause shown:

IT IS HEREBY ORDERED entering default judgment without hearing against Defendant;

IT IS FURTHER ORDERED entering judgment in favor of Plaintiff and against Defendant as follows:

A. The amount of seventy-five thousand dollars ($75,000.00) as compensation for Plaintiff's injuries;

B. Post-judgment interest on the amount of seventy-five thousand dollars ($75,000.00) at a rate of ~~eight percent (8%)~~ 9.5% per annum;

C. Costs for court filing fees, service of process, and postage fees in the amount of $608.20.

No further matters remain pending and this Judgment is entered pursuant to Ariz. R. Civ. P. 54(c)
June 27, 2024

Commissioner Brian J. Palmer



CERTIFIED COPY - 0700 - January 22, 2025 - Page 1 of 2

THE GIESZL FIRM
3200 N. CENTRAL AVENUE, SUITE 1500
PHOENIX, ARIZONA 85012
602-277-0772

Dated this _______ day of May 2024.

MARICOPA COUNTY SUPERIOR
COURT COMMISSIONER

COMMISSIONER BRIAN PALMER

Signature on previous page due to non-compliance with Rule 5.1(d)(1), Ariz.R.Civ.P.

THE GIESZL FIRM
3200 N. CENTRAL AVENUE, SUITE 1500
PHOENIX, ARIZONA 85012
602-277-0772



CERTIFIED COPY - 0700 - January 22, 2025 - Page 2 of 2

**EXHIBIT R**

ARIZONA
DEPARTMENT OF ADMINISTRATION
INDEPENDENT OVERSIGHT COMMITTEES

Department of Health Services (DHS)
Arizona State Hospital Independent Oversight Committee (IOC)
Public Meeting Minutes

Thursday, July 17, 2025

## Call to Order

Meeting called to order by Committee Chair, Laurie Goldstein. The meeting was virtual, no physical address.

*Welcome and Introductions*

- Laurie Goldstein (Chair)
- Charles Goldstein, MD
- Melissa Farling
- Barb Honiberg
- Alyce Klein
- Kay Kunes
- Jane Jepson
- Janina Rotaru
- Kim Scherek

Public in Attendance: Nicolas Oakes

Arizona Department of Administration (ADOA): Larry Allen

AHCCCS: Fredreaka Graham

DDD: Michelle Rademacher

Other IOCS: Holly Gieszl

ASH Administration: Michael Sheldon, Trevor Cooke & Terra Morgan

ARIZONA
DEPARTMENT OF ADMINISTRATION
— INDEPENDENT OVERSIGHT COMMITTEES —

**holly gieszl:** The only way that anybody can do that is to be a registered vendor with the department of administration and then approve to bring their dog whether or the animal whether it is to a prison which is being done to a hospital which is because it's a licensed facility valleywise or wherever or to the Arizona state hospital. So the issue is how you get registered as a vendor of the state in order to bring anything in to one of the state facilities.

**Laurie Goldstein:** Yeah. And that's...

**+1 602-***-**31:** Thank you for the clarification.

**Lawrence Allen:** That is correct. .

**Laurie Goldstein:** What Larry Yeah. I think that

**Jane Jepson:** Okay, great. So, let's jump in and talk about the videos. Alice and I had the opportunity to look at two videos. One, with an incident that occurred on 621 and the second one, with an incident that occurred on 627. One of the things that we recognized right away was that there was no sound available to the video. And so, we understand that there was a point at which a request had previously been made to have sound recordings. And so I would like to make a motion that we have the opportunity to come back in and review both of these videos, but this time with the sound recording playing.

**Laurie Goldstein:** Okay.

**Michael Sheldon:** So, depending on where the camera is, the sound may not be there. So, we have audio coverage in specific areas where,...

**Michael Sheldon:** and this is based on what the attorney generals have told us,...

**Jane Jepson:** Okay.

**Michael Sheldon:** it's not in areas where a patient would expect privacy. So, 100%.

**Jane Jepson:** So if it had been available then we would have heard it.

**Michael Sheldon:** Yes. Yeah.

**Jane Jepson:** So then we'll jump in then for the and in the first video we did, and I believe that that was really the one that was the most problematic and...

**Jane Jepson:** that was flagged by the quality staff. This is an incident that occurred in 621 and we did clearly observe a staff member laying hands on a patient failing to deescalate and with consequential falling of that patient to the floor.

**Alyce:** What I saw was a definite handsome push to the floor by a staff member and it was very clear from different angles and closeups. And then the other thing that we had seen was an issue...

ARIZONA
DEPARTMENT OF ADMINISTRATION
— INDEPENDENT OVERSIGHT COMMITTEES —

**Jane Jepson:** Yeah. Right.

**Alyce:** where a staff member was very obviously verbally assaultive and just verbally coming at the patient and I think it was a nurse kind of like trying to stand in between to make sure it didn't escalate into physical violence. And in cases like this, when a tech or nurse anybody on a unit starts going off on a patient and is not stopped, we all know it endangers everybody in the vicinity.

**Alyce:** It can cause even a patient nearby because it's very stressful to snap and it puts everybody at risk and for example I was worried that the nurse might get hurt due to the escalation and the inability for this patient possibly in that moment to emotionally regulate. It was a provocation that person was looking to get that patient to dysregulate.

01:15:00

**Jane Jepson:** And one of the things that concerned me and...

**Alyce:** It was so obvious.

**Laurie Goldstein:** Hey, Tira.

**Alyce:** Okay. ...

**Laurie Goldstein:** Tara, before you leave, I had a question. Did Tara as a patient advocate and did Sarah, the new ombudsman, were there to view the video as well? I was trying to get her before she left because she was like, I have to leave.

**Alyce:** if it was with us.

**Trevor Cooke:** Tara has viewed the video.

**Alyce:** No, it was the three of us.

**Trevor Cooke:** Terra and I have reviewed it. I don't believe she's coming to see

**Jane Jepson:** We're just talking about the 621 video where we actually saw some gesturing by staff that was almost like a bring it,...

**Alyce:** Yes, 100%.

**Jane Jepson:** bring it on, again, it looked peer-to-peer,...

**Jane Jepson:** not clinician to a vulnerable adult.

**Jane Jepson:** And in that case, even without the audio, it did have the appearance of being inappropriate.

ARIZONA
DEPARTMENT OF ADMINISTRATION
INDEPENDENT OVERSIGHT COMMITTEES

**Alyce:** I've never seen people in the outside world, unless they were very drunk, to be quite honest, act that way. That brings it on and...

**Jane Jepson:** Therapy.

**Alyce:** And that kind of verbal attack. It just within your normal society doesn't exist much less within a clinical setting. Yeah.

**Laurie Goldstein:** So Mike you had your hand up.

**Michael Sheldon:** And this is more of just a clarification question for Trevor, was this one of the situations that APS did look at? I'm confused on what they saw, what they did not see.

**Trevor Cooke:** because I don't know exactly what incident this is as well. I think I have a pretty good idea and the answer is APS has been notified. They have interviewed this patient.

**Michael Sheldon:** Okay.

**Trevor Cooke:** They plan on coming next week to see the video because they canceled on us previously.

**Alyce:** Yeah, Tara had told us they'd seen it and...

**Jane Jepson:** Yeah. Yeah.

**Alyce:** said it wasn't a problem, but my mind was kind of blown. So I heard her in the very beginning as did Jane say that no APS has yet to see these videos. So,

**Jane Jepson:** And for clarification,...

**Trevor Cooke:** If one of them and I don't ...

**Jane Jepson:** we're talking I'm sorry, Trevor. ...

**Trevor Cooke:** go ahead, J. Go ahead.

**Jane Jepson:** I was going to say I just wanted to clarify this is the video that was of the 621. So, it's the 621 video.

**Trevor Cooke:** Yeah, let I'm in a hurry and do some digging because I know there are two videos you guys have seen and...

**Trevor Cooke:** I don't know which one is the 621 and which campus it was. I'll do some digging really

**Jane Jepson:** I do want to speak to 627...

ARIZONA
DEPARTMENT OF ADMINISTRATION
— INDEPENDENT OVERSIGHT COMMITTEES —

**Jane Jepson:** because as troubling as the video was to view, of the incident that happened on 621. I felt even more troubled by the video that we witnessed of an incident that happened on 627, especially in light of the patient's outcome later that day. and so on 627 what we witnessed was one of the primary instigators of the 621 incident who we understood was moved to another unit for separation and that made sense because that seemed like an appropriate hospital directive to give based on what we saw on the 21st.

**Jane Jepson:** In this case, this person made a deliberate return to the unit where this particular resident was now residing and clearly targeted the patient or the resident for additional what looked like harassment. there was no audio but the residents did describe to us certain things that were said and I understand that there's always some exaggeration right and some revision to memory but purely by viewing the video even without sound the clearness of the

01:20:00

**Jane Jepson:** The provocation that was made to this patient is undeniable. and so that concerns me because what I'm concerned about is the failure of accountability and control of the staff knowing that there had been a problem and allowing this situation to reoccur just one week later. And then understanding that it resulted in a clear decompensation of the patient that resulted in an incident of self harm which then escalated sanctions for the patient that were perceived as being punitive and that further by his description caused decompensation and distress.

**Laurie Goldstein:** I'm hoping that obviously there is an incident report and APS is coming to look. So, I think we would look forward to the final results of that investigation from APS on the staff patient interaction.

**holly gieszl:** Hi, I'm not going to comment on this specific case. And I want to be clear about that because I have a conflict of interest.

**holly gieszl:** However, I'm concerned about the areas of the hospital where there is no video. The statute that required the hospital to install audio video and transferred responsibility for doing that to the department of administration did not exclude any of the areas of the hospital. I understand certain areas that you don't want video. You have to have private treatment rooms. You have to have private group rooms.

**holly gieszl:** But if there is no video in the day room at the hospital in each of the units, that is where probably 90% of the incidents that the independent oversight committee was concerned about in not getting audio. So you can't figure out what was being said. Was there this? So, I'm concerned. I'd just like to know what are the specific areas where there is no video. That's a major concern. And if we need to address that with the attorney general and we need to go back and fix it in legislation to require it in certain areas, we can consider whether we want to do that.

**Alyce:** Excuse me,...

**EXHIBIT S**

AZPoint Servicing Agency > Fr

azcourts.gov

Order

**Order Status**

- [ ] Issued (1)
- [x] Modified (1)
- [ ] Dismissed (0)
- [ ] Reinstated (0)

**Order Issue**

mm / dd / yyyy — mm / dd / yyyy

**Order Type**

- [x] OOP (1)
- [ ] IAH (0)
- [ ] IAWH (0)

Service

Court

Misc

## #J0302PO2025000045

Served

| ORDER ASSIGNED | DEFENDANT | PLAINTIFF | CASE STATUS |
|---|---|---|---|
| Jul 15, 2025 | John Benitez | Matthew Phillip Solan | ACTIVE |
| **ISSUE DATE** | **DEFENDANT DOB** | **PLAINTIFF DOB** | |
| Jul 15, 2025 | Jan 1, 1980 | Jul 17, 1989 | |

| COURT | AGENCY | SERVICE STATUS |
|---|---|---|
| Williams Justice | Maricopa County - El Centro Constable | SERVED |

< 1 >

Results per page 10

| Matthew Phillip Solan<br>Plaintiff<br>v.<br>John Benitez<br>Defendant | J0302PO2025000045<br>Case No. | **DECLARATION OF SERVICE**<br>OP/IAH/IAWH Issue Date 07/15/2025 |
|---|---|---|

**USE THIS FORM ONLY IF YOU ARE AUTHORIZED TO SERVE LEGAL PAPERS UNDER ARCP 4 OR ARS § 13-3602(K).**

The undersigned, being first duly qualified by law, swears or certifies that a copy of the following was personally served on Defendant on 7/16/2025 12:15:00 PM at the following location:

501 N. 24th St. Arizona State mental hospital Phoenix AZ 85008
(address where Defendant was served)

- ☐ Petition and Order of Protection (OP)
- ☐ Petition and Injunction Against Harassment (IAH)
- ☐ Petition and Injunction Against Workplace Harassment (IAWH)
- ☐ Notice of Hearing
- ☒ Modified (OP)
- ☐ Modified (IAH)
- ☐ Modified (IAWH)

Plaintiff has been advised of service ☐ Yes ☑ No

Declarant is a ☐ registered process server ☑ peace/correction/detention officer ☐ authorized by the court

| Darlene Martinez | Maricopa County - El Centro Constable | C2528 |
|---|---|---|
| Print: Name | Agency | Identification No. |

Charges*: Services $ 0 Mileage $ 0 Fees Paid $ 0 Total $ 0

**No charges/fees for any OP or for any IAH that arises from a dating relationship or sexual violence.*

I declare under penalty of perjury that the foregoing is true and correct pursuant to ARCP 80(c).

/s/ Darlene Martinez
Signature of Person Serving Document (Declarant)

07/16/2025
Date

Defendant description:

| Sex | Race | DOB | HT | WT | Eyes | Hair | Driver's License # | State | Distinguishing Features |
|---|---|---|---|---|---|---|---|---|---|
| M | W | 01/01/1960 | 505 | 160 | BRO | GRY | | | |

**WILLIAMS JUSTICE COURT**
**700 W RAILROAD AVE, WILLIAMS, AZ 86046 PH - 928-679-7698**

# ORDER OF PROTECTION

[ X ] Amended Order

Case No. J0302PO2025000045

Court ORI No. AZ003023J

County COCONINO State AZ

**PLAINTIFF**

| First | Middle | Last |
|---|---|---|
| MATTHEW | PHILLIP | SOLAN |

**PLAINTIFF IDENTIFIERS**

07/17/1989
Plaintiff's Date of Birth

And on behalf of minor family member or Protected Person listed below. (List name and DOB.)

**V.**

DEFENDANT

| First | Middle | Last |
|---|---|---|
| JOHN | | BENITEZ |

Defendant/Plaintiff Relationship: NON INTIMATE - LIVE TOGETHER NOW OR IN THE PAST -

Defendant's Address: 501 N 24TH ST PHOENIX ARIZONA 85008

**CAUTION:** [ ] Weapon Alleged in Petition

DEFENDANT IDENTIFIERS

| SEX | RACE | DOB | HT | WT |
|---|---|---|---|---|
| MALE | WHITE | 01/01/1960 | 5' 5" | 160 |
| EYES | HAIR | *Arizona Prohibits Release of Social Security Numbers* | | |
| BROWN | GRAY OR PARTIALLY GRAY | | | |
| DRIVER LICENSE # | | STATE | EXP DATE | |
| | | | | |

[ X ] Estimated Date of Birth

**WARNINGS TO DEFENDANT:** This Order shall be enforced, even without registration, by the courts of any state, the District of Columbia, or any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. § 2265). Crossing state, territorial, or tribal boundaries to violate this Order may result in federal imprisonment (18 U.S.C. § 2262). Because of this order, it may be unlawful for you to possess or purchase a firearm or ammunition pursuant to federal law under 18 U.S.C. § 922(g)(8) or state, tribal, territorial, or local law. If you have any questions whether these laws make it illegal for you to possess or purchase a firearm, you should consult an attorney.
**Only the Court, in writing, can change this order. This order is in effect for two years from date of initial service, even if it is later modified.**

**WILLIAMS JUSTICE, << COURTADDRESS_PHONE>>**

**THE COURT HEREBY FINDS THAT:** It has jurisdiction over the parties and the subject matter.
[ ] Defendant received actual notice of this hearing and had an opportunity to participate.
**THE COURT,** finding reasonable cause to believe that Defendant may commit an act of domestic violence or has committed an act of domestic violence within the past year (or good cause exists to consider a longer period),
**HEREBY ORDERS:**
**NO CRIMES.** Defendant shall not commit any crimes, including but not limited to harassment, stalking, or conduct involving the use, attempted use, or threatened use of physical force that would reasonably be expected to cause bodily injury, against Plaintiff or Protected Persons.
[ X ] **NO CONTACT.** Defendant shall have no contact with **Plaintiff** except through attorneys, legal process, court hearings, and as checked:
[ ] **Phone** [ ] Electronic (email, text, etc) [ ] **Mail** [ ] **Other:**
[ ] **NO CONTACT.** Defendant shall have no contact with **Protected Persons** except through attorneys, legal process, court hearings and as checked: [ ] **Phone** [ ] Electronic (email, text, etc.) [ ] **Mail** [ ] **Other:**

THE COURT FURTHER ORDERS:

[ ] **RESIDENCE.** Plaintiff is granted exclusive use and possession of the residence currently shared with Defendant.

[ ] **LAW ENFORCEMENT STANDBY.** Defendant may return once with a law enforcement officer to obtain necessary personal belongings. Neither law enforcement nor this protective order can resolve conflicts over property, title, furniture, finances, real estate, or other ownership issues.

**PROTECTED LOCATIONS.** Defendant shall not go to or near the Plaintiff's or other Protected Person's:

[ X ] Residence (confidential) The plaintiff's Arizona State Hospital Treatment/Housing Unit (Mohave Unit)

[ ] Workplace (leave blank if confidential):

[ X ] School/other: The plaintiff's Arizona State Hospital Treatment/Housing Unit (Mohave Unit)

[ ] **ARIZONA FIREARMS LAW.** Under A.R.S. § 13-3602(G)(4), the Court finds that Defendant poses a credible threat to the physical safety of Plaintiff or Protected Persons. Therefore, Defendant shall not possess, receive, or purchase firearms and shall surrender same within 24 hours of service to:

[] **ANIMALS.** Plaintiff is granted the exclusive care, custody, or control of any animal that is owned, possessed, leased, kept, or held by the plaintiff, the defendant, or a minor child residing in the residence or household of the plaintiff or the defendant. Defendant is ordered to stay away from the animal and shall not take, transfer, encumber, conceal, commit an act of cruelty or neglect in violation of section 13-2910, or otherwise dispose of the animal.

**OTHER ORDERS:**

| Date | Judicial Officer | Printed Name |
|---|---|---|
| 07/15/2025 | /s/ [signature] KROMBEEN, HONORABLE ROBERT | KROMBEEN, HONORABLE ROBERT |

**WARNING:** This is an official court order. If you disobey this order, you will be subject to arrest and prosecution for the crime of interfering with judicial proceedings and any other crime you may have committed in disobeying this order.

**NOTICE:** If you disagree with this order, you have the right to request a hearing, which will be held within 5 to 10 business days after your written request has been filed in the court that issued this order. Violations of this order should be reported to a law enforcement agency, not the court. Each party must notify this court if an action for dissolution (divorce), separation, annulment or paternity/maternity is filed. This is NOT a parenting time (visitation) or custody (legal decision-making) order. You must file those requests separately in Superior Court.

**ADDITIONAL WARNINGS TO DEFENDANT:** Nothing the plaintiff does can stop, change, or undo this order without the court's written approval. You must appear in court to ask a judge to change (modify) or dismiss (quash) this order. **You can be arrested and prosecuted for violating this order, even if the plaintiff contacts you. If you do not want the plaintiff to contact you, you have the right to request a protective order against the plaintiff. But orders are not automatically granted upon request. Legal requirements must be met.**

PCO 1,4,5

All Courts in Arizona/NCIC#/DPS# Address, City, AZ Zip Telephone Number

| | | |
|---|---|---|
| Plaintiff ☐ Employer-Plaintiff if Workplace Injunction<br>Matthew Phillip Solan | Defendant<br>John Benitez | Case No. |
| ☐ On behalf of minor/person in need of protection named: | Defendant's address<br>501 N 24th StreetPhoenix, AZ 85008 | PETITION for:<br>☐ Order of Protection<br>☑ Injunction Against Harassment<br>☐ Workplace Injunction |
| Agent's name (if Workplace Injunction) | Defendant's phone | |

**This is NOT a court order.**

**This petition contains Plaintiff's allegations and requests. To see what the court has ordered, see "Order" form.**

*DIRECTIONS: Please read the Plaintiff's Guide Sheet before filling out this form.*

1. Defendant/Plaintiff Relationship *(or relationship between Defendant and minor/person in need of protection)*
   - ☐ Married (past or present)
   - ☐ Live/lived together as intimate partners
   - ☐ Romantic/sexual (past or present)
   - ☐ Parent of child in common
   - ☐ One party is pregnant by the other
   - ☐ Related as parent, grandparent, child, grandchild, brother, sister (or in-law/step)
   - ☐ Live/lived together but not as intimate partners
   - ☑ Other:

2. ☐ If checked, Defendant and I have a pending action involving maternity, paternity, annulment, legal separation, dissolution, custody, parenting time, or support in ________ County Superior Court, Case # ________.

3. Name of court, if any, in which any other protective order related to this conduct has been filed.
   Court name ________ Case # ________

4. Tell the judge what happened and why you need this order. PRINT both the dates and a brief description of what happened. If there is a contested hearing, a judge can consider only what you write here.
   *NOTE: Defendant will receive a copy of this petition when the order is served.*

| Approx. Date | (Do not write on back or in the margin. Attach additional paper if necessary.) |
|---|---|
| 07/02/2025 | Incident described in declaration of Matthew Phillip Solan and supported by declaration of Nicholas Oakes |
| required | |
| required | |
| required | |
| required | |
| required | |
| required | |
| required | |

Date: 7/13/25

## Facsimile Transmittal Sheet

To: George M. Solan Agency: Fox Ranch Company

Fax: (970)-844-1733 # of Pages 5

From: Nicholas P. Oakes Agency:

Phone: (602)-244-1331, @ Cornerstone [illegible] Re:

Urgent For Review Please Comment Please Reply Please Recycle

If there is a problem with this transmission or you do not receive all the pages, please contact:

_______________ at (number) _______________ immediately.

Comments:

Assault declarations

This facsimile is the property of the Arizona Department of Health Services. The communication contains information that may be privileged, confidential or otherwise exempt from disclosure by applicable law. It is intended only for the person(s) to whom it is addressed. If you receive this communication in error, please do not retain or distribute it. Please notify the sender immediately by telephone (see above) for instructions regarding the return or destruction of this communication. Thank you.



Jul. 13. 2025 6:32AM No. 2647 P. 1

# DECLARATION OF NICHOLAS OAKES

I, Nicholas Oakes, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.
2. I reside on the Cottonwood unit of the Arizona State Hospital ("ASH").
3. John Benitez has been my friend on Mohave unit at ASH for about 5 years.
4. On July 2, 2025, at or about 3:30 p.m., I saw John in the gym on the forensics mall and told him that Matthew Solan transferred from my unit to his, earlier that day.
5. John replied "If he starts anything, I'll kick his ass and beat him to death."
6. I then said "Don't do that, he's severely Autistic."
7. I felt concern for Mr. Solan and told him by phone later that day what transpired so that he could mentally prepare himself to avoid John.

I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** this 12th day of July, 2025.

Nicholas Oakes, MBA



Jul. 13. 2025 6:32AM No. 2647 P. 3

# DECLARATION OF MATTHEW PHILLIP SOLAN

I, Matthew Phillip Solan, hereby declare under penalty of perjury that the following statements are true and correct, and if called upon as a witness, I would testify as follows:

1. I am over 18 years of age, fully competent to testify to the facts as set forth herein, and make this declaration based on my personal knowledge and experience.

2. On July 2, 2025, I was transferred to the Mohave unit of the Arizona State Hospital ("ASH"). On the same day, my business associate, Nicholas Oakes, called me and informed me that John Benitez had threatened to beat me to death, and to be careful around him.

3. I informed my mental health attorney, Holly Gieszl, and unit staff of the threat that had been conveyed to me, but it appears that no action was taken by ASH to protect me.

4. On July 11, 2025, at or around 5:30 p.m., I was sitting in the Mohave unit dayroom in front of the nurse's station, talking with behavioral health technicians Vincent and Xiamara.

5. Mr. Benitez, a Mohave unit patient, was sitting at the far end of the Mohave unit dayroom watching television.

6. Mr. Benitez stood up, and aggressively walked towards me, until he was about 2 feet away from me. He began making fists, stuck out his forefinger, pointed it in my face, and yelled at the top of his lungs, "shut the f*** up!"

7. Mr. Benitez continued to yell and wave his finger in my face, and said he would "beat [my] fat face in" if I didn't shut up.



Jul. 13. 2025 6:32AM No. 2647 P. 5

8. He would not back down or get his hand out of my face unless I agreed not to talk.

9. After I agreed not to talk, Mr. Benitez walked away and sat back down.

10. ASH staff, including the above named BHTs (who refused to provide their last names) failed to intervene to protect me.

11. About 20 minutes after Mr. Benitez had assaulted me, and after I had notified staff that I feared imminent bodily harm, staff allowed Mr. Benitez to walk within a foot of me while I was on the phone. As he passed, Mr. Benitez made fists, flexed his muscles, and glared at me.

12. I informed RN Jaime of the assault, and he brought me into the back room to make a call to the Phoenix Police Department.

13. Phoenix Police officer Painter, Badge number 11687, took my report on or around 12:03 a.m. on July 12, 2025. I was given 2 Phoenix Police Department incident report numbers: 25-1013900 and 25-1015274.

14. I pressed charges against Mr. Benitez but no arrest was made at the time. Officer Painter suggested that I ask ASH staff to move me to another building for my safety.

15. On July 12, 2025, at or around 5:00 p.m., I asked RN Delana to be transferred to another unit for my safety. She said, "I have no authority to move you. Only Michael Sheldon (ASH's CEO) can do that, and it doesn't appear that he's doing that.

16. I fear I am at risk of imminent bodily harm or death at the hands of Mr. Benitez. He is very muscular and big and has a reputation of being very aggressive towards other patients.



Jul. 13. 2025 6:33AM No. 2647 P. 7

**I declare under penalty of perjury that the foregoing is true and correct.**

**EXECUTED**, this 12th day of July, 2025.

Matthew Phillip Solan



Jul. 13. 2025 6:33AM No. 2647 P. 9

| | |
|---|---|
| required | |
| equired | |

5. The following persons should also be on this order. They should be protected because Defendant is a danger to them:

6. Defendant should be ordered to stay away from these locations at all times, even when I am not present.
NOTE: Do not list confidential addresses here.

- [x] Residence (confidential)
- [x] Work 501 N 24th Street Phoenix AZ 85008
- [ ] School (confidential)
- [ ] Other: (confidential)
- [ ] Business Name/Address (if Workplace Injunction)

7a. [ ] Defendant owns or carries a firearm or other weapons.

7b. [x] Defendant should be ordered NOT to possess firearms while this order is in effect because of the risk of harm to me or other protected persons.

8. [x] Defendant should be ordered to stay away from any animal that is owned, possessed, leased, kept or held by me, Defendant, or a minor child living in either my household or Defendant's household.

9. Other requests:

Under penalty of perjury, I swear or affirm the above statements are true to the best of my knowledge. I request an order or an injunction granting relief as allowed by law.

/s/ Matthew Phillip Solan
Plaintiff

Attest: [signature] 7/14/25
Judicial Officer/Clerk/Notary Date

**EXHIBIT T**

**City of Phoenix**
OFFICE OF THE CITY PROSECUTOR
VICTIM SERVICES UNIT

February 4, 2026

MATTHEW P SOLAN
501 N 24TH ST
PHOENIX, AZ 85008

Def: JOHN J BENITEZ
Complaint No: 300003563
Incident No: 202600156124
Location of Incident: 501 N 24th St. Arizona State Hospital

Dear Sir/Madam:

We have been informed that you are a victim in the above-referenced case. You should have received a pamphlet from the police department with an overview of your rights as a crime victim or you will receive an 'Information for Victims in Phoenix Municipal Court' pamphlet from our office. Both cover your victims' rights and steps involved in criminal prosecution.

**Misdemeanor cases can be resolved quickly. A defendant may plead and be sentenced at any court setting. To invoke your rights as a victim and ensure timely notification of court proceedings, please register, and invoke your rights as a victim on our victim notification site. This link will take you directly to our victim notification site:**

https://karpelplatform.hostedbykarpel.com/azcityofphoenix/auth/sign-up?personId=FDA769AF-241E-418A-95B7-431A91202C2E&email=

**When you register through the victim notification site, please go to the frequently asked questions section for instructions on how to use the portal. You will need to select the email option as a contact method to receive notifications via email. If you do not make this selection, you will continue receiving victim notifications via mail. If you do not have access**

**PHOENIX MUNICIPAL COURT** 300 W. Washington St. Phoenix, AZ 85003-2103 602-262-6421 TTY: Use 7-1-1

STATE OF ARIZONA Plaintiff
-vs- BENITEZ, JOHN J G234097
AKA:

**RELEASE ORDER**
☐ 2nd DUI Conviction
☐ Amended

**IT IS HEREBY ORDERED** the defendant be released as indicated and comply with the following Release Conditions while pending disposition.

| | Complaint Number | Violation Code | CNF | OR | 3P | UB | SB | Bail Amount | Sentence | CON |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 300003516201 | 13-1203A1 | | | | | | $ Cash Only ☐ | Amend TO | |
| 2 | L01 | 13-1203A3 | | | | | | $ 500 Cash Only ☐ | | |
| 3 | 300003516301 | 13-1810A2 | | | | | | $ 500 Cash Only ☐ | | |
| 4 | | | | | | | | $ Cash Only ☐ | | |
| 5 | | | | | | | | $ Cash Only ☐ | | |
| 6 | | | | | | | | $ Cash Only ☐ | | |
| 7 | | | | | | | | $ Cash Only ☐ | | |

(CNF = Charge Not Filed; OR = Own Recognizance Release; 3P = 3rd Party; UB = Unsecured Bond; SB = Secured Bond; CON = Concurrent)

**ICE Notice:** ☐ A fine has been ordered and a federal authority or a 287(g) officer has presented sufficient evidence that the defendant is unlawfully in the U.S.

**Jail:** ☐ Defendant has a specified release date of ______________ and is not eligible for two for one credit.

**Bail:** If bail is not posted as indicated above you will be taken to a court hearing on 2-13-[illegible] 8:30 (AM) / PM, Ctrm 605
If you are released from jail, you must report to Court as ordered on your Bail Receipt Form.

**3rd Party Release:** ______________________________
Agency (Area Code) Phone (Area Code) Phone

Release Date ______________, at __________ AM / PM

**Release Conditions:** You must comply with the following marked Release Conditions while pending disposition of your case(s):

☐ 1. Appear at the Phoenix Municipal Court on ______________, at __________ AM / PM
Go to the Customer Service Kiosk (1st floor) and follow instructions, or report to Courtroom __________.
☐ 2. All previously ordered Release Conditions remain in effect.
☒ 3 Obey all laws, do not commit a criminal offense.
☒ 4. Appear at all court proceedings and follow all court orders.
☒ 5. Must not leave Arizona without the court's permission and must notify the court if you change your address.
☒ 6. Do not harass or threaten alleged victims, witnesses and/or arresting officers.
☒ 7. Do not possess any weapons.
☐ 8. Do not possess or have contact with any animal.
☒ 9. Do not consume any alcoholic beverages. no illicit drugs
☒ 10. Do not return to the scene of the alleged crime 501 N. 24th St.
☒ 11. Do not initiate any type of contact with alleged victim(s) Robert Dunn
☐ 12. Do not go to circled Area(s): 1 2 3 4 5 6 10 12 13 20 21 22 23 24, as defined on reverse side.
☐ 13. Other ______________________________

2/14/24 [signature]
Date Judge Courtroom Bailiff

**ACKNOWLEDGMENT:** I fully understand and will comply with ALL release conditions. Detailed Travel Restrictions and consequences of violating this order are on the back.

2/14/24 ISO
Date Defendant Interpreter

DISTRIBUTION WHITE – COURT YELLOW – SIMS OPERATOR PINK – DEFENDANT 30-93D Rev. 11/22

**EXHIBIT U**

City of Phoenix
OFFICE OF THE CITY PROSECUTOR
VICTIM SERVICES UNIT

February 28, 2026

MATTHEW P SOLAN
501 N 24TH ST
PHOENIX, AZ 85008

Def: JOHN J BENITEZ
Complaint No: 300003563

Dear MATTHEW:

We would like to thank you for your help, cooperation and patience throughout the course of this case. We recognize it is not easy being involved in a criminal case.
One or more of the charges in this above-named case has been concluded in Phoenix Municipal Court as follows:

| | | | |
|---|---|---|---|
| **Violation:** | **13-2810A2** | **INTERFERING WITH JUDICIAL PROCEEDINGS** | **GUILTY BY PLEA** |

There may be additional charges still pending. If this is the case, you will continue to receive Victim Rights letters.

For questions or to obtain sentencing information, please call our Victim Services Unit at (602) 261-8192 or visit our webpage at www.phoenix.gov/victims.

If a charge was dismissed, this means that no further action will be taken on this charge at this time. Pursuant to A.R.S. § 13-4419, if you would like to confer with the prosecutor regarding this decision or if you have any other questions, please call our Victim Services Unit at (602) 261-8192 between 8:00 A.M. and 5:00 P.M., Monday-Friday, or email us from our webpage, www.phoenix.gov/victims.

You must notify us of any change of address or phone number to ensure notices of future court dates. If you have any questions, please call our Victim Services Unit at (602) 261-8192.

Thank you again for your cooperation.

Sincerely,

THE CITY OF PHOENIX
PROSECUTOR'S OFFICE
Victim Services Unit
DISPO A.R.S. §13-4410(A), 13-4402.01

PLEASE TELL US ABOUT YOUR EXPERIENCE WITH THE VICTIM SERVICES UNIT BY COMPLETING A BRIEF SURVEY. YOU CAN COMPLETE A SURVEY BY GOING TO http://phoenix.gov/law/victims/svvictim OR CALLING OUR OFFICE AT 602-261-8192. DEFENDANT'S NAME AND CASE NUMBER MUST BE PROVIDED WHEN CONDUCTING A SURVEY.

**EXHIBIT V**

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

## TEXT REVISION

# DSM-5-TR™

AMERICAN PSYCHIATRIC ASSOCIATION

# Neurodevelopmental Disorders

The neurodevelopmental disorders are a group of conditions with onset in the developmental period. The disorders typically manifest early in development, often before the child enters school, and are characterized by developmental deficits or differences in brain processes that produce impairments of personal, social, academic, or occupational functioning. The range of developmental deficits or differences varies from very specific limitations of learning or control of executive functions to global impairments of social skills or intellectual ability. Once thought to be categorically defined, more recent dimensional approaches to measurement of the symptoms demonstrate a range of severity, often without a very clear boundary with typical development. Diagnosis of a disorder thus requires the presence of both symptoms and impaired function.

The neurodevelopmental disorders frequently co-occur with one another; for example, individuals with autism spectrum disorder often have intellectual developmental disorder (intellectual disability), and many children with attention-deficit/hyperactivity disorder (ADHD) also have a specific learning disorder. The neurodevelopmental disorders also frequently co-occur with other mental and behavioral disorders with onset in childhood (e.g., communication disorders and autism spectrum disorder may be associated with anxiety disorders; ADHD with oppositional defiant disorder; tics with obsessive-compulsive disorder). For some neurodevelopmental disorders, the clinical presentation includes behaviors that are more frequent or intense when compared with those of normal children of the same developmental age and gender, as well as deficits and delays in achieving expected milestones. For example, autism spectrum disorder is diagnosed only when the characteristic deficits of social communication are accompanied by excessively repetitive behaviors, restricted interests, and insistence on sameness.

Intellectual developmental disorder is characterized by deficits in general mental abilities, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience. The deficits result in impairments of adaptive functioning, such that the individual fails to meet standards of personal independence and social responsibility in one or more aspects of daily life, including communication, social participation, academic or occupational functioning, and personal independence at home or in community settings. Global developmental delay, as its name implies, is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning. The diagnosis is used for individuals younger than 5 years who are unable to undergo systematic assessments of intellectual functioning, and thus the clinical severity level cannot be reliably assessed. Intellectual developmental disorder may result from an acquired insult during the developmental period from, for example, a severe head injury, in which case a neurocognitive disorder also may be diagnosed.

The communication disorders include language disorder, speech sound disorder, social

(pragmatic) communication disorder, and childhood-onset fluency disorder (stuttering). The first three disorders are characterized by deficits in the development and use of language, speech, and social communication, respectively. Social communication disorder is characterized by deficits in both verbal and nonverbal communication skills that result in



social impairment and are not better explained by low abilities in structural language, intellectual developmental disorder, or autism spectrum disorder. Childhood-onset fluency disorder is characterized by disturbances of the normal fluency and motor production of speech, including repetitive sounds or syllables, prolongation of consonants or vowel sounds, broken words, blocking, or words produced with an excess of physical tension. Like other neurodevelopmental disorders, communication disorders begin early in life and may produce lifelong functional impairments.

Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities. Because symptoms change with development and may be masked by compensatory mechanisms, the diagnostic criteria may be met based on historical information, although the current presentation must cause significant impairment.

Within the diagnosis of autism spectrum disorder, individual clinical characteristics are noted through the use of specifiers (with or without accompanying intellectual impairment; with or without accompanying structural language impairment; associated with a known genetic or other medical condition or environmental factor; associated with a neurodevelopmental, mental, or behavioral problem), as well as specifiers that describe the severity of autistic symptoms. These specifiers provide clinicians with an opportunity to individualize the diagnosis and communicate a richer clinical description of the affected individuals. For example, many individuals previously diagnosed with Asperger's disorder would now receive a diagnosis of autism spectrum disorder without language or intellectual impairment.

ADHD is a neurodevelopmental disorder defined by impairing levels of inattention, disorganization, and/or hyperactivity-impulsivity. Inattention and disorganization entail inability to stay on task, seeming not to listen, and losing materials necessary for tasks, at levels that are inconsistent with age or developmental level. Hyperactivity-impulsivity entails overactivity, fidgeting, inability to stay seated, intruding into other people's activities, and inability to wait—symptoms that are excessive for age or developmental level. In childhood, ADHD frequently overlaps with disorders that are often considered to be "externalizing disorders," such as oppositional defiant disorder and conduct disorder. ADHD often persists into adulthood, with resultant impairments of social, academic, and occupational functioning.

Specific learning disorder, as the name implies, is diagnosed when there are specific deficits in an individual's ability to perceive or process information for learning academic skills efficiently and accurately. This neurodevelopmental disorder first manifests during the years of formal schooling and is characterized by persistent and impairing difficulties with learning foundational academic skills in reading, writing, and/or math. The individual's performance of

Engaging in transvestic behaviors can interfere with, or detract from, heterosexual relationships. This can be a source of distress to men who wish to maintain conventional marriages or romantic partnerships with women.

## Differential Diagnosis

**Transvestism.** Individuals with transvestism experience recurrent and intense sexual arousal from cross-dressing. Unless the fantasies, sexual urges, or behaviors involving cross-dressing are accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning, a diagnosis of transvestic disorder is not warranted.

**Fetishistic disorder.** This disorder may resemble transvestic disorder, in particular, in men with fetishism who put on women's undergarments while masturbating with them. Distinguishing transvestic disorder depends on the individual's specific thoughts during such activity (e.g., are there any ideas of being a woman, being like a woman, or being dressed as a woman?) and on the presence of other fetishes (e.g., soft, silky fabrics, whether these are used for garments or for something else).

**Gender dysphoria.** Individuals with transvestic disorder do not report an incongruence between their experienced gender and their assigned gender or a desire to be of the other gender; and they typically do not have a history of childhood cross-gender behaviors, which would be present in individuals with gender dysphoria. Individuals with a presentation that meets full criteria for transvestic disorder as well as gender dysphoria should be given both diagnoses.

## Comorbidity

Transvestic disorder is often found in association with other paraphilias. The most frequently co-occurring paraphilias are fetishistic sexual interests or behavior and masochistic sexual interests or behavior. One particularly dangerous form of masochistic sexual interests or behavior, *autoerotic asphyxia*, is associated with transvestic sexual interests or behavior in a substantial proportion of fatal cases.



# Other Specified Paraphilic Disorder

**F65.89**

This category applies to presentations in which symptoms characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the paraphilic disorders diagnostic class. The other specified paraphilic disorder category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific paraphilic disorder. This is done by recording "other specified paraphilic disorder" followed by the specific reason (e.g., "zoophilia").

Examples of presentations that can be specified using the "other specified" designation include, but are not limited to, recurrent and intense sexual arousal involving *telephone scatologia* (obscene phone calls), *necrophilia* (corpses), *zoophilia* (animals), *coprophilia* (feces), *klismaphilia* (enemas), or *urophilia* (urine) that has been present for at least 6 months and causes marked distress or impairment in social, occupational, or other important areas of functioning. Other specified paraphilic disorder can be specified as in remission and/or as occurring in a controlled environment.

## Unspecified Paraphilic Disorder

**F65.9**

This category applies to presentations in which symptoms characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the paraphilic disorders diagnostic class. The unspecified paraphilic disorder category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for a specific paraphilic disorder, and includes presentations in which there is insufficient information to make a more specific diagnosis.

**EXHIBIT W**

Woolington Agency LLC

1557 South Street
Wheatland, WY 82201
Office 307-322-9129
Fax 307-322-2426

To: Alliance of Therapy Dogs Members

From: Will de Ryk, Agent
Woolington Agency LLC

Date: April 1, 2024

I'm pleased to offer Alliance of Therapy Dogs an insurance policy that provides coverage to members in good standing.

The policy provides liability insurance that protects you from claims of others for injury or illness and property damage resulting from therapeutic visitation with your dog. This coverage does not protect you or your dog from injury or illness as a result of participation.

Policy Information

- Commercial General Liability Occurrence Form
- Excess Liability Occurrence Form
- $5,000,000 Per Occurrence
- $5,000,000 Aggregate
- $5,000 Deductible Each Occurrence for Bodily Injury and Property Damage
- Defense Costs are Included Within the Limit of Liability
- Includes All Dog Breeds

This coverage pertains to registered handlers and dogs at therapeutic visits while representing Alliance of Therapy Dogs. Events can be held in all 50 states, U.S. territories and possessions, Puerto Rico and Canada. The intent of the policy is to cover Alliance of Therapy Dogs members while doing their volunteer pet therapy visits. Coverage is not extended to visits, contact, or activities that are a part of a member's employment or unrelated to Alliance of Therapy Dogs.

In order to answer specific questions regarding covered activities, please refer to the Member Guidelines. Alliance of Therapy Dogs further defines "therapeutic contact" as petting, brushing, holding, throwing, fetching, and walking. If you are unsure if an activity meets these guidelines, please contact the Alliance of Therapy Dogs corporate office for clarification. To protect your rights to coverage, all guidelines must be followed. Coverage is not provided for damages caused by intentional acts or as a result of an Alliance of Therapy Dogs member acting outside the scope of, or not in compliance with, the Alliance of Therapy Dogs rules and regulations, Part I, II, and III. Both the dog and handler must be registered and dues current. Exception to any guidelines may only be authorized in writing by the Alliance of Therapy Dogs Board of Directors.

I sincerely hope you enjoy your therapy visit. Please be confident that the Alliance of Therapy Dogs Board of Directors and I are committed to providing a quality insurance program at the lowest cost possible.

I know you are very important to those individuals you visit.

Sincerely,

Will de Ryk, Agent
Woolington Agency LLC

Alliance of Therapy Dogs

sharing smiles and joy™

**Affiliation Agreement**

**Between Alliance of Therapy Dogs and** Arizona Department of Health Services (ADHS)

This Affiliation Agreement is made between Alliance of Therapy Dogs and ADHS. Responsibilities are outlined below.

Alliance of Therapy Dogs will provide:

Volunteers - Certified therapy dog teams (dog and handler).

Insurance - ALLIANCE provides liability insurance that protects Volunteers from claims of others for injury, illness, and property damage resulting from therapeutic visitation with their dogs. This coverage does not protect Volunteers or their dogs from injury or illness as a result of participation in this program. Coverage applies to the ATD certified handler/dog team functioning as a therapy dog team. Volunteers are covered by ALLIANCE's insurance policy only when ALLIANCE is the primary insurance and there is no other insurance (whether from the facility or another organization) in effect while they are visiting. By signing this you will be given Additional insured Status under the Blanket additional Insured Endorsement and Blanket Waiver of Rights of Recovery. No other additional Insured status or Waiver will be available."

Alliance will provide a Certificate of Insurance upon execution of this agreement.

ADHS will provide:

Space - Meeting rooms or spaces to the agreed upon specifications.
Scheduling - Scheduling of programs(s), event(s) or spaces required. ___________ will inform volunteers of schedule and changes thereto.
Volunteer Communication - ________ will apprise volunteers of the rules and requirements of the program/event.
Publicity - Signage and appropriate publicity associated with the program/event, as applicable.

[signature] 11/21/2021

Alliance of Therapy Dogs Representative | Date

Jacqueline S. Ortega-Avila [signature] 12/28/2021

_______________Representative | Date

DF2594

**EXHIBIT X**

**EXHIBIT Z**






DREAMER'S ARCH


















THE GOLD

